**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**PALM BEACH DIVISION**
www.flsb.uscourts.gov

In Re:

AUTO WHOLESALE OF BOCA, LLC,          Case No.: 22-15627-EPK

     Debtor.

_____/

FVP OPPORTUNITY FUND III, LP, a
Delaware limited partnership; FVP
INVESTMENTS, LLC, a Delaware limited
liability company; and FVP SERVICING,
LLC, a Delaware limited liability company;
and HI BAR CAPITAL, LLC, a New York
Limited Liability Company.

     Adversary Plaintiffs,

vs.                                         Adversary Case No.: 22-01218-EPK

AUTO WHOLESALE OF BOCA, LLC,
and EDWARD BROWN,

     Adversary Defendants.

_____/

**THIRD AMENDED ADVERSARY COMPLAINT [1]**
**TO DETERMINE OWNERSHIP OF PROPERTY IN THE POSSESSION**
**OF THE DEBTOR AND THE VALIDITY AND EXTENT OF LIENS**
**HELD BY THE PLAINTIFFS AND THAT ANY OWNERSHIP INTEREST OF DEBTOR**
**IS SUBJECT TO PLAINTIFFS' LIENS**

     COME NOW, the Adversary Plaintiffs, FVP Opportunity Fund III, LP, a Delaware limited

---

[1] The pleading filed of record and titled "Amended Adversary Complaint" and filed on August 18, 2022, was mis-titled due an inadvertent failure to notice that a filing of an "Amended Adversary Complaint" occurred immediately after filing the original complaint on July 24, 2022 due to the failure to insert the executed signature pages. [D. E. 3]. This Third Amended Adversary Complaint is therefore the second substantive amendment in this action.

partnership (the "FVP Fund"), FVP Investments LLC, a Delaware limited liability company ("FVP

Investments"), and FVP Servicing, LLC, a Delaware limited liability company ("FVP Servicing"),

(collectively "FVP") and HI BAR CAPITAL, LLC, a New York Limited Liability Company, ("HI

BAR") (collectively, the "Plaintiffs"), and as and for their Second Amended Complaint against

Adversary Defendant Auto Wholesale of Boca, LLC, a Florida limited liability company (the

"Defendant" "AWB" or "the Debtor"), and include Adversary Defendant Edward Brown, as a

party of interest who may claim an interest in one or more of the vehicles that are the allege as

follows:

### **Parties**

1.      At all times material hereto, Plaintiff the FVP Fund was and is a Delaware limited

partnership with its principal place of business in New York County, New York.

2.      At all times material hereto, Plaintiff FVP Investments was and is a Delaware

limited liability company with its principal place of business in New York County, New York.

3.      At all times material hereto, Plaintiff FVP Servicing was and is a Delaware limited

liability company with its principal place of business in New York County, New York.

4.      At all times material hereto, Hi Bar was and is a New York limited liability

company with its principal place of business in New York County, New York.

5.      At all times material hereto, Defendant, the Debtor, was and is a Florida limited

liability company with its principal place of business in Palm Beach County, Florida, and doing

business in Broward County, Florida and Palm Beach County, Florida, and is otherwise *sui juris.*

The manager of the Debtor is Moshe Farache (Farache) who acts for the Debtor.

6.      At all times material hereto, Defendant Edward Brown, was and is a resident of

Palm Beach County, Florida, and is otherwise *sui juris.* Edward Brown is named in this complaint

only as a party of interest as Edward Brown is currently in possession of two vehicles in which the

adversary Plaintiffs claim are owned by Karma of Palm Beach or Karma of Broward and therefore

may claim an interest in the collateral of the Plaintiffs claimed in this complaint.

## Jurisdiction and Venue

7.      On July 22, 2020 (the "Petition Date"), The Debtor filed a voluntary petition for

relief pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for

the Southern District of Florida, bearing case number 22-15627-EPK.

8.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§

157, 1334, 1652 and 2201; Fed. R. Civ. P. 57; and B.R. 7001(1)-(2), (7) and (9),

9.      This action is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), (K) and (O).

10.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408-09.

## Debtor's Claim to Vehicles and Funds and the Plaintiffs Dispute of the Debtor Claims, and Relief Sought

11.     The Debtor has claimed and claims it is the owner of the following vehicles and

funds:

a.  nineteen (19) automobiles, described in its Form 206A/B Schedule as assets at

Part 8 (attached hereto and incorporated herein as **Exhibit A**). Due to orders of

abandonment already entered, one (1) of the nineteen (19) automobiles, [2]

---

[2] A 2020 Lamborghini Urus VIN ZPBUA1ZLXLLA06529 to Eric Dore - [Exhibit A, Vehicle No.3] [D. E. 73] ; 2020 Black 812 Superfast Ferrari, VIN ZFF83CLA1L0254693 2021 to Aby Lipman has a hearing on August 31, 2022 in which Mr. Lipman is entitled to possession and title [ Exhibit A Vehicle No.13 ] [D. E. 74].

described in its Form 206A/B Schedule as assets at Part 8, has been returned to their rightful owner, with a second vehicle scheduled for hearing on August 31, 2022 seeking abandonment which should be granted [see footnote 2] , leaving the remaining seventeen (17) automobiles, described in its Form 206A/B Schedule as assets at Part 8 as those sought by the Plaintiffs.

b.   two (2) vehicles more fully described as a **2016 Ford Rhino Black, VIN 1FDUF4HT8GEB18666** and a **2018 Mclaren 720s Black, VIN, SBM14DCA7JW001804 (**See **Exhibit K**), currently in the possession of the Debtor at his business location at 5471 N. Dixie Highway, Boca Raton, Fl or other locations unknown to the Plaintiffs. The Plaintiffs assert that the Debtor should have listed these vehicles on Form 206A/B Schedule as assets at Part 8 but intentionally omitted the vehicles.

c.   two (2) vehicles more fully described as a **2015 Maclaren 650 S Convertible, Grey, VIN: SBM11FAA4FW003654** and a **2017 Lamborghini Huracan Red, VIN, ZHWUR2ZF8HLA08121** currently in the possession of Karma of Broward at is business in Broward County, Florida.  Karma of Broward has possession of the vehicles, but Farache took the titles and claims ownership for the Debtor.

d.   two (2) vehicles more fully described as a **2021 Rolls Royce Cullinan White,**

---

Further, this Honorable Court has ordered abandoned the following vehicles in which the titles were wrongfully taken by the Debtor and Mr. Farache but not the vehicles. A  Ferrari 812 GTS, VIN ZFF97CMA4M0261176 to Frank Evans [D. E. 79] and 2012 Lamborghini Aventador VIN ZHWUC1ZD2CLA00244 [D. E 82] to Graves Directional Drilling Inc.

**VIN: SLATV8C09MU204097** and a **2021 Lamborghini Urus White, VIN, ZPBUA1ZL1MLA12270** currently in the possession of Edward Brown and located in Palm Beach County, Florida or other location unknown to the Plaintiffs.

e.  one (1) vehicle more fully described as a **2021 Jeep Gladiator Black, VIN: 1C6HJJAG0ML564806** which came into the possession of Farache and the Debtor and was sold on April 14, 2022 by Debtor AWB for $130,000. The funds are currently held in the trust account of Jay Farrow, Esq. and are reflected in the Debtor's Form 206A/B Schedule as assets at Part 1, Cash and Cash Equivalents, at, No.: 4.  The Plaintiffs allege that their claims as to this vehicle are identical to all the other vehicles in which the Plaintiffs claim relief and seek the funds from the sale of this vehicle to be turned over the to the Plaintiffs pursuant to the allegations in this complaint. **Exhibit T.**

(The aforementioned vehicles in the possession of the Debtor as well as those in the possession of Karma of Broward and Edward Brown in which the Debtor holds the titles, totaling twenty three (23) vehicles as well as the proceeds from the sale of one (1) vehicle held in trust by Jay Farrow, Esq., will be referred to collectively herein as the "Vehicles".)

12.     The FVP Plaintiffs and Hi Bar deny that the Debtor has any bona fide legal or beneficial ownership interest in the Vehicles, at most the Debtor holds bare legal title to the same, and even if the Debtor holds an interest in the Vehicles beyond naked legal title, that interest is subject and subordinate to separate, perfected security interests in the Vehicles of the FVP Plaintiffs and Hi Bar.

13.     Neither the FVP Plaintiffs nor Hi Bar has entered into any business transaction with

the Debtor, and neither the FVP Plaintiff nor Hi Bar is a party to any agreement with the Debtor (save, as to the FVP Plaintiffs, the Landlord Waiver executed by the Debtor's principal). Neither the FVP Plaintiffs nor Hi Bar has executed a release, partial or otherwise, with respect to the Vehicles in favor of the Debtor.

14.     The FVP Plaintiffs and Hi Bar by this action intend to establish that (i) the Debtor holds no interest in the Vehicles recognized by 11 U.S.C. Section 541(a)(1), and even it does, (ii) the Debtor's interest is subject and inferior to the security interests of both the FVP Plaintiffs and Hi Bar because, among other reasons, the Debtor was not a "buyer in the ordinary course of business" as required by Sections 679.320 and 671.201(9), Florida Statutes.

15.     The FVP Plaintiffs and Plaintiff HI BAR are not seeking any judicial determination in this case as to the lien priority between them and have agreed that such priority will be resolved by agreement or adjudication in the civil action pending in the Circuit Court of Broward County, Florida in Case No.: CACE-22-5125 (the "Pending State Action").

16.     The FVP Plaintiffs and Hi Bar seek judgment that:

    a.   Declares the Debtor is not the lawful owner of and does not hold any valid interest under Section 541(a)(1) in the Vehicles or proceeds that are more particularly described in Paragraph 11 of this complaint.

    b.   Alternatively, even if the Debtor is found to have any cognizable interest under Section 541(a)(1) in one or more of the Vehicles or proceeds, determines both the FVP Plaintiffs and Hi Bar each have a perfected security interest in the Vehicles under Florida's version of Article 9 of the Uniform Commercial Code, which is superior to the interest of the Debtor.

c.  Declares that the amount of the liens of the FVP Plaintiffs and Hi Bar encumbering the Vehicles and proceeds far exceeds the value of the Vehicles and thus the Debtor has no equity therein.

d.  Orders the Debtor to surrender, abandon or turn over its possession of the Vehicles jointly to the FVP Plaintiffs and Hi Bar for safekeeping pending an order from the Circuit Court in the Pending State Action.

e.  In the event that the Vehicles are monetized in this action by agreement of the Parties, then to order the turnover of the proceeds from the sale of the vehicles to the Plaintiffs to be held in escrow pending an order from the Circuit Court in the Pending State Action.

## The FVP Security Interests

17.     On or about January 26, 2022, the FVP Plaintiffs entered into loan and security agreements with Karma of Palm Beach, Inc. and Karma of Broward, Inc. (collectively, the "Karma Entities"), along with their principals Scott Zankl and Kristen Zankl (the "Zankls").  The executed and operative transactional documents include the following, affixed hereto respectively as the following exhibit letters:

a.  **Exhibit B.**  "Loan Agreement" by and between the Karma Entities and Zankls and FVP Servicing, as administrative agent.

b.  **Exhibit C**. Promissory Note by the Karma Entities in favor of FVP Investments, LLC, as Noteholder - ***$3,000,000.00***.

c.  **Exhibit D**. Promissory Note by the Karma Entities in favor of the FVP Fund, as Noteholder - ***$4,500,000.00***.

d.  **Exhibit E**. Personal Guaranty of Scott Zankl and Kristen Zankl (each a "Guarantor" and, together, "Guarantors") in favor of Agent and the Lenders.

e. **Exhibit F**. Security Agreement by and between the Karma Entities and FVP Servicing, as administrative agent, which among other things, granted the FVP Entities a security interest in "inventory, now or thereafter existing."

f. **Exhibit G**. Collateral Pledge Agreement by and between the Karma Entities and FVP Servicing, as administrative agent.

g. **Exhibit H**. UCC Financing Statement with FVP Servicing, as administrative agent, as the secured party and the Karma Entities as the debtors covering "All Assets."

h. **Exhibit I**. Landlord Waiver and Consent.[3]

18.     The Karma Entities defaulted on Loan and Security Agreements and the FVP Plaintiffs declared all sums due, FVP Servicing, a copy of which is attached hereto as **Exhibit J**, and the FVP Plaintiffs instituted the Pending State Action.

19.     The Karma Entities owe Plaintiff FVP Investments unpaid principal plus default interest at the rate defined in the FVP Investments Note, plus any advances made by Plaintiff FVP Investments against the FVP Investments Note, along with all associated fees and penalties are in excess of $7.5 million, with the more precise amount that will be proved at trial.

20.     "Inventory" pledged to the FVP Plaintiffs includes the Vehicles.

21.     The amounts due the FVP Plaintiffs far exceed the value of the Vehicles.

22.     On or about April 1, 2022, upon information and belief because of threats of violence to Scott Zankl, Kristen Zankl signed a letter, a copy of which is attached hereto as **Exhibit K,** purportedly granting Mr. Moshe Farache or the Debtor an interest in certain described cars, which appears to include some of the Vehicles.

---

[3] The "Landlord" who acknowledged and recognized the FVP Plaintiffs' collateral, now wrongfully taken by the Debtor as pled in this Complaint, is ultimately owned by Moshe Farache, an owner of the Debtor.

## The HI BAR Security Interests

23.     On or about October 27, 2021, Hi Bar and several "merchants," including the Karma Entities, entered into a Revenue Purchase Agreement (the "Purchase Agreement"), a true copy of which is attached hereto as **Exhibit L**.

24.     In the Purchase Agreement, the Karma Entities granted Hi Bar a security interest in assets of the Karma Entities, including "inventory," "now or hereafter owned or acquired."

25.     The Karma Entities materially breached and therefor defaulted under the Purchase Agreement by failing to remit the purchased receivables to Hi Bar in accordance with the terms of the Purchase Agreement.

26.     On December 19, 2021, the Karma Entities, among others, entered into a settlement agreement with Hi Bar (the "Settlement Agreement"), a true and accurate copy of which is attached hereto as **Exhibit M,** in which they admitted one Page 1 that "on November 16, 2021, the Sellers [including them] defaulted on the Purchase Agreement." Paragraph 1.b. of the Settlement Agreement also granted Hi Bar a security interest in assets of the Karma Entities, including "inventory," "now or hereafter owned or acquired."

27.     Karma Entities materially breached the Settlement Agreement by failing to timely pay to Hi Bar the sums required under the terms thereof.

28.     On January 25, 2022, a financing statement was filed by Hi Bar's legal representative with the Florida Secured Transaction Registry against Karma Entities, File No.2021093624865, a certified copy of which is attached hereto as **Exhibit N**, covering among other things "inventory" "now owned or hereafter acquired."

29.     "Inventory" pledged to the Hi Bar includes the Vehicles.

30.     On January 28, 2022, Hi Bar filed suit against Karma Entities and other affiliates in the Supreme Court of New York, Kings County (the "New York Action") for breach of the Settlement Agreement.

31.     On February 1, 2022, Hi Bar and Karma Entities, among others, entered into a Stipulation of Settlement Pursuant to CPLR § 3215(i) with respect to the New York Action (the "**Stipulation**"), a copy of which is attached hereto as **Exhibit O,** in which the Karma Entities again admitted on page 1 that "on November 16, 2021 (the "Default Date"), [they] defaulted on their obligations to [Hi Bar] under the Agreements."

32.     The Karma Entities then materially breached the Stipulation by failing to timely pay to Hi Bar the sums required under the terms thereof.

33.     As of April 28, 2022,  Hi Bar is owed the principal sum of $2,500,000 pursuant to the Purchase Agreement, Settlement Agreement and Stipulation (collectively, the "Agreements"), plus $625,000 in attorneys' fees pursuant to the Stipulation for a subtotal of $3,125,000, and interest and additional attorney's fees and costs as provided in the Agreements.

34.     The amounts due Hi Bar exceed the value of the Vehicles.

**The Debtor's Conversion of the Plaintiffs' Collateral – The Vehicles.**

35.     In the spring of 2021, the Excell Auto Group, Inc., (Excell), a company owned by the Zankls ceased selling cars and thereafter it was the Karma Entities, which were set up as franchisees of the luxury high-end electric car manufacture Karma Automotive and those entities bought, owned and sold all of the cars that were transacted by the Zankls or any of their entities

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
Third Amended Adversary Complaint
Page 11 of 24

from and after that date. The Karma Entities entered into Dealership Agreements with Karma Automotive in June of 2020.

36.    At the time that Excell stopped buying and selling cars in 2021, Excell was indebted to the manager and controlling member of the Debtor, Mr. Moshe Farache ("Farache"). The Debtor had a financing statement filed with the Florida Secured Transaction Registry against Excell and covering Excell's inventory. The Debtor did not have a security agreement with the Karma Entities or financing statements against those entities, although those corporations legally existed as of March and June 2020.

37.    During the year of 2021, unknown to the Plaintiffs, Farache with assistance and knowledge of Mr. Zankl, created  false paperwork to ostensibly show that after one of the Karma Entities purchased a vehicle, it would then purportedly be sold to Excell, which would then either the car on paperwork to the Debtor, or back to one of the Karma Entities, or from the Debtor to one of the Karma. Entities These transactions were without money representing the market value of the vehicles really being paid between any of the parties and were done at the request of Farache who apparently believed that these transactions would give the Debtor a basis to assert a security interest in the vehicle to make up for the Debtor's lack of a security agreement and financing statement from the Karma Entities.

38.    At no time in 2021 for the over one hundred fabricated transactions where the Debtor purports to acquire ownership in the Karma Entities' inventory, did the Debtor or Farache ever take possession of any of the vehicles. At all times the vehicles remained on the Karma Entities' lots until ultimate customers bought the vehicles by paying funds directly to the Karma Entities. In other words, the Karma Entities sold the vehicles to the end customer.

39.     Transactions in 2022 were no different. Farache with the forced acquiescence under duress of Scott Zankl created false paperwork to show ostensibly that after one of the Karma Entities purchased a vehicle from a third party, the vehicle would then be sold to Excell, which would then either transfer it to the Debtor, or back to one of the Karma Entities, or from the Debtor to one of those entities. The 2022 transactions were without objective market value being paid or adequate consideration being exchanged between any of the parties and when compared to the value of the vehicles ostensibly transacted. All the paper transactions were done at the request of Farache who believed that these transactions would give his company, the Debtor, a legitimate claim to a security interest in the vehicles.

40.     All of the Vehicles that are in the possession of the Debtor and the two in the possession of Scott Zankl's entity that owns the Broward location were purchased by the Karma Entities. After the purchase by either of the Karma Entities, false paperwork was exchanged at the request of the Debtor to ostensibly show that the Debtor was a purchaser for value. However, the applicable bank records and other documentary evidence reflect that the Debtor received millions of dollars from the Karma Entities when it should have been paying those sums if the falsely created putative purchase and sale paperwork was in fact true.

41.     The reason for all of the above sham transactions and the participation of Scott Zankl in the false paperwork is that when Scott Zankl told Farache that neither he nor Excell could pay that money that he borrowed from or was invested by the Debtor, Zankl was threatened such that Farache created an atmosphere of extreme duress and intimidation.

42.     On or about April 1, 2022, the FVP Plaintiffs learned that vehicles listed on their collateral inventory and expressly serving as collateral for their loans to the Karma Entities, were

removed from the Karma Entities' dealership lots and that the businesses were closed.

43.     After repeated attempts to communicate with their borrowers went unanswered, and with the FVP Plaintiffs' representatives having observed their collateral automobiles were missing from the lots of both of the Karma Entities. the FVP Plaintiffs notified the Karma Entities of their default (**Exhibit J),** and immediately retained a private investigator with federal law enforcement experience to attempt to determine what happened to the Karma Entities and the automobiles serving as collateral for the FVP Plaintiffs' loans to the Karma Entities.

44.     The FVP Plaintiffs learned through their private investigator that Farache, the Debtor's manager (and husband and father to the Debtor's other two owners, pursuant to the Debtor's Petition), had taken possession of the Vehicles which are currently in its possession.

45.     Of the vehicles taken by Farache on April 1, 2022, nineteen (19) of the automobiles that were taken by Farache are the Vehicles, which also are listed in the Debtor's schedules as "owned" by the Debtor. See **Exhibit A.**

46.     The private investigator hired by the FVP Plaintiffs, coincidentally, was personally known to Scott Zankl and Kristen Zankl. After contacting Scott Zankl and gaining his trust, Scott Zankl gave several statements to this investigator regarding the events that occurred with Farache and the automobiles. Scott Zankl told the investigator:

    a.   That the Zankls were indebted to Farache from past loans, which were years old.

    b.   That Farache had threatened the life of Scott Zankl.

    c.   That both Scott Zankl and Kristen Zankl were petrified of Farache.

d.  That Farache appeared at the Karma of Palm Beach location on April 1, 2022 and told the Zankls that Scott Zankl would "disappear" if they did not give Farache every car along with their titles and keys.

e.  That in extreme fear for their lives, the Zankls turned over all of the automobiles, keys and titles on the lot to Farache, and that Kristen Zankl signed a document produced by Farache, (**Exhibit K**), which on its face indicates that it is "collateral" for the money owed to Farache by the Zankls.

f.  That **Exhibit K** was signed under direct threat.

g.  That the Zankls considered that Farache stole the Plaintiffs' collateral automobiles by threat.

h.  That  the Zankls were initially afraid to report the matter to the police because they feared Farache.

i.  That on April 8, 2022, the Zankls ultimately reported to the police that Farache had, in fact, stolen the vehicles through extortion the week prior. *See Boca Raton Police Department – Report Case No.: 22-4685.*

47.     The Vehicles are subject to the security interests of both the FVP Plaintiffs and Hi Bar, for which the Debtor was on inquiry notice under Florida's version of Article 9 due to the financing statements filed with the Florida Secured Transactions Registry. The Vehicles were wrongfully taken and converted by the Debtor against the superior interests in the property of the FVP Plaintiffs and Hi Bar.

48.     Employees or agents of the Debtor wrongly and fraudulently transferred titles to

itself for the Vehicles without right or authority.

49.     At no time was the Debtor a buyer in the ordinary course as defined under UCC Article 9, Chapter 679, Florida Statutes.

50.     At most, the Debtor has naked possession and bare title to the Vehicles, and the Vehicles are subject to a perfected security interest at the time the Debtor wrongfully took possession of, and wrongfully transferred title to itself, as to the Vehicles, and those security interests survive and continue even if the Debtor can somehow establish a bona fide ownership interest in the Vehicles. The FVP Plaintiffs and Hi Bar security interest in the Vehicles are hereinafter referred to collectively for convenience as the "Liens").

51.     The FVP Plaintiffs and Hi Bar each filed suit against the Debtor as well as the parties to their respective security agreements seeking replevin and foreclosure of their Liens in the Vehicles.

52.     At the request of the FVP Plaintiffs, the Broward Circuit Court, on April 14, 2022, entered a freeze order prohibiting Debtor the Debtor from transferring the Vehicles.  For clarity, the freeze order was an oral ruling first codified in the hearing transcript and then restated in written orders of the Circuit Court (collectively, the "Freeze Order").

53.     Hi Bar intervened in the earlier filed suit filed by the FVP Plaintiffs and asserted similar claims against the Debtor as a priority lien holder with regard to the Vehicles, and also sought and obtained court approval to consolidate its action with the earlier filed lawsuit by the FVP Plaintiffs.

54.     On May 25, 2022, the Circuit Court Judge issued its order to show cause in replevin and scheduled the hearing for July 7, 2022 together with the FVP Plaintiffs' motions for relief

seeking appointment of a receiver and an injunction. **Exhibit P**.

55.     The Debtor's attorneys moved to vacate the freeze order, which the Circuit Court Judge denied and set a two-day evidentiary hearing on the Plaintiffs' Motions for the aforementioned relief for July 25, 2022 and July 26, 2022. **Exhibit Q**.

56.     The Broward Circuit Judge also set a contempt hearing for the morning of July 26, 2022 for Moshe Farache because of alleged intentional misrepresentations to the Circuit Court. **Exhibit R.**

57.     On the last business day before the hearing, the Debtor filed the instant Chapter 11 Bankruptcy.

58.     The FVP Plaintiffs and Hi Bar (collectively, the "Plaintiffs") bring this action jointly for the specific relief requested herein but reserve all rights relative to any dispute between the FVP Plaintiffs and Hi Bar as to priority between their respective claims to be determined exclusively in the Pending State Action.

59.     All conditions precedent to this action have occurred or been met.

**Count One**
**Determination of Ownership of the Vehicles**

60.     The Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 59 as if fully set forth herein.

61.     The Plaintiffs seek a determination of the real ownership of the Vehicles for purposes of Section 541(a)(1) of the Bankruptcy Code.

62.     The Debtor has asserted before this Court in its sworn bankruptcy schedules and verbally at various hearings that it is the lawful owner of the Vehicles.

63.     The Plaintiffs reject those claims and contend that one of the Karma Entities beneficially and legally own the Vehicles.

64.     The Plaintiffs aver that the Debtor has mere naked possession and naked title to the Vehicles that the Debtor procured through conversion, theft, actual or constructive fraud and/or duress.

65.     The Plaintiffs aver that at no time was the Debtor a buyer in the ordinary course.

66.     Adversary Defendant Edward Brown has been named as a party of interest as he may claim some interest in the Vehicles.

67.     WHEREFORE, Plaintiffs demand judgment that:

a.   Declares the Debtor is not the lawful owner of and does not hold any valid interest under Section 541(a)(1) in the Vehicles as collectively defined in Paragraph 11 of this complaint.

b.   Alternatively, even if the Debtor is found to have any cognizable interest under Section 541(a)(1) in one or more of the Vehicles, that the judgment determines both the FVP Plaintiffs and Hi Bar each have a perfected, superior security interests in the Vehicles under Florida's version of Article 9 of the Uniform Commercial Code as to any interest of the Debtor therein, Defendant Edward Brown or any other claimant, and that the Vehicles are subject to those Liens of the adversary Plaintiffs.

c.   Declares that the amount of the liens of the FVP Plaintiffs and Hi Bar encumbering the Vehicles far exceeds the value of the Vehicles and thus the

Debtor has no equity therein.

d.   Orders the Debtor to surrender, abandon or turn over its possession of the Vehicles jointly to the FVP Plaintiffs and Hi Bar for safekeeping pending an order from the Circuit Court in the Pending State Action.

e.   Awarding the FVP Plaintiffs and Hi Bar their costs and expenses under Federal Rule of Bankruptcy Procedure 7054 and Fed. R. Civ. P. 54 as well as such further relief as the Court deems just and proper.

## Count Two
## Determination of Validity and Extent of Liens

68.   The Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 59 as if fully set forth herein.

69.   To the extent the Court determines the Debtor has bona fide interest in the Vehicles under Section 541(a)(1), the Plaintiffs seek a determination that (a) the Debtor's interest is subject and subordinate to the respective valid, perfected security interests of the Plaintiffs and (b) that the Debtor has no equity in the Vehicles because of the extent of their respective Liens on the Vehicles consumes the entire value of the property.

70.   Bankruptcy Rule 7001(2) affords the Plaintiffs the right to bring an adversary proceeding for such a determination.

71.   The Plaintiffs claim superiority of interest against the Debtor, Adversary Defendant Brown and any other claimant in the Vehicles pursuant to their respective security agreements and UCC filings of record perfecting their respective Liens in the Vehicles, which was wrongfully converted by the Debtor.

72.     As mandated by Section 679.2011(1) of the Florida Statutes, "a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors."

73.     The Plaintiffs, as secured parties, have the clear right to recover possession of their collateral upon default pursuant to their Security Agreements, Part 6 of Article 9 of the UCC (Sections 679.601 and 679.609 of the Florida Statutes), and Florida's Replevin law (Chapter 78 of the Florida Statutes).

74.     The Plaintiffs' perfected security interests relative to any vehicle that the Karma Parties acquired beginning upon the filing of the financing statements prevails over any claim of the Debtor to these Vehicles, unless the Debtor was a "buyer in the ordinary course of business" (a "BitOCoB") with respect to its acquisition of the vehicles. See § Section 679.320, Fla. Stat. 4 This provision states:

**679.320   Buyer of goods.**—

(1)   Except as otherwise provided in subsection (5), a buyer in ordinary course of business, … takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence.

1.   Section 671.201(9) of the Florida Statutes defines a BitOCoB as follows, in relevant part:

(9)   "Buyer in ordinary course of business" <u>means a person who, in ordinary course, buys goods in good faith</u>, without knowledge that the sale violates the rights of another person in the goods, from a person, other than a pawnbroker, <u>in the business of selling goods of that</u>

---

[4] Of course, the Debtor's claim to ownership of the Vehicles could also be subject to challenge under other legal theories, including based on Chapter 726 of the Florida Statutes, the State's fraudulent transfer statute, rooted in either actual fraud or constructive fraud.

<u>kind</u>. <u>A person buys goods in ordinary course if the sale to the person comports with the</u> <u>usual or customary practices in the kind of business in which the seller is engaged or with</u> <u>the seller's own usual or customary practices</u>. …. A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit and may acquire goods or documents of title under a preexisting contract for sale. Only a buyer who takes possession of the goods or has a right to recover the goods from the seller under chapter 672 may be a buyer in ordinary course of business. "Buyer in ordinary course of business" <u>does not include a person who acquires goods in a transfer in bulk or as security for or in</u> <u>total or partial satisfaction of a money debt.</u>

(Emphasis added).

75.    "Good faith" means honesty in fact and the observance of reasonable commercial standards of fair dealing." *See* § 679.1021(qq), Fla. Stat. It is no longer merely a subjective standard, as made clear in the Official Comment thereto.

76.    The Debtor is another car dealer licensed as such in Florida, and therefore is a "merchant" under the UCC.

77.    In contrast, the Debtor is not an ordinary customer who walks into a retail dealership to buy a car. Moreover, the conduct, documentation and financial dealings between the Debtor and the Karma Parties and their agents were anything but "ordinary course." The purported sales to the Debtor did not, as required by Section 671.201(9) of the Florida Statutes, "comport with the usual or customary practices in the kind of business in which [the Karma Parties are] engaged or with the seller's own usual or customary practices."  The Karma Parties were not in the business of selling large numbers of their cars to a wholesaler.

78.    In all events, the principals of the Karma Parties, Scott Zankl and Kristen Zankl, and of the Debtor, Farache, engaged in a series of business transactions involving the exchange of hundreds of pages of documents, funds flowing back and forth between the parties, the "fast

tracking" of applications to change the name of the owner on Certificates of Title, and many emails back and forth between them and their agents where the alleged buyer the Debtor is clearly leading the process.

79.     Moreover, the Debtor and Excell Auto Group, Inc. ("Excell"), now in its own Chapter 7 proceeding, had a pre-existing business relationship. Excell may have owed the Debtor money, and the Debtor may have had agreements with Excell that granted it a security interest in assets of Excell. Farache also may be or may have been an investor in Excell and/or its affiliates. However, what the Debtor was not a secured party of the Karma Parties at the legally relevant times.

80.     At some point, Farache, for the Debtor, decided to exercise self-help to try to recover money allegedly owed to him by Excell and/or Scott Zankl. The Debtor engaged in, and in fact led, a series of fraudulent orchestrated transactions to try to reflect that the Debtor was buying cars from Excell, but in fact, those cars had been acquired by the Karma Parties from various third parties (persons or other dealers).

81.     The Karma Parties' names appear as the first "purchaser" on the original Certificates of Title. Farache and other agents of the Debtor, with Scott Zankl's forced acquiescence on the heels of the threats of violence made by Farache, manipulated the transactions and documents to cause purchase papers and title documents to reflect "fake," or at least "not ordinary," sales from the Karma Parties to the Debtor, or from the Karma Parties to Excell and then from Excell to the Debtor.

82.     The Plaintiffs seek an order and then a judgment stating that the FVP Plaintiffs and Hi Bar have a superior right in and to the Vehicles over the Debtor, Adversary Defendant Brown

and any other claimant.

WHEREFORE, FVP Plaintiffs and Hi Bar seek an order stating that they have a superior

right in and to the Vehicles and awarding the FVP Plaintiffs and Hi Bar their costs and expenses

under Federal Rule of Bankruptcy Procedure 7054 and Fed. R. Civ. P. 54 as well as such further

relief as the Court deems just and proper.

## Count Three
## Declaratory Relief

83.     Plaintiffs repeats and realleges the allegations contained in paragraphs 1 through

51 as if fully set forth herein.

84.     A complaint for Declaratory Relief brought pursuant to B.R. 7001(9) can provide

the same relief as is available to the Plaintiffs pursuant to B.R. 7001(1), (2) and (7), because the

Rule provides that a declaratory judgment can include any of the relief available in any other type

of adversary proceeding. It provides that an adversary proceeding includes "a proceeding to obtain

a declaratory judgment relating to any of the foregoing," i.e., any of the adversary proceeding types

delineated in B.R. 7001(1) through (8).

85.     The Plaintiffs seek declaratory rulings as are determined by the Court, and as is

necessary to carry out the purposes and intents of the relief requested in this Complaint.

86.     The Plaintiffs seek a declaration that their rights are superior as to the Vehicles than

those asserted by the Debtor AWB, the Adversary Defendant Brown and/or any other claimant.

WHEREFORE, the FVP Plaintiffs and Hi Bar seek a determination of entitlement to their

collateral property as set forth herein and awarding the FVP Plaintiffs and Hi Bar their costs and

expenses under Federal Rule of Bankruptcy Procedure 7054 and Fed. R. Civ. P. 54 as well as such

further relief as the Court deems just and proper.

<u>For the FVP Plaintiffs</u>

Dated August 25, 2022.

David Softness, Esq.
David R. Softness, P.A.
201 S. Biscayne Blvd., Ste 2740
Miami, Florida 33131
Phone: (305) 763-8708
E-mail: david@softnesslaw.com

Jerrell A. Breslin, Esq.
Baron, Breslin & Sarmiento
The DuPont Building, 169 East Flagler Street, #700
Miami, Florida 33131
Phone: (305) 577-4626
E-mail: JB@RichardBaronLaw.com
        EService@RichardBaronLaw.com

Jonathan Noah Schwartz, Esq.
Florida Bar No. 1014596
Jonathan Schwartz Law PLLC
10200 NW 25th Street, Suite 111
Doral, FL 33172
Tel.: (973) 936-2176
Fax: (786) 338-7435
E-mails:    jschwartz@jonschwartzlaw.com
            JNSEsquire@gmail.com

David R. Softness, P.A.
201 S Biscayne Blvd Ste 2740
Miami, FL 33131-4332
Tel:  305-341-3111
Email: david@softnesslaw.com

By:    <u>s/  David R. Softness</u>
       David R. Softness, Esq.
       Florida Bar No. 513229

<u>For HI BAR</u>

Mark J. Wolfson, Esq.
FOLEY & LARDNER LLP
100 N. Tampa Street
Suite 2700 Tampa

Florida 33602
(813) 229-2300 (telephone)
(813) 221-4210 (facsimile)
Primary email:  mwolfson@foley.com
Secondary email:  crowell@foley.com

Steven William Wells, Esq.
*Admitted Pro Hac Vice*
New York Bar No.: 4184792
Wells Law, P.C.
229 Warner Road
Lancaster, NY 14086
Primary Email: steve@wellspc.com

Counsel for Hi Bar Capital, LLC

By:     /s/ Mark J. Wolfson
        Mark J. Wolfson, Esq.
        Florida Bar No. 0352756

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that; I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that a true and correct copy of the foregoing was served via CM/ECF electronic transmission upon those parties who are registered with the Court to receive notifications in this matter and that I was authorized and directed to do so by Mark J. Wolfson, Esq., for the HI BAR Plaintiff.

                         / s/  David R. Softness
                         David R. Softness, Esq.

# EXHIBIT A

| Debtor | **Auto Wholesale of Boca, LLC** | Case number *(If known)* **22-15627-EPK** |
|---|---|---|
| | Name | |

| 41. | Office equipment, including all computer equipment and communication systems equipment and software | | | |
|---|---|---|---|---|
| | **Computer, software and equipment** | $9,300.00 | | $9,300.00 |

42. **Collectibles** *Examples*: Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles

43. **Total of Part 7.**
Add lines 39 through 42.  Copy the total to line 86.

| | $28,000.00 |
|---|---|

44. **Is a depreciation schedule available for any of the property listed in Part 7?**
■ No
☐ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**
■ No
☐ Yes

**Part 8:**　Machinery, equipment, and vehicles

**46. Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No.  Go to Part 9.
■ Yes Fill in the information below.

| General description<br>Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **47.** **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| 47.1.　**2017 Ferrari F12 Berlinetta**<br>**VIN No. 1036** | $244,600.00 | | $244,600.00 |
| 47.2.　**2019 Aston Martin DB11 Volante**<br>**VIN No. 7671** | $150,000.00 | | $150,000.00 |
| 47.3.　**2020 Lamborghini Urus**<br>**VIN No. 6529** | $185,000.00 | | $185,000.00 |
| 47.4.　**2020 Mercedes G63**<br>**VIN No. 6462** | $175,000.00 | | $175,000.00 |
| 47.5.　**2019 BMW X7**<br>**VIN No. 9222** | $57,100.00 | | $57,100.00 |
| 47.6.　**2019 GMC Yukon**<br>**VIN No. 4378** | $100.00 | | $100.00 |
| 47.7.　**2018 MClaren 720S**<br>**VIN No. 0506** | $180,000.00 | | $180,000.00 |

Debtor **Auto Wholesale of Boca, LLC**                    Case number *(If known)* **22-15627-EPK**
Name

| | | | |
|---|---|---|---|
| 47.8. | **2021 Mercedes G Wagon**<br>VIN No. 0328 | $175,000.00 | $175,000.00 |
| 47.9. | **2020 Mercedes G63**<br>VIN No. 2080 | $175,000.00 | $175,000.00 |
| 47.10· | **2008 Porsche 911**<br>VIN No. 3176 | $37,800.00 | $37,800.00 |
| 47.11· | **2020 MClaren 720S**<br>VIN No. 4229 | $273,000.00 | $273,000.00 |
| 47.12· | **2019 Lamborghini Urus**<br>VIN No. 1961 | $100.00 | $100.00 |
| 47.13· | **2020 Ferrari 812 Superfast**<br>**VIN No. 4963** | $435,500.00 | $434,500.00 |
| 47.14· | **2018 Cadillac Escalade**<br>VIN No. 1612 | $32,500.00 | $32,500.00 |
| 47.15· | **2013 Ferrari 458 Italia**<br>VIN No. 1526 | $191,000.00 | $191,000.00 |
| 47.16· | **2021 Jeep Gladiator**<br>VIN No. 1540 | $39,500.00 | $39,500.00 |
| 47.17· | **2020 Lamborghini Huracan**<br>VIN No. 4316 | $271,000.00 | $271,000.00 |
| 47.18· | **2019 MClaren 720S**<br>VIN No. 3714 | $260,000.00 | $260,000.00 |
| 47.19· | **2020 Mercedes G Class**<br>VIN No. 4940 | $175,000.00 | $175,000.00 |

| | | | |
|---|---|---|---|
| 48. | **Watercraft, trailers, motors, and related accessories** *Examples:* Boats, trailers, motors,<br>floating homes, personal watercraft, and fishing vessels | | |
| 49. | **Aircraft and accessories** | | |
| 50. | **Other machinery, fixtures, and equipment (excluding farm<br>machinery and equipment)**<br>Battery chargers | $200.00 | $200.00 |

| | | | |
|---|---|---|---|
| 51. | **Total of Part 8.**<br>Add lines 47 through 50.  Copy the total to line 87. | | $3,056,400.00 |

Official Form 206A/B                    Schedule A/B Assets - Real and Personal Property                    page 5

# EXHIBIT B

<u>**LOAN AGREEMENT**</u>

This **LOAN AGREEMENT** (this "<u>Agreement</u>") dated as of January 26, 2022, is made by and among **KARMA OF PALM BEACH, INC.**, a Florida corporation ("<u>Palm Beach</u>") and **KARMA OF BROWARD, INC.**, a Florida corporation ("<u>Broward</u>"; Palm Beach and Broward, each, a "<u>Borrower</u>" and collectively, "<u>Borrowers</u>"); each financial institution that from time to time is a Lender (as defined below) hereunder; and **FVP SERVICING, LLC**, a Delaware limited liability company (in its capacity as administrative agent for the Lenders, the "<u>Administrative Agent</u>" and together with Borrowers and the Lenders, the "<u>Parties</u>", and each, a "<u>Party</u>").

W I T N E S S E T H :

WHEREAS, Borrowers have requested that Lender extend credit to Borrowers in the form of certain term loans more particularly described herein, in the aggregate original principal amount of up to Seven Million Five Hundred Thousand and No/100 Dollars ($7,500,000.00), the proceeds of which will be used by Borrowers for purposes of purchasing exotic car inventory for Palm Beach and Broward, paying transaction costs and expenses incurred in connection herewith, for general working capital purposes of Borrowers and other purposes expressly permitted hereunder, and Lenders have agreed to provide such loans, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, upon the terms and conditions hereinafter stated, and in consideration of the mutual premises set forth above and other adequate consideration, the receipt and sufficiency of which is hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

1.    <u>DEFINITIONS AND RULES OF CONSTRUCTION</u>

1.1    As used in this Agreement, the following terms shall have the meanings set forth below (terms defined in the singular to have the same meaning when used in the plural and vice versa):

"<u>Administrative Agent</u>" shall have the meaning given to such term in the introductory paragraph of this Agreement.

"<u>Advance</u>" means an advance of funds by Lenders under this Agreement.

"<u>Affiliate</u>" of any Person means any other Person that directly or indirectly controls, is controlled by or is under direct or indirect common control with such Person.  A Person shall be deemed to "control" another Person if such first Person directly or indirectly possesses the power to direct (or to cause the direction of or to materially influence) the management and policies of the second Person, whether through the ownership of voting securities, by contract or otherwise.  Notwithstanding the foregoing, neither Administrative Agent nor any Lender shall be deemed to be an Affiliate of any Loan Party.

"<u>Agreement</u>" means this Loan Agreement and all exhibits, riders and schedules at any time executed by the Parties and made a part hereof by reference, either as originally executed or as hereafter amended, restated, modified or supplemented from time to time.

"<u>Applicable Law</u>" means all laws, rules and regulations applicable to the Person, conduct, transaction, covenant or Loan Documents in question, including, without limitation, all Applicable Law and equitable principles; all provisions of all applicable state and federal constitutions, statutes, rules, regulations and orders of governmental bodies; and all Orders.

1

"<u>Availability Period</u>" means, with respect to any Delayed Draw Term Loan, the period commencing on the Closing Date and continuing until the one (1) year anniversary of the Closing Date.

"<u>Borrower</u>" and "<u>Borrowers</u>" shall have the meaning given to such term in the introductory paragraph of this Agreement.

"<u>Business Day</u>" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"<u>Cash Flow Available for Debt Service</u>" means, with respect to Borrowers and their respective Subsidiaries for each period of twelve (12) consecutive calendar months ending as of the last day of each fiscal quarter of Borrowers, the sum of (a) net income for such period of determination, (b) interest expense for such period of determination and (c) depreciation, amortization and other non-cash charges for such period of determination, in each case, as determined on a consolidated basis in accordance with GAAP.

"<u>Change of Control</u>" means any event, circumstance or occurrence that results in (a) any Guarantor owning, directly or indirectly, less than the applicable percentage of the issued and outstanding ownership interests of (i) each Borrower held by such Guarantor as of the Closing Date, as specified on <u>Schedule 4.1(o)</u> hereto, or (ii) each other Pledged Entity (as defined in the Pledge Agreement) held by such Guarantor as of the Closing Date, as specified on <u>Schedule A</u> to the Pledge Agreement, or (b) Biltmore Automotive Services ceasing to be engaged to perform financial reporting, accounting and administrative services, including all chief financial officer functions, for and on behalf of each Borrower.

"<u>Closing Date</u>" means January 26, 2022.

"<u>Closing Date Term Loan</u>" means the Loan in the original principal amount of $3,500,000.00 Advanced by Lenders to Borrowers on the Closing Date pursuant to Section 2.1(a) hereof.

"<u>Collateral</u>" means all Property in which Administrative Agent is at any time granted a Lien for purposes of securing the Obligations.

"<u>Commitment</u>" means, collectively, each Lender's commitment to Advance (a) the Closing Date Term Loan on the Closing Date, and (b) any Delayed Draw Term Loan during the Availability Period.

"<u>Debt</u>" of a Person, means all (a) indebtedness for borrowed money; (b) obligations for the deferred purchase price of Property or services; (c) obligations evidenced by notes, bonds, debentures or other similar instruments; (d) obligations as lessee under capital leases; (e) obligations in respect of any interest rate swaps, currency exchange agreements, commodity swaps, caps, collar agreements or similar arrangements entered into by such Person providing for protection against fluctuations in interest rates, currency exchange rates or commodity prices or the exchange of nominal interest obligations, either generally or under specific contingencies; (f) obligations under acceptance facilities and letters of credit; (g) obligations for any merchant cash advance whether based on credit card sales or otherwise; (h) guaranties, endorsements (other than for collection or deposit in the ordinary course of business), and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any Person, or otherwise to assure a creditor against loss, in each case, in respect of indebtedness set out in clauses (a) through (g) of a Person other than such Person; and (i) indebtedness set out in clauses (a) through (h) of any Person other than such Person secured by any lien on any asset of such Person, whether or not such indebtedness has been assumed by such Person.

"<u>Debt Service</u>" means, with respect to Borrowers and their respective Subsidiaries for each period of twelve (12) consecutive calendar months ending as of the last day of each fiscal quarter of Borrowers,

the sum of (a) interest paid in cash for such period of determination, (b) all installments of principal on Debt that are due on demand or during the period of determination, (c) all installments of rent under capitalized lease obligations (to the extent not already accounted for in computation of net income or Debt) that are due on demand or during the period of determination and (d) distributions and dividends to stockholders and advances to Affiliates during the period of determination, in each case, as determined on a consolidated basis in accordance with GAAP.

"Debt Service Coverage Ratio" means, with respect to each Borrower and their Subsidiaries for the period of twelve (12) consecutive calendar months ending as of the last day of each fiscal quarter of Borrowers, the ratio of (a) Cash Flow Available for Debt Service for such period to (b) Debt Service for such period.

"Debtor Relief Law" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, insolvency, reorganization or similar debtor relief laws.

"Default" means the occurrence of any event which, after satisfaction of any requirement for the giving of notice or the lapse of time, or both, would become an Event of Default.

"Default Rate" means the annual percentage interest rate applied to the principal of the Loans not paid when due under the terms of the applicable Loan Documents, which rate shall equal twenty percent (20%).

"Delayed Draw Loan Advance Request" means a request for an Advance in respect of a Delayed Draw Term Loan delivered by Borrower to Lender in the form of Exhibit C hereto.

"Delayed Draw Term Loan" has the meaning set forth in Section 2.1(b).

"Eligible Inventory" means, as of any date of determination, all Collateral consisting of motor vehicle inventory that is (a) acquired by a Borrower in the ordinary course of business with Loan proceeds, and constitutes "inventory" of the applicable Borrower under the UCC, (b) owned by such applicable Borrower as of such date of determination subject to no Liens other than Liens in favor of Administrative Agent, and (c) located at the applicable Site identified on Schedule 4.1(j) attached hereto, excluding any such inventory which Lender otherwise determines is not in the condition required by, or which does not satisfy each of the terms, conditions, representations, warranties and covenants under, the Loan Documents relating thereto.

"Event of Default" shall have the meaning given to such term in Section 7.1 hereof.

"Exclusivity Agreement" means the Exclusivity Agreement dated as of the Closing Date by and among FPS, Borrowers and Excell Auto Sport and Service, Inc. a Florida corporation.

as the same may be amended, modified, supplemented, restated, extended or renewed from time to time.

"FPS" means Feenix Payment Systems, LLC, a Delaware limited liability company (an Affiliate of Lenders).

"GAAP" means generally accepted accounting principles in the United States, consistently applied.

"Governmental Authority" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal or any other level, and any agency,

3

authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government.

"Guaranty" means that certain Guaranty Agreement dated as of the Closing Date by Guarantors in favor of Administrative Agent and the Lenders, as the same may be amended, modified, supplemented, restated, extended or renewed from time to time.

"Guarantors" means Scott Zankl and Kristen Zankl.

"Interest Only Period" means the period commencing on the Closing Date and continuing through and including the January 26, 2023 Payment Date.

"Law" as to any Person, means any law (including common law), statute, ordinance, treaty, rule, regulation, policy or requirement of any Governmental Authority and authoritative interpretations thereon, whether now or hereafter in effect, in each case, applicable to or binding on such Person or any of its properties or to which such Person or any of its properties is subject.

"Lender" means individually and collectively, each of the Persons listed on Schedule I hereto as "Lender", together with any successor, assignee or other transferee of such Lender hereunder, and any other entity subsequently added hereto as a Lender hereunder, or any successor, assignee or other transferee thereof.

"Lender IRR" has the meaning set forth in Section 2.5(c).

"Lien" means any mortgage, pledge, security interest, lien (statutory or otherwise), charge, encumbrance, hypothecation, assignment, deposit arrangement, or other arrangement having the practical effect of the foregoing or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having the same economic effect as any of the foregoing).

"Loan Documents" means this Agreement, the Security Agreement, the Pledge Agreement, the Exclusivity Agreement, the Guaranty, each Note, any Delayed Draw Loan Advance Request, the Westlake Intercreditor Agreement and all other instruments, agreements, documents and writings now or hereafter evidencing, securing or delivered to Administrative Agent and Lender in connection with the Obligations, as each of the foregoing may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Loan Parties" shall mean each Borrower, each Guarantor and each of their respective Affiliates which are a party to any of the Loan Documents, as applicable.

"Loans" means the Closing Date Term Loan and any Delayed Draw Term Loan.

"Maturity Date" means the earlier of (a) the Scheduled Maturity Date, and (b) the date on which all amounts outstanding under this Agreement have been declared or have automatically become due and payable (whether by acceleration or otherwise).

"Maximum Aggregate Loan Amount" means $7,500,000 in the aggregate of all Advances made hereunder.

"Net Proceeds" means, in respect of (a) any incurrence of Debt (other than the Loans or Permitted Debt) by any Borrower or any of their respective Subsidiaries, (b) any casualty or condemnation event involving Property of any Borrower or any of their respective Subsidiaries (excluding any such event for which such Borrower or Subsidiary receives net insurance proceeds of less than $5,000), or (c) any sale or assignment involving Property of any Borrower or any Subsidiary, all cash proceeds (including cash proceeds as and when received in respect of non-cash proceeds received or receivable in connection with such occurrence), net of reasonable and customary out-of-pocket costs and expenses paid or incurred in connection therewith in favor of any Person not an Affiliate of a Loan Party.

"Note" has the meaning set forth in Section 2.1(b).

"Obligations" means all loans (including the Loans), Advances, debts, liabilities and obligations (including reimbursement obligations) for monetary amounts owing by any Borrower or any other Loan Party to the Administrative Agent and the Lenders, whether due or to become due, matured or unmatured, liquidated or unliquidated, contingent or non-contingent, of any kind or nature, present or future, arising under or in respect of this Agreement or any of the Loan Documents.  This term includes all principal, interest (including interest that accrues after the commencement against any Borrower or any other Loan Party of any action under the Federal Bankruptcy Code), premium, reasonable fees and expenses, including any and all arrangement fees, delivery fees, loan fees, commitment fees, agent fees, merchant processing fees and any and all other fees, expenses, costs or other sums (including reasonable attorney's fees) chargeable to any Borrower or any other Loan Party under any of the Loan Documents.

"OLV" means, as of any date of determination, the orderly liquidation value of the Collateral expected to be realized in connection with an "as-is, where-is" sale of such Collateral to one or more third-parties as of such date of determination, as determined by Administrative Agent in its sole and absolute discretion; provided, however, in no event shall any single vehicle be valued at more than $350,000.00 for purposes of calculating OLV.

"Order" as to any Person, means any order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case, applicable to or binding on such Person or any of its properties or to which such Person or any of its properties is subject.

"Organizational Agreements" means the partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement, articles or certificate of organization, bylaws, certificate of formation and other organizational or governing documents, as applicable, of each Borrower.

"Payment Date" means the fifteenth (15th) day of each calendar month during the term of this Agreement commencing with the first Payment Date after the Closing Date; provided, however, if such day is not a Business Day, the next succeeding Business Day.

"Permitted Debt" means (a) Debt existing or arising under this Agreement and any refinancing, extension or modification thereof; (b) Westlake Debt in an amount not to exceed $1,000,000 in the aggregate, subject in all respects to the terms of the Westlake Intercreditor Agreement; (c) trade Debt incurred in the ordinary course of business consistent with past practice; (d) unsecured Debt owed in respect of any netting services, overdrafts and related liabilities arising from treasury, depository and cash management services in connection with any automated clearinghouse transfers of funds; (e) unsecured insurance premiums owing in the ordinary course of business which are also Debt; and (f) unsecured Debt in addition to the amounts in clauses (a) through (e) above in an outstanding principal amount not to exceed $50,000 in the aggregate at any time during the term of this Agreement and which is subordinate in right

of payment to the Debt existing or arising under this Agreement and any refinancing thereof on terms acceptable to Administrative Agent in its sole discretion.

"Permitted Liens" means (a) Liens for taxes not yet due or which are being contested in good faith by appropriate proceedings; and (b) non-consensual Liens arising by operation of law, arising in the ordinary course of business, and for amounts which are not overdue for a period of more than thirty 30 days or that are being contested in good faith by appropriate proceedings.

"Person" means a corporation, an association, partnership, an organization, a business, a business trust, a limited liability company, an individual, a government or political subdivision thereof or a governmental agency.

"Pledge Agreement" means that certain Pledge Agreement dated as of the Closing Date by Guarantors in favor of Administrative Agent and the Lenders, as the same may be modified, amended, supplemented, extended or renewed from time to time.

"Property" means the real property and personal property of a Person, and any interest of a Person in any real or personal property.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Restricted Payment" means (a) any dividend or other distribution (whether in cash, securities or other Property) with respect to any equity securities of any Borrower, (b) any purchase, redemption, retirement or acquisition by any Borrower for value of any equity securities or any distribution of any kind in cash or other Property or assets in respect thereof; (c) any payment (whether in cash, securities or other Property or assets), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such equity securities or on account of any return of capital to any Borrower's equity holders, partners or members (or the equivalent Person thereof), (d) any management, board or director fees or similar fee to a holder of equity securities of any Borrower or any Affiliate thereof, and (e) director or manager fees, any salary, compensation or other payment of any type or nature, or any other advance or Debt of any type or nature, in each case, to any officer, director or manager of any Borrower or any Affiliate thereof or to any equity holder of any Borrower or any Affiliate thereof, including, without limitation, all salary or other compensation of any type or nature paid or payable to Guarantors.

"Scheduled Maturity Date" means January 26, 2025.

"Security Agreement" means that certain Security Agreement dated as of the Closing Date by Borrowers in favor of Administrative Agent and the Lenders, as the same may be modified, amended, supplemented, extended or renewed from time to time.

"Security Documents" means, collectively, the Security Agreement, the Pledge Agreement, each deposit account control agreement with respect to any deposit account of Borrowers, all Uniform Commercial Code financing statements required by this Agreement to be filed with respect to the security interests created pursuant to the Security Documents and  all other documents and agreements executed or delivered to Administrative Agent by Borrowers or any other Loan Party for purposes of securing the Obligations.

"Settlement Date" means, with respect to any Advance hereunder, the date on which funds are advanced by a Lender.

"Site" means each site at which a Borrower operates an auto dealership, as set forth on Schedule 4.1(j) hereto.

"Subsidiary" means any corporation or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions are at the time directly or indirectly owned by any Borrower.

"Westlake" means Westlake Services, LLC, a California limited liability company.

"Westlake Debt" means any debt under any Westlake Financing Documents owed by Borrowers and any Affiliate of Borrowers to Westlake, subject in all respects to the terms of the Westlake Intercreditor Agreement.

"Westlake Intercreditor Agreement" means that certain Intercreditor Agreement dated as of January 26, 2022 by and between Westlake and Administrative Agent.

"Westlake Financing Documents" means and financing documents between Borrowers and Westlake, including, but not limited to, that certain Master Dealer Agreement between Westlake and Palm Beach, subject in all respects to the terms of the Westlake Intercreditor Agreement.

"Yield Maintenance Fee" has the meaning set forth in Section 2.5(c).

"Yield Maintenance Trigger Date" has the meaning set forth in Section 2.5(c).

1.2     Accounting Terms and Determination.  Accounting terms used in this Agreement such as "net income," "amortization," "depreciation," and "interest expense" shall be calculated (both as to amounts and classification of items) in accordance with GAAP.

1.3     Other Interpretive Provisions.  Any pronoun used herein shall be deemed to cover all genders.  All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations, and all references to any instruments or agreements, including, without limitation, references to any of the Loan Documents, shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof. Unless otherwise expressly stated or the context clearly indicates a different intention, then (as may be appropriate in the particular context) a singular reference to Lender used in any Loan Document includes the plural, and a plural reference to Lenders includes the singular.

2.     THE LOANS; USE OF PROCEEDS.

2.1     Funding of the Loans.

(a)     Subject to the terms and conditions of this Agreement, Lenders shall Advance to Borrowers the Closing Date Term Loan on the Closing Date, in the original principal amount of $3,500,000.00.  Proceeds of the Closing Date Term Loan shall be disbursed in accordance with Exhibit B attached hereto.  Upon the funding of such Advance, the Commitment of each Lender with respect to the Closing Date Term Loan hereunder shall be terminated, and no further Advances in respect of the Closing Date Term Loan shall be permitted.  Principal amounts repaid or prepaid in respect of the Closing Date

Term Loan will not be available for reborrowing hereunder. The Closing Date Term Loan shall bear interest from and after the Closing Date at the applicable rate provided in the provisions of Section 2.4 hereof.

(b)    At any time during the Availability Period, Borrowers may request, pursuant to a Delayed Draw Loan Advance Request in accordance with this Section 2.1(b), that Lenders make available to Borrowers three (3) additional term loans, which shall be comprised of an Advance in the original principal amount of up to $4,000,000.00, but in any event, not less than $1,000,000 (each a "Delayed Draw Term Loan"). Each Delayed Draw Term Loan shall be subject to all terms and conditions set forth in this Agreement, including, without limitation, Section 3.2 hereof. In no event shall any Delayed Draw Term Loan be advanced hereunder following the expiration of the Availability Period, or at any time during which an Event of Default has occurred and is continuing. In no event will any Advance be made in respect of a Delayed Draw Term Loan which will cause the aggregate original principal amount of all Advances to exceed the Maximum Aggregate Loan Amount. Principal amounts repaid or prepaid in respect of any Delayed Draw Term Loan will not be available for reborrowing hereunder. Each Delayed Draw Term Loan shall bear interest from and after the related Settlement Date at the applicable rate provided in the provisions of Section 2.4 hereof.

Borrowers shall give Administrative Agent and Lenders written notice of the requested Advance in respect of each Delayed Draw Term Loan in the form of a Delayed Draw Loan Advance Request at least five (5) days prior to the requested Settlement Date; provided, that Administrative Agent and Lenders shall only be obligated to make an Advance in respect of such Delayed Draw Term Loan subject to the other terms and conditions in this Agreement. Each Delayed Draw Loan Advance Request shall be for a minimum of $1,000,000 (or such lesser amount as Administrative Agent may approve) and shall specify in writing where such funds should be disbursed. In no event, however, shall Borrowers have any right whatsoever to receive any Advance under any Commitment if (i) the Availability Period shall have expired, (ii) either before or after giving effect thereto, there shall exist an Event of Default, or (iii) after giving effect to any such Advance, the principal amount outstanding on such Loan would exceed the applicable Commitment thereof or the Maximum Aggregate Loan Amount.

(c)    Each Loan shall be evidenced by one or more promissory notes in the form of Exhibit A hereto (each, as amended, restated, replaced, supplemented, extended or renewed from time to time, a "Note"), in each case payable to the order of the Administrative Agent for the benefit of the applicable Lender. Each Note will be due and payable in full on the Maturity Date. Administrative Agent is authorized to note or endorse the date and amount of the Advance and each payment of the applicable Loan on a schedule annexed to and constituting a part of the Note. Such notations and endorsements, if made, will constitute prima facie evidence of the information noted or endorsed on such schedule, but the absence of any such notation or endorsement will not limit or otherwise affect the obligations or liabilities of Borrowers thereunder or hereunder.

(d)    The obligations of the Lenders under this Section 2.1 shall be several and not joint. The Commitments of each Lender with respect to the Loans are as set forth on Schedule I hereto.

2.2    Repayment.

(a)    *Payment of Principal and Interest*. On each Payment Date during the Interest Only Period, Borrowers shall make monthly payments to Administrative Agent, for the account of the Lenders, with respect to each Loan, equal to all accrued, unpaid interest on the outstanding principal amount thereof. Commencing with the first Payment Date following the Interest Only Period and continuing on each Payment Date thereafter through and including the Maturity Date, Borrowers shall make monthly payments to Administrative Agent, for the account of the Lenders, with respect to each Loan in an amount equal to the sum of (i) all accrued, unpaid interest with respect to such Loan through and including the last day of

the calendar month immediately preceding the calendar month in which such Payment Date occurs, plus (ii) a principal component in an amount equal to two percent (2.00%) of the original principal amount of such Loan. Administrative Agent's calculation of the principal, interest and other amounts from time to time payable hereunder shall be conclusive and binding absent manifest error. Payments of all remaining outstanding principal and accrued, unpaid interest on the Loans, together with all other fees, costs, expenses and other Obligations then outstanding, shall be due and payable by Borrowers to the Administrative Agent, for the account of the Lenders, on the Maturity Date.

        (b)    *Payment Mechanics*. Except as provided below, all payments of principal of, or interest on, the Loan and all other sums due under the terms of the Loan Documents shall be made in either (i) immediately available funds by wire or ACH deposit or (ii) checks or money orders made payable to the Administrative Agent at the address and pursuant to the instructions provided by the Administrative Agent to Borrowers from time to time.

        2.3    Use of Proceeds. The proceeds of the Closing Date Term Loan shall be disbursed in accordance with the Flow of Funds Memorandum attached hereto as Exhibit B and shall be applied by Borrowers solely for the purposes specified therein. Proceeds of any Delayed Draw Term Loan shall be disbursed solely for acquiring exotic car inventory for Palm Beach and Broward and as specified in the Delayed Draw Loan Advance Request. All Loan proceeds shall be applied by Borrowers solely for a legitimate business purpose of Borrowers, and no portion of the Loan proceeds will be used for family, household or consumer purposes.

        2.4    Interest.

        (a)    The unpaid principal amount of each Loan shall, subject to this Section 2.4, bear interest at the rate of fifteen percent (15.00%) per annum (the "Interest Rate"). Interest shall be computed on the basis of a 360-day year for the actual number of days in the interest period. Upon any Default, the Interest Rate shall increase from the date of such Default to a rate equal to the Default Rate. For the avoidance of doubt, all payments of interest on the Loans outstanding under this Agreement on each Payment Date shall be made in accordance with Section 2.2 hereof.

        (b)    In no contingency or event whatsoever shall the amount paid or agreed to be paid to Administrative Agent and Lenders for the use, forbearance or detention of money advanced under this Agreement exceed the highest lawful rate permissible under Applicable Law. It is the intent hereof that Borrowers will not pay or contract to pay, and that Administrative Agent and Lenders will not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be charged to and paid by Borrowers under Applicable Law. All interest (and charges deemed interest) paid or agreed to be paid to the Lenders shall, to the extent permitted by Applicable Law, be amortized, pro-rated, allocated and spread in equal parts throughout the full term hereof until payment in full of the principal amount of the Obligations owing hereunder (including the period of any renewal or extension hereof) so that interest on the principal amount of the Obligations outstanding hereunder for such full period will not exceed the maximum amount permitted by Applicable Law. Each determination by Administrative Agent of an interest amount hereunder shall be made in good faith and, except for manifest error, shall be final, conclusive and binding for all purposes.

        (c)    If any interest or other sum due under any Loan Document is not paid by Borrowers within ten (10) days after the date on which it is due (except for the payment due on the Maturity Date), Borrowers shall pay to Administrative Agent upon demand, an amount equal to five percent (5%) of such unpaid sum or the maximum amount permitted by Applicable Law, in order to defray the expense incurred by Administrative Agent and Lenders in handling and processing such delinquent payment and to

compensate Administrative Agent and Lenders for the loss of the use of such delinquent payment.  Such amount shall be secured by the Loan Documents.

2.5    Fees.

(a)    On the Closing Date, Borrowers will pay to Administrative Agent, for the account of the Lenders, a nonrefundable commitment fee in an amount equal to $75,000 (the "Commitment Fee").  The Commitment Fee shall be fully earned on the Closing Date in accordance with the terms hereof, shall be nonrefundable for any reason whatsoever and shall be in addition to any other fees, costs and expenses payable pursuant to the Loan Documents.  Borrowers' obligations to pay the Commitment Fee will not be subject to counterclaim or setoff or be otherwise affected by any claim or dispute the Loan Parties may have.

(b)    On each Payment Date, Borrowers will pay to Administrative Agent, for Administrative Agent's own account, an agent fee (the "Administrative Agent Fee") in an amount equal to the product of (i) the average outstanding daily balance of the Loans for the calendar month immediately preceding the calendar month in which such Payment Date occurs, multiplied by (ii) 0.50% per annum.  The Administrative Agent Fee shall accrue at all times from and after the Closing Date in accordance with the terms hereof, shall be nonrefundable for any reason whatsoever and shall be in addition to any other fees, costs and expenses payable pursuant to the Loan Documents.  Borrowers' obligations to pay the Administrative Agent Fee will not be subject to counterclaim or setoff or be otherwise affected by any claim or dispute the Loan Parties may have.

(c)    Upon the earliest to occur of (i) the one (1) year anniversary of the Closing Date, (ii) the date on which the outstanding principal amount to Loan and all accrued unpaid interest thereon are paid in full and (iii) the date on which the Obligations are accelerated by Administrative Agent following the occurrence of an Event of Default (the "Yield Maintenance Trigger Date"), Borrowers will pay to Administrative Agent, for the account of the Lenders, a yield maintenance fee (the "Yield Maintenance Fee") in the amount necessary to result in the Lenders achieving an internal rate of return in respect of the Loan (as calculated by Administrative Agent through and including the Yield Maintenance Trigger Date, based on all payments made in respect of the principal of and accrued unpaid interest on the Loan through and including the Yield Maintenance Trigger Date) (the "Lender IRR") of fifteen percent (15.00%).  For the avoidance of doubt, no Yield Maintenance Fee shall be payable if the Lender IRR as of the Yield Maintenance Trigger Date is greater than or equal to fifteen percent (15.00%).  Borrowers' obligations to pay the Yield Maintenance Fee will not be subject to counterclaim or setoff or be otherwise affected by any claim or dispute the Loan Parties may have.

2.6    Prepayment; Application of Payments.

(a)    Voluntary Prepayment.  Borrowers shall have the right to prepay the Loans in whole or in part at any time without premium or penalty, but subject to Borrowers having provided at least fifteen (15) days prior written notice to Administrative Agent.

(b)    Mandatory Prepayment.

(i) Immediately upon the receipt by any Loan Party of any Net Proceeds, Borrowers shall deliver, or cause to be delivered, to Administrative Agent an amount equal to such Net Proceeds for application to the Obligations in accordance with Section 2.6(c) hereof.

(ii) If at any time that the aggregate outstanding balance of the Obligations under the Loan Documents exceeds fifty-five percent (55.00%) of the then-current OLV of the Eligible Inventory, then

Borrowers shall, within ten (10) Business Days following the first date on which such excess exists, and without the requirement of demand or notice from Administrative Agent, prepay the Obligations in an amount equal to such excess (with the amounts so repaid being applied to the Obligations in accordance with Section 2.6(c)).

        (c)    Application of Payments.  Notwithstanding anything herein to the contrary, (i) except as otherwise provided in Section 2.6(c)(iii), all payments, proceeds or recoveries received by Administrative Agent or the Lenders in respect of the Obligations or the Collateral prior to the occurrence of any Event of Default hereunder shall be applied (A) first, to the payment of fees, costs and expenses due and owing to Administrative Agent or any Lender, together with the amount of any protective advances made by Administrative Agent or any Lender to preserve or protect any Collateral, until paid in full, (B) second, to the payment accrued unpaid interest on the Loans, until paid in full, and (C) third, to the payment of the outstanding principal amount of the Loans, until paid in full,  (ii) following the occurrence of any Event of Default hereunder, all payments, proceeds or recoveries received by Administrative Agent or the Lenders in respect of the Obligations or the Collateral shall be applied to the Obligations in such order as Administrative Agent shall determine in its sole discretion, and (iii) with respect to any prepayments under Sections 2.5(a) or 2.5(b) hereof, so long as no Event of Default as occurred hereunder, any portion of such prepayments allocable to principal (other than scheduled periodic payments) will be applied to reduce future scheduled payments in the inverse order of maturity, and the remaining portion of such prepayment shall be applied in the order of priority specified in Section 2.5(c)(i).

        2.7    Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of setoff or otherwise, obtain payment in respect of any principal of or interest on its portion of the Loans or prepayment premium in connection therewith resulting in such Lender's receiving payment of a proportion of the aggregate amount of the Loans and accrued interest thereon and prepayment premium in connection therewith greater than its pro rata share thereof as provided herein, then such Lender shall (a) notify the Administrative Agent of such fact and (b) purchase (for cash at face value) participations in the portions of the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of, accrued interest on and prepayment premium in connection with their respective portions of the Loans and other amounts owing them; provided, that: (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and (ii) the provisions of this Section 2.7 shall not be construed to apply to (x) any payment made by or on behalf of Borrowers pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its portion of the Loans to any assignee or participant.  Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

        3.    CONDITIONS PRECEDENT.

        3.1    Closing Date.  The obligation of Administrative Agent and the Lenders to enter into this Agreement, the other Loan Documents and to make the Advance of the Closing Date Term Loan on the Closing Date shall be subject to the following conditions precedent:

        (a)    Borrowers shall have delivered to Administrative Agent and each Lender the following documents, each in form and substance satisfactory to Administrative Agent and duly executed on behalf of each of the Persons party thereto:

11

(i)        this Agreement;

(ii)       the Security Agreement;

(iii)      each Note;

(iv)      the Guaranty

(v)       the Exclusivity Agreement;

(vi)      the Pledge Agreement; and

(vii)     each of the other Loan Documents and Security Documents, each in form and substance satisfactory to the Administrative Agent and each Lender.

(b)        a validly executed officer's certificate with respect to each Borrower in form and substance acceptable to the Administrative Agent and attaching (i) a fully executed copy of such Person's certificate of formation, certificate or article of incorporation, articles of organization or certificate of partnership (as applicable) bylaws, operating agreements or partnership agreements (as applicable) and all amendments thereto, (i) resolutions evidencing such Person's authorization of the Loans; (iii) evidence of such Person's good standing; and (iv) incumbency certificates.

(c)        Administrative Agent shall have received an opinion letter of counsel to the Loan Parties, in form and substance acceptable to Administrative Agent;

(d)        Administrative Agent shall have received such other documents and information as Administrative Agent may request; and

(e)        on the Closing Date, the following statements shall be true and correct and Borrowers, by requesting and accepting the Advance of the Closing Date Term Loan, shall be deemed to have represented and certified that:

(i)        the representations, warranties and covenants of each of the Borrowers set forth in this Agreement are true and correct; and

(ii)       no Default or Event of Default shall exist immediately before or immediately after giving effect to the Closing Date Term Loan.

3.2      <u>Future Advances</u>.  The obligation of the Administrative Agent and the Lenders to honor any request of an Advance following the Closing Date is subject to the Administrative Agent and the Lenders' receipt of a duly executed Delayed Draw Loan Advance Request and satisfaction of each of the following conditions precedent, unless waived by the Administrative Agent:

(a)        the representations and warranties contained in this Agreement and in each of the other Loan Documents shall be true and correct in all material respects on and as of the Settlement Date of such Advance;

(b)        no Default or Event of Default shall exist immediately before or immediately after giving effect to the requested Advance;

4869-1815-9362.7

(c)     Borrowers shall have provided evidence satisfactory to Administrative Agent, in its sole and absolute discretion, of the price, make, model, vehicle identification number and seller of the vehicle inventory to be purchased with such Advance;

(d)     Borrowers shall have provided to Administrative Agent copies of the certificates of title with respect to all vehicle inventory (including all Eligible Inventory) then owned by Borrower, together with such additional documentation and information as Administrative Agent may require to evidence compliance by Borrower with the terms of Section 2.6(b)(ii) hereof; and

(e)     Administrative Agent shall have received such documentation and other items as Administrative Agent may require to evidence that the conditions to such Advance have been satisfied.

4.     <u>LOAN PARTY REPRESENTATIONS AND WARRANTIES</u>.

4.1     To induce Administrative Agent and each Lender to enter into this Agreement, each Loan Party represents and warrants to Administrative Agent and each Lender, as of the Closing Date, and at all times during which any of the Obligations hereunder remain outstanding, as follows:

(a)     *Existence; Compliance with Laws*.  Each Borrower is duly formed, validly existing and in good standing under the laws of the state of its jurisdiction of organization and has the requisite power and authority, and the legal right, to own, lease and operate its properties and assets and to conduct its business as it is now being conducted.  Each Borrower is in compliance with all Laws and Orders except to the extent that the failure to comply therewith could not be expected to have a material adverse effect on such Borrower's financial condition or the ability of such Borrower to perform its obligations under each of the Loan Documents.

(b)     *Power and Authority*.  Each Borrower has the power and authority, and the legal right, to execute and deliver each of the Loan Documents to which it is a party and to perform its obligations hereunder.

(c)     *Authorization; Execution and Delivery*.  The execution and delivery of each of the Loan Documents by Borrowers and the performance of their respective obligations thereunder have been duly authorized by all necessary corporate or limited liability company (as applicable) action in accordance with all Applicable Laws.  Each Loan Party has duly executed and delivered each of the Loan Documents to which it is a party.

(d)     *No Approvals*.  No consent or authorization of, filing with, notice to or other act by, or in respect of, any Governmental Authority or any other Person is required in order for any Borrower to execute, deliver, or perform any of its obligations under the Loan Documents.

(e)     *No Violations*.  The execution and delivery of each of the Loan Documents and the consummation by each Loan Party of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of any Borrower's organizational documents; (ii) violate any material Law or Order applicable to any Loan Party or by which any of its properties or assets may be bound; or (iii) constitute a material default under any material agreement or contract by which any Loan Party may be bound.

(f)     *Enforceability*.  Each of the Loan Documents to which a Loan Party is a party is a valid, legal and binding obligation of such Loan Party, enforceable against each Loan Party in accordance with its terms.

(g)    *No Litigation*.  No action, suit, litigation, investigation or proceeding of, or before, any arbitrator or Governmental Authority is pending or threatened by or against any Loan Party or any principal, general partner, manager, sole member, managing member or majority shareholder of any Borrower or any of its Property or assets (i) with respect to the Loan Documents or any of the transactions contemplated hereby or (ii) that could reasonably be expected to materially adversely affect any Loan Party's financial condition or the ability of any Loan Party to perform its obligations under any of the Loan Documents.

(h)    *Limited Offering of Notes*.  The offer and sale of the Notes are not required to be registered pursuant to the provisions of Section 5 of the Securities Act of 1933, as amended or the registration or qualification provisions of the blue sky laws of any state.  No Borrower, and no agent on any Borrower's behalf, has solicited or will solicit any offers to sell all or any part of the Notes, to any Person so as to bring the sale of the Notes, by Borrowers within the registration provisions of the Securities Act of 1933, as amended or any state securities laws.  All prior offerings and sales of securities of Borrowers were in compliance with all applicable federal and state securities laws.  Borrowers are under no requirement to register under the Securities Act of 1933, as amended, or the Trust Indenture Act of 1939, as amended, any of its presently outstanding securities or any of its securities that may subsequently be issued.  All taxes imposed on Borrowers in connection with the issuance, sale and delivery of the Notes have been or will be fully paid, and all laws imposing such taxes have been or will be fully satisfied by Borrowers.

(i)    *No Bankruptcy Filing*.  No bankruptcy or insolvency proceedings are pending or contemplated by any Loan Party or, to the best knowledge of each Loan Party, against any principal, general partner, manager, sole member, managing member or majority shareholder of any Borrower.  No petition in bankruptcy has been filed against any Loan Party or any principal, general partner, manager, sole member, managing member or majority shareholder of any Borrower, as applicable, and no Loan Party, nor any principal, general partner, manager, sole member, managing member or majority shareholder of any Borrower has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors.

(j)    *Title*.  Each Loan Party has good and indefeasible title to the Collateral owned and to be pledged by such Loan Party pursuant to the applicable Loan Documents, free and clear of all Liens except the Permitted Liens.  The Security Agreement, the Pledge Agreement and any UCC Financing Statements required to be filed in connection therewith, will create a valid, perfected first priority lien on each Loan Party's interest in the all Collateral, whether now owned or hereafter acquired.  As of the Closing Date, each Borrower is the owner and operator of the applicable Site(s) set forth on <u>Schedule 4.1(j)</u> hereof with respect to such Borrower.

(k)    *Full and Accurate Disclosure*.  No statement of fact made by any Loan Party in any Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading.  There is no material fact presently known to any Loan Party that has not been disclosed to the Administrative Agent or the Lenders which adversely affects, or, as far as any Loan Party can foresee, could reasonably be expected to materially adversely affect the Collateral or the business, operations or condition (financial or otherwise) of any Loan Party.  All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Administrative Agent in respect of any Loan Party (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of such Loan Party as of the date of such reports, and (iii) have been prepared in accordance with sound accounting practices, on a cash/tax basis, consistently applied throughout the periods covered, except as disclosed therein.  Each Loan Party represents that it does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by this Agreement.  Since the date of such financial statements, there

has been no material adverse change in the financial condition, operations or business of any Loan Party from that set forth in said financial statements.

(l)    *Fraudulent Transfer*.  No Loan Party has entered into the Loan Documents or consummated any of the transactions contemplated thereby with the actual intent to hinder, delay, or defraud any creditor, and each Loan Party has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of each Loan Party's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed such Loan Party's probable total liabilities, including subordinated, unliquidated, disputed or contingent liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured.  No Loan Party's assets currently, and immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  No Loan Party intends to, and no Loan Party believes that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of such Loan Party).

(m)    *ERISA*.  No Borrower has an employee pension benefit plan as defined under the Employee Retirement Income Security Act of 1974.

(n)    *No Broker*. No broker or finder introduced by any Loan Party to Administrative Agent or any Lender, brought about this transaction, or is entitled to any commission in connection therewith, except for such brokers as are identified on the Flow of Funds Memorandum attached hereto as Exhibit B and paid in full on the Closing Date, and Borrowers agree to indemnify, defend and hold Administrative Agent and Lenders harmless from and against any and all claims, demands, liabilities or expenses from brokers or other claims for commissions or fees including but not limited to reasonable attorneys' fees and expenses on account of the making of the Loan secured hereby.  Each Borrower's indemnity hereunder shall survive any discharge of the Collateral, if any, and payment in full of the Obligations.

(o)    *Ownership*.  Schedule 4.1(o) hereto sets forth a true and correct copy of the capitalization table and ownership of each Borrower.  Borrowers have no Subsidiaries.  All ownership interests in Borrowers are owned free and clear of any Lien (other than the Liens granted in connection with the Security Agreement and the Pledge Agreement).

(p)    *Name; Principal Place of Business*.  No Borrower uses, and no Borrower will use, any trade name, and no Borrower has done, and no Borrower will do, business under any name other than its actual name set forth herein.  The principal place of business of each Borrower is its primary address for notices as set forth in Section 10.1, and no Borrower has any other place of business (other than any Site Lease owned by such Borrower).

(q)    *Other Debt; Liens*.  No Borrower has any Debt, other than Permitted Debt.  No Property of any Borrower is subject to any Lien, other than Permitted Liens.

4.2    Advances.  The submission of a Delayed Draw Loan Advance Request made by Borrowers pursuant to this Agreement or any other Loan Document shall constitute an automatic representation and warranty by each Loan Party to Administrative Agent and each Lender that there does not then exist any Default or Event of Default and a reaffirmation as of the date of said request that all representations and warranties of each Loan Party contained in Section 4.1 hereof are true in all material respects on and as of the date of the Settlement Date, (a) as stated if such representation and warranty contains an express materiality qualification or (b) in all material respects if such representation and warranty does not contain

15

such a qualification, except, in each case, to the extent deviations from such representation or warranty has been disclosed in writing to Administrative Agent (including on the schedules to the Loan Documents) or expressly relates to an earlier date (in which case such representation and warranty shall be true and correct as of such date).  All representations and warranties contained in this Agreement or in any of the other Loan Documents shall survive the execution, delivery and acceptance hereof by Administrative Agent and each Lender and the closing of the transactions described herein.

5.    AFFIRMATIVE COVENANTS.

5.1    Affirmative Covenants.  During the term of this Agreement, and thereafter for so long as there is any outstanding Obligations to the Administrative Agent or any Lender, each Loan Party covenants that, unless otherwise consented to by Administrative Agent in writing, it shall:

(a)    *Maintenance of Existence*.  (i) Preserve, renew and maintain in full force and effect its corporate or organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, where the failure to do so could not be expected to materially adversely affect any Loan Party's financial condition or the ability of any Loan Party to perform its obligations under the Loan Documents.

(b)    *Compliance*.  Comply with (i) all of the terms and provisions of its Organizational Agreements; (ii) its obligations under its material contracts and agreements; and (iii) all Laws and Orders applicable to it and its business, except where the failure to do so could not be expected to materially adversely affect any Borrower's financial condition or the ability of any Borrower to perform its obligations under the Loan Documents.

(c)    *Payment Obligations*.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all of its material obligations of whatever nature, including any and all taxes, claims or otherwise, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings, and reserves in conformity with GAAP with respect thereto have been provided on its books.

(d)    *Notice of Events of Default*.  As soon as possible and in any event within two (2) Business Days after it becomes aware that a Default or an Event of Default has occurred, notify Administrative Agent and each Lender in writing of the nature and extent of such Default or Event of Default and the action, if any, it has taken or proposes to take with respect to such Default or Event of Default.

(e)    *Further Assurances*.  Each Loan Party shall, on the request of Administrative Agent and at the expense of Loan Parties:  (a) promptly correct any defect, error or omission which may be discovered in the contents of this Agreement or in the contents of any of the other Loan Documents; (b) promptly execute, acknowledge, deliver and record or file such further instruments (including, without limitation, further security agreements, financing statements and continuation statements) and promptly do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Agreement and the other Loan Documents and to subject to the liens and security interests hereof and thereof any property intended by the terms hereof and thereof to be covered hereby and thereby, including specifically, but without limitation, any renewals, additions, substitutions, replacements or appurtenances to the Collateral; and (c) promptly execute, acknowledge, deliver, procure and record or file any document or instrument (including specifically, without limitation, any financing statement) reasonably deemed advisable by Administrative Agent to protect, continue or perfect the Liens or the security interests in the Collateral hereunder or under any of the Security Documents against the rights or interests of third persons.

16

(f)      *Monthly and Quarterly Documents.* As soon as practicable or available after the end of each calendar month and each fiscal quarter of each year, commencing with the first such period ending after the Closing Date, but no later than tenth (10th) Business Day following the end of each calendar month and forty-five (45) calendar days after the end of each respective fiscal quarter of Borrowers, Borrowers must prepare and deliver to the Administrative Agent, with respect to each Borrower (i) a profit and loss statement (both actual and pro-forma for the following twelve (12) months), together with Site-level detail, (ii) a balance sheet, (iii) a cashflow and income statement, (iv) a financial analysis and supplemental financial report, in the form required by Administrative Agent from time to time, (v) a current capitalization table and (vi) a compliance certificate stating whether or not Borrowers are in compliance with the covenant set forth in <u>Sections 5.1(p)</u> hereof, including all calculations evidencing the same and the certification thereto by Borrowers' Chief Financial Officer or other appropriate officer.  All such financial statements and other items shall in in form and substance reasonably acceptable to the Administrative Agent.

(g)      *Annual Financial Statements.*  As soon as practicable or available after the end of each fiscal year of Borrowers, and in any event within one hundred twenty (120) calendar days after the close of each fiscal year, Borrowers must prepare and deliver to Administrative Agent the annual audited financial statement of each Borrower.  Such annual financial statements (a) must include the types of financial statements and information required on a quarterly basis under <u>Section 5.1(f)</u> as well as a reconciliation of consolidated net worth and capital accounts, (b) must be prepared in accordance with GAAP consistently applied and (c) must be prepared by, and include an unqualified audit opinion issued by, an independent certified public accounting firm acceptable to Administrative Agent in its reasonable discretion.  Borrowers shall also deliver no later than thirty (30) days prior to the end of each fiscal year of Borrowers, a comprehensive budget forecasting the revenues, expenses and cash position of each Borrower on a month-to-month basis for the upcoming fiscal year, in form and substance reasonably acceptable to Administrative Agent.  Upon request, Borrowers shall promptly provide any other documentation or information reasonably requested by Administrative Agent and in form and substance reasonable acceptable to Administrative Agent, including but not limited to a current capitalization table of each Borrower.

(h)      *Tax Returns*.  Within fourteen (14) days after the date that any Borrower makes any filing with the IRS relating to its liability for income taxes (or otherwise delivers to any equity owner of Borrowers annual tax or capital information on Form K-1), Borrowers must deliver a complete copy thereof to the Administrative Agent and each Lender.

(i)      *Exclusivity Agreement.*  Contemporaneously with the execution and delivery of this Agreement, Borrowers shall execute and deliver to Administrative Agent the Exclusivity Agreement.

(j)      *Insurance*.  Borrowers shall maintain insurance on the Collateral and Borrowers' businesses in such amounts and in such types as are reasonable and customary for similar businesses. The Collateral insurance shall include a lender's loss payee endorsement in favor of the Administrative Agent. Borrowers shall deliver to Administrative Agent copies of such insurance certificates, on the Closing Date and as requested by Administrative Agent thereafter.

(k)      *Collateral; New Sites; Subsidiaries*.  Loan Parties will warrant and defend the title to the Collateral, and the validity and priority of all Liens granted or otherwise given to Administrative Agent under the Loan Documents, subject only to Permitted Liens, against the claims of all Persons. Without Administrative Agent's prior written consent, Loan Parties shall not create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Collateral or any direct legal or beneficial ownership interest in Borrowers or any other Pledged Entities (as defined in the Pledge Agreement)(including any Person required to be joined as a Borrower hereunder pursuant to <u>Section 5.1(m)</u> hereof), except Liens in

favor of Administrative Agent and Permitted Liens. At all times Borrowers shall maintain Eligible Inventory compromised of not less than thirty-five (35) vehicles. Borrowers may not transfer any Collateral into a Subsidiary, an Affiliate or any other Person without the prior written consent of Administrative Agent. Concurrently with each delivery by Borrowers of quarterly financial statements pursuant to Section 4.1(f) hereof, Borrowers will provide an updated Schedule 4.1(j) hereof reflecting any new Site acquired by a Borrower, or removing any Site at which a Borrower has terminated operations, in each case, since the most recent update to Schedule 4.1(j) delivered hereunder.

(l)     *Books and Records; Inspection and Examination*. Each Loan Party will keep accurate books of record and account for itself pertaining to the Collateral, the Sites and the business and financial condition of Borrowers and such other matters as Administrative Agent may from time to time reasonably request in which true and complete entries will be made in accordance with GAAP consistently applied and, upon request of and reasonable notice by Administrative Agent, will permit any officer, employee, auditor, attorney or accountant for Administrative Agent or any Lender to audit, review, make extracts from or copy any and all corporate and financial books and records of any Loan Party at all reasonable times during ordinary business hours, and to discuss the affairs of Loan Parties, including the operation of the Sites, with any of its members, employees or agents and to conduct a review and audit of each Loan Party's books and records (the foregoing is collectively referred to herein as "Audit Activities"). Loan Parties will reimburse Administrative Agent upon demand for all out-of-pocket costs and expenses incurred by Administrative Agent or any Lender in connection with Audit Activities. Without limitation of the foregoing, not less frequently than two (2) times per calendar month for the first three (3) complete calendar months following the Closing Date, and once per calendar month thereafter, Borrowers will prepare and deliver to Administrative Agent, and at Administrative Agent's request shall allow Administrative Agent and/or its designees to perform and/or verify, a detailed floor plan review and audit with respect to Borrowers' business operations, which shall include a reconciliation of all vehicle inventory and sales, the existence and release of all certificates of title therefor, a sources and uses reconciliation for all Borrower cash flows, and such other matters as Administrative Agent may from time to time require.

(m)     *New Subsidiaries and Affiliates*. Concurrently with (i) the formation by any Borrower of any Subsidiary after the Closing Date, or (ii) the formation or acquisition by any Guarantor or any Borrower of any Person constituting an Affiliate of any Guarantor or any Borrower, or any direct or indirect ownership interest by any Guarantor or any Borrower in any other Person operating a car dealership or other automotive business of any type or nature, Loan Parties will deliver to Administrative Agent (A) a joinder to this Agreement of such Person to add such Person as a "Borrower" hereunder and under the other Loan Documents and a "Merchant" under the Exclusivity Agreement, and (B) a joinder to Security Agreement granting to Administrative Agent, for the benefit of the Lenders, a first priority Lien on all assets of, and all ownership interests in, such Person, in each case, in form and substance acceptable to the Administrative Agent.

(n)     *Cash; Deposit Accounts; Certificates of Title*. Commencing on (i) the date which is twenty (20) days following the Closing Date and continuing at all times thereafter, each Borrower shall cause all cash of Borrowers, including all revenues received by each Borrower in connection with the operation of any Site, to be remitted directly to, and be maintained solely in, one or more segregated deposit accounts of Borrowers, subject at all times to a "springing" deposit account control agreement, in form and substance acceptable to Administrative Agent, and (ii) the Closing Date and continuing at all times thereafter, each Borrower shall keep the original certificates of title with respect to all vehicle inventory of such Borrower in a secure, fireproof safe or other customary and secure on-Site storage location, and shall permit Administrative Agent and its designees with access thereto at all times during ordinary business hours for purposes of verifying compliance by Borrowers with the representations, warranties and covenants of Borrowers hereunder.

(o)    For so long as all or any portion of the Loans or any other Obligation remain outstanding Administrative Agent shall have the right, at its sole option, to attend all meetings of the board of managers or equivalent governing body (and all committees thereof) of Borrowers as a non-voting observer.  Borrowers shall (i) give Administrative Agent notice, at the same time as furnished to the members of the board of managers or equivalent governing body (or any committee thereof), (ii) provide to Administrative Agent all notices, documents and information furnished to the such members or board, whether at or in anticipation of a meeting, an action by written consents or otherwise, at the same time as furnished to the such members or board, (iii) notify Administrative Agent by telephone of, and permit Administrative Agent to attend by telephone, emergency meetings of the board of managers or equivalent governing body (and all committees thereof), and (iv) reimburse Administrative Agent for its reasonable out-of-pocket expenses incurred in connection with its rights under this subsection (o).

(p)    *Debt Service Coverage Ratio*.  Commencing with the fiscal quarter of Borrowers ending December 31, 2021 and continuing thereafter, Borrowers, on a consolidated basis, shall maintain the Debt Service Coverage Ratio, as measured on the last day of each fiscal quarter of Borrowers for the period of twelve (12) consecutive calendar months then ended, at not less than 1.50 to 1.00.

(q)    *Other Notices*.  Each Loan Party shall give notice to Administrative Agent as soon as possible, but in any event no later than five (5) days after it becomes aware of (i) any litigation, investigation, or other adverse change with respect to itself or any other Loan Party, along with any and all pleadings or other materials relating to the same; and (ii) any default by any Loan Party on any other obligation in excess of $25,000 or other defaults under any material contract, along with a copy of any documentation received by such Loan Party pertaining to the same.  Borrowers shall also provide copies of any amendments or modifications to any Westlake Financing Documents to Administrative Agent within five (5) days of executing the same.

6.    <u>NEGATIVE COVENANTS</u>.

6.1    <u>Negative Covenants</u>.  During the term of this Agreement, and thereafter for so long as there are Obligations outstanding, each Loan Party hereby covenants that unless Administrative Agent and each Lender has first consented thereto in writing, it will not (directly or indirectly), with respect to Borrowers, and will not permit Borrowers or any Subsidiary of the foregoing to:

(a)    *Indebtedness*.  Incur, create or assume any Debt, other than Permitted Debt, or provide any Debt to any other Person.

(b)    *Liens*.  Incur, create, assume or suffer to exist any Lien on any of its Property or assets, whether now owned or hereinafter acquired other than Permitted Liens.

(c)    *Line of Business*.  Enter into any business, directly or indirectly, except for (i) those businesses in which Borrowers are engaged on the Closing Date or that are reasonably related thereto, and (ii) other businesses, the entering into of which by Borrowers could not be reasonably expected to cause a material adverse effect on any Borrower's financial condition, the ability of any Borrower to perform its obligations under any of the Loan Documents or the ability of Borrowers to utilize credit card processing and other related services provided by any Lender or any of its Affiliates.

(d)    *Transactions With Affiliates*.  Enter into, or permit to exist, any transaction or agreement with any Affiliate except transactions and agreements in the ordinary course and on terms and conditions not less favorable to them than could be obtained on an arm's-length basis from unrelated third parties.

(e)     *Restricted Payments*.  Make any Restricted Payment, or incur any obligation (contingent or otherwise) to do so.

(f)     *Certain Prohibited Actions*.  Directly or indirectly do any of the following: (i) change its principal place of business or chief executive office without first giving Administrative Agent and each Lender thirty (30) days' prior notice; (ii) make or permit any change, amendment or modification to its certificate of formation or incorporation, operating agreement, by-laws or other organizational documents; (iii) cancel or otherwise forgive or release any claim or Debt owed to such Person by any other Person, except for adequate consideration and in the ordinary course of such Person's business in its reasonable judgment; (iv) take any action which could result in Administrative Agent and the Lenders not having a perfected Lien in all of the assets of and the ownership interests in Borrowers, subject only to Permitted Liens; (v) sell, lease, assign, transfer or otherwise dispose of any Collateral, any Site or any other material portion of such Person's Property; (vi) consolidate with or merge into any Person, or permit any other Person to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all the assets of any other Person; (vii) purchase or acquire, or make any commitment to purchase or acquire any equity interests of any kind of, or any obligations or other securities of, or any interest in, any Person, including the establishment or creation of any Subsidiary hereunder and with respect to which Loan Parties have complied with the requirements of Section 5.1(n) hereof; (viii) make or purchase, or commit to make or purchase, any advance, loan, extension of credit or capital contribution to or any other investment in, any Person; (ix) liquidate, dissolve or suspend its business operations; or (x) acquire or permit an Affiliate to acquire any loans or other debt securities.

(g)     *Insolvency*.  File a petition for bankruptcy under any Debtor Relief Law, request for reorganization or liquidation, or otherwise become insolvent, seek appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or make a general assignment for the benefit of its creditors.

(h)     *Organizational Documents*.  Amend or repeal any Loan Party's Organizational Agreements.

(i)     *Alteration of Rights*.  Otherwise alter the rights and preferences under any Loan Document.

(j)     *Amending Westlake Financing Documents*.  Amend any Westlake Financing Document in a manner which would cause the (1) aggregate debt owed by Borrowers and their respective Affiliates to exceed the maximum principle amount of $1,000,000 or (2) commitment of Westlake to equal an amount in excess of $1,000,000.

7.     <u>EVENTS OF DEFAULT</u>.

7.1     <u>List of Events of Default</u>.  The occurrence of any one or more of the following conditions or events shall constitute an "<u>Event of Default</u>":

(a)     *Failure to Pay*.  Borrowers fail to pay (i) any principal amount of the Loans when due or (ii) interest, fees or any other amount when due under the Loan Documents and such failure continues for five (5) calendar days following receipt by Borrowers of written notice from Administrative Agent of such failure.

(b)     *Breach of Representations and Warranties*.  Any representation or warranty made or deemed made by any Loan Party to Administrative Agent and/or Lender in any Loan Document is incorrect on the date as of which such representation or warranty was made or deemed made.

(c)    *Breach of Covenants*.  Any Loan Party fails to perform or observe any other covenant, condition or agreement of (i) <u>Sections 5</u> or <u>6</u> of this Agreement; or (ii) any other provision of this Agreement or any of the other Loan Documents (other than to the extent the same constitutes an Event of Default under any provision of this <u>Section 7.1</u> other than this <u>Section 7.1(c)(ii)</u>, and such event or circumstance, if capable of being cured, is not cured within (A) thirty (30) days following the occurrence thereof either; or (B) if shorter, the applicable grace period, if any, specified in such other Loan Document.

(d)    *Cross-Defaults*.  Any Loan Party fails to pay when due any of its other Debt in excess of $25,000 in the aggregate, or, in each case, any interest or premium thereon when due (whether by scheduled maturity, acceleration, demand or otherwise), and such failure continues after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt (except for Debt arising under the Loan Documents).

(e)    *Bankruptcy*.  (i) Any Loan Party or any of its Subsidiaries commences any case, proceeding or other action (A) under any existing or future Law relating to bankruptcy, insolvency, reorganization, or other relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or any Loan Party or any of its Subsidiaries makes a general assignment for the benefit of its creditors; (ii) there is commenced against any Loan Party or any of its Subsidiaries any case, proceeding or other action of a nature referred to in <u>Section 7.1(e)(i)</u> above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of thirty (30) days; (iii) there is commenced against any Loan Party or any Subsidiary any case, proceeding or other action seeking issuance of a warrant of attachment, execution or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which has not been vacated, discharged, or stayed or bonded pending appeal within thirty (30) days from the entry thereof; (iv) any Loan Party or any of its Subsidiaries takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in <u>Section 7.1(e)(i)</u>, <u>Section 7.1(e)(ii)</u> or <u>Section 7.1(e)(iii)</u> above; or (v) any Loan Party or any of its Subsidiaries is generally not, or shall be unable to, or admits in writing its inability to, pay its debts as they become due.

(f)    *Judgments*.  One or more judgments or decrees aggregating at least $50,000 shall be entered against any Loan Party or any of its Subsidiaries and all of such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within sixty (60) days from the entry thereof.

(g)    *Exclusivity Agreement*.  Any material breach of (or default under) (subject to applicable cure periods), or any early termination or non-renewal of the Exclusivity Agreement.

(h)    *Change in Condition*.  If the Administrative Agent shall have determined in its sole but reasonable discretion that one or more conditions exist or events have occurred which have resulted or may result in a material adverse change in the business, properties or financial condition of the Borrowers.

(i)    *Change of Control; Guarantors*.  The occurrence of any Change of Control; or the death or permanent incapacitation of any Guarantor that is a natural Person.

(h)    *Criminal Acts.*  Any Loan Party or Related Party of the foregoing is (i) criminally indicted or convicted of a felony; or (ii) charged under any applicable law that could reasonably be expected

to lead to forfeiture of any material portion of the Collateral or a material adverse effect on the financial condition, business prospects, properties or operations of such Person.

8.    REMEDIES.

8.1    Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Administrative Agent may at its option, take any action that it deems advisable to protect and enforce all available rights and remedies of Administrative Agent and the Lenders hereunder, under each of the other Loan Documents or which may otherwise be available at law or in equity, including, without limitation, all rights and remedies with respect to Borrowers, each other Loan Party or the Collateral; and Administrative Agent may, at its option and without notice or demand (a) declare all outstanding Obligations owing or payable hereunder or under any other Loan Document to be immediately due and payable and terminate all Commitments of Lenders hereunder, and when any Event of Default described in subsection (e) of Section 7.1 exists, then all outstanding Obligations shall immediately and automatically become due and payable together with all other amounts payable under the Loan Documents without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Borrowers and each other Loan Party; (c) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents; and (d) exercise any or all of its rights, powers or remedies under Applicable Law.  Notwithstanding the foregoing, if any Event of Default shall occur under Section 7.1(e), the principal of and accrued interest on the Loans shall become immediately due and payable, and all Commitments of Lenders hereunder shall terminate, without any notice, declaration or other act on the part of the Administrative Agent or any Lender.

8.2    If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of Borrowers or any other Loan Party against any and all of the obligations of Borrowers or such other Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or its Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of Borrowers or such other Loan Party may be contingent or unmatured or are owed to a branch office or Affiliate of such Lender different from the branch office or Affiliate holding such deposit or obligated on such Debt.  The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.  Each Lender agrees to notify Borrowers and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

8.3    *Standards for Exercising Remedies*.  To the extent that applicable law imposes duties on the Administrative Agent and/or Lender to exercise remedies in a commercially reasonable manner, each Loan Party acknowledges and agrees that it is not commercially unreasonable for the Administrative Agent and/or Lender (a) to fail to incur expenses deemed significant by the Administrative Agent and/or Lender to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection

22

agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as the Borrowers or any other Loan Party, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure the Administrative Agent and/or Lender against risks of loss, collection or disposition of Collateral or to provide to the Administrative Agent and/or Lender a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by the Administrative Agent and/or Lender, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Lender in the collection or disposition of any of the Collateral. Each Loan Party acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by the Administrative Agent and/or Lender would not be commercially unreasonable in the Administrative Agent's and/or Lender's exercise of remedies against the Collateral and that other actions or omissions by the Administrative Agent and/or Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section. Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any rights to the Borrowers or to impose any duties on the Administrative Agent and/or Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section.

9.    <u>WAIVERS</u>.

Failure by Administrative Agent or any Lender to exercise any right, remedy or option under this Agreement, any other Loan Document, any other documents relating to the Obligations, or as provided by Applicable Law, or any delay by Administrative Agent or any Lender in exercising the same, shall not operate as a waiver of any such right, remedy or option. No waiver hereunder shall be effective unless it is in writing, signed by the party against whom such waiver is sought to be enforced and then only to the extent specifically stated, which in the case of the Administrative Agent or any Lender shall only be granted as provided herein. To the extent permitted by Applicable Law, neither the Administrative Agent nor any Lender, nor any party acting as attorney for the Administrative Agent or any Lender, shall be liable hereunder for any acts or omissions or for any error of judgment or mistake of fact or law other than their gross negligence or willful misconduct hereunder. The rights and remedies of the Administrative Agent and the Lenders under this Agreement shall be cumulative and not exclusive of any other right or remedy that the Administrative Agent or the Lenders may have.

10.    <u>NOTICES</u>.

　　10.1    *Written Notices*.

　　　　(a)    All notices and other communications to any party herein to be effective shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

If to Borrowers or Guarantors:

c/o Karma of Palm Beach, Inc.
1001 Clint Moore Road, Unit B
Boca Raton, FL 33487
Attn: Scott Zankl

If to Administrative Agent and/or Lenders:

c/o FVP Servicing, LLC
1202 Broadway, 7th Floor
New York, NY 10001
Attn: Keith Lee / Tom Betts
Telephone: 646.902.6645
E-mail:klee@feenixpartners.com / tbetts@feenixpartners.com

(b)　　Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and (ii) sent by e-mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by a return e-mail or other written acknowledgment).

(c)　　Any party hereto may change its address for notices and other communications hereunder by notice to the other parties hereto.  All such notices and other communications shall, when transmitted by overnight delivery, be effective when delivered for overnight (next-day) delivery, or if mailed, upon the third Business Day after the date deposited into the mails or if delivered, upon delivery; provided, that notices delivered to Lenders shall not be effective until actually received by such Person at its address specified in this Section 10.

(d)　　Any agreement of Administrative Agent or any Lender herein to receive certain notices by telephone or e-mail is solely for the convenience and at the request of Borrowers.  Administrative Agent and each Lender shall be entitled to rely on the authority of any Person purporting to be a Person authorized by a Loan Party to give such notice and neither Administrative Agent nor any Lender shall have any liability to any Loan Party or other Person on account of any action taken or not taken by Administrative Agent or any Lender in reliance upon such telephonic or e-mail notice.  The obligation of Borrowers to repay the Loans and all other Obligations and hereunder shall not be affected in any way or to any extent by any failure of Administrative Agent or any Lender to receive written confirmation of any telephonic or e-mail notice or the receipt by Administrative Agent or any Lender of a confirmation which is at variance with the terms understood by Administrative Agent or any Lender to be contained in any such telephonic or e-mail notice.

10.2　　*Electronic Communications*.

(a)　　Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and internet or intranet websites) pursuant to procedures approved by Administrative Agent; provided that the foregoing shall not apply to notices to Administrative Agent or any Lender pursuant to Section 2 hereof unless Administrative Agent or such Lender has agreed to receive notices under such Section by electronic communication and have agreed to the procedures governing such communications. Any Party may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(b)　　Unless Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by a return e-mail or other written acknowledgement); provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted

24

to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

11.    EXPENSES AND INDEMNIFICATION.

11.1    Costs and Expenses.  Borrowers shall reimburse Administrative Agent and each Lender upon demand for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Administrative Agent and each Lender in connection with the Loans and other transactions contemplated hereby, including (i) the preparation, negotiation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby; (ii) Borrowers' ongoing performance under and compliance with the Loan Documents, including confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications of or under any Loan Document and any other documents or matters requested by Administrative Agent; (iv) filing and recording of any Loan Documents; (v) the creation, perfection or protection of Administrative Agent's and Lenders' Liens in the Collateral (including fees and expenses for title and lien searches, intangibles taxes, personal property taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports, surveys and engineering reports); (vi) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting any Borrower, any other Loan Party, the Loan Documents, the Collateral, or any other security given for the Obligations; and (vii) enforcing any obligations of or collecting any payments due from any Borrower or any other Loan Party under any Loan Document or with respect to the Collateral or in connection with any refinancing or restructuring of the Loans in the nature of a "work-out", or any insolvency or bankruptcy proceedings.  All obligations provided for in this Section 11.1 shall survive the termination of this Agreement and/or the repayment of the Obligations.

11.2    Indemnity.  Each Borrower shall indemnify Administrative Agent and each Lender, each Affiliate and Subsidiary of Administrative Agent and each Lender, and each investment manager, servicer, partner, member, officer, director, employee, agent and advisor of Administrative Agent and each Lender (each, an "Indemnitee") against, defend and hold each of them harmless from, any and all Specified Losses (defined below) unless such Specified Losses incurred by any such Indemnitee are determined by a court of competent jurisdiction in a final and non-appealable judgment to have resulted from (i) the gross negligence or willful misconduct of such Indemnitee; or (ii) a claim brought by any Borrower, any other Loan Party or any third Person against such Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document.  For purposes of this Section, the term "Specified Losses" means all costs, losses, liabilities, claims, damages and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, which may be incurred by any Indemnitee, or asserted against any Indemnitee by Borrowers, any other Loan Party or any third Person, arising out of, in connection with or as a result of (a) the execution or delivery of this Agreement or any other agreement or instrument contemplated hereby and the performance by Administrative Agent or any Lender of its respective obligations hereunder or the consummation of any of the transactions contemplated hereby, (b) any Loan or any actual use of the proceeds therefrom, (c) any actual claim, litigation, investigation or proceeding relating to any of the foregoing, or (d) any actual claim, litigation or proceeding by any third party, so long as all Indemnitees are in compliance with Applicable Law related to such third party, collections or exercise of remedies relating to any third party.  Borrowers shall pay, and hold Lender harmless from and against, any and all present and future stamp, documentary, and other similar taxes with respect to this Agreement and any other Loan Documents, any collateral described therein, or any payments due thereunder, and save Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission to pay such taxes.

11.3    Taxes.  Borrowers shall pay, and hold Lender harmless from and against, any and all present and future stamp, documentary, and other similar taxes with respect to this Agreement and any other Loan Documents, any collateral described therein, or any payments due thereunder, and save Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission to pay such taxes.

11.4    Reimbursement by Lenders.  To the extent that Borrowers for any reason fail to indefeasibly pay any amount required under this Section 11 to be paid by them to the Administrative Agent (or any sub-agent thereof) or any Related Party thereof, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender), such payment to be made severally among them (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought), provided, further that, the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), or against any Related Party thereof acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this Section 11.4 are subject to the provisions of Section 2.1(b).

11.5    Waiver of Damages.  To the fullest extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, and acknowledges that no other Person shall have, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in Section 11.2 above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

11.6    Payment.  All amounts due under this Section shall be payable promptly after written demand therefor.

11.7    Survival.  The agreements and indemnity provisions of this Section 11 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Obligations.

11.8    Payments Set Aside.  To the extent that any payment by or on behalf of Borrowers or any other Loan Party is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the federal funds rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

4869-1815-9362.7

12.     <u>ADMINISTRATIVE AGENT</u>.

12.1     <u>Appointment and Authority</u>.    Each of the Lenders hereby irrevocably appoints the Administrative Agent to act on its behalf as the administrative agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are incidental thereto.  The provisions of this Section are solely for the benefit of the Administrative Agent and the Lenders, and Borrowers shall have no rights as third-party beneficiaries of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law.  Instead such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties.

12.2     <u>Rights as a Lender</u>.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  The Administrative Agent and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Loan Party or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

12.3     <u>Exculpatory Provisions</u>.

(a)     The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  The parties do not intend to create any agency, partnership, joint venture, trust, fiduciary or other relationship with duties or incidents different from those of parties to an arm's-length contract.  Without limiting the generality of the foregoing, the Administrative Agent (a) shall not be subject to any fiduciary or other implied duties except as expressly set forth in this Agreement, regardless of whether a Default has occurred and is continuing; (b) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Lenders, <u>provided</u> that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law; and (c) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Loan Party or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

(b)     The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Lenders or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given in writing to the Administrative Agent by any Loan Party, or a Lender.

(c)      The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

12.4      Reliance by Administrative Agent.  The Administrative Agent shall be entitled to reasonably rely upon, and shall not incur any liability for reasonably relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may reasonably rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is reasonably satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The Loan Parties shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of such Loan Party.

12.5      Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Section shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

12.6      Resignation of Administrative Agent.  The Administrative Agent may resign as Administrative Agent at any time by giving thirty (30) days advance notice thereof to the Lenders and Borrowers and, thereafter, the retiring Administrative Agent shall be discharged from its duties and obligations hereunder.  Upon any such resignation, the Lenders shall have the right to appoint a successor Administrative Agent.  If no successor Administrative Agent shall have been so appointed by the Lenders, or have accepted such appointment within thirty (30) days after the Administrative Agent's giving of notice of resignation, then the Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all rights, powers, privileges and duties of the retiring Administrative Agent.  After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this Section 12.6 shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by

28

it while it was acting as Administrative Agent. If no successor has accepted appointment as Administrative Agent by the date which is thirty (30) days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Lenders appoint a successor agent as provided for above.

12.7    Non-Reliance on Administrative Agent and Other Lenders. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

12.8    Administrative Agent May File Proofs of Claim. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to Borrowers, the Administrative Agent (irrespective of whether the principal of the Loans shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

(c)    and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent hereunder.

13.    MISCELLANEOUS.

13.1    Entire Agreement; Amendment. This Agreement and the other Loan Documents embody the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, and any prior agreements, whether written or oral, with respect thereof, are expressly superseded hereby. This Agreement, or any term contained herein, may not be modified, waived or amended except by an agreement in writing signed by Borrowers and the Administrative Agent.

13.2    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that no Loan Party may assign this Agreement, any other Loan Document, or any right or benefit hereunder to any Person. Any Lender may assign any or all of its rights and obligations hereunder at any time and to any Person, upon Administrative Agent's prior written consent and the execution and delivery of an assignment and assumption agreement by such assigning Lender to the proposed assignee, in form and substance acceptable to Administrative

Agent. From and after the effective date of any such assignment, the assignee shall be a party to this Agreement and, to the extent of the interest assigned, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Lender, be released from its obligations under this Agreement. Upon request, Borrowers shall execute and deliver a Note to the assignee Lender. Subject to the foregoing, any Lender shall have the right to enter into one or more participations with respect to the Obligations without prior notice or consent of Borrowers.

13.3    <u>Governing Law</u>. This Agreement and the other Loan Documents and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any of the other Loan Documents and the transactions contemplated hereby shall be governed by the laws of the State of New York.

13.4    <u>Submission to Jurisdiction</u>.

(a)    Each Loan Party hereby irrevocably and unconditionally (i) agrees that any legal action, suit or proceeding arising out of or relating to this Agreement and the other Loan Documents may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit or proceeding. Final judgment against any Loan Party in any action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment. Nothing in this <u>Section 13.4</u> shall affect the right of Administrative Agent and each Lender to (i) commence legal proceedings or otherwise sue any Loan Party in any other court having jurisdiction over such Loan Party or (ii) serve process upon any Loan Party in any manner authorized by the laws of any such jurisdiction.

(b)    In accordance with Rule 9, Accelerated Adjudication Actions, as set forth in Section 202.70(g) of the Rules of the Commercial Division of the Supreme Court, subject to the requirements for a case to be heard in the Commercial Division of the Supreme Court of the State of New York, Borrowers hereby agree to submit to the exclusive jurisdiction of the Commercial Division, New York State Supreme Court, and to the application of the such Court's accelerated procedures, in connection with any dispute, claim or controversy arising out of or relating to this Agreement or any other Loan Document, or the breach, termination, enforcement or validity thereof.

13.5    <u>Venue</u>. Each Loan Party irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement and the other Loan Documents in any court referred to in <u>Section 13.4</u> and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

13.6    <u>Advertising</u>. Administrative Agent and each Lender, and their affiliates, in their sole and absolute discretion, may disclose publicly (including on its website) for marketing and promotional purposes that the Borrowers are in such Administrative Agent's and Lender's portfolio, including but not limited to a royalty-free, non-exclusive, worldwide, irrevocable license in any intellectual property for use solely in marketing and promotional materials.

13.7    <u>Waiver of Jury Trial</u>. EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY.

13.8    Counterparts; Effectiveness. This Agreement and the other Loan Documents and any amendments, waivers, consents or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

13.9    Waiver of Notice. Each Loan Party hereby waives demand for payment, presentment for payment, protest, notice of payment, notice of dishonor, notice of nonpayment, notice of acceleration of maturity and diligence in taking any action to collect sums owing hereunder.

13.10    USA PATRIOT Act. Administrative Agent and each Lender hereby notifies each Loan Party that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify, and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow Administrative Agent and each Lender to identify such Loan Party in accordance with the USA PATRIOT Act, and each Loan Party agrees to provide such information from time to time to the Administrative Agent.

13.11    Interpretation. For purposes of this Agreement (i) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (ii) the word "or" is not exclusive; and (iii) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  Unless the context otherwise requires, references herein: (x) to Schedules, Exhibits and Sections mean the Schedules, Exhibits and Sections of this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.   This Agreement and the other Loan Documents shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

13.12    Amendments and Waivers. No term of this Agreement may be waived, modified or amended except by an instrument in writing signed by the Parties hereto.  Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

13.13    Headings.  The headings of the various Sections and subsections herein are for reference only and shall not define, modify, expand or limit any of the terms or provisions hereof.

13.14    No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising on the part of the Administrative Agent or any Lender, of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Applicable Law.

13.15    Electronic Execution. The words "execution," "signed," "signature," and words of similar import in this Agreement shall be deemed to include electronic or digital signatures or the keeping of records in electronic form, each of which shall be of the same effect, validity and enforceability as manually executed signatures or a paper-based recordkeeping system, as the case may be, to the extent and as provided for under Applicable Law, including the Electronic Signatures in Global and National Commerce

31

Act of 2000 (15 USC § 7001 et seq.), the Electronic Signatures and Records Act of 1999 (N.Y. State Tech. Law §§ 301-309), or any other similar state laws based on the Uniform Electronic Transactions Act.

13.16    Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

13.17    Joint and Several Obligations. The obligations of each Borrower hereunder and under each of the other Loan Documents are joint and several. Each reference to the term "Borrower" hereunder or under any other Loan Document shall be deemed to refer to each Borrower, each representation and warranty made by a Borrower hereunder or under any other Loan Document shall be deemed to have been made by each Borrower; each covenant and undertaking on the part of a Borrower hereunder or under any other Loan Document shall be deemed individually applicable with respect to each Borrower; and each event constituting a Default hereunder or under any other Loan Document shall be determined with respect to each Borrower. A separate action or actions may be brought and prosecuted against any Borrower whether an action is brought against any other Borrower or whether any other Borrower is joined in any such action or actions. Each Borrower waives the right to require Administrative Agent to: (a) proceed against any other Borrower; (b) proceed against or exhaust any Collateral held from any other Borrower; or (c) pursue any other remedy in Administrative Agent's power whatsoever. Any consent on the part of a Borrower hereunder or under any other Loan Document shall be effective when provided by any Borrower, and Administrative Agent shall be entitled to rely upon any notice or consent given by any Borrower as being notice and consent given by all Borrowers hereunder and under each other Loan Document. In the event any obligation of a Borrower hereunder and under each other Loan Document is deemed by a court of competent jurisdiction to be an agreement by any Borrower to answer for the debt or default of another Borrower or as a hypothecation of property as security therefor, each Borrower represents, warrants and agrees that: (i) no representation has been made to it as to the creditworthiness of any other Borrower; (ii) it has established an adequate means of obtaining from each other Borrower, on a continuing basis, financial or other information pertaining to each other Borrower's financial condition; (iii) it expressly waives diligence, demand, presentment, protest and notice of every kind and nature whatsoever, consents to the alteration or release by Administrative Agent (in any manner) of any Collateral now or hereafter held in connection with any obligations under any Loan Document, and consents that Administrative Agent and any Borrower may deal with each other in connection with said obligations or otherwise, including the voluntary grant of additional security for the obligations of any Borrower, or alter any contracts now or hereafter existing between them, in any manner whatsoever, including, without limitation, the renewal, extension, acceleration, changes in time for payment, and increases or decreases in any rate of interest or other amounts owing, all without in any way altering the liability of any Borrower, or affecting any security for such obligations. Upon the occurrence and during the continuance of any Default, Administrative Agent is hereby expressly given the right, at its option, to proceed in the enforcement of any Loan Document independently of any other remedy or security it may at any time hold in connection with such Loan Document and it shall not be necessary for Administrative Agent to proceed upon or against and/or exhaust any other security or remedy before proceeding to enforce its rights against any Borrower. Until the Loans and all other Debt or indebtedness under the Loan Documents have been paid in full, each Borrower further waives any right or subrogation, reimbursement, exoneration, contribution, indemnification, setoff or other recourse in respect of sums paid to Lender by any other Borrower. Borrowers do not intend that any Borrower be deemed to be a guarantor.

[signatures appear on following page]

IN WITNESS WHEREOF, the undersigned, by their duly authorized officers, have executed this Agreement and it is effective as of the day and year first above written.

**BORROWERS:**

**KARMA OF BROWARD, INC.,**
a Florida corporation

By:_____
Name: Scott Zankl
Title: President

**KARMA OF PALM BEACH, INC.,**
a Florida corporation

By:_____
Name: Scott Zankl
Title: President

**GUARANTORS:**

_____
**SCOTT ZANKL**

_____
**KRISTEN ZANKL**

*[Signature Page – Loan Agreement]*

**ADMINISTRATIVE AGENT:**

**FVP SERVICING, LLC**,
a Delaware limited liability company

By: _keith lee_____
Name:   Keith Lee
Title:   Manager


**LENDERS:**

**FVP OPPORTUNITY FUND III, LP**,
a Delaware limited partnership


By:  FVP Fund III GP, LLC, its General Partner

By: _keith lee_____
Name:   Keith Lee
Title:   Manager

**FVP INVESTMENTS, LLC**,
a Delaware limited liability company

By: _keith lee_____
Name:   Keith Lee
Title:   Manager


*[Signature Page – Loan Agreement]*
4869-1815-9362.7

**SCHEDULE I TO LOAN AGREEMENT**

**LENDER COMMITMENT SCHEDULE**

| LENDER | COMMITMENT |
|---|---|
| FVP Opportunity Fund III, LP | $4,500,000.00 |
| FVP Investments, LLC | $3,000,000.00*<br>*Subject Commitment limited to Advances in respect of the Delayed Draw Term Loan. |

**SCHEDULE 4.1(O) TO LOAN AGREEMENT**

**LOAN PARTY CAPITALIZATION**

**KARMA OF BROWARD, INC.**

| Name | Ownership |
|---|---|
| Scott Zankl | 50% |
| Kristen Zankl | 50% |
| | |
| Total | 100.00% |

**KARMA OF PALM BEACH, INC.**

| Name | Ownership |
|---|---|
| Scott Zankl | 50% |
| Kristen Zankl | 50% |
| | |
| Total | 100.00% |

**SCHEDULE 4.1(J) TO LOAN AGREEMENT**

**SITES**

| LOAN PARTY | SITE ADDRESS | CONCEPT | FEE OR LEASED/REMAINING LEASE TERM |
|---|---|---|---|
| Karma of Broward, Inc. | 1717 17th Street Ft. Lauderdale, FL 33316 | Auto Dealership | 10 years |
| Karma of Palm Beach, Inc. | 1001 Clint Moore Road Boca Raton, FL 33487 | Auto Dealership | 10 years |

**EXHIBIT A TO LOAN AGREEMENT**

**NOTE**

$4,500,000.00                                                                January 26, 2022

       **FOR VALUE RECEIVED, KARMA OF PALM BEACH, INC.**, a Florida corporation ("Palm Beach") and **KARMA OF BROWARD, INC.**, a Florida corporation ("Broward"; Palm Beach and Broward, each, a "Borrower" and collectively, "Borrowers"), on a joint and several basis, hereby promise to pay to the order of **FVP SERVICING, LLC**, a Delaware limited liability company, as administrative agent ("Administrative Agent"), for the benefit of **FVP OPPORTUNITY FUND III, LP**, a Delaware limited partnership (the "Noteholder"), the principal amount of FOUR MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($4,500,000.00) (or, if less, the aggregate outstanding principal amount of all Advances to Borrowers in respect of the Loans) held by Noteholder, in accordance with the provisions of that certain Loan Agreement dated as of January 26, 2022, by and among Borrowers, the Noteholder, the other Lenders party thereto, Administrative Agent and the other Loan Parties party thereto (the "Loan Agreement").  Capitalized terms used herein shall have the meanings set forth in the Loan Agreement.

Borrowers promise to pay interest on the unpaid principal amount of this Note (this "Note") at such interest rates and at such times as provided in the Loan Agreement.  All payments of principal and interest shall be made to Administrative Agent, for the benefit Noteholder, in immediately available funds by wire, checks or money orders made payable to Administrative Agent in accordance with Section 2.2 of the Loan Agreement.  If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest at a rate, to be paid as set forth in the Loan Agreement.

This Note is entitled to the benefits of the Loan Agreement and may be prepaid in whole or in part subject to the terms and conditions provided therein.  Upon the occurrence and continuation of one or more of the Events of Default specified in the Loan Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as and to the extent provided in the Loan Agreement.  Administrative Agent may attach schedules to this Note and endorse thereon the date, amount and maturity of its Advances under the Loan Agreement and payments with respect thereto.

Each Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[Execution Page Follows]

IN WITNESS WHEREOF, Borrowers have caused this Note to be executed and delivered and it is effective as of the date first written above.

**KARMA OF BROWARD, INC.,**
a Florida corporation

By:_____
Name:
Title:

**KARMA OF PALM BEACH, INC.,**
a Florida corporation

By:_____
Name:
Title:

**NOTE**

$3,000,000.00                                                                                                    January 26, 2022

       **FOR VALUE RECEIVED, KARMA OF PALM BEACH, INC.**, a Florida corporation ("Palm Beach") and **KARMA OF BROWARD, INC.**, a Florida corporation ("Broward"; Palm Beach and Broward, each, a "Borrower" and collectively, "Borrowers"), on a joint and several basis, hereby promise to pay to the order of **FVP SERVICING, LLC**, a Delaware limited liability company, as administrative agent ("Administrative Agent"), for the benefit of **FVP INVESTMENTS, LLC**, a Delaware limited liability company (the "Noteholder"), the principal amount of THREE MILLION AND 00/100 DOLLARS ($3,000,000.00) (or, if less, the aggregate outstanding principal amount of all Advances to Borrowers in respect of the Loans) held by Noteholder, in accordance with the provisions of that certain Loan Agreement dated as of January 26, 2022, by and among Borrowers, the Noteholder, the other Lenders party thereto, Administrative Agent and the other Loan Parties party thereto (the "Loan Agreement"). Capitalized terms used herein shall have the meanings set forth in the Loan Agreement.

Borrowers promise to pay interest on the unpaid principal amount of this Note (this "Note") at such interest rates and at such times as provided in the Loan Agreement. All payments of principal and interest shall be made to Administrative Agent, for the benefit Noteholder, in immediately available funds by wire, checks or money orders made payable to Administrative Agent in accordance with Section 2.2 of the Loan Agreement. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest at a rate, to be paid as set forth in the Loan Agreement.

This Note is entitled to the benefits of the Loan Agreement and may be prepaid in whole or in part subject to the terms and conditions provided therein. Upon the occurrence and continuation of one or more of the Events of Default specified in the Loan Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as and to the extent provided in the Loan Agreement. Administrative Agent may attach schedules to this Note and endorse thereon the date, amount and maturity of its Advances under the Loan Agreement and payments with respect thereto.

Each Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[Execution Page Follows]

IN WITNESS WHEREOF, Borrowers have caused this Note to be executed and delivered and it is effective as of the date first written above.

**KARMA OF BROWARD, INC.,**
a Florida corporation

By:_____
Name:
Title:

**KARMA OF PALM BEACH, INC.,**
a Florida corporation

By:_____
Name:
Title:

**EXHIBIT B TO LOAN AGREEMENT**

**FLOW OF FUNDS MEMORANDUM (CLOSING DATE TERM LOAN)**

| Source of Funds: | Amount | |
|---|---|---|
| Loan Proceeds | $3,500,000.00 | |

| Use of Funds | Amount | Payee/Wire Transfer Instructions |
|---|---|---|
| Net Proceeds to Borrower | $2,913,133.55 | Bank Name:  JPMorgan Chase Bank<br>Bank Address: 240 E. Palmetto Park Road<br>           Boca Raton, FL 33432<br>Account Name:  Karma Broward<br>ABA Routing #:  021000021<br>Account #:  705157995<br>Reference:  Karma |
| Payoff of Existing Debt to Quick Shift Capital, LLC | $487,996.45 | Bank Name:  Synovus Bank<br>Bank Address: 1048 Broadway, Columbus, GA 31901<br>Account Name:  Quick Shift Capital, LLC<br>ABA Routing #:  061100606<br>Account #:  1015599176<br>Reference:  Karma |
| Commitment Fee to Lenders | $75,000.00 | To be withheld by Administrative Agent from Loan proceeds and applied to payment. |
| Attorneys' Fees of Administrative Agent and the Lenders | $23,870.00 | Bank Name:  First National Bank of Omaha<br>Bank Address: 1620 Dodge Street, Omaha, Nebraska<br>Account Name:  Kutak Rock LLP<br>ABA Routing #:  104000016<br>Account #:  24-690470<br>Reference:  Matter #1700101-54 |

**EXHIBIT C TO LOAN AGREEMENT**

**FORM OF DELAYED DRAW LOAN ADVANCE REQUEST**

**[DATE]**

FVP Servicing, LLC
325 Hudson Street, 4th Floor
New York, NY 10013
Attn: Keith Lee / Tom Betts
Telephone: 646.902.6645
E-mail: klee@feenixpartners.com / tbetts@feenixpartners.com

Re:    Request for Advance under that certain Loan Agreement (the "Loan Agreement") dated as of January 26, 2022, by and among Karma of Broward, Inc. and Karma of Palm Beach, Inc. (each, a "Borrower" and, collectively, "Borrowers"), FVP Servicing, LLC, a Delaware limited liability company, as administrative agent for the "Lenders" party thereto from time to time (the "Administrative Agent") and the other parties thereto from time to time. Capitalized terms used herein shall have the meanings set forth in the Loan Agreement.

Ladies and Gentlemen:

The undersigned Borrowers hereby delivers this Delayed Draw Loan Advance Request to the Administrative Agent and the Lenders and hereby request the Lenders to advance the requested funds to Borrowers in accordance with and in reliance upon the following instructions and certifications:

| 1. | Facility Requested | Delayed Draw Term Loan |
|---|---|---|
| 2. | Total Amount Requested | $[1,000,000.00] |
| 3. | Requested Settlement Date | [_____], 20[__] |

In connection with this Delayed Draw Loan Advance Request, the undersigned Borrowers hereby represent and certify to the Administrative Agent and the Lenders as follows, which representations and certifications are accurate and complete as of the date hereof and as of the Settlement Date for the Advance requested hereunder: (i) the proceeds of the requested Advance will be used for purposes that are authorized under the Loan Agreement and otherwise in compliance with the terms of the Loan Agreement; and (ii) all conditions precedent for the Advances requested hereby under the Loan Agreement, as set forth in Section 3.2 of the Loan Agreement, have been satisfied.

The Lenders and Administrative Agent are hereby irrevocably authorized and instructed to arrange for and to disburse the proceeds of the requested Advance in accordance with the instructions below:

Bank: [_____]
Routing No.: [_____]
Account No.: [_____]
Account Name: [_____]

**IN WITNESS WHEREOF**, this Delayed Draw Loan Advance Request is hereby executed, delivered and effective as of the date first written above.

Very truly yours,

**KARMA OF BROWARD, INC.,**
a Florida corporation

By:_____
Name:
Title:

**KARMA OF PALM BEACH, INC.,**
a Florida corporation

By:_____
Name:
Title:

# EXHIBIT C

## NOTE

$3,000,000.00                                                                January 26, 2022

      **FOR VALUE RECEIVED, KARMA OF PALM BEACH, INC.**, a Florida corporation ("Palm Beach") and **KARMA OF BROWARD, INC.**, a Florida corporation ("Broward"; Palm Beach and Broward, each a "Borrower" and collectively, "Borrowers"), on a joint and several basis, hereby promise to pay to the order of **FVP SERVICING, LLC**, a Delaware limited liability company, as administrative agent ("Administrative Agent"), for the benefit of **FVP INVESTMENTS, LLC**, a Delaware limited liability company (the "Noteholder"), the principal amount of THREE MILLION AND 00/100 DOLLARS ($3,000,000.00) (or, if less, the aggregate outstanding principal amount of all Advances to Borrowers in respect of the Loans) held by Noteholder, in accordance with the provisions of that certain Loan Agreement dated as of January 26, 2022, by and among Borrowers, the Noteholder, the other Lenders party thereto, Administrative Agent and the other Loan Parties party thereto (the "Loan Agreement"). Capitalized terms used herein shall have the meanings set forth in the Loan Agreement.

      Borrowers promise to pay interest on the unpaid principal amount of this Note (this "Note") at such interest rates and at such times as provided in the Loan Agreement. All payments of principal and interest shall be made to Administrative Agent, for the benefit Noteholder, in immediately available funds by wire, checks or money orders made payable to Administrative Agent in accordance with Section 2.2 of the Loan Agreement. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest at a rate, to be paid as set forth in the Loan Agreement.

      This Note is entitled to the benefits of the Loan Agreement and may be prepaid in whole or in part subject to the terms and conditions provided therein. Upon the occurrence and continuation of one or more of the Events of Default specified in the Loan Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as and to the extent provided in the Loan Agreement. Administrative Agent may attach schedules to this Note and endorse thereon the date, amount and maturity of its Advances under the Loan Agreement and payments with respect thereto.

      Each Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

      THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[Execution Page Follows]

IN WITNESS WHEREOF, Borrowers have caused this Note to be executed and delivered and it is effective as of the date first written above.

**KARMA OF BROWARD, INC.,**
a Florida corporation

By: _____

Name: Scott Zankl

Title: Pres

**KARMA OF PALM BEACH, INC.,**
a Florida corporation

By: _____

Name: Scott Zankl

Title: Pres

# EXHIBIT D

# NOTE

$4,500,000.00                                                                                                January 26, 2022

       **FOR VALUE RECEIVED, KARMA OF PALM BEACH, INC.**, a Florida corporation ("Palm Beach") and **KARMA OF BROWARD, INC.**, a Florida corporation ("Broward"; Palm Beach and Broward, each, a "Borrower" and collectively, "Borrowers"), on a joint and several basis, hereby promise to pay to the order of **FVP SERVICING, LLC**, a Delaware limited liability company, as administrative agent ("Administrative Agent"), for the benefit of **FVP OPPORTUNITY FUND III, LP**, a Delaware limited partnership (the "Noteholder"), the principal amount of FOUR MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($4,500,000.00) (or, if less, the aggregate outstanding principal amount of all Advances to Borrowers in respect of the Loans) held by Noteholder, in accordance with the provisions of that certain Loan Agreement dated as of January 26, 2022, by and among Borrowers, the Noteholder, the other Lenders party thereto, Administrative Agent and the other Loan Parties party thereto (the "Loan Agreement").  Capitalized terms used herein shall have the meanings set forth in the Loan Agreement.

Borrowers promise to pay interest on the unpaid principal amount of this Note (this "Note") at such interest rates and at such times as provided in the Loan Agreement.  All payments of principal and interest shall be made to Administrative Agent, for the benefit Noteholder, in immediately available funds by wire, checks or money orders made payable to Administrative Agent in accordance with Section 2.2 of the Loan Agreement.  If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest at a rate, to be paid as set forth in the Loan Agreement.

This Note is entitled to the benefits of the Loan Agreement and may be prepaid in whole or in part subject to the terms and conditions provided therein.  Upon the occurrence and continuation of one or more of the Events of Default specified in the Loan Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as and to the extent provided in the Loan Agreement.  Administrative Agent may attach schedules to this Note and endorse thereon the date, amount and maturity of its Advances under the Loan Agreement and payments with respect thereto.

Each Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[Execution Page Follows]

IN WITNESS WHEREOF, Borrowers have caused this Note to be executed and delivered and it is effective as of the date first written above.

**KARMA OF BROWARD, INC.,**
a Florida corporation

By: _____
Name: Scott Zankl
Title: Pres

**KARMA OF PALM BEACH, INC.,**
a Florida corporation

By: _____
Name: Scott Zankl
Title: Pres

# EXHIBIT E

**Exhibit E**

## GUARANTY AGREEMENT

This **GUARANTY AGREEMENT** (this "**Guaranty**") is executed as of January 26, 2022, by **SCOTT ZANKL**, an individual, **KRISTEN ZANKL**, an individual, and each other Person from time to time executing a joinder hereto for purposes of becoming a "Guarantor" hereunder in accordance with Section 5.1(m) of the hereafter defined Loan Agreement (each, a "**Guarantor**" and, collectively, the "**Guarantors**"), for the benefit of **FVP SERVICING, LLC**, in its capacity as administrative agent for the Lenders under the Loan Agreement (as defined below) (the "**Administrative Agent**"), and the Lenders from time to time party to the Loan Agreement.  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such term in the Loan Agreement.

## W I T N E S S E T H:

A.      Pursuant to that certain Loan Agreement dated of even date herewith (as the same may be amended, modified, supplemented, replaced or otherwise modified from time to time, the "**Loan Agreement**") by and among Karma of Broward, Inc. and Karma of Palm Beach, Inc., as borrowers (individually and collectively, "**Borrower**"), Guarantors, Administrative Agent and the Lenders party thereto, Lenders have agreed to make certain term loans to Borrower in the aggregate original principal amount of up to $7,500,000.00 (collectively, the "**Loan**").  Lenders are not willing to make the Loan, or otherwise extend credit, to Borrower unless each Guarantor unconditionally guarantees the payment and performance to Lenders of the Guaranteed Obligations (as herein defined).

B.      Each Guarantor will directly benefit from Lender's making the Loan to Borrower.

NOW, THEREFORE, as an inducement to Lenders to make the Loan to Borrower and to extend such additional credit as Lenders may from time to time agree to extend under the Loan Documents, as an inducement to Administrative Agent and the Lenders to enter into the Loan Documents, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## ARTICLE 1
## NATURE AND SCOPE OF GUARANTY

Section 1.1      Guaranty of Obligation.

(a)      Each Guarantor hereby irrevocably and unconditionally jointly and severally guarantees to Administrative Agent and the Lenders and each of their respective successors and assigns the payment and performance of the Guaranteed Obligations (as defined below) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.  Each Guarantor hereby irrevocably and unconditionally covenants and agrees that it is jointly and severally liable for the Guaranteed Obligations as a primary obligor.

(b)      As used herein, the term "**Guaranteed Obligations**" means the aggregate principal amount of all of the Obligations, whether now existing or made subsequent hereto, or so much thereof as may be due and owing under the Loan Agreement or any of the other Loan Documents, together with interest, fees, costs, expenses and any other sums owing under the Loan Agreement or any of the other Loan Documents and all costs or expenses incurred by Administrative Agent or any Lender in the enforcement or collection of this Guaranty.

Section 1.2      Nature of Guaranty.  This Guaranty is a continuing guaranty of payment and performance and not a guaranty of collection.  This Guaranty may not be revoked by any Guarantor and

shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by such Guarantor and after (if any Guarantor is a natural person) such Guarantor's death (in which event this Guaranty shall be binding upon such Guarantor's estate and such Guarantor's legal representatives and heirs). The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of any Guarantor hereunder with respect to the Guaranteed Obligations. This Guaranty may be enforced by the Administrative Agent, Lenders and any subsequent holder of the Loan Agreement or the Notes and shall not be discharged by the assignment or negotiation of all or part of the Loan Agreement, the Notes or the Obligations.

Section 1.3      Guaranteed Obligations Not Reduced by Offset. The Guaranteed Obligations and the liabilities and obligations of Guarantors hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party against the Administrative Agent or Lenders or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

Section 1.4      Payment By Guarantor. If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, each Guarantor shall, immediately upon demand by Administrative Agent and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, all such notices being hereby waived by each Guarantor, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lenders at Administrative Agent's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations and may be made from time to time with respect to the same or different items of Guaranteed Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

Section 1.5      No Duty To Pursue Others. It shall not be necessary for Administrative Agent or any Lender (and Guarantor hereby waives any rights which such Guarantor may have to require Lender), in order to enforce the obligations of Guarantors hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other Person, (ii) enforce Administrative Agent's or any Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Administrative Agent's or any Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Administrative Agent or Lenders against any collateral which shall ever have been given to secure the Loan or other Obligations, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. All of the remedies set forth herein and/or provided for in or at law or equity shall be equally available to Administrative Agent, and the choice by Administrative Agent of one such remedy over another shall not be subject to question or challenge by any Guarantor or any other Person, nor shall any such choice be asserted as a defense, setoff, or failure to mitigate damages in any action, proceeding, or counteraction by Administrative Agent to recover or seeking any other remedy under this Guaranty, nor shall such choice preclude Administrative Agent from subsequently electing to exercise a different remedy.

Section 1.6      Waivers. Each Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lenders to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Loan Agreement or any other Loan Document, (iv) the execution and delivery by Borrower, Administrative Agent and Lenders of any other loan or credit agreement or of Borrower's execution and delivery of any promissory note or other document arising under the Loan Documents, (v) the occurrence of (A) any breach by Borrower of any of the terms or conditions of the Loan Agreement or any of the other Loan Documents, or (B) an Event of Default, (vi) Administrative

2

Agent's or any Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) the sale or foreclosure (or the posting or advertising for the sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Administrative Agent or any Lender and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and/or the obligations hereby guaranteed.

Section 1.7    <u>Payment of Expenses</u>.  In the event that any Guarantor shall breach or fail to timely perform any provisions of this Guaranty, Guarantors shall, immediately upon demand by Administrative Agent, pay all of Administrative Agent's and each Lender's costs and expenses (including court costs and attorneys' fees) incurred by Administrative Agent and Lenders in the enforcement hereof or the preservation of all of Administrative Agent's and each Lender's rights hereunder, together with interest thereon from the date requested by Administrative Agent until the date of payment to Administrative Agent and Lenders.  The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations.

Section 1.8    <u>Effect of Bankruptcy</u>.  In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Administrative Agent or any Lender must rescind or restore any payment or any part thereof received by Administrative Agent or any Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Administrative Agent or any Lender shall be without effect and this Guaranty shall remain (or shall be reinstated to be) in full force and effect.  It is the intention of Borrower and Guarantors that Guarantor's obligations hereunder shall not be discharged except by each Guarantor's performance of such obligations and then only to the extent of such performance.

Section 1.9    <u>Waiver of Subrogation, Reimbursement and Contribution</u>.    Notwithstanding anything to the contrary contained in this Guaranty, each Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Administrative Agent and each Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for the payment of any or all of the Guaranteed Obligations for any payment made by Guarantors under or in connection with this Guaranty or otherwise.

## ARTICLE 2
## EVENTS AND CIRCUMSTANCES NOT REDUCING
## OR DISCHARGING GUARANTOR'S OBLIGATIONS

Each Guarantor hereby consents and agrees to each of the following and agrees that such Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including, without limitation, rights to notice) which such Guarantor might otherwise have as a result of or in connection with any of the following:

Section 2.1    <u>Modifications</u>.  Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Notes, the Loan Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower, Administrative Agent and Lenders or any other parties pertaining to the Guaranteed Obligations or any failure of Administrative Agent or any Lender to notify any such Guarantor of any such action.

Section 2.2      Adjustment.  Any adjustment, indulgence, forbearance or compromise that might be granted or given by Administrative Agent or any Lender to Borrower or any Guarantor.

Section 2.3      Condition of Borrower or Guarantor.  The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, any Guarantor or any other Person at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or any Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or any Guarantor or any changes in the direct or indirect shareholders, partners or members, as applicable, of Borrower or any Guarantor; or any reorganization of Borrower or any Guarantor.

Section 2.4      Invalidity of Guaranteed Obligations.  The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever.

Section 2.5      Release of Obligors.  Any full or partial release of the liability of Borrower for the Guaranteed Obligations or any part thereof, or of any co-guarantors, or of any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by each Guarantor that such Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support from any other Person, and such Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other Persons (including Borrower) will be liable to pay or perform the Guaranteed Obligations or that Lenders will look to other Persons (including Borrower) to pay or perform the Guaranteed Obligations.

Section 2.6      Other Collateral.  The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

Section 2.7      Release of Collateral.   Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including, without limitation, negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

Section 2.8      Unenforceability.  The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by each Guarantor that such Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.

Section 2.9      Offset.  Any existing or future right of offset, claim or defense of Borrower against Administrative Agent or any Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

Section 2.10      Merger.  The reorganization, merger or consolidation of Borrower or any Guarantor into or with any other Person.

Section 2.11      Preference.  Any payment by Borrower to Administrative Agent or any Lender are held to constitute a preference under bankruptcy laws or for any reason Administrative Agent or any Lender is required to refund such payment or pay such amount to Borrower or to any other Person.

4

Section 2.12     Other Actions Taken or Omitted.   Any (a) defense based upon any legal disability or other defense of Borrower, any other Guarantor or Person, or by reason of the cessation or limitation of the liability of Borrower from any cause other than full payment and performance of those obligations of Borrower which are guaranteed hereunder; (b) any defense based upon any lack of authority of the officers, directors, partners, managers, members or agents acting or purporting to act on behalf of Borrower, any Guarantor or any principal of Borrower or any Guarantor, any defect in the formation of Borrower, any Guarantor or any principal of Borrower or any Guarantor; (c) defense based upon the application by Borrower of the proceeds of the Guaranteed Obligations for purposes other than the purposes represented by Borrower to Administrative Agent or any Lender or intended or understood by Administrative Agent or any Lender or Guarantor; (d) and all rights and defenses arising out of an election of remedies by Administrative Agent or any Lender, even though that election of remedies (such as a nonjudicial foreclosure, if available and/or permitted, with respect to security for a guaranteed obligation) has or may have destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of any applicable state law or otherwise; (e) defense based upon Administrative Agent or any Lender's failure to disclose to any such Guarantor any information concerning Borrower's financial condition or any other circumstances bearing on Borrower's ability to pay and perform its obligations under this Guaranty or any of the other Loan Documents, or upon the failure of any other principals of Borrower to guaranty the Guaranteed Obligations; (f) right of subrogation, any right to enforce any remedy which Administrative Agent or any Lender may have against Borrower and any right to participate in, or benefit from, any security for this Guaranty or the other Loan Documents; (g) presentment, demand, protest and notice of any kind; (h) the benefit of any statute of limitations affecting the liability of any Guarantor hereunder or the enforcement hereof to the extent permitted by law; and (i) duty or obligation on Administrative Agent or any Lender to proceed to collect payment or performance of the obligations from, or to commence an action against, Borrower or any other Person, or to resort to any security or to any balance of any deposit account or credit on the books of Administrative Agent or any Lender in favor of Borrower or any other Person, despite any notice or request of any Guarantor to do so.

Section 2.13     Joint and Several Liability.     THE LIABILITY OF EACH GUARANTOR UNDER THIS AGREEMENT SHALL BE JOINT AND SEVERAL WITH BORROWER AND ALL OTHER GUARANTORS OF GUARANTEED OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

To induce Lenders to enter into the Loan Documents and to extend credit to Borrower, the Guarantors jointly and severally represent and warrant to Administrative Agent and Lenders as follows:

Section 3.1     Benefit.   Each Guarantor is an Affiliate of Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

Section 3.2     Familiarity and Reliance.   Each Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Obligations or Guaranteed Obligations; however, no Guarantor is relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

Section 3.3     No Representation By Lender.   Neither Administrative Agent, Lenders nor any other party has made any representation, warranty or statement to any Guarantor in order to induce such Guarantor to execute this Guaranty.

Section 3.4    <u>Guarantor's Financial Condition</u>.  As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, each Guarantor (a) is and will be solvent, (b) has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and (c) has and will have property and assets sufficient to satisfy and repay its obligations and liabilities, including the Guaranteed Obligations.

Section 3.5    <u>Legality</u>.  The execution, delivery and performance by each Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, contract, agreement or other instrument to which such Guarantor is a party or which may be applicable to such Guarantor.  This Guaranty is a legal and binding obligation of each Guarantor and is enforceable against each Guarantor in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

Section 3.6    <u>Survival</u>.  All representations and warranties made by Guarantors herein shall survive the execution hereof.

Section 3.7    <u>Power and Authority</u>.  Each Guarantor has the power and authority, and the legal right, to execute and deliver this Guaranty and to perform its obligations hereunder.

Section 3.8    <u>Authorization; Execution and Delivery</u>.  The execution and delivery of this Guaranty by Guarantors and the performance of such Guarantor's obligations hereunder have been duly authorized by all necessary corporate or limited liability company action, as applicable, in accordance with all Applicable Laws.  Each Guarantor has duly executed and delivered this Guaranty.

## ARTICLE 4
## SUBORDINATION OF CERTAIN INDEBTEDNESS

Section 4.1    <u>Subordination of All Guarantor Claims</u>.  As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantors, whether such debts and liabilities now exist or are hereafter incurred or arise, and whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be, created, or the manner in which they have been, or may hereafter be, acquired by Guarantors.  The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations.  So long as any portion of the Obligations or the Guaranteed Obligations remain outstanding, no Guarantor shall receive or collect, directly or indirectly, from Borrower or any other Person any amount upon the Guarantor Claims.

Section 4.2    <u>Claims in Bankruptcy</u>.  In the event of any receivership, bankruptcy, reorganization, arrangement, debtor's relief or other insolvency proceeding involving any Guarantor as a debtor, Administrative Agent and Lenders shall have the right to prove their claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims.  Each Guarantor hereby assigns such dividends and payments to Administrative Agent for the ratable benefit of the Lenders. Should Administrative Agent receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to any Guarantor and which, as between Borrower and such Guarantor,

6

shall constitute a credit against the Guarantor Claims, then, upon payment to Administrative Agent for the ratable benefit of the Lenders in full of the Obligations and the Guaranteed Obligations, such Guarantor shall become subrogated to the rights of Administrative Agent and Lenders to the extent that such payments to Administrative Agent and Lenders on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Administrative Agent and Lenders had not received dividends or payments upon the Guarantor Claims.

Section 4.3    Payments Held in Trust.  Notwithstanding anything to the contrary contained in this Guaranty, in the event that any Guarantor should receive any funds, payments, claims and/or distributions which are prohibited by this Guaranty, such Guarantor agrees to hold in trust for Administrative Agent and Lenders an amount equal to the amount of all funds, payments, claims and/or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims and/or distributions so received except to pay such funds, payments, claims and/or distributions promptly to Administrative Agent for the ratable benefit of the Lenders, and Guarantor covenants promptly to pay the same to Administrative Agent for the ratable benefit of the Lenders.

Section 4.4    Liens Subordinate.  Each Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of any Guarantor, Administrative Agent or any Lenders presently exist or are hereafter created or attach.  Without the prior written consent of Administrative Agent, Guarantor shall not (i) exercise or enforce any creditor's rights it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including, without limitation, the commencement of, or the joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgages, deeds of trust, security interests, collateral rights, judgments or other encumbrances on the assets of Borrower held by any Guarantor.  The foregoing shall in no manner vitiate or amend, nor be deemed to vitiate or amend, any prohibition in the Loan Documents against Borrower granting liens or security interests in any of its assets to any Person other than Administrative Agent for the ratable benefit of the Lenders.

## ARTICLE 5
## COVENANTS

Section 5.1    Covenants.  Until all of the Obligations and the Guaranteed Obligations have been paid in full, (i) no Guarantor shall sell, pledge, mortgage or otherwise transfer any of its assets, or any interest therein, on terms materially less favorable than would be obtained in an arms-length transaction, and (ii) within ninety (90) days following the end of each calendar year, each Guarantor acknowledges and agrees to deliver to Administrative Agent, upon request, the financial statements and tax returns of such Guarantor along with such other financial information as Lender may reasonably request.

Section 5.2    Prohibited Transactions.  No Guarantor shall, at any time while a default in the payment of the Guaranteed Obligations has occurred and is continuing, either (i) enter into or effectuate any transaction with any Affiliate which would reduce the Net Worth of Guarantor, including, without limitation, the payment of any dividend or distribution to a shareholder, partner or member, as applicable, or the redemption, retirement, purchase or other acquisition for consideration of any stock or other ownership interest in such Guarantor, or (ii) sell, pledge, mortgage or otherwise transfer to any Person any of such Guarantor's assets, or any interest therein.  As used in this Section 5.2, the term "Net Worth" means, with respect to any Guarantor as of any date of determination, an amount equal to (i) such Guarantor's, total assets as of such date, less (ii) such Guarantor's total liabilities as of such date, in each case, as

4874-0469-8626.4

determined in accordance with GAAP.

## ARTICLE 6
## MISCELLANEOUS

Section 6.1    <u>Waiver</u> .  No failure to exercise, and no delay in exercising, on the part of Administrative Agent or any Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right.  The rights of Administrative Agent and Lenders hereunder shall be in addition to all other rights provided by law.  No modification or waiver of any provision of this Guaranty, nor any consent to any departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved.  No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

Section 6.2    <u>Notices</u>.    All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "**Notice**") required, permitted or desired to be given hereunder shall be in writing and shall be sent by telefax (with answer back acknowledged) or by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or by reputable overnight courier, addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this <u>Section 6.2</u>.  Any Notice shall be deemed to have been received: (a) three (3) days after the date such Notice is mailed, (b) on the date of sending by telefax if sent during business hours on a Business Day (otherwise on the next Business Day), (c) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day), and (d) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

| | |
|---|---|
| If to Lender: | c/o Feenix Venture Partners, LLC |
| | 1202 Broadway, 7th Floor |
| | New York, NY 10001 |
| | Attn: Keith Lee |
| | Telephone: 646.902.6645 |
| | E-mail:klee@feenixpartners.com |
| | |
| with a copy to: | Kutak Rock LLP |
| | The Omaha Building |
| | 1650 Farnam Street |
| | Omaha, NE 68102 |
| | Attention:  Joel L. Wiegert |
| | Email: joel.wiegert@kutakrock.com |
| | |
| If to Guarantor: | Scott Zankl |
| | 1001 Clint Moore Road, Unit B |
| | Boca Raton, FL 33487 |
| | |
| with a copy to: | Kristen Zankl |
| | 1001 Clint Moore Road, Unit B |
| | Boca Raton, FL 33487 |

Any party may change the address to which any such Notice is to be delivered by furnishing ten (10) days' written notice of such change to the other parties in accordance with the provisions of this <u>Section 6.2</u>.

4874-0469-8626.4

Notices shall be deemed to have been given on the date set forth above, even if there is an inability to actually deliver any Notice because of a changed address of which no Notice was given or there is a rejection or refusal to accept any Notice offered for delivery. Notice for any party may be given by its respective counsel.

Section 6.3    Invalid Provisions. If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

Section 6.4    Amendments. This Guaranty may be amended only by an instrument in writing executed by Administrative Agent and each of the other party(ies) against whom such amendment is sought to be enforced.

Section 6.5    Parties Bound; Assignment. This Guaranty shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs and legal representatives. Administrative Agent and Lenders shall have the right to assign or transfer its rights under this Guaranty in connection with any assignment of the Loan and the Loan Documents. Any assignee or transferee of Lenders shall be entitled to all the benefits afforded to Lenders under this Guaranty. No Guarantor shall have the right to assign or transfer its rights or obligations under this Guaranty without the prior written consent of Administrative Agent, and any attempted assignment without such consent shall be null and void.

Section 6.6    Headings. Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

Section 6.7    Recitals. The recitals and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered *prima facie* evidence of the facts and documents referred to therein.

Section 6.8    Counterparts. To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

Section 6.9    Rights and Remedies. If any Guarantor becomes liable for any indebtedness owing by Borrower to Administrative Agent or any Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lenders hereunder shall be cumulative of any and all other rights that Administrative Agent and Lenders may ever have against such Guarantor. The exercise by Administrative Agent or any Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

Section 6.10    <u>Entirety</u>. **THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTORS, ADMINISTRATIVE AGENT AND LENDERS WITH RESPECT TO EACH SUCH GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTORS, ADMINISTRATIVE AGENT AND LENDERS AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTORS, ADMINISTRATIVE AGENT AND LENDERS, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTORS, ADMINISTRATIVE AGENT AND/OR ANY LENDER.**

Section 6.11    <u>Governing Law</u>. This Guaranty and the other Loan Documents and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Guaranty or any of the other Loan Documents and the transactions contemplated hereby shall be governed by the laws of the State of New York.

Section 6.12    <u>Submission to Jurisdiction</u>. Each Guarantor hereby irrevocably and unconditionally (i) agrees that any legal action, suit or proceeding arising out of or relating to this Guaranty and the other Loan Documents may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit or proceeding. Final judgment against Guarantor in any action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.

Section 6.13    <u>Venue</u>. Each Guarantor irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Guaranty and the other Loan Documents in any court referred to in <u>Section 6.12</u> and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

Section 6.14    <u>WAIVER OF JURY TRIAL</u>. EACH GUARANTOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY.

Section 6.15    <u>Cooperation</u>. Each Guarantor acknowledges that Administrative Agent and/or any Lender and its successors and assigns may (i) sell this Guaranty, the Loan Agreements, the Notes and the other Loan Documents to one or more investors as a whole loan or in part, (ii) participate the Loan secured by this Guaranty to one or more investors, (iii) deposit this Guaranty, the Loan Agreements, the Note and the other Loan Documents with a trust, which trust may sell certificates to investors evidencing an ownership interest in the trust assets, or (iv) otherwise sell the Loan or one or more interests therein to investors (the transactions referred to in clauses (i) through (iv) are hereinafter each referred to as "Secondary Market Transaction"). Each Guarantor shall cooperate with Administrative Agent and the Lenders in effecting any such Secondary Market Transaction and shall cooperate to implement all requirements imposed by any of the rating agencies involved in any Secondary Market Transaction. Each Guarantor shall provide such information and documents relating to such Guarantor and Borrower, as

applicable, as Administrative Agent or the Lenders may reasonably request in connection with such Secondary Market Transaction. In addition, each Guarantor shall make available to Administrative Agent all information concerning its business and operations that Administrative Agent may reasonably request. Administrative Agent shall be permitted to share all such information with the investment banking firms, Rating agencies, accounting firms, law firms and other third-party advisory firms involved with the Loan and the Loan Documents or the applicable Secondary Market Transaction. It is understood that the information provided by any Guarantor to Administrative Agent, including any and all financial statements provided to Lenders pursuant hereto, may ultimately be incorporated into the offering documents for the Secondary Market Transaction and thus various investors and potential investors may also see some or all of the information. Administrative Agent, Lenders and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, any such Guarantor in the form as provided by such Guarantor. Administrative Agent and Lenders may publicize the existence of the Loan in connection with its marketing for a Secondary Market Transaction or otherwise as part of its business development.

Section 6.16    <u>Reinstatement in Certain Circumstances</u>. If at any time any payment of the principal of or interest under the Loan or any other amount payable by Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, each Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

Section 6.17    <u>Gender; Number; General Definitions</u>. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, (a) words used in this Guaranty may be used interchangeably in the singular or plural form, (b) any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, (c) the word "Borrower" shall mean "each Borrower from time to time under the Loan Agreement", (d) the word "Lender" shall mean "Lenders and any subsequent holder of a Note or otherwise party to the Loan Agreement", (e) the word "Guarantor" shall mean each Guarantor and any subsequent Guarantor from time to time party hereto, (f) the word "Note" shall mean "the Note and any other evidence of indebtedness secured by the Loan Agreement", including, without limitation, and additional notes issues under the Loan Agreement, (g) the word "Property" shall include any portion of the Property and any interest therein, and (g) the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels, incurred or paid by Administrative Agent or Lenders in protecting its interest in the Collateral, and/or in enforcing its rights hereunder.

**[NO FURTHER TEXT ON THIS PAGE]**

IN WITNESS WHEREOF, each Guarantor has executed this Guaranty as of the day and year first above written.

**GUARANTORS:**

_____
**SCOTT ZANKL**

_____
**KRISTEN ZANKL**

SIGNATURE PAGE TO GUARANTY AGREEMENT

**ACKNOWLEDGED, ACCEPTED AND AGREED TO BY**:

FVP SERVICING, LLC,
as Administrative Agent

By: _____

Name:   Keith Lee

Title:    Manager

# EXHIBIT F

**Exhibit F**

## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** is made and effective as of January 26, 2022, by and among **KARMA OF PALM BEACH, INC.**, a Florida corporation ("Palm Beach"), and **KARMA OF BROWARD, INC.**, a Florida corporation ("Broward"; Palm Beach, Broward and each other direct or indirect Subsidiary of Borrowers added as a "Grantor" hereunder, each, a "Grantor", and collectively, the "Grantors"), in favor of **FVP SERVICING, LLC**, a Delaware limited liability company, as administrative agent (including any successor, participant, assignee or transferee thereof, "Administrative Agent") for itself and the Lenders (as defined in the Loan Agreement referred to below).

R E C I T A L S

WHEREAS, pursuant to that certain Loan Agreement (as amended, restated, supplemented, extended or otherwise modified from time to time, the "Loan Agreement") dated as of the date hereof by and among Palm Beach and Broward, as borrowers (each, a "Borrower" and, together, "Borrowers"), the other Grantors from time to time party thereto, Administrative Agent and the Lenders from time to time party thereto, each Grantor is required to have executed and delivered this Security Agreement encumbering substantially all of each Grantor's tangible and intangible personal property assets in favor of Administrative Agent for the ratable benefit of itself and the Lenders; and

WHEREAS, each Grantor has determined that it is in its best interest to execute this Security Agreement.

NOW, THEREFORE, for good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged) and intending to be legally bound hereby, each Grantor and Administrative Agent hereby agree as follows:

ARTICLE 1

SECURITY INTEREST, COLLATERAL ASSIGNMENT AND PLEDGE

1.1     Grant of Security.

To secure the prompt payment and performance in full when due of the Secured Obligations, each Grantor (as of the effective date of becoming a signatory hereto) hereby grants to Administrative Agent, for the ratable benefit of itself and the Lenders, a continuing security interest in such Grantor's right, title and interest in and to all of the following (collectively, the "Collateral"): (a) all Accounts; (b) all cash and currency; (c) all Chattel Paper; (d) those certain Commercial Tort Claims set forth on Schedule 2.10 hereto; (e) all Copyrights; (f) all Copyright Licenses; (g) all Deposit Accounts; (h) all Documents; (i) all Domain Names; (j) all Equipment; (k) all Fixtures; (l) all General Intangibles; (m) all Instruments; (n) all Inventory; (o) all Investment Property; (p) all Letter-of-Credit Rights; (q) all Other Intellectual Property; (r) all Patents; (s) all Patent Licenses; (t) all Pledged Equity and dividends and distributions thereon; (u) all Software; (v) all Supporting Obligations; (w) all Trademarks; (x) all Trademark Licenses; (y) all Goods and other personal property of any kind; and (z) all Accessions and all Proceeds of any and all of the foregoing, in each instance (whether or not expressly specified above), wherever located, and whether now existing, owned, leased or licensed or hereafter acquired, leased, licensed, arising, developed, generated, adopted or created for or by any Grantor, and howsoever any Grantor's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise).

1.2     Security for Secured Obligations. This security interest created hereby in the Collateral secures the payment and performance in full when due of (a) all Obligations and (b) all costs and expenses

incurred by Administrative Agent or any Lender in enforcing and collecting the Obligations (collectively, the "Secured Obligations").

1.3     Continuing Security Interest; Assignment; Termination.  This Security Agreement creates a continuing security interest in the Collateral and will remain in full force and effect until terminated in accordance with the Loan Agreement.  This Security Agreement is binding upon each Grantor and its successors, transferees and assignees, and (together with the rights and remedies of Administrative Agent hereunder) inures to the benefit of Administrative Agent and its permitted successors, transferees, participants and assignees.  Upon any such termination, (a) all security interests arising under this Security Agreement automatically shall be released, discharged and terminated (without representation, warranty, recourse or liability of any kind by Administrative Agent) and (b) Administrative Agent (at Grantors' request and sole expense) (i) will execute and deliver such UCC termination statements and other documentation and instruments (all in form and substance reasonably acceptable to Administrative Agent) as may be reasonably requested and provided to Administrative Agent to effect such releases and terminations, and (ii) will deliver to a Grantor or to another Person designated by a Grantor or, if required by applicable law, to another Person that Administrative Agent reasonably believes may be entitled thereto (without any representation, warranty or recourse of any kind whatsoever) all stock certificates, and instruments representing or evidencing Collateral being physically held by Administrative Agent hereunder.

1.4     Security Interest Absolute.  All rights of Administrative Agent and the Lenders and the security interests granted to Administrative Agent hereunder, and all obligations of each Grantor hereunder, are absolute and unconditional, irrespective of the occurrence of any one or more of the following:

      (a)     Any lack of validity or enforceability of any Loan Document; or

      (b)     The failure of Administrative Agent or any Lender or any holder of any Note:

            (i)     To assert any claim or demand or to enforce any right or remedy under the provisions of any Loan Document or otherwise, or

            (ii)     To exercise any right or remedy against any other Grantor of, or collateral securing, any obligations of any Borrower or any other Grantor owing to any Lender; or any change in the time, manner or place of payment of, or in any other term of, any Secured Obligation; or

      (c)     Any other extension, increase, refinancing, restructuring, compromise or renewal of any Secured Obligation; or

      (d)     Any reduction, limitation, impairment or termination of any Secured Obligation for any reason, including any waiver, release, surrender, alteration or compromise; or

      (e)     Any amendment to, rescission, waiver, or other modification of, or any consent to departure from, the terms of any Loan Document; or

      (f)     Any addition, exchange, release, surrender or nonperfection of any collateral (including the Collateral), or any amendment to or waiver or release of or addition to or consent to departure from any guaranty, for any Secured Obligation; or

4870-1882-2658.5

(g)    Any other circumstances which might otherwise constitute a defense available to, or a legal or equitable discharge of, any Grantor or its obligations hereunder, including, without limitation, any and all suretyship defenses.

Each Grantor hereby waives any right to or any claim of any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of any invalidity, illegality, nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Secured Obligation.

1.5    Collateral Assignment of Contracts.

(a)    Grant of Security Interest.  Subject to Section 1.1, without limiting the generality thereof, each Grantor grants a security interest in and collaterally assigns to Administrative Agent all of such Grantor's right, title and interest in and to all of such Grantor's contracts, licenses, leases and other agreements and all rights, interests, powers, privileges and other benefits thereunder (including the rights to receive all proceeds and payments under each such contract, license, lease and other agreement.  This collateral assignment of each contract, license, lease and other agreement constitutes a fully perfected security interest and collateral assignment; provided, however, that so long as no Event of Default has occurred and is continuing, each Grantor may exercise all rights and powers under and may receive all payments and enjoy all other benefits of each such contract, license, lease and other agreement, subject to the other terms and provisions of this Security Agreement and the other Loan Documents.

(b)    Administrative Agent's Right to Cure.  Administrative Agent shall have the right (but not the obligation) to cure or remedy any breach or default on the part of any Grantor under any contract, license, lease or other agreement included in the Collateral.  The exercise by Administrative Agent of any of its rights hereunder will not release any Grantor from any of its duties or obligations under any such contracts, licenses, leases or other agreements included in the Collateral.  Neither Administrative Agent nor any Lender has any obligation or liability under any such contracts, licenses, leases or other agreements included in the Collateral by reason of this Security Agreement, nor is Administrative Agent or any Lender obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

1.6    Collateral Interest.  Notwithstanding anything to the contrary herein, Administrative Agent's interest in the Collateral is as a security interest and not as an absolute assignment.

ARTICLE 2

REPRESENTATIONS AND WARRANTIES

Each Grantor hereby represents and warrants to Administrative Agent, as of the Closing Date and as of the Settlement Date for each Advance, as set forth in this Article 2.

2.1    Location of Collateral.  Schedule 2.1 identifies (a) all of the locations at which the Collateral is located (other than (i) Inventory or Equipment in transit to any location of a Grantor or (ii) in the possession of employees of a Grantor and used on a remote basis in the ordinary course of business) and (b) the location of the chief executive office of each Grantor.

2.2    Ownership.  Grantors own or have the right to possess and use the Collateral and full corporate, partnership or limited liability company authority, as applicable, to grant a security interest in the Collateral.  There exists no "adverse claim" within the meaning of Section 8-102 of the UCC with respect to the Pledged Equity of any Grantor.

2.3     Government Contracts.  Except as identified on Schedule 2.3, no Grantor is a party to any federal, state or local government contract (either domestic or foreign).

2.4     Negotiable Documents, Instruments, Certificated Securities and Chattel Paper. Contemporaneously with the execution hereof, each Grantor has delivered to Administrative Agent possession of all originals of all certificated Pledged Equity, Instruments, Documents or Tangible Chattel Paper (other than checks received in the ordinary course of business) owned or held by such Grantor on the date hereof (duly endorsed in blank, if requested by Administrative Agent).

2.5     Intellectual Property Collateral.  With respect to each item of Intellectual Property Collateral:

(a)     Schedule 2.5(a) sets forth a complete and accurate list of all (i) applications and registrations for Intellectual Property Collateral owned by any Grantor, (ii), all Copyright Licenses (including customized applications and systems integration software licenses, but excluding "off-the-shelf" mass market, non-customized software licenses), Patent Licenses, and Trademark Licenses and (iii) all Software (including customized applications and systems integration software licenses, but excluding "off-the-shelf" mass market, non-customized software licenses).

(b)     To each Grantor's knowledge, the Intellectual Property Collateral is subsisting, valid and enforceable; and the Intellectual Property Collateral owned by such Grantor has not been adjudged invalid or unenforceable, in whole or in part.

(c)     To each Grantor's knowledge, no claim has been made that the use of any Intellectual Property Collateral does or may violate the rights of any Person.

(d)     Each Grantor has performed all acts and has paid all required fees and taxes to maintain the Intellectual Property Collateral owned by any grantor in full force and effect in the jurisdictions in which it engages in commerce and it deems it reasonably necessary, as applicable, except where such fees and taxes are being contested in good faith with diligent prosecution.

(e)     Each Grantor owns, or is entitled to use by license or otherwise, all Intellectual Property Collateral necessary for or used in the conduct of its business.  To the extent any such Intellectual Property Collateral was developed, authored, conceived or created, in whole or in part, for or on behalf of any Grantor by any Person (except in the case of a Copyright, by an employee of any Grantor acting within the scope of such employee's employment), then such Grantor has entered into a written agreement with such Person in which such Person has assigned all right, title and interest in and to such Intellectual Property Collateral to such Grantor.

(f)     To each Grantor's knowledge, neither the operation of its business nor any slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Grantor violates, infringes or misappropriates any rights held by any other Person.  To each Grantor's knowledge, no claim or litigation regarding any of the foregoing is pending or threatened.

2.6     Pledged Equity.  With respect to any Pledged Equity constituting Collateral, which is set forth on Schedule 2.6, all of such Pledged Equity is validly issued, fully paid, and non-assessable and, except as set forth on Schedule 2.6, constitutes all of the issued and outstanding shares or interests (and other rights) of equity ownership of each Subsidiary owned by any Grantor.

2.7    <u>Valid and Perfected Security Interest</u>.  This Security Agreement creates a valid security interest in the Collateral and proceeds thereof securing the payment and performance in full of the Secured Obligations.  Upon (a) the filing of UCC financing statements (i) naming each Grantor as "debtor", (ii) naming Administrative Agent as "secured party" and (iii) describing the Collateral, in the state of formation of such Grantor, (b) in the case of the Pledged Equity consisting of certificated Securities or evidenced by Instruments, in addition to filing of such UCC financing statements, delivery of the certificates representing such certificated Securities and delivery of such Instruments to Administrative Agent (and in the case of Pledged Equity issued by a foreign issuer, any actions required under foreign law to perfect a security interest in such Pledged Equity), in each case duly endorsed or accompanied by duly executed instruments of assignment or transfer in blank, (c) in the case of Collateral consisting of the Intellectual Property Collateral, in addition to the filing of such UCC financing statements, the recordation of a grant of security interest with the PTO, the United States Copyright Office or any other Official Body, as applicable, (d) in the case of Equipment that is covered by a certificate of title, the filing with the registrar of motor vehicles or other appropriate authority in the applicable jurisdiction of an application requesting the notation of the security interest created hereunder on such certificate of title, and (e) in the case of Collateral consisting of a Deposit Account or Securities Account or held in a Securities Account, the execution and delivery by the applicable Grantor, the applicable Bank or Securities Intermediary and Administrative Agent of an agreement granting control to Administrative Agent over such Collateral, the security interests in the Collateral granted to Administrative Agent for the ratable benefit of Lenders will constitute perfected security interests therein prior to all other Liens (except for Permitted Liens).

2.8    <u>Authorization and Approval</u>.  No authorization, approval or other action by (and no notice to or filing with) any Official Body or other Person is required either (a) for the grant by any Grantor of the security interest granted hereby, or (b) for the execution, delivery and performance of this Security Agreement by any Grantor, or (c) for the perfection by Administrative Agent of its rights and interests hereunder (other than as set forth in <u>Section 2.7</u> hereof), or (d) for the exercise by Administrative Agent of its rights and remedies hereunder.

2.9    <u>Type of Collateral</u>.  None of the Collateral consists of, or is the Proceeds of, As-Extracted Collateral, Consumer Goods, Farm Products, Manufactured Homes or standing timber.

2.10    <u>Commercial Tort Claims</u>.  As of the date hereof, no Grantor has any Commercial Tort Claims other than as set forth on <u>Schedule 2.10</u> hereto.

2.11    <u>Partnership and Limited Liability Company Interests</u>.  Except as set forth on <u>Schedule 2.11</u> hereto, none of the Collateral (i) is dealt in or traded on a securities exchange or in a securities market, (ii) by its terms expressly provides that it is a Security governed by Article 8 of the UCC, (iii) is an investment company security, (iv) is held in a Securities Account or (v) constitutes a Security or a Financial Asset.

2.12    <u>Title</u>.  The Collateral is free and clear of all Liens except (a) Liens for taxes not yet due or which are being contested in good faith by appropriate proceedings; (b) non-consensual Liens arising by operation of law, arising in the ordinary course of business, and for amounts which are not overdue for a period of more than thirty 30 days or that are being contested in good faith by appropriate proceedings; and (c) those Liens listed on <u>Schedule 2.12</u> (collectively, the "<u>Permitted Liens</u>").

2.13    Litigation. Except for the litigation disclosed on <u>Schedule 2.13</u>, no action, suit, litigation, investigation or proceeding of, or before, any arbitrator or Governmental Authority is pending or, to the knowledge of any Grantor, threatened by or against any Grantor.   Each Grantor represents and warrants that none of the actions disclosed on <u>Schedule 2.13</u> are reasonably likely to result in a material adverse

effect on its financial condition or the ability of such Grantor to perform its obligations under this Agreement or any of the other Loan Documents.

ARTICLE 3

COVENANTS

Each Grantor covenants and agrees that, so long as this Security Agreement remains effective, each Grantor will comply with the covenants set forth in this Article 3, unless Administrative Agent otherwise consents in writing.

3.1     Pledged Equity.

(a)     Powers and Appointments.  Each Grantor will promptly deliver to Administrative Agent all such certificates, powers, appointments, instruments and similar documents (satisfactory in form and substance to Administrative Agent) constituting Pledged Equity.  Prior to delivery to Administrative Agent, all such certificates constituting Pledged Equity shall be held in trust by such Grantor for the benefit of Administrative Agent pursuant hereto. From time to time at Administrative Agent's request after the occurrence and during the continuance of any Event of Default, each Grantor will promptly transfer any Pledged Equity or other shares of capital stock or ownership interests constituting Collateral into the name of any nominee designated by Administrative Agent.

(b)     Pledged Equity. Each Grantor will warrant and defend the right and title herein granted to Administrative Agent in and to the Pledged Equity (and all right, title, and interest represented by the Pledged Equity) against the claims and demands of all Persons.

(c)     Voting Rights.

(i)     So long as no Event of Default shall have occurred and be continuing, (A) each Grantor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Pledged Equity or any part thereof for any purpose not prohibited by the terms of this Security Agreement or the Loan Agreement; provided, no Grantor shall exercise or refrain from exercising any such right if Administrative Agent shall have notified such Grantor that, in Administrative Agent's judgment, such action would infringe on the interests of the Administrative Agent in the Collateral in a material manner and such Grantor shall promptly notify Administrative Agent in writing of material infringements detected, and (B) each Grantor shall be entitled to receive and retain any and all dividends, other distributions, principal and interest paid in respect of the Pledged Equity.

(ii)     Upon the occurrence and during the continuation of an Event of Default, (A) upon written notice from Administrative Agent to any Grantor, all rights of such Grantor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant hereto shall cease, and all such rights shall thereupon become vested in Administrative Agent who shall thereupon have the sole right to exercise such voting and other consensual rights; (B) all rights of such Grantor to receive the dividends and other distributions which it would otherwise be authorized to receive and retain pursuant hereto shall cease, and all such rights shall thereupon become vested in Administrative Agent who shall thereupon have the sole right to receive and hold as Collateral such dividends and other distributions; and (C) all dividends and other distributions which are received by such Grantor contrary to the provisions of clause (B) above shall be received in trust for the benefit of Administrative Agent, shall be segregated from other funds of such Grantor and shall forthwith be paid over to Administrative Agent as Collateral in the same form as

6

so received (with any necessary endorsements as determined by Administrative Agent).  Upon the cure or waiver by the Administrative Agent of any such Event of Default, the provisions of clause (c)(i) above shall apply.

(iii)    In order to permit Administrative Agent to exercise the voting and other consensual rights which it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions which it may be entitled to receive hereunder, (A) each Grantor shall promptly execute and deliver (or cause to be executed and delivered) to Administrative Agent all such proxies, dividend payment orders and other instruments as Administrative Agent may from time to time reasonably request, and (B) without limiting the effect of clause (A) above, each Grantor hereby grants to Administrative Agent an irrevocable proxy to vote the Pledged Equity and to exercise all other rights, powers, privileges and remedies to which a holder of the Pledged Equity would be entitled (including giving or withholding written consents of holders of equity interests, calling special meetings of holders of equity interests and voting at such meetings), which proxy shall be effective automatically and without the necessity of any action (including any transfer of any Pledged Equity on the record books of the issuer thereof) by any other Person (including the issuer of the Pledged Equity or any officer or agent thereof), upon the occurrence of an Event of Default and which proxy shall only terminate upon the payment in full of the Secured Obligations, the cure of such Event of Default or waiver thereof as evidenced by a writing executed by Administrative Agent.

3.2    As to Intellectual Property Collateral.  With respect to each item of Intellectual Property Collateral:

(a)    No Grantor (i) will fail to use a commercially appropriate standard of quality (which may be consistent with such Grantor's past practices) in the manufacture, sale and delivery of products and services sold or delivered under or in connection with Trademarks owned by or licensed to such Grantor, or (ii) will fail to employ with all Trademarks (whether or not registered with any Official Body) an appropriate notice of such Trademark, or (iii) will fail to employ with all Copyrights an appropriate notice of such Copyright, or (iv) will fail to employ with all Patents registered with the PTO, or with an Official Body in a foreign country, an appropriate notice of such registration.

(b)    No Grantor will do or permit any act (or omit to do any act) whereby any Intellectual Property Collateral owned by Grantor may lapse or become abandoned, forfeited, invalid, dedicated to the public or unenforceable (except upon expiration of the end of an unrenewable term of a registration thereof) without the prior written consent of Administrative Agent; provided that so long as no Default or Event of Default has occurred or is continuing, no Grantor shall be obligated to protect, defend or maintain any such Intellectual Property Collateral that such Grantor determines, in the good faith and reasonable exercise of its business judgment, is no longer material to such Grantor, to Grantors taken as a whole, or to the business or operations of such Grantor or Grantors taken as a whole (but provided further, that after the occurrence and during the continuance of a Default or Event of Default, Administrative Agent may require a Grantor to protect, defend or maintain such Intellectual Property Collateral and thereafter protect, defend or maintain such Intellectual Property Collateral in such jurisdictions as Administrative Agent deems necessary or desirable).

(c)    Each Grantor will promptly notify Administrative Agent if such Grantor believes (or has reason to believe) that (i) any application to register or registration relating to any Intellectual Property Collateral may become abandoned, dedicated to the public, placed in the public domain, invalid or unenforceable, or (ii) there has been or will be an adverse determination

7

or development (including the institution of, or any determination or development in, any proceeding in the PTO, the United States Copyright Office or any other Official Body) regarding such Grantor's ownership of any Intellectual Property Collateral, its right to register the same, or its right to use, keep, maintain and enforce the same.

(d)     If any Grantor files an application for the registration of any Intellectual Property Collateral with the PTO, the United States Copyright Office or any other Official Body, then such Grantor must notify Administrative Agent thereof within 90 calendar days thereafter (or 30 calendar days thereafter, for any Copyright), and upon request of Administrative Agent, must promptly execute and deliver any and all agreements, instruments, documents and papers that Administrative Agent may request to evidence Administrative Agent's security interest in such Intellectual Property Collateral.

(e)     Each Grantor will perform all acts and will pay all required fees and taxes (including in any proceeding before the PTO, the United States Copyright Office or any other Official Body) to maintain all Intellectual Property Collateral owned by such Grantor (including Domain Names registered by or on behalf of Grantor) in full force and effect in such jurisdictions as is necessary (in such Grantor's reasonable business judgment, unless otherwise provided in Section 3.2(b)) for the proper conduct of such Grantor's business and to pursue any application for registration filed with respect to such Intellectual Property Collateral, including the filing of applications for renewal, affidavits of use, affidavits of incontestability and opposition, and interference and cancellation proceedings.

(f)     Upon any Grantor's acquisition of any Intellectual Property Collateral, the acquisition of which must be recorded in order to perfect such Grantor's interest therein, then such Grantor will promptly record its interest therein.

(g)     Each Grantor (i) will protect, defend and maintain the validity and enforceability of all the Intellectual Property Collateral and (ii) will use commercially reasonable efforts to detect violations, infringements and misappropriations of such Intellectual Property Collateral and promptly notify Administrative Agent in writing of material violations, infringements and/or misappropriations detected.

(h)     Each Grantor, on a continuing basis, will apply to register such Grantor's Trademarks, pursue patent protection for such Grantor's inventions, and register the most recent versions of any of such Grantor's Copyrights and Other Intellectual Property to the extent that any such registration would be consistent with customary industry practice or such Grantor's historical business practices or the failure to register could reasonably be expected to be materially adverse to Grantor's business.

(i)     No Grantor will enter into any agreement that would impair or conflict with such Grantor's obligations hereunder with respect to the Intellectual Property Collateral, except as otherwise permitted hereby or under the Loan Agreement.

(j)     Each Grantor, on a continuing basis, will make, execute, acknowledge and deliver, and will file and record in the proper filing and recording places in the United States, any state thereof and any other country or any political subdivision thereof, all such instruments, collateral agreements and filings (including all appropriate financing and continuation statements) with the PTO, the United States Copyright Office or any other Official Body, as applicable, and will take all such action as Administrative Agent may reasonably deem to be necessary to perfect Administrative Agent's security interest in all Intellectual Property Collateral and otherwise to

carry out the intent and purpose of this Security Agreement, or for assuring and confirming to Administrative Agent the grant or perfection of a security interest in all Intellectual Property Collateral.

(k)       Each Grantor, on a continuing basis, will ensure that it has appropriate measures in place to ensure that all material that may constitute Intellectual Property Collateral created by or on behalf of such Grantor has been appropriately assigned by any developer to such Grantor.

3.3       <u>As to Customer and Material Business Records and Computer Software, and Trade Secrets</u>. Each Grantor will utilize standard industry precautions to safeguard the utility, value and confidentiality of all such records, materials and information covered by this Section.

3.4       <u>Issuance or Acquisition of Equity Interests</u>.  No Grantor shall, without executing and delivering, or causing to be executed and delivered, to Administrative Agent such agreements, documents and instruments as Administrative Agent may reasonably require, issue or acquire any Pledged Equity consisting of an interest in a partnership or a limited liability company that (i) is dealt in or traded on a securities exchange or in a securities market, (ii) by its terms expressly provides that it is a Security governed by Article 8 of the UCC, (iii) is an investment company security, (iv) is held in a Securities Account or (v) constitutes a Security or a Financial Asset.

3.5       <u>Further Assurances</u>.  Each Grantor (from time to time at its own expense) will promptly execute and deliver all further instruments and documents, and will take all further action, that may be necessary (or that Administrative Agent may reasonably request) in order to perfect any security interest, collateral assignment or pledge granted or purported to be granted hereby or to enable Administrative Agent to exercise and enforce its rights and remedies hereunder with respect to any Collateral.  Without limiting the generality of the foregoing, each Grantor shall:

(a)       If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument or Tangible Chattel Paper, or if any Property constituting Collateral shall be stored or shipped subject to a Document, ensure that such Instrument, Tangible Chattel Paper or Document is either in the possession of such Grantor at all times or, if requested by Administrative Agent to perfect its security interest in such Collateral, is delivered to Administrative Agent duly endorsed in a manner satisfactory to Administrative Agent.  Such Grantor shall ensure that any Collateral consisting of Tangible Chattel Paper is marked with a legend acceptable to Administrative Agent indicating Administrative Agent's security interest in such Tangible Chattel Paper.

(b)       Execute and deliver all agreements, assignments, instruments or other documents as reasonably requested by Administrative Agent for the purpose of obtaining and maintaining control with respect to any Collateral consisting of (i) Deposit Accounts, (ii) Investment Property, (iii) Letter-of-Credit Rights and (iv) Electronic Chattel Paper.

(c)       If any Collateral is at any time in the possession or control of a warehouseman, bailee or any agent or processor of such Grantor and Administrative Agent so requests (i) notify such Person in writing of Administrative Agent's security interest therein, (ii) instruct such Person to hold all such Collateral for Administrative Agent's account and subject to Administrative Agent's instructions and (iii) use reasonable best efforts to obtain a written acknowledgment from such Person that it is holding such Collateral for the benefit of Administrative Agent.

(d)       To the extent that any Grantor shall, now or at any time hereafter, hold or acquire a Commercial Tort Claim, such Grantor shall immediately notify Administrative Agent in a writing

signed by such Grantor of the particulars thereof and grant to Administrative Agent, for the benefit of the Lenders and Administrative Agent, in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Security Agreement, with such writing to be in form and substance reasonably satisfactory to Administrative Agent.

(e)    Will execute and file such financing or continuation statements, or amendments thereto, and such other instruments or notices as may be necessary (or as Administrative Agent may reasonably request) in order to perfect the security interests, collateral assignments, pledges and other rights granted or purported to be granted to Administrative Agent hereby.

(f)    Will furnish to Administrative Agent (from time to time at Administrative Agent's request) statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Administrative Agent may reasonably request, all in reasonable detail.

(g)    Will notify Administrative Agent in writing immediately upon such Grantor becoming a party to any federal, state or local government contract (either domestic or foreign), and, upon the request of Administrative Agent, promptly take all actions required under the Federal Assignment of Claims Act or any similar state, local or foreign laws as Administrative Agent may reasonably request.

3.6    Joinder.  Each Grantor added after the date hereof shall execute the joinder in the form attached hereto as Schedule 3.6, whereupon such party shall be deemed to be a party to, and shall be subject to all of the terms and conditions of, this Agreement as if it were a Grantor on the date of this Agreement.

3.7    Liens.  Each grantor covenants and agrees not to create, assume or suffer to exist any Lien on any of its Property or assets, whether now owned or hereinafter acquired other than Permitted Liens.

3.8    Litigation.  Each Grantor covenants and agrees to provide Administrative Agent written evidence of the payment in full for any judgment entered against such Grantor or settlement entered into by such Grantor that relates to the actions disclosed on Schedule 2.13, within the earlier of thirty (30) days of such judgment being entered or the period set forth in such settlement.

With respect to the foregoing and the grant of the security interest hereunder, each Grantor hereby authorizes Administrative Agent to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of such Grantor where permitted by law.  A carbon, photographic or other reproduction of this Security Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

ARTICLE 4

LENDER

4.1    Administrative Agent Appointed Attorney-in-Fact.  Each Grantor hereby irrevocably appoints Administrative Agent as such Grantor's attorney-in-fact, with full authority in the name, place and stead of such Grantor or otherwise, from time to time in Administrative Agent's reasonable discretion, to take any action and to execute any instrument which Administrative Agent may deem reasonably necessary to accomplish the purposes of this Security Agreement.  This authority includes the power, upon the occurrence of and during the continuance of an Event of Default:

(a)    To ask, demand, collect, sue for, recover, compromise, restructure, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral including proceeding against any of the Collateral; and/or

(b)    To notify the parties obligated on any of the Collateral to make payment to Administrative Agent of any amount due or to become due in connection therewith; and/or

(c)    To receive, endorse, and collect any drafts, checks or other instruments, documents and chattel paper in connection with clause (a) of this Section 4.1; and/or

(d)    To file any claims or take any action or institute any proceedings which Administrative Agent may deem reasonably necessary for the collection of any of the Collateral or otherwise to enforce the rights of Administrative Agent, any Lender or any Grantor with respect to any of the Collateral; and/or

(e)    To execute (in the name, place and stead of any Grantor) endorsements, assignments, powers and other instruments of conveyance or transfer with respect to all or any of the Collateral; and/or

(f)    To exercise all rights with respect to any Pledged Collateral of such Grantor hereunder; and/or

(g)    To perform any and all of the affirmative obligations and covenants of such Grantor hereunder (with notice thereof to be provided to such Grantor by Administrative Agent within a reasonable time thereafter).

Each Grantor hereby acknowledges, consents and agrees that the power of attorney granted pursuant to this Section 4.1 is irrevocable and coupled with an interest, but that it will terminate upon the termination of this Security Agreement pursuant to Section 1.3.

4.2    Administrative Agent May Perform.   From time to time, Administrative Agent (at its option) may perform (or may cause the performance of) any act which any Grantor agrees hereunder to perform and which such Grantor fails to perform after being requested in writing so to perform (it being understood that no such request need be given during the continuance of an Event of Default), and Administrative Agent from time to time (at its option) may also take any other action (or may cause the performance of any action) which Administrative Agent reasonably deems necessary for the maintenance, preservation or protection of any of the Collateral or of its security interest therein or collateral assignments or pledges thereof.   The costs and expenses of Administrative Agent incurred in connection with any such performance will be payable by Grantors (jointly and severally) and shall be Secured Obligations.

4.3    Administrative Agent Has No Duty.   The rights and powers conferred upon Administrative Agent hereunder are solely to protect Administrative Agent's and each Lender's interest in the Collateral and do not impose any duty on Administrative Agent to exercise any such rights or powers.   Except for reasonable care of any Collateral in Administrative Agent's possession in accordance with Section 4.4 and the accounting for moneys actually received by it hereunder, Administrative Agent has no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

4.4    Reasonable Care.   Administrative Agent is required to exercise reasonable care in the custody and preservation of any of the Collateral in its possession; provided, however, Administrative Agent will be deemed to have exercised such reasonable care in the custody and preservation of any of the

Collateral if Administrative Agent takes such action for that purpose as any Grantor reasonably requests in writing at times other than after the occurrence or during the continuance of a Default. Notwithstanding the foregoing, any failure or refusal by Administrative Agent at any time to comply with any such request by any Grantor will not in itself be deemed a failure to exercise reasonable care.

## ARTICLE 5

## DEFAULTS AND REMEDIES

5.1    <u>Certain Remedies</u>.  If any Event of Default occurs and is continuing:

(a)    In addition to other rights and remedies provided for herein (including under <u>Article 4</u>) or otherwise available to Administrative Agent or any Lender (including under the other Loan Documents and/or applicable law), Administrative Agent may also exercise in respect of the Collateral all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral).  Upon the occurrence of any Event of Default, Administrative Agent will have the immediate right to enforce and realize upon any and all collateral security granted under the Loan Documents (including the Collateral hereunder) in any manner or order that Administrative Agent deems expedient without regard to any equitable principles of marshalling or otherwise.  All rights and remedies available to Administrative Agent or any Lender are to be considered cumulative in nature.

(b)    Without notice, except as expressly specified herein or required by applicable law, Administrative Agent may also sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Administrative Agent's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as Administrative Agent may deem commercially reasonable.  To the extent notice of sale is required by law, each Grantor agrees that prior notice to a Grantor of at least ten (10) calendar days indicating the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. Administrative Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  Administrative Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale (without further notice) may be made at the time and place to which it was so adjourned.

(c)    Administrative Agent may require Grantors to, and each Grantor hereby agrees (at its expense) that it will, forthwith assemble all or part of the Collateral as directed by Administrative Agent and make such Collateral available to Administrative Agent at a place designated by Administrative Agent that is reasonably convenient to both Administrative Agent and Grantors.

(d)    Unless Administrative Agent otherwise consents, each Grantor will remit to Administrative Agent all cash proceeds received in respect of any sale of, or collection from, or other realization upon all or any part of the Collateral.  All cash proceeds received by Administrative Agent from any Grantor or otherwise in respect of any sale of, collection from, or other realization upon all or any part of the Collateral (in the discretion of Administrative Agent) may be held by Administrative Agent as additional Collateral for the Secured Obligations, and/or then or at any time thereafter may be applied in whole or in part by Administrative Agent against all or any part of the Secured Obligations in an order consistent with the designated application of payments provided for in the Loan Agreement.  Any surplus of such cash or cash proceeds held by Administrative Agent and remaining after payment in full of all the Secured Obligations will be paid over to a Grantor or to whomsoever Administrative Agent reasonably believes may be lawfully entitled to receive such surplus.

(e)      To the extent any of the Collateral represents an interest in a partnership, a limited liability company or other unincorporated enterprise, in addition to any other rights and remedies available to Administrative Agent or any Lender under the Loan Documents or applicable law, Administrative Agent (at its option but with notice to the relevant Grantor) may also exercise all rights and privileges of the holder of such interest under the agreements governing such Collateral and the Organizational Documents for the related organization or may instruct such Grantor how to exercise such rights and privileges (with which instructions each Grantor hereby agrees to comply).  Each Grantor, in addition, covenants and agrees (at Administrative Agent's request) to amend (and to use commercially reasonable efforts to cause others to amend) any of the Organizational Documents for such organization in order to authorize Administrative Agent to so exercise any such rights and privileges associated with such Collateral (including voting rights and the rights to participate in management decisions).  The rights of Administrative Agent under this Section 5.1(e) may be transferred to and exercised by any subsequent acquiror or transferee of the Collateral pursuant to any sale of or foreclosure on such Collateral.  Each Grantor hereby agrees that the rights of Administrative Agent and each Lender (or any subsequent acquiror or transferee of the Collateral) under this Section 5.1(e) may be enforced by specific performance or otherwise.

5.2      Special Securities-Related Remedies—Compliance with Restrictions.  Each Grantor agrees that, in any sale of any of the Pledged Equity, Administrative Agent is authorized to comply with any limitation or restriction in connection with the type of such sale pursued as Administrative Agent may be advised by counsel is necessary in order to avoid any violation of applicable law (including compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that such prospective bidders and purchasers have certain qualifications, and restrict such prospective bidders and purchasers to persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of such Collateral), or in order to obtain any required approval of the sale or of the purchaser by any Official Body.  Each Grantor further agrees that such compliance will not result in such sale being considered or deemed not to have been made in a commercially reasonable manner, nor will Administrative Agent or any Lender be liable or accountable to any Grantor for any discount allowed by reason of the fact that such Collateral is sold at foreclosure or otherwise in compliance with any such limitation or restriction or by reason of the fact that such Pledged Equity may represent a minority interest in any Grantor.

5.3      Special IP-Related Remedies (License of Intellectual Property Collateral).  Each Grantor hereby grants Administrative Agent a royalty-free, non-exclusive, worldwide, irrevocable license (the "Remedies License") under all present and future Intellectual Property Collateral of such Grantor to make, have made, use, sell, offer for sale, import, rent, lease, reproduce, display, distribute, perform, prepare derivative works (including the right to sub-license such rights to another Person), in any and all media now known or hereafter developed and in all channels of distribution, without restriction, from time to time after the occurrence and during the continuance of any Event of Default and delivery of notice thereof by Administrative Agent (unless such Event of Default is under Section 7.1(e) of the Loan Agreement, in which case no such notification shall be required) in connection with the maintenance, preservation, preparation, sale, disposition, collection, foreclosure, or other realization of, upon, or with respect to the Collateral or payment of the Secured Obligations in accordance with the Loan Documents, with the use of registered Trademarks subject to a commercially appropriate standard of quality.  The Remedies License shall remain in full force and effect until this Security Agreement is terminated in accordance with Section 1.3 (but any sub-license or transfer of the Remedies License prior to the termination of the Remedies License shall survive such termination of the Remedies License unless otherwise provided on such sub-license or transfer document).  The rights of Administrative Agent under the Remedies License are assignable by Administrative Agent (without the consent of such Grantor) in connection with (a) any sale or other disposition of Collateral in accordance with the Loan Documents to the extent necessary to permit the purchaser of such Collateral to have continuing and royalty free, worldwide rights with respect to the

13

items of Collateral sold to such purchaser or (b) any assignment or other transfer by Administrative Agent of all or any part of its rights under and in accordance with the Loan Documents.  Upon or at any time after the occurrence of any Event of Default, each Grantor will deliver (or cause to be delivered) to Administrative Agent (at Administrative Agent's request but at such Grantor's expense) a copy of all such Intellectual Property Collateral and all related other Collateral in a form requested by Administrative Agent.  Administrative Agent's rights, as a licensee under this Section 5.3, constitute a separately enforceable contract from the balance of this Security Agreement.

5.4     Retention of Collateral.  In addition to the rights and remedies hereunder, Administrative Agent may, in compliance with Sections 9-620 and 9-621 of the UCC or otherwise complying with the requirements of applicable law of the relevant jurisdiction, accept or retain the Collateral in satisfaction of the Secured Obligations.  Unless and until Administrative Agent shall have provided such notices, however, Administrative Agent shall not be deemed to have retained any Collateral in satisfaction of any Secured Obligations for any reason.

5.5     Deficiency.  In the event that the proceeds of any sale, collection or realization are insufficient to pay all amounts to which Administrative Agent or the Lenders are legally entitled, the Grantors shall be jointly and severally liable for the deficiency, together with interest thereon as provided in the Loan Agreement, together with the costs of collection and the fees, charges and disbursements of counsel.  Any surplus remaining after the full payment and satisfaction of the Secured Obligations shall be returned to the Grantors or to whomsoever a court of competent jurisdiction shall determine to be entitled thereto.

5.6     Administrative Agent's Rights Upon Occurrence of a Liquidation Event.

(a)     Right to Certain Payments and Distributions.  Upon the occurrence of any Liquidation Event, any payment or distribution of any kind or character (whether in cash, securities or other property) that but for this Security Agreement would be payable or deliverable to a Grantor must instead be paid or delivered directly to Administrative Agent for application to the Secured Obligations.

(b)     Non-Cash Payments and Distributions.  Notwithstanding the provisions of clause (a) of this Section 5.6, if Administrative Agent receives delivery of any such payment or distribution in connection with a Liquidation Event in a form other than cash, then Administrative Agent may hold such Property as additional Collateral for the Secured Obligations, and no Grantor of the Secured Obligations will be entitled to a credit with respect to the Secured Obligations, nor will the Secured Obligations otherwise be adjusted in any respect, until such time as Administrative Agent (in its sole and absolute discretion) has sold, discounted or otherwise liquidated such distribution and then (subject to the terms of Section 7.6), such credit or adjustment to the Secured Obligations will be limited only to the net cash proceeds realized therefrom after the payment of all costs and expenses associated with such sale or liquidation.

(c)     Collection of Payments and Distributions.  In addition to any rights otherwise permitted under the Loan Documents or applicable law, each Grantor hereby irrevocably authorizes and empowers Administrative Agent, upon the occurrence of any Liquidation Event, to file and/or vote claims and take such other proceedings, in each instance in Administrative Agent's own name or in the name of a Grantor, or otherwise, all as Administrative Agent may reasonably deem necessary for the enforcement of this Security Agreement.  Each Grantor further agrees duly and promptly to (i) take such action as may be requested by Administrative Agent to assist in the collection and/or compromise of any amounts owed to any Grantor in respect of a Liquidation Event, (ii) file appropriate proofs of claim in respect of such amounts, (iii) execute and deliver to

14

Administrative Agent on demand such powers of attorney, proofs of claim, assignments of claim or other instruments as may be requested by Administrative Agent to enable Administrative Agent to enforce any and all claims upon or with respect to such amounts, and (iv) collect, compromise and receive any and all payments or distributions which may be payable or deliverable at any time upon or with respect to such amounts.

5.7    <u>Delivery of Payments and Distributions</u>.  If any Grantor receives any payment, distribution or any other funds or property in contravention of the provisions hereof or any other Loan Document, then such Grantor must immediately deliver such payment, distribution or other funds or property (or proceeds thereof) to Administrative Agent in precisely the form received (except for the endorsement or assignment without recourse of such Grantor where necessary) for application to the Secured Obligations (or, at Administrative Agent's option, held as additional Collateral therefor), whether or not then due or mature in accordance with the provisions of the Loan Agreement.  Until such funds or property are delivered to Administrative Agent, such Grantor must hold such payment, distribution or other funds or property (or proceeds thereof) (a) in trust for the benefit of and as property of Administrative Agent and (b) separate from (i.e., not commingled with) its other assets.  If a Grantor fails or refuses to make any such endorsement or assignment, then Administrative Agent (or any of its officers or employees) is hereby irrevocably authorized by such Grantor to make the endorsement and/or assignment.

5.8    <u>Cooperation and Assistance</u>.  Each Grantor agrees (during the existence of a Default or an Event of Default) to take any actions that Administrative Agent may reasonably request in order to enable Administrative Agent and each Lender to receive the full rights and benefits granted to Administrative Agent and each Lender by the Loan Documents.  Each Grantor further agrees that each Grantor will assist and cooperate with Administrative Agent (and will use its best efforts to cause others to assist and cooperate with Administrative Agent) to ensure that each Grantor continues (a) to operate in the normal course of business, (b) to fulfill all of its legal, regulatory and contractual obligations and (c) to otherwise be properly and professionally managed.  At Administrative Agent's request and the expense of Grantors (jointly and severally), at any time during the existence of an Event of Default, such assistance and cooperation may include the employment of (and, to the maximum extent not prohibited by the rules, regulations and orders of any Official Body with jurisdiction, the delegation of appropriate management authority to) one or more qualified and independent consultants and professional managers acceptable to Administrative Agent to assist in the interim operations of Grantors; all of which each Grantor hereby agrees not to challenge.

5.9    <u>Standards for Exercising Remedies</u>.  To the extent that applicable law imposes duties on the Administrative Agent and/or Lender to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it is not commercially unreasonable for the Administrative Agent and/or Lender (a) to fail to incur expenses deemed significant by the Administrative Agent and/or Lender to prepare the Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as such Grantor, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i)

15

to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure the Administrative Agent and/or Lender against risks of loss, collection or disposition of Collateral or to provide to the Administrative Agent and/or Lender a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by the Administrative Agent and/or Lender, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Lender in the collection or disposition of any of the Collateral. Each Grantor acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by the Administrative Agent and/or Lender would not be commercially unreasonable in the Administrative Agent's and/or Lender's exercise of remedies against the Collateral and that other actions or omissions by the Administrative Agent and/or Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section. Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any rights to the Grantors or to impose any duties on the Administrative Agent and/or Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section.

## ARTICLE 6

## DEFINITIONS

6.1    <u>Loan Agreement Definitions</u>.  Unless otherwise defined herein or the context otherwise requires, capitalized terms used in this Security Agreement (including the preamble and recitals hereof) have the meanings provided in the Loan Agreement.

6.2    <u>Rules of Construction</u>.  The rules of interpretation and construction set forth in the Loan Agreement apply to the interpretation and construction of this Security Agreement.

6.3    <u>Certain Terms</u>.  The following terms (whether or not underscored) when used in this Security Agreement (including the preamble and recitals hereof) have the following meanings:

"<u>Administrative Agent</u>" is defined in the introductory paragraph hereof.

"<u>Borrower</u>" or "<u>Borrowers</u>" is defined in the introductory paragraph hereof.

"<u>Collateral</u>" is defined in <u>Section 1.1</u>.

"<u>Copyright License</u>" means any agreement, whether written or oral, providing for the grant by or to a Grantor of any right under any Copyright.

"<u>Copyrights</u>" means all copyright and similar rights under the laws of the United States (including all proprietary rights afforded pursuant to Title 17 of the United States Code, including, without limitation, all rights in copyrights, works of authorship, original designs and mask works) and all other countries for the full term thereof (and including all rights accruing by virtue of bilateral or international copyright treaties and conventions), whether registered or unregistered, including, but not limited to, all registrations, applications for registration, renewals, extensions, reversions or restorations thereof now or hereafter provided for by law, all rights to make applications for registrations and recordations, and all adaptations, derivations, and versions thereof, regardless of the medium of fixation or means of expression, now existing or hereafter applied for, registered, created, or acquired.

"<u>Domain Names</u>" means all internet domain names and applications therefor and all URLs.

"Grantor" is defined in the introductory paragraph hereof.

"Intellectual Property Collateral" means, collectively, all Copyrights, all Domain Names, all Patents, all Software, all Trademarks, all Trade Secrets, and all Other Intellectual Property owned and/or used by a Grantor, and all Copyright Licenses, all Patent Licenses, and all Trademark Licenses granted by or to a Grantor.

"Liquidation Event" means any foreclosure on or any sale of all or any material part of the assets of any Grantor, or any liquidation, dissolution or other winding up (partial or complete) of any Grantor or any Grantor's business, or any sale, receivership, insolvency or bankruptcy proceeding, any assignment for the benefit of creditors, or any other proceeding by or against any Grantor or its assets for any relief under any bankruptcy or insolvency law relating to the relief of debtors, readjustment of indebtedness, arrangements, reorganizations, compositions or extensions.

"Loan Agreement" is defined in the recitals hereof.

"Other Intellectual Property" means all worldwide intellectual property rights, industrial property rights, proprietary rights and common-law rights, whether registered or unregistered, not otherwise included in Copyrights, Copyright Licenses, Domain Names, Patents, Patent Licenses, Trademarks, Trademark Licenses and Trade Secrets, including, without limitation, all rights to and under all new and useful inventions, discoveries, technology, confidential information, methods, processes, designs, technology, art, brands, formulas, algorithms, software, concepts, protocols, electronic or other databases, tangible embodiments (in whatever form or medium), and all improvements thereof and all know-how related thereto, together with the rights to all related past, present and future causes of action and any and all interests, claims, and rights for damages, profits, and other awards or remedies by reason of any infringement, unauthorized use, dilution, misappropriation, or other violation of intellectual property rights, now existing or hereafter created or acquired.

"Patent License" means any agreement, whether written or oral, providing for the grant by or to a Grantor of any right under any Patent.

"Patents" means all letters patent and patent applications in the United States and all other countries (and all letters patent that issue therefrom), including all industrial designs, industrial models, utility models, certificates of invention and other indices of invention ownership, and all reissues, reexaminations, extensions, renewals, substitutes, divisions and continuations (including continuations-in-part and continuing prosecution applications) thereof, all rights to make applications for issuance and recordations, for the full term thereof, now existing or hereafter applied for, issued, or acquired.

"Pledged Equity" means, with respect to each Grantor, (a) 100% of the issued and outstanding equity interests of each Subsidiary that is directly owned by Grantor and (b) 66% (or such greater percentage that, due to a change in an applicable law after the date hereof, (i) could not reasonably be expected to cause the undistributed earnings of such foreign Subsidiary as determined for United States federal income tax purposes to be treated as a deemed dividend to such foreign Subsidiary's United States parent and (ii) could not reasonably be expected to cause any material adverse tax consequences) of the issued and outstanding equity interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and 100% of the issued and outstanding equity interests not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) in each foreign Subsidiary that is directly owned by such Grantor, including the equity interests of the Subsidiaries owned by such Grantor as set forth on Schedule 2.6 hereto, in each case together with the certificates (or other agreements or instruments), if any, representing such equity interests, and all

options and other rights, contractual or otherwise, with respect thereto, including, but not limited to, (A) all equity interests representing a dividend thereon, or representing a distribution or return of capital upon or in respect thereof, or resulting from a stock split, revision, reclassification or other exchange therefor, and any subscriptions, warrants, rights or options issued to the holder thereof, or otherwise in respect thereof; and (B) in the event of any consolidation or merger involving the issuer thereof and in which such issuer is not the surviving Person, all shares of each class of the equity interests of the successor Person formed by or resulting from such consolidation or merger, to the extent that such successor Person is a direct Subsidiary of such Grantor.

"Secured Obligations" is defined in Section 1.2.

"Security Agreement" means this Security Agreement and all exhibits, schedules and supplemental addenda hereto, all as may be amended and otherwise modified from time to time hereafter.

"Software" means computer software (including source code and object code), data, databases and all documentation related thereto.

 "Trade Secrets" means any data or information of any Grantor that is not commonly known by or available to the public, and which (a) derives economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"Trademark License" means any agreement, written or oral, providing for the grant by or to Grantor of any right to use any Trademark.

 "Trademarks" means all trademark and service mark rights, statutory and common-law trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, trade dress, logos and other source or business identifiers and indicia of commercial source or origin, together with all translations, adaptations, derivations and combinations thereof, and the goodwill associated therewith, all registrations and applications for registration thereof, and all rights to make applications for registrations and recordations, under the laws of the United States, any state thereof or any other country or any political subdivision thereof, or otherwise, for the full term and all renewals thereof, now existing or hereafter applied for, registered, adopted, or acquired.

6.4     UCC Definitions.  The following terms shall have the meanings ascribed to such terms as defined in the Uniform Commercial Code in effect from time to time in the State of New York except as such terms may be used in connection with the perfection of the Collateral and then the applicable jurisdiction with respect to such affected Collateral shall apply (the "UCC"): Accession, Account, As-Extracted Collateral, Bank, Chattel Paper, Commercial Tort Claim, Consumer Goods, Deposit Account, Document, Electronic Chattel Paper, Equipment, Farm Products, Financial Asset, Fixtures, General Intangible, Goods, Instrument, Inventory, Investment Property, Letter-of-Credit Right, Manufactured Home, Proceeds, Securities Entitlement, Securities Account, Securities Intermediary, Security, Software, Supporting Obligation and Tangible Chattel Paper.

ARTICLE 7

MISCELLANEOUS PROVISIONS

18

7.1    Loan Document.  This Security Agreement and each separate assignment executed in connection herewith are Loan Documents executed pursuant to the Loan Agreement and (unless otherwise expressly indicated herein) are to be construed, administered and applied in accordance with the terms and provisions thereof.

7.2    Amendments.  No amendment to or waiver of any provision of this Security Agreement, nor consent to any departure by any Grantor herefrom, shall in any event be effective unless such amendment, waiver or consent is in writing and signed by Administrative Agent and Grantor.  Any such waiver or consent will be effective only in the specific instance and for the specific purpose for which given.

7.3    Notices.

(a)    Written Notices.

(i)    All notices and other communications to any party herein to be effective shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, as follows:

If to Grantor:

c/o Excell Auto Group, Inc.
1001 Clint Moore Road, Unit B
Boca Raton, FL 33487

Attn: Scott Zankl If to Administrative Agent:

FVP Servicing, LLC
1201 Broadway, 7th Floor
New York, NY 10001
Attn: Keith Lee / Tom Betts
Telephone: 646.902.6645
E-mail:klee@feenixpartners.com / tbetts@feenixpartners.com

(ii)    Notices if (a) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and (b) sent by e-mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment).

(iii)    Any party hereto may change its address for notices and other communications hereunder by notice to the other parties hereto.  All such notices and other communications shall, when transmitted by overnight delivery, be effective when delivered for overnight (next-day) delivery, or if mailed, upon the third Business Day after the date deposited into the mails or if delivered, upon delivery; provided, that notices delivered to Lenders shall not be effective until actually received by such Person at its address specified in this Section 10.

(iv)    Any agreement of Administrative Agent or any Lender herein to receive certain notices by telephone or e-mail is solely for the convenience and at the request of Borrowers.  Administrative Agent and each Lender shall be entitled to rely on the authority of any Person purporting to be a Person authorized by

Borrowers to give such notice and neither Administrative Agent nor any Lender shall have any liability to Borrowers or other Person on account of any action taken or not taken by Administrative Agent or any Lender in reliance upon such telephonic or e-mail notice.  The obligation of Borrowers to repay the Loans and all other obligations and hereunder shall not be affected in any way or to any extent by any failure of Administrative Agent or any Lender to receive written confirmation of any telephonic or e-mail notice or the receipt by Administrative Agent or any Lender of a confirmation which is at variance with the terms understood by Administrative Agent or any Lender to be contained in any such telephonic or e-mail notice.

(b)        Electronic Communications.

(i)        Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and internet or intranet websites) pursuant to procedures approved by Administrative Agent; provided that the foregoing shall not apply to notices to Administrative Agent or any Lender pursuant to Section 2 hereof unless Administrative Agent or such Lender has agreed to receive notices under such Section by electronic communication and have agreed to the procedures governing such communications. Any Party may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(ii)        Unless Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

7.4        Severability.  Wherever possible, each provision of this Security Agreement shall be interpreted in such manner as to be effective and valid under applicable law.  If any provision of this Security Agreement shall be prohibited by or invalid under such law, then such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Security Agreement.

7.5        Entire Agreement.  This Security Agreement and the other Loan Documents constitute the entire understanding among the parties hereto with respect to the subject matter hereof and supersede any prior agreements (written or oral) with respect thereto.

7.6        Reinstatement.  To the maximum extent not prohibited by applicable law, this Security Agreement shall continue to be effective or be reinstated if at any time any amount received by

Administrative Agent or any Lender in respect of the Loan Agreement or any other Loan Document is rescinded or must otherwise be restored or returned by Administrative Agent or any Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of any Grantor or upon the appointment of any receiver, intervenor, conservator, trustee or similar official for any Grantor or any substantial part of any Grantor's assets, or otherwise, all as though such payments had not been made.

7.7     Conflict Provision.  In the event of any irreconcilable conflict between the terms and conditions of this Security Agreement and the terms and conditions of the Loan Agreement, the terms and conditions of the Loan Agreement shall govern.

7.8     Administrative Agent.  References in this Security Agreement to Administrative Agent shall mean either to Administrative Agent in such capacity or (where appropriate) to Administrative Agent for the benefit of itself and other Lenders.  Unless otherwise indicated in this Security Agreement or the other Loan Documents, all Collateral held and all payments received by Administrative Agent are deemed to be held and received, respectively, for the benefit of itself and the other Lenders.

7.9     Waiver of Suretyship Defenses.  Each Grantor hereby waives any and all defenses and rights of discharge based on suretyship or impairment of collateral (including any lack of attachment or perfection with respect thereto) that it may now have or may hereafter acquire with respect to Administrative Agent or any Lender or any of such Grantor's obligations hereunder or under any other agreement that it may have or hereafter enter into with Administrative Agent or any Lender.

7.10     Waiver of Subrogation.  Until this Security Agreement is terminated in accordance with Section 1.3, each Grantor hereby irrevocably waives any claim or other rights which it may now have or may hereafter acquire against any other Grantor that arise from the existence, payment, performance or enforcement of any Grantor's obligations under this Security Agreement or any other Loan Document, including any right of subrogation, reimbursement, contribution, exoneration, or indemnification, any right to participate in any claim or remedy of Administrative Agent or any Lender against any other Grantor or any collateral which Administrative Agent or any Lender now has or hereafter acquires, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law.

7.11     Waiver of Notice; Waiver of Bond.  Each Grantor waives all rights of notice and hearing of any kind prior to the exercise by Administrative Agent or any Lender of its rights during the continuance of any Event of Default to repossess the Collateral with judicial process or to replevy, attach or levy upon the Collateral.  Each Grantor waives the posting of any bond otherwise required of Administrative Agent or any Lender in connection with any judicial process or proceeding to obtain possession of, replevy, attach or levy upon Collateral or other security for the Secured Obligations, to enforce any judgment or other court order entered in favor of Administrative Agent or any Lender, or to enforce by specific performance, temporary restraining order or preliminary or permanent injunction this Security Agreement or any other Loan Document.

7.12     Waiver of Liability.  Each Grantor (a) agrees that neither Administrative Agent nor any Lender (nor any director, officer, employee or agent of Administrative Agent or any Lender) shall have any liability to any Grantor (whether sounding in tort, contract or otherwise) for losses or costs suffered or incurred by any Grantor in any way related to the transactions contemplated or the relationship established by any Loan Document, or any act, omission or event occurring in connection therewith, except for actual losses resulting directly from Administrative Agent's or such Lender's own gross negligence, willful misconduct or fraud, and (b) waives, releases and agrees not to sue upon any claim against Administrative Agent or any Lender (or their directors, officers, employees or agents) whether sounding in tort, contract or otherwise, except for claims for actual losses resulting directly from Administrative Agent's or such Lender's own gross negligence, willful misconduct or fraud.  Moreover, whether or not such damages are

related to a claim that is subject to the waiver effected above and whether or not such waiver is effective, neither Administrative Agent nor any Lender (nor any director, officer, employee or agent of Administrative Agent or any Lender) shall have any liability with respect to (and each Grantor hereby waives, releases and agrees not to sue upon any claim for) any special, indirect, consequential, punitive or non-foreseeable damages suffered by any Grantor in any way related to the transactions contemplated or the relationship established by any Loan Document, or any act, omission or event occurring in connection therewith.

7.13    Counterparts.  This Security Agreement may be executed in any number of counterparts with the same effect as if all the signatures on such counterparts appeared on one document.  Each counterpart will be deemed to be an original, but all counterparts together will constitute one and the same instrument.  A signature page hereto sent or delivered by facsimile or other electronic transmission shall be as legally binding and enforceable as a signed original for all purposes.

7.14    Governing Law; Submission to Jurisdiction; Venue; WAIVER OF JURY TRIAL.  The terms of Sections 13.3, 13.4, 13.5 and 13.7 of the Loan Agreement with respect to governing law, submission to jurisdiction, venue and waiver of jury trial are incorporated herein by reference, *mutatis mutandis*, and the parties hereto agree to such terms.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the undersigned, by their duly authorized officers, have executed this Security Agreement, and it is effective as of the day and year first above written.

**GRANTORS:**

**KARMA OF BROWARD, INC.,**
a Florida corporation

By: _____
Name: *Scott Zurell*
Title: *Pres*

**KARMA OF PALM BEACH,**
**INC.,** a Florida corporation

By: _____
Name: *Scott Zurell*
Title: *Pres*

**ADMINISTRATIVE
AGENT:**

**FVP SERVICING, LLC**,
a Delaware limited liability company,
as Administrative Agent

By: _keith lee_____

Name: Kenneth Lee

Title: Manager

Schedule 2.1

Location of Collateral

| Grantor | Address |
|---------|---------|
| Karma of Broward, Inc. | 1717 17th Street, Ft. Lauderdale, FL 33316 |
| Karma of Palm Beach, Inc. | 1001 Clint Moore Road, Boca Raton, FL 33487 |

SECURITY AGREEMENT

Schedule 2.3

Government Contracts

None.

Schedule 2.5A

Intellectual Property Collateral

None.

<u>Schedule 2.6</u>

<u>Pledged Equity</u>

None.

SECURITY AGREEMENT

Schedule 2.10

Commercial Tort Claims

None.

Schedule 2.11

Pledged Interests – Securities

None.

Schedule 2.13

Litigation

None.

Schedule 3.6
Form Joinder

JOINDER BY _____
TO SECURITY AGREEMENT

The undersigned, _____, a _____ ("New Grantor") hereby joins in the Security Agreement dated as of January 26, 2022 (the "Security Agreement") by and among the Grantors thereto (collectively, the "Grantor") and FVP SERVICING, LLC, as administrative agent (including any successor, participant, assignee or transferee thereof, "Administrative Agent") for itself and the Lenders (as defined in the Loan Agreement). All terms not defined herein shall have the meanings ascribed to them in the Security Agreement.  New Grantor has received and reviewed a copy of the Security Agreement and hereby acknowledges and affirms:

1.     the continuing validity of the Security Agreement and the other Loan Documents to which New Grantor is a party;

2.     all of the terms, conditions and obligations contained in the Security Agreement and other Loan Documents to which New Grantor is a party, which terms, conditions and obligations are and shall remain in full force and effect;

3.     that the Security Agreement and other Loan Documents to which New Grantor is a party are the legal, valid and binding obligations of New Grantor as a party thereto, and the obligations and liabilities thereunder shall not be diminished by the execution hereof; and

4.     that this instrument is executed by New Grantor as an inducement to the Administrative Agent and each Lender to continue the Loans, and with the knowledge that the Administrative Agent and each Lender shall rely on the statements made herein.

Dated: _____, 20__                    _____

Address for Notice:                                      By: _____
_____                                    Print Name:
_____                                    Print Title:
_____

# EXHIBIT G

**Exhibit G**

## PLEDGE AND SECURITY AGREEMENT

**THIS PLEDGE AND SECURITY AGREEMENT** (the "Agreement") is dated as of January 26, 2022, and is by and among **SCOTT ZANKL**, an individual, **KRISTEN ZANKL**, an individual (individually and collectively, "Pledgor"), and **FVP SERVICING, LLC**, in its capacity as administrative agent for the Lenders under the Loan Agreement (as defined below) (the "Administrative Agent"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such term in the Loan Agreement.

## BACKGROUND

1.     Pledgor is the owner of the number of the Equity Interests listed next to its name on Schedule A in the entities listed on Schedule A next to its name (each such entity, a "Pledged Entity").

2.     Contemporaneously with the execution of this Agreement, Karma of Palm Beach, Inc. and Karma of Broward, Inc. (each, a "Borrower" and, together, "Borrowers") are entering into a Loan Agreement (as amended, modified, supplemented, extended, restated or renewed from time to time, the "Loan Agreement") with Administrative Agent and the lenders party thereto (collectively, the "Lenders"), pursuant to which, among other things, the Lenders have agreed to make certain term loans to Borrowers in the aggregate original principal amount of $7,500,000.00 (the "Loan").

3.     As a condition to entering into the Loan Agreement, Administrative Agent requires that Pledgor pledge and grant a security interest in favor of Administrative Agent, for the benefit of itself and the Lenders, in all of Pledgor's right, title and interest in and to all Equity Interests in each Pledged Entity to secure, *inter alia*, the repayment of the Loan and the due and prompt payment and performance of all other Obligations (as hereinafter defined) under the Loan Documents.

4.     Pledgor will derive substantial direct and indirect benefits from the making of the Loan by the Lenders to Borrowers and the consummation of the transactions contemplated by the Loan Agreement, and is willing to execute and deliver this Agreement to induce Administrative Agent to enter into the Loan Agreement.

NOW THEREFORE, the parties agree as follows:

## AGREEMENT

1.     Definitions.  As used in this Agreement, the following terms shall have the meanings specified below:

"Distributions" means all dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and payments or economic benefits or interests to which Pledgor is entitled with respect to the Pledged Equity whether or not received by or otherwise distributed to Pledgor, whether such dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and economic benefits are paid or distributed by each Pledged Entity in respect of operating profits, sales, exchanges, refinancing, condemnations or insured losses of the company's assets, the liquidation of the company's assets and affairs, management fees, guaranteed payments, repayment of loans, reimbursement of expenses or otherwise in respect of or in exchange for any or all of the Pledged Equity.

"Equity Interests" means (a) partnership interests (general or limited) in a partnership; (b) membership interests in a limited liability company; (c) shares or stock interests in a corporation, and (d) the beneficial ownership interests in a trust.

"Event of Default" means any "Event of Default" as defined in the Loan Agreement.

"Obligations" means the "Obligations" as defined in the Loan Agreement.

"Organizational Agreement" means the partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement, articles or certificate of organization, by-laws, certificate of formation and other organizational or governing documents, as applicable, of each Pledged Entity.

"Pledged Equity" means all Equity Interests issued by each Pledged Entity owned or held by or on behalf of Pledgor, whether beneficially or of record, and whether now owned or hereafter acquired, including all such Equity Interests described in Schedule A hereto, and all certificates, instruments and other documents, if any, representing or evidencing such Equity Interests and all interests of Pledgor on the books and records of each Pledged Entity with respect to such Equity Interests, and all Distributions and other dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Equity Interests.

"Security Interest" has the meaning assigned to such term in Section 2a hereof.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

2.    Security Interest.

a.    Grant of Security.  As security for the payment and performance in full of the Obligations and Pledgor's obligations under this Agreement, whether allowed or allowable as claims (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, including without limitation the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)) (collectively, the "Secured Obligations"), Pledgor hereby grants, pledges, hypothecates, transfers and assigns to Administrative Agent, for the benefit of itself and the Lenders, a first priority (except to the extent of any Permitted Liens) and continuing lien on and security interest in (the "Security Interest"), and, in furtherance of such grant, pledge, hypothecation, transfer and assignment, hereby transfers and assigns to Administrative Agent, for the benefit of itself and the Lenders, as collateral security, all of Pledgor's right, title, ownership, equity or other interests in and to the following, whether now owned or hereafter acquired, now existing or hereafter arising and wherever located (collectively, the "Collateral"):

(i)    the legal and beneficial ownership interests in and to the Pledged Equity;

(ii)    all rights, privileges, general intangibles, payments intangibles, voting rights, authority and power arising from its interest in the Pledged Equity;

(iii)    the capital of Pledgor and any and all profits, losses, Distributions, and allocations attributable to the Pledged Equity as well as the proceeds of any Distribution thereof, whether arising under the terms of any Organizational Agreement or otherwise;

(iv)    all Distributions and all other payments, if any, due or to become due, to Pledgor and all other present or future claims by Pledgor against each Pledged Entity, or in respect of the Pledged Equity,

2

under or arising out of (i) any Organizational Agreement, (ii) monies loaned or advanced, for services rendered or otherwise, (iii) any other contractual obligations, commercial tort claims, supporting obligations, damages, insurance proceeds, condemnation awards or other amounts due to Pledgor from each Pledged Entity or with respect to the Pledged Equity;

(v)    Pledgor's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or arising out of the ownership of the Pledged Equity;

(vi)    to the extent permitted by applicable law, Pledgor's rights, if any, in each Pledged Entity pursuant to any Organizational Agreement, or at law, to exercise and enforce every right, power, remedy, authority, option and privilege of Pledgor relating to the Pledged Equity, including without limitation, the right to (i) execute any instruments and to take any and all other action on behalf of and in the name of Pledgor in respect of the Pledged Equity, (ii) exercise any and all voting, consent and management rights of Pledgor in or with respect to each Pledged Entity, (iii) exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval with respect to each Pledged Entity, (iv) enforce or execute any checks, or other instruments or orders of each Pledged Entity, and (v) file any claims and to take any action in connection with any of the foregoing, together with full power and authority to demand, receive, enforce or collect any of the foregoing or any property of each Pledged Entity;

(vii)    all Investment Property (as such term is defined in Section 9-102 of the UCC) issued by or relating to each Pledged Entity, or otherwise relating to the Pledged Equity;

(viii)    all additional Equity Interests or other property, securities, or assets now existing or hereafter acquired by Pledgor relating to each Pledged Entity, including, without limitation, as a result of any consolidation, combinations, mergers, reorganizations, acquisitions, exchange offers, recapitalizations of any type, contributions to capital, splits, spin-offs, or similar actions or the exercise of options or other rights relating to the Pledged Equity;

(ix)    all partnership certificates, member certificates, stock certificates, or any other instrument, note, chattel paper, electronic chattel paper or certificate (including, without limitation, all "certificated securities" within the meaning of Section 8-102 of the UCC) (whether or not qualifying as Investment Property) representing the Pledged Equity in each Pledged Entity and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such certificates or writings, and all options and warrants for the purchase of such Equity Interests now or hereafter held in the name of Pledgor (collectively, "Certificated Securities"), and all Certificated Securities in each Pledged Entity from time to time acquired by Pledgor in any manner, and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such Certificated Securities, and all securities convertible into and options, warrants, dividends, cash, instruments and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Certificated Securities (including all rights to request or cause the issuer thereof to register any or all of the Collateral under federal and state securities laws to the maximum extent possible under any agreement for such registration rights), and all put rights, tag-along rights or other rights pertaining to the sale or other transfer of such Collateral, together in each case with all right under any Organizational Agreements pertaining to such rights; and

(x)    (i) all "proceeds" (as such term is defined in Section 9-102 of the UCC) of any or all of the foregoing (whether cash or non-cash proceeds, including insurance proceeds), (ii) whatever is receivable or received when any of the Collateral is sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto and also includes all interest, dividends and other property receivable or received on account of any of the Collateral or proceeds thereof, and in any

3

event, shall include all Distributions or other income from any of the Collateral, all collections thereon or all Distributions with respect thereto, and (iii) all proceeds, products, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the Collateral. The inclusion of proceeds in the Collateral does not authorize Pledgor to sell, dispose of or otherwise use the Collateral in any manner not specifically authorized hereby.

b.    <u>Continuing Perfection and Priority</u>.  Pledgor hereby covenants and agrees that, if at any time on or after the date hereof any asset or property acquired, owned or held by or on behalf of Pledgor that constitutes or would constitute Collateral hereunder is not subject to the Security Interest in favor of the Administrative Agent hereunder with the perfection or priority required hereby, then Pledgor shall, at its own cost and expense, promptly (i) notify Administrative Agent thereof and (ii) execute and deliver any and all agreements, instruments and other documents, and take all further action (including the filing and recording of financing statements and other documents), that may be necessary or reasonably requested by the Administrative Agent to cause such asset or property to become subject to a perfected lien and security interest in favor of the Administrative Agent hereunder (including, where applicable, perfection by establishing "sole dominion and control" under applicable law and "control" within the meaning of the UCC), with the priority required hereby.

c.    <u>Security for Obligations</u>.  This Agreement secures, and the Collateral is collateral security for, the prompt and complete payment or performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 262(a) of Title 11 of the United States Code, or any similar provision of any other bankruptcy, insolvency, receivership or other similar law), of all Secured Obligations.

d.    <u>No Assumption of Liability</u>.  Notwithstanding anything to the contrary herein, the Security Interest is granted as security only and shall not subject the Administrative Agent to, or in any way alter or modify, any obligation or liability of Pledgor with respect to or arising out of the Pledged Equity.

3.    <u>Representations, Warranties and Covenants</u>.

a.    <u>Representations and Warranties</u>.  Pledgor represents and warrants to the Administrative Agent, jointly and severally, for the benefit of itself and the Lenders that:

i.    Scott Zankl and Kristen Zankl are individuals and residents of the State of Florida and their full and correct legal names and the address of such individual's residence is specified on <u>Schedule A</u>, such name and address matches that reflected on each individual's respective driver's license or other government-issued identification card.

ii.    Pledgor owns the applicable Equity Interests in each Pledged Entity specified next to its name on <u>Schedule A</u>.  Pledgor has good and valid title to the Pledged Equity specified next to its name on <u>Schedule A</u> and all related Collateral, and Pledgor does not have any outstanding options or rights or other agreements to acquire or sell or otherwise transfer all or any portion of any Pledged Equity or other Collateral.

iii.    All actions and consents, including all filings, notices, registrations and recordings, necessary or desirable to create, perfect or ensure the priority of the Security Interest in the Pledged Equity and the other Collateral or for the exercise by the Administrative Agent of any voting or other rights provided for in this Agreement or the exercise of any remedies in respect of the Pledged Equity and the other Collateral have been made or obtained.

iv.    The Pledged Equity and other Collateral of Pledgor is owned by Pledgor free and clear of any lien, security interests or other encumbrance.  Pledgor has not filed nor authorized the filing of (A) any financing statement or analogous document under the UCC or any other applicable laws covering the Pledged Equity or any other Collateral, or (B) any assignment in which Pledgor assigns any of the Pledged Equity or other Collateral, or any pledge agreement or similar instrument covering any of the Pledged Equity or other Collateral, with any foreign governmental authority or other office, in each case which financing statement, analogous document, assignment or other instrument, as applicable, is still in effect.

v.    The Pledged Equity has been duly authorized and is validly issued.

vi.    The Pledged Equity constitutes all of the issued and outstanding Equity Interests of each Pledged Entity.

vii.    The pledge of the Pledged Equity and the other Collateral pursuant to this Agreement creates a valid and, upon the filing of a financing statement in accordance with the UCC, to the extent such security interest can be perfected by filing of a financing statement under the UCC, or other appropriate method, perfected security interest in the Pledged Equity and the other Collateral securing the payment and performance of the Secured Obligations.  The taking possession by the Administrative Agent of the Certificated Securities (if any) described on Schedule A hereto, together with endorsed stock or unit powers duly executed in blank, will perfect the Administrative Agent's Security Interest in all of the Pledged Equity and related Collateral evidenced by such Certificated Securities.

viii.    Except for consents already obtained by Pledgor in connection with this Agreement, no consent of any other person or entity and no authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required (A) for the pledge by Pledgor of the Pledged Equity pursuant to this Agreement or for the execution, delivery or performance of this Agreement by Pledgor, (B) for the perfection or maintenance of the Security Interest created hereby or (C) for the exercise by Administrative Agent of the voting or other rights provided for in this Agreement or the remedies in respect of the Pledged Equity and other Collateral pursuant to this Agreement (except as may be required in connection with any disposition of any portion of the Pledged Equity by laws affecting the offering and sale of securities generally).

ix.    There are no conditions precedent to the effectiveness of this Agreement that have not been satisfied or waived.

x.    Pledgor has, independently and without reliance upon Administrative Agent, and based on such documents and information as Pledgor has deemed appropriate, and following consultation with Pledgor's independent legal counsel, made its own credit analysis and decision to enter into this Agreement.

xi.    Except as expressly provided in this Agreement, Pledgor will not sell, convey or otherwise dispose of any of the Pledged Equity or other Collateral, nor will Pledgor create, incur or permit to exist any lien, security interest or other encumbrance with respect to any of the Pledged Equity or other Collateral.

xii.    There are no contractual restrictions upon the voting rights or the transfer of the Pledged Equity.

xiii.    The execution, delivery and performance hereof, and the grant of the Security Interest in the Pledged Equity and the other Collateral hereunder, to Pledgor's knowledge, do not contravene

5

any law, rule or regulation or any judgment, decree or order of any governmental authority or any agreement or instrument to which Pledgor is a party or by which Pledgor or any of Pledgor's property is bound or affected or constitute a default thereunder.

xiv.    Attached hereto as <u>Exhibit B</u> are true, correct, and complete copies of the Organizational Agreement of each Pledged Entity. Each Organizational Agreement is in full force and effect and has not been modified or amended except as attached hereto. Pledgor is not in default of any of its obligations under the Organizational Agreements.  Pledgor shall not allow any Pledged Entity to (A) amend any provision of its Organizational Agreements, (B) cause any of its Equity Interests to become Certificated Securities after the date hereof, (C) dissolve, liquidate, wind-up, merge or consolidate with any other entity, (D) transfer any of its respective assets and properties to any person or entity (or otherwise) except as permitted by the Loan Documents, or (E) take any action, or refrain from taking any action, in either case, to the extent the same would constitute an Event of Default.  The Organizational Agreements of each Pledged Entity provide that (A) all owners of Equity Interests therein are authorized to pledge or assign such Equity Interests to Administrative Agent, and that such pledge or assignment shall include all voting, management and control rights and is not limited to economic rights; (B) neither the exercise by Administrative Agent of any right or remedy under the Loan Documents, including, foreclosure of the Collateral, nor the transfer to Administrative Agent or its successors or assigns of title to any Collateral, shall constitute a default or breach, or give rise to any right of first refusal or option to purchase under the Organizational Agreement of any Pledged Entity; (C) until the Secured Obligations are paid in full: (1) no owners of Equity Interests in any Pledged Entity shall be entitled to withdraw from any Pledged Entity or assign, encumber, or convey any interest in any Pledged Entity (except in favor of Administrative Agent pursuant to the Loan Documents); (2) no additional Equity Interests in each Pledged Entity shall be created or issued, no Equity Interest shall be redeemed, exchanged, diluted or modified and, without limitation of the foregoing, no Equity Interests shall become Certificated Securities; (3) no Pledged Entity shall be dissolved, either voluntarily or as the result of the withdrawal or removal of any owners of Equity Interests in such Pledged Entity; (4) the Organizational Agreements of each Pledged Entity shall not be modified or terminated in any manner adverse to Administrative Agent; and (5) upon foreclosure or other transfer of the Pledged Equity by Administrative Agent or its successors or assigns pursuant to the Loan Documents or applicable law, Administrative Agent has the right to terminate all non-member managers of each Pledged Entity.

b.    <u>Covenants and Agreements</u>.  Pledgor hereby covenants and agrees as follows:

i.    Pledgor will promptly notify the Administrative Agent in writing of any change in Pledgor's legal name, the address at which Pledgor maintains its residency, maintains books or records relating to any of the Pledged Equity or Pledgor's social security number.  Pledgor agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Administrative Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Pledged Equity and the other Collateral with the priority required hereby.

ii.    Pledgor shall maintain, at Pledgor's own cost and expense, such complete and accurate records with respect to the Pledged Equity as is consistent with Pledgor's current practices, but in any event to include complete accounting records indicating all Distributions received with respect to any part of the Pledged Equity, and, at such time or times as the Administrative Agent may reasonably request (but in no event more than one time in any calendar year, unless an Event of Default has occurred and is continuing), promptly to prepare and deliver to the Administrative Agent a duly certified schedule or schedules in form and detail satisfactory to the Administrative Agent showing the identity and amount of any and all such Pledged Equity.

6

iii.    Pledgor shall, at Pledgor's own cost and expense, take any and all actions reasonably necessary to defend title to the Pledged Equity and the other Collateral against all persons and to defend the Security Interest in the Pledged Equity and the other Collateral and the priority thereof against any lien, security interest or other encumbrance, and in furtherance thereof, Pledgor shall not take, or permit to be taken, any action not otherwise expressly permitted by the Loan Agreement that could reasonably be expected to impair the Security Interest or the priority thereof or the Administrative Agent's rights in or to the Pledged Equity or the other Collateral.

iv.    Upon reasonable prior written notice, the Administrative Agent and such persons as the Administrative Agent may designate shall have the right, at the cost and expense of Administrative Agent (except during the continuance of an Event of Default, in which event such cost and expense shall be the sole responsibility of Pledgor), to inspect all of Pledgor's records (and to make extracts and copies from such records) concerning the Pledged Equity and to verify under reasonable procedures the validity, amount, quality, quantity, value, condition and status of, or any other matter relating to, the Pledged Equity or the other Collateral.

v.    At its option after the occurrence and during the continuance of an Event of Default, Administrative Agent may discharge past due taxes, assessments, charges, fees, liens, security interests or other encumbrances at any time levied or placed on the Pledged Equity or the other Collateral, and may pay for the maintenance and preservation of the Pledged Equity or the other Collateral to the extent Pledgor fails to do so as required hereby and by the Loan Documents, and Pledgor agrees to reimburse the Administrative Agent on demand for any payment made or any reasonable expense incurred by the Administrative Agent pursuant to the foregoing authorization; provided, however, that nothing in this paragraph shall be interpreted as excusing Pledgor from the performance of, or imposing any obligation on the Administrative Agent to cure or perform, any covenants or other promises of Pledgor with respect to taxes, assessments, charges, fees, liens, security interests or other encumbrances and maintenance as set forth herein or in the Loan Documents.

vi.    Pledgor shall observe and perform all the conditions and obligations to be observed and performed by it under each contract, agreement or instrument relating to the Pledged Equity and the other Collateral, all in accordance with the terms and conditions thereof, and Pledgor agrees to indemnify, defend and hold harmless the Administrative Agent from and against any and all liability to perform such conditions and obligations, except if caused by the gross negligence or willful misconduct of Administrative Agent.

vii.    Pledgor shall not make, nor permit to be made, an assignment, pledge or hypothecation of the Pledged Equity or the other Collateral or grant any other lien, security interest or other encumbrance in respect of the Pledged Equity or the other Collateral.  Pledgor not shall make nor permit to be made any transfer of the Pledged Equity or the other Collateral, and Pledgor shall remain the owner, beneficially and of record, of the Pledged Equity and the other Collateral.

4.    Pledged Equity Interests.

a.    Pledged Equity; Certificated Securities.  Pledgor represents and warrants that, except as otherwise specified on Schedule A hereto, none of the Pledged Equity is issued in the form of Certificated Securities.  Pledgor represents and warrants that it has delivered to Administrative Agent all Certificated Securities constituting the Pledged Equity, duly indorsed in blank within the meaning of the UCC, and all such Certificated Securities have been in the physical possession of the applicable Pledgor at all times prior to such delivery to Administrative Agent.  Pledgor covenants and agrees that it shall not permit each Pledged Entity to convert existing Equity Interests, or issue new Equity Interests. Notwithstanding the foregoing, Pledgor shall promptly notify Administrative Agent if any Equity Interests with respect to each Pledged

7

Entity (whether now owned or hereafter acquired by Pledgor) is not evidenced by a Certificated Security, and shall promptly thereafter take all actions required to perfect the security interest of Administrative Agent in such Pledged Equity under applicable law as required under Section 2. Pledgor further agrees to take such additional actions as Administrative Agent deems necessary or desirable to effect the foregoing and to permit Administrative Agent to exercise any of its rights and remedies hereunder and agrees to provide an opinion of counsel satisfactory to Administrative Agent with respect to any such pledge of Equity Interests which are not Certificated Securities promptly upon request of Administrative Agent. WITHOUT LIMITING THE EFFECT OF THE IMMEDIATELY PRECEDING CLAUSE AND SUBJECT TO SECTION 2 HEREOF, PLEDGOR HEREBY GRANTS TO ADMINISTRATIVE AGENT AN IRREVOCABLE PROXY TO, FOLLOWING THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT OF DEFAULT, VOTE THE PLEDGED EQUITY AND TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF THE PLEDGED EQUITY WOULD BE ENTITLED (INCLUDING WITHOUT LIMITATION (A) GIVING OR WITHHOLDING WRITTEN CONSENTS, (B) CALLING SPECIAL MEETINGS, (C) VOTING AT SUCH MEETINGS, AND (D) VOTING AT ANY TIME OR PLACE) WITH RESPECT TO ANY ACTION, DECISION, DETERMINATION OR ELECTION BY THE PLEDGED ENTITIES OR THE HOLDERS OF THE RESPECTIVE EQUITY INTERESTS THEREIN THAT THE PLEDGED EQUITY (OR ANY NEW OR ADDITIONAL EQUITY INTEREST IN SUCH PLEDGED ENTITY) BE, OR CEASE TO BE, A CERTIFICATED SECURITY, AND ALL OTHER MATTERS RELATED TO ANY SUCH ACTION, DECISION, DETERMINATION OR ELECTION, WHICH PROXY SHALL BE EFFECTIVE AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY PLEDGED EQUITY ON THE RECORD BOOKS OF THE ISSUER THEREOF BY ANY OTHER PERSON (INCLUDING THE ISSUER OF THE PLEDGED EQUITY OR ANY OFFICER OR AGENT THEREOF) AS OF THE DATE HEREOF) AND WHICH SHALL ONLY TERMINATE UPON THE CURE OF SUCH EVENT OF DEFAULT. THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

b.      Registration in Nominee Name; Denominations. Pledgor hereby agrees that (i) the Administrative Agent shall have the right (in its sole and absolute discretion) to hold any Pledged Equity in its own name as Administrative Agent or in the name of its nominee, (ii) at the Administrative Agent's request, Pledgor will promptly give to Administrative Agent copies of any material notices or other communications received by it with respect to any Pledged Equity registered in its name, and (iii) the Administrative Agent shall at all times have the right to exchange any certificates, instruments or other documents representing or evidencing any Pledged Equity owned or held by or on behalf of Pledgor for certificates, instruments or other documents of smaller or larger denominations for any purpose consistent with this Agreement.

c.      Pledged Equity. Pledgor shall (a) deliver to Administrative Agent any Certificated Securities representing the Pledged Equity, in form and content reasonably acceptable to Administrative Agent, duly endorsed or subscribed in blank, or accompanied by appropriate stock or unit powers or other instruments of transfer, pledge or assignment, and enter into such other arrangements as may be necessary to give control of any Investment Property to Administrative Agent within the meaning of Section 8-106 of the UCC, (b) cause each Pledged Entity to execute and deliver the Agreement and Acknowledgment to Pledge attached hereto as Exhibit A (the "Agreement and Acknowledgment"), and (c) promptly take all other actions required to perfect the security interest of Administrative Agent in the Collateral under applicable law. It is the intention of Pledgor and Administrative Agent that at all times while any Secured Obligations under the Loan Agreement remains outstanding, the Pledged Equity shall constitute Investment Property, and, to that end, Pledgor shall take, and shall cause the Pledged Entity to take, all necessary action to obtain such classification pursuant to the UCC.

d.   _Issuance or Acquisition of Equity Interests_.  Pledgor shall not, without executing and delivering, or causing to be executed and delivered, to the Administrative Agent such agreements, documents and instruments as the Administrative Agent may reasonably require, issue or acquire any Equity Interests that (i) is dealt in or traded on a securities exchange or in a securities market, (ii) by its terms expressly provides that it is a Security (as defined in the UCC) governed by Article 8 of the UCC, (iii) is an investment company security, (iv) is held in a Securities Account (as defined in the UCC)  or (v) constitutes a Security or a Financial Asset (each as defined in the UCC).

e.   _Voting and Distributions_.

i.   Unless and until an Event of Default shall have occurred and for so long as same is continuing:

(1)   Pledgor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of the Pledged Equity, or any part thereof, for any purpose consistent with the terms of this Agreement and the other Loan Documents; provided, however, that Pledgor will not exercise any such right if the result thereof is reasonably likely to adversely affect the rights inuring to a holder of the Pledged Equity or the rights and remedies of the Administrative Agent under this Agreement or any of the other Loan Documents.

(2)   Pledgor shall be entitled to receive, retain or use any cash Distributions paid on the Pledged Equity not in connection with a partial or total liquidation or dissolution, return of capital, capital surplus or paid-in surplus, in each case, to the extent expressly permitted pursuant to the terms of the Loan Agreement.

(3)   All non-cash Distributions paid or payable in cash or otherwise in connection with a partial or total liquidation or dissolution, return of capital, capital surplus or paid-in surplus, and all other Distributions (other than distributions referred to in the preceding sentence) made on or in respect of the Pledged Equity, whether paid or payable in cash or otherwise, whether resulting from a subdivision, combination or reclassification of the outstanding Pledged Equity or received in exchange for the Pledged Equity, or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Equity, and, if received by Pledgor, shall not be commingled with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of the Administrative Agent and the Lenders hereunder and shall be forthwith delivered to the Administrative Agent in the same form received (with any necessary endorsement).

ii.   Without limiting the generality of the foregoing, upon the occurrence and during the continuance of an Event of Default, all rights of Pledgor to receive and retain Distributions and to exercise the voting and consensual rights and powers it is entitled to exercise pursuant to the above, and the obligations of the Administrative Agent in connection therewith, shall cease, and all such rights shall thereupon become vested in the Administrative Agent, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers.

iii.   All Distributions received by or on behalf of Pledgor contrary to the provisions of this Agreement or the Loan Agreement shall be held in trust for the benefit of Administrative Agent, shall be segregated from other property or funds of Pledgor and shall be forthwith delivered to the Administrative Agent upon demand in the same form as so received (with any necessary endorsement).  Any and all money and other property paid over to or received by the Administrative Agent pursuant to the provisions of this Section shall be applied by Administrative Agent to the Secured Obligations in such order as Administrative

Agent shall determine in its sole discretion.

4.    Further Assurances

Pledgor hereby covenants and agrees, at the cost and expense of Pledgor, to execute, acknowledge, deliver and/or cause to be duly filed all such further agreements, instruments and other documents (including favorable legal opinions), and take all such further actions, that are necessary to preserve, protect and perfect to the extent contemplated hereby (including without limitation as a result of any change in applicable law) the Pledged Equity and the Security Interest granted by Pledgor and the rights and remedies created hereby, including the payment of any fees and taxes required in connection with its execution and delivery of this Agreement, the granting by Pledgor of the Security Interest and the filing of any financing statements or other documents in connection herewith or therewith.  In addition, to the extent permitted by applicable law, Pledgor hereby irrevocably authorizes the Administrative Agent to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Pledged Equity and the other Collateral and agrees that a photographic or other reproduction of this Agreement or of a financing statement shall be sufficient as a financing statement and may be filed as a financing statement in any and all jurisdictions.  Pledgor hereby further irrevocably authorizes Administrative Agent to file a record or records, including financing statements, in all jurisdictions and with all filing offices that Administrative Agent may determine, in its sole and absolute discretion, are necessary, advisable or prudent to perfect the Security Interest granted by Pledgor and agrees that such financing statements may describe the Pledged Equity and the other Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner that the Administrative Agent may determine, in its sole and absolute discretion, is necessary, advisable or prudent to perfect the Security Interest granted by Pledgor.

5.    Administrative Agent Appointed Attorney-In-Fact

Pledgor hereby appoints the Administrative Agent as Pledgor's true and lawful agent and attorney-in-fact for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Administrative Agent may deem necessary or advisable to accomplish the purposes hereof, which appointment is irrevocable and coupled with an interest and is effective only upon the occurrence and during the continuance of an Event of Default.  The Administrative Agent shall have the right, with power of substitution for Pledgor and in Pledgor's name or otherwise, for the use and benefit of the Administrative Agent, only upon the occurrence and during the continuance of an Event of Default, (i) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Pledged Equity, the other Collateral or any part thereof; (ii) to demand, collect, receive payment of, give receipt for, and give discharges and releases of, any of such Pledged Equity or other Collateral; (iii) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on any of the Pledged Equity or the other Collateral or to enforce any rights in respect of any of such Collateral; (iv) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to any of such Pledged Equity or other Collateral; (v) to notify, or to require Pledgor to notify, issuers or obligors to make payment directly to the Administrative Agent, and (vi) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Pledged Equity or the other Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Administrative Agent were the absolute owner of such Pledged Equity or other Collateral for all purposes; provided, however, that nothing herein contained shall be construed as requiring or obligating the Administrative Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Administrative Agent, or to present or file any claim or notice, or to take any action with respect to any of the Pledged Equity, the other Collateral or the moneys due or to become due in respect thereof or any property covered thereby, and no action taken or omitted to be taken by the

10

Administrative Agent with respect to any of the Pledged Equity or the other Collateral shall give rise to any defense, counterclaim or offset in favor of Pledgor or to any claim or action against Administrative Agent. The provisions of this Section 5 shall in no event relieve Pledgor of any of its obligations hereunder or under the other Loan Documents with respect to any of the Pledged Equity or the other Collateral or impose any obligation on the Administrative Agent to proceed in any particular manner with respect to any of the Pledged Equity or the other Collateral, or in any way limit the exercise by the Administrative Agent of any other or further right that it may have on the date of this Agreement or hereafter, whether hereunder, under any Loan Document, by law or otherwise.

6.    Remedies Upon Default

a.    Remedies Generally.

i.    General Rights.  If any Event of Default shall have occurred and is continuing, the Administrative Agent shall have all the rights and remedies of a secured party under the UCC or otherwise available at law or in equity and, in addition, the Administrative Agent may without being required to give any notice, (i) liquidate any of the Pledged Equity or the other Collateral for cash for application to the payment of the Secured Obligations, absolutely free of any right or claim of Pledgor of any kind.  If Administrative Agent should be required by law to give any notice to Pledgor of the sale of any Pledged Equity or other Collateral, Pledgor agrees that notice mailed postage prepaid to Pledgor in accordance with Section 17 below at least ten (10) days before the sale shall be reasonable.  Without limiting the generality of the foregoing, Pledgor agrees that the Administrative Agent shall have the right, subject to the mandatory requirements of applicable law, to sell or otherwise dispose of any of the Pledged Equity or the other Collateral at public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Administrative Agent shall deem appropriate.  At any such sale, the Pledged Equity and the other Collateral, or any portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as Administrative Agent may determine.  The Administrative Agent shall be irrevocably authorized at any such sale of the Pledged Equity or other Collateral (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to persons who will represent and agree that they are purchasing such Pledged Equity or other Collateral for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale, the Administrative Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Pledged Equity or other Collateral so sold.  Each such purchaser at any sale shall hold the property sold absolutely free from any claim or right on the part of Pledgor and Pledgor waives and releases, to the extent permitted by law, any right of equity of redemption of the Pledged Equity and the other Collateral, stay or appraisal which Pledgor now has or at any time in the future may have under any rule of law or statute, now existing or hereafter enacted.  Administrative Agent shall not be required to proceed against the Pledged Equity and the other Collateral in any order and Administrative Agent may proceed against any and all of the Pledged Equity and the other Collateral in any order it deems advisable in its sole discretion.

ii.    Application of Proceeds of Sale.  The Administrative Agent may apply the proceeds of any collection or sale of the Pledged Equity or the other Collateral, as well as any Collateral consisting of cash, to the Secured Obligations in such order as Administrative Agent shall determine.  The Administrative Agent shall have sole discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement.

7.    Reimbursement of Administrative Agent

In the event that Pledgor shall breach or fail to timely perform any provisions of this Agreement, Pledgor shall, immediately upon demand by Administrative Agent, pay all of Administrative Agent's and each Lender's costs and expenses (including court costs and attorneys' fees) incurred by Administrative

Agent and Lenders in the enforcement hereof or the preservation of all of Administrative Agent's and each Lender's rights hereunder, together with interest thereon from the date requested by Administrative Agent until the date of payment to Administrative Agent and Lenders. The covenant contained in this Section shall survive the payment and performance of the Secured Obligations.

8. <u>Waivers; Amendment</u>

No failure or delay of the Administrative Agent in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent are cumulative and are not exclusive of any rights or remedies that Administrative Agent would otherwise have. No waiver of any provision of this Agreement or any other agreement or consent to any departure by Pledgor or any Pledged Entity therefrom shall in any event be effective unless the same shall be in writing and signed by the Administrative Agent, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on Pledgor in any case shall entitle Pledgor to any other or further notice or demand in similar or other circumstances. Neither this Agreement nor any provision hereof may be waived, amended, supplemented or otherwise modified, or any departure therefrom consented to, except pursuant to an agreement or agreements in writing entered into between the Administrative Agent and Pledgor to which such waiver, amendment, supplement, modification or consent relates.

9. <u>Security Interest Absolute</u>

All rights of the Administrative Agent hereunder, the Security Interest and all obligations of Pledgor hereunder shall be absolute and unconditional irrespective of (i) any lack of validity or enforceability of any of the Loan Documents, any agreement with respect to any of the Secured Obligations, or any other agreement or instrument relating to any of the foregoing, (ii) any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other waiver, amendment, supplement or other modification of, or any consent to any departure from any of the Loan Documents or any other agreement or instrument relating to any of the foregoing, (iii) any exchange, release or non-perfection of any lien on any other collateral, or any release or waiver, amendment, supplement or other modification of, or consent under, or departure from, any guaranty, securing or guaranteeing all or any of the Secured Obligations, or (iv) any other circumstance that might otherwise constitute a defense available to, or a discharge of, Pledgor in respect of the Secured Obligations or in respect of this Agreement, any other Loan Document, or any other agreement or instrument between Pledgor and Administrative Agent and/or any Lender.

10. <u>Waivers; Obligations Not Waived</u>

Pledgor waives presentment, demand of payment and protest in connection with any of the Obligations or the Note and also waives notice of acceptance of its pledge hereunder and notice of protest for nonpayment. To the fullest extent permitted by applicable law, the obligations of Pledgor hereunder shall not be affected by (i) the failure of the Administrative Agent to assert any claim or demand or to enforce or exercise any right or remedy against Borrower or any guarantor under the provisions of the Loan Documents, or any other document or instrument, or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from, any of the terms or provisions of this Agreement, any other document or instrument, any guarantee or any other agreement or (iii) the failure to perfect any security interest in, or the release of, any of the security held by or on behalf of the Administrative Agent or any Lender.

11. <u>Defenses Waived</u>

Pledgor waives any defense based on or arising out of any defense of Borrower or any guarantor of the Secured Obligations or the unenforceability of the Secured Obligations or any part thereof from any cause, or the cessation from any cause of the liability of Borrower or any guarantor of the Secured Obligations, other than the final and indefeasible payment in full in cash and full performance of the Secured Obligations. The Administrative Agent may, at its election, following the occurrence and during the continuance of an Event of Default, foreclose on any security held by it by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Secured Obligations, make any other accommodation with any other person or exercise any other right or remedy available to it against any other person, without affecting or impairing in any way the liability of Pledgor hereunder except to the extent the Secured Obligations have been fully, finally and indefeasibly paid in cash. Pursuant to applicable law, Pledgor waives any defense arising out of any such election even though such election operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of Pledgor against each Pledged Entity, or any security.

12.    Agreement To Pay; Subordination

Upon payment by Pledgor of any sums to the Administrative Agent, all rights of Pledgor against any other person or entity arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior final and indefeasible payment in full in cash of the Secured Obligations. If, notwithstanding the foregoing, any amount shall be paid to Pledgor on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such debt of any other person or entity, such amount shall be held in trust for the benefit of the Administrative Agent and shall forthwith be paid to Administrative Agent to be credited against the payment of the Secured Obligations, whether matured or unmatured.

13.    Information

Pledgor assumes all responsibility for being and keeping itself informed of all circumstances bearing upon the risk of nonpayment of the Secured Obligations and the nature, scope and extent of the risks that Pledgor assumes and incurs hereunder, and agrees that the Administrative Agent will not have any duty to advise Pledgor of information known to it regarding such circumstances or risks.

14.    Reasonable Care

Beyond the exercise of reasonable care to assure the safe custody of the Pledged Equity while held hereunder, under no circumstances shall Administrative Agent be deemed to assume any responsibility for or obligation or duty with respect to any part or all of the Pledged Equity or the other Collateral of any nature or kind or any matter or proceedings arising out of or relating thereto. Administrative Agent shall not have any duty or liability to collect any sums due in respect thereof or to protect or preserve its or Pledgor's rights pertaining thereto and shall be relieved of all responsibility for any of the Pledged Equity or the other Collateral upon surrendering the same to Pledgor.

15.    Marshalling

Administrative Agent shall not be required to marshal any present or future collateral security (including, but not limited to the Pledged Equity) for, or other assurances of payment of, the Secured Obligations, or any of them, or to resort to such collateral security or other assurances of payment in any particular order. All of Administrative Agent's rights and remedies hereunder and in respect of such

13

security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising.  To the extent that Pledgor lawfully may, Pledgor hereby agrees that it will not invoke any law relating to the marshalling of collateral that might cause delay in or impede the enforcement of Administrative Agent's rights under this Agreement or under any other instrument evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and to the extent that it lawfully may, Pledgor hereby irrevocably waives the benefits of all such laws.

16.    Termination; Effectiveness

(a)    Pledgor's obligations hereunder shall terminate when all the Secured Obligations have been finally and indefeasibly paid in full in cash and all other obligations performed thereunder.

(b)    This Agreement shall continue to be effective or be automatically reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Secured Obligations is rescinded or must otherwise be restored or returned by the Administrative Agent or any of the Secured Obligations as a preference, fraudulent conveyance or otherwise under any bankruptcy, insolvency or similar law, all as though such payment had not been made; provided that in the event payment of all or any part of the Secured Obligations is rescinded or must be restored or returned, all reasonable costs and expenses (including, without limitation, attorneys' fees, the allocated cost of internal counsel and disbursements) actually incurred by the Administrative Agent or any holder of the Secured Obligations in defending and enforcing such reinstatement shall be deemed to be included as a part of the Secured Obligations.

17.    Notices

All communications and notices hereunder shall be in writing and given as provided in the Loan Agreement, in each case, at the applicable notice address specified (a) in the Loan Agreement, with respect to Administrative Agent, and (b) on Schedule A hereto (or at such other address as the applicable Pledgor may thereafter specify for such purpose in accordance with the terms of the Loan Agreement), with respect to Pledgor.

18.    Binding Effect; Several Agreement; Assignments

Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party, and all covenants, promises and agreements by or on behalf of Pledgor that are contained in this Agreement shall bind and inure to the benefit of each party hereto and its successors and assigns.  Notwithstanding the foregoing, Pledgor shall not have any right to assign its rights or obligations hereunder without the consent of Administrative Agent, and any such assignment in violation of this Section 18 shall be null and void.

19.    Survival of Agreement; Severability

All covenants, agreements, representations and warranties made by Pledgor herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the Administrative Agent and shall survive the execution and delivery of hereof, regardless of any investigation made by the Administrative Agent or on its behalf, and shall continue in full force and effect until this Agreement shall terminate.  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein or therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any

14

other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

20.     Counterparts

This Agreement may be executed and delivered in any number of counterparts each of which shall constitute an original, but all of which taken together shall constitute but one and the same agreement. Delivery of an executed signature page to this Agreement by facsimile or e-mail transmission shall be effective as delivery of a manually signed counterpart of this Agreement.

21.     Headings

Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

22.     Governing Law

This Agreement and the other Loan Documents and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any of the other Loan Documents and the transactions contemplated hereby shall be governed by the laws of the State of New York.

23.     Submission to Jurisdiction; Venue

(a)     Pledgor hereby irrevocably and unconditionally (i) agrees that any legal action, suit or proceeding arising out of or relating to this Agreement may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit or proceeding.  Final judgment against Pledgor in any action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.  Nothing in this Agreement or any other Loan Document shall affect the right of Administrative Agent to bring any action or proceeding relating to this Agreement or any other Loan Document against Pledgor, any Pledged Entity or their respective properties in the courts of any jurisdiction.

(b)     Pledgor irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any court referred to in Section 23(a) and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

24.     Waiver of Jury Trial

**PLEDGOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY.**

25.     Joint and Several Liability.

THE LIABILITY OF PLEDGOR UNDER THIS AGREEMENT SHALL BE JOINT AND SEVERAL WITH BORROWER UNDER THIS AGREEMENT AND THE OTHER LOAN

15

DOCUMENTS.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the parties hereto have duly executed this Pledge and Security Agreement as of the day and year first above written.

**PLEDGOR:**

_____
**SCOTT ZANKL**

_____
**KRISTEN ZANKL**

*Signature Page to Pledge and Security Agreement*

ADMINISTRATIVE AGENT:

**FVP SERVICING, LLC**,
as Administrative Agent

By: _____

Name: Keith Lee

Title: Manager

*Signature page to Pledge and Security Agreement*

18

### SCHEDULE A
### List of Pledged Equity Interests and Pledgor Information

I.  Pledgor Information

| Pledgor | Pledgor Notice Address |
|---|---|
| Scott Zankl | 1001 Clint Moore Road, Unit B<br>Boca Raton, FL 33487<br>Attn: Scott Zankl |
| Kristen Zankl | 1001 Clint Moore Road, Unit B<br>Boca Raton, FL 33487<br>Attn: Scott Zankl |

II.  Pledged Equity Interests

| Pledgor | Pledged Entity | Description of Equity Interests Owned | Percentage of Issued Equity Interests Owned | Certificated Security (Yes/No) and Certificate No. (if applicable) |
|---|---|---|---|---|
| Scott Zankl | Karma of Broward, Inc. | Stock | 50% | No |
| | Karma of Palm Beach, Inc. | Stock | 50% | No |
| | Excell Auto Sport and Service, Inc. | Stock | 23% | No |
| | Excell Auto Finance, LLC | Membership Interests | 25% | No |
| Kristen Zankl | Karma of Broward, Inc. | Stock | 50% | No |
| | Karma of Palm Beach, Inc. | Stock | 50% | No |
| | Excell Auto Sport and Service, Inc. | Stock | 0% | No |
| | Excell Auto Finance, LLC | Membership Interests | 0% | No |

4870-8593-1522.4

## EXHIBIT A

### Agreement and Acknowledgment

Each of the undersigned (each, a "Pledged Entity") hereby consents to the pledge of Equity Interests in such Pledged Entity as described in the Pledge and Security Agreement dated as of January 26, 2022 (as amended, modified, supplemented, extended, restated or renewed from time to time, the "Pledge Agreement") by and among Scott Zankl and Kristen Zankl, individual and collectively as Pledgor, and FVP Servicing, LLC, as Administrative Agent.  Each Pledged Entity agrees that upon the receipt of a written notice from Administrative Agent that an Event of Default has occurred and is continuing under the Loan Agreement, each Pledged Entity shall pay all Distributions on the Pledged Equity issued by it directly to Administrative Agent.  All capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Pledge Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the undersigned hereby represents, warrants, covenants and agrees for the benefit of Administrative Agent as follows:

1. Representations and Warranties. Each of the undersigned represents and warrants that (a) the execution and delivery of the Pledge Agreement does not violate any of such undersigned's Organizational Agreements or any other agreement to which such undersigned is a party or by which any of the property of such undersigned is bound, (b) the undersigned has not entered into a control agreement perfecting a security interest in any of the Pledged Equity Interests favor of any other party, other than pursuant to a Permitted Lien, (c) the Collateral is not subject to any security interest or lien in favor of any person or entity (or otherwise) other than Administrative Agent and has not been pledged, transferred or assigned to, and is not otherwise in the control of, any person or entity (or otherwise) other than Administrative Agent, in each case, other than pursuant to a Permitted Lien, (d) none of the undersigned has any present claim, right of offset, or counterclaim against Pledgor under or with respect to the Collateral or otherwise under the Organizational Agreements of any of the undersigned, (e) no Pledgor is in default to the undersigned or otherwise under or in respect of any of its respective obligations under any of such undersigned's Organizational Agreements, and (f) all of the representations and warranties of Pledgor made in the Pledge Agreement are true, accurate and complete in all respects and, without limitation of the foregoing, the ownership of each Pledged Entity, as set forth on Schedule A to the Pledge Agreement, is true, accurate and complete in all respects.

2. Covenants and Agreements.

(a) Books and Records.  Each of the undersigned (i) shall cause all of its respective books and records to reflect the pledge of the Collateral to Administrative Agent and agrees not to consent to or to permit any transfer thereof or any other action that may be taken by Pledgor that might constitute an Event of Default so long as any of the Secured Obligations remain outstanding, (ii) agrees that Administrative Agent and/or its representatives may, upon reasonable advance notice and at any reasonable time during normal business hours, inspect the books, records and properties of such undersigned.

(b) UCC Matters.  The undersigned confirms, agrees and acknowledges that (i) all Pledged Equity has been validly issued and is fully paid for, (ii) none of the Pledged Equity in the undersigned is, except as otherwise specified in Schedule A to the Pledge Agreement, a Certificated Security, (iii) with respect to such Pledged Equity so designated in Schedule A to the Pledge Agreement as a Certificated Security (A) such Pledged Equity is and shall continue to be evidenced by one (1) certificate issued to the Pledgor specified in Schedule A, as its sole members or shareholders, as the case may be, (B) such certificate represents and embodies all right, title and interest in and to the Pledged Equity, (C) each such original

certificate that has been physically delivered to Administrative Agent, was in the physical possession of the Pledgor at all times prior to such delivery to Administrative Agent, and has been duly indorsed in blank within the meaning of the UCC, and (D) such certificate has not been modified or amended and remains in full force and effect, (iv) ownership of all Pledged Equity in each of the undersigned is registered in the respective books and records of the undersigned in the name of the Pledgor, in such amounts and in such manner as specified in Schedule A to the Pledge Agreement, subject only to the pledge thereof in favor of Administrative Agent as security for the Secured Obligations and Permitted Liens, (v) notwithstanding any provisions in the Organizational Agreements, Pledgor is hereby authorized and permitted to pledge, assign and grant a security interest in the Collateral in favor of Administrative Agent pursuant to the Pledge Agreement, (vi) this Agreement and Acknowledgment is intended to, and shall, provide Administrative Agent with "control" over the Collateral within the meaning of Articles 8 and 9 of the UCC, (vii) each of the undersigned shall comply with all instructions relating to the Collateral originated by Administrative Agent without further authorization or consent from Pledgor, the intention of such covenant being to comply with Section 8-106(c)(2) of the UCC, and (viii) no additional Equity Interest held by Pledgor in any of the undersigned other than those held by Pledgor and specified in Schedule A to the Pledge Agreement are valid or will be recognized by the undersigned.

(c) Organizational Agreements; Additional Issuances.  None of the undersigned shall (i) suffer or permit its Organizational Agreements to be amended or modified in any manner adverse to Administrative Agent, or (ii) issue any additional Equity Interests (other than to Pledgor), in each case, without the prior written consent of Administrative Agent.

(d) Notices; Defaults.  Each of the undersigned shall give Administrative Agent a copy of all notices, reports or communicates received or given pursuant to its Organizational Agreements promptly after the same shall have been received or contemporaneously with the giving thereof, as the case may be. The undersigned shall permit Administrative Agent the right to cure any default (beyond any applicable notice and cure periods) by Pledgor under the Organizational Agreements, and no notice of any default by Pledgor with respect to the Organizational Agreements shall be effective unless and until such notice has been received by Administrative Agent; provided, however, in no event shall Administrative Agent be obligated to cure such default. Administrative Agent shall have fifteen (15) days in excess of the amount of time to cure any such default as given to Pledgor under the Organizational Agreements, as measured from the date notice of such default has been received by Administrative Agent.

3. Events of Default; Sales of Collateral.  Each of the undersigned hereby agrees that during the continuance of an Event of Default, (a) all Distributions will be made directly to Administrative Agent, (b) Administrative Agent shall have the sole and exclusive right to exercise all voting, consensual and other powers of ownership pertaining to the Collateral in accordance with the Pledge Agreement, (c) Administrative Agent may take any reasonable action which Administrative Agent may deem necessary for the maintenance, preservation and protection of any of the Collateral or Administrative Agent's security interests therein, including, without limitation, the right to declare any or all Secured Obligations to be immediately due and payable without demand or notice and the right to transfer any of the Pledged Equity or other Collateral into Administrative Agent's name or the name of any designee or nominee of Administrative Agent, (d) Administrative Agent may dispose of the Collateral in accordance with Articles 8 and 9 of the UCC and the provisions of the Pledge Agreement, in which case, notwithstanding anything to the contrary in the Organizational Agreements, (i) Administrative Agent, or its designee or assign, at its election, shall automatically be admitted as a shareholder, member or partner, as the case may be, of the undersigned and shall be entitled to receive all benefits and exercise all rights in connection therewith pursuant to the Organizational Agreements of the undersigned, (ii) the undersigned shall recognize Administrative Agent (or its designee or assign), at its election, as the successor in interest to Pledgor, and (iii) notwithstanding any provisions to the contrary in the Organizational Agreements, Administrative Agent shall not be required to pay any fees or other consideration of any type, or execute any documents,

or be limited by any requirements or conditions whatsoever (regarding Distributions receivable by Administrative Agent from the undersigned, Administrative Agent's financial condition or otherwise), other than any such requirements, if any, that are expressly set forth in the Loan Documents.

4. No Liability.  Notwithstanding the security interests of Administrative Agent in the Collateral or any of its rights hereunder or under the Pledge Agreement, (a) Administrative Agent shall have no obligation or liability whatsoever for matters in connection with the Pledged Equity arising or occurring, directly or indirectly, prior to Administrative Agent's (or its designee's, successor's or assign's) becoming a shareholder, member or partner, as the case may be, of the undersigned, and (b) Administrative Agent shall not be obligated to perform any of the obligations or duties of Pledgor under any of the undersigned's Organizational Agreements, or to take any action to collect or enforce any claim for payment due Pledgor arising thereunder.

5. Transfers.  Each of the undersigned acknowledges that the security interest of Administrative Agent in the Collateral and all of Administrative Agent's rights and remedies under the Pledge Agreement may be freely transferred or assigned by Administrative Agent. In the event of any such transfer or assignment, all of the provisions of this Agreement and Acknowledgment shall inure to the benefit of the transferees, successors, and/or assigns of Administrative Agent. The provisions of this Agreement and Acknowledgment shall likewise be binding upon any and all permitted transferees, successors and assigns of the undersigned.

6. Further Assurances.  Each of the undersigned shall, from time to time, promptly execute and deliver such further instruments, documents and agreements, and perform such further acts as may be reasonably necessary or proper to carry out and effect the terms of the Pledge Agreement and this Agreement and Acknowledgment.

7. Reliance.  This Agreement and Acknowledgment is being given to induce Administrative Agent to accept the Pledge Agreement and with the understanding that Administrative Agent will rely hereon.

8. Counterparts.  This Agreement and Acknowledgment may be executed in counterparts.

9. Miscellaneous.  The provisions of Sections 8, 10, 11, 17-19, 21, 23-25 and 27 of the Pledge Agreement are hereby incorporated herein by this reference (with all references to Pledgor therein deemed to mean and refer to the undersigned).

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, each of the undersigned has duly executed this Agreement and Acknowledgment as of the day and year first above written.

**KARMA OF BROWARD, INC.**,
a Florida corporation

By: _____
Name: Scott Zankl
Title: Pres

**KARMA OF PALM BEACH, INC.**,
a Florida corporation

By: _____
Name: Scott Zankl
Title: Pres

**EXCELL AUTO SPORT AND SERVICE, INC.**, a Florida corporation

By: _____
Name: Scott Zankl
Title: Pres

**EXCELL AUTO FINANCE, LLC**,
a Florida limited liability company

By: _____
Name: Scott Zankl
Title: Pres

*Signature Page to Agreement and Acknowledgment*

<u>Exhibit B</u>
Organizational Agreements

[See Attached]



**State of Florida**

**Department of State**

I certify the attached is a true and correct copy of the Articles of Incorporation, as amended to date, of KARMA OF BROWARD, INC., a corporation organized under the laws of the State of Florida, as shown by the records of this office.

The document number of this corporation is P20000026081.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Nineteenth day of November, 2021



*Laurel M. Lee*

*Secretary of State*

CR2E022 (01-11)

# Electronic Articles of Incorporation For

**P20000026081**
**FILED**
**March 25, 2020**
**Sec. Of State**
**wlawrence**

KARMA OF BROWARD, INC.

The undersigned incorporator, for the purpose of forming a Florida profit corporation, hereby adopts the following Articles of Incorporation:

## Article I

The name of the corporation is:

KARMA OF BROWARD, INC.

## Article II

The principal place of business address:

1699 S. FEDERAL HIGHWAY
SUITE 300
BOCA RATON, FL.   33432

The mailing address of the corporation is:

1699 S. FEDERAL HIGHWAY
SUITE 300
BOCA RATON, FL.   33432

## Article III

The purpose for which this corporation is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The number of shares the corporation is authorized to issue is:

100

## Article V

The name and Florida street address of the registered agent is:

THOMAS U GRANER
1699 S. FEDERAL HIGHWAY
SUITE 300
BOCA RATON, FL.   33432

I certify that I am familiar with and accept the responsibilities of registered agent.

Registered Agent Signature:   THOMAS U. GRANER

P20000026081
FILED
March 25, 2020
Sec. Of State
wlawrence

## Article VI

The name and address of the incorporator is:

THOMAS U. GRANER
1699 S. FEDERAL HIGHWAY
SUITE 300
BOCA RATON, FL 33432

Electronic Signature of Incorporator:   THOMAS U. GRANER

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.  I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of this corporation and every year thereafter to maintain "active" status.

## Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

Title:   P
SCOTT ZANKL
1699 S. FEDERAL HIGHWAY
BOCA RATON, FL.   33432  US

## Article VIII

The effective date for this corporation shall be:

03/20/2020

**Articles of Amendment**
**to**
**Articles of Incorporation**
**of**

KARMA OF BROWARD, INC.

**(Name of Corporation as currently filed with the Florida Dept. of State)**

P20000026081

(Document Number of Corporation (if known))

Pursuant to the provisions of section 607.1006, Florida Statutes, this *Florida Profit Corporation* adopts the following amendment(s) to its Articles of Incorporation:

**A. If amending name, enter the new name of the corporation:**

_____ *The new name must be distinguishable and contain the word "corporation," "company," or "incorporated" or the abbreviation "Corp.," "Inc.," or Co.," or the designation "Corp," "Inc," or "Co". A professional corporation name must contain the word "chartered," "professional association," or the abbreviation "P.A."*

**B. Enter new principal office address, if applicable:**
*(Principal office address MUST BE A STREET ADDRESS )*

**C. Enter new mailing address, if applicable:**
*(Mailing address MAY BE A POST OFFICE BOX)*

**D. If amending the registered agent and/or registered office address in Florida, enter the name of the new registered agent and/or the new registered office address:**

*Name of New Registered Agent* _____

_____
*(Florida street address)*

*New Registered Office Address*: _____, Florida_____
*(City)*                                                        *(Zip Code)*

**New Registered Agent's Signature, if changing Registered Agent:**
*I hereby accept the appointment as registered agent.  I am familiar with and accept the obligations of the position.*

_____
*Signature of New Registered Agent, if changing*

**Check if applicable**
☐ The amendment(s) is/are being filed pursuant to s. 607.0120 (11) (e), F.S.

**If amending the Officers and/or Directors, enter the title and name of each officer/director being removed and title, name, and address of each Officer and/or Director being added:**

*(Attach additional sheets, if necessary)*

*Please note the officer/director title by the first letter of the office title:*

*P = President; V= Vice President; T= Treasurer; S= Secretary; D= Director; TR= Trustee; C = Chairman or Clerk; CEO = Chief Executive Officer; CFO = Chief Financial Officer. If an officer/director holds more than one title, list the first letter of each office held. President, Treasurer, Director would be PTD.*

*Changes should be noted in the following manner. Currently John Doe is listed as the PST and Mike Jones is listed as the V. There is a change, Mike Jones leaves the corporation, Sally Smith is named the V and S. These should be noted as John Doe, PT as a Change, Mike Jones, V as Remove, and Sally Smith, SV as an Add.*

**Example:**

| | | |
|---|---|---|
| X Change | PT | John Doe |
| X Remove | V | Mike Jones |
| X Add | SV | Sally Smith |

| Type of Action (Check One) | Title | Name | Address |
|---|---|---|---|
| 1) __X__ Change ____ Add ____ Remove | P ___ | KRISTEN N. ZANKL | 1699 S FEDERAL HIGHWAY BOCA RATON, FL 33432 |
| 2) ____ Change __X__ Add ____ Remove | VP | SCOTT T. ZANKL | 1699 S FEDERAL HIGHWAY BOCA RATON, FL 33432 |
| 3) ____ Change ____ Add ____ Remove | ___ | | |
| 4) ____ Change ____ Add ____ Remove | ___ | | |
| 5) ____ Change ____ Add ____ Remove | ___ | | |
| 6) ____ Change ____ Add ____ Remove | ___ | | |

**E. If amending or adding additional Articles, enter change(s) here:**
   (Attach *additional sheets, if necessary).    (Be specific)

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


**F. If an amendment provides for an exchange, reclassification, or cancellation of issued shares, provisions for implementing the amendment if not contained in the amendment itself:**
   (*if not applicable, indicate N/A*)

_____

_____

_____

_____

_____

_____

_____

_____

**The date of each amendment(s) adoption:** _____ , if other than the date this document was signed.

**Effective date if applicable:** _____

*(no more than 90 days after amendment file date)*

**Note:** If the date inserted in this block does not meet the applicable statutory filing requirements, this date will not be listed as the document's effective date on the Department of State's records.

**Adoption of Amendment(s)**          **(CHECK ONE)**

■ The amendment(s) was/were adopted by the incorporators, or board of directors without shareholder action and shareholder action was not required.

☐ The amendment(s) was/were adopted by the shareholders. The number of votes cast for the amendment(s) by the shareholders was/were sufficient for approval.

☐ The amendment(s) was/were approved by the shareholders through voting groups. *The following statement must be separately provided for each voting group entitled to vote separately on the amendment(s):*

"The number of votes cast for the amendment(s) was/were sufficient for approval

by _____."

*(voting group)*

Dated_____

Signature _____

(By a director, president or other officer – if directors or officers have not been selected, by an incorporator – if in the hands of a receiver, trustee, or other court appointed fiduciary by that fiduciary)

SCOTT T. ZANKL
_____
(Typed or printed name of person signing)

PRESIDENT
_____
(Title of person signing)



# State of Florida

## Department of State

I certify the attached is a true and correct copy of the Articles of Incorporation of KARMA OF PALM BEACH, INC., a corporation organized under the laws of the State of Florida, filed on June 16, 2020, as shown by the records of this office.

The document number of this corporation is P20000045476.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Nineteenth day of November, 2021



*Laurel M. Lee*

*Secretary of State*

CR2E022 (01-11)

# Electronic Articles of Incorporation For

**P20000045476**
**FILED**
**June 16, 2020**
**Sec. Of State**
**kepage**

KARMA OF PALM BEACH, INC.

The undersigned incorporator, for the purpose of forming a Florida profit corporation, hereby adopts the following Articles of Incorporation:

## Article I

The name of the corporation is:

KARMA OF PALM BEACH, INC.

## Article II

The principal place of business address:

1001 CLINT MOORE ROAD
SUITE 101
BOCA RATON, FL. US  33487

The mailing address of the corporation is:

1001 CLINT MOORE ROAD
SUITE 101
BOCA RATON, FL. US  33487

## Article III

The purpose for which this corporation is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The number of shares the corporation is authorized to issue is:

100

## Article V

The name and Florida street address of the registered agent is:

THOMAS U GRANER
1699 S FEDERAL HIGHWAY
SUITE 300
BOCA RATON, FL.  33432

I certify that I am familiar with and accept the responsibilities of registered agent.

Registered Agent Signature:   THOMAS U. GRANER

P20000045476
FILED
June 16, 2020
Sec. Of State
kepage

# Article VI

The name and address of the incorporator is:

THOMAS U. GRANER
1699 S FEDERAL HIGHWAY
SUITE 300
BOCA RATON, FL 33432

Electronic Signature of Incorporator:  THOMAS U. GRANER

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.  I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of this corporation and every year thereafter to maintain "active" status.

# Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

Title:  P
SCOTT ZANKL
1001 CLINT MOORE ROAD, #101
BOCA RATON, FL.  33487  US

Title:  VP
KRISTEN  ZANKL
1001 CLINT MOORE ROAD, #101
BOCA RATON, FL.  33487  US

# Electronic Articles of Organization For
# Florida Limited Liability Company

L16000193119
FILED 8:00 AM
October 19, 2016
Sec. Of State
tscott

## Article I

The name of the Limited Liability Company is:

EXCELL AUTO FINANCE, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

5471 N. DIXIE HIGHWAY
SUITE 5
BOCA RATON, FL. US  33487

The mailing address of the Limited Liability Company is:

5471 N. DIXIE HIGHWAY
SUITE 5
BOCA RATON, FL. US  33487

## Article III

Other provisions, if any:

ANY AND ALL LAWFUL PURPOSES

## Article IV

The name and Florida street address of the registered agent is:

THOMAS U GRANER
720 E. PALMETTO PARK ROAD
BOCA RATON, FL.  33432

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   THOMAS U. GRANER

# Article V

The name and address of person(s) authorized to manage LLC:

L16000193119
FILED 8:00 AM
October 19, 2016
Sec. Of State
tscott

Title:  MGR
SCOTT  ZANKL
5471 N. DIXIE HIGHWAY, SUITE 5
BOCA RATON, FL.   33487  US

Title:  MGR
THOMAS U GRANER
720 E. PALMETTO PARK ROAD
BOCA RATON, FL.   33432  US

# Article VI

The effective date for this Limited Liability Company shall be:

10/19/2016

Signature of member or an authorized representative

Electronic Signature: THOMAS U. GRANER

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# Electronic Articles of Organization For
# Florida Limited Liability Company

**L16000180406**
**FILED 8:00 AM**
**September 27, 2016**
**Sec. Of State**
**kpcardwell**

## Article I

The name of the Limited Liability Company is:

EXCELL AUTO SPORT AND SERVICE, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

5471 N. DIXIE HIGHWAY
SUITE 5
BOCA RATON, FL. US  33487

The mailing address of the Limited Liability Company is:

6560 W. ROGERS CIRCLE
SUITE 27
BOCA RATON, FL. US  33487

## Article III

Other provisions, if any:

ANY AND ALL LAWFUL PURPOSES

## Article IV

The name and Florida street address of the registered agent is:

SCOTT  GHERMAN
902 CLINT MOORE ROAD
SUITE 108
BOCA RATON, FL.   33487

Having been named as registered agent and to accept service of process for the above stated limited
liability company at the place designated in this certificate, I hereby accept the appointment as registered
agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes
relating to the proper and complete performance of my duties, and I am familiar with and accept the
obligations of my position as registered agent.

Registered Agent Signature:   SCOTT GHERMAN

# Article V

The name and address of person(s) authorized to manage LLC:

**L16000180406**
**FILED 8:00 AM**
**September 27, 2016**
**Sec. Of State**
**kpcardwell**

Title:  MGR
MOSHE  FARACHE
2660 NW 2ND AVE
BOCA RATON, FL.   33431  US

Title:  MGR
ROBERT  O'CONNELL JR
2660 NW 2ND AVE
BOCA RATON, FL.   33431  US

Title:  MGR
SCOTT  ZANKL
5471 N. DIXIE HIGHWAY, SUITE 5
BOCA RATON, FL.   33487  US

## Signature of member or an authorized representative

Electronic Signature: THOMAS U. GRANER

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# Bylaws
## of
## KARMA OF BROWARD, Inc.

## ARTICLE I – DIRECTORS

<u>Section 1 – Function</u>.  All corporate powers shall be exercised by or under the authority of the Board of Directors.  The business and affairs of the Corporation shall be managed under the direction of the Board of Directors.  Directors must be natural persons who are at least 18 years of age but need not be shareholders of the Corporation.  Residents of any state may be directors.  If the Corporation is a professional corporation, in order for a director to also be a shareholder of the Corporation the director must be duly licensed or otherwise legally authorized to render the same professional service as the Corporation.

<u>Section 2 – Compensation</u>.  The shareholders shall have authority to fix the compensation of directors.  Unless specifically authorized by a resolution of the shareholders, the directors shall serve in such capacity without compensation.

<u>Section 3 – Presumption of Assent</u>.  A director who is present at a meeting of the Board of Directors or a committee of the Board of Directors at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless he objects at the beginning of the meeting (or promptly upon arriving) to the holding of the meeting or transacting the specified business at the meeting, or if the director votes against the action taken or abstains from voting because of an asserted conflict of interest.

<u>Section 4 – Number</u>.  The Corporation shall have a least the minimum number of directors required by law.  The number of directors may be increased or decreased from time to time by the Board of Directors.

<u>Section 5 – Election and Term</u>.  At each annual meeting of the shareholders, the shareholders shall elect directors to hold office until the next annual meeting or until their earlier resignation, removal from office or death.  Directors shall be elected by a plurality of the votes cast by the shares entitled to vote in the election at a meeting at which a quorum is present.

<u>Section 6 – Vacancies</u>.  Any vacancy occurring in the Board of Directors, including a vacancy created by an increase in the number of directors, may be filled by the shareholders or by the affirmative vote of a majority of the remaining directors though less than a quorum of the Board of Directors.  A director elected to fill a vacancy shall hold office only until the next election of directors by the shareholders.  If there are no remaining directors, the vacancy shall be filled by the shareholders.

<u>Section 7 – Removal of Directors</u>.  At a meeting of shareholders, any director or the entire Board of Directors may be removed, with or without cause, provided the notice of the meeting states that one of the purposes of the meeting is the removal of the director.  A director may be removed only if the number of votes cast to remove him/her exceeds the number of votes cast against removal.

Section 8 – Quorum and Voting.  A majority of the number of directors fixed by these Bylaws shall constitute a quorum for the transaction of business.  The act of a majority of directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

Section 9 – Executive and Other Committees.  The Board of Directors, by resolution adopted by a majority of the full Board of Directors, may designate from among its members one or more committees each of which must have at least two members.  Each committee shall have the authority set forth in the resolution designating the committee.

Section 10 – Place of Meeting.  Regular and special meeting of the Board of Directors shall be held at the principal place of the business of the Corporation or at another place designated by person or persons giving notice of otherwise calling the meeting.

Section 11 – Time, Notice and Call of Meetings.  Regular meetings of the Board of Directors shall be held without notice at the time and on the date designated by resolution of the Board of Directors.  Written notice of the time, date and place of special meetings of the Board of Directors shall be given to each director by mail delivery at least two days before the meeting.

Notice of a meeting of the Board of Directors need not be given to a director who signs a waiver of notice either before or after the meeting.  Attendance of a director at a meeting constitutes a waiver of notice of that meeting and waiver of all objections to the place of the meeting, the time of the meeting, and the manner in which it has been called or convened, unless a director objects to the transaction of business (promptly upon arrival at the meeting) because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors must be specified in the notice or waiver of notice of the meeting.

A majority of the directors present, whether or not a quorum exists, may adjourn any meeting of the Board of Directors to another time and place.  Notice of an adjourned meeting shall be given to the directors who were not present at the time of the adjournment and, unless the time and place of the adjournment and, unless the time and place of the adjourned meeting are announced at the time of the adjournment, to the other directors.  Meetings of the Board of Directors may be called by the President of the Chairman of the Board of Directors.  Members of the Board of Directors and any committee of the Board may participate in a meeting by telephone conference or similar communications equipment if all persons participating in the meeting can hear each other at the same time.  Participation by these means constitutes presence in person at a meeting.

Section 12 – Action by Written Consent.  Any action required or permitted to be taken at a meeting of directors may be taken without a meeting if consent in writing setting forth the action to be taken and signed by all of the directors is filed in the minutes of the proceedings of the Board.  The action taken shall be deemed effective when the last director signs the consent, unless the consent specifies otherwise.

## ARTICLE II – MEETINGS OF SHAREHOLDERS

Section 1 – Annual Meeting.  The annual meeting of the shareholders of the corporation for the election of officers and for such other business as may properly come before the meeting shall be held at such time and place as designated by the Board of Directors.

Section 2 – Special Meeting.  Special meetings of the shareholders shall be held when directed by the President or when requested in writing by shareholders holding at least ten percent (10%) of the Corporation's stock having the right and entitled to vote at such meeting.  A meeting requested by shareholders shall be called by the President for a date note less than ten (10) nor more than sixty (60) days after the request is made.  Only business within the purposes described in the meeting notice may be conducted at a special shareholders' meeting.

Section 3 – Place.  Meetings of the shareholders will be held at the principal place of business of the Corporation or at such other place as is designated by the Board of Directors.

Section 4 – Notice.  A written notice of each meeting of shareholders shall be mailed to each shareholder having the right and entitled to vote at the meeting at the address as it appears on the records of the Corporation.  The meeting notice shall be mailed not less than ten (10) nor more than sixty (60) days before the date set for the meeting.  The record date for determining shareholders entitled to vote at the meeting will be the close of business on the date before the notice is sent.  The notice shall state the time and place the meeting is to be held.  A notice of a special meeting shall also state the purposes of the meeting.  A notice of meeting shall be sufficient for that meeting and any adjournment of it.  If a shareholder transfers any shares after the notice is sent, it shall not be necessary to notify the transferee.  All shareholders may waive notice of a meeting at any time.

Section 5 – Shareholder Quorum.  A majority of the shares entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of shareholders.  Any number of shareholders, even if less than a quorum, may adjourn the meeting without further notice until a quorum is obtained.

Section 6 – Shareholder Voting.  If a quorum is present, the affirmative vote of a majority of the shares represented at the meeting and entitled to vote on the subject matter shall be the act of the shareholders.  Each outstanding share shall be entitled to one vote on each matter submitted to a vote at a meeting of shareholders.  An alphabetical list of all shareholders who are entitled to notice of a shareholders' meeting along with their addresses and the number of shares held by each shall be produced at a shareholders' meeting upon the request of any shareholder.

Section 7 – Proxies.  A shareholder entitled to vote at any meeting of shareholders or any adjournment thereof may vote in person or by proxy executed in writing and signed by the shareholder of his attorney-in-fact.  The appointment of proxy will be effective when received by the Corporation's officer or agent authorized to tabulate votes.  No proxy shall be valid more than eleven (11) months after the date of its execution unless a longer term is expressly stated in the proxy.

Section 8 – Validation.  If shareholders who hold a majority of voting stock entitled to vote at a meeting are present at the meeting, and sign a written consent to the meeting on the record, the acts of the meeting shall be valid, even if the meeting was not legally called and noticed.

Section 9 – Conduct of Business by Written Consent.  Any action of the shareholders may be taken without a meeting if written consents, setting forth the action taken, are signed by at least a majority of shares entitled to vote and are delivered to the officer of agent of the Corporation having custody of the Corporation's records within sixty (60) days after the date that the earliest written consent was delivered.  Within ten (10) days after obtaining an authorization of an action by written consent, notice shall be given to those shareholders who have not consented in writing or who are not entitled to vote on the action.  The notice shall fairly summarize the material features of the authorized action.  If the action creates dissenters' rights, the notice shall contain a clear statement of the right of dissenting shareholders to be paid the fair value of their shares upon compliance with and as provided for by the state law governing corporations.

## ARTICLE III – OFFICERS

Section 1 – Officers; Election; Resignation; Vacancies.  The Corporation shall have the officers and assistant officers that the Board of Directors appoint from time to time.  Except as otherwise provided in an employment agreement which the Corporation has with an officer, each officer shall serve until a successor is chosen by the directors at a regular or special meeting of the directors or until removed.  Officers and agents shall be chosen, serve for the terms, and have the duties determined by the directors.  A person may hold two or more offices.

Any officer may resign at any time upon written notice to the Corporation.  The resignation shall be effective upon receipt, unless the notice specifies a later date.  If the resignation is effective at a later date and the Corporation accepts the future effective date, the Board of Directors may fill the pending vacancy before the effective date provided the successor officer does not take office until the future effective date.  Any vacancy occurring in any office of the Corporation by death, resignation, removal or otherwise may be filled for the unexpired portion of the term by the Board of Directors at any regular or special meeting.

Section 2 – Powers and Duties of Officers.  The officers of the Corporation shall have such powers and duties in the management of the Corporation to sign for loans that have been approved by the Corporation, as well as any other powers and duties as may be prescribed by the Board of Directors and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board of Directors.

Section 3 – Removal of Officers.  An officer or agent or member of a committee elected or appointed by the Board of Directors may be removed by the Board with or without cause whenever in its judgment the best interests of the Corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Election or appointment of an officer, agent or member of a committee shall not of itself create contract rights. Any officer, if appointed by another officer, may be removed by that officer.

Section 4 – Salaries.  The Board of Directors may cause the Corporation to enter into employment agreements with any officer of the Corporation.  Unless provided for in an employment agreement between the Corporation and an officer, all officers of the Corporation serve in their capacities without compensation.

Section 5 – Bank Accounts.  The Corporation shall have accounts with financial institutions as determined by the Board of Directors.

## ARTICLE IV – DISTRIBUTIONS

The Board of Directors may, from time to time, declare distributions to its shareholders in cash, property, or its own shares, unless the distribution would cause (i) the Corporation to be unable to pay its debts as they become due in the usual course of business, or (ii) the Corporation's assets to be less than its liabilities plus the amount necessary, if the Corporation were dissolved at the time of the distribution, to satisfy the preferential rights of shareholders whose rights are superior to those receiving the distribution.  The shareholders and the Corporation may enter into an agreement requiring the distribution of corporate profits, subject to the provisions of law.

## ARTICLE V – CORPORATE RECORDS

Section 1 – Corporate Records.  The corporation shall maintain its records in written form or in another form capable of conversion into written form within a reasonable time.  The Corporation shall keep as permanent records minutes of all meetings of its shareholders and Board of Directors, a record of all actions taken by the shareholders or Board of Directors without a meeting, and a record of all actions taken by a committee of the Board of Directors on behalf of the Corporation. The Corporation shall maintain accurate accounting records and a record of its shareholders in a form that permits preparation of a list of the names and addresses of all shareholders in alphabetical order by class of shares showing the number and series of shares held by each.

The Corporation shall keep a copy of its articles or restated articles of incorporation and all amendments to them currently in effect; these Bylaws or restated Bylaws and all amendments currently in effect; resolutions adopted by the Board of Directors creating one or more classes or series of shares and fixing their relative rights, preferences, and limitations, if shares issued pursuant to those resolutions are outstanding; the minutes of all shareholders' meetings and records of all actions taken by shareholders without a meeting for the past three years; written communications to all shareholders generally or all shareholders of a class of series within the past three years, including the financial statements furnished for the last three years; a list of names and business street addresses of its current directors and officers; and its most recent annual report delivered to the Department of State.

Section 2 – Shareholders' Inspection Rights.  A shareholder is entitled to inspect and copy, during regular business hours at a reasonable location specified by the Corporation, any books and records of the Corporation.  The shareholder must give the Corporation written notice of this demand at least five (5) business dates before the date on which he/she wishes to inspect and copy the record(s).  The demand must be made in good faith and for a proper purpose.  The shareholder must describe with reasonable particularity the purpose and the records he/she desires to inspect,

and the records must be directly connected with this purpose.  This Section does not affect the right of a shareholder to inspect and copy the shareholders' list described in this Article if the shareholder is in litigation with the Corporation.  In such a case, the shareholder shall have the same rights as any other litigant to compel the production of corporate records for examination.

The Corporation may deny any demand for inspection if the demand was made for an improper purpose, or if the demanding shareholder has within the two (2) years preceding his demand, sold or offered for sale any list of shareholders of the Corporation or of any other corporation, had aided or abetted any person in procuring any list of shareholders for that purpose, or has improperly used any information secured through any prior examination of the records of this Corporation or any other corporation.

Section 3 – Financial Statements for Shareholders.  Unless modified by resolution of the shareholders with 120 days after the close of each fiscal year, the Corporation shall furnish its shareholders with annual financial statements which may be consolidated or combined statements of the Corporation and one or more of its subsidiaries, as appropriate, that include a balance sheet as of the end of the fiscal year, an income statement for that year, and a statement of cash flows for that year.  If financial statements are prepared for the Corporation on the basis of generally accepted accounting principles, the annual financial statements must also be prepared on the basis.

If the annual financial statements are reported upon by a public accountant, his/her report must accompany them.  If not, the statements must be accompanied by a statement of the President or the person responsible for the Corporation's accounting records stating his reasonable belief whether the statements were prepared on the basis of generally accepted accounting principles and, if not, describing the basis of preparation and describing any respects in which the statements were not prepared on a basis of accounting consistent with the statements prepared for the preceding year.  The Corporation shall mail the annual financial statements to each shareholder within 120 days after the close of each fiscal year or within such additional time thereafter as is reasonably necessary to enable the Corporation to prepare its financial statements.  Thereafter, on written request from a shareholder who was not mailed the statements, the Corporation shall mail him/her the latest annual financial statement.

Section 4 – Other Reports to Shareholders.  If the Corporation indemnifies or advances expenses to any director, officer, employee or agent otherwise than by court order or action by the shareholders or by an insurance carrier pursuant to insurance maintained by the Corporation, the Corporation shall report the indemnification or advance in writing to the shareholders with or before the notice of the next annual shareholders' meeting, or prior to the meeting if the indemnification or advance occurs after the giving of the notice but prior to the time the annual meeting is held.  This report shall include a statement specifying the persons paid, the amounts paid, and the nature and status at the time of such payment of the litigation or threatened litigation.

If the Corporation issues or authorizes the issuance of shares for promises to render services in the future, the Corporation shall report in writing to the shareholders then number of shares authorized or issued, and the consideration received by the corporation, with or before the notice of the next shareholders' meeting.

## ARTICLE VI – STOCK CERTIFICATES

Section 1 – Issuance.  The Board of Directors may authorize the issuance of some or all of the shares of any or all of its classes or series without certificates.  Each certificate issues shall be signed by the President and the Secretary (or the Treasurer).  The rights and obligations of shareholders are identical whether or not their shares are represented by certificates.

Section 2 – Registered Shareholders.  No certificate shall be issued for any share until the share is fully paid.  The Corporation shall be entitled to treat the holder of record of shares as the holder in fact and, except as otherwise provided by law, shall not be bound to recognize any equitable or other claim to or interest in the shares.

Section 3 – Transfer of Shares.  Shares of the Corporation shall be transferred on its books only after the surrender to the Corporation of the share certificates duly endorsed by the holder of record or attorney-in-fact.  If the surrender certificates are canceled, new certificates shall be issued to the person entitled to them, and the transaction recorded on the books of the Corporation.

Section 4 – Lost, Stolen or Destroyed Certificates.  If a shareholder claims to have lost or destroyed a certificate of shares issued by the Corporation, a new certificate shall be issued upon the delivery to the Corporation of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed, and, at the discretion of the Board of Directors, upon the deposit of a bond other indemnity as the Board reasonably requires.

## ARTICLE VII – INDEMNIFICATION

Section 1 – Right to Indemnification.  The Corporation hereby indemnifies each person (including heirs, executors, administrators, or estate of such person) who is or was a director or officer of the Corporation to the fullest extent permitted or authorized by current or future legislation or judicial or administrative decision against all fines, liabilities, costs and expenses, including attorneys' fees, arising out of his or her status as a director, officer, agent, employee or representative.  The foregoing right of indemnification shall not be exclusive of other rights to which those seeking an indemnification may be entitled.  The Corporation may maintain insurance, at its expense, to protect itself and all officers and directors against fines, liabilities, costs and expenses, whether or not the Corporation would have the legal power to indemnify them directly against such liability.

Section 2 – Advances.  Costs, charges and expenses (including attorneys' fees) incurred by a person referred to in Section 1 of this Article in defending a civil or criminal proceeding shall be paid by the Corporation in advance of the final disposition thereof upon receipt of an undertaking to repay all amounts advanced if it is ultimately determined that the person is not entitled to be indemnified by the Corporation as authorized by this Article, and upon satisfaction of other conditions required by current or future legislation.

Section 3 – Savings Clause.  If this Article or any portion of it is invalidated on any ground by a court of competent jurisdiction, the Corporation nevertheless indemnifies each person described in Section 1 of this Article to the fullest extent permitted by all portions of this Article that have not been invalidated and to the fullest extent permitted by law.

## ARTICLE VIII – AMENDMENT

These Bylaws may be altered, amended or repealed, and new Bylaws adopted, by a majority vote of the directors or by a vote of the shareholders holding a majority of the shares.

I certify that these are the Bylaws adopted by the Board of Directors of the Corporation.

Date: 12-28-21

_____
Scott Zankl, President

Date: 12-28-21

_____
Kristen Zankl, Vice President

8

# Bylaws
of
## KARMA OF PALM BEACH, Inc.

### **ARTICLE I – DIRECTORS**

<u>Section 1 – Function</u>.  All corporate powers shall be exercised by or under the authority of the Board of Directors.  The business and affairs of the Corporation shall be managed under the direction of the Board of Directors.  Directors must be natural persons who are at least 18 years of age but need not be shareholders of the Corporation.  Residents of any state may be directors.  If the Corporation is a professional corporation, in order for a director to also be a shareholder of the Corporation the director must be duly licensed or otherwise legally authorized to render the same professional service as the Corporation.

<u>Section 2 – Compensation</u>.  The shareholders shall have authority to fix the compensation of directors.  Unless specifically authorized by a resolution of the shareholders, the directors shall serve in such capacity without compensation.

<u>Section 3 – Presumption of Assent</u>.  A director who is present at a meeting of the Board of Directors or a committee of the Board of Directors at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless he objects at the beginning of the meeting (or promptly upon arriving) to the holding of the meeting or transacting the specified business at the meeting, or if the director votes against the action taken or abstains from voting because of an asserted conflict of interest.

<u>Section 4 – Number</u>.  The Corporation shall have a least the minimum number of directors required by law.  The number of directors may be increased or decreased from time to time by the Board of Directors.

<u>Section 5 – Election and Term</u>.  At each annual meeting of the shareholders, the shareholders shall elect directors to hold office until the next annual meeting or until their earlier resignation, removal from office or death.  Directors shall be elected by a plurality of the votes cast by the shares entitled to vote in the election at a meeting at which a quorum is present.

<u>Section 6 – Vacancies</u>.  Any vacancy occurring in the Board of Directors, including a vacancy created by an increase in the number of directors, may be filled by the shareholders or by the affirmative vote of a majority of the remaining directors though less than a quorum of the Board of Directors.  A director elected to fill a vacancy shall hold office only until the next election of directors by the shareholders.  If there are no remaining directors, the vacancy shall be filled by the shareholders.

<u>Section 7 – Removal of Directors</u>.  At a meeting of shareholders, any director or the entire Board of Directors may be removed, with or without cause, provided the notice of the meeting states that one of the purposes of the meeting is the removal of the director.  A director may be removed only if the number of votes cast to remove him/her exceeds the number of votes cast against removal.

Section 8 – Quorum and Voting.  A majority of the number of directors fixed by these Bylaws shall constitute a quorum for the transaction of business.  The act of a majority of directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

Section 9 – Executive and Other Committees.  The Board of Directors, by resolution adopted by a majority of the full Board of Directors, may designate from among its members one or more committees each of which must have at least two members.  Each committee shall have the authority set forth in the resolution designating the committee.

Section 10 – Place of Meeting.  Regular and special meeting of the Board of Directors shall be held at the principal place of the business of the Corporation or at another place designated by person or persons giving notice of otherwise calling the meeting.

Section 11 – Time, Notice and Call of Meetings.  Regular meetings of the Board of Directors shall be held without notice at the time and on the date designated by resolution of the Board of Directors.  Written notice of the time, date and place of special meetings of the Board of Directors shall be given to each director by mail delivery at least two days before the meeting.

Notice of a meeting of the Board of Directors need not be given to a director who signs a waiver of notice either before or after the meeting.  Attendance of a director at a meeting constitutes a waiver of notice of that meeting and waiver of all objections to the place of the meeting, the time of the meeting, and the manner in which it has been called or convened, unless a director objects to the transaction of business (promptly upon arrival at the meeting) because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors must be specified in the notice or waiver of notice of the meeting.

A majority of the directors present, whether or not a quorum exists, may adjourn any meeting of the Board of Directors to another time and place.  Notice of an adjourned meeting shall be given to the directors who were not present at the time of the adjournment and, unless the time and place of the adjournment and, unless the time and place of the adjourned meeting are announced at the time of the adjournment, to the other directors.  Meetings of the Board of Directors may be called by the President of the Chairman of the Board of Directors.  Members of the Board of Directors and any committee of the Board may participate in a meeting by telephone conference or similar communications equipment if all persons participating in the meeting can hear each other at the same time.  Participation by these means constitutes presence in person at a meeting.

Section 12 – Action by Written Consent.  Any action required or permitted to be taken at a meeting of directors may be taken without a meeting if consent in writing setting forth the action to be taken and signed by all of the directors is filed in the minutes of the proceedings of the Board.  The action taken shall be deemed effective when the last director signs the consent, unless the consent specifies otherwise.

## ARTICLE II – MEETINGS OF SHAREHOLDERS

Section 1 – Annual Meeting.  The annual meeting of the shareholders of the corporation for the election of officers and for such other business as may properly come before the meeting shall be held at such time and place as designated by the Board of Directors.

Section 2 – Special Meeting.  Special meetings of the shareholders shall be held when directed by the President or when requested in writing by shareholders holding at least ten percent (10%) of the Corporation's stock having the right and entitled to vote at such meeting.  A meeting requested by shareholders shall be called by the President for a date note less than ten (10) nor more than sixty (60) days after the request is made.  Only business within the purposes described in the meeting notice may be conducted at a special shareholders' meeting.

Section 3 – Place.  Meetings of the shareholders will be held at the principal place of business of the Corporation or at such other place as is designated by the Board of Directors.

Section 4 – Notice.  A written notice of each meeting of shareholders shall be mailed to each shareholder having the right and entitled to vote at the meeting at the address as it appears on the records of the Corporation.  The meeting notice shall be mailed not less than ten (10) nor more than sixty (60) days before the date set for the meeting.  The record date for determining shareholders entitled to vote at the meeting will be the close of business on the date before the notice is sent.  The notice shall state the time and place the meeting is to be held.  A notice of a special meeting shall also state the purposes of the meeting.  A notice of meeting shall be sufficient for that meeting and any adjournment of it.  If a shareholder transfers any shares after the notice is sent, it shall not be necessary to notify the transferee.  All shareholders may waive notice of a meeting at any time.

Section 5 – Shareholder Quorum.  A majority of the shares entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of shareholders.  Any number of shareholders, even if less than a quorum, may adjourn the meeting without further notice until a quorum is obtained.

Section 6 – Shareholder Voting.  If a quorum is present, the affirmative vote of a majority of the shares represented at the meeting and entitled to vote on the subject matter shall be the act of the shareholders.  Each outstanding share shall be entitled to one vote on each matter submitted to a vote at a meeting of shareholders.  An alphabetical list of all shareholders who are entitled to notice of a shareholders' meeting along with their addresses and the number of shares held by each shall be produced at a shareholders' meeting upon the request of any shareholder.

Section 7 – Proxies.  A shareholder entitled to vote at any meeting of shareholders or any adjournment thereof may vote in person or by proxy executed in writing and signed by the shareholder of his attorney-in-fact.  The appointment of proxy will be effective when received by the Corporation's officer or agent authorized to tabulate votes.  No proxy shall be valid more than eleven (11) months after the date of its execution unless a longer term is expressly stated in the proxy.

Section 8 – Validation.  If shareholders who hold a majority of voting stock entitled to vote at a meeting are present at the meeting, and sign a written consent to the meeting on the record, the acts of the meeting shall be valid, even if the meeting was not legally called and noticed.

Section 9 – Conduct of Business by Written Consent.    Any action of the shareholders may be taken without a meeting if written consents, setting forth the action taken, are signed by at least a majority of shares entitled to vote and are delivered to the officer of agent of the Corporation having custody of the Corporation's records within sixty (60) days after the date that the earliest written consent was delivered.  Within ten (10) days after obtaining an authorization of an action by written consent, notice shall be given to those shareholders who have not consented in writing or who are not entitled to vote on the action.  The notice shall fairly summarize the material features of the authorized action.  If the action creates dissenters' rights, the notice shall contain a clear statement of the right of dissenting shareholders to be paid the fair value of their shares upon compliance with and as provided for by the state law governing corporations.

# ARTICLE III – OFFICERS

Section 1 – Officers; Election; Resignation; Vacancies.  The Corporation shall have the officers and assistant officers that the Board of Directors appoint from time to time.  Except as otherwise provided in an employment agreement which the Corporation has with an officer, each officer shall serve until a successor is chosen by the directors at a regular or special meeting of the directors or until removed.  Officers and agents shall be chosen, serve for the terms, and have the duties determined by the directors.  A person may hold two or more offices.

Any officer may resign at any time upon written notice to the Corporation.  The resignation shall be effective upon receipt, unless the notice specifies a later date.  If the resignation is effective at a later date and the Corporation accepts the future effective date, the Board of Directors may fill the pending vacancy before the effective date provided the successor officer does not take office until the future effective date.  Any vacancy occurring in any office of the Corporation by death, resignation, removal or otherwise may be filled for the unexpired portion of the term by the Board of Directors at any regular or special meeting.

Section 2 – Powers and Duties of Officers.  The officers of the Corporation shall have such powers and duties in the management of the Corporation to sign for loans that have been approved by the Corporation, as well as any other powers and duties as may be prescribed by the Board of Directors and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board of Directors.

Section 3 – Removal of Officers.  An officer or agent or member of a committee elected or appointed by the Board of Directors may be removed by the Board with or without cause whenever in its judgment the best interests of the Corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Election or appointment of an officer, agent or member of a committee shall not of itself create contract rights. Any officer, if appointed by another officer, may be removed by that officer.

Section 4 – Salaries.  The Board of Directors may cause the Corporation to enter into employment agreements with any officer of the Corporation.  Unless provided for in an employment agreement between the Corporation and an officer, all officers of the Corporation serve in their capacities without compensation.

Section 5 – Bank Accounts.  The Corporation shall have accounts with financial institutions as determined by the Board of Directors.

## ARTICLE IV – DISTRIBUTIONS

The Board of Directors may, from time to time, declare distributions to its shareholders in cash, property, or its own shares, unless the distribution would cause (i) the Corporation to be unable to pay its debts as they become due in the usual course of business, or (ii) the Corporation's assets to be less than its liabilities plus the amount necessary, if the Corporation were dissolved at the time of the distribution, to satisfy the preferential rights of shareholders whose rights are superior to those receiving the distribution.  The shareholders and the Corporation may enter into an agreement requiring the distribution of corporate profits, subject to the provisions of law.

## ARTICLE V – CORPORATE RECORDS

Section 1 – Corporate Records.  The corporation shall maintain its records in written form or in another form capable of conversion into written form within a reasonable time.  The Corporation shall keep as permanent records minutes of all meetings of its shareholders and Board of Directors, a record of all actions taken by the shareholders or Board of Directors without a meeting, and a record of all actions taken by a committee of the Board of Directors on behalf of the Corporation. The Corporation shall maintain accurate accounting records and a record of its shareholders in a form that permits preparation of a list of the names and addresses of all shareholders in alphabetical order by class of shares showing the number and series of shares held by each.

The Corporation shall keep a copy of its articles or restated articles of incorporation and all amendments to them currently in effect; these Bylaws or restated Bylaws and all amendments currently in effect; resolutions adopted by the Board of Directors creating one or more classes or series of shares and fixing their relative rights, preferences, and limitations, if shares issued pursuant to those resolutions are outstanding; the minutes of all shareholders' meetings and records of all actions taken by shareholders without a meeting for the past three years; written communications to all shareholders generally or all shareholders of a class of series within the past three years, including the financial statements furnished for the last three years; a list of names and business street addresses of its current directors and officers; and its most recent annual report delivered to the Department of State.

Section 2 – Shareholders' Inspection Rights.  A shareholder is entitled to inspect and copy, during regular business hours at a reasonable location specified by the Corporation, any books and records of the Corporation.  The shareholder must give the Corporation written notice of this demand at least five (5) business dates before the date on which he/she wishes to inspect and copy the record(s).  The demand must be made in good faith and for a proper purpose.  The shareholder must describe with reasonable particularity the purpose and the records he/she desires to inspect,

and the records must be directly connected with this purpose.  This Section does not affect the right of a shareholder to inspect and copy the shareholders' list described in this Article if the shareholder is in litigation with the Corporation.  In such a case, the shareholder shall have the same rights as any other litigant to compel the production of corporate records for examination.

The Corporation may deny any demand for inspection if the demand was made for an improper purpose, or if the demanding shareholder has within the two (2) years preceding his demand, sold or offered for sale any list of shareholders of the Corporation or of any other corporation, had aided or abetted any person in procuring any list of shareholders for that purpose, or has improperly used any information secured through any prior examination of the records of this Corporation or any other corporation.

Section 3 – Financial Statements for Shareholders.  Unless modified by resolution of the shareholders with 120 days after the close of each fiscal year, the Corporation shall furnish its shareholders with annual financial statements which may be consolidated or combined statements of the Corporation and one or more of its subsidiaries, as appropriate, that include a balance sheet as of the end of the fiscal year, an income statement for that year, and a statement of cash flows for that year.  If financial statements are prepared for the Corporation on the basis of generally accepted accounting principles, the annual financial statements must also be prepared on the basis.

If the annual financial statements are reported upon by a public accountant, his/her report must accompany them.  If not, the statements must be accompanied by a statement of the President or the person responsible for the Corporation's accounting records stating his reasonable belief whether the statements were prepared on the basis of generally accepted accounting principles and, if not, describing the basis of preparation and describing any respects in which the statements were not prepared on a basis of accounting consistent with the statements prepared for the preceding year.  The Corporation shall mail the annual financial statements to each shareholder within 120 days after the close of each fiscal year or within such additional time thereafter as is reasonably necessary to enable the Corporation to prepare its financial statements.  Thereafter, on written request from a shareholder who was not mailed the statements, the Corporation shall mail him/her the latest annual financial statement.

Section 4 – Other Reports to Shareholders.  If the Corporation indemnifies or advances expenses to any director, officer, employee or agent otherwise than by court order or action by the shareholders or by an insurance carrier pursuant to insurance maintained by the Corporation, the Corporation shall report the indemnification or advance in writing to the shareholders with or before the notice of the next annual shareholders' meeting, or prior to the meeting if the indemnification or advance occurs after the giving of the notice but prior to the time the annual meeting is held.  This report shall include a statement specifying the persons paid, the amounts paid, and the nature and status at the time of such payment of the litigation or threatened litigation.

If the Corporation issues or authorizes the issuance of shares for promises to render services in the future, the Corporation shall report in writing to the shareholders then number of shares authorized or issued, and the consideration received by the corporation, with or before the notice of the next shareholders' meeting.

## ARTICLE VI – STOCK CERTIFICATES

Section 1 – Issuance.  The Board of Directors may authorize the issuance of some or all of the shares of any or all of its classes or series without certificates.  Each certificate issues shall be signed by the President and the Secretary (or the Treasurer).  The rights and obligations of shareholders are identical whether or not their shares are represented by certificates.

Section 2 – Registered Shareholders.  No certificate shall be issued for any share until the share is fully paid.  The Corporation shall be entitled to treat the holder of record of shares as the holder in fact and, except as otherwise provided by law, shall not be bound to recognize any equitable or other claim to or interest in the shares.

Section 3 – Transfer of Shares.  Shares of the Corporation shall be transferred on its books only after the surrender to the Corporation of the share certificates duly endorsed by the holder of record or attorney-in-fact.  If the surrender certificates are canceled, new certificates shall be issued to the person entitled to them, and the transaction recorded on the books of the Corporation.

Section 4 – Lost, Stolen or Destroyed Certificates.  If a shareholder claims to have lost or destroyed a certificate of shares issued by the Corporation, a new certificate shall be issued upon the delivery to the Corporation of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed, and, at the discretion of the Board of Directors, upon the deposit of a bond other indemnity as the Board reasonably requires.

## ARTICLE VII – INDEMNIFICATION

Section 1 – Right to Indemnification.  The Corporation hereby indemnifies each person (including heirs, executors, administrators, or estate of such person) who is or was a director or officer of the Corporation to the fullest extent permitted or authorized by current or future legislation or judicial or administrative decision against all fines, liabilities, costs and expenses, including attorneys' fees, arising out of his or her status as a director, officer, agent, employee or representative.  The foregoing right of indemnification shall not be exclusive of other rights to which those seeking an indemnification may be entitled.  The Corporation may maintain insurance, at its expense, to protect itself and all officers and directors against fines, liabilities, costs and expenses, whether or not the Corporation would have the legal power to indemnify them directly against such liability.

Section 2 – Advances.  Costs, charges and expenses (including attorneys' fees) incurred by a person referred to in Section 1 of this Article in defending a civil or criminal proceeding shall be paid by the Corporation in advance of the final disposition thereof upon receipt of an undertaking to repay all amounts advanced if it is ultimately determined that the person is not entitled to be indemnified by the Corporation as authorized by this Article, and upon satisfaction of other conditions required by current or future legislation.

Section 3 – Savings Clause.  If this Article or any portion of it is invalidated on any ground by a court of competent jurisdiction, the Corporation nevertheless indemnifies each person described in Section 1 of this Article to the fullest extent permitted by all portions of this Article that have not been invalidated and to the fullest extent permitted by law.

## ARTICLE VIII – AMENDMENT

These Bylaws may be altered, amended or repealed, and new Bylaws adopted, by a majority vote of the directors or by a vote of the shareholders holding a majority of the shares.

I certify that these are the Bylaws adopted by the Board of Directors of the Corporation.

Date: 12-28-21

Scott Zankl, President

Date: 12-28-21

Kristen Zankl, Vice President

8

### BYLAWS OF Excell Auto Sport and Service, Inc
(the "Corporation")

### SHAREHOLDERS (the "Shareholders")

#### Annual Meeting

1. A meeting of the Shareholders will be held annually for the purpose of electing directors (the "Directors") of the Corporation and for the purpose of doing other business as may come before the meeting. If the day fixed for the annual meeting is a legal holiday in the State of Florida, the annual meeting will be held on the next succeeding business day or on a date determined by the board of directors for the Corporation (the "Board") that is no later than two weeks after the date specified in the meeting notice.

2. The Corporation must hold its annual meeting within any 13 months period. If the annual meeting is not held within that time period then any shareholder may apply to the circuit court of the county where the Corporation's principal office is located to fix the time and place of the meeting.

#### Special Meetings

3. Unless otherwise prescribed by statute, special meetings of the Shareholders may only be called for any purpose or purposes in the following ways:

    a. By a majority of the Board; or

    b. By the president of the Corporation (the "President"); or

    c. By the holders of shares entitled to cast in total not less than 10 percent of the votes on any issue proposed for the meeting where written request(s) describing the purpose or purposes for the special meeting are signed, dated and delivered to a member of the Board or other Officer of the Corporation.

4. The Board will determine the time, place and date of any special meeting provided that, in the case of a special meeting called by the requisite percentage of Shareholders in accordance with these Bylaws, the Board will issue notice of the special meeting within 60 days of receipt of the written demand(s) by the relevant Officer of the Corporation.

### Place of Meeting

5. The annual meetings or special meetings of the Shareholders may be held at any place in or out of the State of Florida at a place to be determined at the discretion of the Board. If no designation of the location is made for any annual or special meeting of the Shareholders, the place of the meeting will be the Principal Office of the Corporation.

### Notice of Meetings

6. The written notice of any meeting will be given not less than 10 days, but not more than 60 days before the date of the meeting to each Shareholder entitled to vote at that meeting. The written notice of the meeting will state the place, date and hour of the meeting, the means of remote communications, if any, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.

7. If mailed, notice is given when the notice is deposited in the United States mail, postage prepaid, and directed to the Shareholder at the address of the Shareholder as it appears on the records of the Corporation. An affidavit of the secretary (the "Secretary") of the Corporation that the notice has been given will, in the absence of fraud, be prima facie evidence of the facts stated in the notice.

8. A written waiver, signed by the person entitled to a notice of meeting, or a waiver by electronic transmission by the person entitled to that notice, whether before or after the time stated in the notice, will be deemed equivalent to the person receiving the notice. Further, attendance of a person at a meeting will constitute a waiver of notice of that meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

### Consent of Shareholders in Lieu of Meeting

9. Any action to be taken at any annual or special meeting of Shareholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action to be taken, is signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take the action at a meeting at which all shares entitled to vote on the matter were present and voted is delivered to the Corporation. Every written consent will bear the date of signature of each Shareholder who signs the consent. However, no written consent will be effective unless the consent is delivered, either by hand or by certified or registered mail, within 90 days of the earliest dated consent, to the Principal

Office of the Corporation in this state, the Principal Place of Business of the Corporation, the corporate secretary, or another agent of the Corporation having custody of the book in which proceedings of meetings of Shareholders are recorded.

**Remote Communication Meetings**

10. Remote communication means any electronic communication including conference telephone, video conference, the Internet, or any other method currently available or developed in the future by which Shareholders not present in the same physical location may simultaneously communicate with each other.

11. Where permitted under the statutes and regulations of the State of Florida, and in the sole and reasonable discretion of the Board of Directors, a meeting of Shareholders of the Corporation may be held at a specific location or may be held by any means of remote communication. Where a meeting will employ remote communication, one or more Shareholders may participate by means of remote communication or the meeting may be held solely by means of remote communication at the sole discretion of the Board of Directors. Where any remote communication is used in a Shareholder meeting, all persons authorized to vote or take other action at the meeting must be able to hear each other during the meeting and each person will have a reasonable opportunity to participate. This remote participation in a meeting will constitute presence in person at the meeting. All votes or other actions taken at the meeting by means of electronic transmission must be maintained as a matter of record by the Corporation.

**List of Shareholders Entitled to Vote**

12. The Officer who has charge of the Shareholders' List of the Corporation will prepare and make, not more than 70 days before every meeting of the Shareholders, a complete list of the Shareholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each Shareholder and the number of shares of stock registered in the name of each Shareholder. The list must be available for inspection by any Shareholder beginning ten days prior to the meeting and continuing through the meeting. The list must be provided for any purpose related to the meeting:

   a. On a reasonably accessible electronic network, so long as the information required to access the list is provided with the notice of the meeting; or

b. During ordinary business hours, at the Principal Office of the Corporation, the office of the Corporation's transfer agent if specified in the meeting notice or at another place identified in the meeting notice in the city where the meeting will be held.

13. If the Corporation decides to make the list available on an electronic network, the Corporation will ensure that this information is available only to Shareholders of the Corporation. If the meeting is to be held at a physical location, then the list will be produced and kept at the time and place of the meeting during the whole time of the meeting and may be inspected by any Shareholder who is present.

14. If the meeting is to be held solely by means of remote communication, then the list will also be open to the examination of any Shareholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access the list will be provided with the notice of the meeting.

15. If any Director willfully neglects or refuses to produce the list of Shareholders at any meeting for the election of Directors, or to open such a list to examination on a reasonably accessible electronic network during any meeting for the election of Directors held solely by means of remote communication, those Directors will be ineligible for election to any office at that meeting.

16. The Shareholders' List will be the only evidence as to who are the Shareholders entitled by this section to examine the list required by this section or to vote in person or by proxy at any meeting of Shareholders.

### **Quorum and Required Vote**

17. A minimum of 51 percent of the shares entitled to vote, present in person or represented by proxy, will constitute a quorum entitled to take action at a meeting of Shareholders.

18. In all matters other than the election of Directors, any act of the Shareholders must be passed by an affirmative vote of the majority of the shares present in person or represented by proxy at the meeting and entitled to vote on the matter.

19. Directors will be elected by a majority of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of Directors.

20. Where a separate vote by a class or series or classes or series of shares ("Eligible Shares") is required, 51 percent of the outstanding Eligible Shares present in person or represented by proxy, will constitute a quorum entitled to take action with respect to that vote on that matter. Any act to be taken must be passed by an affirmative vote of the majority of the outstanding Eligible Shares present in person or represented by proxy.

## **Shareholders Voting Rights and Proxies**

21. Subject to the Articles of Incorporation, each Shareholder will be entitled to one vote for each share of stock held by that Shareholder.

22. Each Shareholder entitled to vote at a meeting of Shareholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for that Shareholder by proxy, but no proxy will be valid after 11 months from the date of its execution unless the proxy provides for a longer period.

23. Execution of a proxy may be accomplished by the Shareholder or by the authorized Officer, Director, employee or agent of the Shareholder, signing the writing or causing that person's signature to be affixed to the writing by any reasonable means including, but not limited to, by facsimile signature.

24. A duly executed proxy will be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the shares or an interest in the Corporation generally.

## **Voting Rights of Fiduciaries, Pledgers and Joint Owners of Shares**

25. Persons holding shares in a fiduciary capacity will be entitled to vote the shares so held. Persons whose shares are pledged will be entitled to vote, unless, in the transfer by the pledger on the books of the Corporation, that person has expressly empowered the pledgee to vote the shares, in which case only the pledgee, or that pledgee's proxy, may represent and vote the shares.

## **Voting Trusts and Other Voting Agreements**

26. Two or more Shareholders may, by agreement in writing, create a voting trust by depositing their shares with a voting trustee, who will have the authority to vote the shares in accordance with the

terms and conditions of the voting trust agreement. To be valid, the voting trustee must deliver copies of the list of Shareholders and the voting trust agreement to the Principal Office of the Corporation. Upon receiving the voting trust agreement, the Corporation will issue new share certificates in the name of the trustee and cancel the old share certificates. The new share certificates issued will state that they are issued pursuant to a voting trust agreement.

27. Any amendment to a voting trust agreement will be made by a written agreement, a copy of which will be filed with the Principal Office of the Corporation.

28. The right of inspection of any voting trust agreement or related amendment by a Shareholder of record or a holder of a voting trust certificate, in person or by agent, will be the same right of inspection that applies to the securities register of the Corporation.

29. An agreement between two or more Shareholders, if in writing and signed by the parties to the agreement, may provide that in exercising any voting rights, the shares held by them will be voted as provided by the agreement, or as the parties may agree, or as determined in accordance with a procedure agreed upon by them.

30. The above provisions concerning voting trusts and voting agreements will not be deemed to invalidate any voting or other agreement among Shareholders or any irrevocable proxy which is not otherwise illegal.

## Cumulative Voting

31. Shareholders may use cumulative voting elections when electing Directors.


# BOARD OF DIRECTORS

## General Powers

32. The business and affairs of the Corporation will be managed by or under the direction of the Board.

## Number, Tenure and Quorum

33. The Board will consist of three members, each of whom will be a natural person. Directors need not be Shareholders. Each Director will hold office until that Director's successor is elected and

qualified or until that Director's earlier resignation or removal. Any Director may resign at any time upon notice given in writing or by electronic transmission to the Corporation. In order to transact business at a meeting of the Directors, a quorum of 51 percent of the total number of Directors eligible to vote will be required. The vote of the majority of the Directors present at a meeting at which a quorum is present will be the act of the Board.

### Regular Meetings

34. By resolution, the Board may provide the time and place, either within or without the State of Florida, for the holding of regular meetings without any notice other than that resolution.

### Special Meetings

35. Special meetings of the Board may be called by or at the request of the President or by a majority of the Directors. The person or persons calling that special meeting of the Board may fix any date, time or place, either within or without the State of Florida, to be the date, time and place for holding that special meeting.

### Notice

36. Written notice of the date, time, and place of a special meeting of the Board will be given at least 10 days prior to the date set for that meeting. The written notice can be given personally, by mail, by private carrier, by telegraph, by telephone facsimile, or by any other manner as permitted by the Florida Business Corporation Act. The notice will be given by the Secretary or one of the persons authorized to call Directors' meetings.

37. If written notice is mailed, correctly addressed to a Director's address as provided in the Corporation's current records, the notice will be deemed to have been given to that Director at the time of mailing. If written notice is sent by private carrier or if the written notice is sent by United States mail, postage prepaid and by registered or certified mail, return receipt requested, the notice will be deemed to have been given to a Director on the date shown on the return receipt. Otherwise notice is effective when received by a Director.

38. Notice of any Directors' meeting may be waived by a Director before or after the date and time of the meeting. The waiver must be in writing, must be signed by a Director, and must be delivered to the Corporation for inclusion in the minutes or filing with the corporate records. The attendance of a Director at a meeting of the Board will constitute a waiver of notice of that meeting except where

a Director attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully convened.

### Action by Directors Without a Meeting

39. Any action to be taken at any meeting of the Board or of any committee of the Board may be taken without a meeting if all members of the Board or committee, as the case may be, consent to it in writing, or by electronic transmission and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board, or committee. This filing will be in paper form if the minutes are maintained in paper form and will be in electronic form if the minutes are maintained in electronic form.

### Remote Communication Meetings

40. Remote communication means any electronic communication including conference telephone, video conference, the Internet, or any other method currently available or developed in the future by which Directors not present in the same physical location may simultaneously communicate with each other.

41. A meeting of the Board may be held by any means of remote communication by which all persons authorized to vote or take other action at the meeting can hear each other during the meeting and each person has a reasonable opportunity to participate. This remote participation in a meeting will constitute presence in person at the meeting.

### Vacancies and Newly Created Directorships

42. When vacancies or newly created directorships resulting from any increase in the authorized number of Directors occur, a majority of the Directors then in office, although less than a quorum, or a sole remaining Director will have the power to appoint new Directors to fill this vacancy or vacancies. Each new Director so chosen will hold office until the next annual meeting of the Shareholders.

43. If at any time, by reason of death or resignation or other cause, the Corporation should have no Directors in office, then any Officer or any Shareholder or an executor, administrator, trustee or guardian of a Shareholder, or other fiduciary entrusted with like responsibility for the person or estate of a Shareholder, may call a special meeting of Shareholders for an election to fill the vacancy.

44. When one or more Directors resign from the Board and the resignation is to become effective at a future date, a majority of the Directors then in office, including those who have so resigned, will have the power to appoint new Directors to fill this vacancy or vacancies. The appointments of these new Directors will take effect when the resignation or resignations are to become effective, and each new Director so chosen will hold office until the next annual meeting of the Shareholders.

## Removal

45. Any Director or the entire Board may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of Directors at a special meeting of the Shareholders called for that purpose. No director may be removed when the votes cast against removal would be sufficient to elect the director if voted cumulatively at an election where the same total number of votes were cast.

## Organization

46. Meetings of the Board will be presided over by the President, or in the President's absence by a Director chosen at the meeting. The Secretary will act as secretary of the meeting, but in the absence of the Secretary, the person presiding at the meeting may appoint any person to act as secretary of the meeting.

## Chairman of the Board

47. The Chairman of the Board, if present, will preside at all meetings of the Board, and exercise and perform any other authorities and duties as may be from time to time delegated by the Board.

## Compensation

48. The Board will, by resolution, fix the fees and other compensation for the Directors for their services as Directors, including their services as members of committees of the Board. All changes to Director compensation are subject to ratification by the Shareholders.

## Presumption of Assent

49. A Director of the Corporation who is present at a meeting of the Board will be presumed to have assented to an action taken on any corporate matter at the meeting unless:

a. The Director objects at the beginning of the meeting, or promptly upon the Director's arrival, to holding the meeting or transacting business at the meeting;

b. The Director's dissent or abstention from the action taken is entered in the minutes of the meeting; or

c. The Director delivers written notice of the Director's dissent or abstention to the presiding officer of the meeting before the adjournment of the meeting or to the Corporation within a reasonable time after adjournment of the meeting.

50. Any right to dissent or abstain from the action will not apply to a Director who voted in favor of that action.

## COMMITTEES

### **Appointment**

51. The Board may designate one or more committees, each committee to consist of one or more of the Directors of the Corporation. The Board may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.

52. In the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not that member or members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any absent or disqualified member.

53. The committee or committees, to the extent provided in the resolution of the Board will have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it. No such committee will have the power or authority in reference to the following matters:

a. Approving or adopting, or recommending to the Shareholders, any action or matter (other than the election or removal of Directors) expressly required by the Florida Business Corporation Act to be submitted to Shareholders for approval; or

b. Adopting, amending or repealing any Bylaw of the Corporation.

## Tenure

54. Each member of a committee will serve at the pleasure of the Board.

## Meetings and Notice

55. The method by which Directors' meetings may be called and the notice requirements for these meetings as set out in these Bylaws will apply to any committee designated by the Board as appropriate.

## Quorum

56. The requirements for a quorum for the Board as set out in these Bylaws will apply to any committee designated by the Board as appropriate.

## Action Without a Meeting

57. The requirements and procedures for actions without a meeting for the Board as set out in these Bylaws will apply to any committee designated by the Board as appropriate.

## Resignation and Removal

58. Any member of a committee may be removed at any time, with or without cause, by a resolution adopted by a majority of the full Board. Any member of a committee may resign from the committee at any time by giving written notice to the Chairman of the Board of the Corporation, and unless otherwise specified in the notice, the acceptance of this resignation will not be necessary to make it effective.

## Vacancies

59. Any vacancy in a committee may be filled by a resolution adopted by a majority of the full Board.

## Committee Rules of Procedure

60. A committee will elect a presiding officer from its members and may fix its own rules of procedure provided they are not inconsistent with these Bylaws. A committee will keep regular minutes of its proceedings, and report those minutes to the Board at the first subsequent meeting of the Board.

## OFFICERS

### Appointment of Officers

61. The Officers of the Corporation (individually the "Officer" and collectively the "Officers") will consist of the President, a treasurer (the "Treasurer") and the Secretary.

62. The Officers will be appointed by the Board at the first meeting of the Directors or as soon after the first meeting of the Directors as possible, if Officers have not already been appointed. Any appointee may hold one or more offices.

### Term of Office

63. Each Officer will hold office until a successor is duly appointed and qualified or until the Officer's death or until the Officer resigns or is removed as provided in these Bylaws.

### Removal

64. Any Officer or agent appointed by the Board or by the Incorporators may be removed by the Board at any time with or without cause, provided, however, any contractual rights of that person, if any, will not be prejudiced by the removal.

### Vacancies

65. The Board may fill a vacancy in any office because of death, resignation, removal, disqualification, or otherwise.

### President

66. Subject to the control and supervisory powers of the Board and its delegate, the powers and duties of the President will be:

a. To have the general management and supervision, direction and control of the business and affairs of the Corporation;

b. To preside at all meetings of the Shareholders when the Chairman of the Board is absent;

c. To call meetings of the Shareholders to be held at such times and at such places as the President will deem proper within the limitations prescribed by law or by these Bylaws;

d. To ensure that all orders and resolutions of the Board are effectively carried out;

e. To maintain records of and certify, whenever necessary, all proceedings of the Board and the Shareholders;

f. To put the signature of the Corporation to all deeds, conveyances, mortgages, guarantees, leases, obligations, bonds, certificates and other papers and instruments in writing which have been authorized by the Board or which, in the opinion of the President, should be executed on behalf of the Corporation; to sign certificates for the Corporation's shares; and, subject to the instructions of the Board, to have general charge of the property of the Corporation and to supervise and manage all Officers, agents and employees of the Corporation; and

g. To perform all other duties and carry out other responsibilities as determined by the Board.

**<u>Treasurer</u>**

67. Subject to the control and supervisory powers of the Board and its delegate, the powers and duties of the Treasurer will be:

a. To keep accurate financial records for the Corporation;

b. To deposit all money, drafts and checks in the name of and to the credit of the Corporation in the banks and depositories designated by the Board;

c. To endorse for deposit all notes, checks and drafts received by the Corporation as instructed by the Board, making proper vouchers for them;

d. To disburse corporate funds and issue checks and drafts in the name of the Corporation, as instructed by the Board;

e. To submit to the President and the Board, as requested, an account of all transactions by the Treasurer and the financial condition of the Corporation;

f. To prepare and submit to the Board annual reports detailing the financial status of the Corporation; and

g. To perform all other duties and carry out other responsibilities as prescribed by the Board or the President.

## **<u>Secretary</u>**

68. The Secretary will perform the following duties:

a. Prepare the minutes of the meetings of the Shareholders and meetings of the Board and keep those minutes in one or more books provided for that purpose;

b. Authenticate the records of the Corporation as will from time to time be required;

c. Ensure that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

d. Act as custodian of the corporate records and of the corporate seal, if any, and ensure that the seal of the Corporation, if any, is affixed to all documents the execution of which on behalf of the Corporation under its seal is duly authorized;

e. Keep a register of the post office address of each Shareholder;

f. Sign, along with the President, certificates for shares of the Corporation, the issuance of which will have been authorized by resolution of the Board;

g. Have general charge of the Shareholders' List of the Corporation; and

h. Perform all duties incidental to the office of Secretary and any other duties as from time to time may be delegated to the Secretary by the President or the Board.

## Delegation of Authority

69. The Board reserves the authority to delegate the powers of any Officer to any other Officer or agent, notwithstanding any provision in these Bylaws.

## LOANS, CHECKS, DEPOSITS, CONTRACTS

## Loans

70. Without authorization by a resolution of the Board, the Corporation is prohibited from making or accepting loans in its name, or issuing evidences of indebtedness in its name. The authorization of the Board for the Corporation to perform these acts can be general or specific.

## Checks, Drafts, Notes

71. All checks, drafts, or other orders for the payment of money, notes, or other evidences of indebtedness issued in the name of the Corporation must be signed by a designated Officer or Officers, agent or agents of the Corporation and in a manner as will from time to time be determined by resolution of the Board.

## Deposits

72. All funds of the Corporation not otherwise used will be deposited to the credit of the Corporation in banks, trust companies, or other depositories designated by the Board.

## Voting Securities Held by the Corporation

73. The President, or another Officer or agent designated by the Board will, with full power and authority attend, act, and vote, on behalf of the Corporation, at any meeting of security holders or interest holders of other corporations or entities in which the Corporation may hold securities or interests. At that meeting, the President or other delegated agent will have and execute any and all rights and powers incidental to the ownership of the securities or interests that the Corporation holds.

## <u>Contracts</u>

74. The Board may give authority to any Officer or agent, to make any contract or execute and deliver any instrument in the name of the Corporation and on its behalf, and that authority may be general or specific.

## <u>Conflict of Interest by Directors</u>

75. A Director or Officer of the Corporation will be disqualified from voting as a Director or Officer on a specific matter where that Director or Officer deals or contracts with the Corporation either as a vendor or purchaser.

76. A Director or Officer of the Corporation will not be disqualified as a Director or Officer for the sole reason that the Director or Officer deals or contracts with the Corporation either as a vendor, purchaser, or otherwise.

## <u>Loans to Employees and Officers</u>

77. The Corporation may lend money to, or guaranty any obligation of, or otherwise assist, any Officer or employee of the Corporation or of its subsidiary, including any Officer or employee who is a Director of the Corporation or any subsidiary of the Corporation, whenever, in the opinion of the Directors, the loan, guaranty or assistance may reasonably be expected to benefit the Corporation. The loan, guaranty or other assistance may be with or without interest, and may be unsecured, or secured in such manner as the Board will approve, including, without limitation, a pledge of shares of the Corporation. Nothing contained in this section is to be construed so as to deny, limit or restrict the powers of guaranty or warranty of the Corporation at common law or under any applicable statute.

## APPENDIX

## Glossary

- **Bylaws** - the purpose of these bylaws (the "Bylaws") is to provide rules governing the internal management of the Corporation.

- **Chairman of the Board** - Once a Board of Directors has been appointed or elected by the Shareholders, the Board will then elect a chairman (the "Chairman of the Board"). The Chairman of the Board will act to moderate all meetings of the Board of Directors and any other duties and obligations as described in these Bylaws.

- **Corporate Officer** - A corporate officer (individually the "Officer" and collectively the "Officers") is any individual acting for or on behalf of the Corporation. An Officer of the Corporation will usually be appointed to a specific task such as secretary, president, treasurer or other similar position. One person may hold several offices. The Officers will manage the day-to-day operations of the Corporation and report to the Board of Directors.

- **Principal Executive Office** - The Principal Executive Office for the Corporation is where the President of the Corporation has an office.

- **Principal Office** - The Principal Office of the Corporation is the address designated in the annual report where the executive offices of the Corporation are located.

- **Principal Place of Business** - The Principal Place of Business is the address at which the Corporation conducts its primary business.

- **Registered Office** - The Registered Office is the physical street address within the state where the registered agent can be contacted during normal business hours for service of process.

- **Shareholders' List** - A Shareholders' List is the complete record of the owners of shares of stock in the Corporation.

# Signature Page

By:_____

Name: Scott Zurick

Title: Director    V.P

By:_____

Name: ROB O'Connell

Title: Director   Secretary

By:_____

Name: Jay Hecker

Title: Director   pres.

By:_____

Name:

Title: Director

# OPERATING AGREEMENT

## OF

## EXCELL AUTO FINANCE, LLC

**THIS OPERATING AGREEMENT** (hereinafter referred to as the "Agreement") is made and entered into as of the ___19th___ day of ___October___, 2016, and effective as of said date ("Effective Date"), by and among SCOTT ZANKL and THOMAS GRANER (referred to from time-to-time herein collectively as the "Members" and each individually as a "Member").

## W I T N E S S E T H :

**WHEREAS**, it is the intention of the parties to form a Limited Liability Company, pursuant to the laws of the State of Florida and, in particular, the Florida Revised Limited Liability Company Act, Chapter 605 of the Florida Statutes (the "Act");

**WHEREAS**, the parties desire to enter into this Agreement to establish their respective rights and obligations in connection with the limited liability company, which will be operated and maintained pursuant to the laws of the State of Florida and for the purposes hereinafter set forth;

**NOW, THEREFORE**, in consideration of the mutual covenants set forth herein and other valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties agree as follows:

### 1.  Formation and Definitions

The parties hereby confirm that there has been formed a limited liability company (the "Limited Liability Company") pursuant to the provisions of Chapter 605 of the Act.  To the extent permitted by the Act, the terms and provisions of this Agreement shall control if there is a conflict between such law and this Agreement.

### 2.  Name; Members and Interest Holders

The name of the Limited Liability Company is EXCELL AUTO FINANCE, LLC, and all business of the Limited Liability Company shall be conducted under said name, or such other name as the Members from time to time may determine.  For purposes of this Agreement, any person who owns an interest in the Limited Liability Company but is not admitted as a Member or that has become a Withdrawing Member (as defined in Article 17 below) shall be referred to as an "Interest Holder."  An Interest Holder shall have no right to participate in any matter that requires the vote or consent of the Members and shall not have any other rights of a Member, except as specifically provided in this Agreement.

1

### 3. Purposes

The Limited Liability Company is formed for the purpose of engaging in an automobile financing business, and engaging in any and all activities necessary or incidental to the foregoing, and for all other purposes authorized under the Act and the laws of the State of Florida.

### 4. Place of Business

The principal place of business of the Limited Liability Company shall be 1001 Clint Moore Road, Suite 101, Boca Raton, Florida 33487, or such other or additional places of business within or outside of the State of Florida as the Members from time to time may designate. The mailing address of the Limited Liability Company shall be 1001 Clint Moore Road, Suite 101, Boca Raton, Florida 33487, or such other or additional mailing addresses within or outside of the State of Florida as the Members from time to time may designate.

The Limited Liability Company has designated Thomas Graner, whose address is 720 East Palmetto Park Road, Boca Raton, Florida 33432, as the Registered Agent of the Limited Liability Company for service of process.

The registered office and Registered Agent may be changed from time to time by the Members by filing the prescribed forms with the appropriate governmental authorities.

### 5. Term

The term of the Limited Liability Company shall continue until the occurrence of an event hereinafter set forth which causes the termination of the Limited Liability Company.

### 6. Capital Contributions

As initial contributions to the Limited Liability Company, THOMAS GRANER has agreed to contribute the capital necessary for the automobile financial transactions conducted by the Limited Liability Company; SCOTT ZANKL shall contribute to the Limited Liability Company his business contacts, prospects, customer lists and client base by directing business to the Limited Liability Company. In exchange for the foregoing initial contributions ("Capital Contributions"), the Members shall receive Percentage Interests in the Limited Liability Company in the amounts and percentages set forth on Exhibit "A" attached hereto. Each Member's initial Capital Contributions plus any additional Capital Contributions, less any distributions made to a Member pursuant to Article 8(g) and Article 20 shall be referred to as each Member's "Contribution Account."

The capital of the Limited Liability Company shall be the amount noted in the company records, which shall consist of the aggregate of the Capital Contributions made by the Members in accordance with this Agreement and applicable law.

Except as specifically provided in this Agreement or required by law, no Member shall have the right to withdraw or reduce its contributions to the capital of the Limited Liability

2

Company until the termination of the Limited Liability Company. No Member shall have the right to demand and receive any distribution from the Limited Liability Company in any form other than cash, regardless of the nature of such Member's Capital Contribution. No Member shall be paid interest on such Member's Capital Contributions to the Limited Liability Company, except as otherwise provided herein.

The liability of any Member for the losses, debts, liabilities and obligations of the Limited Liability Company shall be limited to: the Capital Contribution of such Member when due under this Agreement; such Member's share of any undistributed assets of the Limited Liability Company; and (only if and to the extent at any time required by applicable law) any amounts previously distributed to such Member by the Limited Liability Company.

The Members shall make additional Capital Contributions in cash, as may be determined by the Members from time to time to be reasonably necessary to pay any operating, capital or other expenses relating to the Limited Liability Company's business (such additional Capital Contributions, the "Additional Capital Contributions"). In the event a Member does not make timely payment of the required Additional Capital Contributions (the "Non-Contributing Member"), the other Members (the "Contributing Members") may make the Additional Capital Contribution on behalf of the Non-Contributing Member and the Contributing Members shall be entitled to reimbursement for said amount out of any proceeds and/or distributions made by the Limited Liability Company plus ten percent (10%) interest per annum until said sum is paid in full out of said proceeds and/or distributions. The Members understand and agree that the nature of the business and operations of the Limited Liability Company is such that capital calls and Additional Capital Contributions by the Members may be necessary to operate the business of the Limited Liability Company, acquire assets, service and maintain such assets, and pay costs and expenses associated therewith, and that although existing Capital Contributions will be used to a certain extent to satisfy the aforesaid costs and expenses, the Members may determine that it is in the best interest of the Limited Liability Company to utilize Additional Capital Contributions for such purposes.

For purposes of this Article 6, the term "Members" shall also include "Interest Holders," except with respect to any matter requiring the consent or vote of the Members.

## 7. Loans and Advances by Members

If any Member shall loan or advance any funds to the Limited Liability Company in excess of the Capital Contribution of such Member prescribed herein, except as described in Article 8 below, such loan or advance shall not be deemed a Capital Contribution to the Limited Liability Company and shall not in any respect increase such Member's interest in the Limited Liability Company.

For purposes of this Article 7, the term "Members" shall also include "Interest Holders."

## 8. Allocations and Distributions

(a)    The term "cash receipts" shall mean all cash receipts of the Limited Liability Company from whatever source derived, except not including Capital Contributions made by the Members, minus all reasonable and necessary expenses of the Limited Liability Company, including, without limitation, the proceeds of any sale, exchange, or other disposition of all or any part of the assets of the Limited Liability Company; the proceeds of any loan to the Limited Liability Company; the proceeds of any insurance policy payable to the Limited Liability Company; and the proceeds from the liquidation of the assets of the Limited Liability Company following a termination of the Limited Liability Company.

(b)    The term "Percentage Interests" shall mean the percentages of each Member as set forth in the attached Exhibit "A".  Any reference to Exhibit "A" in this Agreement means Exhibit "A" as revised from time to time by the Members to reflect any changes in the information specified herein.  The Members acknowledge and agree that their Percentage Interests as of the date of this Agreement are consistent with their understanding as to their interests upon formation of the Limited Liability Company.

(c)    The term "Amortized Principal" shall mean the amortized principal for each payment received pursuant to the amortization schedule to which Members shall agree for each separate financing transaction.

(d)    Profits for each fiscal year (and each item of income and gain entering into the computation thereof) shall be allocated among the Members (and credited to their respective Capital Accounts) in the following order and priority:

(i)    First, to the Members, based on the amount of Losses being offset, until the cumulative Profits allocated pursuant to this Article 8(c)(i) are equal to the cumulative Losses, if any, previously allocated to the Members pursuant to Article 8(d)(v) for all prior periods in proportion to the Members' respective shares of the Losses being offset;

(ii)    Second, to the Members, based on the amount of Losses being offset, until the cumulative Profits allocated pursuant to this Article 8(c)(ii) are equal to the cumulative Losses, if any, previously allocated to the Members pursuant to Article 8(d)(iv) for all prior periods in proportion to the Members' respective shares of the Losses being offset;

(iii)    Third, to the Members, based on the amount of Losses being offset, until the cumulative Profits allocated pursuant to this Article 8(c)(iii) are equal to the cumulative Losses, if any, previously allocated to the Members pursuant to Article 8(d)(iii) for all prior periods in proportion to the Members' respective shares of the Losses being offset;

(iv)    Fourth, to the Members, based on the amount of Losses being offset, until the cumulative Profits allocated pursuant to this Article 8(c)(iv) are equal to the cumulative Losses, if any, previously allocated to the Members pursuant to Article 8(d)(ii) for all prior periods in proportion to the Members' respective shares of the Losses being offset; and

(v)    Fifth, to the Members, in accordance with their Percentage Interests.

(e)    Notwithstanding the above, the Members acknowledge that THOMAS GRANER will provide the Limited Liability Company with the requisite capital for each individual financing transaction and shall be repaid by the cash receipts of the Limited Liability Company on a preferred basis. The Limited Liability Company shall make monthly distributions from its cash receipts to the Members allocated in the following order and priority:

(i)    First, to THOMAS GRANER, for the amount of Amortized Principal received from each financing transaction;

(ii)    Second, to THOMAS GRANER, for the cost of capital based on the Wall Street Journal published prime rate plus two points, which is currently 3.5% (meaning the current cost of capital shall be 5.5% as of the date of this Agreement), of the amortized loan balance remaining on each financing transaction; and

(iii)    Third, to the Members in accordance with their Percentage Interests.

(f)    Losses for each fiscal year (and each item of loss and deduction entering into the computation thereof) shall be allocated among the Members (and charged to their respective Capital Accounts) in the following order and priority:

(i)    First, to the Members, pro rata based on the amount of Profits being offset, until the cumulative Losses allocated pursuant to this Article 8(d)(i) are equal to the cumulative Profits, if any, previously allocated to the Members pursuant to Article 8(c)(v) for all prior periods in proportion to the Members' respective shares of the Profits being offset;

(ii)    Second, to the Members, in proportion to, and in the amount of, the excess of (1) the total amount of the additional Capital Contributions (i.e. not included in each Member's initial Capital Contributions) made by each of the Members and (2) the Losses previously allocated to each of the Members pursuant to this Article 8(d)(ii);

(iii)    Third, if any, to the Members in accordance with their Contribution Account balances as of the end of the period to which the allocation of Losses under this Article 8(d)(iii) relates;

(iv)    Fourth, to the Members in accordance with their Percentage Interests; and

(v)    Losses allocated in accordance with clauses (i), (ii), (iii), or (iv) of this Article 8(d) to the Capital Account of any Member shall not exceed the maximum amount of Losses that can be so allocated without creating an Adjusted Capital Account Balance deficit with respect to such Capital Account. This limitation shall be applied individually with respect to each Member in order to permit the allocation pursuant to this Article 8(d)(v) of the maximum amount of Losses permissible under Treasury Regulations ("Regulations") § 1.704-1(b)(2)(ii)(d). All Losses in excess of the limitations set forth in this Article 8(d)(v) shall be allocated solely to those Members that bear the economic risk for such additional Losses within the meaning of § 704(b) of the Internal Revenue Code of 1986, as thereafter amended ("Code"), and the Regulations thereunder. If it is necessary to allocate Losses under the preceding sentence, the Members shall, in accordance with the

Regulations promulgated under Code § 704(b), determine those Members that bear the economic risk for such additional Losses.

(g)    Except as otherwise provided in Article 8(f) below, for income tax purposes, all items of income, gain, loss, deduction and credit of the Limited Liability Company for any tax period shall be allocated among the Members in accordance with the allocation of Profits and Losses prescribed in this Article 8.

(h)    In accordance with Code § 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Limited Liability Company shall, solely for tax purposes, be allocated among Members so as to take account of any variation between the adjusted basis of such property to the Limited Liability Company for federal income tax purposes and its initial Gross Asset Value under the Traditional Method as defined under Regulations § 1.704-3(b).  Allocations pursuant to Articles 8(e) and (f) are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses or other items or distributions pursuant to any other provision of this Agreement.

(i)    Except as provided in Article 20 (in connection with the dissolution or liquidation of the Limited Liability Company), or otherwise agreed to by the Members, distributions of cash receipts shall be on a monthly basis and in amounts determined by the Profits for the previous month after any expenses, and any such distribution shall be allocated among the Members in proportion to the Percentage Interests.

(j)    For purposes of this Article 8, the term "Members" shall also include "Interest Holders," except with respect to any matter requiring the consent or vote of the Members.

## 9.  Books, Records and Tax Returns

At all times during the continuance of the Limited Liability Company, the Members shall keep or cause to be kept complete and accurate records and books of account in which shall be entered each transaction of the Limited Liability Company in accordance with generally accepted accounting principles.

The fiscal year of the Limited Liability Company for both accounting and income tax purposes shall be the calendar year.  The Limited Liability Company shall report its operations, net income and net losses in accordance with the methods of accounting selected by the Members.

To the extent deemed necessary, the Members may choose and employ, on behalf of the Limited Liability Company, and at the expense of the Limited Liability Company, such firm of certified public accountants as is appropriate to serve as the Limited Liability Company's accountants.

The Members shall prepare or cause to be prepared all required Federal, State and local income tax and information returns for the Limited Liability Company, and shall cause such tax and information returns to be filed timely with the appropriate governmental authorities.  After the end of each fiscal year, the Members shall forward to each Member and Interest Holder during the

6

preceding fiscal year a true copy of the Limited Liability Company's information return filed with the Internal Revenue Service for the preceding fiscal year.

All books and records of the Limited Liability Company shall be kept at the office of the Limited Liability Company or at such other place or places as may be determined by the Members and shall be available at reasonable times during business hours and upon reasonable notice for inspection and examination by the Members or their duly authorized representatives. For clarification, Interest Holders shall have no right to inspect and examine the books and records of the Limited Liability Company.

## 10. Bank Accounts

All funds of the Limited Liability Company shall be deposited in the Limited Liability Company's name in such account or accounts as shall be designated by the Members.

## 11. Management of the Limited Liability Company

Management of the Limited Liability Company is vested in the Members. All actions or decisions affecting or arising from the management of the Limited Liability Company must be approved by the consent of the Members whose Percentage Interests exceed fifty percent (50%) of the Percentage Interests of all Members ("Majority of the Members"). Except as otherwise provided in this Agreement, acts of the Members shall require the prior consent of the Majority of the Members. Except as expressly authorized in this Agreement or approved by the consent of the Majority of Members, no single Member is authorized or empowered to execute, deliver, or perform any agreements, acts, transactions, or matters on behalf of the Limited Liability Company as agent for the Limited Liability Company.

The business and affairs of the Limited Liability Company shall be conducted and managed by the Members of the Limited Liability Company in accordance with this Agreement and the Act. The Limited Liability Company shall have all powers afforded to such entities under the Act and any other applicable laws, and the Members may exercise all such powers and authority and take all such actions as are necessary to carry out the powers and purposes of the Limited Liability Company, in accordance with and subject to the terms and provisions of this Agreement and the Act.

The Members shall oversee the management of the business and affairs of the Limited Liability Company, and each Member shall devote such time and provide such managerial and administrative services as are necessary to further the interests of the Limited Liability Company, it being understood that the Members shall not be required to devote any specific amount of time to the affairs of the Limited Liability Company. The Members shall not receive a salary or compensation associated with their management roles as Members of the Limited Liability Company.

The Limited Liability Company shall reimburse all reasonable costs and expenses incurred by the Members in connection with the management and administration of the Limited Liability Company. The Members are hereby expressly authorized to negotiate and enter into contracts

with such brokers, agents, management firms, attorneys, and other professionals and individuals as the Members may deem in their discretion necessary for the furtherance of the purposes of the Limited Liability Company, including such contracts as may provide for payment of such individuals out of the proceeds of the operations of the Limited Liability Company, and the Limited Liability Company shall reimburse the Members for any costs and expenses advanced in connection with the foregoing.

A Member's duty of care in the discharge of the Member's duties to the Limited Liability Company and the Members is limited to refraining from engaging in grossly negligent conduct, intentional misconduct, or a knowing violation of law. In discharging the duties of a Members, each Member shall be fully protected in relying in good faith upon the records of the Limited Liability Company and upon such information, opinions, reports or statements by Members, agents, accountants, attorneys, management professionals, or other persons as to matters each Member reasonably believes are within such person's professional or expert competence, including without limitation information, opinions, reports or statements as to the value or amount of the assets, liabilities, profits or losses of the Limited Liability Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

To the extent of the Limited Liability Company's assets, and to the extent permitted by law, the Limited Liability Company shall indemnify and hold each Member harmless from and against all liability, claim, loss, damage or expense, including reasonable attorneys' fees, incurred by the Member by reason of any act or omission of the Member made in good faith on behalf of the Limited Liability Company.

The Members shall have the power to hire, appoint, or promote such number of employees and officers, and to set the compensation of the same, of the Limited Liability Company or any of its affiliates as the Members deem appropriate, and to remove, replace, demote, accept the resignation of, or terminate the services of the same.

## 12. Member Meetings

(a)    Regular and special meetings of the Members may be held at any place within or without the State of Florida as agreed by the Members. In accordance with the procedures in Article 22, notice shall be delivered personally or sent by mail, fax, or email. Except where not required in this Agreement, notice is required to be given to each Member five days prior to the meeting. Any meeting, regular or special, may be held by conference telephone or similar communication equipment. So long as all Members participating in the meeting can hear one another, all such Members shall be deemed to be present at the meeting.

(b)    No annual meetings of the Members are required.

(c)    Regular meetings of the Members shall be held without notice and without call at such time as from time to time may be agreed by the Members.

(d)    Special meetings of the Members for any purpose or purposes shall be called at any time by any Member.

8

(e)     Any action of the Members may be approved without a meeting provided that such action shall be by written consent of all of the Members ("Unanimous Consent"). Such written consent or consents shall be filed with the minutes of the proceedings of the Members and shall have the same force and effect as a vote of the Majority of the Members at a meeting duly held.

(f)     The presence of the Majority of the Members at a meeting of the Members constitutes a quorum for the transaction of business. Every act or decision done or made by the majority of the quorum at a meeting duly held at which a quorum is present shall be the act of the Members, unless a greater number, or the same number after disqualifying one or more Members from voting, is required by law, by the articles of organization, or by this Agreement. A meeting at which a quorum is initially present may continue to transact business notwithstanding the departure of a Member, provided that any action taken is approved by at least the majority of the quorum for such meeting. If less than a quorum shall be in attendance at the time for which said meeting shall have been called, those present may, by majority vote, adjourn the said meeting to another date certain.

(g)     Without limiting the generality of the powers of the Members to manage the Limited Liability Company, the Members are not authorized to make the following decisions without the prior Unanimous Consent of the Members:

(i)     To cause or permit the Limited Liability Company to dissolve, wind up, or liquidate;

(ii)     To terminate or amend this Agreement;

(iii)     To determine the fair market value of any property distributed in-kind to a Member, pursuant to Article 20; and

(iv)     To designate a Liquidating Agent (as defined in Article 20).

(h)     The transactions of any meeting of the Members which transactions satisfy the approval requirements set forth above, but which transactions are deficient for reason of improper notice shall be valid as though duly held after regular call and notice if a quorum is present and if, either before or after the meeting, each Member not present, or who though present had prior to the meeting or at its commencement protested the lack of proper notice to him, signs a written waiver of notice or a consent to holding such meeting or an approval of the minutes thereof. All such waivers, consents, or approvals shall be filed with the Limited Liability Company records or made a part of the minutes of the meeting.

(i)     The majority of the quorum may adjourn any Members meeting to meet again at a stated day and hour; provided, however, that in the absence of a quorum, a majority of the Members present at any Members meeting, either regular or special, may adjourn from time to time until the time fixed for the next regular meeting of the Members.

(j)     If the meeting is adjourned for more than 24 hours, notice of any adjournment to another time or place shall be given prior to the time of the adjourned meeting to the Members who were not present at the time of adjournment. Otherwise notice of the time and place of holding

an adjourned meeting need not be given to absent Members if the time and place be fixed at the meeting adjourned.

(k)     For clarification, Interest Holders shall have no right to participate in any matter, including, without limitation, any meeting and the receipt of any notice of any meeting, requiring the consent or vote of the Members.

## 13.  Member Deadlock and Activities

(a)     In the event that after 30 days the Members are deadlocked as to any action to be taken or task to be performed by the Members ("Deadlock Issue"), any Member may refer the Deadlock Issue to a mediator by written notice to the other Members.  If not resolved by mediation, the parties shall resolve the Deadlock Issue by arbitration pursuant to this Article.   In the arbitration, a Member may tender an offer to buy the Interest of another Member or all of the assets of the Limited Liability Company.   The arbitrator has the power and authority to resolve the Deadlock Issue and may do so by compelling the sale of one or more Interests (either to a tendering Member or a third party) or the dissolution and liquidation of the Limited Liability Company, by such means and at such prices as the arbitrator determines to be in the best interests of the Limited Liability Company and its Members.  The arbitrator may compel production of documents, order reports, or retain experts to assist him in the arbitration, and the costs are allocated among the Members as the arbitrator determines.  The provisions of this Section 13 do not limit the remedies that the arbitrator may otherwise award.  Notwithstanding the foregoing, except as it pertains to a Deadlock Issue, either party may file a lawsuit in the Circuit Court of the appropriate jurisdiction as it relates to any dispute arising out of this Agreement or as otherwise allowed by applicable law.

(b)     In the event that either party hereto seeks to collect any damages resulting from, or the injunction of any action constituting, a breach of any of the terms or provisions of this Agreement, then the party found to be at fault shall pay all reasonable costs and attorneys' fees (including costs of appeal) of the other.

(c)     Each Member may engage in or possess interests in other business ventures of every kind and description for such person's own account, including but not limited to those competitive with the business of the Limited Liability Company.  Neither the Limited Liability Company nor any of the other Members shall have any rights by virtue of this Agreement in and to such independent business ventures or to the income or profits derived therefrom.

## 14.  Assignment of Interests

Except as otherwise provided in this Agreement, no Members may assign, pledge, hypothecate, transfer or otherwise dispose of all or any part of his or her interest in the Limited Liability Company, including without limitation the capital, profits or distributions of the Limited Liability Company, without the prior written consent of the Majority of the Members.

An assignment, pledge, hypothecation, transfer or other disposition of all or any part of the interest of a Member in the Limited Liability Company in violation of the provisions hereof shall be null and void for all purposes.

As between a Member and an assignee or transferee of such Member's interest in accordance with this Agreement, allocations and distributions for any fiscal year shall be apportioned as of the date of the assignment or transfer, on the basis of the number of days before and after said date, without regard to the results of the Limited Liability Company's operations before or after the assignment or transfer.

No assignment or other disposition of any interest of any Member may be made if such assignment or disposition, alone or when combined with other transactions, would result in the termination of the Limited Liability Company within the meaning of the Code or under any other relevant section of the Code or any successor statute. No assignment or other disposition of any interest of any Member may be made without an opinion of counsel satisfactory to the Members that such assignment or disposition is subject to an effective registration under, or exempt from the registration requirements of, applicable State and Federal securities laws. No interest in the Limited Liability Company may be assigned or given to any person below the age of 21 years or to a person who has been adjudged to be insane or incompetent.

Anything herein contained to the contrary, the Members and the Limited Liability Company shall be entitled to treat the record holder of the interest of a Member as the absolute owner thereof, and shall incur no liability by reason of distributions made in good faith to such record holder, unless and until there has been delivered to the Members the assignment or other instrument of transfer and such other evidence as may be reasonably required by the Members to establish to the satisfaction of the Members that an interest has been assigned or transferred in accordance with this Agreement.

Notwithstanding anything contained in this Article 14 or elsewhere to the contrary, assignments or other dispositions of any interest of a Member to a Member's spouse, a Member's issue, the spouse of such issue, or a trust for the benefit of any of the foregoing may be made without compliance with the terms and conditions of this Agreement pertaining to assignments or other dispositions.

For purposes of this Article 14, the term "Members" shall also include "Interest Holders," except with respect to any matter requiring the consent or vote of the Members.

## 15. Right of First Refusal

If a Member or Interest Holder desires to sell, transfer or otherwise dispose of all or any part of his or her interest in the Limited Liability Company, such Member (the "Selling Member") shall first offer to sell and convey such interest to the other Members ("Non-Selling Members") before selling, transferring or otherwise disposing of such interest to any other person, corporation or other entity ("Offer"). Such Offer shall be in writing, shall be given to every Non-Selling Member, and shall set forth the interest to be sold, the purchase price to be paid, the date on which the closing is to take place (which date shall be not less than 30 nor more than 60 days after the delivery of the offer), the location at which the closing is to take place, and all other material terms and conditions of the sale, transfer or other disposition.

11

Within 30 days after the delivery of said Offer ("Offer Period"), the Non-Selling Members shall deliver to the Selling Member a written notice either accepting or rejecting the Offer. Failure to deliver said notice within the Offer Period conclusively shall be deemed a rejection of the Offer. Any or all of the Non-Selling Members may elect to accept the Offer, and if more than one of the Non-Selling Members elects to accept the Offer, the interest being sold and the purchase price therefor shall be allocated among the Non-Selling Members accepting the Offer in proportion to such Non-Selling Members' Percentage Interests, unless they otherwise agree in writing.

If any or all of the Non-Selling Members elect to accept the Offer, then the closing of title shall be held in accordance with the Offer and the Selling Member shall deliver to the Non-Selling Members who have accepted the Offer an assignment of the interest being sold by the Selling Member, and the Non-Selling Members shall pay the purchase price prescribed in the Offer.

If no Non-Selling Member accepts the Offer, or if the Non-Selling Members who have accepted such Offer default in their obligations to purchase the interest, then the Selling Member within 120 days after the delivery of the Offer ("Post-Offer Period") may sell such interest to any other person or entity at a purchase price which is not less than the purchase price prescribed in the Offer and upon terms and conditions which are substantially the same as the terms and conditions set forth in the Offer, provided all other applicable requirements of this Agreement are complied with. An assignment of such interest to a person or entity who is not a Member of the Limited Liability Company shall only entitle such person or entity to the allocations and distributions to which the assigned interest is entitled as an Interest Holder, unless such person or entity applies for admission to the Limited Liability Company and is admitted to the Limited Liability Company as a Member in accordance with this Agreement.

If the Selling Member does not sell such interest within the Post-Offer Period, then the Selling Member may not thereafter sell such interest without again offering such interest to the Non-Selling Members in accordance with this Article 15.

For clarification, for purposes of this Article 15 the term "Selling Member" shall include "Interest Holders," but otherwise the term "Member" or "Non-Selling Member" as used in this Article 15 shall not include Interest Holders.

## 16. Admission of New Members

The Members may admit new Members (or transferees of any interests of existing Members or Interest Holders) into the Limited Liability Company only by the consent of the Majority of the Members.

As a condition to the admission of a new Member, such new Member shall execute and acknowledge such instruments, in form and substance satisfactory to the Members, as the Members may deem necessary or desirable to effectuate such admission and to confirm the agreement of such new Member to be bound by all of the terms, covenants and conditions of this Agreement, as the same may have been amended. Such new Member shall pay all reasonable expenses in connection with such admission, including without limitation reasonable attorneys' fees and the cost of the preparation, filing or publication of any amendment to this Agreement or the Articles

of Organization, which the Members may deem necessary or desirable in connection with such admission.

No new Member shall be entitled to any retroactive allocation of income, losses, or expense deductions of the Limited Liability Company. The Members may make pro rata allocations of income, losses or expense deductions to a new Member for that portion of the tax year in which the new Member was admitted in accordance with applicable sections of the Code and Regulations thereunder.

In no event shall a new Member be admitted to the Limited Liability Company if such admission would be in violation of applicable Federal or State securities laws or would adversely affect the treatment of the Limited Liability Company for income tax purposes.

## 17.  Withdrawal Events Regarding Members and Election to Continue the Limited Liability Company

In the event of the death, permanent disability, withdrawal, expulsion, dissociation or dissolution of a Member, or an event of bankruptcy or insolvency, as hereinafter defined, with respect to a Member, or the occurrence of any other event which terminates the continued membership of a Member in the Limited Liability Company pursuant to the laws of the State of Florida (each of the foregoing being hereinafter referred to as a "Withdrawal Event" and each such Member a "Withdrawing Member"), the Limited Liability Company shall not terminate and the business of the Limited Liability Company shall continue, unless, within 60 days after notice to the Members of such Withdrawal Event, the remaining Members, by the consent of a Majority of the Members (other than the Withdrawing Member who caused the Withdrawal Event), shall elect to terminate the Limited Liability Company.

In the event of a Withdrawal Event with respect to Withdrawing Member, such Withdrawing Member's membership and participation in the Limited Liability Company shall cease, any successor in interest to such Withdrawing Member (including without limitation any executor, administrator, heir, committee, guardian, trustee, receiver, or other representative or successor) shall not become entitled to any rights or interest of such Withdrawing Member in the Limited Liability Company, including the right to review or obtain books or records of the Limited Liability Company (unless required by law), other than the allocations and distributions to which such Withdrawing Member would be entitled, unless such successor in interest is admitted as a Member in accordance with this Agreement, and the Withdrawing Member shall become and have only the rights of an Interest Holder under this Agreement.

An "event of bankruptcy or insolvency" with respect to a Member shall occur if such Member: applies for or consents to the appointment of a receiver, trustee or liquidator of all or a substantial part of his assets; or makes a general assignment for the benefit of creditors; or is adjudicated a bankrupt or an insolvent; or files a voluntary petition in bankruptcy or a petition or an answer seeking an arrangement with creditors or to take advantage of any bankruptcy, insolvency, readjustment of debt or similar law or statute, or an answer admitting the material allegations of a petition filed against him in any bankruptcy, insolvency, readjustment of debt or similar proceedings; or takes any action for the purpose of effecting any of the foregoing; or an

13

order, judgment or decree shall be entered, with or without the application, approval or consent of such Member, by any court of competent jurisdiction, approving a petition for or appointing a receiver or trustee of all or a substantial part of the assets of such Member, and such order, judgment or decree shall continue unstayed and in effect for thirty days.

## 18. Purchase Upon a Withdrawal Event

(a)    Upon the death of a Member ("Decedent"), the Limited Liability Company shall not terminate. If the Decedent's interest in the Limited Liability Company is bequeathed or passed by operation of law to one or more of the Decedent's spouse, issue, spouse of such issue or a trust for their benefit, such successors shall be substituted for the Decedent as Members of the Limited Liability Company. (The fact that the Decedent's interest may be held by the Decedent's personal representatives for a period of time shall not disqualify such interest from falling within the preceding sentence.) Otherwise, the Decedent's interest in the Limited Liability Company shall be subject to the provisions of Article 18(b) below, provided, however, that if a Majority of the Members vote to have the personal representative of the Decedent substituted for the Decedent as a Member of the Limited Liability Company, and, in such event, the personal representative agrees to such substitution, then such personal representative shall be substituted in the place and stead of the Decedent and such personal representative shall have the same rights and obligations in the Limited Liability Company as the Decedent would have had if the Decedent had survived.

(b)    Upon the occurrence of a Withdrawal Event as defined above, and subject to the provisions of Article 18(a) above, unless the remaining Members have consented to terminate the Limited Liability Company as provided in Article 17 and unless a successor of the Withdrawing Member has been substituted for the Withdrawing Member as a Member of the Limited Liability Company, within 30 days of the Withdrawal Event the Withdrawing Member, or the legal representative or representatives of, or the heirs, distributees or beneficiaries of, or the executor or administrator of, or the trustee, receiver, or guardian of the estate of the Withdrawing Member, as the case may be (the "Withdrawing Member's representative"), shall notify the Limited Liability Company in writing of the occurrence of the Withdrawal Event ("Withdrawal Notice"). If a Withdrawal Notice is not sent as contemplated herein, then notice shall be deemed given 30 days from the date the Limited Liability Company is made aware of such Withdrawal Event. For the 60 day period (the "Company's Option Period") commencing upon the date the Withdrawal Notice is given, the Limited Liability Company shall have the option (the "Company's Withdrawal-Related Purchase Option") to purchase all, and not less than all, of the Withdrawing Member's interest in the Limited Liability Company. The Company's Withdrawal-Related Purchase Option shall be deemed exercised upon delivery of written notice (the "Company's Withdrawal-Related Exercise Notice") to the Withdrawing Member (or the Withdrawing Member's representative) prior to the expiration of the Company's Option Period.

(c)    The purchase price for the interest in the Limited Liability Company purchased pursuant to this Article 18 shall be determined in accordance with the provisions of Article 19 below. The following terms and conditions shall apply to the purchase and sale of the interest in the Limited Liability Company of a Withdrawing Member:

14

(i)    Not less than 30% percent of the purchase price for the interest in the Limited Liability Company shall be paid in cash or by certified check to the Withdrawing Member or such Withdrawing Member's representative on the closing date indicated in the Company's Withdrawal-Related Exercise Notice, which shall not be a date that is less than five business days nor more than 60 business days after the end of the Company's Option Period ("Closing Date").

(ii)    Any balance of the purchase price shall be paid to the Withdrawing Member or such Withdrawing Member's representative in cash or by certified check, or, at the option of the Limited Liability Company, in 36 consecutive equal monthly installments, with the first installment to be paid on the date which is 30 days after the Closing Date, and with each subsequent payment to be paid on the like day of each succeeding month. This obligation shall be evidenced by a negotiable promissory note to the order of the Withdrawing Member or such Withdrawing Member's representative providing for: (1) the right of prepayment without penalty; and (2) acceleration of the entire unpaid principal balance in the event of a default in payment for more than ten days after notice and demand. Said promissory note shall be executed and delivered by the Limited Liability Company simultaneously with the payment provided for in Article 18(c)(i) above.

(iii)    Upon receipt of the cash payment and the promissory note, if any, required in Article 18(c)(i) and (ii) above, the Withdrawing Member or such Withdrawing Member's representative shall deliver an assignment to the Limited Liability Company of all of the interest in the Limited Liability Company of the Withdrawing Member, with any other instruments required by the Limited Liability Company, including any applicable tax waivers, so that full and complete title to the Withdrawing Member's interest in the Limited Liability Company can be transferred on the books of the Limited Liability Company.

(iv)    If the Withdrawing Member's interest in the Limited Liability Company has been purchased by delivery of a promissory note, then, when the interest is transferred as provided in Article 18(c)(iii), the Limited Liability Company shall note in its books that said interest is held as collateral security for payment of the promissory note and is not to be further transferred until the promissory note is paid in full.

If the remaining Members unanimously elect to terminate the Limited Liability Company because of the Withdrawal Event pursuant to Article 17 above, the provisions of this Article 18 shall be null and void.

## 19.  Purchase Price

For purposes of a purchase of an interest in the Limited Liability Company referring to this Article 19, the purchase price for the interest in the Limited Liability Company shall be the fair market value of such interest as determined pursuant to this Article. The fair market value of each one percent interest in the Limited Liability Company as re-determined from time to time shall take into account the tangible and intangible assets of the Limited Liability Company, including good will and other relevant factors, and liabilities of the Limited Liability Company.

15

If the parties hereto fail to re-determine the fair market value of each one percent interest in the Limited Liability Company within 60 days after any fiscal year, the fair market value of each one percent interest in the Limited Liability Company for the purpose of establishing the purchase price hereunder shall be as agreed upon by the Withdrawing Member or the Withdrawing Member's representative and the Limited Liability Company. In the event the purchase price is being computed as a result of a Withdrawal Event, the fair market value shall be computed as of the date immediately preceding said Withdrawal Event. If the parties are unable to agree upon the fair market value 30 days prior to the date of the purchase, then the fair market value of each one percent interest in the Limited Liability Company shall be determined by appraisal performed by a qualified business appraiser mutually selected by the Withdrawing Member or the Withdrawing Member's representative and the Limited Liability Company. All costs of any such appraisal shall be borne equally by the Withdrawing Member or the Withdrawing Member's representative and the Limited Liability Company. If the Withdrawing Member or the Withdrawing Member's representative and the Limited Liability Company cannot agree on an appraiser within 25 days prior to the date of the purchase, then an appraiser shall be determined as follows:

      (i)     Not less than 20 days prior to the date of the purchase, the Withdrawing Member or the Withdrawing Member's representative shall appoint one appraiser, and the Limited Liability Company shall appoint one appraiser.

      (ii)    If either the Withdrawing Member or the Withdrawing Member's representative or the Limited Liability Company shall fail to appoint an appraiser, the appraiser appointed by the other shall determine the fair value of each interest in the Limited Liability Company.

      (iii)   If the two appraisers appointed by the Withdrawing Member or the Withdrawing Member's representative and the Limited Liability Company shall fail to agree upon the fair value of each one percent interest in the Limited Liability Company ten days prior to the date of the purchase, the two appraisers shall appoint a third appraiser to evaluate the appraisals of the first two appraisers, and the determination of the majority of the appraisers shall be binding upon all parties.

      (iv)   All costs of any such appraisal shall be borne equally by the Withdrawing Member or the Withdrawing Member's representative and the Limited Liability Company.

## 20. Dissolution and Liquidation

The Limited Liability Company shall terminate upon the occurrence of any of the following: the election by Unanimous Consent of the Members to dissolve the Limited Liability Company; or any other event which pursuant to this Agreement or applicable law, as either may hereafter be amended, shall cause a termination of the Limited Liability Company.

The liquidation of the Limited Liability Company shall be conducted and supervised by the Members or by a person designated for such purposes by the Unanimous Consent of the Members (the "Liquidating Agent"). The Liquidating Agent hereby is authorized and empowered to execute any and all documents and to take any and all actions necessary or desirable to effectuate

the dissolution and liquidation of the Limited Liability Company in accordance with this Agreement.

Promptly after the termination of the Limited Liability Company, the Members or Liquidating Agent shall cause to be prepared and furnished to the Members a statement setting forth the assets and liabilities of the Limited Liability Company as of the date of termination. The Members or Liquidating Agent, to the extent practicable, shall liquidate the assets of the Limited Liability Company as promptly as possible, but in an orderly and businesslike manner so as not to involve undue sacrifice.

The proceeds of sale and all other assets of the Limited Liability Company shall be applied and distributed in the following order of priority: (a) to the payment of the expenses of liquidation and the debts and liabilities of the Limited Liability Company, other than debts and liabilities to Members; (b) to the payment of debts and liabilities to Members; (c) to the setting up of any reserves which the Members or Liquidating Agent may deem necessary or desirable for any contingent or unforeseen liabilities or obligations of the Limited Liability Company, to be held for a period of two years for the purpose of payment of the aforesaid liabilities and obligations, at the expiration of which period the balance of such reserves shall be distributed as hereinafter provided; (d) to the Members in accordance with the positive balance of each Member's Capital Account as determined after taking into account all Capital Account adjustments for the Limited Liability Company's taxable year during which the liquidation occurs, including any Capital Account adjustments associated with the allocation of Profits and Losses with respect to any sale, transfer or other taxable disposition of the property of the Limited Liability Company; any such distributions to the Members in respect of their Capital Accounts shall be made within the time requirements of Regulations § 1.704-1(b)(2)(ii)(b)(2); and (e) to the Members in proportion to the Members' Percentage Interests.

No Member shall have any obligation to contribute or advance any funds or other property to the Limited Liability Company by reason of any negative or deficit balance in such Member's Capital Account during or upon completion of winding up or at any other time except to the extent that a deficit balance is directly attributable to a distribution in violation of this Agreement.

A Member shall have no right to demand and receive any distribution from the Limited Liability Company in any form other than cash.

Upon compliance with the distribution plan, the Members shall cease to be such, and the Members or Liquidating Agent shall execute, acknowledge and cause to be filed such certificates and other instruments as may be necessary or appropriate to evidence the dissolution and termination of the Limited Liability Company.

For purposes of this Article 20, the term "Members" shall also include "Interest Holders," except with respect to any matter requiring the consent or vote of the Members.

17

## 21.  Representations of Members

Each of the Members represents, warrants and agrees that the Member is holding the interest in the Limited Liability Company for the Member's own account as an investment and not with a view to the sale or distribution thereof; the Member, if an individual, is over the age of 21, or if the Member is an organization, such organization is duly organized, validly existing and in good standing under the laws of its state of organization and that it has full power and authority to execute and perform its obligations under this Agreement; and the Member shall not dispose of such interest or any part thereof in any manner which would constitute a violation of the Securities Act of 1933, the Rules and Regulations of the Securities and Exchange Commission, or any applicable laws, rules or regulations of any State or other governmental authorities, as the same may be amended.  Each party to this Agreement represents and warrants to each other party that such party has read and fully understood the terms and provisions hereof, has had an unlimited opportunity to review this Agreement with legal counsel, and has executed this Agreement based upon such party's own judgment and advice of independent legal counsel, if sought.

For purposes of this Article 21, the term "Members" shall also include "Interest Holders."

## 22.  Notices

All notices, demands, requests or other communications which any of the parties to this Agreement may desire or be required to give hereunder shall be in writing and shall be deemed to have been properly given if sent by Federal Express courier or by registered or certified mail, return receipt requested, with postage prepaid, addressed as follows:  (a) if to the Limited Liability Company, to the Limited Liability Company at such address or addresses as may be designated by the Limited Liability Company or the Members by notice to the Members pursuant to this Article 22; and (b) if to any Member, to such address as may be designated by said Member by notice to the Limited Liability Company and the other Members pursuant to this Article 22.  Unless otherwise designated, the addresses referred to in this Article 22 shall be the addresses reflected in the books and records of the Limited Liability Company.

For purposes of this Article 22, the term "Members" shall also include "Interest Holders," except with respect to any matter requiring the consent or vote of the Members.

## 23.  Amendments

This Agreement may not be altered, amended, changed, supplemented, waived or modified in any respect or particular unless the same shall be in writing and agreed to by the Unanimous Consent of the Members.

## 24.  Miscellaneous

This Agreement and the rights and liabilities of the parties hereunder shall be governed by and determined in accordance with the laws of the State of Florida.  If any provision of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement, which shall remain in full force and effect.

18

The captions in this Agreement are for convenience only and are not to be considered in construing this Agreement. All pronouns shall be deemed to be the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require. References to a person or persons shall include partnerships, corporations, limited liability companies, unincorporated associations, trusts, estates and other types of entities.

This Agreement, and any amendments hereto, may be executed in counterparts all of which taken together shall constitute one agreement.

To the extent any provision of this Agreement is prohibited or otherwise ineffective under Chapter 605 of the Florida Statutes, such provision shall be considered to be ineffective to the smallest degree possible in order to make this Agreement effective under Chapter 605 of the Florida Statutes. If Chapter 605 of the Florida Statutes is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

Subject to the limitations on transferability contained herein, this Agreement shall be binding upon and inure to the benefit of the parties hereto and to their respective heirs, executors, administrators, successors and assigns. No provision of this Agreement is intended to be for the benefit of or enforceable by any third party.

(REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)

19

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement effective as of the date first above written.

**MEMBERS:**

WITNESSES:

Print Name: Ashley Durst

**THOMAS GRANER**, Individually

Print Name: Ashley Durst

**SCOTT ZANKL**, Individually

20

# OPERATING AGREEMENT

## OF

## EXCELL AUTO FINANCE, LLC

## EXHIBIT "A"

Percentage Interest of each Member in Limited Liability Company.

| MEMBER | PERCENTAGE INTEREST IN THE LLC |
|---|---|
| THOMAS GRANER | 75% |
| SCOTT ZANKL | 25% |

# EXHIBIT H

**Exhibit H**

**FINANCING STATEMENT FORM**

| A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON |
|---|
| CAPITOL SERVICES; 8003454647 |
| Email MSHUNK@CAPITOLSERVICES.COM |

| B. SEND ACKNOWLEDGEMENT TO: |
|---|
| |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (1a OR 1b) - Do Not Abbreviate or Combine Names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| KARMA OF BROWARD, INC. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS Line One | | This space not available. | | |
| 1717 17TH STREET | | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| | FT. LAUDERDALE | FL | 33316 | US |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (2a OR 2b) - Do Not Abbreviate or Combine Names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| KARMA OF PALM BEACH, INC. | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS Line One | | This space not available. | | |
| 1001 CLINT MOORE ROAD, UNIT B | | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| | BOCA RATON | FL | 33487 | US |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| FVP SERVICING, LLC | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS Line One | | This space not available. | | |
| 1201 BROADWAY, 7TH FLOOR | | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| | NEW YORK | NY | 10001 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

ALL ASSETS OF DEBTORS NOW OWNED OR HEREAFTER ACQUIRED AND WHEREVER LOCATED.

| 5. ALTERNATE DESIGNATION (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR |
|---|---|---|---|
| | ☐ AG LIEN | ☐ NON-UCC FILING | ☐ SELLER/BUYER |

**6. Florida DOCUMENTARY STAMP TAX** - YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☑ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**    1700101-54 (FEENIX KARMA) - FL - STATE

**STANDARD FORM - FORM UCC-1 (REV.05/2013)**    Filing Office Copy    Approved by the Secretary of State, State of Florida

# EXHIBIT I

**Exhibit I**

TO:        FVP Servicing LLC

FROM:    1001 Clint Moore, LLC

DATE:    January __, 2022

Re:        Loan to Karma of Palm Beach, Inc./Karma of Broward, Inc.

1001 Clint Moore LLC ("1001") is the owner of the property located at 1001 Clint Moore Road, Unit B, Boca Raton, Florida (the "Leased Premises"). The Leased Premises are currently being rented to Excell Auto Group, Inc. ("Excell") and Karma of Palm Beach, Inc., pursuant to a written lease agreements between 1001 and Excell and 1001 and Karma of Palm Beach, Inc. as amended, modified, supplemented, restated, extended or renewed from time to time, (the "Lease").

The owner/representative of Excell and Karma of Palm Beach, Inc., Scott Zankl ("Zankl"), has advised us that his companies Karma of Palm Beach, Inc./Karma of Broward, Inc., (collectively "Karma") are attempting to obtain financing from FVP Servicing LLC ("FVP"), on its own behalf and/or as agent for and on behalf of one or more other lenders (collectively, "Lender"); and, as condition to the loan, FVP requires 1001's agreement that, in the event of Excell's and/or Karma of Palm Beach, Inc., default of the Lease, 1001 will allow FVP access to the Lease Premises to retrieve the collateral that serves as the security for its loan.

Although neither 1001, nor any of its members, are parties to the loan, or will in any way either directly, or indirectly, receive any consideration by virtue of the loan to Karma, in good faith, 1001 agrees to allow FVP/Lender access to the Lease Premises to retrieve the collateral that serves as the security for its loan.

Please note that, in giving its agreement for FVP/Lender to access to the Leased Premises to retrieve the collateral securing its loan, 1001 has not been asked, nor is it agreeing to provide notice to FVP/Lender in the event of Excell's default of the lease, except as required by Florida law. In addition, the access being granted by 1001 is for the specific purpose of FVP/Lender retrieving only the property owned by Karma securing FVP/Lender's loan, and does not include any property owned by 1001, or other person or entity, including but not limited to, any fixtures, furniture, office equipment, and/or vehicles, which is currently or may from time to time be located on the Leased Premises.

Finally, in exchange 1001's good faith agreement to FVP/Lender in the event of a default of the Lease, 1001 expects that FVP/Lender will show the same good faith in the event FVP/Lender will be accessing the Leased Premises to retrieve its collateral under circumstances where there has been no default of the Lease, by providing 1001 written notice of its intent do the same. Accordingly, 1001 does hereby request that, in any circumstance where FVP/Lender will be accessing the Leased Premises for the purpose of retrieving the collateral securing its loan to Karma, FVP will give at least five (5) days prior to notice to 1001, including the date and time FVP/Lender will be making access.

Please send any and all future notices pertaining to this matter via email to:

Lisa Farache (lisafarache@gmail.com )
Moshe Farache (moshefarache@gmail.com)
Michele Martin (michelemartin1010@gmail.com )
Scott C. Gherman, Esq. (sgherman@scottghermanpa.com)

LANDLORD:

**1001 CLINT MOORE, LLC**

By: _____ Manager

Name: Lisa Farache, as Manager

# EXHIBIT J

**Exhibit J**

# KUTAKROCK

**Kutak Rock LLP**

The Omaha Building | 1650 Farnam Street, Omaha, NE 68102-2186
office 402.346.6000

JOEL L. WIEGERT
402.346.6000
joel.wiegert@kutakrock.com

April 7, 2022

**VIA FEDERAL EXPRESS AND**
**VIA ELECTRONIC MAIL**

Karma of Palm Beach, Inc.
Karma of Broward, Inc.
Scott Zankl
Kristen Zankl
1001 Clint More Road, Unit B
Boca Raton, Florida 33487

RE:    NOTICE OF DEFAULT, ACCELERATION AND DEMAND

Ladies and Gentlemen:

Reference is hereby made to (a) that certain Loan Agreement dated as of January 26, 2022 (as amended, modified, supplemented, extended or renewed from time to time, the "Loan Agreement") by and among Karma of Palm Beach, Inc. ("Karma Palm Beach"), Karma of Broward, Inc. ("Karma Broward"; Karma Broward and Karma Palm Beach, each, a "Borrower" and, together, "Borrowers"), FVP Servicing, LLC, as administrative agent (in such capacity, "Agent"), and the Lenders from time to time party thereto, (b) that certain Guaranty Agreement dated as of January 26, 2022 (as amended, modified, supplemented, extended or renewed from time to time, the "Guaranty") by Scott Zankl ("S. Zankl") and Kristen Zankl ("K. Zankl"; K. Zankl and S. Zankl, each, a "Guarantor" and, together, "Guarantors") in favor of Agent and the Lenders. Capitalized terms used herein without definition shall have the meanings assigned to such terms in the Loan Agreement. Kutak Rock LLP represents Agent and the Lenders in connection with the Loan Agreement, the Guaranty and the Events of Default described herein.

Borrowers and Guarantors are hereby notified that Events of Default have occurred and are continuing under the Loan Documents as a result of, among other things, Borrowers' failure to deliver required financial reporting information, including evidence of Borrowers' vehicle inventory constituting Collateral, as and when required pursuant to Sections 5.1(f), (l) and (n) of the Loan Agreement (collectively, the "Subject Defaults"). As a result of the Subject Defaults, Agent, at the direction of the Lenders, has elected to accelerate the Obligations, including the outstanding principal amount of the Loan, all accrued unpaid interest thereon and all fees, costs and expenses payable under the Loan Documents (the "Accelerated Balance"). Interest, fees, costs and expenses shall continue to accrue on the Accelerated Balance from and after the date hereof in accordance with the terms of the Loan Documents.

Agent hereby makes demand upon Borrowers and Guarantors, on a joint and several basis, for the immediate payment in full of the Accelerated Balance. Please contact the undersigned for a statement of the amounts required to pay the Accelerated Balance as of the applicable date of payment. Agent and the

**KUTAK**ROCK

Lenders hereby reserve the right to exercise all other rights and remedies by contract, at law or in equity on account of the Subject Defaults, in such order as Agent and the Lenders may determine in their sole discretion.

Nothing contained in this letter shall be construed to (a) limit the right of Agent or any Lender to receive any and all sums that are or may become due or payable pursuant to the Loan Documents, or otherwise, including, without limitation, costs of collection (including reasonable attorneys' fees); (b) waive any default or Event of Default under any Loan Document, whether or not known to Agent or any Lender; (c) waive, limit, modify, prejudice or otherwise adversely affect any rights, remedies or powers of Agent or any Lender under the Loan Documents, by statute, at law or in equity, all of which rights, remedies and powers are expressly reserved; (d) alter or amend any of the Loan Documents; (e) create a course of dealing; or (f) waive, limit, modify, prejudice or otherwise adversely affect any of the claims of Agent or any Lender against Borrowers, Guarantors or any other obligor under the Loan Documents.

Sincerely,

Joel L. Wiegert

Kutak Rock LLP

# EXHIBIT K

Exhibit K

K A R M A | PALM BEACH

O: 561.998.5557
F: 561.998.4703
1001 Clint Moore Rd. Ste 103
Boca Raton, FL 33487

On 04/01/2022,

The following vehicle titles are being given to Auto Wholesale of Boca LLC as collateral against the loan amount

of $_____:

2013 Ferrari 458 #0191526---$230,000
2021 Jeep Gladiator #564806---$117,000
2018 Cadillac Escalade #261612---$60,000
2018 Mclaren 720 #001804----$282,080.03
2020 Lamborghini Huracan Evo #A14316---$330,000

2017 Lamborghini Huracan #A08121---$240,000
2019 Mclaren 720s #003714---$295,000
2020 Mercedes G63 #334940---$225,000
2021 Jeep Gladiator #571540---$138,607.80

The values of these vehicles, along with the $115,000.00 wired to Auto Wholesale of Boca LLC on 4/1/22
towards 2020 Bentley Flying Spur #082455, shall serve as collateral for the aforementioned loan amount.

As the loan is reduced, these vehicle titles will be returned.

_Moshe Farache MGR_

Moshe Farache--Auto Wholesale of Boca LLC

_Kristen Zankl_

Kristen Zankl- Karma Palm Beach

# EXHIBIT L

Exhibit L

MERCHANT AGREEMENT TERMS AND CONDITIONS

**1        TERMS OF ENROLLMENT IN PROGRAM**

1.1        Merchant Deposit Agreement and Processor. Merchant shall (A) execute an agreement acceptable to hbc with a Bank acceptable to hbc to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to HBC with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide HBC and/or its authorized agent(s) with all of the information authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes HBC and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to HBC for the receipts as specified herein and to pay such amounts to HBC. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre- approved by HBC or not. This additional authorization is not a waiver of HBC's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which HBC did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of HBC.

1.2        Term of Agreement. This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by HBC as per the terms of this Agreement.

1.3        Reconciliation. As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to Reconciliations@hibarcapital.com Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. HBC retains the right the request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software and Merchant's refusal to provide access shall be a breach of this Agreement and HBC shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by HBC within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by HBC shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with HBC's right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

1.4        Adjustments to the Remittance. As long as Event of Default, or breach of this agreement, has not occurred, Merchant may give notice to HBC to request a decrease in the Remittance, should they experience a decrease in its Future Receipts. All requests hereunder must be in writing to Reconciliations@hibarcapital.com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding from the date of this Agreement through and including the date the request is made  HBC retains the right the request additional reasonable documentation including without limitation bank login or 3rd party software access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and HBC shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Merchant shall provide HBC with viewing access to their bank account as well as all information reasonably requested by HBC to properly calculate the Merchant's Remittance. At the end of two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement

1.5        Financial Condition. Merchant and Guarantor(s)(s) (as hereinafter defined and limited) authorize HBC and its agents to investigate their financial responsibility and history, and will provide to HBC any authorizations, bank or financial statements, tax returns, etc., as HBC requests in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. HBC is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

1.6        Transactional History. Merchant authorizes all of its banks, brokers and processor to provide HBC with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide HBC with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from HBC.

1.7        Indemnification. Merchant and Guarantor(s)(s) hereby jointly and severally indemnify and hold harmless HBC and each Processor, their respective officers, directors, agents and representatives, and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any such indemnitee as a direct or indirect result of (a) claims asserted by HBC for monies owed to HBC from Merchant and (b) actions taken by indemnitee in reliance upon any fraudulent, misleading or deceptive information or instructions provided by HBC

1.8        No Liability. In no event will HBC be liable for any claims asserted by Merchant or Guarantor(s)s under any legal or equitable theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s)(s). In the event these claims are nonetheless raised, Merchant and Guarantor(s)s will be jointly liable for all of HBC's attorney's fees and expenses resulting therefrom.

1.9        Reliance on Terms. Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, HBC, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action. 1.10        Sale of Receipts. Merchant and HBC agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from HBC to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. HBC has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Merchant acknowledges that HBC's share of Receipts collected are being held by Merchant in trust and are the sole property of HBC until they are remitted to HBC. Payments made to HBC in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. By this Agreement, Merchant transfers to HBC full and complete ownership of the Purchased Amount and Merchant retains no legal or equitable interest therein. HBC hereby appoints Merchant, and Merchant accepts appointment, as servicer for and on behalf of HBC for the purpose of collecting and delivering Receipts to HBC as required by this Agreement until HBC has received the Receipts Purchased Amount, and Merchant agrees that all such Receipts shall be received and held in trust for the benefit of SPFL for purposes of carrying out the terms of this Agreement. Merchant agrees that it will treat the amounts received and the Purchased Amount delivered to HBC under this Agreement in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that HBC is entitled to audit Merchant's accounting records upon reasonable notice in order to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant asserts that this transaction is anything other than a sale of future receipts. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties herein specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that HBC has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and HBC shall promptly refund to Merchant any interest received by HBC in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that HBC shall not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

1.11        Power of Attorney. Merchant irrevocably appoints HBC and its agents and representatives, as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to HBC from Processor, or in the case of a violation by Merchant of Section 1 or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to HBC; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s)(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which HBC may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by merchant

1.12        Protections against Default. The following Protections 1 through 8 may be invoked by HBC immediately and without notice to Merchant in the event:

(a)

Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the HBC electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to HBC; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts or ceases the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of HBC, and (ii) the written agreement of any HBC or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to HBC; (e) Merchant takes any action, fails

PROPERTY OF HI BAR CAPITAL

2

Initial(1)         Initial(2)

to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide HBC with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from HBC, or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of Default contained in Section 3.1 herein. These protections are in addition to any other remedies available to HBC at law, in equity or otherwise pursuant to this

Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** HBC may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes HBC to execute in the name of the Merchant a Confession of Judgment in favor of HBC pursuant to the terms of the Confession of Judgment. Upon an Event of Default, HBC may enter this Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** HBC may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.

**Protection 5.** HBC may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9

**Protection 6.** HBC may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if HBC recovers a Judgment against Merchant, Merchant shall be liable for all of HBC's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to HBC. Upon breach of any provision in this Agreement, HBC may exercise its rights under this Assignment of Lease without prior Notice to Merchant. **Protection 8.** HBC may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to HBC. **Protection 8.** HBC may debit Merchant's depository accounts wherever situated in such amounts as determined by HBC in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to HBC by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to HBC.

**L13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor(s), in respect of himself or herself personally, authorizes HBC to disclose information concerning Merchant's and each Owner's and each Guarantor(s)'s credit standing (including credit bureau reports that HBC obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor(s) hereby and each waives to the maximum extent permitted by law any claim for damages against HBC or any of its affiliates relating to any (i)investigation undertaken by or on behalf of HBC as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by HBC, including this Agreement and any other HBC documents (collectively, "Confidential Information") are proprietary and confidential information of HBC. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of HBC to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles HBC to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.15 Publicity.** Merchant and each of Merchant's Owners and all Guarantor(s)s hereto all hereby authorizes HBC to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that HBC may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between HBC and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2**       **REPRESENTATIONS, WARRANTIES AND COVENANTS**

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

2.1      **Financial Condition and Financial Information.** Merchant's and Guarantor(s)s' bank and financial statements, copies of which have been furnished to HBC, and future statements which will be furnished hereafter at the discretion of HBC, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s)s have a continuing, affirmative obligation to advise HBC of any material adverse change in their financial condition, operation or ownership. HBC may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s)s shall provide them to HBC within five business days after request from HBC. Merchant's or Guarantor(s)s' failure to do so is a material breach of this Agreement.

2.2      **Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

2.3      **Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4      **Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

2.5      **Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without HBC's prior written consent. Any such changes shall be a material breach of this Agreement.

2.6      **Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and HBC, nor shall Merchant change any of its places of business without prior written consent by HBC.

2.7      **Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

2.8      **Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from HBC to Merchant, execute, acknowledge and deliver to HBC and/or to any other person, firm or corporation specified by HBC, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

2.9      **No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection pursuant to the United States Bankruptcy Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

2.10      **Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts and all collateral in which HBC has been granted a security interest under the Security Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of HBC or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of HBC.

2.11      **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.12      **Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

2.13      **Good Faith.** Merchant and Guarantor(s)s hereby affirm that Merchant is receiving the Purchase Price and selling HBC the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business

**3**      **EVENTS OF DEFAULT AND REMEDIES**

(a)      Merchant or Guarantor(s) shall violate any term or covenant in this Agreement;

(b)      Any representation or warranty by Merchant or Guarantor(s) in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

(c)      the sending of notice of termination by Merchant or verbally notifying HBC of its intent to breach this Agreement;

(d)      the Merchant fails to give HBC 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored

Initial(1): _____    Initial(2): _____

by Merchant's bank, the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;

(e)    Merchant fails to provide its bank statements, and/or month to date bank activity, and/or accounts receivable reports, and/or bank login information within two (2) business days of a request by HBC;

(f)    Merchant shall voluntarily transfer or sell all or substantially all its assets.

(g)    Merchant shall make or send notice of any intended bulk sale or transfer by Merchant.

(h)    Merchant shall use multiple depository accounts without the prior written consent of HBC or takes any other action that intentionally interferes with or prevents HBC from receiving the Purchased Amount in accordance with the terms of this Agreement.

(i)    Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.

(j)    Merchant shall change its depositing account without the prior written consent of HBC; or

(k)    Merchant shall close its depositing account used for ACH debits without the prior written consent of HBC

(l)    Merchant's bank returns a code other than NSF cutting HBC from its collections

(m)    Merchant or any Owner/Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant.

(n)    Merchant shall default under any of the terms, covenants and conditions of any other agreement with HBC.

3.2    **Limited Personal Guaranty** Upon the occurrence of an Event of Default, HBC will enforce its rights against the Guarantor(s)s of this transaction. Said Guarantor(s)s will jointly and severally liable to HBC for all of HBC's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

3.3    **Remedies.** Upon the occurrence of an Event of Default occurs and is not waived pursuant to Section 4.4. hereof, HBC may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of HBC in connection with this Agreement may be exercised at any time by HBC after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.4    **Attorney's Fees.** Upon the occurrence of an Event of Default, and HBC retains an attorney or law firm to enforce this Agreement, Merchant and Guarantor(s) agree that a fee equal to 30% of the Remaining Balance (purchased amount less amount remitted by Merchant) ("Attorney's Fees") shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable.

3.5    **Costs.** Merchant shall pay to HBC all reasonable costs associated with (a) an Event of Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof; and(c) the enforcement of HBC's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

3.6    **Required Notifications.** Merchant is required to give HBC written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give HBC seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

4    **MISCELLANEOUS**

4.1    **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by HBC.

4.2    **Assignment.** HBC may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

4.3    **Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to HBC shall become effective only upon receipt by HBC. Notices to Merchant shall become effective three days after mailing.

4.4    **Waiver Remedies.** No failure on the part of HBC to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.5    **Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums attachments, exhibits, and other documents relating to this Agreement in any way, shall be binding upon and inure to the benefit of Merchant and Guarantor(s) on the one hand, and HBC and their respective successors and assigns, except that Merchant and Guarantor(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of HBC which consent may be withheld in HBC's sole discretion. HBC reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if HBC so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). All Parties to this Agreement, including but not limited to, Merchant, Guarantor(s), Corporate Guarantor(s) Merchant and Guarantor(s) that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant and Guarantor(s) waives any right to oppose any motion or application made by HBC to transfer such proceeding to an Acceptable Forum. Merchant and Guarantor(s) hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by HBC by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement, or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

4.6    **Survival of Representation**, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

4.7    **Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

4.8    **Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

4.9    **Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant Guarantor(s) and Corporate Guarantor(s)s and HBC and supersede all prior agreements and understandings relating to the subject matter hereof.

4.10    **JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND    ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

4.11    **CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.12    **Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

Initial(1):                Initial(2):

## SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY OF PEFORMANCE. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT. INCLUDING THE TERMS AND CONDITIONS.

Merchant's Legal Name: EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

D/B/A: EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"    Federal ID#:

Physical Address: 1001 CLINT MOORE ROAD #101    City: BOCA RATON    State: FL    Zip: 33487

### SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. To secure Merchant's obligations under the Revenue Purchase Agreement to make available or deliver Purchased Amount to HBC and HBC's right to realize the Purchased Amount, as and to the extent required by the terms of the Revenue Purchase Agreement, and performance of and compliance by Merchant with its other undertakings and agreements herein, Merchant and Guarantor(s)(s) grants to HBC a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) amounts which may be due to HBC under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to HBC upon request to cover Merchant's obligations under this Agreement. HBC is granted a further security interest in all of if at any time there are insufficient funds in Merchant's Account to cover HBC's entitlements under this Agreement. HBC is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of HBC's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, HBC or an affiliate of HBC is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

In the event Merchant, any of its officers or directors or any Owner/Guarantor(s), during the term of the Revenue Purchase Agreement or while Merchant remains liable to HBC for any obligations under the Revenue Purchase Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due HBC under the Revenue Purchase Agreement. With respect to any such entity. HBC shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an usual UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. HBC shall be held harmless by Merchant and each Owner/Guarantor(s) and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. HBC shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of HBC's rights, including without limitation, HBC's right to collect all accounts, and to notify any payment card processor or creditor of such entity that HBC has such rights in such entity's assets. Merchant also agrees that, at the HBC's discretion, HBC may choose to amend any existing financing statement to include any such newly formed entity as debtor.

This security interest may be exercised by HBC without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. HBC shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, HBC has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, HBC will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from HBC written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor(s) (s) agree(s) that this is a contract of recoupment and HBC is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s)(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by HBC. Merchant and Guarantor(s)(s) agree(s) to execute and deliver to HBC such instruments and documents HBC may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. HBC is authorized to execute all such instruments and documents in Merchant's and Guarantor(s)(s) name.

Merchant and Guarantor(s)(s) each acknowledge and agree that any security interest granted to HBC under any other agreement between Merchant or Guarantor(s)(s) and HBC (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s)(s) each agrees to execute any documents or take any action in connection with this Agreement as HBC deems necessary to perfect or maintain HBC's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s)(s) each hereby authorizes HBC to file any financing statements deemed necessary by HBC to perfect or maintain HBC's security interest. Merchant and Guarantor(s)(s) shall be liable for, and HBC may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by HBC in protecting, preserving and enforcing HBC's security interest and rights.

**Negative Pledge.** Merchant and Guarantor(s)(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** HBC shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, HBC may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that HBC may enter into an agreement with Merchant's landlord giving HBC the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies.** Upon any Event of Default, HBC may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to HBC, whether by acceleration or otherwise.

5

Initial(1)    Initial(2):

## GUARANTY OF PERFORMANCE

As an additional inducement for HBC to enter into the Revenue Purchase Agreement, the undersigned Guarantor(s)(s) hereby provides HBC with this Guaranty. Guarantor(s)(s) will not be personally liable for any amount due under the Revenue Purchase Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of the Revenue Purchase Agreement. Each Guarantor(s) shall be jointly and severally liable for all amounts owed to HBC in the Event of Default. Guarantor(s)(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement including the Merchant's full and timely delivery of the Purchased Amount pursuant to (and limited by) the Revenue Purchase Agreement, in each case as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor(s)'s obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor(s) Waivers.** In the event of a breach of the above, HBC may seek recovery from Guarantor(s)s for all of HBC's losses and damages by enforcement of HBC's rights under this Agreement without first seeking to obtain payment from Merchant, any other Guarantor(s), or any Collateral or Additional Collateral HBC may hold pursuant to this Agreement or any other guaranty. In addition, Section 4.5, 4.10 and 4.11 are expressly reiterated in the Security Agreement and Guaranty herein. HBC is not required to notify Guarantor(s) of any of the following events and Guarantor(s) will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) HBC's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to HBC. In addition, HBC may take any of the following actions without releasing Guarantor(s) from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to HBC; (ii) release Merchant from its obligations to HBC;
(iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations, and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor(s) to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to HBC under the Merchant Agreement and this Agreement are paid in full, Guarantor(s) shall not seek reimbursement from Merchant or any other Guarantor(s) for any amounts paid by it under this Agreement. Guarantor(s) permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other Guarantor(s), or any collateral provided by Merchant or any other Guarantor(s), for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that HBC must return any amount paid by Merchant or any other Guarantor(s) of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor(s)'s obligations under this Agreement shall include that amount.

**Guarantor(s) Acknowledgement.** Guarantor(s) acknowledges that: (i) He/She has read the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (iii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

This Security Agreement and Guaranty and Guaranty of Performance shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if HBC so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant, Guarantor and Corporate Guarantors waives any right to oppose any motion or application made by HBC to transfer such proceeding to an Acceptable Forum.

The Merchant Guarantor(s) and Corporate Guarantor(s) acknowledge that they have read Paragraph 4.5 of this Agreement in its entirety and understand that they are waiving their right to Service of Process by traditional manners and will accept process of any Summons and Complaint or other legal process by certified mail return receipt requested to the Mailing Address on Page 1 of this Agreement.

FOR ALL MERCHANT(S) (#1) By: KRISTEN ZANKL
                                (Print Name and Title)

_____ (Signature)

FOR ALL MERCHANT(S) (#2) By: SCOTT THOMAS ZANKL
                                (Print Name and Title)

DocuSigned by:
_Scott Thomas Zankl_ (Signature)

GUARANTOR(S) (#1) By: KRISTEN ZANKL
                        (Print Name and Title)

_____ (Signature)

GUARANTOR(S) (#2) By: SCOTT THOMAS ZANKL
                        (Print Name and Title)

DocuSigned by:
_Scott Thomas Zankl_ (Signature)

SSN

6

## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT), DIRECT PAYMENTS (ACH DEBITS), AND CHECK DEBIT

Merchant: EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

(Merchant's Legal Name)

Merchant Agreement: Merchant Agreement between HBC and Merchant, dated as of: 10/27/2021

Designated Checking Account:

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. This Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.

**DISBURSEMENT OF ADVANCE PROCEEDS.** By signing below, Merchant authorizes HBC to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. By signing below, Merchant also authorizes HBC to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits or to initiate a Check Debit to the Designated Checking Account, as follows:

Bank Name: _____      Branch: _____

Federal ID#: _____

ABA: Routing: _____      DDA: Account: _____

In the Amount of: $ 150,000.00

(Or) Percentage of each Banking Deposit: 20 _____ %

On the Following Days: MONDAY-FRIDAY

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that HBC may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes HBC to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.**   HBC is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination   of ACH debits and credits to the Designated   Checking Account must comply with applicable   provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association). This Authorization Agreement is to remain in full force and effect until HBC has received written notification from Merchant  at the address set forth below at least 5 banking days prior of its termination to afford HBC a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all  ACH entries initiated in accordance with this Authorization Agreement.

Merchant agrees to be bound by the ACH Rules as defined by the National ACH Association (NACHA). Merchant understands that this authorization is to remain in full force and effect until HBC has received written notification from me of its termination at least five (5) business days prior to the payment due date. Merchant further understands that canceling their ACH authorization does not relieve them of the responsibility of paying account in full, and that if Merchant cancels or revokes this authorization before any remaining debt is paid in full, the HBC may take additional actions including legal actions to secure the debt.

EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

Merchant: _____

(Merchant's Legal Name)

Print Name: SCOTT THOMAS ZANKL

Print Name: KRISTEN ZANKL

X _____
(Signature)     Kristen

X _____
(Signature)     scott zankl

(Title) _____

(Title) _____

Date: 10/27/2021
(Month) (Day) (Year)

Date: 10/27/2021
(Month) (Day) (Year)

7

PROPERTY OF HI BAR CAPITAL

## APPENDIX A - THE FEE STRUCTURE:

A.  **Underwriting Fee:** $ 5,687.50  to cover Underwriting and relates expenses.

B.  **UCC Filing Fee:** $499.00 and are not an automated process, requiring us to charge this fee to cover costs.

C.  **NSF Fee Standard:** $50.00 (each) up to TWO TIMES ONLY before a default is declared.

D.  **Bank Change Fee:** $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

E.  **Blocked ACH Payment:** $5,000.00 This fee is applied when Merchant directs the bank to BLOCK our ACH Debits. Blocking ACH Debits will place Merchant's account in default.

F.  **Default Fee:** Shall be applied to Merchant's account in the event that Merchant defaults under the terms of the Merchant Agreement.

G.  **ACH Processing Fee:** $249.00 (or 10% of the contract amount, depending on size of advance) ACH's are labor intensive

H.  **Account Management Fee:** At the end of each month, Merchant will pay to HBC an Account Management Fee. This fee will not be applied towards the reduction of the Purchased Amount. This monthly fee will equal the average of all the payments received as a Specified percentage of the Merchants settlement amount for that Month.

I.  **Miscellaneous Service Fee:** Merchant shall pay certain fees for services related to the origination and maintenance of Accounts. Each Merchant shall receive their funding electronically to their designated bank account and will be charged $30.00 for a Fed Wire or 0.00 for a bank ACH. The current charge for the underwriting and origination of each Merchant

J.  **Working Capital Funding:** A fee of $5,000.00 or 10% shall be applied every time Merchant enters into any arrangement, agreement, or commitment that relates to or involves the Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales with any party other than HBC

K.  **Contract Service Fee:** Commencing at date funded (the "Start Date"), merchant shall pay a fee of $499.00 per month (the "Monthly Fee") the monthly fee is payable each month during the term of this agreement, at a minimum of three months.

L.  **Attorney's Fees:** $10,000. When merchant breaches any term of this Agreement and HBC is required to retain counsel to enforce, defend or collect any term of this Agreement.

[ALL FEES ARE SUBJECT TO CHANGE]

FOR THE MERCHANT (#1) By: KRISTEN ZANKL

(Print Name and Title)

(Signature)

FOR THE MERCHANT (#2) By: SCOTT THOMAS ZANKL

(Print Name and Title)

(Signature)

8

PROPERTY OF HI BAR CAPITAL

**EXHIBIT A**

**ADDENDUM TO**
**THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT AND GUARANTY**

This **ADDENDUM TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT and GUARANTY (this "Addendum"),** dated 10/27/2021 is entered into by and among **PROPERTY OF HI BAR CAPITAL** ("BUYER") and **Business Legal Name: EXCELL AUTO GROUP, INC** D/B/A: EXCELL AUTO GROUP

Business Legal Name: LEGAL/CORPORATE NAME: KARMA OF PALM BEACH INC
DBA: KARMA OF PALM BEACH
**Form of Business Entity:**

EIN #:
("Seller #1"); and

**Business Legal Name:** AUTOMOTIVE SERVICE SYSTEMS, INC.
**Form of Business Entity:**

EIN #:
("Seller #2"); and

**Business Legal Name:** KZ CONSULTANTS, INC.
**Form of Business Entity:**

EIN #:
("Seller #3"); and

**Business Legal Name:** MISS KRIS, LLC
**Form of Business Entity:**

EIN #:
("Seller #4"); and

**Business Legal Name:** EXCELL AUTO LEASING INC
**Form of Business Entity:**

EIN #:
("Seller #5"); and

**Business Legal Name:** EXCELL AUTO WHOLESALE INC.
**Form of Business Entity:**

EIN #:
("Seller #6"); and

**Business Legal Name:** DEALER SOUQ USA LLC
**Form of Business Entity:**

EIN #:
("Seller #7"); and

**Business Legal Name:** EAG WHOLESALE LLC
**Form of Business Entity:**

EIN #:
("Seller #8"); and

**Business Legal Name:** KARMA OF BROWARD, INC.
**Form of Business Entity:**

EIN #:
("Seller #9"); and

**Business Legal Name:** LAVISH HERO FUND INC
**Form of Business Entity:**

EIN #:
("Seller #10"); and

**Business Legal Name:** KARMA OF PALM BEACH, INC.
**Form of Business Entity:**

EIN #:
("Seller #11"); and

**Business Legal Name:** APPLE 3 INVESTMENTS, INC.
**Form of Business Entity:**

EIN #:
("Seller #12"); and

Business Legal Name: KZ CONSULTANTS INC

**Form of Business Entity:**

EIN #:
("Seller #13"); and

**Business Legal Name: EXCELL AUTO
SPORT AND SERVICE, INC**

EIN #:
("Seller #14").

Signature: _____

Name: **KRISTEN ZANKL**

Signature: _____

Name: **SCOTT THOMAS**

Title: **OWNER**

Title: **OWNER 2**

Hereinafter: (i) Seller # 1 is referred to as the "Original Seller"; and (ii) Seller # 2, Seller # 3 and Seller # 4 are referred to, individually and collectively, jointly and severally, as the "Additional Seller"; and (iii) the Original Seller and the Additional Seller are referred to, individually and collectively, jointly and severally, as the "Seller."

Hereinafter, Guarantor # 1 is referred to as the "Original Guarantor."

**W-I-T-N-E-S-S-E-T-H**

**WHEREAS,** BUYER, the Original Seller and the Original Guarantor entered into that certain FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT, dated 10/27/2021   (the "Agreement"); and

**WHEREAS,** the obligations of the Original Seller under the Agreement are further guaranteed by the Original Guarantor pursuant to the Personal Guaranty of Performance set forth as Exhibit A to the Agreement (the "Guaranty"); and

**WHEREAS,** the parties hereto desire to amend and restate the Agreement by adding the name(s) of the Additional Seller as the parties to the Agreement, as if the Additional Seller were the signatories to the Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged, the parties to this Addendum hereby agree to the foregoing and as follows:

Guarantor #1 Initials: _____   Guarantor #2 Initials: STZ

PROPERTY OF HI BAR CAPITAL

**Bank Login Information**

Dear Merchant,

Thank you for accepting this offer from HBC. We look forward to being your funding partner for as long as you need.

**Daily ACH Program:**

HBC will require viewing access to your bank account, each business day, in order to verify the amount of your daily payment. Please be assured that e w carefully safeguard your confidential information, and only essential personnel will have access to it.

HBC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

* Be sure to indicate capital or lower-case letters.

Name of Bank: _____

Bank portal website: _____

Username: _____

Password: _____

Security Question / Answer 1: _____

Security Question /Answer 2: _____

Security Question / Answer 3: _____

Any other information necessary to access your account: _____

| | | |
|---|---|---|
| KRISTEN ZANKL | _DocuSigned by:_ | 10/27/2021 |
| FOR THE MERCHANT (#1) By: | | Date |
| SCOTT THOMAS ZANKL | _DocuSigned by:_ Scott Thomas Zankl | 10/27/2021 |
| FOR THE MERCHANT (#2) By: | | Date |

9

PROPERTY OF HI BAR CAPITAL

# EXHIBIT M

**Exhibit M**

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

# SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "SETTLEMENT AGREEMENT" or "Agreement") is entered into by and between **EXCELL AUTO GROUP, INC.; KARMA OF PALM BEACH INC; AUTOMOTIVE SERVICE SYSTEMS, INC.; KZ CONSULTANTS, INC.; MISS KRIS, LLC; EXCELL AUTO LEASING INC; EXCELL AUTO WHOLESALE INC.; DEALER SOUQ USA LLC; EAG WHOLESALE LLC; KARMA OF BROWARD, INC.; LAVISH HERO FUND; KARMA OF PALM BEACH, INC.; APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC.** (collectively the "Seller" or "Sellers"), **KRISTIN ZANKL and SCOTT THOMAS ZANKL** (collectively the "Guarantors,"), and referred to herein together with Seller collectively and individually as (the "Sellers"), and **HI BAR CAPITAL, LLC** ("Purchaser,") and referred to herein collectively with the Sellers as (the "Parties") on this **December 19, 2021** (the "Effective Date").

WHEREAS, the Parties entered into a receivables purchase agreement on **October 27, 2021**; (collectively the "Purchase Agreement")

WHEREAS, on NOVEMBER 16, 2021, the Sellers defaulted on the Purchase Agreement. ("Default Date")

WHEREAS, the Sellers are indebted to Purchaser in the amount of **$2,677,880.00** plus fees and costs.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED BETWEEN THE PARTIES AS FOLLOWS:

Sellers shall pay to Purchaser the agreed amount of **$2,677,880.00** at a 1.50 factor rate for a total payback amount of $4,016,820 ("Settlement Amount") as follows:

1. Payments
    a. Seller shall make payments of **$200,000.00** per week until the balance plus factor rate is paid in full. See attached Payment Schedule attached hereto as **Exhibit "B"**.
    b. First payment shall be due on Monday, December 20, 2021 and shall continue each week until paid in full.
2. Early Payoff Discount.
    a. Within 30 days of execution of this Settlement Agreement, Seller may payoff the Settlement Amount at a discounted factor rate of **1.10** for a total payback amount of **$2,945,668.00**.
    b. If Seller does not exercise this early payoff option, payments shall continue at the agreed payment schedule as listed in Exhibit "B".
3. Payments shall be made by Wire or ACH each week on the scheduled payment dates.

1. **SECURITY AGREEMENT**:
    Sellers and Guarantor agree to provide security interest in the following collateral:

    a. Security Interest in Vehicle
        i. Sellers shall provide an unencumbered security interest in the **2017 Pagani (VIN #ZA9H12UA5HSF76013)**. (the "Vehicle") A copy of the Vehicle's Title is attached

Settlement Agreement and Release - Page 1 of 10

EXHIBIT B

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

hereto as **Exhibit "A"**.

    ii.  Sellers shall execute a security interest and any other documents necessary to effectuate this security interest and perfect the lien against the Vehicle.

    iii.  Sellers shall deliver an original title to the Vehicle to be held in escrow until the Settlement Amount is paid in full.

b.  <u>Additional Security</u>

    i.  As additional security for the prompt and complete payment and performance of any and all liabilities, obligations, covenants or agreements of Seller under this Settlement Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Sellers hereby pledge, assign and hypothecate to Purchaser (collectively, "Pledge") and grants to Purchaser a continuing, perfected and first priority lien upon and security interest in, to and under all of Sellers' right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

        1.  all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Sellers; and all of Sellers' proceeds, as such term is defined by Article 9 of the UCC.

c.  REPRESENTATIONS AND WARRANTIES. Sellers warrant and covenant that:

    i.  No other creditors has a security interest in the Collateral Sellers is the owner of the Collateral free from any adverse lien or encumbrance except this lien and the others described in this Agreement.

    ii.  Sellers will defend the Collateral against all claims of other persons.

    iii.  Sellers will immediately notify the Purchaser in writing of any change in name or address.

    iv.  Sellers will do all such things as Purchaser at any time or from time to time may reasonably request to establish and maintain a perfected security interest in the Collateral.

    v.  Sellers will pay the cost of filing this agreement in all public offices where recording is deemed by Purchaser to be necessary or desirable. A photographic or other reproduction of this agreement is sufficient as a financing statement.

    vi.  Sellers will not transfer or encumber the Collateral without the prior written consent of Purchaser.

    vii.  Sellers will keep the Collateral insured against risk of loss or damage upon such terms as Purchaser may reasonably require.

    viii.  Sellers will keep the Collateral free from any adverse lien and in good repair, will not waste or destroy the Collateral, and will not use the Collateral in violation of any law or policy of insurance. Purchaser may examine and inspect the Collateral at any reasonable time.

    ix.  Sellers will pay promptly when due all taxes and assessments upon the Collateral or for its use or operation or upon this Agreement or upon any note evidencing the Obligations.

d.  <u>Representations with Respect to Collateral</u>. Sellers hereby represents and warrants to Purchaser that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC-1s); and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Sellers are a party or by which any of Sellers' assets (including, without limitation, the Collateral) are bound.

e.  Further Assurances. Upon the request of Purchaser, Sellers, at Sellers' sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as Purchaser may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

f.  Attorney-in-Fact. Sellers hereby authorize Purchaser at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints Purchaser as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Sellers and in the name of Seller or otherwise, from time to time, in Purchaser's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Sellers, and thereafter filing any such financing and/or continuation statements, and

to receive, endorse and collect all instruments made payable to Sellers.

2.  There shall be no cure period. If any payment is not received on the aforementioned dates, Purchaser shall have leave to enforce the full balance due less any payments made hereunder.

3.  Purchaser hereby covenants not to sue and forever releases, acquits, and discharges Sellers and any of their guarantors, agents, employees, officers, partners, principals, insurers, representatives, successors, transferees or assigns, from any and all liability, claims, damages or demands Purchaser has now or may have in connection with said Purchase Agreement, unless there is a breach of this Settlement Agreement.

4.  Upon Sellers' fulfillment of its obligations hereunder and the clearance of all payments in accordance with the terms of this Settlement Agreement, Sellers and any applicable guarantor of the sums due under the Receivables Purchase Agreement shall be relieved of any such further liability.

5.  Within five (5) business days after Sellers' fulfillment of its obligations hereunder and the clearance of all payments in accordance with the terms of this Settlement Agreement, Purchaser terminate any/all UCC filings and liens previously filed by Purchaser against Sellers, and release any/all of Sellers' obligations to Purchaser pursuant to the Receivables Purchase Agreement, and Purchaser will so notify Sellers' attorney in writing.

6.  Waiver of Purchaser's Liability. Upon the Effective Date, the Sellers for itself and on behalf of all parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns, hereby releases and forever discharges Purchaser and its respective parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, actions, causes of action and suits, known or unknown, liquidated or contingent, arising from, which may arise in the future from, or which are related in any manner to the Action or the underlying Agreement, including any claims that were or could have been asserted,

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

other than Purchaser's obligations under this Settlement Agreement.

7.    Withdraw Claims and Consent to Judgment. Seller and Guarantor hereby withdraw any defenses arising from the Purchase Agreement or any pending actions filed by the Purchaser. Sellers and Guarantors further agree to waive all defenses, claims, or counterclaims that may arise from this Agreement or the Purchase Agreement. In the event of default of this Agreement, Purchaser may, without further notice, file a claim for the total indebtedness plus accrued fees and costs less payments received.

8.    CONSENT TO JURISDICTION. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Sellers and Guarantors irrevocably submits to the exclusive jurisdiction of any New York county Supreme Court or any federal court sitting within the State of New York over any suit, action or proceeding arising out of or relating to this Agreement. Seller and Guarantor irrevocably waive, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Seller and Guarantor agree that final judgment in any such suit, action or proceeding brought in such a court shall be enforced in any court of proper jurisdiction by a suit upon such judgment, provided that service of process in such action, suit or proceeding shall have been effected upon the Seller and Guarantor in a manner permitted by law.

9.    WAIVER OF SERVICE OF PROCESS. The parties further agree to waive personal service of process and to accept mail by electronic mail or by mailing by certified or registered mail, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

10.    Alter Egos. Seller may not own, operate, or affiliate with any entities in the same or similar industry without Purchaser's express consent.

11.    Personal Guaranty ("Guaranty"). as an inducement for Purchaser to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantors hereby agree as follows:

    a.    Defined Terms. All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

    b.    Guaranty of Obligations. Guarantors hereby irrevocably, absolutely and unconditionally guarantees to Purchaser prompt, full, faithful and complete performance and observance of all of Sellers' obligations in this Agreement; and Guarantors unconditionally covenants to Purchaser that if default or breach shall at any time be made by Sellers, Guarantors shall well and truly pay or perform (or cause to be paid or performed) the all obligations under this Agreement and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

    c.    Guarantors' Other Agreements. Guarantors will not dispose, convey, sell or otherwise transfer, or cause Sellers to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Sellers' business without the prior written consent of Purchaser, which consent may be withheld for any reason, until receipt of the entire Settlement Amount. Guarantors shall pay to Purchaser upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Purchaser's rights hereunder or Purchaser's rights under the Agreement. This Guaranty is binding upon Guarantors and Guarantors' heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Purchaser. If there is more than one

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantors shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Sellers and Purchaser, or the existence of any defense, setoff or counterclaim, which Seller may assert. Purchaser is hereby authorized, without notice or demand and without affecting the liability of Guarantors hereunder, to at any time renew or extend Sellers' obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement.

12. **Seller's Obligations Upon Default**. Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to Purchaser the entire unpaid portion of the Settlement Amount plus fees, penalties, and costs. In addition, Seller shall also pay to Purchaser, as additional damages, any reasonable expenses incurred by Purchaser in connection with recovering the monies due to Purchaser from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees in the amount 33% of the undelivered portion of the Settlement Amount (collectively, "Reasonable Damages"). The parties agree that Purchaser shall not be required to itemize or prove its Reasonable Damages and that the fair value of the Reasonable Damages, not including attorneys' fees or collections fees, shall be calculated as twenty-five percent (25%) of the undelivered portion of the Settlement Amount upon the occurrence of an event of default.

13. **Remedies Upon Default**. Upon Seller's default, Purchaser may immediately proceed to protect and enforce its rights under this Agreement and/or Guaranty by:
    a. Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of Purchaser's security interest;
    b. Enforcing the provisions of the personal guaranty against the personal guarantors named herein without first seeking recourse from Seller for the full balance owed at the time of default plus applicable fees and costs;
    c. Commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy including without limitation Purchaser's rights of a secured party under the UCC.

14. **Remedies are not Exclusive**. All rights, powers and remedies of Purchaser in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall be in addition to any other rights, powers or remedies provided to Purchaser by law or equity.

15. **Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

16. **Assignment**. Purchaser may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Sellers. Sellers shall not assign its rights or obligations under this Agreement without first obtaining Purchaser's written consent.

17. **Notices**. Unless different means of delivering notices are set forth elsewhere in this Agreement, all notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective as of the date of receipt or declined receipt.

18. **Waiver Remedies**. No failure on the part of Purchaser to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

19. **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties and their

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

respective successors and permitted assigns.

20. <u>JURY WAIVER</u>. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

21. <u>Severability</u>. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

22. <u>Entire Agreement</u>. This Agreement embodies the entire agreement between Seller and Purchaser and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

THE UNDERSIGNED REPRESENT AND WARRANT THAT THEY HAVE READ THIS STIPULATED SETTLEMENT AGREEMENT IN ITS ENTIRETY AND HAVE THE FULL CAPACITY, POWER, AND AUTHORITY TO MAKE THIS AGREEMENT AS SET FORTH ABOVE, AND THAT NO OTHER REPRESENTATIONS OR INDUCEMENTS APART FROM THIS STIPULATED SETTLEMENT AGREEMENT, EITHER WRITTEN OR ORAL, HAVE BEEN MADE.

IN WITNESS WHEREOF, Sellers and Purchaser have hereunder set their hands and seals on **December 19, 2021**.

[SIGNATURES ON FOLLOWING PAGE]

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

**"SELLERS"**

EXCELL AUTO GROUP, INC.;
KARMA OF PALM BEACH INC;
AUTOMOTIVE SERVICE SYSTEMS, INC.;
KZ CONSULTANTS, INC.; MISS KRIS, LLC;
EXCELL AUTO LEASING INC;
EXCELL AUTO WHOLESALE INC.;
DEALER SOUQ USA LLC;
EAG WHOLESALE LLC; KARMA OF
BROWARD, INC.;
LAVISH HERO FUND; KARMA OF PALM
BEACH, INC.;
APPLE 3 INVESTMENTS, INC.; KZ
CONSULTANTS INC.; EXCELL AUTO
SPORT AND SERVICE, INC. (collectively the
"Sellers")

X _____
Name: KRISTIN ZANKL, individually and as
authorized signor on behalf of the Sellers

EXCELL AUTO GROUP, INC.;
KARMA OF PALM BEACH INC;
AUTOMOTIVE SERVICE SYSTEMS, INC.;
KZ CONSULTANTS, INC.; MISS KRIS, LLC;
EXCELL AUTO LEASING INC;
EXCELL AUTO WHOLESALE INC.;
DEALER SOUQ USA LLC;
EAG WHOLESALE LLC; KARMA OF
BROWARD, INC.;
LAVISH HERO FUND; KARMA OF PALM
BEACH, INC.;
APPLE 3 INVESTMENTS, INC.; KZ
CONSULTANTS INC.; EXCELL AUTO
SPORT AND SERVICE, INC. (collectively the
"Sellers")

X _____
Name: SCOTT THOMAS ZANKL, individually
and as authorized signor on behalf of the Sellers

**"GUARANTORS"**

SCOTT THOMAS ZANKL
"GUARANTOR"

X _____
SCOTT THOMAS ZANKL,
Individually

KRISTIN ZANKL
"GUARANTOR"

X _____
KRISTIN ZANKL,
Individually

**"PURCHASER"**
HI BAR CAPITAL, LLC

X _____
Name: Steven Zakharyayev
Title:    Attorney for Purchaser, Hi Bar Capital

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

# EXHIBIT A



DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

## EXHIBIT B

## PAYMENT SCHEDULE

| Weeks | Payment Due Date | Payments |
|-------|------------------|----------|
| 1 | 12/20/21 | $200,000.00 |
| 2 | 12/27/21 | $200,000.00 |
| 3 | 01/03/22 | $200,000.00 |
| 4 | 01/10/22 | $200,000.00 |
| 5 | 01/17/22 | $200,000.00 |
| 6 | 01/24/22 | $200,000.00 |
| 7 | 01/31/22 | $200,000.00 |
| 8 | 02/07/22 | $200,000.00 |
| 9 | 02/14/22 | $200,000.00 |
| 10 | 02/21/22 | $200,000.00 |
| 11 | 02/28/22 | $200,000.00 |
| 12 | 03/07/22 | $200,000.00 |
| 13 | 03/14/22 | $200,000.00 |
| 14 | 03/21/22 | $200,000.00 |
| 15 | 03/28/22 | $200,000.00 |
| 16 | 04/04/22 | $200,000.00 |
| 17 | 04/11/22 | $200,000.00 |
| 18 | 04/18/22 | $200,000.00 |
| 19 | 04/25/22 | $200,000.00 |
| 20 | 05/02/22 | $216,820.00 |

# EXHIBIT N

Exhibit N

FINANCING STATEMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
STEVEN ZAKHARYAYEV; 9546044222
Email  STEVEN@STEVENZLAW.COM

**B. SEND ACKNOWLEDGEMENT TO:**

# FILED

2022 Jan 25 10:55 PM
****** 202109624865 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME**- INSERT ONLY ONE DEBTOR NAME (1a OR 1b) - Do Not Abbreviate or Combine Names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| EXCELL AUTO GROUP INC. | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS Line One | | | |
| 1001 CLINT MOORE ROAD | | This space not available. | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| #101 | BOCA RATON | FL | 33487 | US |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (2a OR 2b) - Do Not Abbreviate or Combine Names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| KARMA OF PALM BEACH INC. | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS Line One | | | |
| 1001 CLINT MOORE ROAD | | This space not available. | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| #101 | BOCA RATON | FL | 33487 | US |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| LAW OFFICES OF STEVEN ZAKHARYAYEV, AS REPRESENTATIVE FOR SECURED PARTY | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS Line One | | | |
| 10 WEST 37TH STREET | | This space not available. | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| #602 | NEW YORK | NY | 10018 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

All accounts receivable, receipts, instruments, contract rights, and other rights to receive the payment of money, patents, goods, inventory, equipment, deposit accounts, money, chattel paper, licenses, leases, and general intangibles, whether now owned or hereafter acquiredac

**5. ALTERNATE DESIGNATION (If applicable)**    ☐ LESSEE/LESSOR    ☐ CONSIGNEE/CONSIGNOR    ☐ BAILEE/BAILOR
☐ AG LIEN    ☐ NON-UCC FILING    ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** - YOU ARE REQUIRED TO CHECK EXACTLY ONE   BOX
☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.
☑ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

STANDARD FORM - FORM UCC-1 (REV.05/2013)        Filing Office Copy        Approved by the Secretary of State, State of Florida

Exhibit E

**STATE OF FLORIDA UNIFORM COMMERICAL CODE
FINANCING STATEMENT FORM - ADDITIONAL PARTY**

**18. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT**

| 18a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| EXCELL AUTO GROUP INC. | | | |
| 18b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**19. MISCELLANEOUS:**

---

**20. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (20a OR 20b) - Do Not Abbreviate or Combine Names

| 20a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| AUTOMOTIVE SERVICE SYSTEMS INC. | | | | | |
| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 20c. MAILING ADDRESS Line One | | | | | |
| 1001 CLINT MOORE ROAD | | This space not available. | | | |
| MAILING ADDRESS Line Two | | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | | BOCA RATON | FL | 33487 | US |

**21. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (21a OR 21b) - Do Not Abbreviate or Combine Names

| 21a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| KZ CONSULTANTS INC. | | | | | |
| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 21c. MAILING ADDRESS Line One | | | | | |
| 1001 CLINT MOORE ROAD | | This space not available. | | | |
| MAILING ADDRESS Line Two | | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | | BOCA RATON | FL | 33487 | US |

**22. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (22a OR 22b) - Do Not Abbreviate or Combine Names

| 22a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| MISS KRIS LLC | | | | | |
| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 22c. MAILING ADDRESS Line One | | | | | |
| 1001 CLINT MOORE ROAD | | This space not available. | | | |
| MAILING ADDRESS Line Two | | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | | BOCA RATON | FL | 33487 | US |

**23. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (23a OR 23b) - Do Not Abbreviate or Combine Names

| 23a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| EXCELL AUTO LEASING INC. | | | | | |
| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 23c. MAILING ADDRESS Line One | | | | | |
| 1001 CLINT MOORE ROAD | | This space not available. | | | |
| MAILING ADDRESS Line Two | | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | | BOCA RATON | FL | 33487 | US |

**24. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (24a OR 24b) - Do Not Abbreviate or Combine Names

| 24a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| EXCELL AUTO WHOLESALE INC. | | | | | |
| 24b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 24c. MAILING ADDRESS Line One | | | | | |
| 1001 CLINT MOORE ROAD | | This space not available. | | | |
| MAILING ADDRESS Line Two | | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | | BOCA RATON | FL | 33487 | US |

**25. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (25a OR 25b) - Do Not Abbreviate or Combine Names

| 25a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| DEALER SOUQ USA LLC | | | | | |
| 25b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 25c. MAILING ADDRESS Line One | | | | | |
| 1001 CLINT MOORE ROAD | | This space not available. | | | |
| MAILING ADDRESS Line Two | | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | | BOCA RATON | FL | 33487 | US |

**STATE OF FLORIDA UNIFORM COMMERICAL CODE**
**FINANCING STATEMENT FORM - ADDITIONAL PARTY**

**18. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT**

| 18a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| EXCELL AUTO GROUP INC. | | | |
| 18b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**19. MISCELLANEOUS:**

**26. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (26a OR 26b) - Do Not Abbreviate or Combine Names

| 26a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| EAG WHOLESALE LLC | | | | |
| 26b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 26c. MAILING ADDRESS Line One | | | | |
| 1001 CLINT MOORE ROAD | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | BOCA RATON | FL | 33487 | US |

**27. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (27a OR 27b) - Do Not Abbreviate or Combine Names

| 27a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| KARMA OF BROWARD INC. | | | | |
| 27b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 27c. MAILING ADDRESS Line One | | | | |
| 1001 CLINT MOORE ROAD | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | BOCA RATON | FL | 33487 | US |

**28. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (28a OR 28b) - Do Not Abbreviate or Combine Names

| 28a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| LAVISH HERO FUND INC. | | | | |
| 28b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 28c. MAILING ADDRESS Line One | | | | |
| 1001 CLINT MOORE ROAD | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | BOCA RATON | FL | 33487 | US |

**29. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (29a OR 29b) - Do Not Abbreviate or Combine Names

| 29a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| KRISTIN ZANKL | | | | |
| 29b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 29c. MAILING ADDRESS Line One | | | | |
| 16937 PIERRE CIR | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| | DEL RAY BEACH | FL | 33446 | US |

**30. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (30a OR 30b) - Do Not Abbreviate or Combine Names

| 30a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| SCOTT THOMAS ZANKL | | | | |
| 30b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 30c. MAILING ADDRESS Line One | | | | |
| 16937 PIERRE CIR | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| | DEL RAY BEACH | FL | 33446 | US |

# EXHIBIT O

**Exhibit O**

## STIPULATION OF SETTLEMENT PURSUANT TO CPLR 3215(i)

THIS STIPULATION OF SETTLMENT (the "STIPULATION OF SETTLEMENT") is entered into by and between **EXCELL AUTO GROUP, INC.; KARMA OF PALM BEACH INC; AUTOMOTIVE SERVICE SYSTEMS, INC.; KZ CONSULTANTS, INC.; MISS KRIS, LLC; EXCELL AUTO LEASING INC; EXCELL AUTO WHOLESALE INC.; DEALER SOUQ USA LLC; EAG WHOLESALE LLC; KARMA OF BROWARD, INC.; LAVISH HERO FUND; KARMA OF PALM BEACH, INC.; APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC.** (individually and collectively the "Merchant"), **KRISTIN ZANKL and SCOTT THOMAS ZANKL** (collectively the "Guarantors" and together with the Merchant, the "Obligated Parties") and **HI BAR CAPITAL, LLC** ("Purchaser,") and referred to herein collectively with the Obligated Parties as (the "Parties") on this **February 1, 2022** (the "Effective Date").

WHEREAS, the Parties entered into a receivables purchase agreement on **October 27, 2021** pursuant to which the Purchase purchased a specified percentage of the Merchant's total future accounts receivable up to a specified amount in exchange for an upfront purchase price (the "Purchase Agreement");

WHEREAS, the Guarantors guaranteed the Merchant's obligations to Purchase pursuant to the Purchase Agreement pursuant to a Guaranty agreement that was contained in the Purchase Agreement (the "Guaranty" and together with the Purchase Agreement, the "Agreements");

WHEREAS, on NOVEMBER 16, 2021 (the "Default Date"), the Obligated Parties defaulted on their obligations to Purchaser under the Agreements.

WHEREAS, on December 19, 2021, the Parties entered into a settlement agreement (the "Settlement Agreement") pursuant to which the Parties settled the dispute between them arising from the Obligated Parties' breaches of the Agreements. A copy of the Settlement Agreement is attached as **Exhibit A**.

WHEREAS, on December 27, 2021, the Obligated Parties defaulted on the Settlement Agreement.

WHEREAS, on January 28, 2022, Purchaser filed an action against the Obligated Parties for breach of the Settlement Agreement in Kings County Supreme Court, Index No. **502846/2022** (the "Action").

WHEREAS, the parties seek to resolve the claims asserted in the Action pursuant to the terms of this Stipulation of Settlement.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED BETWEEN THE PARTIES AS FOLLOWS:

Obligated Parties shall pay to Purchaser the sum of **$3,800,000.00 ("Settlement Amount")** as follows:

1. Payments
   a. $1,300,000 by February 7, 2022
   b. $1,300,000 by February 11, 2022
   c. $600,000 by February 16, 2022

d. $600,000 by February 21, 2022

Payments shall be made by wire transfer to Purchaser's attorney each week on the scheduled payment date to the following account:

**Law Offices of Steven Zakharyayev, PLLC**
**10 W. 37th St, #602, New York, NY 10018**
**JP Morgan Chase Bank N.A.**
**Routing Number: 021 000 021**
**Account Number: 317 527 817**

1.      **SETTLEMENT AGREEMENT**: Notwithstanding the terms herein, all terms agreed upon in the Settlement Agreement dated December 19, 2021 shall remain enforceable against the Parties. Any conflicts between the terms of the Settlement Agreement and this Stipulation of Settlement shall be resolved in favor of this Stipulation of Settlement.

2.  REPRESENTATIONS AND WARRANTIES AND INDEMNITY.

a.  Obligated Parties warrant and covenant that any payments to Purchaser pursuant to this Stipulation of Settlement shall be made from unencumbered assets free of any liens or superior interests to Purchaser.

b.  In the event any payments made to Purchaser are subject to a levy or a party claiming to hold a superior interest in any assets of the Merchant to Purchaser, Obligated Parties agree to indemnify, defend, and hold Purchaser and any employees, agents, partners, or affiliates harmless from any and all claims, demands, costs, liabilities, losses, expenses and damages (including reasonable attorneys' fees, costs, and expert witnesses' fees) arising out of or in connection with any claim brought by a third party against Purchaser.

3.      **Default Judgment pursuant to CPLR 3215(i)**. There shall be no cure period for the settlement payments set forth above. In the event that a settlement payment is not made, the Obligated Parties hereby acknowledge, consent and agree that the Purchaser may file an application for a default judgment to the Kings County Clerk in the Action pursuant to CPLR 3215(i) for the full Settlement Amount ($3,800,000) less payments made pursuant to this Agreement, plus the sum of 25% of the amount due at the time of default for attorneys' fees (based upon standard contingency fee rates), plus interest at the rate of 16% per annum from the date of default to the date of entry of judgment. The Parties agree that it shall be sufficient for the entry of such default judgment for the Purchaser's attorney of record to submit an affirmation stating the amount paid pursuant to this Stipulation of Settlement, the date of the default hereunder, the amount outstanding, and an amount for attorneys' fees to be included in the default judgment calculated as 25% of the Settlement Amount less payments made pursuant to this Stipulation of Settlement. The Parties agree that the application to the Kings County Clerk for a default judgment may be made without notice to the Obligated Parties and that this Stipulation of Settlement shall not be required to be filed in the Action unless and until there is a default hereunder.

4.      Upon the Obligated Parties' full performance of the their obligations pursuant to this Stipulation of Settlement including, without limitation, the full payment of the Settlement Amount, Purchaser hereby covenants not to sue and forever releases, acquits, and discharges the Obligated Parties and any of their guarantors, agents, employees, officers, partners, principals, insurers, representatives, successors, transferees or assigns, from any and all liability, claims, damages or demands Purchaser has now or may have in connection with said Purchase Agreement. For avoidance of doubt, this release shall be null and void in the event of a breach of this Stipulation

of Settlement by the Obligated Parties.

5.      Within five (5) business days after Obligated Parties' fulfillment of their obligations hereunder and the clearance of all payments in accordance with the terms of this Stipulation of Settlement, Purchaser terminate any/all UCC filings and liens previously filed by Purchaser against Merchant, and release any/all of Obligated Parties' obligations to Purchaser pursuant to the Agreements, and Purchaser will so notify the Obligated Parties' attorney in writing. Purchaser further agrees to file a discontinuance of the Action.

6.      Waiver of Purchaser's Liability. Upon the Effective Date, the Obligated Parties for themselves and on behalf of all parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns, hereby releases and forever discharges Purchaser and its respective parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, actions, causes of action and suits, known or unknown, liquidated or contingent, arising from, which may arise in the future from, or which are related in any manner to the Action or the underlying Agreement, including any claims that were or could have been asserted, other than Purchaser's obligations under this Settlement Agreement.

7.      Withdraw Claims and Consent to Judgment.   Merchant and Guarantors hereby withdraw any defenses they may have to the claims asserted in the Action.

8.      CONSENT TO JURISDICTION. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Merchant and Guarantors irrevocably submits to the exclusive jurisdiction of any New York Supreme Court or any federal court sitting within the State of New York over any suit, action or proceeding arising out of or relating to this Agreement. Merchant and Guarantors irrevocably waive, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Merchant and Guarantors agree that final judgment in any such suit, action or proceeding brought in such a court shall be enforced in any court of proper jurisdiction by a suit upon such judgment, provided that service of process in such action, suit or proceeding shall have been effected upon the Merchant and Guarantors in a manner permitted by law.

9.      WAIVER OF SERVICE OF PROCESS. The Parties further agree to waive personal service of process and to accept mail by electronic mail or by mailing by certified or registered mail, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

10.      Alter Egos.  Merchant may not own, operate, or affiliate with any entities in the same or similar industry without Purchaser's express consent.

11. Modifications; Agreements. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all Parties.
12. Assignment. Purchaser may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Sellers. Sellers shall not assign its rights or obligations under this Agreement without first obtaining Purchaser's written consent.
13. Notices. Unless different means of delivering notices are set forth elsewhere in this Agreement, all notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective as of the date of receipt or declined receipt.

14. <u>Waiver Remedies</u>. No failure on the part of Purchaser to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

15. <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

16. <u>JURY WAIVER</u>. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

17. <u>Severability</u>. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

18. <u>Entire Agreement</u>. This Agreement embodies the entire agreement between Seller and Purchaser and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

THE UNDERSIGNED REPRESENT AND WARRANT THAT THEY HAVE READ THIS STIPULATED SETTLEMENT AGREEMENT IN ITS ENTIRETY AND HAVE THE FULL CAPACITY, POWER, AND AUTHORITY TO MAKE THIS AGREEMENT AS SET FORTH ABOVE, AND THAT NO OTHER REPRESENTATIONS OR INDUCEMENTS APART FROM THIS STIPULATED SETTLEMENT AGREEMENT, EITHER WRITTEN OR ORAL, HAVE BEEN MADE.

IN WITNESS WHEREOF, Sellers and Purchaser have hereunder set their hands and seals on **February 1, 2022**.

| "MERCHANT" | "GUARANTORS" |
|---|---|

**"MERCHANT"**

EXCELL AUTO GROUP, INC.;
KARMA OF PALM BEACH INC;
AUTOMOTIVE SERVICE SYSTEMS, INC.;
KZ CONSULTANTS, INC.; MISS KRIS, LLC;
EXCELL AUTO LEASING INC;
EXCELL AUTO WHOLESALE INC.;
DEALER SOUQ USA LLC;
EAG WHOLESALE LLC; KARMA OF
BROWARD, INC.;
LAVISH HERO FUND; KARMA OF PALM
BEACH, INC.;
APPLE 3 INVESTMENTS, INC.; KZ
CONSULTANTS INC.; EXCELL AUTO
SPORT AND SERVICE, INC. (collectively the
"Merchants")

X _____
Name: KRISTIN ZANKL, individually and as
authorized signor on behalf of the Merchants
referenced above

EXCELL AUTO GROUP, INC.;
KARMA OF PALM BEACH INC;
AUTOMOTIVE SERVICE SYSTEMS, INC.;
KZ CONSULTANTS, INC.; MISS KRIS, LLC;
EXCELL AUTO LEASING INC;
EXCELL AUTO WHOLESALE INC.;
DEALER SOUQ USA LLC;
EAG WHOLESALE LLC; KARMA OF
BROWARD, INC.;
LAVISH HERO FUND; KARMA OF PALM
BEACH, INC.;
APPLE 3 INVESTMENTS, INC.; KZ
CONSULTANTS INC.; EXCELL AUTO
SPORT AND SERVICE, INC. (collectively the
"Merchants")

X _____
Name: SCOTT THOMAS ZANKL, individually
and as authorized signor on behalf of the
Merchants

**"GUARANTORS"**

SCOTT THOMAS ZANKL
"GUARANTOR"

X _____
SCOTT THOMAS ZANKL,
Individually

KRISTIN ZANKL
"GUARANTOR"

X _____
KRISTIN ZANKL,
Individually

**"PURCHASER"**
HI BAR CAPITAL, LLC

X _____
Name: Steven Zakharyayev
Title: Attorney for Purchaser, Hi Bar Capital

Settlement Agreement and Release - Page 5 of 5

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

# SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "SETTLEMENT AGREEMENT" or "Agreement") is entered into by and between **EXCELL AUTO GROUP, INC.; KARMA OF PALM BEACH INC; AUTOMOTIVE SERVICE SYSTEMS, INC.; KZ CONSULTANTS, INC.; MISS KRIS, LLC; EXCELL AUTO LEASING INC; EXCELL AUTO WHOLESALE INC.; DEALER SOUQ USA LLC; EAG WHOLESALE LLC; KARMA OF BROWARD, INC.; LAVISH HERO FUND; KARMA OF PALM BEACH, INC.; APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC.** (collectively the "Seller" or "Sellers"), **KRISTIN ZANKL and SCOTT THOMAS ZANKL** (collectively the "Guarantors,"), and referred to herein together with Seller collectively and individually as (the "Sellers"), and **HI BAR CAPITAL, LLC** ("Purchaser,") and referred to herein collectively with the Sellers as the (the "Parties") on this **December 19, 2021** (the "Effective Date").

WHEREAS, the Parties entered into a receivables purchase agreement on **October 27, 2021**; (collectively the "Purchase Agreement")

WHEREAS, on NOVEMBER 16, 2021, the Sellers defaulted on the Purchase Agreement. ("Default Date")

WHEREAS, the Sellers are indebted to Purchaser in the amount of **$2,677,880.00** plus fees and costs.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED BETWEEN THE PARTIES AS FOLLOWS:

Sellers shall pay to Purchaser the agreed amount of **$2,677,880.00** at a 1.50 factor rate for a total payback amount of $4,016,820 ("Settlement Amount") as follows:

1. Payments
   a. Seller shall make payments of **$200,000.00** per week until the balance plus factor rate is paid in full. See attached Payment Schedule attached hereto as **Exhibit "B"**.
   b. First payment shall be due on Monday, December 20, 2021 and shall continue each week until paid in full.
2. Early Payoff Discount.
   a. Within 30 days of execution of this Settlement Agreement, Seller may payoff the Settlement Amount at a discounted factor rate of **1.10** for a total payback amount of **$2,945,668.00**.
   b. If Seller does not exercise this early payoff option, payments shall continue at the agreed payment schedule as listed in Exhibit "B".
3. Payments shall be made by Wire or ACH each week on the scheduled payment dates.

1. **SECURITY AGREEMENT**:
   Sellers and Guarantor agree to provide security interest in the following collateral:

   a. Security Interest in Vehicle
      i. Sellers shall provide an unencumbered security interest in the **2017 Pagani (VIN #ZA9H12UA5HSF76013)**. (the "Vehicle") A copy of the Vehicle's Title is attached

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

hereto as **Exhibit "A"**.

    ii. Sellers shall execute a security interest and any other documents necessary to effectuate this security interest and perfect the lien against the Vehicle.

    iii. Sellers shall deliver an original title to the Vehicle to be held in escrow until the Settlement Amount is paid in full.

  b. <u>Additional Security</u>

    i. As additional security for the prompt and complete payment and performance of any and all liabilities, obligations, covenants or agreements of Seller under this Settlement Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Sellers hereby pledge, assign and hypothecate to Purchaser (collectively, "Pledge") and grants to Purchaser a continuing, perfected and first priority lien upon and security interest in, to and under all of Sellers' right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

        1. all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Sellers; and all of Sellers' proceeds, as such term is defined by Article 9 of the UCC.

  c. REPRESENTATIONS AND WARRANTIES. Sellers warrant and covenant that:

    i. No other creditors has a security interest in the Collateral Sellers is the owner of the Collateral free from any adverse lien or encumbrance except this lien and the others described in this Agreement.

    ii. Sellers will defend the Collateral against all claims of other persons.

    iii. Sellers will immediately notify the Purchaser in writing of any change in name or address.

    iv. Sellers will do all such things as Purchaser at any time or from time to time may reasonably request to establish and maintain a perfected security interest in the Collateral.

    v. Sellers will pay the cost of filing this agreement in all public offices where recording is deemed by Purchaser to be necessary or desirable. A photographic or other reproduction of this agreement is sufficient as a financing statement.

    vi. Sellers will not transfer or encumber the Collateral without the prior written consent of Purchaser.

    vii. Sellers will keep the Collateral insured against risk of loss or damage upon such terms as Purchaser may reasonably require.

    viii. Sellers will keep the Collateral free from any adverse lien and in good repair, will not waste or destroy the Collateral, and will not use the Collateral in violation of any law or policy of insurance. Purchaser may examine and inspect the Collateral at any reasonable time.

    ix. Sellers will pay promptly when due all taxes and assessments upon the Collateral or for its use or operation or upon this Agreement or upon any note evidencing the Obligations.

  d. <u>Representations with Respect to Collateral</u>. Sellers hereby represents and warrants to Purchaser that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC-1s); and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Sellers are a party or by which any of Sellers' assets (including, without limitation, the Collateral) are bound.

e.   Further Assurances. Upon the request of Purchaser, Sellers, at Sellers' sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as Purchaser may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

f.   Attorney-in-Fact. Sellers hereby authorize Purchaser at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints Purchaser as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Sellers and in the name of Seller or otherwise, from time to time, in Purchaser's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Sellers, and thereafter filing any such financing and/or continuation statements, and

to receive, endorse and collect all instruments made payable to Sellers.

2.      There shall be no cure period. If any payment is not received on the aforementioned dates, Purchaser shall have leave to enforce the full balance due less any payments made hereunder.

3.      Purchaser hereby covenants not to sue and forever releases, acquits, and discharges Sellers and any of their guarantors, agents, employees, officers, partners, principals, insurers, representatives, successors, transferees or assigns, from any and all liability, claims, damages or demands Purchaser has now or may have in connection with said Purchase Agreement, unless there is a breach of this Settlement Agreement.

4.      Upon Sellers' fulfillment of its obligations hereunder and the clearance of all payments in accordance with the terms of this Settlement Agreement, Sellers and any applicable guarantor of the sums due under the Receivables Purchase Agreement shall be relieved of any such further liability.

5.      Within five (5) business days after Sellers' fulfillment of its obligations hereunder and the clearance of all payments in accordance with the terms of this Settlement Agreement, Purchaser terminate any/all UCC filings and liens previously filed by Purchaser against Sellers, and release any/all of Sellers' obligations to Purchaser pursuant to the Receivables Purchase Agreement, and Purchaser will so notify Sellers' attorney in writing.

6.      Waiver of Purchaser's Liability. Upon the Effective Date, the Sellers for itself and on behalf of all parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns, hereby releases and forever discharges Purchaser and its respective parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, actions, causes of action and suits, known or unknown, liquidated or contingent, arising from, which may arise in the future from, or which are related in any manner to the Action or the underlying Agreement, including any claims that were or could have been asserted,

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

other than Purchaser's obligations under this Settlement Agreement.

7.    Withdraw Claims and Consent to Judgment. Seller and Guarantor hereby withdraw any defenses arising from the Purchase Agreement or any pending actions filed by the Purchaser. Sellers and Guarantors further agree to waive all defenses, claims, or counterclaims that may arise from this Agreement or the Purchase Agreement. In the event of default of this Agreement, Purchaser may, without further notice, file a claim for the total indebtedness plus accrued fees and costs less payments received.

8.    CONSENT TO JURISDICTION. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Sellers and Guarantors irrevocably submits to the exclusive jurisdiction of any New York county Supreme Court or any federal court sitting within the State of New York over any suit, action or proceeding arising out of or relating to this Agreement. Seller and Guarantor irrevocably waive, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Seller and Guarantor agree that final judgment in any such suit, action or proceeding brought in such a court shall be enforced in any court of proper jurisdiction by a suit upon such judgment, provided that service of process in such action, suit or proceeding shall have been effected upon the Seller and Guarantor in a manner permitted by law.

9.    WAIVER OF SERVICE OF PROCESS. The parties further agree to waive personal service of process and to accept mail by electronic mail or by mailing by certified or registered mail, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

10.    Alter Egos. Seller may not own, operate, or affiliate with any entities in the same or similar industry without Purchaser's express consent.

11.    Personal Guaranty ("Guaranty"). as an inducement for Purchaser to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantors hereby agree as follows:

a.    Defined Terms. All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

b.    Guaranty of Obligations. Guarantors hereby irrevocably, absolutely and unconditionally guarantees to Purchaser prompt, full, faithful and complete performance and observance of all of Sellers' obligations in this Agreement; and Guarantors unconditionally covenants to Purchaser that if default or breach shall at any time be made by Sellers, Guarantors shall well and truly pay or perform (or cause to be paid or performed) the all obligations under this Agreement and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

c.    Guarantors' Other Agreements. Guarantors will not dispose, convey, sell or otherwise transfer, or cause Sellers to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Sellers' business without the prior written consent of Purchaser, which consent may be withheld for any reason, until receipt of the entire Settlement Amount. Guarantors shall pay to Purchaser upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Purchaser's rights hereunder or Purchaser's rights under the Agreement. This Guaranty is binding upon Guarantors and Guarantors' heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Purchaser. If there is more than one

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantors shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Sellers and Purchaser, or the existence of any defense, setoff or counterclaim, which Seller may assert. Purchaser is hereby authorized, without notice or demand and without affecting the liability of Guarantors hereunder, to at any time renew or extend Sellers' obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement.

12. **Seller's Obligations Upon Default**. Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to Purchaser the entire unpaid portion of the Settlement Amount plus fees, penalties, and costs. In addition, Seller shall also pay to Purchaser, as additional damages, any reasonable expenses incurred by Purchaser in connection with recovering the monies due to Purchaser from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees in the amount 33% of the undelivered portion of the Settlement Amount (collectively, "Reasonable Damages"). The parties agree that Purchaser shall not be required to itemize or prove its Reasonable Damages and that the fair value of the Reasonable Damages, not including attorneys' fees or collections fees, shall be calculated as twenty-five percent (25%) of the undelivered portion of the Settlement Amount upon the occurrence of an event of default.

13. **Remedies Upon Default**. Upon Seller's default, Purchaser may immediately proceed to protect and enforce its rights under this Agreement and/or Guaranty by:
    a. Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of Purchaser's security interest;
    b. Enforcing the provisions of the personal guaranty against the personal guarantors named herein without first seeking recourse from Seller for the full balance owed at the time of default plus applicable fees and costs;
    c. Commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy including without limitation Purchaser's rights of a secured party under the UCC.

14. **Remedies are not Exclusive**. All rights, powers and remedies of Purchaser in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall be in addition to any other rights, powers or remedies provided to Purchaser by law or equity.

15. **Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

16. **Assignment**. Purchaser may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Sellers. Sellers shall not assign its rights or obligations under this Agreement without first obtaining Purchaser's written consent.

17. **Notices**. Unless different means of delivering notices are set forth elsewhere in this Agreement, all notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective as of the date of receipt or declined receipt.

18. **Waiver Remedies**. No failure on the part of Purchaser to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

19. **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties and their

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

respective successors and permitted assigns.

20. <u>JURY WAIVER</u>. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

21. <u>Severability</u>. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

22. <u>Entire Agreement</u>. This Agreement embodies the entire agreement between Seller and Purchaser and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.


THE UNDERSIGNED REPRESENT AND WARRANT THAT THEY HAVE READ THIS STIPULATED SETTLEMENT AGREEMENT IN ITS ENTIRETY AND HAVE THE FULL CAPACITY, POWER, AND AUTHORITY TO MAKE THIS AGREEMENT AS SET FORTH ABOVE, AND THAT NO OTHER REPRESENTATIONS OR INDUCEMENTS APART FROM THIS STIPULATED SETTLEMENT AGREEMENT, EITHER WRITTEN OR ORAL, HAVE BEEN MADE.

IN WITNESS WHEREOF, Sellers and Purchaser have hereunder set their hands and seals on **December 19, 2021**.


[SIGNATURES ON FOLLOWING PAGE]

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

| "SELLERS" | "GUARANTORS" |
|---|---|

**"SELLERS"**

EXCELL AUTO GROUP, INC.;
KARMA OF PALM BEACH INC;
AUTOMOTIVE SERVICE SYSTEMS, INC.;
KZ CONSULTANTS, INC.; MISS KRIS, LLC;
EXCELL AUTO LEASING INC;
EXCELL AUTO WHOLESALE INC.;
DEALER SOUQ USA LLC;
EAG WHOLESALE LLC; KARMA OF
BROWARD, INC.;
LAVISH HERO FUND; KARMA OF PALM
BEACH, INC.;
APPLE 3 INVESTMENTS, INC.; KZ
CONSULTANTS INC.; EXCELL AUTO
SPORT AND SERVICE, INC. (collectively the
"Sellers")

X _____ *kristin Zankl* _____
Name: KRISTIN ZANKL, individually and as
authorized signor on behalf of the Sellers

EXCELL AUTO GROUP, INC.;
KARMA OF PALM BEACH INC;
AUTOMOTIVE SERVICE SYSTEMS, INC.;
KZ CONSULTANTS, INC.; MISS KRIS, LLC;
EXCELL AUTO LEASING INC;
EXCELL AUTO WHOLESALE INC.;
DEALER SOUQ USA LLC;
EAG WHOLESALE LLC; KARMA OF
BROWARD, INC.;
LAVISH HERO FUND; KARMA OF PALM
BEACH, INC.;
APPLE 3 INVESTMENTS, INC.; KZ
CONSULTANTS INC.; EXCELL AUTO
SPORT AND SERVICE, INC. (collectively the
"Sellers")

X _____ *Scott Thomas Zankl* _____
Name: SCOTT THOMAS ZANKL, individually
and as authorized signor on behalf of the Sellers

**"GUARANTORS"**

SCOTT THOMAS ZANKL
"GUARANTOR"

X _____ *Scott Thomas Zankl* _____
SCOTT THOMAS ZANKL,
Individually

KRISTIN ZANKL
"GUARANTOR"

X _____ *kristin Zankl* _____
KRISTIN ZANKL,
Individually

**"PURCHASER"**
HI BAR CAPITAL, LLC

X _____ *Steven Zakharyayev* _____
Name: Steven Zakharyayev
Title:    Attorney for Purchaser, Hi Bar Capital

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

## EXHIBIT A



DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

# EXHIBIT B

## PAYMENT SCHEDULE

| Weeks | Payment Due Date | Payments |
|-------|------------------|----------|
| 1 | 12/20/21 | $200,000.00 |
| 2 | 12/27/21 | $200,000.00 |
| 3 | 01/03/22 | $200,000.00 |
| 4 | 01/10/22 | $200,000.00 |
| 5 | 01/17/22 | $200,000.00 |
| 6 | 01/24/22 | $200,000.00 |
| 7 | 01/31/22 | $200,000.00 |
| 8 | 02/07/22 | $200,000.00 |
| 9 | 02/14/22 | $200,000.00 |
| 10 | 02/21/22 | $200,000.00 |
| 11 | 02/28/22 | $200,000.00 |
| 12 | 03/07/22 | $200,000.00 |
| 13 | 03/14/22 | $200,000.00 |
| 14 | 03/21/22 | $200,000.00 |
| 15 | 03/28/22 | $200,000.00 |
| 16 | 04/04/22 | $200,000.00 |
| 17 | 04/11/22 | $200,000.00 |
| 18 | 04/18/22 | $200,000.00 |
| 19 | 04/25/22 | $200,000.00 |
| 20 | 05/02/22 | $216,820.00 |

# EXHIBIT P

**Exhibit P**

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

CASE NO. <u>CACE22005125</u>   DIVISION: <u>21</u>   JUDGE: <u>Singer, Michele Towbin (21)</u>

**FVP Opportunity Fund III, LP, et al**

Plaintiff(s) / Petitioner(s)

v.

**Scott Zankl, et al**

Defendant(s) / Respondent(s)

_____ /

<u>**ORDER SCHEDULING EVIDENTIARY HEARING ON DEFENDANTS' MOTION TO
DISSOLVE APRIL 14, 2022 ORAL FREEZE ORDER AND ON PLAINTIFFS' MOTION FOR
TEMPORARY INJUNCTION AND APPOINTMENT OF RECEIVER, AND SHOW CAUSE
IN REPLEVIN**</u>

THIS CAUSE comes before the Court on Defendants, MOSHE FARACHE, AUTO
WHOLESALE OF BOCA, LLC and MMS ULTIMATE SERVICES, INC.'s (the "Farache
Defendants") Motion to Schedule Hearing Pursuant to Fla. R. Civ. P. 1.610(d) Within 5 Days on
Defendants' Motion to Dissolve April 14, 2022 Oral Freeze Order or; Alternatively, Set Evidentiary
Hearing on Plaintiffs' Verified Motion for Temporary Restraining Order and Injunction, and the Court
having commenced a hearing on the Plaintiffs' Motion for Injunction and Appointment of a Receiver
beginning on April 14, 2022 which the Plaintiffs seek the Court to conclude, and the Court being
advised that the Plaintiffs have filed a Motion for Order to Show Cause in Replevin to which they are
entitled to a hearing; and the Court being otherwise fully advised in the premises, it is hereby

ORDERED AND ADJUDGED

1. The Parties shall appear before the Court in person in Courtroom 15170 on Defendants,
   Moshe Farache, Auto Wholesale Of Boca, LLC's, and MMS Ultimate Services, Inc.'s
   Motion to Dissolve April 14, 2022 Oral Freeze Order; Plaintiffs Motion for Injunction
   and Appointment of a Receiver; and to show cause should not be taken from the
   possession of the Farache Defendants who have possession of the same and delivered to
   the Plaintiffs.

2. The hearing on this matter shall be heard on July 8, 2022 at 3 p.m..

3. The Farache Defendants may file affidavits, appear personally or with an attorney, and present testimony at the time of the hearing, or, on a finding by the court pursuant to Section 78.067(2) of the Florida Statutes that the Plaintiffs are entitled to possession of the Vehicle Inventory pending final adjudication of the claims of the parties, file with the Court a written undertaking executed by a surety approved by the Court in an amount equal to the value of the property to stay an Order authorizing the delivery of the property to the Plaintiffs.

**DONE AND ORDERED** in Chambers at Broward County, Florida on 25th day of May, 2022.



CACE22005125 05-25-2022 3:56 PM
Hon. Michele Towbin Singer
**CIRCUIT JUDGE**
Electronically Signed by Singer, Michele Towbin (21)

**Copies Furnished To:**
Alan R Crane , E-mail : rrivera@furrcohen.com
Alan R Crane , E-mail : staff1@furrcohen.com
Alan R Crane , E-mail : acrane@furrcohen.com
Bradford M Cohen , E-mail : service@floridajusticefirm.com
Bradford M Cohen , E-mail : lawronin@aol.com
Cory Mauro , E-mail : cory@maurolawfirm.com
Cory Mauro , E-mail : service@maurolawfirm.com
Cory Mauro , E-mail : cory.mauro@maurolawfirm.com
Evan Appell , E-mail : evan@maurolawfirm.com
Henry B Handler , E-mail : hbh@whcfla.com
Henry B Handler , E-mail : filings@whcfla.com
Henry B Handler , E-mail : jn@whcfla.com
Jay L Farrow , E-mail : service@farrowlawfirm.com
Jay L Farrow , E-mail : stephanie@farrowlawfirm.com
Jerrell Andrew Breslin , E-mail : jerrellbreslin@gmail.com
Jerrell Andrew Breslin , E-mail : jb@richardbaronlaw.com
Jerrell Andrew Breslin , E-mail : eservice@richardbaronlaw.com
Joel L. Wiegert, Esq. , E-mail : Joel.Wiegert@KutakRock.com
Jonathan Noah Schwartz , E-mail : jnsesquire@gmail.com
Jonathan Noah Schwartz , E-mail : JNS.NGQB@case.prolific.com
Jonathan Schwartz, Esq. , E-mail : jschwartz@jonschwartzlaw.com
Jose J Teurbe-Tolon , E-mail : jose@xanderlaw.com
Jose J Teurbe-Tolon , E-mail : service@xanderlaw.com
Keith Lee , E-mail : klee@feenixpartners.com
Mark C Perry , E-mail : mark@markperrylaw.com
Mark C Perry , E-mail : maureen@markperrylaw.com

Matthew Pilkington , E-mail : mpilkington@feenixpartners.com
Michael A. Mullavey , E-mail : mmullavey@mcper.com
Michael James McMullen , E-mail : Service@FloridaJusticeFirm.com
Michael James McMullen , E-mail : Michael@FloridaJusticeFirm.com
Thomas U Graner , E-mail : kristin@granerlaw.com
Thomas U Graner , E-mail : ivy@granerlaw.com
Thomas U Graner , E-mail : tom@granerlaw.com
Xavier A Franco , E-mail : docketclerk@mcper.com
Xavier A Franco , E-mail : xfranco@mcper.com

# EXHIBIT Q

**Exhibit Q**

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

CASE NO. <u>CACE22005125</u>   DIVISION: <u>21</u>    JUDGE: <u>Singer, Michele Towbin (21)</u>

**FVP Opportunity Fund III, LP, et al**

Plaintiff(s) / Petitioner(s)

v.

**Scott Zankl, et al**

Defendant(s) / Respondent(s)

_____/

<u>**Order on Defendants' Motion to Dissolve April 14, 2022 Oral Freeze Order**</u>

THIS CAUSE comes before the Court on Defendants, MOSHE FARACHE, AUTO WHOLESALE OF BOCA, LLC and MMS ULTIMATE SERVICES, INC.'s (the "Farache Defendants") on Defendants' Motion to Dissolve April 14, 2022 Oral Freeze Order Pursuant to Fla. R. Civ. P. 1.610(d) Within 5 Days. In response to the motion, the Court scheduled a hearing on the motion for June 3, 2022 at which hearing counsel for the Plaintiffs and the Farache Defendants appeared and the Court having heard the arguments of Counsel and the Court being otherwise fully advised in the premises, it is hereby

ORDERED AND ADJUDGED

1. The motion of the Farache Defendants to dissolve the injunction is Denied, without prejudice, for the reasons stated by the Court on the record.

2. This Court will hold a full evidentiary hearing and has scheduled two (2) full days for the hearing on the Plaintiffs' Motion for Injunction, Plaintiffs Motion to Appoint a Receiver, Plaintiffs Rule to Show Cause in Replevin and the Farache Defendants Motion to Dissolve the Injunction. The hearing will be held on July 25, 2022 and July 26, 2022.

3. This Courts' Order of May 25, 2022 entitled "ORDER SCHEDULING EVIDENTIARY HEARING ON DEFENDANTS' MOTION TO DISSOLVE APRIL 14, 2022 ORAL FREEZE ORDER AND ON PLAINTIFFS' MOTION FOR TEMPORARY INJUNCTION AND APPOINTMENT OF RECEIVER, AND SHOW CAUSE IN REPLEVIN" is hereby modified only to the extent that the date of the hearing is

rescheduled from July 8, 2022 to July 25, 2022 and July 26, 2022.

4. The Court on June 3, 2022 also heard the Plaintiffs' *ore tenus* motion to compel the discovery due from the Farache Defendants as ordered by the Court on April 14, 2022 as well as the production requested by the Plaintiffs on the Farache Defendants on April 18, 2022. In response the parties agreed as follows:

    a. The Farache Defendants shall supply the ordered discovery and supply the discovery requested in the Plaintiffs' discovery requests by close of business June 15, 2022.

    b. The Plaintiffs shall comply with production requests from the Farache Defendants within ten (10) days of the request or by close of business June 15, 2022, whichever is later.

    c. The Court ratifies the agreement of the parties and orders the parties to comply with the Agreement to supply discovery.

    d. To the extent that there are any disputes regarding the discovery, either party shall set the dispute on the next available motion calendar date and notify opposing counsel of the date and the Court will resolve the dispute. It is the intent of the Court for discovery to be exchanged well in advance of the hearings scheduled for July 25, 2022 and July 26, 2022.

5. The Court reserves jurisdiction to enforce this Order as required.

**DONE AND ORDERED** in Chambers at Broward County, Florida on <u>7th day of June, 2022</u>.

CACE22005125 0(

<u>CACE22005125 06-07-2022 2:34 PM</u>
Hon. Michele Towbin Singer
**CIRCUIT JUDGE**
Electronically Signed by Singer, Michele Towbin (21)

**Copies Furnished To:**
Alan R Crane , E-mail : rrivera@furrcohen.com
Alan R Crane , E-mail : staff1@furrcohen.com
Alan R Crane , E-mail : acrane@furrcohen.com
Bradford M Cohen , E-mail : bmc@floridajusticefirm.com
Bradford M Cohen , E-mail : service@floridajusticefirm.com
Bradley S Shraiberg , E-mail : dwoodall@slp.law
Bradley S Shraiberg , E-mail : bss@slp.law

Bradley S Shraiberg , E-mail : pmouton@slp.law
Cory Mauro , E-mail : cory@maurolawfirm.com
Cory Mauro , E-mail : service@maurolawfirm.com
Cory Mauro , E-mail : cory.mauro@maurolawfirm.com
Evan Appell , E-mail : evan@maurolawfirm.com
Henry B Handler , E-mail : hbh@whcfla.com
Henry B Handler , E-mail : filings@whcfla.com
Henry B Handler , E-mail : jn@whcfla.com
Jay L Farrow , E-mail : service@farrowlawfirm.com
Jay L Farrow , E-mail : stephanie@farrowlawfirm.com
Jerrell Andrew Breslin , E-mail : jerrellbreslin@gmail.com
Jerrell Andrew Breslin , E-mail : jb@richardbaronlaw.com
Jerrell Andrew Breslin , E-mail : eservice@richardbaronlaw.com
Joel L. Wiegert, Esq. , E-mail : Joel.Wiegert@KutakRock.com
Jonathan Noah Schwartz , E-mail : jnsesquire@gmail.com
Jonathan Noah Schwartz , E-mail : JNS.NGQB@case.prolific.com
Jonathan Schwartz, Esq. , E-mail : jschwartz@jonschwartzlaw.com
Jose J Teurbe-Tolon , E-mail : jose@xanderlaw.com
Jose J Teurbe-Tolon , E-mail : service@xanderlaw.com
Keith Lee , E-mail : klee@feenixpartners.com
Mark C Perry , E-mail : mark@markperrylaw.com
Mark C Perry , E-mail : maureen@markperrylaw.com
Mark J Wolfson , E-mail : CRowell@foley.com
Mark J Wolfson , E-mail : mwolfson@foley.com
Matthew Pilkington , E-mail : mpilkington@feenixpartners.com
Michael A. Mullavey , E-mail : mmullavey@mcper.com
Michael James McMullen , E-mail : Service@FloridaJusticeFirm.com
Michael James McMullen , E-mail : Michael@FloridaJusticeFirm.com
Patrick Dorsey , E-mail : pdorsey@slp.law
Thomas U Graner , E-mail : kristin@granerlaw.com
Thomas U Graner , E-mail : ivy@granerlaw.com
Thomas U Graner , E-mail : tom@granerlaw.com
Xavier A Franco , E-mail : docketclerk@mcper.com
Xavier A Franco , E-mail : xfranco@mcper.com

# EXHIBIT R

**Exhibit R**

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

CASE NO. <u>**CACE22005125**</u>   DIVISION: <u>**21**</u>   JUDGE: <u>**Singer, Michele Towbin (21)**</u>

**FVP Opportunity Fund III, LP, et al**

Plaintiff(s) / Petitioner(s)

v.

**Scott Zankl, et al**

Defendant(s) / Respondent(s)

_____/

<u>**ORDER ISSUING RULE TO SHOW CAUSE IN CONTEMPT AND SETTING CONTEMPT
HEARING OF DEFENDANT MOSHE FARACHE**</u>

THIS CAUSE comes before the Court on the Motion For Rule To Show Cause In Contempt For Fraud Upon The Court ("Motion") directed at Defendant Moshe Farache ("Farache"), the Court has reviewed the Motion, the arguments of counsel, and noting of the Farache's counsel agreed to the setting of an evidentiary hearing upon Plaintiff's Motion, it is hereby:

ORDERED AND ADJUDGED that:

A. Defendant Moshe Farache is hereby ordered to appear before this Court to show cause as to why he should not be held in contempt of this Court for knowingly and intentionally filing allegedly false statements in an Affidavit in the record of this Court.

A. **DEFENDANT MOSHE FARACHE IS HEREBY ORDERED TO APPEAR IN PERSON BEFORE THIS COURT, THE HONORABLE MICHELE TOWBIN SINGER, CIRCUIT COURT JUDGE, BROWARD COUNTY COURTHOUSE, 201 S.E. 6TH STREET, COURTROOM WW15170, FORT LAUDERDALE, FL 33301, ON JULY 26, 2022 AT 10:30 A.M. TO SHOW CAUSE AS TO WHY HE SHOULD NOT BE HELD IN CONTEMPT OF COURT.**

B. The Defendant may have legal counsel present with him, and may present testimony, including witness testimony, or other evidence at such hearing.

C. Defendant Farache, on the record and further pursuant to the representations of his Attorney, Jay L. Farrow, Esq., has agreed to accept service of this Order by service upon Attorney Jay L. Farrow, Esq., which may be effectuated electronically.

**DONE AND ORDERED** in Chambers at Broward County, Florida on <u>8th day of July, 2022</u>.

*CACE22005125 0*

<u>CACE22005125 07-08-2022 3:55 PM</u>
Hon. Michele Towbin Singer
**CIRCUIT JUDGE**
Electronically Signed by Michele Towbin Singer

**Copies Furnished To:**
Alan R Crane , E-mail : staff1@furrcohen.com
Alan R Crane , E-mail : rrivera@furrcohen.com
Alan R Crane , E-mail : acrane@furrcohen.com
Allison B Duffie , E-mail : abd@mellingerlaw.com
Allison B Duffie , E-mail : legalassistant@duffie.law
Allison B Duffie , E-mail : allison@duffie.law
Bradford M Cohen , E-mail : bmc@floridajusticefirm.com
Bradford M Cohen , E-mail : service@floridajusticefirm.com
Bradley S Shraiberg , E-mail : dwoodall@slp.law
Bradley S Shraiberg , E-mail : bss@slp.law
Bradley S Shraiberg , E-mail : pmouton@slp.law
Cory Mauro , E-mail : cory@maurolawfirm.com
Cory Mauro , E-mail : service@maurolawfirm.com
Cory Mauro , E-mail : cory.mauro@maurolawfirm.com
Craig H. Blinderman , E-mail : cblinderman@kfb-law.com
Craig H. Blinderman , E-mail : bvillalobos@kfb-law.com
Craig H. Blinderman , E-mail : lbevans@kfb-law.com
Crystal B Carswell , E-mail : atownsend@foley.com
Crystal B Carswell , E-mail : ccarswell@foley.com
Darin Wade Mellinger , E-mail : dwm@mellingerlaw.com
Evan Appell , E-mail : evan@maurolawfirm.com
Henry B Handler , E-mail : hbh@whcfla.com
Henry B Handler , E-mail : filings@whcfla.com
Henry B Handler , E-mail : jn@whcfla.com
Jay L Farrow , E-mail : service@farrowlawfirm.com
Jay L Farrow , E-mail : stephanie@farrowlawfirm.com

Exhibits Page 257 of 261
Case Number: CACE22005125

Jerrell Andrew Breslin , E-mail : jb@richardbaronlaw.com
Jerrell Andrew Breslin , E-mail : jerrellbreslin@gmail.com
Jerrell Andrew Breslin , E-mail : eservice@richardbaronlaw.com
Joel L. Wiegert, Esq. , E-mail : Joel.Wiegert@KutakRock.com
John M. Brennan Jr. , E-mail : jessica.rolon@gray-robinson.com
John M. Brennan Jr. , E-mail : jack.brennan@gray-robinson.com
Jonathan Noah Schwartz , E-mail : jnsesquire@gmail.com
Jonathan Noah Schwartz , E-mail : JNS.NGQB@case.prolific.com
Jonathan Schwartz, Esq. , E-mail : jschwartz@jonschwartzlaw.com
Jose J Teurbe-Tolon , E-mail : service@xanderlaw.com
Jose J Teurbe-Tolon , E-mail : jose@xanderlaw.com
Keith Lee , E-mail : klee@feenixpartners.com
Mark C Perry , E-mail : mark@markperrylaw.com
Mark C Perry , E-mail : maureen@markperrylaw.com
Mark J Wolfson , E-mail : mwolfson@foley.com
Mark J Wolfson , E-mail : CRowell@foley.com
Matthew Pilkington , E-mail : mpilkington@feenixpartners.com
Michael James McMullen , E-mail : Michael@FloridaJusticeFirm.com
Michael James McMullen , E-mail : Service@FloridaJusticeFirm.com
Patrick Dorsey , E-mail : pdorsey@slp.law
Thomas U Graner , E-mail : kristin@granerlaw.com
Thomas U Graner , E-mail : ivy@granerlaw.com
Thomas U Graner , E-mail : tom@granerlaw.com

# EXHIBIT T

**Exhibit T**



# BILL OF SALE

## THIS IS NOT AN INVOICE

## DOCUMENT NOT VALID FOR EXPORT

Exhibit Page 259 of 461

**831 MANHEIM PALM BEACH**
1300 SANSBURYS WAY
WEST PALM BEACH, FL 33411 US

Please refer to the vehicle release for the pickup location

### Vehicle Information
2021 JEEP GLAD SPT S
CREW SPORT S BLACK Four Wheel Drive
1C6HJTAG0ML584806

Mileage: 1267 Miles          0

License Plate No:

### Title Information
State: FL          Number: 1

### Vehicle Features
Convertible Hardtop
6-cylinder Gas
Power Steering
CRA
Leather Seats
A/C

Power Windows
Power Door Locks
Cruise Control
A/T
Rear Defrost
Driver Air Bag
Emissions label missing

| | |
|---|---|
| **Sale Date** | |
| 14-APR-2022 17:28:48 | |
| **Yr Wk Ln Rn** | |
| 2022-15-94-11 | |
| **Sale Type** | |
| OVE | |

### Seller
AUTO WHOLESALE OF BOCA LLC
6560 W ROGERS CIR # B27
BOCA RATON, FL 33487 US

Seller Rep:
*Signature on file*

### Auction Lights
GREEN     Buyer protection to conditions
YELLOW    Certain conditions announced prior to sale

### Odometer Disclosure
Federal (and state law, if applicable) requires the Seller to state the mileage upon transfer of ownership. Failure to complete or providing false information may result in fines and/or imprisonment.

Seller hereby states that the odometer for this Vehicle now reads identically to the Mileage stated on this Bill of Sale under Vehicle Information and certifies to the best of Seller's knowledge that this reflects the actual mileage of the Vehicle, unless disclosed otherwise in the Announcements & Notes below.

### Announcements & Notes
STRUCTURAL ALTERATION
THIRD PARTY SELLER

| **Sale Price** | |
|---|---|
| **Adjustments** | |
| **Final Sale Price** | |

| **Vehicle Purchase Price** | |
|---|---|
| $ 130,000.00 | |
| $      0.00 | |
| $ 130,000.00 | |

### Remarketer
LUXLANE REMARKETING

### Owner
AUTO WHOLESALE OF BOCA LLC

### Buyer
PROVIDENCE AUTO GROUP LLC
1635 N ALBANY AVE
ATLANTIC CITY, NJ 08401 US

Buyer Rep: MIRANDA, ANTHONY
*Signature on file*

Seller agrees to sell the vehicle covered by this Bill of Sale to Buyer for the price noted herein.
Seller is the transferor of the vehicle and is responsible for all disclosures, including odometer and mileage.
Buyer must return a signed copy of the title front and back, including the odometer statement therein, to Seller or be subject to civil and criminal penalties. See 49 CFR § 580.5(f).
Manheim retains a purchase money security interest in the Vehicle and its title until good funds are received from the Buyer.
Seller and Buyer agree to the Manheim Terms and Conditions in effect at the time of the sale.
Sale terms and this Bill of Sale are subject to adjustments by Manheim. Please check your customer account at Manheim.com for most current version of this document.
Bill of Sale is not an Invoice. Please refer to Invoices in your account on Manheim.com.

(M) Manheim

# Credit Memo # 52629085

Page 283 of 285
Excludes 2030629639

**PAY TO**
AUTO WHOLESALE OF BOCA LLC
6560 W ROGERS CIR # B27
BOCA RATON, FL 33487 US

**BUYER**
PROVIDENCE AUTO GROUP LLC
11235 N ALBANY AVE
ATLANTIC CITY, NJ 08401 US

**REMARKETER**
LUXLANE REMARKETING
6579 NW 31ST WAY
BOCA RATON, FL 33496 US

**REMIT TO**
Cox Automotive, Inc.
PO Box 105156
Atlanta, GA 30348-5156 US

**INVOICING-SALES LOCATION**
MANHEIM PALM BEACH
600 SANSBURY'S WAY
WEST PALM BEACH, FL 33411 US

| | | Seller |
|---|---|---|
| INVOICE TYPE | | 10-MAY-2022 |
| INVOICE DATE | | 10-MAY-2022 |
| INVOICE DUE DATE | | MIRANDA, ANTHONY |
| PAYMENT DUE DATE | | 731 MANHEIM PALM BEACH |
| BUYER REPRESENTATIVE | | |
| TRANSACTION LOCATION | | |
| ORIGINAL BUYER | | |
| LEASE ACCOUNT NO | | |
| YEAR MAKE MODEL | | 2021 JEEP GLAD SPT S |
| VIN | | 1C6HJTAG0ML564806 |
| MILEAGE | | 1267 Miles |

| CHARGE DATE | WORK ORDER | UNIVERSAL KEY | DESCRIPTION | CUSTOMER PO# | PRICE | TAX | LINE TOTAL |
|---|---|---|---|---|---|---|---|
| 14-APR-2022 | 2062859 | 2022-15-94-11 | 2021 JEEP GLAD SPT S | | ($130,000.00) | $0.00 | ($130,000.00) |
| 14-APR-2022 | 2062859 | 2022-15-94-11 | SELLER SUCCESS FEE | | $575.00 | $0.00 | $575.00 |
| 29-APR-2022 | 2062859 | 2022-15-94-11 | REMIT ADMIN FEE TO SELLER - Luxlane Remarketing Rep fee | | $250.00 | $0.00 | $250.00 |
| 08-APR-2022 | 2062859 | 2022-15-94-11 | 15+3 Image Fee | | $25.00 | $0.00 | $25.00 |
| 08-APR-2022 | 2062859 | 2022-15-94-11 | CR W/O ESTIMATE FEE | | $25.00 | $0.00 | $25.00 |

| | | | | | SUB TOTAL | ($129,125.00) |
|---|---|---|---|---|---|---|
| | | | | | TAX | $0.00 |
| | | | | | ADJUSTMENTS | $0.00 |
| | | | | | TOTAL BEFORE PAYMENTS | ($129,125.00) |
| | | | | | PAYMENTS | ($129,125.00) |
| | | | | | AMOUNT DUE TO | $0.00 |

**ADJUSTMENTS**

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| | | |

TOTAL ADJUSTMENTS   $0.00

**PAYMENTS**

| DATE | REF NO | DESCRIPTION | AMOUNT |
|---|---|---|---|
| 10-MAY-2022 | 1970195 | Invoice Applied SBM18RAA6KW006903 | $2,000.00 |
| 10-MAY-2022 | 6131991 | Check Issued | $127,125.00 |

TOTAL PAYMENTS   $129,125.00

**SPECIAL INSTRUCTIONS**
Please include the invoice number on all remittances and include remittance copy with postal payments.
Visit your Account at Manheim.com to manage preferences, view invoices & statuses, see history and pay invoices.
A late fee will be added, wherever applicable, to all past due invoices, subject to details in the Manheim Terms and Conditions.
If you have questions concerning this invoice, please call or email Manheim Client Care @ 1-866-MANHEIM (626-4346), Mon-Sat 8am-10pm; or email us by clicking on Contact Us on Manheim.com.

Overnight mailing address:
Cox Automotive Inc, Attn: Lockbox 105156, 3585 Atlanta Avenue, Hapeville, GA 30354-1705 US

Printed on: 2022-05-11 14:12:50

# Manheim

# Invoice # 1970196

| | Seller |
|---|---|
| INVOICE TYPE | 27-APR-2022 |
| INVOICE DATE | 27-APR-2022 |
| PAYMENT DUE DATE | WILDRICK, RYAN |
| BUYER REPRESENTATIVE | 731 MANHEIM PALM BEACH |
| TRANSACTION LOCATION | |
| ORIGINAL BUYER | |
| LEASE ACCOUNT NO | |
| YEAR MAKE MODEL | 2019 MCLAREN 600LT |
| VIN | SBM13RAA6KW006903 |
| MILEAGE | 7673 Miles |

**DUE FROM**
AUTO WHOLESALE OF BOCA LLC
8560 W ROGERS CIR # B27
BOCA RATON, FL 33487 US
4233629
Ext BUYER ID
Site 26

**BUYER**
EMD LLC
22 PLYMOUTH ST STE 4R
EAST BRIDGEWATER, MA 02333 US

**REMARKETER**
LUXLANE REMARKETING
6579 NW 31ST WAY
BOCA RATON, FL 33496 US

**REMIT TO**
Cox Automotive, Inc.
PO Box 105156
Atlanta, GA 30348-5156 US

**INVOICING-SALES LOCATION**
MANHEIM PALM BEACH
600 SANSBURYS WAY
WEST PALM BEACH, FL 33411 US

| CHARGE DATE | WORK ORDER | UNIVERSAL KEY | DESCRIPTION | CUSTOMER PO# | PRICE | TAX | LINE TOTAL |
|---|---|---|---|---|---|---|---|
| | 2062658 | 2022-14-2-109 | Sale Price Adjustment Item | | $2,000.00 | $0.00 | $2,000.00 |

**ADJUSTMENTS DATE**

| | DESCRIPTION | | TOTAL ADJUSTMENTS | AMOUNT |
|---|---|---|---|---|
| | | | | $0.00 |

**PAYMENTS**

| DATE | REF NO | DESCRIPTION | | AMOUNT |
|---|---|---|---|---|
| 10-MAY-2022 | 52629085 | Credit Memo Applied 1C6HJTAG0ML564806 | | $2,000.00 |

| | AMOUNT |
|---|---|
| SUB TOTAL | $2,000.00 |
| TAX | $0.00 |
| ADJUSTMENTS | $0.00 |
| TOTAL BEFORE PAYMENTS | $2,000.00 |
| PAYMENTS | ($2,000.00) |
| OUTSTANDING BALANCE | $0.00 |

| | AMOUNT |
|---|---|
| TOTAL PAYMENTS | $2,000.00 |

**SPECIAL INSTRUCTIONS**
Please include the invoice number on all remittances and include remittance copy with postal payments.

Visit your Account at Manheim.com to manage preferences, view invoices & statuses, see history and pay invoices.

A late fee will be added, wherever applicable, to all past due invoices, subject to details in the Manheim Terms and Conditions.

If you have questions concerning this invoice, please call or email Manheim Client Care @ 1-866-MANHEIM (626-4346), Mon-Sat 8am-10pm; or email us by clicking on Contact Us on Manheim.com.

Overnight mailing address:
Cox Automotive Inc, Attn: Lockbox 105156, 3585 Atlanta Avenue, Hapeville, GA 30354-1705 US

Printed on: 2022-05-11 18:18:08