Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division

CASE NO. 22-15627-EPK

IN RE:

AUTO WHOLESALE OF BOCA, LLC,

Debtors.
_____/

FVP OPPORTUNITY FUND III, L.P.,

Plaintiffs,

vs.                          ADV. NO. 22-1218-EPK

AUTO WHOLESALE OF BOCA, LLC,

Defendant.
_____/

MOTION FOR TURNOVER OF PROPERTY (114) and
EMERGENCY MOTION TO RETURN FUNDS TO TRUST ACCOUNT (31)

September 28, 2022

The above-entitled cause came on for hearing before the Honorable ERIK P. KIMBALL, one of the Judges in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, via Video Teleconference on September 28, 2022, commencing at or about 9:30 a.m., and the following proceedings were had:

Transcribed from a digital recording by:
Anna M. Meagher, Stenographic Reporter

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 2

APPEARANCES:
(Via Video Teleconference)

James B. Miller, P.A., by
James B. Miller, Esquire
On behalf of the Debtor.
Email:  Bkcmiami@gmail.com

Baron, Breslin & Sarmiento, by
Jerrell A. Breslin, Esquire
On behalf of FVP Investments, LLC,
FVP Opportunity Fund III, LP,
FVP Servicing, LLC
Email:  Jb@richardbaronlaw.com

David R. Softness, P.A., by
David R. Softness, Esquire
On behalf of FVP Investments, LLC,
FVP Opportunity Fund III, LP,
FVP Servicing, LLC
Email:  David@softnesslaw.com

Shraiberg Page, P.A., by
Bradley S. Shraiberg, Esquire
On behalf of Franklin Capital Funding, LLC
Email:  Bss@slp.law

Foley & Lardner, LLP, by
Mark J. Wolfson, Esquire
On behalf of Hi Bar Capital, LLC
Email:  Mwolfson@foley.com

Akerman LLP, by
Amanda Klopp, Esquire
On behalf of Edward Brown
Email:  Amanda.klopp@akerman.com

Continued...

Mauro Law, by
C. Cory Mauro, Esquire
On behalf of Derek Stephens
Email:  Cory@maurolawfirm.com


Linda Leali, P.A., by
Linda Marie Leali, Subchapter V Trustee
Email:  Trustee@lealilaw.com


Weiss, Handler & Cornwell, P.A., by
Harry Winderman, ESQ.
On behalf of Karma of Palm Beach, Inc.
Email:  Harry4334@hotmail.com


Office of the United States Trustee, by
Dan Gold, Attorney/Advisor


_  _  _  _  _  _  _  _

Page 4

THE COURT:  Let's move onto the next case.  Pardon me while I scroll a little bit.  I think the next case is FVP Opportunity Fund III against Auto Wholesale of Boca and others.

And, let's see, we have Mr. Softness, I believe.

MR. SOFTNESS:  Yes, Judge.  David Softness, S-O-F-T-N-E-S-S.  I represent the plaintiff, FVP.  There are several of them.  That is our acronym.

THE COURT:  Very good.

Let's see, Ms. Klopp, I believe.

No, maybe not.

Perhaps I should make clear that we're also hearing today the Chapter 11 case, Auto Wholesale of Boca.  But I'm just going to go down my list.

Mr. Shraiberg.

MR. SHRAIBERG:  Good afternoon, your Honor.  Brad Shraiberg on behalf of creditor Winning Lake Capital Partners, formerly known as Franklin Capital Group.

THE COURT:  Thank you.

Ms. Klopp, I apologize.  You were connecting.

Go ahead.

MS. KLOPP:  Sorry about that, your Honor.

Good afternoon.  Amanda Klopp for Ed Brown.

THE COURT:  Now, let's see, Mr. Miller.

MR. MILLER:  Good afternoon, your Honor.  James

Page 5

Miller, M-I-L-L-E-R, on behalf of the debtor-in-possession.

THE COURT:  Ms. Leali.

MS. LEALI:  Good afternoon, your Honor.  Linda Leali, I'm the Subchapter V trustee in this case.

THE COURT:  Mr. Wolfson.

MR. WOLFSON:  Good afternoon, Judge.  Mark Wolfson of a Foley & Lardner on behalf of Hi Bar Capital, LLC.

THE COURT:  All right.  Who else would like to make an appearance in either the adversary or the main case.

MR. BRESLIN:  Good afternoon, Judge.  Jerry Breslin, I'm co-counsel with Mr. Softness for the FVP plaintiffs.

THE COURT:  Thank you.

Mr. Gold.

MR. GOLD:  Good afternoon, your Honor.  Dan Gold for U.S trustee, here for the main case.

THE COURT:  Mr. Winderman.

MR. WINDERMAN:  Harry Winderman on behalf of Karma of Palm Beach, and I'm joined by my client Scott Zankl, an owner of Karma of Palm Beach.

