**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**PALM BEACH DIVISION**
www.flsb.uscourts.gov

In Re:

AUTO WHOLESALE OF BOCA, LLC,        Case No.: 22-15627-EPK

      Debtor.

_____/

FVP OPPORTUNITY FUND III, LP;  FVP
INVESTMENTS, LLC; and FVP SERVICING,
LLC,

      Adversary Plaintiffs,

vs.                                      Adversary Case No.: 22-01218-EPK

AUTO WHOLESALE OF BOCA, LLC; HI
BAR CAPITAL, LLC; WING LAKE
PARTNERS f/k/a FRANKLIN CAPITAL
GROUP, LLC; KARMA OF PALM BEACH,
INC.; KARMA OF BROWARD, INC.;
EXCELL AUTO SPORT AND SERVICE, INC.;
CHAPTER 7 TRUSTEE FOR THE ESTATE OF
EXCELL AUTO GROUP, INC., and EDWARD
BROWN,

      Adversary Defendants, Adversary
      Plaintiffs, Cross Plaintiffs, and
      Cross Defendants.

_____/

KARMA OF PALM BEACH, INC.; a Florida
Corporation; KARMA OF BROWARD, INC., a
Florida Corporation,

      Adversary Plaintiffs,

 vs.

AUTO WHOLESALE OF BOCA, LLC; FVP
OPPORTUNITY FUND III, LP; FVP
INVESTMENTS, LLC; FVP SERVICING,
LLC; WING LAKE PARTNERS f/k/a

FRANKLIN CAPITAL GROUP, LLC; KARMA OF PALM BEACH, INC.; KARMA OF BROWARD, INC.; EXCELL AUTO SPORT AND SERVICE, INC; CHAPTER 7 TRUSTEE FOR THE ESTATE OF EXCELL AUTO GROUP, INC., and EDWARD BROWN

> Adversary Defendants, Adversary Plaintiffs, Cross Plaintiffs, and Cross Defendants.

_____/

WING LAKE PARTNERS f/k/a FRANKLIN CAPITAL GROUP, LLC, a Delaware limited liability company,

> Adversary Plaintiff,

vs.

AUTO WHOLESALE OF BOCA, LLC; FVP OPPORTUNITY FUND III, LP; FVP INVESTMENTS, LLC; FVP SERVICING, LLC; HI BAR CAPITAL, LLC; KARMA OF PALM BEACH, INC.; KARMA OF BROWARD, INC.; EXCELL AUTO SPORT AND SERVICE, INC.; CHAPTER 7 TRUSTEE FOR THE ESTATE OF EXCELL AUTO GROUP, INC., and EDWARD BROWN EDWARD BROWN,

> Adversary Defendants, Adversary Plaintiffs, Cross Plaintiffs, and Cross Defendants.

_____/

**THE FVP, KARMA ENTITIES AND WING LAKE'S
JOINT ADVERSARY COMPLAINT
TO DETERMINE OWNERSHIP OF PROPERTY IN THE POSSESSION
OF THE DEBTOR IN PART I,
AND, IF NECESSARY,
PART II, THE VALIDITY AND EXTENT
OF LIENS HELD BY THE PARTIES IN ANY PROPERTY OWNED BY THE DEBTOR**

COME NOW various parties, FVP Opportunity Fund III, LP, a Delaware limited partnership (the "FVP Fund"), FVP Investments LLC, a Delaware limited liability company ("FVP Investments"), FVP Servicing, LLC, a Delaware limited liability company ("FVP Servicing"),

(collectively, the FVP Fund, FVP Investments and FVP Servicing are "FVP"); Wing Lake Partners f/k/a Franklin Capital Group, LLC, a Delaware limited liability company ("Wing Lake"); Karma of Palm Beach, Inc., a Florida corporation; Karma of Broward, Inc., a Florida corporation, (collectively, Karma of Palm Beach, Inc. and Karma of Broward, Inc. are the "Karma Entities") (collectively, FVP, Wing Lake and the Karma Entities are the "Plaintiff Parties"), and hereby sue the Debtor, Auto Wholesale of Boca, LLC, a Florida limited liability company ("AWB"); Hi Bar Capital, LLC, a New York limited liability company ("Hi Bar"); Excell Auto Sport And Service, Inc. ("Excell Service"); Edward Brown, an individual ("Brown"), and Nicole Testa Mehdipour, Chapter 7 trustee (the "Excell Trustee") for the estate of the Chapter 7 Debtor Excell Auto Group, Inc. ("Excell," "Excell Auto" or "Excell Auto Group"), in Case No.: 22-12790-EPK, as common Defendants in all counts pled herein, and further the Plaintiff Parties each bring claims, each against the other, regarding the ownership of the vehicles in the possession of AWB, as well as the priority of security interests of each party in any vehicles that are determined to be owned by AWB.

## INTRODUCTION TO THE RELIEF REQUESTED

### THE PLAINTIFF PARTIES JOINDER IN PART I ONLY, AND, THE PLAINTIFF PARTIES RESERVATION OF RIGHTS AS TO ANY CLAIMS OTHER THAN CLAIMS AS TO THE DISPUTED VEHICLES

### PART I

The Plaintiff Parties have agreed, and hereby plead, that it is the purpose and intent of this joint pleading to streamline the claims of each of the parties in a bifurcated adversary trial. The first proceeding, referred to herein as Part I, shall comprise an adversary trial as it relates to Count I, Declaratory Relief (the "Declaratory Relief Action"). Count I seeks that this Honorable Court determine in a non-jury adversary trial the ownership of the vehicles both in the possession of Debtor AWB, and those claimed to be unlawfully taken and converted by the Debtor AWB (defined below, the "Disputed Vehicles"). As pled herein, at the conclusion of the adversary trial on the Declaratory Relief Action in Part I, Count I, the Plaintiff Parties seek that the Court determine ownership of the Disputed Vehicles in one of three categories.

1. That the Debtor owns some or all of the Disputed Vehicles. This is the position advocated by Debtor AWB.

2.  That the Karma Entities owns some or all of the Disputed Vehicles. This is the position advocated by the FVP, Hi Bar and the Karma Entities.

3.  That Excell Auto Group owns some or all of the Disputed Vehicles. This is the position advocated Wing Lake.

If, at the conclusion of the Declaratory Relief Action, in Part I, Count I, this Court determines that Karma Entities owns some, or all, of the Disputed Vehicles, then those vehicles will be removed from this Bankruptcy action with the parties free to litigate their claims as to those vehicles in the current pending state court action, Case No. CACE 22005125, pending in the Circuit Court of Broward County, Florida. ("State Court Action"), or another appropriate forum. The FVP, Wing Lake and Karma Entities Plaintiffs have stipulated and agreed that in the event that this Court determines that parties other than the Debtor own some, or all, of the Disputed Vehicles, then the FVP, Wing Lake and Karma Entities Plaintiffs are free to raise any and all claims regarding security interests and the priority thereof in said vehicles in as appropriate forum.

If at the conclusion of the Declaratory Relief Action, in Part I, Count I, this Court determines that Excell Auto Group owns some, or all, of the Disputed Vehicles, then those vehicles will be removed from this Bankruptcy action to the pending Excell Bankruptcy with the parties free to litigate their claims as to those vehicles in that Bankruptcy Court case, or another appropriate forum.

If at the conclusion of the Declaratory Relief Action, in Part I, Count I, this Court determines that Debtor AWB owns some, or all, of the Disputed Vehicles, then any such vehicles determined to be owned by the Debtor will then be subject to the claims of the Parties in Part II of this Adversary Action, as to both the vesting and priority of the Parties conflicting claims as to security interests in the Disputed Vehicles.

## PART II
### JOINED OR SEPARATE CLAIMS BROUGHT BY THE VARIOUS PLAINTIFF PARTIES

The litigation of the Plaintiff Parties' conflicting claims, each against the other, as to priority of security interests in the Disputed Vehicles, if necessary, will be addressed in Part II of the Adversary Proceedings. Each of the Plaintiff Parties in Part II will each bring their claims, either jointly or separately as chosen by the individual Plaintiff Party, against each other as it

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
FVP, Wing Lake and Karma Entities Joint Adversary Complaint

relates to the Plaintiff Parties priority of claims against any of the Disputed Vehicles that are deemed to be owned by the Debtor and remain in the Bankruptcy Estate at the conclusion of the Part I proceedings.

No Plaintiff Parties are bound by any facts pled in this Joint Complaint as it relates to Part I, or as to any claims or defenses raised, or to be raised, by any of the Plaintiff Parties in Part II unless expressly adopted by the Plaintiff Party.

The Plaintiff Parties expressly reserve the right to bring any claims against any persons or entities, including the Plaintiff Parties, unrelated to the priority of lien claims raised, or to be raised, in this Adversary Proceeding.  Further, no facts set forth herein shall be binding on, or have any legal effect on the ownership of the vehicles by nonparties to this litigation.

**NOTHING IN THIS JOINT PLEADING AS TO PART I, IS INTENDED TO CONSENT TO, OR WAIVE, ANY RIGHTS, DEFENSES OR OBJECTIONS, INCLUDING, WITHOUT LIMITATION, JURISDICTION OR THE RIGHT TO TRIAL BY JURY AS TO ANY OF THE CLAIMS RAISED BY THE PLAINTIFF PARTIES NAMED IN PART I, EACH AGAINST THE OTHER, OR THE RIGHT TO AMEND OR BRING OTHER CLAIMS IN ANY COURT OF COMPETENT JURISDICTION OR COUNTERCLAIMS OR CROSS CLAIMS, ALL OF WHICH ARE EXPRESSLY RESERVED.**

## PARTIES

1.    At all times material hereto, Plaintiff the FVP Fund was and is a Delaware limited partnership with its principal place of business in New York County, New York.

2.    At all times material hereto, Plaintiff FVP Investments was and is a Delaware limited liability company with its principal place of business in New York County, New York.

3.    At all times material hereto, Plaintiff FVP Servicing was and is a Delaware limited liability company with its principal place of business in New York County, New York.

4.    Wing Lake Partners f/k/a Franklin Capital Group, LLC is a Delaware limited liability company that maintains its principal place of business in Oakland County, Michigan.

5.    At all times material hereto, Plaintiff, KARMA OF PALM BEACH, INC., was and is a Florida corporation with its principal place of business in Palm Beach County, Florida.

6.    At all times material hereto, Plaintiff, KARMA OF BROWARD, INC., was and is a Florida corporation with its principal place of business in Broward County, Florida. Karma of Palm Beach, Inc.  and Karma of Broward, Inc. are hereinafter referred to collectively as the "Karma

Entities").

Collectively the "Plaintiff Parties"

7.      At all times material hereto, Defendant Auto Wholesale of Boca, LLC, the Debtor, was and is a Florida limited liability company with its principal place of business in Palm Beach County, Florida, and doing business in Broward County, Florida and Palm Beach County, Florida, and is otherwise *sui juris.*

8.      At all times material hereto, Hi Bar was and is a New York limited liability company with its principal place of business in New York County, New York.