THE COURT:  All right.  Very good.

Anybody else that I've missed?

MR. MAURO:  Good afternoon, your Honor.  Cory Mauro on behalf of Derek Stephens.

THE COURT:  Very good.  Sorry, Mr. Mauro --

MR. MAURO:  Not at all.

THE COURT:  -- I didn't see you on the list.

All right.  So which -- does anyone have a view, Mr. Miller perhaps, whether I should start with the main case matter or the adversary matter?

Does it matter?

MR. MILLER:  Your Honor, Miller speaking.

I would suggest probably the main case matter on the Derek Stephens motion.

THE COURT:  Let's do that.

Mr. Mauro.

MR. MAURO:  Yeah.  Again, good afternoon, your Honor.  Cory Mauro.  Today I represent Derek Stephens, another aggrieved consumer.

This time we're dealing with a 2013 Ferrari 458 Spider.  Mr. Stephens owns this Ferrari.  He has owned it since 2021.  He left the car at Karma on consignment.  And make no mistake about it, this matter is governed exclusively by the consignment agreement between Mr. Stephens and Karma.  We're going to talk about that consignment agreement in a moment, but let's talk a bit about how this dispute arose, Judge.

Karma called my client up, the car was there, and said, "Hey, we've got a buyer."  And so Mr. Stephens went down to the dealership.  The idea at the time was that the

Ferrari would sell to the new buyer, and Mr. Stephens would receive a credit toward the purchase of a new car.  It was a Lamborghini that he was looking at.  As it turns out, they paper the transaction that way.  So the Ferrari, again, was contemplated as a trade toward the Lamborghini, but low and behold the buyer fell through.  So no buyer on the Ferarri.  There's nothing to credit to the new car.  It's Friday evening at this point.

Here's what the parties decided to do.  My client simply paid for the new car.  He paid for the Lamborghini, wrote a check.  To be clear this is a stand-alone transaction at this point.  The Ferrari is uninvolved altogether.  Mr. Stephens simply pays for the new car.  Now, with respect to the Ferrari, he wasn't going to drive off in two cars, physically incapable of doing so, and he wanted to sell the Ferrari in any event.  So he entered into, with Karma, a consignment an agreement.  That is after he bought the Lamborghini, after he paid for the Lamborghini, and the agreement is simple.

We've attached it to the affidavit in support of our motion, Judge.  I'm pleased to share my screen, although I don't see a whole lot of lawyers doing that in this --

THE COURT:  Well, it's okay.  I've read it.  I've read all the documents.  So you're pointing to the consignment agreement that you had attached to your motion.

Page 8

MR. MAURO:  I am, your Honor, and I'm just going to touch on some of the language.  Again, it's the attachment --

THE COURT:  Right.

MR. MAURO:  -- to the affidavit.

Right off the bat the consignment says, I quote, "Consignor warrants said vehicle to be held by a good marketable title, which consignor will freely assign to dealer upon purchase of sale -- purchase or sale of said vehicle."  So we've got "will," future looking, it hasn't happened yet, not "has."  And then "upon the sale of the vehicle," language of condition.  It only happens, title is only transferred, if the purchase occurs.

So this first piece is critical, Judge, because my opposition's theory is, "Hey, wait a minute, this isn't a consignment, because Derek Stephens actually signed over his title to the dealership," but that's flat wrong.  He provided title documents to the dealership on the condition of a sale within the scope of the consignment agreement.  He only authorized the transfer of title if a purchase happened, and that never happened.

THE COURT:  Well, why would he --

MR. MAURO:  I'm continuing with --

THE COURT:  -- have bothered to sign the title on that day?  I believe the date on the signature is March 11th

on the title.

MR. MAURO:  Yeah, and the answer is simply to facilitate the future sale of the car.  My client lives in Dallas.  He knew that he couldn't run down to the dealership and effectuate the transaction by signing off on title.  So this is, essentially, an escrow situation.  By the way, the protocol of Karma, it's what they did.  It's what they told him to do, "Sign the consignment agreement, give us title, and that way when a buyer comes in and is ready to purchase the car, we can simply transfer title upon the sale, as you have agreed to do."

THE COURT:  So what was the purchase price for the Lamborghini, according to your client?

MR. MAURO:  It's 270,000 and change.

THE COURT:  That -- you're looking at the contract, I assume?

MR. MAURO:  I'm not looking at the contract at the moment, but it's -- it's in that neighborhood, Judge --

THE COURT:  It's not --

MR. MAURO:  -- I can get the --

THE COURT:  -- it's not two-fifty?

MR. MAURO:  -- exact number -- just a moment.

Okay.  So the purchase price, the purchase price of the Lamborghini was 250,000, correct.

THE COURT:  And he paid 250,000.

Page 10

MR. MAURO:  Yes.

THE COURT:  And then a few days later, four days, I think, he paid another 22,337.88, correct?