9.      At all times material hereto, Defendant Edward Brown, was and is an individual who resides in Palm Beach County, Florida and is and is otherwise *sui juris.*

10.     Excell Auto Sport And Service, Inc., ("Excell Service") is a Florida corporation currently in possession, or constructive possession, of two of the Disputed Vehicles.

11.     Non Party, Excell Auto Group, Inc., ("Excell") is a Florida corporation currently a debtor in Chapter 7 Bankruptcy and is named for informational purposes only.

12.     Nicole Testa Mehdipour, Chapter 7 trustee (the "Excell Trustee") for the estate  of Excell Auto Group, Inc., in Case No.: 22-12790-EPK in this District.

## JURISDICTION AND VENUE

13.     On July 22, 2020 (the "Petition Date"), The Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida, bearing case number 22-15627-EPK.

14.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, 1652 and 2201; Fed. R. Civ. P. 57; and B.R. 7001(1)-(2), (7) and (9),

15.     This action is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), (K) and (O).

16.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408-09.

17.     The Plaintiff Parties are represented by counsel as reflected in the signature pages below and each has agreed to pay their respective counsel a reasonable fee for their services.

18.     All conditions precedent to this action have been performed, have occurred or have

been waived.

## ALLEGATIONS COMMON TO ALL COUNTS IN PART I,
## COMPLAINT FOR DECLARATORY RELIEF

### THE DISPUTED VEHICLES

19.     The Debtor claims it is the owner of the following vehicles:

a.     Seventeen (17) high-end automobiles as described in Debtors Form 206A/B Schedule as assets at Part 8. (the original nineteen (19) filed at Case 22-15627-EPK Doc 65 Filed 08/09/22 Page 5, and 6 of 21 – **Exhibit A** - minus the 2020 Lamborghini Urus Vin# 6529, and 2020 Ferrari Superfast Vin# 4963 which have been returned to their rightful owners), and more specifically defined as:

Vehicle No:

1. 2017 Ferrari F12 Berlinetta, VIN# ZFF74UFA7H0221036

2. 2019 Aston Martin DB11 Volante VIN# SCFRMFCW6KGM07671

3. 2020 Mercedes G63 VIN# W1NYC7HJ6LX346462

4. 2019 BMW X7 VIN# 5UXCX4C56KLS39222

5. 2019 GMC Yukon VIN#  1GKS1CKJ8KR354378

6. 2018 MClaren 720S VIN# SBM14DCA9JW000606

7. 2021 Mercedes G Wagon VIN# W1NVC7HJ0MX390328

8. 2020 Mercedes G63 VIN# W1NYC7HJ6LX362080

9. 2008 Porsche 911 VIN# WP0AD29978S783176

10. 2020 MClaren 720S VIN# SBM14FCASLW004229

11. 2019 Lamborghini Urus VIN# ZPBUA1ZLXKLA01961

12. 2018 Cadillac Escalade VIN# 1GYS4BKJXJR261612

13. 2013 Ferrari 458 Italia VIN#ZFF68NHA8D0191526

14. 12021 Jeep Gladiator VIN# 1C6HJTAG1ML571540

15. 2020 Lamborghini Huracan VIN# ZHWUT4ZF1LLA14316

16. 2019 MClaren 720S VIN# SBM14FCA9KW003714

17. 2020 Mercedes G Class VIN# WDCYC7HJ9LX334940

b.      (Vehicle 18) 2016 Ford Rhino, VIN # 1FDUF4HT2GEB79768, which is currently in the possession of Nicole Testa Mehdipour, Chapter 7 trustee for the estate  of Excell Auto Group, Inc., in Case No.: 22-12790-EPK.

c.      (Vehicle 19) 2018 McLaren 720s Black, VIN # SBM14DCA7JW001804, which is currently in the possession of Adversary Defendant Excell Service, either actually or constructively. Parts of Vehicle 19 are located at the business location of the Defendant in Broward County, Florida with parts at a location in the state of North Carolina.

d.      (Vehicle 20) 2007 Lamborghini Gallardo 2DR Convertible, Blue, VIN# ZHWGU22T67LA04210 which is currently in the possession of Adversary Defendant Excell Service, in Broward County, Florida.

e.      (Vehicle 21) 2015 Maclaren 650 S Convertible, VIN: SBM11FAA4FW003654, located at the Karma of Broward facility in Fort Lauderdale, Fl.

f.      (Vehicle 22) 2017 Lamborghini Huracan Red, VIN, ZHWUR2ZF8HLA08121 located at the Karma of Broward facility in Fort Lauderdale, Fl.

g.      (Vehicle 23) 2021 Rolls Royce Cullinan White, VIN # SLATV8C09MU20497, which is currently in the possession of Edward Brown and located in Palm Beach County, Florida or some other location unknown to the Plaintiff Parties.

h.      (Vehicle 24) Lamborghini Urus White, VIN # ZPBUA1ZL1MLA12270, which is currently in the possession of Edward Brown and located in Palm Beach County, Florida or some other location unknown to the Plaintiff Parties.

i.      (Vehicle 25) 2021 Ferrari SF 90 VIN # ZFF95NLA7M0265077, which is currently in the possession of Edward Brown and located in Palm Beach County, Florida or some other location unknown to the Plaintiff Parties

j.      (Vehicle 26) 2021 Ferrari Roma, VIN # ZFF98RNA3M0263662, which is currently in the possession of Edward Brown and located in Palm Beach County, Florida

or some other location unknown to the Plaintiff Parties.

k.      (Vehicle 27 – Funds Only) 2021 Jeep Gladiator Black, VIN # 1C6HJJAG0ML564806, which came into the possession of the Debtor, and was sold on April 14, 2022, by the Debtor for $130,000. **Exhibit T.** The funds were formerly held in the trust account of Jay Farrow, Esq., and now are in the account of the Debtor.

Hereinafter, the "Disputed Vehicles", (which shall include the funds from Vehicle 27 currently held by the Debtor).

20.     The Plaintiff Parties deny that the Debtor has any bona fide legal or beneficial ownership interest in the Vehicles. The Plaintiff Parties assert that, at most, the Debtor holds bare legal title to the same, and even if the Debtor holds an interest in the Vehicles beyond naked legal title, that interest is subject and subordinate to separate, perfected security interests in the Vehicles of the Plaintiff Parties.

21.     The Plaintiff Parties have not entered into any business transaction with the Debtor, (save, as to the FVP Plaintiffs, the Landlord Waiver executed by the Debtor's principal). The Plaintiff Parties have not executed a release, partial or otherwise, with respect to the Disputed Vehicles in favor of the Debtor.

22.     The Plaintiff Parties by this adversary action in Part I, intend to establish that the Debtor holds no interest in the Vehicles recognized by 11 U.S.C. Section 541(a)(1) and that the Disputed Vehicles are owned by either the Karma Entities or Excell Auto Group.

23.     In the event that the Court determines in Part I of this adversary action that the Debtor holds an interest recognized by 11 U.S.C. Section 541(a)(1) as to the Disputed Vehicles, then in Part II of the adversary proceedings as pled in this joint pleading, the Plaintiff Parties will seek a finding that the Debtor's interest is subject and inferior to the security interests of the Plaintiff Parties because, among other reasons, the Debtor was not a "buyer in the ordinary course of business" as required by Sections 679.320 and 671.201(9), Florida Statutes.

## THE FVP SECURITY INTERESTS

24.     On or about January 26, 2022, the FVP Plaintiffs entered into loan and security agreements with Karma of Palm Beach, Inc. and Karma of Broward, Inc. (collectively, the "Karma Entities"), along with their principals Scott Zankl and Kristen Zankl (the "Zankl's"). The executed

and operative transactional documents include the following documents incorporated herein, respectively as the following exhibit letters:

     a.  **Exhibit B.** "Loan Agreement" by and between the Karma Entities and Zankl's and FVP Servicing, as administrative agent.

     b.  **Exhibit C**. Promissory Note by the Karma Entities in favor of FVP Investments, LLC, as Noteholder - *$3,000,000.00*.

     c.  **Exhibit D**. Promissory Note by the Karma Entities in favor of the FVP Fund, as Noteholder - *$4,500,000.00*.

     d.  **Exhibit E**. Personal Guaranty of Scott Zankl and Kristen Zankl (each a "Guarantor" and, together, "Guarantors") in favor of Agent and the Lenders.

     e.  **Exhibit F**. Security Agreement by and between the Karma Entities and FVP Servicing, as administrative agent, which among other things, granted the FVP Entities a security interest in "inventory, now or thereafter existing."

     f.  **Exhibit G**. Collateral Pledge Agreement by and between the Karma Entities and FVP Servicing, as administrative agent.

     g.  **Exhibit H**. UCC Financing Statement with FVP Servicing, as administrative agent, as the secured party and the Karma Entities as the debtors covering "All Assets."

     h.  **Exhibit I**. Landlord Waiver and Consent.[1]

25.    The Karma Entities defaulted on Loan and Security Agreements and the FVP Plaintiffs declared all sums due, FVP Servicing, a copy of which is attached hereto as **Exhibit J**, and the FVP Plaintiffs instituted the Pending State Action.

26.    The Karma Entities owe Plaintiff FVP Investments unpaid principal plus default interest at the rate defined in the FVP Investments Note, plus any advances made by Plaintiff FVP Investments against the FVP Investments Note, along with all associated fees and penalties are in excess of $7.5 million, with the more precise amount that will be proved at trial.

27.    "Inventory" pledged to the FVP Plaintiffs includes the Disputed Vehicles.

---

[1] The "Landlord" who acknowledged and recognized the FVP Plaintiffs' collateral, now wrongfully taken by the Debtor as pled in this Complaint, is ultimately owned by Moshe Farache, an owner of the Debtor.

28.     The amounts due the FVP Plaintiffs far exceed the value of the Disputed Vehicles.

29.     On or about April 1, 2022, upon information and belief because of threats of violence to Scott Zankl, Kristen Zankl signed a letter, a copy of which is attached hereto as **Exhibit K,** purportedly granting Mr. Moshe Farache or the Debtor an interest in certain described cars, which appears to include some of the Disputed Vehicles.

## THE PURPORTED SECURITY INTERESTS OF HI BAR

30.     On or about October 27, 2021, Hi Bar and the Karma Entities, executed a Revenue Purchase Agreement (the "Purchase Agreement"), a true copy of which is attached hereto as **Exhibit L**.

31.     In the Purchase Agreement, the Karma Entities purported to grant Hi Bar a security interest in assets of the Karma Entities, including "inventory," "now or hereafter owned or acquired."

32.     On December 19, 2021, the Karma Entities, among others, executed a settlement agreement with Hi Bar (the "Settlement Agreement"), a true and accurate copy of which is attached hereto as **Exhibit M,** in which the document states on Page 1 that "on November 16, 2021, the Sellers [including the Karma Entities] defaulted on the Purchase Agreement." Paragraph 1.b. of the Settlement Agreement also purports to grant Hi Bar a security interest in assets of the Karma Entities, including "inventory," "now or hereafter owned or acquired."