MR. MAURO:  That's correct, Judge.

THE COURT:  Why?

MR. MAURO:  The additional payment -- I believe the additional payment is characterized on the purchase agreement as the total -- I'm sorry, the --

THE COURT:  It's the difference between the purchase price --

MR. MAURO:  -- delivery price.

THE COURT:  -- and the trade, taking into account tax and some other charges.

MR. MAURO:  Correct.  But the trade never occurred because the sale fell through, and I don't want to jump off of your question, your Honor, if I can --

THE COURT:  No, I'm just trying to figure out how you got to these numbers.  Because if he made an outright purchase of the Lamborghini, one would think that he would need to pay sales tax on $250,000 under Florida law, and it doesn't appear that that happened.

MR. MAURO:  You know, how they came up with the numbers, exactly, I'm looking at the exact same document you are, which I think, frankly, is a bit of a distraction because it was a straight consignment agreement, and the

Lamborghini transaction was handled separately, but to -- I can't tell you exactly to the dime how they came up with that $22,337.85, but we can certainly get to the bottom of that.

But continuing with the agreement, the consignment agreement, Judge, my client agreed to pay expenses, quote, for the purpose of selling the agreement (sic), the dealer was only authorized to, quote, sell the vehicle on consignor's behalf.  There's no authority to leverage the vehicle, no authority to pledge it as collateral.  And it goes on that Mr. Stephens would keep the vehicle insured, which to this day it remains insured by Mr. Stephens.  He agreed to hold the dealer harmless for any damage. Certainly not something that you would do in the context of a sale.  None of those things are.

And, finally, I think it's critical, Judge, that there's an integration clause contained in this agreement. I'll read it for your Honor:  "There are no -- there are not promises, terms, conditions, or obligations other than those outlined herein, and this contract supersedes all previous communications, representations, or agreement either verbal or written between the consignor and the dealer."  So why is the integration clause important?  Again, the consignment occurs -- the consignment agreement occurs after the purchase of a new car, after he strokes the check for the

new car.

It is undisputed that the party before this Court and at least anybody who I've talked to or who's filed a position disputes that my client was not paid for the Ferrari. Nobody disputes that. Nobody disputes that the Ferrari was not sold. Nobody disputes that my client paid for the Lamborghini, and how they got to the dime, you know, I'm not sure. But he paid for the Lamborghini to the satisfaction of the seller. Nobody disputes that. The governing consignment simply was not performed, and like those that have come before him in this court, Judge, Derek Stephens is yet another aggrieved consumer who has been taken advantage of.

Now, let me turn briefly to the opposition. I want to resist the urge to kind a do a tit-for-tat on their fact allegations. It's a bit of a diversion as well. But their fact recitation is designed to take our collective eyes off of the ball. The only agreement in play is the consignment agreement, period. There's --

THE COURT: So I should pretend that those other documents don't exist? I think you'll need to explain why -- unless you're telling me that they are fabricated, I think you would need to explain those other documents and why the payments add up to the amounts that they do.

MR. MAURO: Okay.

THE COURT:  Or if --

MR. MAURO:  Sure, sure.

THE COURT:  -- it is just a consignment, the fact that the Ferrari is reflected as a trade on the purchase order for the Lamborghini and that the calculations are done based on what I would think of as fairly run-of-the-mill calculations in connection with a trade.  Although, I personally have never paid $250,000 for a vehicle.  But there's nothing strange about that purchase arrangement for the Lamborghini reflecting a trade and how the calculations are done, including the tax, for example.

And, indeed, for Mr. Softness, the only question I had when reading through his presentation is, why is the second wire, A, separate, and, B, four days later.  That I couldn't figure out.  But their view appears to be consistent with looking at all the documents, and you're telling me I need to pretend there's only one, I think.

MR. MAURO:  Well, I -- look, I think what their argument means is they're asking -- they're asking you to find that the parties abandoned the consignment, but Mr. Stephens bought the other car outright.  They are actually arguing then that Mr. Stephens gifted the Ferrari to Karma, just gifted it to them.  Remember --

THE COURT:  Well --

MR. MAURO:  -- he already paid for the --

Page 14

THE COURT:  -- no, they didn't --

MR. MAURO:  -- other car.

THE COURT:  -- say that.  They said there was an agreement that he would be paid back the $250,000 when the Ferrari sold.  That's what their theory is.  I don't know where -- I assume that there's some evidence beyond the documentation to fill in the blanks.

MR. MAURO:  But there would be no cause, your Honor, for my client to simply give title over to Karma after having written a check for the new car.  And there's no evidence presented whatsoever by Mr. Breslin's side that suggests that the consignment was tossed in the garbage. It's the operative agreement.  Nothing suggests that the parties abandoned it or didn't intend to, you know, continue to be bound by it.

THE COURT:  Right.  So if all he did was purchase the Lamborghini, why did he pay $272,337.88?  I'm trying to figure that out.