33.     On January 25, 2022, a financing statement was filed by Hi Bar's legal representative with the Florida Secured Transaction Registry against the Karma Entities, File No.2021093624865, a certified copy of which is attached hereto as **Exhibit N**, covering among other things "inventory" "now owned or hereafter acquired."

34.     On January 28, 2022, Hi Bar filed suit against Karma Entities and other affiliates in the Supreme Court of New York, Kings County (the "New York Action") for breach of the Settlement Agreement.

35.     On February 1, 2022, Hi Bar and Karma Entities, among others, executed a Stipulation of Settlement, a copy of which is attached hereto as **Exhibit O.**

36.     As of April 28, 2022,  Hi Bar alleges to be owned owed the principal sum of

$2,500,000 pursuant to the Purchase Agreement, Settlement Agreement and Stipulation (collectively, the "Agreements"), plus $625,000 in attorneys' fees pursuant to the Stipulation for a subtotal of $3,125,000, as more fully pled in Part II below.

### THE WING LAKE SECURITY INTERESTS

37.     Non-party, Spin Capital, LLC ("Spin") is a New York limited liability company.

38.     Hi Bar is an affiliate of Spin.

39.     Hi Bar and Spin (together, the "MCA's") are merchant cash advance funding companies that operate throughout the United States.

40.     In November 2021, Excell obtained a loan from Franklin Capital Group, LLC, now known as Wing Lake, and granted Wing Lake, among other things, a security interest in its accounts receivable and those of its affiliates as collateral.

41.     Concurrently, Wing Lake purchased the obligations of Excell and its affiliates to Spin, including any security interests that they had granted to Spin in their accounts receivable, among other collateral, and the parties agreed that Spin would not enter into any other agreements with Excell or its affiliates or otherwise interfere with Wing Lake's collateral.

42.     In particular, on or about November 3, 2021, Excell executed and delivered to Wing Lake a Promissory Note evidencing a loan in the original principal amount of $6,000,000 ('the 'Note"). A copy of the Note is attached as **Exhibit U.**

43.     To further evidence the terms of the loan from Wing Lake, including all present and future loans and credit, Wing Lake and Excell executed a loan agreement dated November 3, 2021 (the "Loan Agreement"). A copy of the Loan Agreement is attached as **Exhibit V**.

44.     In executing the Loan Agreement, Excell represented and warranted to Wing Lake that it would not incur any debts beyond its ability to pay, that there were no other non-permitted security interests covering its assets, and that Excell would keep its assets unencumbered.

45.     As security for the loan, Excell and its affiliates, Karma of Palm Beach, Inc. ("Karma of Palm Beach") and Karma of Broward, Inc. ("Karma of Broward" and, together with Karma of Palm Beach, the "Karma Entities") executed and delivered to Wing Lake a Continuing Security Agreement dated November 3, 2021 (the "Security Agreement"), in which they granted

Wing Lake a security interest in substantially all of their assets (the "Wing Lake Collateral").  A copy of the Security Agreement is attached as **Exhibit W**.

46.     Wing Lake perfected its security interests by filing a UCC-1 financing statement with the State of Florida as to Excell on September 9, 2021, a UCC-1 financing statement with the State of Florida as to Karma of Palm Beach, Inc. on January 27, 2022, and a UCC-1 financing statement with the State of Florida as to Karma of Broward, Inc. on January 27, 2022 (collectively, "Financing Statements"). Copies of the Financing Statements are attached as **Composite Exhibit X**.

47.     Concurrently with the making of its loan to Excell, Wing Lake purchased from Spin, and Spin sold and assigned to Wing Lake, the obligations of Excell and its affiliates owing to Spin under an Assignment of Obligations and Merchant Documents agreement (the "Assignment Agreement"). A copy of the Assignment Agreement is attached as **Exhibit Y.**

48.     Under the Assignment Agreement, Spin assigned to Wing Lake all of its right, title, and interest under its agreements with Excell and its affiliates, "including any claims, rights or actions [Spin] may have (whether known or unknown to [Spin] as of the date hereof) against any third party arising in connection with, or otherwise related to, [its agreements with Spin] or the Obligations [then owing to Spin]."

49.     In addition, Wing Lake and Spin agreed that Wing Lake could file UCC-3 assignments assigning from Spin to Wing Lake all UCC-1 financing statements that Spin had filed.

50.     Thereafter, Wing Lake filed any necessary UCC-3 assignments, and it then held the most senior perfected security interest in the assets of Excell and its affiliates, including its accounts receivable.  Copies of these UCC-3 assignments are attached as **Composite Exhibit Z.**

51.     In executing the Assignment Agreement, Spin further acknowledged that Wing Lake is in the business of making secured commercial loans and agreed, inter alia: (a) not to purchase any portion of accounts, receipts or other obligations from Excell or the Karma Entities (together, the "Borrowers"), (b) not to take extend credit to or take a security interest in assets of the Borrowers, and (c) in the event Spin received payment from the Borrowers, the payment would be held in trust for the benefit to Wing Lake.  See Ex. Y, p. 2, ¶ 6.

### THE KARMA ENTITIES' ALLEGATIONS

52.     The Karma Entities claim ownership to all of the Disputed Vehicles.

53.     During the year of 2021, Farache created false paperwork to ostensibly show that after one of the Karma Entities purchased a vehicle, it would then purportedly be sold to Excell, which would then either the car on paperwork to the Debtor, or back to one of the Karma Entities, or from the Debtor to one of the Karma. Entities These transactions were without money representing the market value of the vehicles really being paid between any of the parties and were done at the request of Farache who apparently believed that these transactions would give the Debtor a basis to assert a security interest in the vehicle to make up for the Debtor's lack of a security agreement and financing statement from the Karma Entities.

54.     At no time in 2021 for the over one hundred fabricated transactions where the Debtor purports to acquire ownership in the Karma Entities' inventory, did the Debtor or Farache ever take possession of any of the vehicles. At all times the vehicles remained on the Karma Entities' lots until ultimate customers bought the vehicles by paying funds directly to the Karma Entities. In other words, the Karma Entities sold the vehicles to the end customer.

55.     Transactions in 2022 were no different. Farache with the forced acquiescence under duress of Scott Zankl and other Karma Entities employees created false paperwork to show ostensibly that after one of the Karma Entities purchased a vehicle from a third party, the vehicle would then be sold to Excell, which would then either transfer it to the Debtor, or back to one of the Karma Entities, or from the Debtor to one of those entities. The 2022 transactions were without objective market value being paid or adequate consideration being exchanged between any of the parties and when compared to the value of the vehicles ostensibly transacted. All the paper transactions were done at the demand of Farache who believed that these transactions would give his company, the Debtor, a legitimate claim to a security interest in the vehicles.

56.     All of the Disputed Vehicles were purchased by the Karma Entities. After the purchase by either of the Karma Entities, paperwork was created and exchanged at the request of the Debtor to ostensibly show that the Debtor was a purchaser for value. However, the applicable bank records and other documentary evidence reflect that the Debtor received millions of dollars from the Karma Entities when it should have been paying those sums if the created putative purchase and sale paperwork was in fact true.

57.     The reason for all of the above sham transactions and the participation of Scott

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
FVP, Wing Lake and Karma Entities Joint Adversary Complaint

Zankl in the false paperwork is that when Scott Zankl told Farache that he and Excell were having problems paying the money that Excell borrowed from the Debtor, Zankl was threatened by Farache who created an atmosphere of extreme duress and intimidation.

58.     Therefore, the Karma Entities assert that all of the Disputed Vehicles remain owned by the Karma Entities and at no time was the Debtor a legitimate buyer in the ordinary course of any of the Disputed Vehicles and therefore the Disputed Vehicles remain the property and inventory of the Karma Entities.

<u>The Edward Brown Vehicles</u>

59.     The Karma Entities assert that Defendant Edward Brown is a lender and investor in Excell Auto and the Karma Entities and has no other rights in the Disputed Vehicles.

60.     Brown was a very close friend of Scott Zankl and his wife Kristen prior to the events that occurred on April 1, 2022. On that date Moshe Farache and his agents unlawfully seized over 30 automobiles from the lots of Karma of Palm Beach and Karma of Broward (collectively, the "Karma Entities") which caused a cascade of actions and events that led to multiple litigations, this Bankruptcy, and this motion.

61.     In the years prior to the events surrounding April 1, 2022, Mr. Brown invested in, and loaned many millions of dollars to, companies owned by Mr. Zankl and his wife, including the Karma Entities.

62.     As part of the perquisites and privileges for his investment and loans, it was agreed that Brown could drive any of the vehicles that he desired on the Karma Entities' lots for as long as he wanted, and then simply return the cars and take another car of his choosing.

63.     In 2021 under this agreement, Brown took possession of the following vehicles:

   a.   (Vehicle 23): 2021 Rolls Royce Cullinan White, VIN # SLATV8C09MU20497, which is currently in the possession of Edward Brown.

   b.   (Vehicle 24): Lamborghini Urus White, VIN # ZPBUA1ZL1MLA12270, which is currently in the possession of Edward Brown.

   c.   (Vehicle 25): 2021 Ferrari SF 90 VIN # ZFF95NLA7M0265077, which is currently in the possession of Edward Brown.

d.   (Vehicle 26): 2021 Ferrari Roma, VIN # ZFF98RNA3M0263662, which is currently in the possession of Edward Brown.

(Collectively, the "Karma / Brown Vehicles").

64.     All of the Karma / Brown Vehicles that Brown took possession of were, and at all times remained, dealer inventory of the Karma Entities.

65.     Brown never purchased any of the Karma / Brown Vehicles. Indeed, Brown never paid sales tax for any of the Karma / Brown Vehicles.

66.     If Brown wanted a particular vehicle which was not on the lot of the Karma Entities, he would tell Scott Zankl to have one of the Karma Entities purchase it. If the Karma Entities did not have sufficient funds available at that time, then Brown would wire some or all of the amount needed to the Karma Entities for the Karma Entities to purchase the vehicle and place it in inventory.

67.     The particular vehicle purchased would be registered in "DealerTrack" as dealer inventory, the vehicle registered to one of the Karma Entities, dealer plates issued and Brown free to use the vehicle until such time as he no longer wanted to use it, or wanted a different car, at which time the car would be delivered to the lot and sold as inventory of one of the Karma Entities by the respective one of the Karma Entities. If Brown put up any money toward the purchase, that money would be refunded to him when the vehicle was sold.

68.     Brown and Scott Zankl, for the Karma Entities, followed this format and procedure for numerous vehicles over the years, and this was the arrangement for all of the Karma / Brown Vehicles.

69.     At all times, the Karma / Brown Vehicles remained titled to the Karma Entities, were assigned dealer plates and were insured by the Karma Entities and are owned by the Karma Entities and the Karma Entities ask the Court to declare all the Karma / Brown Vehicles to be owned by Karma Entities in Part I of this complaint.

## THE DEBTOR'S CONVERSION OF THE DISPUTED VEHICLES

70.     On or about April 1, 2022, the Plaintiff Parties learned that all of the vehicles on the Karma lots were removed from the Karma Entities' dealership lots and that the businesses were

closed.