MR. MAURO:  Yeah, the --

THE COURT:  Because the purchase price was, I thought, two-fifty and adding on twenty-two three-thirty-seven eighty-eight would be more than the tax due. So I'm not sure how you would get to that number.

MR. MAURO:  Yeah, that's an absolutely fair question, and I wish I was in the position to answer it.  I

can certainly examine that, and we can come back to the Court with a clear answer on that particular piece, which we will do.

THE COURT:  All right.

MR. MAURO:  Okay.

THE COURT:  Okay.  So we did have a response, and who would like to address that.

UNIDENTIFIED SPEAKER:  I would, Judge.  I drafted the response.

And your Honor hit the nail on the head, taxes. What happened here was Mr. Stephens purchased the car from Karma.  He then went back, and he had conversations with them about taking the car on consignment and selling the car for him.  At the same time he fell in love with this Lamborghini that he absolutely, as we say in our papers, he absolutely had to have for that weekend.

So the parties entered into an agreement that he would put up $250,000, which is the purchase price of the Lambo without paying any taxes, basically, as a deposit.  He would then pay -- he would then trade the Spider, the Ferrari, towards the Lamborghini, which would require him to make an additional payment of -- it's actually 22,337.00 as is reflected in the purchase agreement.  The purchase agreement says very clearly it's a trade.

So the agreement was, I'm gonna give you two-fifty

as a deposit.  I'm going to pay you the whole amount.  I'm gonna pay you two-fifty, plus the twenty-two three-three-seven.  Since I only owe the twenty-two three-three-seven, you will sell -- the title will be transferred to Karma inventory.  You will sell the Spider, and then when you sell the Spider, you're going to pay me 250,000.  That was the deal that was made.

So that's why the paperwork is exactly -- the paperwork says exactly that.  The title was transferred.  There was trade-in paperwork.  Two-hundred-and-fifty was transferred that day, because he wanted to drive the car off the lot.  If this was a straight-up purchase and consignment, he just would have bought the Lambo, and there would have been no transfer of title; there would have been no trade-in paperwork, and he just would have just left the Ferrari there to be sold, and when they sold it, he would transfer title to the buyer as the consignment agreement says.  Because the consignment agreement says that title doesn't transfer until there's a buyer.

So that's why the paperwork -- that's why the -- the paperwork says exactly what the deal was and why, because he didn't want to pay taxes on the two-fifty.  So his deal was, I'm gonna give you two-fifty.  I'm going to get my two-fifty back.  It's like a deposit.  When you sell the Spider, you pay me the two-fifty.  That way he doesn't

Page 17

have to pay taxes on the two-fifty.  It's just a -- there's just the difference in the trade-in.  So that's what happened, Judge.

And so I think it's important for you to note that everything that Mr. Mauro just said is not in his papers. He says in his papers, there's one document that's relevant, that's the consignment agreement and don't look at anything else.  Well, you have to look at everything.  And there's even more evidence, Judge, because what happened here was, which I didn't put in my papers, because I didn't find out about it until today, when Mr. Veracci (phonetic) was there picking up the cars, Mr. Stephens went to the dealership and physically got in the Spider, because he knew he wasn't -- he would get paid when that car was sold.  And, furthermore, the agreement was for Karma to pay him the two-fifty, and he received a check that day.  He was actually given a check for two-fifty that day from Karma, which I didn't put in my papers, because I wasn't aware of it.  So this is --

THE COURT:  And what happened to that check?

UNIDENTIFIED SPEAKER:  It was a bad check --

THE COURT:  Oh, okay --

UNIDENTIFIED SPEAKER:  -- it bounced.

THE COURT:  -- well, I get that.  But what happened to it, Mr. Breslin?

Does it still exist some place?  It's been

Page 18

endorsed and attempted to be deposited, I take it.

MR. BRESLIN:  Are you asking me?

THE COURT:  Yeah, you said you found out there was a check.

What happened to it?

MR. BRESLIN:  Well, no, I found out that a check was written that day when Mr. Veracci took all the vehicles, and it was a bad check, because ultimately the funds -- those accounts were frozen by the FVP lenders, as they were entitled to under the law.  So that $250,000 check was never -- was never cashed, but the --

THE COURT:  And someone has this check?  Does someone have this check?

MR. BRESLIN:  I guess Mr. Mauro's client has the check.

THE COURT:  Interesting.

UNIDENTIFIED SPEAKER:  We have a copy of the check, yes.

MR. BRESLIN:  All right.  So, Judge, there's just a lot more here and the FVP --

THE COURT:  Fascinating.