71.    After repeated attempts to communicate with their borrowers went unanswered, the FVP Plaintiffs' representatives having observed their collateral automobiles were missing from the lots of both of the Karma Entities, the FVP Plaintiffs notified the Karma Entities of their default (**Exhibit J**). At the same time the FVP Plaintiffs retained a private investigator with federal law enforcement experience to attempt to determine what happened to the Karma Entities and the automobiles serving as collateral for the FVP Plaintiffs' loans to the Karma Entities.

72.    The FVP Plaintiffs learned through their private investigator that Moshe Farache, the Debtor's manager ("Farache") (and husband and father to the Debtor's other two owners, pursuant to the Debtor's Petition), had taken unlawful possession of the vehicles which included the Disputed Vehicles.

73.    The private investigator hired by the FVP Plaintiffs, coincidentally, was personally known to Scott Zankl and Kristen Zankl (the "Zankl's"). Scott Zankl gave several statements to this investigator regarding the events that occurred with Farache and the automobiles on or about April 1, 2022. Scott Zankl told the investigator:

   a.    That the Zankl's were indebted to Farache from past loans, which were years old.

   b.    That Farache had threatened the life of Scott Zankl.

   c.    That both Scott Zankl and Kristen Zankl were petrified of Farache.

   d.    That Farache appeared at the Karma of Palm Beach location on April 1, 2022 and demanded every car at the premises along with their titles and keys.

   e.    That in extreme fear for their lives, the Zankl's turned over all of the automobiles, keys and titles on the lot to Farache. Kristen Zankl signed a document produced by Farache, (**Exhibit K**), which on its face indicates that it is "collateral" for the money owed to Farache by the Zankl's.

   f.    That **Exhibit K** was signed under direct threat.

   g.    That the Zankl's considered that Farache stole automobiles by threat.

   h.    That  the Zankl's were initially afraid to report the matter to the police because

they feared Farache.

i.  That on April 8, 2022, the Zankl's reported to the police that Farache had, in fact, stolen the vehicles through extortion the week prior. *See Boca Raton Police Department – Report Case No.: 22-4685.*

74.     The Disputed Vehicles, among others, were those taken by Farache on or about April 1, 2022.  The Vehicles were wrongfully taken and converted by the Debtor against the superior interests in the property of the Plaintiff Parties. Additionally, some of the Disputed Vehicles were wrongfully taken from other locations.

75.     Employees or agents of the Debtor wrongly and fraudulently transferred titles to itself for the Vehicles without right or authority.

76.     At no time was the Debtor a buyer in the ordinary course as defined under UCC Article 9, Chapter 679, Florida Statutes.

77.     At most, the Debtor has naked possession and bare title to the Disputed Vehicles, and the Disputed Vehicles are subject to one or more perfected security interests at the time the Debtor wrongfully took possession of, and wrongfully transferred title of the Disputed Vehicles to itself.

78.     The FVP Plaintiffs filed suit against the Debtor as well as individual parties to their respective security agreements seeking, inter alia, replevin and foreclosure of their Liens in the Disputed Vehicles in the State Court Action.

79.     At the request of the FVP Plaintiffs, the State Court, on April 14, 2022, entered a freeze order prohibiting Debtor the Debtor from transferring the Vehicles.  (the "Freeze Order").

80.     Defendant  Hi Bar intervened in the earlier filed suit filed by the FVP Plaintiffs and consolidated claims against the Debtor with regard to the Disputed Vehicles.

81.     On May 25, 2022, the Circuit Court Judge issued its order to show cause in replevin and scheduled the hearing for July 7, 2022 together with the FVP Plaintiffs' motions for relief seeking appointment of a receiver and an injunction. **Exhibit P**.

82.     The Debtor's attorneys moved to vacate the freeze order, which the Circuit Court Judge denied and set a two-day evidentiary hearing on the Plaintiffs' Motions for the

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
FVP, Wing Lake and Karma Entities Joint Adversary Complaint

aforementioned relief for July 25, 2022 and July 26, 2022. **Exhibit Q**.

83.    The State Court Judge also set a contempt hearing for the morning of July 26, 2022 for Moshe Farache because of alleged intentional misrepresentations to the Circuit Court. **Exhibit R.**

84.    On the last business day before the hearing, the Debtor filed the instant Chapter 11 Bankruptcy.

85.    The Plaintiff Parties bring this action jointly for the specific relief requested herein but reserve all rights relative to any dispute between the Plaintiff Parties as to the existence of, or priority, between their respective claims to the Disputed Vehicles, should this Court determine that the Debtor is not the owner of the Disputed Vehicles to be determined in the Pending State Action.

86.    All conditions precedent to this action have occurred or been met.

## PART I

### COUNT ONE

### DECLARATORY ACTION TO DETERMINE OWNERSHIP OF THE DISPUTED VEHICLES

87.    The Plaintiff Parties repeat and reallege the allegations contained in paragraphs 1 through 85  as if fully set forth herein.

88.    This Count for Declaratory Relief is pursuant to B.R. 7001(9) can provide the same relief as is available to the Plaintiffs pursuant to B.R. 7001(1), (2) and (7), because the Rule provides that a declaratory judgment can include any of the relief available in any other type of adversary proceeding. It provides that an adversary proceeding includes "a proceeding to obtain a declaratory judgment relating to any of the foregoing," i.e., any of the adversary proceeding types delineated in B.R. 7001(1) through (8).

89.    The Plaintiff Parties seek a judicial determination and declaration of the ownership of the Vehicles for purposes of Section 541(a)(1) of the Bankruptcy Code.

90.    The Debtor has asserted before this Court in its sworn bankruptcy schedules and verbally at various hearings that it is the lawful owner of the Disputed Vehicles.

91.    The Plaintiff Parties reject those claims.

92.    No other person or entity affiliated with Moshe Farache, or the Debtor has any other

claim to the Disputed Vehicles other than the Debtor.

93.     The FVP and Karma Entities Plaintiffs contend that one of the Karma Entities beneficially and legally owns all of the Disputed Vehicles and that the Debtor holds no ownership in the Disputed Vehicles.

94.     The Wing Lake Plaintiff contends that Excell legally owns all of the Disputed Vehicles, and that the Debtor holds no ownership in the Disputed Vehicles.

95.     The Debtor contends that it is the owner of the Disputed Vehicles.

96.     All of the Plaintiff Parties aver that the Debtor has mere naked possession and naked title to the Disputed Vehicles and that the Debtor procured its possession through conversion, theft, actual or constructive fraud and/or duress.

97.     There is a bona fide, actual, present, practical need for the Court to issue a declaration regarding the ownership interests in the Disputed Vehicles.

98.     The Declaration deals with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.

99.     There is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

WHEREFORE, the Plaintiff Parties demand a declaratory judgment that:

a.   Declares the Debtor is not the lawful owner of, and does not hold any valid interest under Section 541(a)(1) in, some or all of the Disputed Vehicles.

b.   Declares that Karma of Broward, Inc, is the lawful owner of some or all of the Disputed Vehicles.

c.   Declares that Karma of Palm Beach, Inc, is the lawful owner of some or all of the Disputed Vehicles.

d.   Declares that Excell Auto Group, Inc., is the lawful owner of some or all of the Disputed Vehicles.

e.   Declares that as to any of the Disputed Vehicles that are determined by the Court to be owned by the Karma Entities at the conclusion of Part I, that the

Court determine whether the evidence presented establishes that the Wing Lake security interest arising from the UCC financing statement in the Excell Auto Group assets, or arises from funds received by the Excell Auto Group under the Wing Lake / Excell Auto Group loan facility, is sufficiently traceable to the purchase of the Disputed Vehicles to grant Wing Lake a perfected and enforceable security interest in any of the Disputed Vehicles.

And thereafter:

f.   As to any of the Disputed Vehicles that are declared to be owned by one of the Karma Entities, order those Vehicles to be released from the jurisdiction of the Bankruptcy Court to the joint custody of the FVP and Karma Entities Plaintiffs, and, as the case may be, Wing Lake if Wing Lake is determined to have an enforceable security interest in any of the Disputed Vehicles.

g.   As to any of the Disputed Vehicles that are declared to be owned by Excell Auto Group, Inc., order those Vehicles to be released from the jurisdiction of this Bankruptcy Court case to the custody of the Trustee in Bankruptcy Case No.: 22-12790-EPK.

h.   As to any of the Disputed Vehicles that are declared to be owned by the Debtor, order those Vehicles to remain subject to the jurisdiction of this Court and proceed to Part I, Count II, to determine the one or more of the Plaintiff Parties have an enforceable security interest in the Disputed Vehicles that exceeds the value of the Disputed Vehicles and that therefore Debtor has no voice in Part II of this Adversary Complaint; and thereafter to Part II of this Adversary Complaint.

## COUNT TWO

### DETERMINATION OF THE SUPERIORITY OF THE PLAINTIFF PARTIES' LIENS IN THE DISPUTED VEHICLES OVER THE CLAIMS OF THE DEBTOR WITHOUT DETERMINING PRIORITY

### ALL PLAINTIFF PARTIES VS. DEBTOR

100.   The Plaintiff Parties repeat and reallege the allegations contained in paragraphs 1 through 86 as if fully set forth herein.

101.    The Plaintiff Parties seek a determination in this count that one or more of the Plaintiff Parties have a superior claim to the Disputed Vehicles than that of the Debtor without considering any of the claims of the Plaintiff Parties each against the other to invalidate or subordinate any such interests.

102.    To the extent the Court determines the Debtor has an ownership interest in the Vehicles under Section 541(a)(1), the Plaintiff Parties seek a determination that (a) one or more of the Plaintiff Parties have a perfected security interest in the Disputed Vehicles owned by the Debtor; (b) the Debtor's interest is subject and subordinate to the respective valid, perfected security interests of one or more of the Plaintiff Parties, and (c) that the Debtor has no equity in the Disputed Vehicles because of the extent of one or more of the Plaintiff Parties respective Liens on the Vehicles consumes the entire value of the property.

103.    Bankruptcy Rule 7001(2) affords the Plaintiffs the right to bring an adversary proceeding for such a determination.

104.    One or more of the Plaintiff Parties claim superiority of interest against the Debtor in the Disputed Vehicles pursuant to their respective security agreements and UCC filings of record perfecting their respective Liens in the Vehicles, which was wrongfully converted by the Debtor.

105.    As mandated by Section 679.2011(1) of the Florida Statutes, "a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors."

106.    As secured parties, one or more of the Plaintiff Parties have the clear right to recover possession of their collateral upon default pursuant to their Security Agreements, Part 6 of Article 9 of the UCC (Sections 679.601 and 679.609 of the Florida Statutes), and Florida's Replevin law (Chapter 78 of the Florida Statutes).

107.    The security interests relative to any vehicle now owned by the Debtor that the Karma Parties acquired beginning upon the filing of the financing statements prevails over any claim of the Debtor to these Disputed Vehicles, unless the Debtor was a "buyer in the ordinary course of business" (a "BitOCoB") with respect to its acquisition of the vehicles. See § Section 679.320, Fla. Stat. This provision states:

> **679.320    Buyer of goods.**—
>
> (1)    Except as otherwise provided in subsection (5), a buyer in ordinary course of business, … takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence.