MR. BRESLIN:  -- plaintiffs have never interfered with any lawful buyers that are trying to get their cars back.  But what happened with this particular car is because of the unusual circumstances, Mr. Stephens agreed that the

Page 19

Spider would go into Karma inventory, okay, he transferred title to Karma.  The minute he transferred title to Karma, it became Karma inventory, and it became our collateral.  So this one is different, and there was never a good faith purchaser of that vehicle, so --

THE COURT:  Now, when you were putting together your motion, I have to admit to you, if I laid all these documents out, if you told me nothing at all and someone just laid out these documents on a table in front of me, I would be extremely confused, especially if I didn't have the wire transfer data.

Was there evidence in addition to the documentary evidence that led you to understand the story that you presented in the motion?

MR. BRESLIN:  Are you talking to me, Judge?

THE COURT:  Yes.

MR. BRESLIN:  Yeah, yeah, absolutely.  I went over every fact with Mr. Zankl, and he confirmed every fact in the motion to be true, and he's present in court today.  Now, I know this isn't set for an evidentiary hearing, but he will testify at an evidentiary hearing when it's set.

THE COURT:  It's not, but it will be set for one, because I think there's a substantial dispute on how I should interpret these various documents, and I think it would be helpful if there is, in fact, other evidence,

documentary or testimonial, to assist me in reaching a conclusion on who I should believe, frankly. It's a fascinating set of facts, I have to admit. Your motion is supported, I think -- I think the most important things are the payments, and that check would be very interesting to have as well.

All right. Is there anything else I need to know before we discuss scheduling on setting this matter for hearing?

Anybody else wish to be heard?

Yes, Mr. Wolfson.

MR. WOLFSON: Good afternoon, your Honor. Mark Wolfson for Hi Bar Capital.

Like, as you know, as Mr. Breslin's client VP, we -- Hi Bar also asserted a blanket lien in the Karma inventory, and I don't recall if this got addressed or not, but in preparing I was thinking about it, which is, I don't recall if there was a UCC compliance -- you know, a consignor usually files a UCC, and then it also -- in Karma it's under nine-three-twenty-four if the satisfy -- in order to kind of get the status of a VFP (sic) consignor, and that probably should be addressed, should be something we address as well.

THE COURT: Very good. Thank you for raising the issue.

Page 21

Yes, Mr. Shraiberg.

MR. SHRAIBERG:  Just Franklin Capital agrees with both Mr. Wolfson and Mr. Breslin, and we support their response.

THE COURT:  Understood.

All right.  So how much time -- is there a need to do -- yes, Mr. Miller.

MR. MILLER:  My apologies, Judge.  Miller on behalf of debtor-in-possession.

Although we disagree with Mr. Breslin's description and language, ultimately we do agree that the car is not a car that should be surrendered to Mr. Mauro's client, and, indeed, there was a check handed to Mr. Stephens for the car.  Whether he negotiated it or it bounced, I don't know.  Maybe Mr. Winderman knows because he represents the Karma entities, but I don't know.

THE COURT:  And I'm curious if Mr. Stephens lives in Texas, what was he doing in Fort Lauderdale, correct, just so happens on that particular day?

MR. MAURO:  He's here season --

THE COURT:  Oh, I see.

MR. MAURO:  I'm sorry, your Honor, I didn't --

THE COURT:  Okay.  All right.

MR. MAURO:  He's here seasonally, and he actually traveled here for the transaction.

Page 22

THE COURT: Okay. Well, that was, I assume, not all on March 11th, and I noticed that one of the wire transfers was on the 15th, I think, and I couldn't figure out why that would be. But I'm sure I'll hear at some later time, or maybe not. Who knows? It might be one of those mysteries I have at the end of an evidentiary hearing.

All right. How much time do I need between today and when a hearing is set, and I'll hear from Mr. Mauro first.

MR. MAURO: We would love to do it as quickly as possible, your Honor, a couple weeks.

THE COURT: Okay. Anyone else want to weigh in on timing?

MR. BRESLIN: Judge, timing we have no problem with moving it expeditiously, our -- the witness is Mr. Zankl, so to the extent that he's available, the FVP plaintiffs will be available.

THE COURT: Anybody else wish to weigh in on that?

All right. Ms. Leonard, what do we have? Let's go out just a few weeks if we could.

THE CLERK: Let's see. We don't really have a whole lot. We have the 7th, which is kind of close.

THE COURT: Let me have a look myself. Just so all of you know, I'm actually in the courtroom. Ms. Leonard is wisely not here.

Page 23

All right.  The 7th is a Friday.

Anybody interested in the 7th?

UNIDENTIFIED SPEAKER:  Judge --

THE COURT:  Yes, Mr. Miller.

UNIDENTIFIED SPEAKER:  -- we're finishing our mediation.

MR. MILLER:  Your Honor, we --

THE COURT:  Oh, I do not want to stand in the way of that.

Ms. Leonard, next?

THE CLERK:  Let's see, the whole next week is full.

THE COURT:  No, go further out.

THE CLERK:  The following week, okay.  So we're looking at the 25th, October 25th?