108.    Section 671.201(9) of the Florida Statutes defines a BitOCoB as follows, in relevant part:

> (9)    "Buyer in ordinary course of business" <u>means a person who, in ordinary course, buys goods in good faith</u>, without knowledge that the sale violates the rights of another person in the goods, from a person, other than a pawnbroker, <u>in the business of selling goods of that kind. A person buys goods in ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices</u>. …. A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit and may acquire goods or documents of title under a preexisting contract for sale. Only a buyer who takes possession of the goods or has a right to recover the goods from the seller under chapter 672 may be a buyer in ordinary course of business. "Buyer in ordinary course of business" <u>does not include a person who acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt.</u>

(Emphasis added).

109.    "Good faith" means honesty in fact and the observance of reasonable commercial standards of fair dealing." See § 679.1021(qq), Fla. Stat. It is no longer merely a subjective standard, as made clear in the Official Comment thereto.

110.    The Debtor is another car dealer licensed as such in Florida, and therefore is a "merchant" under the UCC.

111.    In contrast, the Debtor is not an ordinary customer who walks into a retail dealership to buy a car. Moreover, the conduct, documentation and financial dealings between the Debtor and the Karma Parties and their agents were anything but "ordinary course." The purported sales to the Debtor did not, as required by Section 671.201(9) of the Florida Statutes, "comport with the usual or customary practices in the kind of business in which [the Karma Parties are] engaged or with the seller's own usual or customary practices." The Karma Parties were not in the business of selling large numbers of their cars to a wholesaler.

112.    In all events, the principals of the Karma Parties, Scott Zankl and Kristen Zankl, and of the Debtor, Farache, engaged in a series of business transactions involving the exchange of hundreds of pages of documents, millions of dollars flowing back and forth between the parties,

the "fast tracking" of applications to change the name of the owner on Certificates of Title, and many emails back and forth between them and their agents where the alleged buyer, the Debtor, is clearly leading the process.

113.    Moreover, the Debtor and Excell Auto Group, Inc. ("Excell"), now in its own Chapter 7 proceeding, had a pre-existing business relationship. Excell may have owed the Debtor money, and the Debtor may have had agreements with Excell that granted it a security interest in assets of Excell. Farache also may be or may have been an investor in Excell and/or its affiliates. However, what the Debtor was not a secured party of the Karma Parties at the legally relevant times.

114.    At some point, Farache, for the Debtor, decided to exercise self-help to try to recover money allegedly owed to him by Excell and/or Scott Zankl. The Debtor engaged in, and in fact led, a series of fraudulent orchestrated transactions to try to reflect that the Debtor was buying cars from Excell, but in fact, those cars had been acquired by the Karma Parties from various third parties (persons or other dealers).

115.    The Karma Parties' names appear as the first "purchaser" on the original Certificates of Title. Farache and agents of the Debtor, with Scott Zankl's forced acquiescence on the heels of the threats of violence made by Farache, manipulated the transactions and documents to cause purchase papers and title documents to reflect "fake," or at least "not ordinary," sales from the Karma Parties to the Debtor, or from the Karma Parties to Excell and then from Excell to the Debtor.

116.    The Plaintiffs Parties request a determination that one or more of the Plaintiff Parties have a valid and enforceable security interest in the Disputed Vehicles and that that interest exceeds the value of the Disputed Vehicles.

117.    As to the priority of the security interests each against the other, the Plaintiff Parties plead their claims as priority, invalidation and subordination in Part II of this adversary complaint.

WHEREFORE, the Plaintiff Parties seek an order and judgment finding that:

a.    Some or all of the Plaintiff Parties have a valid and enforceable security interest in the Disputed Vehicles.

b.    That the Debtor was not a buyer in the ordinary course as to any of the Disputed

Vehicles as to defeat the security interests held by one or more of the Plaintiff Parties.

    c.   The Value of the security interests in Disputed Vehicles held by one or more of the Plaintiff Parties exceeds the value of the Disputed Vehicles.

    d.   That the Debtor has no voice in the priority of the respective interests held by the Plaintiff Parties determined to hold a valid interest.

    e.   The claims, disputes and objections of the Plaintiff Parties as to priority of the liens and security interests between the Plaintiff Parties or other parties be determined in Part II of this adversary complaint.

    f.   Awarding the Plaintiff Parties their costs and expenses under Federal Rule of Bankruptcy Procedure 7054 and Fed. R. Civ. P. 54 as well as such further relief as the Court deems just and proper.

## PART II

### ADVERSARY COMPLAINT TO DETERMINE VALIDITY AND EXTENT OF LIENS IN PROPERTY DETERMINED TO BE OWNED BY THE DEBTOR

### JURY TRIAL IS DEMANDED AS TO COUNTS FOUR, FIVE AND SIX BY THE FVP PLAINTIFFS

### COUNT THREE

### DETERMINATION OF PRIORITY OF LIENS
### FVP V WING LAKE

118.    The FVP Plaintiffs repeats and realleges the allegations contained in paragraphs 1 through 86 as if fully set forth herein.

119.    The FVP Plaintiffs seek a declaration that their rights are superior as to the Disputed Vehicles than those asserted by Plaintiff Party Wing Lake.

120.    The Wing Lake Plaintiff terminated their UCC Financing Statement as to the Karma Entities on November 16, 2021. **Exhibit S.**

121.    The FVP Plaintiffs seek a declaratory ruling as is necessary to carry out the purposes and intents of the relief requested in this Complaint.

122.    The Plaintiffs seek a declaration that their rights are superior as to the Disputed

Vehicles than those asserted by Plaintiff Party Wing Lake.

WHEREFORE, the FVP Plaintiffs seek a determination that the FVP security interests that have vested in the Disputed Vehicles are superior in right and priority to those claimed by Plaintiff Wing Lake.  The FVP Plaintiffs seek their costs and expenses under Federal Rule of Bankruptcy Procedure 7054 and Fed. R. Civ. P. 54 as well as such further relief as the Court deems just and proper.

<u>**COUNT FOUR**</u>

<u>**COMPLAINT TO VOID LIEN BASED ON FRAUD**
**FVP V. HI BAR**</u>

<u>**JURY TRIAL DEMANDED**</u>

123.    The FVP Plaintiffs repeat and realleges the allegations contained in paragraphs 1 through 86 as if fully set forth herein.

124.    FVP provides original loans by first engaging in a thorough underwriting review of the business applicant to ensure that the business qualifies to receive the loan.  If a business applicant meets FVP's underwriting requirements, FVP will typically agree to loan the business customer a principal amount.

125.    Of critical importance to FVP in its underwriting of loans is to ensure that its business customer is in a position to repay its loan and that there is adequate security available to FVP to safeguard repayment.

126.    By contrast, a merchant cash advance is an agreement in which merchants can receive cash much more quickly with less underwriting than traditional loans offered by conventional financial institutions.  The advances are very expensive and require a steady flow of receivables from which the advances are repaid.

127.    Hi Bar is a merchant cash advance company ("MCA") and the transaction in this case, providing money to the Karma Entities and Excell was a merchant cash advance.

128.    Under a merchant cash advance agreement, a MCA agrees to purchase a business customer's receivables at a discounted cash purchase price. For example, a funding company could purchase $25,000 of a business customers' receivables at the discounted cash purchase price of $20,000. The business customer receives the discounted cash purchase price, and the funding

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
FVP, Wing Lake and Karma Entities Joint Adversary Complaint

company debits the business customer's bank account for a certain percentage of the business customer's receivables either daily or weekly until the purchase price is repaid.

129.    Such merchant cash advance funding companies currently are under intense scrutiny for what legislators and regulators have deemed heavy-handed lending and unlawful collection tactics. Merchant cash advance funding companies advance money at exorbitant interest rates and often require borrowers to execute a confession of judgment or consent to other legal process as a condition to obtaining the funds, opening the door for rampant abuse of power. Funding companies have been known to forge documents, lie about how much is owed, and fabricate defaults to convince a court, typically in New York, to obtain a judgment. *See, e.g.,* the Bloomberg article titled, "I hereby confess judgment" and the Yahoo! Finance article titled, "'We're coming after you': Inside the merchant cash advance industry." A borrower never even has a chance to dispute whether it committed a default or the amount outstanding before the merchant cash advance funding company seizes all of its assets. Under the facts and circumstances of this case, the merchant cash advances were in fact a criminally usurious loan, which is unenforceable and making any security interest in the Disputed Vehicles unenforceable

THE INITIATION OF THE HI BAR FRAUD

130.    Non-party, Spin Capital, LLC ("Spin") is a New York limited liability company.

131.    Hi Bar is an affiliate of Spin with Josh Lubin, the Principal of Spin, negotiating for and speaking for Hi Bar for all purposes.

132.    Hi Bar and Spin are both MCA's, which on information and belief, are controlled by Josh Lubin.

133.    In or around September of 2021, Scott Zankl on behalf of Excell entered into communications with Wing Lake to borrow money to pay off MCA loans that Excell and the Karma Entities with Spin and two other MCA's.

134.    Wing Lake advised Zankl, that it would fund a loan to pay off the two other MCA loans only if the Spin loan was satisfied.

135.    In response, Zankl had extensive conversations with Josh Lubin, the Principal of Spin about the fact that he would not be able to borrow the money from Wing Lake without Spin's MCA loan being paid off.

136.    Lubin advised Zankl that he would shift the debt owed to Spin to another company that he controlled named Hi Bar. At all times, all of Scott Zankl's communications with both Spin and Hi Bar were with Josh Lubin.

137.    In October 2021, Zankl and Lubin agreed that Hi Bar would payoff the Spin debt and that Zankl and his companies, Excell and the Karma Entities, would then only have a debt to Hi Bar and it would appear to Wing Lake that the Spin debt was satisfied.

138.    On October 27, 2022, the Zankl's on behalf of Excell and the Karma Entities, entered into the money advance transaction documents with Hi Bar. **Exhibits L through Exhibit N.**

139.    Critically, the Hi Bar documents materially increased the debt owed by Zankl, Excell and the Karma Entities for no reason as there was never a default of the Spin debt. Further no money was paid by Hi Bar to Spin, and no money was paid to Excell and the Karma Entities for the increased debt. No consideration was supplied by Hi Bar for its imaginary advance to Excell and the Karma Entities.

140.    In response to this paperwork, Lubin and Spin notified Wing Lake that Spin no longer had any sums owed by Excell and the Karma Entities but intentionally and fraudulently withheld the fact that Spin had merely rebranded the debt in the name of Hi Bar.

141.    Based on this representation, Wing Lake and Excell and the Karma Entities entered into the Wing Lake transaction documents depicted in **Exhibits U through Exhibit Z**.

142.    Under the Assignment Agreement, Spin acknowledged that Wing Lake is in the business of making secured commercial loans and agreed, inter alia: (a) not to purchase any portion of accounts, receipts or other obligations from Excell or the Karma Entities (together, the "Borrowers"), (b) not to take extend credit to or take a security interest in assets of the Borrowers, and (c) in the event Spin received payment from the Borrowers, the payment would be held in trust for the benefit to Wing Lake.  See Ex. Y, p. 2, ¶ 6.