THE COURT:  Let's just see and that's a Tuesday, October 25th.  I don't see this taking more than a day.

Does anyone believe -- hold on, Mr. Miller.

Does anybody believe we'll need more than a day?

UNIDENTIFIED SPEAKER:  No, your Honor.

THE COURT:  Okay.  Mr. Miller.

MR. MILLER:  My apologies, Judge, I actually have an evidentiary hearing before her honor, Judge Isicoff, in the morning.

THE COURT:  Well, she is the chief judge, so she

Page 24

wins.

All right.  Ms. Leonard, next?

THE CLERK:  Twenty-eighth.

THE COURT:  Twenty-eighth, that's a Friday.

UNIDENTIFIED SPEAKER:  Your Honor, to the extent that I need to be at that hearing, and I'm not sure, I'm going to be out-of-town from the 26th to November 3rd.

THE COURT:  Okay.  That was Mr. Winderman, I think.

MR. WINDERMAN:  Yes, your Honor.

THE COURT:  Okay.  Now, we're moving further and further out.  It looks like I've given away my courtroom on the 7th and the 8th of November.  We keep going -- oh, and the 10th, Ms. Leonard; is that true?  And then court is -- we're going into mid-November at this point.

THE CLERK:  Your Honor, the 18th is the next.

THE COURT:  The 8th of what?

THE CLERK:  The 18th of November looks like that's the --

THE COURT:  Right, because there's another judge using my courtroom.  Eighteenth of November.

Anyone else?  Okay.  Seems like forever, frankly.

UNIDENTIFIED SPEAKER:  Judge, I'm specially set for a trial in Cincinnati on the 18th.  Every other day that you offered works for me, though.

Page 25

THE COURT:  Okay.

UNIDENTIFIED SPEAKER:  Judge, I don't think we're going to need a whole day.  I think half --

THE COURT:  Yes, we do.

UNIDENTIFIED SPEAKER:  Okay.

THE COURT:  I've never had a situation where someone said a half day, and it actually took a half day.

UNIDENTIFIED SPEAKER:  I understand.

THE CLERK:  Twenty --

THE COURT:  How about next Monday, the 3rd?

UNIDENTIFIED SPEAKER:  Your Honor, I'm out-of-town --

THE COURT:  Who is that?

UNIDENTIFIED SPEAKER:  -- I'll be in Philly for -- this is Mr. Winderman again.

THE COURT:  Thank you.

UNIDENTIFIED SPEAKER:  Judge, I'm sorry, Monday my son is being operated on, and --

THE COURT:  Oh, I'm sorry to hear that.

UNIDENTIFIED SPEAKER:  -- I have to be with him. I can't do that.

THE COURT:  I'm very sorry to hear that.  I hope it turns out okay.

UNIDENTIFIED SPEAKER:  Thank you, your Honor.

THE COURT:  Do we --

Page 26

UNIDENTIFIED SPEAKER:  Judge, we could go back, like we used to do with Judge Paskay, and meet on Saturdays --

THE COURT:  No --

UNIDENTIFIED SPEAKER:  -- I'm just kidding.

THE COURT:  Yeah, yeah, I'm not doing that, and you know that was all about encouraging settlement.  All right.  So the -- I love Judge Paskay, I have to admit.

The 6th, did we nix the 6th.  That's a Thursday, next week.  No, I can't do the 6th, I'm sorry, darn.  And we've already nixed the 7th, correct?

UNIDENTIFIED SPEAKER:  And the 10th.

THE COURT:  And the 10th.  And I have Chapter 13's on the 11th and a calendar on the 12th and can't do that Thursday.  This is terrible.

Ms. Leonard, when is the next thing we have? We're getting into late November.

THE CLERK:  Yeah.  Then we'll be looking at -- did we say November 18th was not good or the 21st?

THE COURT:  There was the 18th.

The 21st?

UNIDENTIFIED SPEAKER:  Judge, I'm out Thanksgiving week.

THE COURT:  That's Thanksgiving week.  Indeed it is.  Now, we're going after Thanksgiving, the 28th.

UNIDENTIFIED SPEAKER:  I'm available.

THE COURT:  Ah, that's nice.  Anything else?  I mean, this is forever in the bankruptcy world.

MR. SHRAIBERG:  I thought bankruptcies were down.

THE COURT:  Yeah, well, I mean, I have all these litigious people.

The 28th of November at 9:30.  I'll do a notice. It will have the exchange of exhibits, et cetera, that you're all used to, electronic documents.  I apologize that it's going to take so long to get there, but people have conflicts.

All right.  So that was the motion for turnover, 114, in the main case.

Do I need to address anything there before I head over to the adversary?

(No audible response.)

THE COURT:  All righty.  So we have a continued hearing on ECF 31 in the adversary.  This is the motion with regard to some funds that at one point had been held in an attorney trust fund.