143.    As is seen in the Spin transaction documents with Wing Lake, which were signed by Spin just days after the Hi Bar transaction, Spin and Hi Bar colluded and conspired to defraud Wing Lake as the Hi Bar debt, which was *de facto* the Spin debt, was hidden from Wing Lake. As such, Wing Lake was intentionally defrauded by both Spin and Hi Bar as both companies, as well

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
FVP, Wing Lake and Karma Entities Joint Adversary Complaint

as Lubin, materially mislead Wing Lake into entering into the loan agreements in the first instance by materially misrepresenting that the Spin debt was satisfied, when it was simply relabeled.

THE HI BAR FRAUD CONTINUES

144.    Shortly after the Wing Lake transaction, Scott Zankl engaged FVP in communications regarding a loan transaction.

145.    To that end, through November and December 2021, Zankl had detailed conversations with FVP about a $7.5 million dollar loan facility which would be collateralized by the inventory of the Karma Entities but would specifically not include any collateral or security interests in Excell.

146.    Notwithstanding the fact that Hi Bar was ostensibly permitted to file a UCC financing statement on October 27, 2021, Hi Bar did not do so.

147.    The decision of Hi Bar not to file a financing statement was intentional to maintain the fraud against Wing Lake hidden as long as possible, and to commit further fraud against FVP.

148.    At that same time, Zankl had conversations with Lubin regarding the FVP loan. Lubin specifically requested that Zankl let him know when the FVP loan was going be funded and told Zankl to forward all of the FVP loan documents to him for his review. It was Lubin's intent to have Zankl secure the FVP loan without FVP knowing about the Hi Bar loan so Zankl would pay a substantial part of the proceeds of the FVP loan to Hi Bar to satisfy its illegal usurious loan.

149.    Just before December 15, 2021, Zankl advised Lubin that he was closing the loan with FVP. In response to this information, and in anticipation of the funding, Lubin caused a UCC Financing Statement to be filed on Excell and the Karma Entities on December 15, 2021. **Exhibit AA**. Lubin filed the UCC on that date because he was led to believe that FVP was funding the Karma's loan on or about that date.

150.    When the loan did not close, Lubin accused Zankl of misleading him and pressured Zankl to email him the actual loan documents provided by FVP to confirm his representations. On December 17, 2022 Zankl emailed Lubin all of the FVP / Excell / Karma loan documents. **Exhibit BB**.

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
FVP, Wing Lake and Karma Entities Joint Adversary Complaint

151.    After Lubin received the FVP loan documents, he was fully aware of the fact that the FVP loan proceeds could not be used to repay any other lenders including Hi Bar.

152.    On December 19, 2021, Zankl told Lubin that FVP became aware of the December 15, 2021 filing of the UCC Financing Statement and advised Zankl that the funding was off and that therefore Zankl could not pay Hi Bar.

153.    In response, Lubin demanded that Zankl sign a "Settlement Agreement" which astronomically increased the amounts due Hi Bar **Exhibit M.** The December 19, 2022 "Settlement Agreement" falsely and fraudulently described a "default" that never occurred, and reiterated that Hi Bar had a "security interest" in the Karma Entities collateral as described in the Hi Bar UCC Financing Statement filed just four days prior on December 15, 2021. **Exhibit AA.**

154.    Notwithstanding the purported confirmation that Hi Bar was entitled to maintain the just filed UCC filing, Hi Bar did the exact opposite of what the documents purported to grant, and on December 19, 2021, Hi Bar *instead filed a termination* of the four day old UCC Financing Statement - **Exhibit CC -** which terminated the Hi Bar financing statement as to Excell, Zankl and the Karma Entities.

155.    This termination of the four day old UCC Financing Statement - **Exhibit CC** - was specifically and intentionally made as a direct, false and fraudulent representation to FVP that Hi Bar had no secured interests in the Karma Entities collateral. The termination states:

> "Effectiveness of the Financing Statement identified above is terminated with respect to the security interests of the Secured Party authorizing this Termination Statement".

156.    This representation file of record in Exhibit CC was intentionally made to FVP and was for the sole purpose of notifying FVP that Hi Bar had no security interests to protect. This representation was false when made and intentionally false. FVP justifiably relied upon the misrepresentation to their detriment.

157.    To double down on the fraud, Hi Bar advised Frank O'Donnell, an agent intermediary between FVP and Zankl, that the Hi Bar UCC Financing Statement of December 15, 2021 was a mistake and was "erroneously filed". **Exhibit DD.** This representation was specifically made to FVP for the sole purpose of notifying FVP that Hi Bar had no security interests to protect and was false when made and intentionally false. FVP justifiably relied upon the misrepresentation

to their detriment.

158.    The sole purpose of the termination communicated to FVP was to convince FVP that Hi Bar had no protectable interest in the collateral of the Karma Entities so that FVP would rest assured that Hi Bar was not a threat to their priority of security and proceed to fund a loan to the Karma Entities with Lubin waiting in the wings to pounce with a second UCC Financing Statement which would be filed minutes before an FVP filing.

THE STING

159.    The fraud worked. Upon being supplied the UCC termination notice, FVP reinstituted the loan process with Zankl and the Karma Entities.

160.    The negotiations carried through to mid January 2022 with Zankl advising Lubin every step of the way on the progress of the FVP funding so Lubin would be ready to act.

161.    On January 21, 2022 Zankl again emailed Lubin the FVP loan documents and promised Lubin that as soon as he got the loan from FVP, which would be Monday January 24, 2022, that Zankl would pay Lubin from the FVP proceeds. **Exhibit EE.**

162.    Again, after Lubin received the FVP loan documents, he was fully aware of the fact that the FVP loan proceeds could not be used to repay any other lenders including Hi Bar.

163.    On Monday January 24, 2022, Lubin again demanded that Zankl email him all of the actual loan closing agreements. In response, Zankl sent Lubin four (4) separate emails which included all the FVP loan documents. **Exhibit FF Composite**. Later that day when no closing occurred Zankl texted Lubin that he would be closing the next day January 25, 2022. **Exhibit GG.** The text again confirmed that Lubin would be receiving the FVP loan proceeds which he was fully aware he could not receive under the terms of the FVP transaction documents.

164.    On January 25, 2022, Zankl advised Lubin that he would be closing he next day, January 26, 2022, with certainty.

165.    In response, and to finalize the fraud, at Lubin's direction Hi Bar refiled its UCC Financing Statement on January 25, 2022 at **10:55 pm** knowing that:

      a.    the FVP funding was to close the next day on January 26, 2022;

      b.    The FVP loan could not be used to pay Hi Bar;

    c.    That Zankl fully intended to pay Hi Bar with the proceeds as stated in the text of January 24. 2022.

    d.    That but for the material misrepresentation of the December 19, 2021 UCC Termination, Exhibit CC, that there never would have been an FVP loan in the first instance.

166.    At all times Josh Lubin acted for both Spin and Hi Bar in an identical fashion and all of Zankl's communications with both Spin and Hi Bar were with Josh Lubin.

167.    In fact, on January 3, 2022, Josh Lubin told Scott Zankl to wire the funds due Hi Bar to Spin. **Exhibit HH.**

168.    It was always Josh Lubin who personally pressured and threatened Scott Zankl and the Karma Entities with a (Hi Bar) lawsuit ("I have to file tomorrow") if payments were not made to Lubin's satisfaction. See eg, **Exhibit II** regarding pressure and threats on January 13, 2022.

169.    It was Josh Lubin who personally directed Scott Zankl where to send every payment due Hi Bar after the Hi Bar documents were executed. For example, on February 7, 8 and 9, 2022, Lubin directed Zankl to wire to an attorneys account. On those dates a total of $1.3 million was wired to a Lubin / Hi Bar attorney with funds, on information and belief, that came from the FVP $7.5 million dollar loan the prior week.

170.    The actions of Hi Bar comprise fraudulent conduct with the intended and expressed target of the fraud being FVP.

171.    The UCC Financing Statement filed on December 19, 2021 was an "instrument" as defined in Fla. Stat. § 817.535 and was filed with the intent to defraud.

172.    The UCC Financing Statement filed on January 25, 2022 at 10:55 pm was an "instrument" as defined in Fla. Stat. § 817.535 and was filed with the intent to defraud.

173.    The UCC Financing Statement filed on January 25, 2022 at 10:55 pm contained a material false statement as it represented that Hi Bar had a legitimate lien in the property defined therein when Hi Bar had no legitimate enforceable interest to protect; as Hi Bar paid no consideration for the alleged interest, was a participant in a fraudulent transfer as defined in Fla. Stat. § 726.105; was a participant in an illegal and usurious shake down of Zankl and the Karma Entities, and was surreptitiously filed with the intent to defraud.

174.    The FVP Plaintiffs demand that the court declare the Hi Bar UCC Financing Statement filed on January 25, 2022 at 10:55 pm null and void *ab initio* and order the instrument sealed and removed from any searchable electronic database. See § 817.535(8)(b)(1).

175.    The FVP Plaintiffs demand that the Court award the FVP Plaintiffs as the victim injunctive relief, damages, civil penalties, costs and attorney fees. See § 817.535(8)(b)(3).

176.    The FVP Plaintiffs demand a trial by jury on this Count and reserve the right to seek punitive damages upon proper motion pursuant to Fla. Stat. § 768.72.

WHEREFORE, the FVP Plaintiffs demand that the Hi Bar UCC Financing Statement filed on January 25, 2022 at 10:55 pm be declared null and void ab initio and award damages, attorney's fees and costs to the FVP Plaintiffs as well as such further relief as the Court deems just and proper and demand a trial by jury on this count.

### COUNT FIVE
### COMPLAINT TO VOID LIEN BASED ON ILLEGALITY
### FVP V HI BAR

### JURY TRIAL DEMANDED

177.    The FVP Plaintiffs repeats and realleges the allegations contained in paragraphs 1 through 86 and 124 through 173 as if fully set forth herein.

178.    MCA's have come under intense scrutiny for their unconscionable and unlawful conduct. See *Attorney General of the State of New York, v. Various MCA Companies*, Index No. 451368/ 2020 Supreme Court of the State of New York, County of New York (alleging, among other things, that Richmond, Giardina, and others have preyed upon thousands of small businesses throughout the United States by offering funding under "merchant cash advances" that "are in fact fraudulent, usurious loans with interest rates in the triple and even quadruple digits, far above the maximum rate permissible for a loan under New York law - Criminal Usury, Fraud in the Form of Unconscionability – pending); *Fleetwood v RAM Capital Funding, et al.,* Unites States District Court for the Southern District of New York, Case No. 20-cv-5120(LJL), See June 6, 2022, Opinion and Order; See also *Federal Trade Commission v. RCG Advances*, LLC, No. 20-cv-4432 (S.D.N.Y.) same.