I made the mistake of asking for additional briefing on what I thought was the suggestion that there was an oral escrow agreement, and as I remember, I think this is a quote, "I'll give you the opportunity to show me case law in which there is an oral agreement, which was enforced as

an escrow agreement for the purpose of removing property of the estate," end quote.  And then I got a supplemental memo at ECF 50 and a response at ECF 65, which were only partly about that.

In the original motion, in paragraphs 5 through 7, and that is the motion at ECF 31, it argues that the agreement is, and this is a quote from paragraph 6, "The parties and their attorneys agree that the entirety of the Jeep proceeds would be held in the trust account of Farrow Law, P.A., the debtor's state court counsel."  That's really what I was focusing on.

Let me address, just very briefly, because I do not want to hear extensive argument on this, there's an argument in the supplemental memo that Florida Bar Rule 5-1.1, which is the trust provision, gives rise to an actual trust, and, therefore, could be the basis of a claim. There is no law to support that.  There are actually multiple appeals court decisions in Florida, one of which is in the 4th D.C.A. and specifically addresses that rule, that there is no private right of action as a result of that provision.  It does not create a trust that is enforceable under state law.  That is solely for purposes of matters of the Florida Bar and not lawsuits between parties.  That cannot be the basis of an escrow.

And so, as far as I know, the only potential basis

of an escrow, which both of you have correctly pointed out needs to involve both an agreement of the effected parties and an agreement with the person holding the money, which can be two or one agreement.  The only basis is the alleged agreement between the parties and counsel, and so it seems to me that there's a specific dispute on that.  I have an allegation in the motion that says, we all agree, and then I have a response that says, not only was there not an agreement, they didn't even know about the fact that the funds were being held by the lawyer until they discovered that fact in discovery.

So why do I not need to have evidence on whether or not there was, in fact, an agreement?

Who wants to start, Mr. Softness?

MR. SOFTNESS:  Judge, my role is going to be hold Mr. Breslin's coat for this argument?

THE COURT:  Okay.  Mr. Breslin, Mr. Softness has your coat.

MR. BRESLIN:  Well, Judge, you know, I endeavored to bring to your Honor's attention the law that I thought was relevant, and I think that to the extent that your Honor needs to hear evidence whether or not there was an agreement, then absolutely.

THE COURT:  The law --

MR. BRESLIN:  I --

Page 30

THE COURT:  -- I don't think we have any dispute on the law.

I think the question is, is there an escrow agreement?

MR. BRESLIN:  Right.

THE COURT:  And a lawyer accepting something from a client with documentation between the lawyer and a client does not create an escrow agreement on behalf of a party that doesn't know it exists, so -- and that's your argument. Your argument was, the parties and their attorneys agreed that the entirety of the Jeep proceeds would be held in trust.  How did they agree?  It's not in writing, apparently, because I would have it.  So is it --

MR. BRESLIN:  Well, then why --

THE COURT:  -- correspondence?  Is it telephone calls?  What is it?

MR. BRESLIN:  Well, it's -- Judge, I submit that it's the -- A, it's the agreement that I had with Mr. Dilley.  B, it's the --

THE COURT:  Okay.  Stop --

MR. BRESLIN:  -- documents themselves.

THE COURT:  -- stop --

MR. BRESLIN:  Why --

THE COURT:  -- how did you reach that agreement with him?

MR. BRESLIN:  On the telephone.

THE COURT:  Okay.  So you're saying it was an agreement made over the phone.

And is he on the line today?

Apparently not.  He was here at the last hearing.

So they're apparently saying there is no such agreement, I guess.  Although there is that one email you point to, which was recent, that seems to suggest there might have been an agreement.

So don't I need to have somebody testify on this?

Also nobody actually provided me with case law about whether the escrow agreement can be entirely oral.  So I will glad to have an evidentiary hearing on the issue, and you just heard when all the dates are, and it's all the same people.  So it looks like we're going into sometime in late November or December.  Glad to address it.

UNIDENTIFIED SPEAKER:  There were some dates that -- earlier on that we could use, because I don't think Mr. Winderman has to be involved in this.

THE COURT:  All right.  Is Mr. Winderman still on?

UNIDENTIFIED SPEAKER:  At least one date.

THE COURT:  Okay.  What was the one date that Mr. Winderman nixed --

UNIDENTIFIED SPEAKER:  I didn't write it down, Judge.

Page 32

THE COURT:  -- that everybody else was okay with.

Ms. Leonard, do you happen to remember that?  It was a Friday.

THE CLERK:  Was it the 7th?

THE COURT:  The 7th?

Yes, Mr. Miller.

MR. MILLER:  Thank you, your Honor.