179.    Hi Bar is the subject of several lawsuits for the same illegal and inequitable conduct

outlined in this Count which are summarized as follows:

    a.   The Counterclaim in *Hi Bar Capital, LLC v. Excell Auto Group, Inc., et al*., Index No. 502846/2022, Supreme Court of the State of New York, County of Kings, (Fraud and Usury – pending) in which the Excell Trustee in Case 22-12790-EPK recently stated in a motion:

> The Trustee contends that each contract referenced above constitutes a loan agreement that at minimum violated New York's criminal usury laws, and that notwithstanding all the other entities being listed as "co-obligors," the only entity that was truly a party to any of the contracts was the Debtor. From these contracts the bankruptcy estate has substantial claims and defenses against Hi Bar, its principals, and related entities.
>
> Accordingly, the stay should be enforced to stay the New York Litigation, which is proceeding as a sham against the other entities, who neither received nor paid any monies to Hi Bar under any contract at issue. However, the New York Court is being asked to interpret the rights of the Debtor under the terms of three agreements.

Case 22-12790-EPK Doc 286 Filed 10/20/22

    b.   *JAR 259 Food Corp., v. Hi Bar Capital, a/k/a Kingdom Kapital*, Adversary Proceeding #: 1-22-01033-jmm in the United States Bankruptcy Court for the Eastern District of New York. (Fraud, Rico, Civil Conspiracy, Unconscionable Loan Practice – pending).

    c.   *Wing Dingers Texas, LLC, v. Hi Bar Capital,* Adversary Proceeding #: 21—06016 01033-jmm in the United States Bankruptcy Court Eastern District of Texas. (Rico, Civil Conspiracy, Unconscionable Loan Practice – closed, settled).

    d.   *Consultants For America's Veterans, LLC et al. v. Hi Bar Capital,* et al., Index No. 522534/2021, Supreme Court of the State of New York, County of Kings, (Usury, annual interest rate of 559.2% and 406.0% - pending).

    180.   On August 31, 2021, Non Party Spin entered into a "Revenue Purchase Agreement" with Excell. (the "First Agreement"). Under the First Agreement, which was self-defined as a sale of receivables, Excell was indebted to Spin in the amount of **$2,998,000** for receipt of the sum of **$2,000,000.** The First Agreement stated: " Excell is selling a portion of future revenue to Spin at a discount, and is not borrowing money from Spin, therefore there is no interest rate or payment

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
FVP, Wing Lake and Karma Entities Joint Adversary Complaint

schedule and no time period during which the Purchased Amount must be collected by Spin."

181.    The First Agreement then goes on to state that Excell must pay $150,000.00 weekly, or, 20% of its receivables. Excell had no receivables.

182.    On October 18, 2021, Spin issued to Zankl a balance notice that stated that Excell owed Spin **$2,264,312.50.** Neither Zankl nor Excell were in default, but Zankl was required to eliminate the Spin debt to comply with the Wing Lake demands for its financing.

183.    Days later, Lubin agreed to "transfer" the Spin debt to Hi Bar which he described to Zankl as a "no net refi" with Hi Bar, a company he controlled, which, he represented, would simply exchange the creditors names with no change in terms. This was an intentionally false statement.

184.    Lubin emailed the Hi Bar paperwork to Zankl which he viewed on his phone, and trusting Lubin's representations about what was in the paperwork, DocuSigned the documents on his phone on October 27, 2021.

185.    After the Zankl was able to intelligently review the documents, he learned that Hi Bar failed account for the approximately $750,000.00 already paid to Spin and discovered that Excell and now the Karma Entities owed Hi Bar **$3,177,880**.

186.    Therefore, Hi Bar increased the debt a little less than $1,000.000.00 from just a week prior with the stroke of a pen. This with no additional funds paid to Excell or Karma Entities. with weekly payments of $150,000.00. Over the next two months Zankl and Excell paid Hi Bar approximately $500,000.00 and in mid-December had a balance of **$2,677,880.00**.

187.    Therefore, over the course of three and one half months, Excell became indebted in the amount of **$2,998,000 (**and received **$2,000,000.00) repaid $1,250,000.00 and was told it owed a balance of $2,677,880.00.** Incredibly, Zankl and Excell (and now the Karma Entities which were added as obligors) were told they were in default and would be sued unless they signed a "Settlement Agreement".

188.    Fearing what a lawsuit would do to his business, Scott Zankl executed a "Settlement Agreement" in mid-December 2021 which increased the balance owed to Hi Bar to **$4,016,820**. An increase of the amount owed by **$1.3 million**. So, in approximately 100 days, **Excell received $2 million, repaid $1.2 million and owed $4 million.** No, that is not a typo.

189.    It gets worse. By mid-January Excell paid Hi Bar an additional **$1.3 million** making the total payment by Excell **$3,083,687.50** on the original obligation of **$2,998,000** incurred on August 31, 2021.

190.    On January 28, 2022, Hi Bar sued Zankl, Excell and the Karma Entities for what it deemed it was owed under the "merchant advance", the sum of **$3,616,820,** plus attorneys' fees in the amount of **$625,000.00** or 33% of the Outstanding Balance. That case remains pending.

191.    So, in four months, **Excell repaid over 100% of the incurred debt**, (which was 33% more that the money received) and **still owed $1.6 million more than the original debt.**

192.    Incredibly, Hi Bar never paid a penny to Excell, or the Karma Entities at any time to receive this patently illegal windfall.

193.    On information and belief, Hi Bar never paid Spin any money to "pay off" the Spin debt and that the "Balance Transfer" transaction was simply a fiction invented by Lubin and his associates to mercilessly rip off Zankl, Excell and the Karma Entities.

194.    All of Scott Zankl's communications regarding the money owed to Hi Bar were with Josh Lubin personally. It was Lubin that constantly pressured Zankl for the Hi Bar payments.

195.    The acts of Spin, Lubin and Hi Bar are outrageous, violate Florida Public Policy, are unconscionable and unquestionably illegal in Florida. To the extent that this Court is required to view the acts of Hi Bar through the prism of New York law, it is equally illegal as is outlined in the lawsuit filed by the Attorney General of New York cited above.

196.    Spin and Hi Bar may call it an "advance" or "purchase of receivables", but it was and is, an obvious usurious loan, plain and simple. Hi Bar and Spin attempted to mask their loan agreements as receivables purchases but even the most cursory examination proves what anyone looking at this already knows. Spin and Hi Bar never bothered to analyze the Excell receivables because the fact that Excell had no receivables would have made no difference.

197.    These were criminally usurious loan contracts under both New York law and Florida law created by very smart lawyers for very unethical lenders. As to the "Balance Transfer" to Hi Bar, the loan charges increased by 50.3 %. When Hi Bar and Zankl, Excell and the Karma Entities executed a "Settlement Agreement" the loan charges increased another 50%. Without a penny being paid to Excell.

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
FVP, Wing Lake and Karma Entities Joint Adversary Complaint

198.    The FVP Plaintiff's demand that this Court find and adjudicate that the merchant contract agreements entered into between Spin, Hi Bar, Scott Zankl, Excell and the Karma Entities were unconscionable, illegal, and violative of both New York and Florida Public Policy and therefore void and unenforceable.

199.    As the Hi Bar UCC Financing Statement filed on January 25, 2022 at 10:55 pm was based on unconscionable and illegal contracts, the FVP Plaintiffs demand that the Karma Entities obligation to Hi Bar be avoided in its entirely or, alternatively, the subordination of the UCC Financing Statement filed on January 25, 2022 at 10:55 pm **Exhibit N** to the FVP UCC Financing Statement filed on January 26, 2022. **Exhibit H**.

WHEREFORE, the FVP Plaintiffs demand the Karma Entities obligation to Hi Bar be avoided to the extent necessary to satisfy their claims and that the FVP Plaintiffs be awarded their costs and expenses under Federal Rule of Bankruptcy Procedure 7054 and Fed. R. Civ. P. 54 as well as such further relief as the Court deems just and proper and demands a trial by jury on this count.

## COUNT SIX

### COMPLAINT TO VOID LIEN BASED ON THE FLORIDA UNIFORM FRAUDULENT TRANSFER ACT FVP V HI BAR

### JURY TRIAL DEMANDED

200.    The FVP Plaintiffs repeats and realleges the allegations contained in paragraphs 1 through 86 and 124 through 173 and 178 through 199 as if fully set forth herein.

201.    This is a claim to avoid a fraudulent obligation as to a future creditor pursuant to sections 726.105(1)(a) and 726.105(l)(b), Florida Statutes, the Florida Uniform Fraudulent Transfers Act.

202.    The FVP Plaintiffs are a creditor as defined in Fla. Stat. § 726.102 as they hold claims against the Karma Entities under its loan agreements.

203.    The Karma Entities are a debtor as defined in Fla. Stat. § 726.102 to both the FVP Plaintiff's and Hi Bar.

204.    On or about October 17, 2021, Scott Zankl for Excell and the Karma Entities, entered into a financial transaction with Hi Bar.

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
FVP, Wing Lake and Karma Entities Joint Adversary Complaint

205.    The result of that transaction was that Excell, and the Karma Entities, became obligated to Hi Bar as Debtors resulting in Hi Bar having purported rights under the transaction documents, to which the Plaintiff's object, to file a UCC Financing Statement against the Karma Entities inventory.

206.    The obligation to Hi Bar was incurred by Scott Zankl for Excell and the Karma Entities with the actual intent of hindering, delaying, or defrauding creditors including the FVP Plaintiffs and was made with: a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation.

207.    At the time of the obligation, Scott Zankl for Excell and the Karma Entities: was engaged in, or was about to engage in, a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or, intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

208.    At the time the obligation was incurred, Scott Zankl for Excell and the Karma Entities, concealed the obligation; prior to the obligation the Excell and the Karma Entities were sued or threatened with suit; the obligation was incurred just days before another substantial debt was incurred; Excell and the Karma Entities received no equivalent value for the obligation and in fact received additional debt instead of consideration; no proceeds of the Hi Bar "financing" were funded to, or for, the benefit of the Karma entities; and Excell and the Karma Entities were insolvent at the time the obligation was incurred, or were rendered insolvent by such obligation, or, became insolvent shortly after the obligation was incurred.

209.    The FVP Plaintiffs have a claim in the amount of $7.5 million dollars against the Karma Entities which the Hi Bar obligation, if valid, and not avoided, would eliminate the FVP Plaintiffs ability to satisfy their claim.

210.    The FVP Plaintiffs demand the avoidance of the Hi Bar obligation to the extent necessary to satisfy their claims to their security interests in the Karma Entities inventory pursuant to Fla. Stat. § 726.108(1)(a).

211.    The FVP Plaintiffs demand the Karma Entities obligation to Hi Bar be avoided in

its entirely or, alternatively, the subordination of the UCC Financing Statement filed on January 25, 2022 at 10:55 pm **Exhibit N** to the FVP UCC Financing Statement filed on January 26, 2022. **Exhibit H**.

WHEREFORE, the FVP Plaintiffs demand the Karma Entities obligation to Hi Bar be avoided to the extent necessary to satisfy their claims and that the FVP Plaintiffs be awarded their costs and expenses under Federal Rule of Bankruptcy Procedure 7054 and Fed. R. Civ. P. 54 as well as such further relief as the Court deems just and proper and demands a trial by jury on this count.