I think you initially asked Mr. Breslin why we would need an evidentiary hearing, and his point is he would like to have an evidentiary hearing because you offered it, not that he would offer up anything different than what he's argued.  But you said --

THE COURT:  Well, hold on.  He would actually have to testify, since --

MR. MILLER:  Right, and --

THE COURT:  -- he was the person that was on the phone, which means Mr. Softness will be running the hearing for that client, and his statement is not testimony.

MR. MILLER:  And my whole point is this; you said that there could be a slight argument based upon an email between Mr. Breslin and counsel.  That email is not with the attorney who had the money in trust.  The attorney who had the money in trust was Jay Farrow at Jay Farrow, P.A.

THE COURT:  Yes.

MR. MILLER:  Mr. Breslin (audio cuts out) argue in

his pleadings that Mr. Farrow had such an agreement with him. There's nothing attached to it, and as you said, there's two-step process, both the parties had to agree to it, and the person who's holding the proceeds had to agree to it. Mr. Breslin hasn't argued that. He hasn't argued that there was an agreement between the parties either. He just argues there was an attorney agreement, according to him, between him and opposing counsel, which I'm assuming is Will Dilley, who is the attorney identified in the email.

So I don't see the necessity of an evidentiary hearing when he can't even argue in good faith that there was an agreement between him and Mr. Farrow, A. And, B, he can't make a proffer that there was an agreement between the parties, because there's no argument to that effect in their pleadings that there was such an agreement between the parties themselves.

UNIDENTIFIED SPEAKER: Judge --

THE COURT: Wouldn't an agreement between counsel for the parties amount to an agreement between the parties, Mr. Miller?

UNIDENTIFIED SPEAKER: Yes.

MR. MILLER: I --

THE COURT: Yes. All right. That's great. So I think we're done with that objection to having an evidentiary hearing.

Page 34

Now we're getting down to scheduling.  And, Ms. Leonard, let's just run through the dates again.

THE CLERK:  Okay.  So we have October the 7th.

THE COURT:  Objections?

UNIDENTIFIED SPEAKER:  We're in mediation.

THE COURT:  That's right.  Sorry.

THE CLERK:  That's right.

Okay.  October 25th.

THE COURT:  Twenty-fifth.

UNIDENTIFIED SPEAKER:  That works --

UNIDENTIFIED SPEAKER:  That works for us.

UNIDENTIFIED SPEAKER:  -- that works for me, Judge.

MR. MILLER:  I have an evidentiary hearing before Judge Isicoff.

THE COURT:  No.  Miller says no.

Next.

THE CLERK:  Isicoff, right.

October 28th?

THE COURT:  Twenty-eighth.

UNIDENTIFIED SPEAKER:  No.

UNIDENTIFIED SPEAKER:  Yes.

THE COURT:  Okay.  Who said no?

MR. WINDERMAN:  I did, your Honor.  This is Mr. Winderman again, and I believe you're right, I don't

Page 35

think I need to participate in that hearing.

THE COURT:  I'm not sure how you would get to participate, since you're not a party to the adversary.

UNIDENTIFIED SPEAKER:  (Laughing.)

THE COURT:  But --

MR. WINDERMAN:  I'm about to file a motion --

THE COURT:  -- is there a new client, Mr. Winderman, that we haven't heard about?

MR. WINDERMAN:  No, your Honor.  I'm about to file a motion to intervene in the adversary on behalf of Karma of Palm Beach.

THE COURT:  I haven't granted that yet --

MR. WINDERMAN:  And it's yet to be filed --

THE COURT:  -- nor have I seen it, so --

MR. WINDERMAN:  -- and you're right.  But I just wanted to give the Court the idea that I do -- I will have standing at some point, but I don't have any objection, so it doesn't matter.

THE COURT:  Good.  Excellent.

Then was that the 28th?

THE CLERK:  Yes.

UNIDENTIFIED SPEAKER:  Yes, your Honor.

THE COURT:  At 9:30, I'll do an order.  It will have the usual exchange of exhibits, et cetera.

All righty.  I think we're done with these cases.

Page 36

UNIDENTIFIED SPEAKER:  (Inaudible.)

THE COURT:  Please remember that evidentiary matters are in person only.  Okay.  Very good.

UNIDENTIFIED SPEAKER:  The end of an era.

THE COURT:  If you want to watch and not speak, you may do that by video.

All right.  Let's move on to another case.  Thank you all.  Good afternoon.

MR. SHRAIBERG:  Thank you, your Honor.

UNIDENTIFIED SPEAKER:  Thank you, Judge.

(Whereupon, the hearing was concluded.)

CERTIFICATION

STATE OF FLORIDA                    :

COUNTY OF PALM BEACH                :


        I, Anna M. Meagher, Stenographic Reporter, do hereby certify that the foregoing proceedings were transcribed by me from a digital recording held on the date and from the place as stated in the caption hereto on page 1 to the best of my ability.

        WITNESS my hand this 17th day of October 2022.



                    _____
                           Anna M. Meagher
                        Stenographic Reporter