### COUNT SEVEN

### EQUITABLE SUBORDINATION - 11 U.S.C. § 510(C)
### FVP V HI BAR

212.    The FVP Plaintiffs repeats and realleges the allegations contained in paragraphs 1 through 86 and 124 through 173 and 178 through 199 as if fully set forth herein.

213.    Hi Bar was engaged in illegal and inequitable conduct.

214.    The misconduct has resulted in injury to the FVP Plaintiffs.

215.    To the extent Hi Bar holds an allowed claim against the Debtor, subordination of the claim to the claim of the FVP Plaintiffs is not inconsistent with the provisions of either the Bankruptcy Act or Bankruptcy Code.

**WHEREFORE**, the FVP Plaintiffs respectfully requests that the Court enter an order (1) subordinating any allowed claim of Hi Bar, including a claim secured by the Vehicles, to be subordinated to the claim of the FVP Plaintiffs  under 11 U.S.C. § 510(c); and (2) awarding court costs and interest, and such other relief as the Court deems just and proper.

### COUNT EIGHT

### DETERMINATION OF PRIORITY OF LIENS
### WING LAKE V FVP

216.    Wing Lake repeats and realleges the allegations contained in paragraphs 1 through 86 as if fully set forth herein.

217.    Wing Lake seeks a declaration that their rights are superior as to the Disputed Vehicles than those asserted by Plaintiff FVP.

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
FVP, Wing Lake and Karma Entities Joint Adversary Complaint

218.    Wing Lake seeks a determination that the evidence presented establishes that the Wing Lake security interest arising from the UCC financing statement in the Excell Auto Group assets, or arises from funds received by the  Excell Auto Group under the Wing Lake / Excell Auto Group loan facility, is sufficiently traceable to the purchase of the Disputed Vehicles to grant Wing Lake a perfected and enforceable security interest in any of the Disputed Vehicles regardless of ownership.

219.    Wing Lake seeks a declaratory ruling as is necessary to carry out the purposes and intents of the relief requested in this Complaint.

220.    Wing Lake seeks a declaration that their rights are superior as to the Disputed Vehicles than those asserted by Plaintiff FVP.

WHEREFORE, the Wing Lake Plaintiff seeks a determination that the Wing Lake security interests that have vested in the Disputed Vehicles are superior in right and priority to those claimed by Plaintiff  FVP.  The Wing Lake Plaintiff seeks their costs and expenses under Federal Rule of Bankruptcy Procedure 7054 and Fed. R. Civ. P. 54 as well as such further relief as the Court deems just and proper.

## COUNT NINE

### DETERMINATION OF PRIORITY OF LIENS
### WING LAKE V HI BAR

221.    Wing Lake repeats and realleges the allegations contained in paragraphs 1 through 86 as if fully set forth herein.

222.    Wing Lake seeks a declaration that their rights are superior as to the Disputed Vehicles than those asserted by Hi Bar.

223.    Wing Lake seeks a determination that the evidence presented establishes that the Wing Lake security interest arising from the UCC financing statement in the Excell Auto Group assets or arises from funds received by the  Excell Auto Group under the Wing Lake / Excell Auto Group loan facility, is sufficiently traceable to the purchase of the Disputed Vehicles to grant Wing Lake a perfected and enforceable security interest in any of the Disputed Vehicles regardless of ownership.

224.    Wing Lake seeks a declaratory ruling as is necessary to carry out the purposes and

intents of the relief requested in this Complaint.

225.    Wing Lake seeks a declaration that their rights are superior as to the Disputed Vehicles than those asserted by Hi Bar.

WHEREFORE, the Wing Lake Plaintiff seeks a determination that the Wing Lake security interests that have vested in the Disputed Vehicles are superior in right and priority to those claimed by Hi Bar.  The Wing Lake Plaintiff seeks their costs and expenses under Federal Rule of Bankruptcy Procedure 7054 and Fed. R. Civ. P. 54 as well as such further relief as the Court deems just and proper.

## COUNT TEN

### EQUITABLE SUBORDINATION - 11 U.S.C. § 510(C)
### WING LAKE V HI BAR

226.    The Wing Lake Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 86 and further states.

227.    Hi Bar has engaged in inequitable conduct.

228.    The misconduct has resulted in injury to the Wing Lake Plaintiff.

229.    To the extent Hi Bar holds an allowed claim against the Debtor, subordination of the claim to the claim of the Wing Lake Plaintiff is not inconsistent with the provisions of either the Bankruptcy Act or Bankruptcy Code.

**WHEREFORE**, the Wing Lake respectfully requests that the Court enter an order (1) subordinating any allowed claim of Hi Bar, including a claim secured by the Vehicles, to be subordinated to the claim of Wing Lake under 11 U.S.C. § 510(c); and (2) awarding court costs and interest, and such other relief as the Court deems just and proper.

## COUNT ELEVEN

### COMPLAINT TO VOID LIEN BASED ON ILLEGALITY
### WING LAKE V HI BAR

213.    Wing Lake repeats and realleges the allegations contained in paragraphs 1 through 86 and 125 through 173 and 175 through 196 if fully set forth herein.

214.    Wing Lake demands that this Court find and adjudicate that the merchant contract agreements entered into between Spin, Hi Bar, Scott Zankl, Excell and the Karma Entities were

unconscionable, illegal, and violative of both New York and Florida Public Policy and therefore void and unenforceable.

WHEREFORE, Wing Lake demands that any obligations of Excell and the Karma Entities' to Hi Bar be avoided to the extent necessary to satisfy its claims and that Wing Lake be awarded its costs and expenses under Federal Rule of Bankruptcy Procedure 7054 and Fed. R. Civ. P. 54 as well as such further relief as the Court deems just and proper.

## COUNT TWELVE

### COMPLAINT TO VOID LIEN AND OBLIGATIONS
### PURSUANT TO FLA. STAT. §§ 726.105(1)(A), 726.105(1)(B), 726.106(1) AND 726.108
### WING LAKE V HI BAR

215.    Wing Lake repeats and realleges the allegations contained in paragraphs 1–86 as if fully set forth herein.

216.    On or about October 17, 2021, Excell and the Karma Entities entered into a financial transaction with Hi Bar (the "Hi Bar Transaction").

217.    The result of that transaction was that Excell, and the Karma Entities became obligated to Hi Bar.

218.    Following the Hi Bar Transaction, Hi Bar filed UCC filings against Excell and the Karma Entities (together, the "Hi Bar UCC Filings").

219.    At all relevant times Franklin was a creditor of Excell and the Karma Entities within the meaning of Fla. Stat. § 726.102(5).

220.    Through the Hi Bar Transaction and Hi Bar UCC Filings, Excell and the Karma Entities incurred obligations and transferred property.

221.    Excell and the Karma Entities incurred obligations and transferred property with the actual intent to hinder, delay or defraud creditors, including Wing Lake, within the meaning of Fla. Stat. § 726.105(1)(a).

222.    Excell and the Karma Entities incurred obligations and transferred property at a time when they were engaged in, or was about to engage in, a business or a transaction for which their remaining assets were unreasonably small in relation to the business or transaction; or, intended to incur, or believed or reasonably should have believed that they would incur, debts

beyond their ability to pay as they became due, within the meaning of Fla. Stat. § 726.105(1)(b).

223.    Excell and the Karma Entities incurred obligations and transferred property while insolvent, or as a result of such obligations and transfers became insolvent, within the meaning of Fla. Stat. § 726.106(1).

224.    Excell and the Karma Entities did not receive reasonably equivalent value for the Hi Bar Transaction and Hi Bar UCC Filings.

225.    Wing Lake demands the avoidance of the obligations of Excell and the Karma Entities to Hi Bar, together with the voiding of any liens acquired by Hi Bar in the assets of such entities, pursuant to Fla. Stat. § 726.108(1)(a).

WHEREFORE, the Wing Lake demands the obligations of Excell and the Karma Entities o Hi Bar be avoided to the extent necessary to satisfy its claims, and that Wing Lake be awarded its costs and expenses under Federal Rule of Bankruptcy Procedure 7054 and Fed. R. Civ. P. 54 as well as such further relief as the Court deems just and proper and demands a trial by jury on this count.

Dated: November 2, 2022

For the FVP Plaintiffs

| | |
|---|---|
| Jerrell A. Breslin, Esq.<br>Baron, Breslin & Sarmiento<br>The DuPont Building<br>169 East Flagler Street, #700<br>Miami, Florida 33131<br>Phone: (305) 577-4626<br>E-mail:  JB@RichardBaronLaw.com<br>EService@RichardBaronLaw.com<br><br>By:     s/ Jerrell Breslin, Esq.<br>         Jerrell Breslin, Esq.<br>          Fla Bar No: 269573 | David Softness, Esq.<br>David R. Softness, P.A.<br>201 S. Biscayne Blvd., Ste 2740<br>Miami, Florida 33131<br>Phone: (305) 341-3111<br>E-mail:david@softnesslaw.com |
| Jonathan Noah Schwartz, Esq.<br>Florida Bar No. 1014596<br>Jonathan Schwartz Law PLLC<br>10200 NW 25th Street, Suite 111<br>Doral, FL 33172<br>Tel.: (973) 936-2176 | |

| E-mails:jschwartz@jonschwartzlaw.com JNSEsquire@gmail.com | |
|---|---|

*The Plaintiff Parties Below have Authorized the Filing of this Joint Pleading by the FVP Parties.*

For the Karma Entities

Harry Winderman, Esq.
Weiss, handler & Cornwell, P.A.
2255 glades road, suite 205 A
Boca Raton, FL  33431

By:      /s/ Harry Winderman

For Wing Lake

SHRAIBERG PAGE, P.A.
Attorneys for Wing Lake / Franklin
2385 NW Executive Center Drive, Suite 300
Boca Raton, Florida 33431
Email: bss@slp.law
Email: pdorsey@slp.law

By: /s/ Bradley Shraiberg
Bradley Shraiberg
Fla Bar No. 121622
Patrick Dorsey
Fla. Bar No. 0085841

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that; I electronically filed the foregoing was served via Email electronic transmission under Local Rule 7026 -1 upon those parties and attorneys who are registered with the Court to receive notifications in this matter but not filed of record and by email upon: the office of the US Trustee by serving Heidi A. Feinman, Esq. at Heidi.A.Feinman@usdoj.gov, upon the Subchapter 5 Trustee by serving Linda Leali, Esq. at lleali@lealilaw.com, upon the Debtor/Defendant by serving James B. Miller, Esq. at bkcmiami@gmail.com, upon Karma or Broward, Inc. and Karma of Palm Beach, Inc. by serving Harry Winderman, Esq. at harry4334@hotmail.com, upon Ed Brown by serving Brett Marks, Esq., at brett.marks@akerman.com, and upon Hi Bar by serving Jarret P. Hitchings, Esq., at jarret.hitchings@bclplaw.com for Hi Bar.

/ s/ Jerrell Breslin
Jerrell Breslin, Esq.