**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**PALM BEACH DIVISION**
www.flsb.uscourts.gov

In Re:

AUTO WHOLESALE OF BOCA, LLC,            Case No.: 22-15627-EPK

  Debtor.

_____/

FVP OPPORTUNITY FUND III, LP; FVP
INVESTMENTS, LLC; and FVP SERVICING,
LLC,

  Adversary Plaintiffs,

vs.                                     Adversary Case No.: 22-01218-EPK

AUTO WHOLESALE OF BOCA, LLC; HI
BAR CAPITAL, LLC; WING LAKE
PARTNERS f/k/a FRANKLIN CAPITAL
GROUP, LLC; KARMA OF PALM BEACH,
INC.; KARMA OF BROWARD, INC.;
EXCELL AUTO SPORT AND SERVICE, INC.;
and EDWARD BROWN,

  Adversary Defendants, Adversary
  Plaintiffs, Cross Plaintiffs.

_____/

KARMA OF PALM BEACH, INC.; a Florida
Corporation; KARMA OF BROWARD, INC., a
Florida Corporation,

  Adversary Plaintiffs,
 vs.

AUTO WHOLESALE OF BOCA, LLC; HI
BAR CAPITAL, LLC; FVP OPPORTUNITY
FUND III, LP; FVP INVESTMENTS, LLC;
FVP SERVICING, LLC; WING LAKE
PARTNERS f/k/a FRANKLIN CAPITAL
GROUP, LLC; EXCELL AUTO SPORT AND
SERVICE, INC; and EDWARD BROWN,

Adversary Defendants, Adversary
Plaintiffs, Cross Plaintiffs, and
Cross Defendants.

_____/

## THE FVP PARTIES AND KARMA ENTITIES
## JOINT AMENDED ADVERSARY COMPLAINT

### PART I

### DECLARATORY RELIEF
### TO DETERMINE OWNERSHIP AND RIGHTS TO PROPERTY
### CLAIMED BY THE DEBTOR,

#### AND, IF NECESSARY,

### PART II

### THE VALIDITY, EXTENT AND PRIORITY OF LIENS IN PROPERTY OWNED BY
### THE DEBTOR DETERMINED TO BE SUBJECT TO LIENS

COME NOW, FVP Opportunity Fund III, LP, a Delaware limited partnership (the "FVP Fund"), FVP Investments LLC, a Delaware limited liability company ("FVP Investments"), FVP Servicing, LLC, a Delaware limited liability company ("FVP Servicing"), (collectively, the FVP Fund, FVP Investments and FVP Servicing are "FVP" or the "FVP Parties"); and Karma of Palm Beach, Inc., a Florida corporation; Karma of Broward, Inc., a Florida corporation, (collectively, Karma of Palm Beach, Inc. and Karma of Broward, Inc. are the "Karma Entities") (collectively, FVP and the Karma Entities are the "Plaintiff Parties"), and hereby sue the Debtor, Auto Wholesale of Boca, LLC, a Florida limited liability company ("AWB"); Hi Bar Capital, LLC, a New York limited liability company ("Hi Bar"); Wing Lake Partners f/k/a Franklin Capital Group, LLC, a Delaware limited liability company ("Wing Lake"); Excell Auto Sport And Service, Inc. ("Excell Service"); and Edward Brown, an individual ("Brown").

### INTRODUCTION TO THE RELIEF REQUESTED

The Plaintiff Parties seek a streamlined and bifurcated trial, which for organizational purposes only shall be referred to as Part I, and, if necessary, Part II.

Part I, seeks Declaratory Relief (the "Declaratory Relief Action") in Counts One, Two and Three. Count One seeks that this Honorable Court determine in a non-jury adversary trial whether certain defined vehicles in the possession of the Debtor, or claimed by the Debtor, are owned by the Debtor. Alternatively, whether the Debtor has some vested identifiable legal or equitable

interest in those defined vehicles, even if not owned by the Debtor, that place the vehicle(s) or proceeds from the sales therefrom, within the bankruptcy estate as defined in Section 541(a)(1) of the Bankruptcy Code.

As to any of those certain defined vehicles found *not to be owned by the Debtor*, then those vehicles would be abandoned, with the Plaintiff Parties free to litigate as appropriate in an appropriate forum.

If at the conclusion of the Declaratory Relief Action, in Part I, Count One, this Court determines that the *Debtor owns some or all of the defined vehicles*, or otherwise has a vested identifiable interest in some or all of the defined vehicles or the proceeds therefrom, then the Plaintiffs request this Court to determine in Part I, Count Two, whether the Debtor was a buyer in the ordinary course as to any of those defined vehicles that were found to be owned by the Debtor in Count One.

In Count Two, as to any of those certain defined vehicles found by the Court to be <u>both</u> *owned by the Debtor, and the Court determines that the Debtor <u>was</u> a buyer in the ordinary course as to those defined vehicles*; then the Plaintiff Parties' claims would be inferior to those of the Debtor and no determinations of priority need be made.

Finally, in Count Two, as to any of those certain defined vehicles found to be <u>both</u> *owned by the Debtor,* and *the Court determines that the Debtor <u>was not</u> a buyer in the ordinary course as to those defined vehicles*, then those vehicles would be deemed *Debtor Owned Vehicles Subject to Liens* and the FVP claims would proceed to Count Three, to determine the extent of the FVP lien in the Debtor's property and then to Part II to determine the priority of FVP liens as to any other claimants.

**NOTHING IN THIS JOINT PLEADING IS INTENDED TO CONSENT TO, OR WAIVE, ANY RIGHTS, DEFENSES OR OBJECTIONS, INCLUDING, WITHOUT LIMITATION, JURISDICTION OR THE RIGHT TO TRIAL BY JURY AS TO ANY CLAIMS HELD BY THE PLAINTIFF PARTIES AGAINST ANY OF THE DEFENDANT PARTIES IN ANY COURT ON ANY AND ALL CLAIMS AND TORTS ALL OF WHICH ARE EXPRESSLY RESERVED.**

## PARTIES

1.      At all times material hereto, Plaintiff the FVP Fund was and is a Delaware limited partnership with its principal place of business in New York County, New York.

2.      At all times material hereto, Plaintiff FVP Investments was and is a Delaware limited liability company with its principal place of business in New York County, New York.

3.      At all times material hereto, Plaintiff FVP Servicing was and is a Delaware limited liability company with its principal place of business in New York County, New York.

4.      At all times material hereto, Plaintiff, Karma of Palm Beach, Inc., was and is a Florida corporation with its principal place of business in Palm Beach County, Florida.

5.      At all times material hereto, Plaintiff, Karma of Broward, Inc., was and is a Florida corporation with its principal place of business in Broward County, Florida.

6.      At all times material hereto, Defendant AWB, the Debtor, was and is a Florida limited liability company with its principal place of business in Palm Beach County, Florida, and doing business in Broward County, Florida and Palm Beach County, Florida, and is otherwise *sui juris*.

7.      At all times material hereto, Hi Bar was and is a New York limited liability company with its principal place of business in New York County, New York.

8.      At all times material hereto, Wing Lake Partners f/k/a Franklin Capital Group, LLC was and is a Delaware limited liability company that maintains its principal place of business in Oakland County, Michigan.

9.      At all times material hereto, Defendant Edward Brown, was and is an individual who resides in Palm Beach County, Florida and is and is otherwise *sui juris*.

10.     At all times material hereto, Excell Auto Sport And Service, Inc., ("Excell Service") is a Florida corporation currently in possession, or constructive possession, of one of the Disputed Vehicles as defined below.

## JURISDICTION AND VENUE

11.     On July 22, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida, bearing case number 22-15627-EPK.

12.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, 1652 and 2201; Fed. R. Civ. P. 57; and B.R. 7001(1)-(2), (7) and (9),

13.     This action is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), (K) and (O).

14.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408-09.

15.     The Plaintiff Parties are represented by counsel as reflected in the signature pages below and each has agreed to pay their respective counsel a reasonable fee for their services.

## THE SUBJECT VEHICLES AND PROCEEDS

16.     The Debtor claims it is the owner of the following vehicles in which the Debtor either holds possession of the vehicle, title to the vehicle or the proceeds from the sale of the vehicles:

a.     Seventeen (17) high-end automobiles as described in Debtors Form 206A/B Schedule as assets at Part 8. (the original nineteen (19) filed at Case 22-15627-EPK Doc 65 Filed 08/09/22 Page 5, and 6 of 21 – **Exhibit A** - minus the 2020 Lamborghini Urus Vin# 6529, and 2020 Ferrari Superfast Vin# 4963 which have been returned to their rightful owners), and more specifically defined as:

Vehicle No:

1.  2017 Ferrari F12 Berlinetta, VIN# ZFF74UFA7H0221036

2.  2019 Aston Martin DB11 Volante VIN# SCFRMFCW6KGM07671

3.  2020 Mercedes G63 VIN# W1NYC7HJ6LX346462

4.  2019 BMW X7 VIN# 5UXCX4C56KLS39222

5.  2019 GMC Yukon VIN#  1GKS1CKJ8KR354378

6.  2018 MClaren 720S VIN# SBM14DCA9JW000606

7.  2021 Mercedes G Wagon VIN# W1NVC7HJ0MX390328

8.  2020 Mercedes G63 VIN# W1NYC7HJ6LX362080

9.  2008 Porsche 911 VIN# WP0AD29978S783176

10. 2020 MClaren 720S VIN# SBM14FCASLW004229

11. 2019 Lamborghini Urus VIN# ZPBUA1ZLXKLA01961

12. 2018 Cadillac Escalade VIN# 1GYS4BKJXJR261612

13. 2013 Ferrari 458 Italia VIN#ZFF68NHA8D0191526

14. 2021 Jeep Gladiator VIN# 1C6HJTAG1ML571540

15. 2020 Lamborghini Huracan VIN# ZHWUT4ZF1LLA14316

16. 2019 MClaren 720S VIN# SBM14FCA9KW003714

17. 2020 Mercedes G Class VIN# WDCYC7HJ9LX334940

b.      (Vehicle 18) 2018 McLaren 720s Black, VIN # SBM14DCA7JW001804, which is currently in the possession of Adversary Defendant Excell Service, either actually or constructively. Parts of Vehicle 18 are located at the business location of the Defendant in Broward County, Florida with parts at a location in the state of North Carolina.

c.      (Vehicle 19) 2015 Maclaren 650 S Convertible, VIN: SBM11FAA4FW003654, located at the Karma of Broward facility in Fort Lauderdale, Fl.

d.      (Vehicle 20) 2017 Lamborghini Huracan Red, VIN, ZHWUR2ZF8HLA08121 located at the Karma of Broward facility in Fort Lauderdale, Fl.

e.      (Vehicle 21) 2021 Rolls Royce Cullinan White, VIN # SLATV8C09MU20497, which is currently in the possession of Edward Brown and located in Palm Beach County, Florida or some other location unknown to the Plaintiff Parties.

f.      (Vehicle 22) Lamborghini Urus White, VIN # ZPBUA1ZL1MLA12270, which is currently in the possession of Edward Brown and located in Palm Beach County, Florida or some other location unknown to the Plaintiff Parties.

g.      (Vehicle 23 – Funds Only) 2021 Jeep Gladiator Black, VIN # 1C6HJJAG0ML564806, which came into the possession of the Debtor, and was sold on April 14, 2022, by the Debtor for $130,000. **Exhibit T.** The funds were formerly held in the trust account of Jay Farrow, Esq., and transferred to the account of the Debtor. The FVP Plaintiffs asset a security interest in those proceeds under the FVP / Karma Loan and Security Agreements.

**The above defined vehicles and funds shall be referred to as the "Disputed Vehicles" as to this Part I, Declaratory Relief - Count One only**.

17.      FVP and the Karma Entities deny that the Debtor has any bona fide good faith legal

or beneficial ownership interest in the Disputed Vehicles.

18.     At no time was the Debtor a buyer in the ordinary course of business as to any of the Disputed Vehicles.

19.     FVP and the Karma Entities assert that, at most, the Debtor holds bare legal title to the Disputed Vehicles, and even if the Debtor holds an interest in the Disputed Vehicles beyond naked legal title, that interest is subject and subordinate to separate, perfected security interests in the Disputed Vehicles of FVP.

20.     FVP has not entered into any business transaction with the Debtor, (save, as to the FVP / Landlord Waiver executed by the Debtor's principal expressly acknowledged the FVP security interests.). FVP and the Karma Entities have not executed a release, partial or otherwise, with respect to the Disputed Vehicles in favor of the Debtor.

## THE FVP SECURITY INTERESTS

21.     On or about January 26, 2022, the FVP Plaintiffs entered into loan and security agreements with the Karma Entities along with their principals Scott Zankl and Kristen Zankl (the "Zankl's").  The executed and operative transactional documents include the following documents incorporated herein, respectively as the following exhibit letters:

    a.   **Exhibit B.**  "Loan Agreement" by and between the Karma Entities and Zankl's and FVP Servicing, as administrative agent.

    b.   **Exhibit C**. Promissory Note by the Karma Entities in favor of FVP Investments, LLC, as Noteholder - ***$3,000,000.00***.

    c.   **Exhibit D**. Promissory Note by the Karma Entities in favor of the FVP Fund, as Noteholder - ***$4,500,000.00***.

    d.   **Exhibit E**. Personal Guaranty of Scott Zankl and Kristen Zankl (each a "Guarantor" and, together, "Guarantors") in favor of Agent and the Lenders.

    e.   **Exhibit F**. Security Agreement by and between the Karma Entities and FVP Servicing, as administrative agent, which among other things, granted the FVP Entities a security interest in "inventory, now or thereafter existing."

    f.   **Exhibit G**. Collateral Pledge Agreement by and between the Karma Entities and FVP Servicing, as administrative agent.

    g.   **Exhibit H**. UCC Financing Statement with FVP Servicing, as administrative agent, as the secured party and the Karma Entities as the debtors covering "All

Assets."

h.  **Exhibit I**. Landlord Waiver and Consent.[1]

22.    The Karma Entities defaulted on the Loan and Security Agreements and the FVP Plaintiffs declared all sums due, FVP Servicing, a copy of which is attached hereto as **Exhibit J**, and the FVP Plaintiffs instituted the Pending State Action. *See FVP Opportunity Fund III, LP, et al. v. Zankl, et al.*, Case No. CACE-22-005125 (Fla. 17th Cir.) [hereinafter, the "Pending State Action"].

23.    The Karma Entities owe Plaintiff FVP Investments unpaid principal plus default interest at the rate defined in the FVP Investments Note, plus any advances made by Plaintiff FVP Investments against the FVP Investments Note, along with all associated fees and penalties which are in excess of $7.5 million, with the precise amount that will be proven at trial.

24.    "Inventory" pledged to the FVP Plaintiffs includes the Disputed Vehicles.

25.    Neither Scott Zankl, Kristen Zankl nor the Karma Entities dispute the FVP Security Interests or debt and agree that the FVP Security Interests were perfected in the Karma Entities inventory and the Disputed Vehicles.

26.    The amounts due the FVP Plaintiffs far exceed the value of the Disputed Vehicles.

27.    On or about April 1, 2022, upon information and belief because of threats of violence to Scott Zankl, Kristen Zankl signed a letter, a copy of which is attached hereto as **Exhibit K,** purportedly granting Mr. Moshe Farache or the Debtor an interest in certain described cars, which appears to include some of the Disputed Vehicles.

### THE SECURITY INTERESTS ALLEGED BY HI BAR

28.    On or about October 27, 2021, Hi Bar and the Karma Entities, executed a Revenue Purchase Agreement (the "Purchase Agreement"), a true and correct copy of which is attached hereto as **Exhibit L**.

29.    In the Purchase Agreement, the Karma Entities purported to grant Hi Bar a security interest in assets of the Karma Entities, including "inventory," "now or hereafter owned or

---

[1] The "Landlord" who acknowledged and recognized the FVP Plaintiffs' collateral, is owned by Moshe Farache, the principal owner of the Debtor.

acquired."

30.     On December 19, 2021, the Karma Entities, among others, executed a settlement agreement with Hi Bar (the "Settlement Agreement"), a true and accurate copy of which is attached hereto as **Exhibit M,** which document states on Page 1 that "on November 16, 2021, the Sellers [including the Karma Entities] defaulted on the Purchase Agreement." Paragraph 1.b. of the Settlement Agreement also purports to grant Hi Bar a security interest in assets of the Karma Entities, including "inventory," "now or hereafter owned or acquired."

31.     On January 25, 2022, a financing statement was filed by Hi Bar's legal representative with the Florida Secured Transaction Registry against the Karma Entities, File No.2021093624865, a certified copy of which is attached hereto as **Exhibit N**, covering among other things "inventory" "now owned or hereafter acquired."

32.     On January 28, 2022, Hi Bar filed suit against Karma Entities and other affiliates in the Supreme Court of New York, Kings County (the "New York Action") for breach of the Settlement Agreement.

33.     On February 1, 2022, Hi Bar and the Karma Entities, among others, executed a Stipulation of Settlement, a copy of which is attached hereto as **Exhibit O.**

34.     As of April 28, 2022, Hi Bar alleges to be owed the principal sum of $2,500,000 pursuant to the Purchase Agreement, Settlement Agreement and Stipulation (collectively, the "HI Bar Agreements"), plus $625,000 in attorneys' fees pursuant to the Stipulation for a subtotal of $3,125,000.

35.     Scott Zankl, Kristen Zankl and the Karma Entities dispute the Hi Bar Security Interests as being the product of usury and fraud.

### THE SECURITY INTERESTS ALLEGED BY WING LAKE

36.     Non-party, Spin Capital, LLC ("Spin") is a New York limited liability company.

37.     Hi Bar is an affiliate of Spin.

38.     Hi Bar and Spin (together, the "MCA's") are merchant cash advance funding companies that operate throughout the United States.

39.     In November of 2021, Excell Auto Group, Inc., ("Excell") a company now in

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
FVP, Karma Entities Joint Adversary Complaint

bankruptcy, obtained a loan from Franklin Capital Group, LLC, now known as Wing Lake, and granted Wing Lake, among other things, a security interest in its accounts receivable and those of its affiliates as collateral.

40.     Concurrently, Wing Lake purchased the obligations of Excell and its affiliates to Spin, including any security interests that they had granted to Spin in their accounts receivable, among other collateral, and the parties agreed that Spin would not enter into any other agreements with Excell or its affiliates or otherwise interfere with Wing Lake's collateral.

41.     In particular, on or about November 3, 2021, Excell executed and delivered to Wing Lake a Promissory Note evidencing a loan in the original principal amount of $6,000,000 ('the "Note"). A copy of the Note is attached hereto as **Exhibit U.**

42.     To further evidence the terms of the loan from Wing Lake, including all present and future loans and credit, Wing Lake and Excell executed a loan agreement dated November 3, 2021 (the "Loan Agreement"). A copy of the Loan Agreement is attached hereto as **Exhibit V**.

43.     In executing the Loan Agreement, Excell represented and warranted to Wing Lake that it would not incur any debts beyond its ability to pay, that there were no other non-permitted security interests covering its assets, and that Excell would keep its assets unencumbered.

44.     As security for the loan, Excell and its affiliates, together with the Karma Entities executed and delivered to Wing Lake a Continuing Security Agreement dated November 3, 2021 (the "Security Agreement"), in which they granted Wing Lake a security interest in substantially all of their assets (the "Wing Lake Collateral").  A copy of the Security Agreement is attached hereto as **Exhibit W**.

45.     Wing Lake perfected its security interests by filing a UCC-1 financing statement with the State of Florida as to Excell on September 9, 2021, a UCC-1 financing statement with the State of Florida as to Karma of Palm Beach, Inc. on January 27, 2022, and a UCC-1 financing statement with the State of Florida as to Karma of Broward, Inc. on January 27, 2022 (collectively, "Financing Statements"). Copies of the Financing Statements are attached hereto as **Composite Exhibit X**.

46.     Concurrently with the making of its loan to Excell, Wing Lake purchased from Spin, and Spin sold and assigned to Wing Lake, the obligations of Excell and its affiliates owing

to Spin under an Assignment of Obligations and Merchant Documents agreement (the "Assignment Agreement"). A copy of the Assignment Agreement is attached hereto as **Exhibit Y.**

47.     Under the Assignment Agreement, Spin assigned to Wing Lake all of its right, title, and interest under its agreements with Excell and its affiliates, "including any claims, rights or actions [Spin] may have (whether known or unknown to [Spin] as of the date hereof) against any third party arising in connection with, or otherwise related to, [its agreements with Spin] or the Obligations [then owing to Spin]."

48.     In addition, Wing Lake and Spin agreed that Wing Lake could file UCC-3 assignments assigning from Spin to Wing Lake all UCC-1 financing statements that Spin had filed.

49.     Thereafter, Wing Lake filed any necessary UCC-3 assignments, and it then held the most senior perfected security interest in the assets of Excell and its affiliates, including its accounts receivable.  Copies of these UCC-3 assignments are attached hereto as **Composite Exhibit Z.**

50.     In executing the Assignment Agreement, Spin further acknowledged that Wing Lake is in the business of making secured commercial loans and agreed, inter alia: (a) not to purchase any portion of accounts, receipts or other obligations from Excell or the Karma Entities (together, the "Borrowers"), (b) not to take extend credit to or take a security interest in assets of the Borrowers, and (c) in the event Spin received payment from the Borrowers, the payment would be held in trust for the benefit of Wing Lake.  **See Exhibit. Y, at p. 2, ¶ 6.**

## THE DEBTOR'S USURY AND FRAUD

51.     The Karma Entities claim ownership to all of the Disputed Vehicles and claim that the Disputed Vehicles were taken by conversion, force and fraud undertaken and/or directed by the Debtor and its members, Moshe Farache ("Farache"), Lisa Farache and Chase Farache.

52.     Farache is the principal of the Debtor.

53.     Farache and Scott Zankl had a lender / borrower relationship that was both legal and illegal. There were two (2) sets of loans. One legal loan with paperwork and notes and legal interest rates, and a simultaneous illegal loan without notes or paperwork and bearing usurious and illegal interest rates.

54.     Farache was a lender, not a car dealer as is reflected in the allegations of a lawsuit sworn to by him filed in Palm Beach County, Florida. All of the paperwork created by or for Farache was created solely to support both the legal and illegal loan transactions and to explain the usurious interest payments that Zankl was paying to Farache on the loans that had no paperwork.

55.     During the year of 2021, Farache created false paperwork to ostensibly show well over one hundred purchase agreements between AWB and the Karma Entities that never occurred. The typical papers showed that after one of the Karma Entities purchased a vehicle, it would then purportedly be sold to Excell, which would then either sell the car on paper to the Debtor, or back to one of the Karma Entities, or from the Debtor to one of the Karma Entities. All imaginary.

56.     These were not transactions but only papers being created and were without money representing the market value of the vehicles really being paid between any of the parties and were done at the request of Farache who apparently believed that these fabricated documents would give the Farache and the Debtor a basis to explain usurious interest payments paid to him by Zankl and his companies and to falsely assert a security interest in vehicles to make up for the Debtor's lack of any security interest in any of the inventory of the Karma Entities.

57.     At no time in 2021 for the over one hundred (100) fabricated transactions where the Debtor purports to acquire ownership in the Karma Entities' inventory, did the Debtor or Farache ever take possession of any of the vehicles. At all times the vehicles remained on the Karma Entities' lots until ultimate customers bought the vehicles by paying funds directly to the Karma Entities. In other words, the Karma Entities sold the vehicles to the end customer.

58.     Transactions in 2022 were no different.

59.     Farache with the forced acquiescence under duress of Scott Zankl who directed his employees to give Farache anything he wanted, created false paperwork to show ostensibly that after one of the Karma Entities purchased a vehicle from a third party, the vehicle would then be sold to Excell, which would then either transfer it to the Debtor, or back to one of the Karma Entities, or from the Debtor to one of those entities. All paper transactions and all false.

60.     The 2022 transactions were without objective market value being paid for any of the paper transactions. All the paper transactions were false and fraudulent and were done at the

demand of Farache who believed that these false paper transactions would give his company, the Debtor, an apparently legitimate claim to a security interest in the vehicles mentioned in the papers superior to those of FVP in the Karma Entities inventory.

61.     However, the records show the falsity of the scheme. All of the Disputed Vehicles were purchased by the Karma Entities and taken into Karma Entities inventory. After the purchase by the Karma Entities, the sham paperwork was created and exchanged at the request of the Debtor to ostensibly show that the Debtor was a purchaser for value. However, the applicable bank records and other documentary evidence reflect that the Debtor *received* millions of dollars from the Karma Entities when the Debtor should have been *paying* those millions of dollars if the created sham purchase and sale paperwork was in fact true.

62.     The reason for all of the above described sham transactions and the participation of Scott Zankl in the false paperwork is that when Scott Zankl told Farache that he and Excell were having problems paying the money that he and Excell borrowed from Farache, Farache threatened Scott Zankl.

63.     Zankl justifiably believed the threat and gave in to it. All of the transactions in which Farache and his agents took the Karma Entities inventory, either by papers, titles or actually removing the vehicles, was only because of extreme duress and intimidation.

64.     Therefore, the Karma Entities assert that all of the Disputed Vehicles remain owned by the Karma Entities and at no time was the Debtor a legitimate good faith purchaser for value and buyer in the ordinary course of any of the Disputed Vehicles and therefore the Disputed Vehicles remain the property and inventory of the Karma Entities.

## THE EDWARD BROWN VEHICLES

65.     Defendant Edward Brown ("Brown") is a lender and investor in Excell Auto and the Karma Entities and has no other rights in the Disputed Vehicles.

66.     Brown was a very close friend of the Zankl's prior to the events that occurred on April 1, 2022.

67.     On that date Farache and his agents unlawfully seized over 30 automobiles from the lots of the Karma Entities which directly caused a cascade of actions and events that led to multiple litigations, this underlying Bankruptcy, and this Adversary Complaint.

68.     In the years prior to the events surrounding April 1, 2022, Brown invested in, and loaned many millions of dollars to, companies owned by the Zankl's including the Karma Entities.

69.     As part of the agreed and perquisites and privileges for his investment and loans, it was agreed that Brown could drive any of the vehicles that he desired on the Karma Entities' lots on "dealer plates" and without paying sales tax for as long as he wanted, and then simply return the cars for sale to a customer and take another car of his choosing.

70.     In 2021 under this agreement, Brown took possession of the following vehicles:

a.  (Vehicle 21): 2021 Rolls Royce Cullinan White, VIN # SLATV8C09MU20497, which is currently in the possession of Edward Brown.

b.  (Vehicle 22): Lamborghini Urus White, VIN # ZPBUA1ZL1MLA12270, which is currently in the possession of Edward Brown.

(Vehicles 21 and 22 are referred to collectively as the "Karma / Brown Vehicles"). [2]

71.     All of the Karma / Brown Vehicles that Brown took possession of were, and at all times remained, dealer inventory of the Karma Entities.

72.     Brown never purchased any of the Karma / Brown Vehicles. Indeed, Brown never paid sales tax for any of the Karma / Brown Vehicles.

73.     If Brown wanted a particular vehicle which was not on the lot of the Karma Entities, he would tell Scott Zankl to have one of the Karma Entities purchase it. If the Karma Entities did not have sufficient funds available at that time, then Brown would wire some or all of the amount needed to the Karma Entities for the Karma Entities to purchase the vehicle as inventory and the vehicle would be placed in the Karma Entities inventory.

74.     All of the Karma / Brown Vehicles were registered in "DealerTrack" as dealer inventory, the vehicle registered to one of the Karma Entities, dealer plates issued and Brown free to use the vehicle on dealer plates until such time as he no longer wanted to use it, or wanted a

---

[2] Brown has two additional Karma Entities inventory vehicles in his possession at this time under the above agreement, a 2021 Ferrari SF 90 VIN # ZFF95NLA7M0265077 and a 2021 Ferrari Roma, VIN # ZFF98RNA3M0263662 which are both currently in the possession of Edward Brown and both of which are the subject of a separate lawsuit in the Circuit Court of Palm Beach County Florida, Case No.: 50-2022-CA-008259-XXXX-MB and being sought by FVP as Karma Entities inventory and FVP collateral.

different car, at which time the car would be delivered to the lot and sold as inventory of one of the Karma Entities by the respective one of the Karma Entities. If Brown put up any money toward the purchase, that money would be refunded to him when the vehicle was sold.

75.    Brown and Scott Zankl, for the Karma Entities, followed this format and procedure for numerous vehicles over the years, and this was the arrangement for all of the Karma / Brown Vehicles.

76.    At all times, the Karma / Brown Vehicles remained titled to the Karma Entities, were assigned dealer plates and were insured by the Karma Entities and are owned by the Karma Entities and the Karma Entities ask the Court to declare all the Karma / Brown Vehicles to be owned by Karma Entities in Part I of this complaint.

### THE DEBTOR'S CONVERSION OF THE DISPUTED VEHICLES

77.    On or about April 1, 2022,  FVP learned that all of the vehicles on the Karma Entities lots disappeared and that the businesses were closed.

78.    After repeated attempts to communicate with their borrowers went unanswered, and having observed that their collateral automobiles were missing from the lots of both of the Karma Entities, FVP notified the Karma Entities of their default (**Exhibit J**). At the same FVP immediately retained a private investigator with federal law enforcement experience to attempt to determine what happened to the Karma Entities and the automobiles serving as collateral for the FVP loans.

79.    FVP learned through their private investigator that Farache had taken unlawful possession of the vehicles on the Karma Entities lots which included the Disputed Vehicles.

80.    The private investigator hired by FVP, coincidentally, was personally known to the "Zankl's". Scott Zankl gave several statements to the investigator regarding the events that occurred with Farache and the automobiles on or about April 1, 2022. Scott Zankl told the investigator:

a.  That the Zankl's were indebted to Farache from past loans, which were years old.

b.  That Farache had threatened the life of Scott Zankl.

c.  That both Scott Zankl and Kristen Zankl were petrified of Farache.

d.  That Farache appeared at the Karma of Palm Beach location on April 1, 2022 and demanded every car at the premises along with their titles and keys.

e.  That in extreme fear for their lives, the Zankl's turned over all of the automobiles, keys and titles on the lot to Farache. Kristen Zankl signed a document produced by Farache, (**Exhibit K**), which on its face indicates that it is "collateral" for the money owed to Farache by the Zankl's.

f.  That **Exhibit K** was signed under direct threat.

g.  That the Zankl's considered that Farache stole automobiles by threat.

h.  That  the Zankl's were initially afraid to report the matter to the police because they feared Farache.

i.  That on April 8, 2022, the Zankl's reported to the police that Farache had, in fact, stolen the vehicles through extortion the week prior. *See Boca Raton Police Department – Report Case No.: 22-4685.*

81.    The Disputed Vehicles, among others, were those taken by Farache on or about April 1, 2022.

82.    The Disputed Vehicles, among others, as well as titles to other vehicles were wrongfully taken and converted by Farache for himself or the Debtor against the superior interests in the property rights of FVP.

83.    Employees or agents of the Debtor wrongly and fraudulently transferred titles to itself for the Disputed Vehicles, among others, without right or authority.

84.    At no time was the Debtor a good faith purchaser for value.

85.    At no time was the Debtor a buyer in the ordinary course of business as defined under UCC Article 9, Chapter 679, Florida Statutes and Florida common law.

86.    At most, the Debtor has naked possession and bare title to the Disputed Vehicles, and the Disputed Vehicles are subject to the FVP perfected security interests at the time the Debtor wrongfully took possession of the Disputed Vehicles, and wrongfully transferred title in and to the Disputed Vehicles to itself.

87.     The FVP Plaintiffs filed suit against the Debtor as well as individual parties to their respective security agreements seeking, inter alia, replevin and foreclosure of their Liens in the Disputed Vehicles in the Pending State Court Action.

88.     At the request of the FVP Plaintiffs, the State Court, on April 14, 2022, entered a Freeze Order prohibiting the Debtor from transferring the Vehicles.  (the "Freeze Order").

89.     Defendant  Hi Bar intervened in the earlier filed suit filed by FVP and consolidated claims against the Debtor with regard to the Disputed Vehicles.

90.     On May 25, 2022, the Circuit Court Judge issued its order to show cause in replevin and scheduled the hearing for July 7, 2022 together with the FVP Plaintiffs' motions for relief seeking appointment of a receiver and an injunction. **Exhibit P**.

91.     The Debtor's attorneys moved to vacate the Freeze Order, which the Circuit Court Judge denied and set a two-day evidentiary hearing on the Plaintiffs' Motions for the aforementioned relief for July 25, 2022 and July 26, 2022. **Exhibit Q**.

92.     The Circuit Judge in the Pending State Court Action also set a contempt hearing for the morning of July 26, 2022 for Moshe Farache because of alleged intentional misrepresentations to the Circuit Court. **Exhibit R.**

93.     On the last business day before the hearing, the Debtor filed the instant Chapter 11 Bankruptcy.

94.     The rule to show cause in contempt against Moshe Farache for intentional misrepresentations to the Circuit Court on matters relevant to this adversary complaint remain pending hearing in the state court on a rule to show cause in contempt.

95.     All conditions precedent to this action have occurred or been met.

## PART I
## DECLARATORY RELIEF

### COUNT ONE

### DECLARATORY COUNT TO DETERMINE OWNERSHIP OF THE DISPUTED VEHICLES

96.     The Plaintiff Parties repeat and reallege the allegations contained in paragraphs 1 through 95  as if fully set forth herein.

97. This Count One, and Count Two and Count Three, for Declaratory Relief are brought pursuant to B.R. 7001(9) which can provide the same relief as is available to the Plaintiffs pursuant to B.R. 7001(1), (2) and (7), because the Rule provides that a declaratory judgment can include any of the relief available in any other type of adversary proceeding. It provides that an adversary proceeding includes "a proceeding to obtain a declaratory judgment relating to any of the foregoing," i.e., any of the adversary proceeding types delineated in B.R. 7001(1) through (8).

98. The Plaintiff Parties seek a judicial determination and declaration of the ownership of the Disputed Vehicles for purposes of Section 541(a)(1) of the Bankruptcy Code.

99. The Debtor has asserted before this Court in its sworn bankruptcy schedules and verbally at various hearings that it is the lawful owner of the Disputed Vehicles.

100. No other person or entity affiliated with Farache, or the Debtor has any other claim to the Disputed Vehicles other than the Debtor.

101. FVP and the Karma Entities contend that one of the Karma Entities, either Karma of Palm Beach, or Karma of Broward, beneficially and legally owns all of the Disputed Vehicles and that the Debtor holds no ownership in the Disputed Vehicles.

102. FVP and the Karma Entities contend that that the Debtor has mere naked possession and naked title to the Disputed Vehicles and that the Debtor procured its possession through conversion, theft, actual or constructive fraud and/or duress.

103. There is a bona fide, actual, present, and practical need for the Court to issue a declaration regarding the ownership interests in the Disputed Vehicles.

104. The Declaration deals with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.

105. There is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

WHEREFORE, FVP and the Karma Entities demand a declaratory judgment that:

a. Declares the Debtor is not the lawful owner of, and does not hold any valid interest under Section 541(a)(1) in, some or all of the Disputed Vehicles.

And thereafter:

b.   As to any of the Disputed Vehicles that the Court declares that the Debtor is not the lawful owner of, and does not hold any valid interest under Section 541(a)(1) in, **order the abandonment of those vehicles**.

c.   As to any of the Disputed Vehicles that the Court declares that the Debtor is the lawful owner of, or otherwise holds a valid interest under Section 541(a)(1) in, deem those vehicles a **"Debtor Owned Vehicle"** and proceed to Count Two to determine whether the Debtor was a buyer in the ordinary course as to each and every Debtor Owned Vehicle.

<u>COUNT TWO</u>

<u>DECLARATORY COUNT TO DETERMINE WHETHER THE DEBTOR WAS A BUYER IN THE ORDINARY COURSE AS TO ANY DEBTOR OWNED VEHICLES</u>

106.   The Plaintiff Parties repeat and reallege the allegations contained in paragraphs 1 through 95 as if fully set forth herein.

107.   As to any Debtor Owned Vehicle as found in Count One, the Debtor was not a "buyer in the ordinary course of business" (a "BitOCoB") with respect to its acquisition of the vehicles. See § Section 679.320, Fla. Stat. This provision states:

**679.320   Buyer of goods.**—

(1)   Except as otherwise provided in subsection (5), a buyer in ordinary course of business, … takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence.

108.   Section 671.201(9) of the Florida Statutes defines a BitOCoB as follows, in relevant part:

(9)   "Buyer in ordinary course of business" <u>means a person who, in ordinary course, buys goods in good faith</u>, without knowledge that the sale violates the rights of another person in the goods, from a person, other than a pawnbroker, <u>in the business of selling goods of that kind</u>. <u>A person buys goods in ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices</u>. …. A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit and may acquire goods or documents of title under a preexisting contract for sale. Only a buyer who takes possession of the goods or has a right to recover the goods from the seller under chapter 672 may be a buyer in ordinary course of business. "Buyer in ordinary course of business" <u>does not include a person who acquires goods in a transfer in bulk or as security for or in</u>

<u>total or partial satisfaction of a money debt.</u>

(Emphasis added).

109.    "Good faith" means honesty in fact and the observance of reasonable commercial standards of fair dealing." See § 679.1021(qq), Fla. Stat. It is no longer merely a subjective standard, as made clear in the Official Comment thereto.

110.    The Debtor, both a legal commercial lender as well as a usurious lender masquerading as another car dealer licensed as such in Florida, is a "merchant" under the UCC.

111.    In contrast, the Debtor is not an ordinary customer who walks into a retail dealership to buy a car. Moreover, the conduct, documentation and financial dealings between the Debtor and the Karma Entities and their agents were anything but "ordinary course."

112.    The purported sales to the Debtor did not, as required by Section 671.201(9) of the Florida Statutes, "comport with the usual or customary practices in the kind of business in which [the Karma Entities are] engaged or with the seller's own usual or customary practices."  The Karma Parties were not in the business of selling large numbers of their cars to a wholesaler.

113.    In all events, the principals of the Karma Entities, Scott Zankl and Kristen Zankl, and of the Debtor, Farache, engaged in a series of business transactions involving the exchange of hundreds of pages of documents, millions of dollars flowing back and forth between the parties, the "fast tracking" of applications to change the name of the owner on Certificates of Title, and many emails back and forth between them and their agents where the alleged buyer, the Debtor, is clearly leading the process.

114.    Moreover, the Debtor and Excell Auto Group, Inc. ("Excell"), now in its own Chapter 7 proceeding, had a pre-existing business relationship. Excell may have owed the Debtor money, and the Debtor may have had agreements with Excell that granted it a security interest in assets of Excell. Farache also may be or may have been an investor in Excell and/or its affiliates. However, what the Debtor was not a secured party of the Karma Entities at the legally relevant times.

115.    At some point, Farache, for the Debtor, decided to exercise self-help to try to recover money allegedly owed to him by Excell and/or Scott Zankl. The Debtor engaged in, and in fact led, a series of fraudulent orchestrated transactions to try to reflect that the Debtor was

buying cars from Excell, but in fact, those cars had been acquired by the Karma Parties from various third parties (persons or other dealers).

116.    The Karma Entities names appear as the first "purchaser" on the original Certificates of Title. Farache and agents of the Debtor, with Scott Zankl's forced acquiescence on the heels of the threats of violence made by Farache, manipulated the transactions and documents to cause purchase papers and title documents to reflect "fabricated," or and certainly "not ordinary," purported sales from the Karma Entities to the Debtor, or from the Karma Entities to Excell and then from Excell to the Debtor.

117.    Further, Farache has made multiple and conflicting representations about his acquisition of the vehicles for the Debtor, all under oath. In a back to back affidavits, he described himself as a lender foreclosing on his "collateral" and, inexplicably, a week later as "Purchaser".

118.    His latest iteration is that he took the cars to repay "antecedent debt".

119.    Whatever version Farache finally settles on for trial, it is indisputable that there was not a single transaction as to any of the Debtor Owned Vehicle's that comprised what the law deems a buyer in the ordinary course of business (BitCoB).

120.    The Declaration sought in this Count Two deals with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.

121.    There is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

WHEREFORE, the Plaintiff Parties demand a declaratory judgment that:

a. Declares the Debtor was not a BitCoB as to the purchase of some or all of the Debtor Owned Vehicles.

b. As to any Debtor Owned Vehicle that this Court declares were not purchased by the Debtor in the ordinary course of business, that this Honorable Court declare those vehicles **"Debtor Owned Vehicles Subject to Liens"** and proceed to Count Three, and then those counts in Part II.

c. As to any Debtor Owned Vehicle that this Court declares were purchased by the Debtor in the ordinary course of business, that this Honorable Court enter

judgment accordingly as to those vehicles.

## COUNT THREE

### DECLARATORY COUNT TO DETERMINE THAT FVP'S LIENS ATTACH TO, AND EXCEED THE VALUE OF, THE DEBTOR OWNED VEHICLES SUBJECT TO LIENS

122. FVP repeats and realleges the allegations contained in paragraphs 1 through 95 as if fully set forth herein.

123. FVP seeks a declaration that:

   a.  FVP has a perfected security interest in the Debtor Owned Vehicles Subject to Liens.

   b. FVP's perfected security interest is superior to the Debtor's interest in the Debtor Owned Vehicles Subject to Liens.

   c. FVP's perfected security interest is in the amount of $7,500,00.00.

   d. FVP's perfected security interest consumes the entire value of the property.

   e. Debtor has no equity in the Debtor Owned Vehicles Subject to Liens because of the extent of FVP's perfected security interest and liens in the vehicles.

124. Bankruptcy Rule 7001(2) affords the FVP the right to bring an adversary proceeding for such a determination.

125. As secured parties, FVP have the clear right to recover possession of their collateral upon default pursuant to their Security Agreements, Part 6 of Article 9 of the UCC (Sections 679.601 and 679.609 of the Florida Statutes), and Florida's Replevin law (Chapter 78 of the Florida Statutes).

WHEREFORE, FVP demands a declaratory judgment that declares:

   a. FVP has a perfected security interest in the Debtor Owned Vehicles Subject to Liens.

   b. FVP's perfected security interest is superior to the Debtor's interest in the Debtor Owned Vehicles Subject to Liens.

   c. FVP's perfected security interest is in the amount of $7,500,00.00.

    d.   FVP's perfected security interest consumes the entire value of the property.

    a.   Debtor has no equity in the Debtor Owned Vehicles Subject to Liens because of the extent of FVP's perfected security interest and liens in the Debtor Owned Vehicles Subject to Liens.

## PART II

## VALIDITY AND PRIORITY OF LIENS IN THE DEBTOR OWNED VEHICLES SUBJECT TO LIENS

### COUNT FOUR

### COMPLAINT TO DETERMINE PRIORITY OF LIENS
### FVP V WING LAKE

126.    The FVP Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 95 as if fully set forth herein.

127.    The FVP Plaintiffs seek a declaration that their rights are superior as to the Debtor Owned Vehicles Subject to Liens than those asserted by Defendant Wing Lake.

128.    Wing Lake terminated their UCC Financing Statement as to the Karma Entities on November 16, 2021. **Exhibit S.**

129.    The FVP Plaintiffs seek a declaratory ruling as is necessary to carry out the purposes and intents of the relief requested in this Count.

130.    The Plaintiffs seek a declaration that their rights are superior as to the Debtor Owned Vehicles Subject to Liens than those asserted by Defendant Wing Lake.

WHEREFORE, the FVP Plaintiffs seek a determination that the FVP security interests that have vested in the Debtor Owned Vehicles Subject to Liens are superior in right and priority to those claimed by Defendant Wing Lake.  The FVP Plaintiffs seek their costs and expenses under Federal Rule of Bankruptcy Procedure 7054 and Fed. R. Civ. P. 54 as well as such further relief as the Court deems just and proper.

### COUNT FIVE

### COMPLAINT TO VOID HI BAR UCC FILING, LIEN AND PRIORITY BASED ON FRAUD ONLY TO THE EXTENT THAT IT CREATES A LIEN ON PROPERTY OF THE ESTATE FOR A PRIORITY DETERMINATION
### FVP V. HI BAR

131.    The FVP Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 95 as if fully set forth herein.

132.    FVP seeks to void the lien on the property of the estate and in particular in the Debtor Vehicles Subject to Liens based on the Hi Bar UCC filing based on fraud as alleged in this Count only to the extent that it creates a lien on those Debtor Vehicles Subject to Liens for a priority determination.

133.    FVP provides original loans by first engaging in a thorough underwriting review of the business applicant to ensure that the business qualifies to receive the loan.  If a business applicant meets FVP's underwriting requirements, FVP will typically agree to loan the business customer a principal amount.

134.    Of critical importance to FVP in its underwriting of loans is to ensure that its business customer is in a position to repay its loan and that there is adequate security available to FVP to safeguard repayment.

135.    By contrast, a merchant cash advance is an agreement in which merchants can receive cash much more quickly with less underwriting than traditional loans offered by conventional financial institutions.  The advances are very expensive and require a steady flow of receivables from which the advances are repaid.

136.    Hi Bar is a merchant cash advance funding company ("MCA") and the transaction in this case, providing money to the Karma Entities and Excell was a merchant cash advance.

137.    Under a merchant cash advance agreement, an MCA agrees to purchase a business customer's receivables at a discounted cash purchase price. For example, a funding company could purchase $25,000 of a business customers' receivables at the discounted cash purchase price of $20,000. The business customer receives the discounted cash purchase price, and the funding company debits the business customer's bank account for a certain percentage of the business customer's receivables either daily or weekly until the purchase price is repaid.

138.    Such MCA funding companies currently are under intense scrutiny for what legislators and regulators have deemed heavy-handed lending and unlawful collection tactics. MCA funding companies advance money at exorbitant interest rates and often require borrowers

to execute a confession of judgment or consent to other legal process as a condition to obtaining the funds, opening the door for rampant abuse of power. Funding companies have been known to forge documents, lie about how much is owed, and fabricate defaults to convince a court, typically in New York, to obtain a judgment. *See, e.g.,* the Bloomberg article titled, *"I hereby confess judgment"* and the Yahoo! Finance article titled, *"'We're coming after you': Inside the merchant cash advance industry."* A borrower never even has a chance to dispute whether it committed a default or the amount outstanding before the merchant cash advance funding company seizes all of its assets.

139.    Under the facts and circumstances of this case, the Hi Bar merchant cash advances were in fact a criminally usurious loan, which is unenforceable and making any security interest in the Debtor Owned Vehicles Subject unenforceable

THE INITIATION OF THE HI BAR FRAUD

140.    Non-party, Spin Capital, LLC ("Spin") is a New York limited liability company.

141.    Hi Bar is an affiliate of Spin with Josh Lubin, the Principal of Spin, negotiating for and speaking for Hi Bar for all purposes.

142.    Hi Bar and Spin are both MCA's, which on information and belief, are controlled by Josh Lubin.

143.    In or around September of 2021, Scott Zankl on behalf of Excell entered into communications with Wing Lake to borrow money to pay off MCA loans that Excell and the Karma Entities had with Spin and two other MCA's.

144.    Wing Lake advised Zankl, that it would fund a loan to pay off the two other MCA loans only if the Spin loan was satisfied.

145.    In response, Zankl had extensive conversations with Josh Lubin, the Principal of Spin about the fact that he would not be able to borrow the money from Wing Lake without Spin's MCA loan being paid off.

146.    Lubin advised Zankl that he would shift the debt owed to Spin to another company that he controlled named Hi Bar. At all times, all of Scott Zankl's communications with both Spin and Hi Bar were with Josh Lubin.

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
FVP, Karma Entities Joint Adversary Complaint

147.    In October 2021, Zankl and Lubin agreed that Hi Bar would pay off the Spin debt and that Zankl and his companies, Excell and the Karma Entities, would then only have a debt to Hi Bar and it would appear to Wing Lake that the Spin debt was satisfied.

148.    On October 27, 2022, the Zankl's on behalf of Excell and the Karma Entities, entered into the money advance transaction documents with Hi Bar. **Exhibits L through Exhibit N.**

149.    Critically, the Hi Bar documents materially increased the debt owed by Zankl, Excell and the Karma Entities for no reason as there was never a default of the Spin debt. Further no money was paid by Hi Bar to Spin, and no money was paid to Excell and the Karma Entities for the increased debt. No consideration was supplied by Hi Bar for its imaginary advance to Excell and the Karma Entities.

150.    In response to this paperwork, Lubin and Spin notified Wing Lake that Spin no longer had any sums owed by Excell and the Karma Entities but intentionally and fraudulently withheld the fact that Spin had merely rebranded the debt in the name of Hi Bar.

151.    Based on this representation, Wing Lake and Excell and the Karma Entities entered into the Wing Lake transaction documents depicted in **Exhibits U through Exhibit Z**.

152.    Under the Assignment Agreement, Spin acknowledged that Wing Lake is in the business of making secured commercial loans and agreed, inter alia: (a) not to purchase any portion of accounts, receipts or other obligations from Excell or the Karma Entities (together, the "Borrowers"), (b) not to take extend credit to or take a security interest in assets of the Borrowers, and (c) in the event Spin received payment from the Borrowers, the payment would be held in trust for the benefit to Wing Lake.  See Exhibit. Y, p. 2, ¶ 6.

153.    As is seen in the Spin transaction documents with Wing Lake, which were signed by Spin just days after the Hi Bar transaction, Spin and Hi Bar colluded and conspired to defraud Wing Lake as the Hi Bar debt, which was *de facto* the Spin debt, was hidden from Wing Lake. As such, Wing Lake was intentionally defrauded by both Spin and Hi Bar as both companies, as well as Lubin, materially mislead Wing Lake into entering into the loan agreements in the first instance by materially misrepresenting that the Spin debt was satisfied, when it was simply relabeled.

THE HI BAR FRAUD CONTINUES

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
FVP, Karma Entities Joint Adversary Complaint

154. Shortly after the Wing Lake transaction, Scott Zankl engaged FVP in communications regarding a loan transaction.

155. To that end, through November and December of 2021, Zankl had detailed conversations with FVP about a $7.5 million dollar loan facility which would be collateralized by the inventory of the Karma Entities but would specifically not include any collateral or security interests in Excell.

156. Notwithstanding the fact that Hi Bar was ostensibly permitted to file a UCC financing statement on October 27, 2021, Hi Bar did not do so.

157. The decision of Hi Bar not to file a financing statement was intentional to maintain the fraud against Wing Lake hidden as long as possible, and to commit further fraud against FVP.

158. At that same time, Scott Zankl had conversations with Lubin regarding the FVP loan. Lubin specifically requested that Zankl let him know when the FVP loan was going be funded and told Scott Zankl to forward all of the FVP loan documents to him for his review. It was Lubin's intent to have Zankl secure the FVP loan without FVP knowing about the Hi Bar loan so that Scott Zankl would pay a substantial part of the proceeds of the FVP loan to Hi Bar to satisfy its illegal usurious loan.

159. Just before December 15, 2021, Scott Zankl advised Lubin that he was closing the loan with FVP. In response to this information, and in anticipation of the funding, Lubin caused a UCC Financing Statement to be filed on Excell and the Karma Entities on December 15, 2021. **Exhibit AA**. Lubin filed the UCC on that date because he was led to believe that FVP was funding the Karma's loan on or about that date.

160. When the loan did not close, Lubin accused Scott Zankl of misleading him and pressured Zankl to email him the actual loan documents provided by FVP to confirm his representations. On December 17, 2022 Zankl emailed Lubin all of the FVP / Excell / Karma loan documents. **Exhibit BB**.

161. After Lubin received the FVP loan documents, he was fully aware of the fact that the FVP loan proceeds could not be used to repay any other lenders including Hi Bar.

162. On December 19, 2021, Scott Zankl told Lubin that FVP became aware of the December 15, 2021 filing of the UCC Financing Statement and advised Zankl that the funding was

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
FVP, Karma Entities Joint Adversary Complaint

off and that therefore Zankl could not pay Hi Bar.

163.    In response, Lubin demanded that Scott Zankl sign a "Settlement Agreement" which astronomically increased the amounts due Hi Bar **Exhibit M.** The December 19, 2022 "Settlement Agreement" falsely and fraudulently described a "default" that never occurred, and reiterated that Hi Bar had a "security interest" in the Karma Entities collateral as described in the Hi Bar UCC Financing Statement filed just four (4) days prior on December 15, 2021. **Exhibit AA.**

164.    Notwithstanding the purported confirmation that Hi Bar was entitled to maintain the just filed UCC filing, Hi Bar did the exact opposite of what the documents purported to grant, and on December 19, 2021, Hi Bar *instead filed a termination* of the four (4) day old UCC Financing Statement (**Exhibit CC)** which terminated the Hi Bar financing statement as to Excell, Zankl and the Karma Entities.

165.    This termination of the four (4) day old UCC Financing Statement (**Exhibit CC)** was specifically and intentionally made as a direct, false and fraudulent representation to FVP that Hi Bar had no secured interests in the Karma Entities' collateral. The termination states:

> "Effectiveness of the Financing Statement identified above is terminated with respect to the security interests of the Secured Party authorizing this Termination Statement".

166.    This representation filed of record in **Exhibit CC** was intentionally made to FVP and was made to FVP for the sole purpose of notifying FVP that Hi Bar had no security interests to protect. This representation was false when made and intentionally false. FVP justifiably relied upon the misrepresentation to their detriment.

167.    To double down on the fraud, Hi Bar advised Frank O'Donnell, an agent intermediary between FVP and Scott Zankl, that the Hi Bar UCC Financing Statement of December 15, 2021 was a mistake and was "erroneously filed." **Exhibit DD.** This representation was specifically made to FVP for the sole purpose of notifying FVP that Hi Bar had no security interests to protect and was false when made and intentionally false. FVP justifiably relied upon the misrepresentation to their detriment.

168.    The sole purpose of the termination communicated to FVP was to convince FVP that Hi Bar had no protectable interest in the collateral of the Karma Entities so that FVP would

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
FVP, Karma Entities Joint Adversary Complaint

rest assured that Hi Bar was not a threat to their priority of security and proceed to fund a loan to the Karma Entities with Lubin waiting in the wings to pounce with a second UCC Financing Statement which would be filed minutes before an FVP filing.

THE STING

169. The fraud worked. Upon being supplied the UCC termination notice, FVP reinstituted the loan process with Scott Zankl and the Karma Entities.

170. The negotiations carried through to mid-January 2022 with Scott Zankl advising Lubin every step of the way on the progress of the FVP funding so that Lubin would be ready to act.

171. On January 21, 2022, Scott Zankl again emailed Lubin the FVP loan documents and promised Lubin that as soon as he got the loan from FVP, which would be Monday January 24, 2022, that Scott Zankl would pay Lubin from the FVP proceeds. **Exhibit EE.**

172. Again, after Lubin received the FVP loan documents, he was fully aware of the fact that the FVP loan proceeds could not be used to repay any other lenders including Hi Bar.

173. On Monday January 24, 2022, Lubin again demanded that Zankl email him all of the actual loan closing agreements. In response, Scott Zankl sent Lubin four (4) separate emails which included all of the FVP loan documents. **Exhibit FF Composite**. Later that day when no closing occurred, Scott Zankl texted Lubin that he would be closing the next day January 25, 2022. **Exhibit GG.** The text again confirmed that Lubin would be receiving the FVP loan proceeds which he was fully aware he could not receive under the terms of the FVP transaction documents.

174. On January 25, 2022, Scott Zankl advised Lubin that he would be closing he next day, January 26, 2022, with certainty.

175. In response, and to finalize the fraud, at Lubin's direction Hi Bar refiled its UCC Financing Statement on January 25, 2022 at **10:55 pm** knowing that:

    a. the FVP funding was to close the next day on January 26, 2022;

    b. the FVP loan could not be used to pay Hi Bar;

    c. that Zankl fully intended to pay Hi Bar with the proceeds as stated in the text of January 24. 2022; and

d. That but for the material misrepresentation of the December 19, 2021 UCC Termination, **Exhibit CC**, that there never would have been an FVP loan in the first instance.

176. At all times Josh Lubin acted for both Spin and Hi Bar in an identical fashion and all of Scott Zankl's communications with both Spin and Hi Bar were with Josh Lubin.

177. In fact, on January 3, 2022, Josh Lubin told Scott Zankl to wire the funds due Hi Bar to Spin. **Exhibit HH.**

178. It was always Josh Lubin who personally pressured and threatened Scott Zankl and the Karma Entities with a (Hi Bar) lawsuit ("I have to file tomorrow") if payments were not made to Lubin's satisfaction. See eg, **Exhibit II** evidencing pressure and threats on January 13, 2022.

179. It was Josh Lubin who personally directed Scott Zankl where to send every payment due Hi Bar after the Hi Bar documents were executed. For example, on February 7, 8 and 9, 2022, Lubin directed Scott Zankl to wire funds to an attorneys account. On those dates, a total of $1.3 million was wired to a Lubin / Hi Bar attorney with funds, on information and belief, that came from the FVP $7.5 million dollar loan the prior week.

180. The actions of Hi Bar comprise fraudulent conduct with the intended and express target of the fraud being FVP.

181. The UCC Financing Statement filed on December 19, 2021 was an "instrument" as defined in Fla. Stat. § 817.535 and was filed with the intent to defraud.

182. The UCC Financing Statement filed on January 25, 2022 at 10:55 pm was an "instrument" as defined in Fla. Stat. § 817.535 and was filed with the intent to defraud.

183. The UCC Financing Statement filed on January 25, 2022 at 10:55 pm contained a material false statement as it represented that Hi Bar had a legitimate lien in the property defined therein when Hi Bar had no legitimate enforceable interest to protect; as Hi Bar paid no consideration for the alleged interest, was a participant in a fraudulent transfer as defined in Fla. Stat. § 726.105; was a participant in an illegal and usurious shake down of Scott Zankl and the Karma Entities, and was surreptitiously filed with the intent to defraud.

184. The FVP Plaintiffs demand that the court declare the Hi Bar UCC Financing Statement filed on January 25, 2022 at 10:55 pm null and void if, and only to the extent, that it

creates a lien on the Debtor Owned Vehicles Subject to Liens for a priority determination.

WHEREFORE, the FVP Plaintiffs demand that the Hi Bar UCC Financing Statement filed on January 25, 2022 at 10:55 pm be declared null and void if, and only to the extent, that it creates a lien on the Debtor Owned Vehicles Subject to Liens for a priority determination as to those liens.

### COUNT SIX

### COMPLAINT TO VOID HI BAR UCC FILING, LIEN AND PRIORITY BASED ON ILLEGALITY ONLY TO THE EXTENT THAT IT CREATES A LIEN ON PROPERTY OF THE ESTATE FOR A PRIORITY DETERMINATION

### FVP V. HI BAR

185.    The FVP Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 95 as if fully set forth herein.

186.    The relief sought in this Count Six is necessary for a determination as to the priority of liens in the property of the Bankruptcy estate and is sought only to the extent necessary for that purpose.

187.    FVP seeks to void a lien on the property of the estate and in particular in the Debtor Vehicles Subject to Liens based on the Hi Bar UCC filing based on the patent illegality of Hi Bar as alleged in this Count.

188.    MCA's have come under intense scrutiny for their unconscionable and unlawful conduct. See *Attorney General of the State of New York, v. Various MCA Companies*, Index No. 451368/ 2020 Supreme Court of the State of New York, County of New York (alleging, *inter alia*, that Richmond, Giardina, and others have preyed upon thousands of small businesses throughout the United States by offering funding under "merchant cash advances" that "are in fact fraudulent, usurious loans with interest rates in the triple and even quadruple digits, far above the maximum rate permissible for a loan under New York law - Criminal Usury, Fraud in the Form of Unconscionability – pending); *Fleetwood v RAM Capital Funding, et al.,* United States District Court for the Southern District of New York, Case No. 20-cv-5120(LJL), See June 6, 2022, Opinion and Order; See also *Federal Trade Commission v. RCG Advances*, LLC, No. 20-cv-4432 (S.D.N.Y.) same.

189.    Hi Bar is the subject of several lawsuits for the same illegal and inequitable conduct outlined in this Count Six which are summarized as follows:

a. The Counterclaim in *Hi Bar Capital, LLC v. Excell Auto Group, Inc., et al.*, Index No. 502846/2022, Supreme Court of the State of New York, County of Kings, (Fraud and Usury – pending) in which the Excell Trustee in Case 22-12790-EPK recently stated in a motion:

The Trustee contends that each contract referenced above constitutes a loan agreement that at minimum violated New York's criminal usury laws, and that notwithstanding all the other entities being listed as "co-obligors," the only entity that was truly a party to any of the contracts was the Debtor. From these contracts the bankruptcy estate has substantial claims and defenses against Hi Bar, its principals, and related entities.

Accordingly, the stay should be enforced to stay the New York Litigation, which is proceeding as a sham against the other entities, who neither received nor paid any monies to Hi Bar under any contract at issue. However, the New York Court is being asked to interpret the rights of the Debtor under the terms of three agreements.

[D. E. 286] Case 22-12790-EPK Filed 10/20/22

b. *JAR 259 Food Corp., v. Hi Bar Capital, a/k/a Kingdom Kapital*, Adversary Proceeding No: 1-22-01033-jmm in the United States Bankruptcy Court for the Eastern District of New York. (Fraud, Rico, Civil Conspiracy, Unconscionable Loan Practice – pending).

c. *Wing Dingers Texas, LLC, v. Hi Bar Capital,* Adversary Proceeding No: 21—06016 01033-jmm in the United States Bankruptcy Court Eastern District of Texas. (Rico, Civil Conspiracy, Unconscionable Loan Practice – closed, settled).

d. *Consultants For America's Veterans, LLC et al. v. Hi Bar Capital,* et al., Index No. 522534/2021, Supreme Court of the State of New York, County of Kings, (Usury, annual interest rate of 559.2% and 406.0% - pending).

190. On August 31, 2021, non-party Spin entered into a "Revenue Purchase Agreement" with Excell. (the "First Agreement"). Under the First Agreement, which was self-defined as a sale of receivables, Excell was indebted to Spin in the amount of **$2,998,000** for receipt of the sum of **$2,000,000.** The First Agreement stated: " Excell is selling a portion of future revenue to Spin at a discount, and is not borrowing money from Spin, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Spin."

191.     The First Agreement then goes on to state that Excell must pay $150,000.00 weekly, or, 20% of its receivables. Excell had no receivables.

192.     On October 18, 2021, Spin issued to Scott Zankl a balance notice that stated that Excell owed Spin **$2,264,312.50.** Neither Scott Zankl nor Excell were in default, but Scott Zankl was required to eliminate the Spin debt to comply with the Wing Lake demands for its financing.

193.     Days later, Lubin agreed to "transfer" the Spin debt to Hi Bar which he described to Scott Zankl as a "no net refi" with Hi Bar, a company he controlled, which, he represented, would simply exchange the creditors names with no change in terms. This was an intentionally false statement.

194.     Lubin emailed the Hi Bar paperwork to Scott Zankl which he viewed on his phone, and trusting Lubin's representations about what was in the paperwork, DocuSigned the documents on his phone on October 27, 2021.

195.     After the Scott Zankl was able to intelligently review the documents, he learned that Hi Bar failed account for the approximately $750,000.00 already paid to Spin and discovered that Excell and now the Karma Entities owed Hi Bar **$3,177,880.00**.

196.     Therefore, Hi Bar increased the debt a little less than $1,000.000.00 from just a week prior with the stroke of a pen. This with no additional funds paid to Excell or the Karma Entities. with weekly payments of $150,000.00. Over the next two months Zankl and Excell paid Hi Bar approximately $500,000.00 and in mid-December had a balance of **$2,677,880.00**.

197.     Therefore, over the course of three and one half months, Excell became indebted in the amount of **$2,998,000** (and received **$2,000,000.00**), **repaid $1,250,000.00 and was told it owed a balance of $2,677,880.00.** Incredibly, Scott Zankl and Excell (and now the Karma Entities which were added as obligors) were told they were in default and would be sued unless they signed a "Settlement Agreement".

198.     Fearing what a lawsuit would do to his business, Scott Zankl executed a "Settlement Agreement" in mid-December of 2021 which increased the balance owed to Hi Bar to **$4,016,820**. An increase of the amount owed by **$1.3 million**. So, in approximately 100 days, **Excell received $2 million, repaid $1.2 million and owed $4 million.** No, that is not a typo.

199.     It gets worse. By mid-January Excell paid Hi Bar an additional **$1.3 million** making

the total payment by Excell **$3,083,687.50** on the original obligation of **$2,998,000** incurred on August 31, 2021.

200.    On January 28, 2022, Hi Bar sued Scott Zankl, Excell and the Karma Entities for what it deemed it was owed under the "merchant advance", the sum of **$3,616,820,** plus attorneys' fees in the amount of **$625,000.00** or 33% of the Outstanding Balance. That case remains pending.

201.    So, in four months, **Excell repaid over 100% of the incurred debt**, (which was 33% more that the money received) and **still owed $1.6 million more than the original debt.**

202.    Incredibly, Hi Bar never paid a penny to Excell, or the Karma Entities at any time to receive this patently illegal windfall.

203.    On information and belief, Hi Bar never paid Spin any money to "pay off" the Spin debt and that the "Balance Transfer" transaction was simply a fiction invented by Lubin and his associates to mercilessly rip off Scott Zankl, Excell and the Karma Entities.

204.    All of Scott Zankl's communications regarding the money owed to Hi Bar were with Josh Lubin personally. It was Lubin that constantly pressured Zankl for the Hi Bar payments.

205.    The acts of Spin, Lubin and Hi Bar are outrageous, violate Florida Public Policy, are unconscionable and are unquestionably illegal in Florida. To the extent that this Court is required to view the acts of Hi Bar through the prism of New York law, it is equally illegal as is outlined in the lawsuit filed by the Attorney General of New York cited above.

206.    Spin and Hi Bar may call it an "advance" or "purchase of receivables", but it was and is, an obvious usurious loan, plain and simple. Hi Bar and Spin attempted to mask their loan agreements as receivables purchases but even the most cursory examination proves what anyone looking at this already knows. Spin and Hi Bar never bothered to analyze the Excell receivables because the fact that Excell had no receivables would have made no difference.

207.    These were criminally usurious loan contracts under both New York law and Florida law created by very smart lawyers for very unethical lenders. As to the "Balance Transfer" to Hi Bar, the loan charges increased by 50.3 %. When Hi Bar and Scott Zankl, Excell and the Karma Entities executed a "Settlement Agreement" the loan charges increased another 50%. Without a penny being paid to Excell.

208.    The FVP Plaintiff's demand that this Court find that the merchant contract

agreements entered into between Spin, Hi Bar, Scott Zankl, Excell and the Karma Entities and ensuing conduct and pressure tactics were unconscionable, illegal, and violative of both New York and Florida Public Policy and therefore are void and unenforceable.

209.    The Hi Bar UCC Financing Statement filed on January 25, 2022 was the intended result and the fruit of the unconscionable and illegal conduct and was intended to cause direct harm to FVP.

210.    The FVP Plaintiffs demand that the court declare the Hi Bar UCC Financing Statement filed on January 25, 2022 at 10:55 pm null and void if, and only to the extent, that it creates a lien on the Debtor Owned Vehicles Subject to Liens for a priority determination.

WHEREFORE, the FVP Plaintiffs demand that the Hi Bar UCC Financing Statement filed on January 25, 2022 at 10:55 pm be declared null and void if, and only to the extent, that it creates a lien on the Debtor Owned Vehicles Subject to Liens for a priority determination as to those liens.

## COUNT SEVEN

### EQUITABLE SUBORDINATION OF LIENS IN PROPERTY OF THE ESTATE BASED ON ILLEGALITY AND FRAUD - 11 U.S.C. § 510(C)

### FVP V HI BAR

211.    The FVP Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 95 and paragraphs 133 through 83 in Count Five and paragraphs 187 through 209 in Count Six as if fully set forth herein.

212.    Hi Bar was engaged in illegal and inequitable conduct.

213.    The misconduct has resulted in injury to the FVP Plaintiffs.

214.    To the extent that Hi Bar holds an allowed claim against the property of the estate, subordination of the claim to the claim of the FVP Plaintiffs is not inconsistent with the provisions of either the Bankruptcy Act or Bankruptcy Code and is consistent with principles of justice and equity and should be employed.

WHEREFORE, the FVP Plaintiffs respectfully requests that the Court enter an order (1) subordinating any allowed claim of Hi Bar, including a claim secured by the Vehicles, to be subordinated to the claim of the FVP Plaintiffs under 11 U.S.C. § 510(c); and (2) awarding court costs and interest, and such other relief as the Court deems just and proper.

## COUNT EIGHT

## COMPLAINT TO VOID HI BAR UCC FILING, LIEN AND PRIORITY BASED ON FLORIDA UNIFORM FRAUDULENT TRANSFER ACT
## ONLY TO THE EXTENT THAT IT CREATES A LIEN ON PROPERTY OF THE ESTATE FOR A PRIORITY DETERMINATION

## FVP V. HI BAR

215. The FVP Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 95 as if fully set forth herein.

216. The relief sought in this Count Eight is necessary for a determination as to the priority of liens in the property of the Bankruptcy estate and is sought only to the extent necessary for that purpose.

217. FVP seeks to void the lien on the property of the estate and in particular in the Debtor Vehicles Subject to Liens based on the Hi Bar UCC filing based on the Florida Uniform Fraudulent Transfer Act (the "FUFTA") as alleged in this Count Eight only to the extent that it creates a lien on those Debtor Vehicles Subject to Liens and only to the extent necessary for a priority determination.

218. This is a claim to avoid a fraudulent obligation as to a future creditor pursuant to sections 726.105(1)(a) and 726.105(l)(b), 726.108 (1) Florida Statutes, the FUFTA.

219. The FVP Plaintiffs are a creditor as defined in Fla. Stat. § 726.102 as they hold claims against the Karma Entities under its loan agreements and a future creditor as defined in Fla. Stat. § 726.105.

220. The Karma Entities are a debtor as defined in Fla. Stat. § 726.102 to both the FVP Plaintiff's and Hi Bar.

221. On or about October 17, 2021, Scott Zankl for Excell and the Karma Entities, entered into a financial transaction with Hi Bar.

222. The result of that transaction was that Excell, and the Karma Entities, became obligated to Hi Bar as debtors, resulting in Hi Bar having purported rights under the transaction documents, to which the FVP Plaintiff's object, to file a UCC Financing Statement against the Karma Entities' inventory.

223. The obligation to Hi Bar was incurred by Scott Zankl for Excell and the Karma

Entities with the actual intent of hindering, delaying, or defrauding creditors including the FVP Plaintiffs and was made with: a) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation.

224.    At the time of the obligation, Scott Zankl for Excell and the Karma Entities: was engaged in, or was about to engage in, a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or, intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

225.    At the time the obligation was incurred, Scott Zankl for Excell and the Karma Entities, concealed the obligation; prior to the obligation the Excell and the Karma Entities were sued or threatened with suit; the obligation was incurred just days before another substantial debt was incurred; Excell and the Karma Entities received no equivalent value for the obligation and in fact received additional debt instead of consideration; no proceeds of the Hi Bar "financing" were funded to, or for, the benefit of the Karma Entities; and Excell and the Karma Entities were insolvent at the time the obligation was incurred, or were rendered insolvent by such obligation, or, became insolvent shortly after the obligation was incurred.

226.    The FVP Plaintiffs are entitled to the avoidance of the Karma / Hi Bar obligation to the extent necessary to satisfy their claims to their security interests in the Debtor property pursuant to Fla. Stat. § 726.108(1)(a).

227.    The FVP Plaintiffs have a claim in the amount of $7.5 million dollars against the Karma Entities which is reflected in a lien on the property of the estate.

228.    Hi Bar has a corresponding lien in the property of the estate that arises from a transaction that is voidable under the FUFTA.

229.    The FVP Plaintiffs demand that the court avoid the Hi Bar UCC Financing Statement filed on January 25, 2022 at 10:55 pm  if, and only to the extent, that it creates a lien on the Debtor Owned Vehicles Subject to Liens for a priority determination.

WHEREFORE, the FVP Plaintiffs demand that the Hi Bar UCC Financing Statement filed on January 25, 2022 at 10:55 pm be avoided under the Florida Uniform Fraudulent Transfer Act

if, and only to the extent, that it creates a lien on the Debtor Owned Vehicles Subject to Liens for a priority determination as to those liens.

Dated: December 9, 2022

For the FVP Plaintiffs

| | |
|---|---|
| Jerrell A. Breslin, Esq.<br>Baron, Breslin & Sarmiento<br>The DuPont Building<br>169 East Flagler Street, #700<br>Miami, Florida 33131<br>Phone: (305) 577-4626<br>E-mail: JB@RichardBaronLaw.com<br>EService@RichardBaronLaw.com<br><br>By:　　s/ Jerrell Breslin<br>　　　Jerrell Breslin, Esq.<br>　　　Fla Bar No: 269573 | David Softness, Esq.<br>David R. Softness, P.A.<br>201 S. Biscayne Blvd., Ste 2740<br>Miami, Florida 33131<br>Phone: (305) 341-3111<br>E-mail:david@softnesslaw.com<br><br>By:　　s/ David R. Softness<br>David R. Softness, Esq.<br>Florida Bar No. 513229 |
| Jonathan Noah Schwartz, Esq.<br>Florida Bar No. 1014596<br>Jonathan Schwartz Law PLLC<br>10200 NW 25th Street, Suite 111<br>Doral, FL 33172<br>Tel.: (973) 936-2176<br>E-mails:jschwartz@jonschwartzlaw.com<br>JNSEsquire@gmail.com | |

***Counsel for Karma Entities Below have Authorized the Filing of this***
***Joint Pleading for the Karma Entities by the FVP Parties.***
For the Karma Entities

By:　　s/ Harry Winderman
Harry Winderman, Esq.
Weiss, Handler & Cornwell, P.A.
2255 glades road, suite 205 A
Boca Raton, FL  33431

By:　　/s/ Harry Winderman

## CERTIFICATE OF SERVICE

　　**I HEREBY CERTIFY** that; I electronically filed the foregoing was served via Email electronic transmission under Local Rule 7026 -1 upon those parties and attorneys who are registered with the Court to receive notifications in this matter but not filed of record and by email

upon: the office of the US Trustee by serving Heidi A. Feinman, Esq. at Heidi.A.Feinman@usdoj.gov, upon the Subchapter 5 Trustee by serving Linda Leali, Esq. at lleali@lealilaw.com, upon the Debtor/Defendant by serving James B. Miller, Esq. at bkcmiami@gmail.com, upon Karma or Broward, Inc. and Karma of Palm Beach, Inc. by serving Harry Winderman, Esq. at harry4334@hotmail.com, upon Ed Brown by serving Brett Marks, Esq., at brett.marks@akerman.com, and upon Hi Bar by serving Jarret P. Hitchings, Esq., at jarret.hitchings@bclplaw.com for Hi Bar.

/ s/ Jerrell Breslin
Jerrell Breslin, Esq.

# EXHIBIT A

Debtor **Auto Wholesale of Boca, LLC**  Case number *(If known)* **22-15627-EPK**
Name

41. **Office equipment, including all computer equipment and communication systems equipment and software**
**Computer, software and equipment**    $9,300.00    $9,300.00

42. **Collectibles** *Examples*: Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles

43. **Total of Part 7.**    $28,000.00
Add lines 39 through 42. Copy the total to line 86.

44. **Is a depreciation schedule available for any of the property listed in Part 7?**
■ No
☐ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**
■ No
☐ Yes

| Part 8: | Machinery, equipment, and vehicles |
|---|---|

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No. Go to Part 9.
■ Yes Fill in the information below.

| General description<br>Include year, make, model, and identification numbers<br>(i.e., VIN, HIN, or N-number) | Net book value of<br>debtor's interest<br>(Where available) | Valuation method used<br>for current value | Current value of<br>debtor's interest |
|---|---|---|---|
| 47. **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| 47.1. **2017 Ferrari F12 Berlinetta**<br>**VIN No. 1036** | $244,600.00 | | $244,600.00 |
| 47.2. **2019 Aston Martin DB11 Volante**<br>**VIN No. 7671** | $150,000.00 | | $150,000.00 |
| 47.3. **2020 Lamborghini Urus**<br>**VIN No. 6529** | $185,000.00 | | $185,000.00 |
| 47.4. **2020 Mercedes G63**<br>**VIN No. 6462** | $175,000.00 | | $175,000.00 |
| 47.5. **2019 BMW X7**<br>**VIN No. 9222** | $57,100.00 | | $57,100.00 |
| 47.6. **2019 GMC Yukon**<br>**VIN No. 4378** | $100.00 | | $100.00 |
| 47.7. **2018 MClaren 720S**<br>**VIN No. 0506** | $180,000.00 | | $180,000.00 |

Official Form 206A/B    Schedule A/B Assets - Real and Personal Property    page 4

Debtor __Auto Wholesale of Boca, LLC_____    Case number *(If known)* __22-15627-EPK__
Name

| | | | | |
|---|---|---|---|---|
| 47.8. | **2021 Mercedes G Wagon**<br>**VIN No. 0328** | $175,000.00 | | $175,000.00 |
| 47.9. | **2020 Mercedes G63**<br>**VIN No. 2080** | $175,000.00 | | $175,000.00 |
| 47.10· | **2008 Porsche 911**<br>**VIN No. 3176** | $37,800.00 | | $37,800.00 |
| 47.11· | **2020 MClaren 720S**<br>**VIN No. 4229** | $273,000.00 | | $273,000.00 |
| 47.12· | **2019 Lamborghini Urus**<br>**VIN No. 1961** | $100.00 | | $100.00 |
| 47.13· | **2020 Ferrari 812 Superfast**<br>**VIN No. 4963** | $435,500.00 | | $434,500.00 |
| 47.14· | **2018 Cadillac Escalade**<br>**VIN No. 1612** | $32,500.00 | | $32,500.00 |
| 47.15· | **2013 Ferrari 458 Italia**<br>**VIN No. 1526** | $191,000.00 | | $191,000.00 |
| 47.16· | **2021 Jeep Gladiator**<br>**VIN No. 1540** | $39,500.00 | | $39,500.00 |
| 47.17· | **2020 Lamborghini Huracan**<br>**VIN No. 4316** | $271,000.00 | | $271,000.00 |
| 47.18· | **2019 MClaren 720S**<br>**VIN No. 3714** | $260,000.00 | | $260,000.00 |
| 47.19· | **2020 Mercedes G Class**<br>**VIN No. 4940** | $175,000.00 | | $175,000.00 |

48. **Watercraft, trailers, motors, and related accessories** *Examples:* Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels

49. **Aircraft and accessories**

50. **Other machinery, fixtures, and equipment (excluding farm machinery and equipment)**
    **Battery chargers**                      $200.00                      $200.00

51. **Total of Part 8.**                      **$3,056,400.00**

    Add lines 47 through 50. Copy the total to line 87.

# EXHIBIT B

## LOAN AGREEMENT

This **LOAN AGREEMENT** (this "Agreement") dated as of January 26, 2022, is made by and among **KARMA OF PALM BEACH, INC.**, a Florida corporation ("Palm Beach") and **KARMA OF BROWARD, INC.**, a Florida corporation ("Broward"; Palm Beach and Broward, each, a "Borrower" and collectively, "Borrowers"); each financial institution that from time to time is a Lender (as defined below) hereunder; and **FVP SERVICING, LLC**, a Delaware limited liability company (in its capacity as administrative agent for the Lenders, the "Administrative Agent" and together with Borrowers and the Lenders, the "Parties", and each, a "Party").

WITNESSETH:

WHEREAS, Borrowers have requested that Lender extend credit to Borrowers in the form of certain term loans more particularly described herein, in the aggregate original principal amount of up to Seven Million Five Hundred Thousand and No/100 Dollars ($7,500,000.00), the proceeds of which will be used by Borrowers for purposes of purchasing exotic car inventory for Palm Beach and Broward, paying transaction costs and expenses incurred in connection herewith, for general working capital purposes of Borrowers and other purposes expressly permitted hereunder, and Lenders have agreed to provide such loans, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, upon the terms and conditions hereinafter stated, and in consideration of the mutual premises set forth above and other adequate consideration, the receipt and sufficiency of which is hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

1.    DEFINITIONS AND RULES OF CONSTRUCTION

1.1    As used in this Agreement, the following terms shall have the meanings set forth below (terms defined in the singular to have the same meaning when used in the plural and vice versa):

"Administrative Agent" shall have the meaning given to such term in the introductory paragraph of this Agreement.

"Advance" means an advance of funds by Lenders under this Agreement.

"Affiliate" of any Person means any other Person that directly or indirectly controls, is controlled by or is under direct or indirect common control with such Person. A Person shall be deemed to "control" another Person if such first Person directly or indirectly possesses the power to direct (or to cause the direction of or to materially influence) the management and policies of the second Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing, neither Administrative Agent nor any Lender shall be deemed to be an Affiliate of any Loan Party.

"Agreement" means this Loan Agreement and all exhibits, riders and schedules at any time executed by the Parties and made a part hereof by reference, either as originally executed or as hereafter amended, restated, modified or supplemented from time to time.

"Applicable Law" means all laws, rules and regulations applicable to the Person, conduct, transaction, covenant or Loan Documents in question, including, without limitation, all Applicable Law and equitable principles; all provisions of all applicable state and federal constitutions, statutes, rules, regulations and orders of governmental bodies; and all Orders.

1

4869-1815-9362.7

"Availability Period" means, with respect to any Delayed Draw Term Loan, the period commencing on the Closing Date and continuing until the one (1) year anniversary of the Closing Date.

"Borrower" and "Borrowers" shall have the meaning given to such term in the introductory paragraph of this Agreement.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"Cash Flow Available for Debt Service" means, with respect to Borrowers and their respective Subsidiaries for each period of twelve (12) consecutive calendar months ending as of the last day of each fiscal quarter of Borrowers, the sum of (a) net income for such period of determination, (b) interest expense for such period of determination and (c) depreciation, amortization and other non-cash charges for such period of determination, in each case, as determined on a consolidated basis in accordance with GAAP.

"Change of Control" means any event, circumstance or occurrence that results in (a) any Guarantor owning, directly or indirectly, less than the applicable percentage of the issued and outstanding ownership interests of (i) each Borrower held by such Guarantor as of the Closing Date, as specified on Schedule 4.1(o) hereto, or (ii) each other Pledged Entity (as defined in the Pledge Agreement) held by such Guarantor as of the Closing Date, as specified on Schedule A to the Pledge Agreement, or (b) Biltmore Automotive Services ceasing to be engaged to perform financial reporting, accounting and administrative services, including all chief financial officer functions, for and on behalf of each Borrower.

"Closing Date" means January 26, 2022.

"Closing Date Term Loan" means the Loan in the original principal amount of $3,500,000.00 Advanced by Lenders to Borrowers on the Closing Date pursuant to Section 2.1(a) hereof.

"Collateral" means all Property in which Administrative Agent is at any time granted a Lien for purposes of securing the Obligations.

"Commitment" means, collectively, each Lender's commitment to Advance (a) the Closing Date Term Loan on the Closing Date, and (b) any Delayed Draw Term Loan during the Availability Period.

"Debt" of a Person, means all (a) indebtedness for borrowed money; (b) obligations for the deferred purchase price of Property or services; (c) obligations evidenced by notes, bonds, debentures or other similar instruments; (d) obligations as lessee under capital leases; (e) obligations in respect of any interest rate swaps, currency exchange agreements, commodity swaps, caps, collar agreements or similar arrangements entered into by such Person providing for protection against fluctuations in interest rates, currency exchange rates or commodity prices or the exchange of nominal interest obligations, either generally or under specific contingencies; (f) obligations under acceptance facilities and letters of credit; (g) obligations for any merchant cash advance whether based on credit card sales or otherwise; (h) guaranties, endorsements (other than for collection or deposit in the ordinary course of business), and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any Person, or otherwise to assure a creditor against loss, in each case, in respect of indebtedness set out in clauses (a) through (g) of a Person other than such Person; and (i) indebtedness set out in clauses (a) through (h) of any Person other than such Person secured by any lien on any asset of such Person, whether or not such indebtedness has been assumed by such Person.

"Debt Service" means, with respect to Borrowers and their respective Subsidiaries for each period of twelve (12) consecutive calendar months ending as of the last day of each fiscal quarter of Borrowers,

2

the sum of (a) interest paid in cash for such period of determination, (b) all installments of principal on Debt that are due on demand or during the period of determination, (c) all installments of rent under capitalized lease obligations (to the extent not already accounted for in computation of net income or Debt) that are due on demand or during the period of determination and (d) distributions and dividends to stockholders and advances to Affiliates during the period of determination, in each case, as determined on a consolidated basis in accordance with GAAP.

"Debt Service Coverage Ratio" means, with respect to each Borrower and their Subsidiaries for the period of twelve (12) consecutive calendar months ending as of the last day of each fiscal quarter of Borrowers, the ratio of (a) Cash Flow Available for Debt Service for such period to (b) Debt Service for such period.

"Debtor Relief Law" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, insolvency, reorganization or similar debtor relief laws.

"Default" means the occurrence of any event which, after satisfaction of any requirement for the giving of notice or the lapse of time, or both, would become an Event of Default.

"Default Rate" means the annual percentage interest rate applied to the principal of the Loans not paid when due under the terms of the applicable Loan Documents, which rate shall equal twenty percent (20%).

"Delayed Draw Loan Advance Request" means a request for an Advance in respect of a Delayed Draw Term Loan delivered by Borrower to Lender in the form of Exhibit C hereto.

"Delayed Draw Term Loan" has the meaning set forth in Section 2.1(b).

"Eligible Inventory" means, as of any date of determination, all Collateral consisting of motor vehicle inventory that is (a) acquired by a Borrower in the ordinary course of business with Loan proceeds, and constitutes "inventory" of the applicable Borrower under the UCC, (b) owned by such applicable Borrower as of such date of determination subject to no Liens other than Liens in favor of Administrative Agent, and (c) located at the applicable Site identified on Schedule 4.1(j) attached hereto, excluding any such inventory which Lender otherwise determines is not in the condition required by, or which does not satisfy each of the terms, conditions, representations, warranties and covenants under, the Loan Documents relating thereto.

"Event of Default" shall have the meaning given to such term in Section 7.1 hereof.

"Exclusivity Agreement" means the Exclusivity Agreement dated as of the Closing Date by and among FPS, Borrowers and Excell Auto Sport and Service, Inc. a Florida corporation.

as the same may be amended, modified, supplemented, restated, extended or renewed from time to time.

"FPS" means Feenix Payment Systems, LLC, a Delaware limited liability company (an Affiliate of Lenders).

"GAAP" means generally accepted accounting principles in the United States, consistently applied.

"Governmental Authority" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal or any other level, and any agency,

3

authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government.

"Guaranty" means that certain Guaranty Agreement dated as of the Closing Date by Guarantors in favor of Administrative Agent and the Lenders, as the same may be amended, modified, supplemented, restated, extended or renewed from time to time.

"Guarantors" means Scott Zankl and Kristen Zankl.

"Interest Only Period" means the period commencing on the Closing Date and continuing through and including the January 26, 2023 Payment Date.

"Law" as to any Person, means any law (including common law), statute, ordinance, treaty, rule, regulation, policy or requirement of any Governmental Authority and authoritative interpretations thereon, whether now or hereafter in effect, in each case, applicable to or binding on such Person or any of its properties or to which such Person or any of its properties is subject.

"Lender" means individually and collectively, each of the Persons listed on Schedule I hereto as "Lender", together with any successor, assignee or other transferee of such Lender hereunder, and any other entity subsequently added hereto as a Lender hereunder, or any successor, assignee or other transferee thereof.

"Lender IRR" has the meaning set forth in Section 2.5(c).

"Lien" means any mortgage, pledge, security interest, lien (statutory or otherwise), charge, encumbrance, hypothecation, assignment, deposit arrangement, or other arrangement having the practical effect of the foregoing or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having the same economic effect as any of the foregoing).

"Loan Documents" means this Agreement, the Security Agreement, the Pledge Agreement, the Exclusivity Agreement, the Guaranty, each Note, any Delayed Draw Loan Advance Request, the Westlake Intercreditor Agreement and all other instruments, agreements, documents and writings now or hereafter evidencing, securing or delivered to Administrative Agent and Lender in connection with the Obligations, as each of the foregoing may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Loan Parties" shall mean each Borrower, each Guarantor and each of their respective Affiliates which are a party to any of the Loan Documents, as applicable.

"Loans" means the Closing Date Term Loan and any Delayed Draw Term Loan.

"Maturity Date" means the earlier of (a) the Scheduled Maturity Date, and (b) the date on which all amounts outstanding under this Agreement have been declared or have automatically become due and payable (whether by acceleration or otherwise).

"Maximum Aggregate Loan Amount" means $7,500,000 in the aggregate of all Advances made hereunder.

4

"Net Proceeds" means, in respect of (a) any incurrence of Debt (other than the Loans or Permitted Debt) by any Borrower or any of their respective Subsidiaries, (b) any casualty or condemnation event involving Property of any Borrower or any of their respective Subsidiaries (excluding any such event for which such Borrower or Subsidiary receives net insurance proceeds of less than $5,000), or (c) any sale or assignment involving Property of any Borrower or any Subsidiary, all cash proceeds (including cash proceeds as and when received in respect of non-cash proceeds received or receivable in connection with such occurrence), net of reasonable and customary out-of-pocket costs and expenses paid or incurred in connection therewith in favor of any Person not an Affiliate of a Loan Party.

"Note" has the meaning set forth in Section 2.1(b).

"Obligations" means all loans (including the Loans), Advances, debts, liabilities and obligations (including reimbursement obligations) for monetary amounts owing by any Borrower or any other Loan Party to the Administrative Agent and the Lenders, whether due or to become due, matured or unmatured, liquidated or unliquidated, contingent or non-contingent, of any kind or nature, present or future, arising under or in respect of this Agreement or any of the Loan Documents.  This term includes all principal, interest (including interest that accrues after the commencement against any Borrower or any other Loan Party of any action under the Federal Bankruptcy Code), premium, reasonable fees and expenses, including any and all arrangement fees, delivery fees, loan fees, commitment fees, agent fees, merchant processing fees and any and all other fees, expenses, costs or other sums (including reasonable attorney's fees) chargeable to any Borrower or any other Loan Party under any of the Loan Documents.

"OLV" means, as of any date of determination, the orderly liquidation value of the Collateral expected to be realized in connection with an "as-is, where-is" sale of such Collateral to one or more third-parties as of such date of determination, as determined by Administrative Agent in its sole and absolute discretion; provided, however, in no event shall any single vehicle be valued at more than $350,000.00 for purposes of calculating OLV.

"Order" as to any Person, means any order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case, applicable to or binding on such Person or any of its properties or to which such Person or any of its properties is subject.

"Organizational Agreements" means the partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement, articles or certificate of organization, bylaws, certificate of formation and other organizational or governing documents, as applicable, of each Borrower.

"Payment Date" means the fifteenth (15th) day of each calendar month during the term of this Agreement commencing with the first Payment Date after the Closing Date; provided, however, if such day is not a Business Day, the next succeeding Business Day.

"Permitted Debt" means (a) Debt existing or arising under this Agreement and any refinancing, extension or modification thereof; (b) Westlake Debt in an amount not to exceed $1,000,000 in the aggregate, subject in all respects to the terms of the Westlake Intercreditor Agreement; (c) trade Debt incurred in the ordinary course of business consistent with past practice; (d) unsecured Debt owed in respect of any netting services, overdrafts and related liabilities arising from treasury, depository and cash management services in connection with any automated clearinghouse transfers of funds; (e) unsecured insurance premiums owing in the ordinary course of business which are also Debt; and (f) unsecured Debt in addition to the amounts in clauses (a) through (e) above in an outstanding principal amount not to exceed $50,000 in the aggregate at any time during the term of this Agreement and which is subordinate in right

5

4869-1815-9362.7

of payment to the Debt existing or arising under this Agreement and any refinancing thereof on terms acceptable to Administrative Agent in its sole discretion.

"Permitted Liens" means (a) Liens for taxes not yet due or which are being contested in good faith by appropriate proceedings; and (b) non-consensual Liens arising by operation of law, arising in the ordinary course of business, and for amounts which are not overdue for a period of more than thirty 30 days or that are being contested in good faith by appropriate proceedings.

"Person" means a corporation, an association, partnership, an organization, a business, a business trust, a limited liability company, an individual, a government or political subdivision thereof or a governmental agency.

"Pledge Agreement" means that certain Pledge Agreement dated as of the Closing Date by Guarantors in favor of Administrative Agent and the Lenders, as the same may be modified, amended, supplemented, extended or renewed from time to time.

"Property" means the real property and personal property of a Person, and any interest of a Person in any real or personal property.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Restricted Payment" means (a) any dividend or other distribution (whether in cash, securities or other Property) with respect to any equity securities of any Borrower, (b) any purchase, redemption, retirement or acquisition by any Borrower for value of any equity securities or any distribution of any kind in cash or other Property or assets in respect thereof; (c) any payment (whether in cash, securities or other Property or assets), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such equity securities or on account of any return of capital to any Borrower's equity holders, partners or members (or the equivalent Person thereof), (d) any management, board or director fees or similar fee to a holder of equity securities of any Borrower or any Affiliate thereof, and (e) director or manager fees, any salary, compensation or other payment of any type or nature, or any other advance or Debt of any type or nature, in each case, to any officer, director or manager of any Borrower or any Affiliate thereof or to any equity holder of any Borrower or any Affiliate thereof, including, without limitation, all salary or other compensation of any type or nature paid or payable to Guarantors.

"Scheduled Maturity Date" means January 26, 2025.

"Security Agreement" means that certain Security Agreement dated as of the Closing Date by Borrowers in favor of Administrative Agent and the Lenders, as the same may be modified, amended, supplemented, extended or renewed from time to time.

"Security Documents" means, collectively, the Security Agreement, the Pledge Agreement, each deposit account control agreement with respect to any deposit account of Borrowers, all Uniform Commercial Code financing statements required by this Agreement to be filed with respect to the security interests created pursuant to the Security Documents and  all other documents and agreements executed or delivered to Administrative Agent by Borrowers or any other Loan Party for purposes of securing the Obligations.

4869-1815-9362.7

"Settlement Date" means, with respect to any Advance hereunder, the date on which funds are advanced by a Lender.

"Site" means each site at which a Borrower operates an auto dealership, as set forth on Schedule 4.1(j) hereto.

"Subsidiary" means any corporation or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions are at the time directly or indirectly owned by any Borrower.

"Westlake" means Westlake Services, LLC, a California limited liability company.

"Westlake Debt" means any debt under any Westlake Financing Documents owed by Borrowers and any Affiliate of Borrowers to Westlake, subject in all respects to the terms of the Westlake Intercreditor Agreement.

"Westlake Intercreditor Agreement" means that certain Intercreditor Agreement dated as of January 26, 2022 by and between Westlake and Administrative Agent.

"Westlake Financing Documents" means and financing documents between Borrowers and Westlake, including, but not limited to, that certain Master Dealer Agreement between Westlake and Palm Beach, subject in all respects to the terms of the Westlake Intercreditor Agreement.

"Yield Maintenance Fee" has the meaning set forth in Section 2.5(c).

"Yield Maintenance Trigger Date" has the meaning set forth in Section 2.5(c).

1.2    Accounting Terms and Determination.  Accounting terms used in this Agreement such as "net income," "amortization," "depreciation," and "interest expense" shall be calculated (both as to amounts and classification of items) in accordance with GAAP.

1.3    Other Interpretive Provisions.  Any pronoun used herein shall be deemed to cover all genders.  All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations, and all references to any instruments or agreements, including, without limitation, references to any of the Loan Documents, shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof. Unless otherwise expressly stated or the context clearly indicates a different intention, then (as may be appropriate in the particular context) a singular reference to Lender used in any Loan Document includes the plural, and a plural reference to Lenders includes the singular.

2.    THE LOANS; USE OF PROCEEDS.

2.1    Funding of the Loans.

(a)    Subject to the terms and conditions of this Agreement, Lenders shall Advance to Borrowers the Closing Date Term Loan on the Closing Date, in the original principal amount of $3,500,000.00.  Proceeds of the Closing Date Term Loan shall be disbursed in accordance with Exhibit B attached hereto.  Upon the funding of such Advance, the Commitment of each Lender with respect to the Closing Date Term Loan hereunder shall be terminated, and no further Advances in respect of the Closing Date Term Loan shall be permitted.  Principal amounts repaid or prepaid in respect of the Closing Date

7

Term Loan will not be available for reborrowing hereunder.  The Closing Date Term Loan shall bear interest from and after the Closing Date at the applicable rate provided in the provisions of <u>Section 2.4</u> hereof.

(b)    At any time during the Availability Period, Borrowers may request, pursuant to a Delayed Draw Loan Advance Request in accordance with this Section 2.1(b), that Lenders make available to Borrowers three (3) additional term loans, which shall be comprised of an Advance in the original principal amount of up to $4,000,000.00, but in any event, not less than $1,000,000 (each a "<u>Delayed Draw Term Loan</u>").  Each Delayed Draw Term Loan shall be subject to all terms and conditions set forth in this Agreement, including, without limitation, <u>Section 3.2</u> hereof.  In no event shall any Delayed Draw Term Loan be advanced hereunder following the expiration of the Availability Period, or at any time during which an Event of Default has occurred and is continuing.  In no event will any Advance be made in respect of a Delayed Draw Term Loan which will cause the aggregate original principal amount of all Advances to exceed the Maximum Aggregate Loan Amount.  Principal amounts repaid or prepaid in respect of any Delayed Draw Term Loan will not be available for reborrowing hereunder.  Each Delayed Draw Term Loan shall bear interest from and after the related Settlement Date at the applicable rate provided in the provisions of <u>Section 2.4</u> hereof.

Borrowers shall give Administrative Agent and Lenders written notice of the requested Advance in respect of each Delayed Draw Term Loan in the form of a Delayed Draw Loan Advance Request at least five (5) days prior to the requested Settlement Date; provided, that Administrative Agent and Lenders shall only be obligated to make an Advance in respect of such Delayed Draw Term Loan subject to the other terms and conditions in this Agreement.  Each Delayed Draw Loan Advance Request shall be for a minimum of $1,000,000 (or such lesser amount as Administrative Agent may approve) and shall specify in writing where such funds should be disbursed.  In no event, however, shall Borrowers have any right whatsoever to receive any Advance under any Commitment if (i) the Availability Period shall have expired, (ii) either before or after giving effect thereto, there shall exist an Event of Default, or (iii) after giving effect to any such Advance, the principal amount outstanding on such Loan would exceed the applicable Commitment thereof or the Maximum Aggregate Loan Amount.

(c)    Each Loan shall be evidenced by one or more promissory notes in the form of <u>Exhibit A</u> hereto (each, as amended, restated, replaced, supplemented, extended or renewed from time to time, a "<u>Note</u>"), in each case payable to the order of the Administrative Agent for the benefit of the applicable Lender.  Each Note will be due and payable in full on the Maturity Date.  Administrative Agent is authorized to note or endorse the date and amount of the Advance and each payment of the applicable Loan on a schedule annexed to and constituting a part of the Note.  Such notations and endorsements, if made, will constitute prima facie evidence of the information noted or endorsed on such schedule, but the absence of any such notation or endorsement will not limit or otherwise affect the obligations or liabilities of Borrowers thereunder or hereunder.

(d)    The obligations of the Lenders under this <u>Section 2.1</u> shall be several and not joint.  The Commitments of each Lender with respect to the Loans are as set forth on <u>Schedule I</u> hereto.

    2.2    <u>Repayment</u>.

(a)    *Payment of Principal and Interest*.  On each Payment Date during the Interest Only Period, Borrowers shall make monthly payments to Administrative Agent, for the account of the Lenders, with respect to each Loan, equal to all accrued, unpaid interest on the outstanding principal amount thereof.  Commencing with the first Payment Date following the Interest Only Period and continuing on each Payment Date thereafter through and including the Maturity Date, Borrowers shall make monthly payments to Administrative Agent, for the account of the Lenders, with respect to each Loan in an amount equal to the sum of (i) all accrued, unpaid interest with respect to such Loan through and including the last day of

the calendar month immediately preceding the calendar month in which such Payment Date occurs, plus (ii) a principal component in an amount equal to two percent (2.00%) of the original principal amount of such Loan.  Administrative Agent's calculation of the principal, interest and other amounts from time to time payable hereunder shall be conclusive and binding absent manifest error.  Payments of all remaining outstanding principal and accrued, unpaid interest on the Loans, together with all other fees, costs, expenses and other Obligations then outstanding, shall be due and payable by Borrowers to the Administrative Agent, for the account of the Lenders, on the Maturity Date.

(b)    *Payment Mechanics*.  Except as provided below, all payments of principal of, or interest on, the Loan and all other sums due under the terms of the Loan Documents shall be made in either (i) immediately available funds by wire or ACH deposit or (ii) checks or money orders made payable to the Administrative Agent at the address and pursuant to the instructions provided by the Administrative Agent to Borrowers from time to time.

2.3    Use of Proceeds.  The proceeds of the Closing Date Term Loan shall be disbursed in accordance with the Flow of Funds Memorandum attached hereto as Exhibit B and shall be applied by Borrowers solely for the purposes specified therein.  Proceeds of any Delayed Draw Term Loan shall be disbursed solely for acquiring exotic car inventory for Palm Beach and Broward and as specified in the Delayed Draw Loan Advance Request.  All Loan proceeds shall be applied by Borrowers solely for a legitimate business purpose of Borrowers, and no portion of the Loan proceeds will be used for family, household or consumer purposes.

2.4    Interest.

(a)    The unpaid principal amount of each Loan shall, subject to this Section 2.4, bear interest at the rate of fifteen percent (15.00%) per annum (the "Interest Rate").  Interest shall be computed on the basis of a 360-day year for the actual number of days in the interest period.  Upon any Default, the Interest Rate shall increase from the date of such Default to a rate equal to the Default Rate.  For the avoidance of doubt, all payments of interest on the Loans outstanding under this Agreement on each Payment Date shall be made in accordance with Section 2.2 hereof.

(b)    In no contingency or event whatsoever shall the amount paid or agreed to be paid to Administrative Agent and Lenders for the use, forbearance or detention of money advanced under this Agreement exceed the highest lawful rate permissible under Applicable Law.  It is the intent hereof that Borrowers will not pay or contract to pay, and that Administrative Agent and Lenders will not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be charged to and paid by Borrowers under Applicable Law.  All interest (and charges deemed interest) paid or agreed to be paid to the Lenders shall, to the extent permitted by Applicable Law, be amortized, pro-rated, allocated and spread in equal parts throughout the full term hereof until payment in full of the principal amount of the Obligations owing hereunder (including the period of any renewal or extension hereof) so that interest on the principal amount of the Obligations outstanding hereunder for such full period will not exceed the maximum amount permitted by Applicable Law.  Each determination by Administrative Agent of an interest amount hereunder shall be made in good faith and, except for manifest error, shall be final, conclusive and binding for all purposes.

(c)    If any interest or other sum due under any Loan Document is not paid by Borrowers within ten (10) days after the date on which it is due (except for the payment due on the Maturity Date), Borrowers shall pay to Administrative Agent upon demand, an amount equal to five percent (5%) of such unpaid sum or the maximum amount permitted by Applicable Law, in order to defray the expense incurred by Administrative Agent and Lenders in handling and processing such delinquent payment and to

9

compensate Administrative Agent and Lenders for the loss of the use of such delinquent payment.  Such amount shall be secured by the Loan Documents.

2.5     Fees.

(a)     On the Closing Date, Borrowers will pay to Administrative Agent, for the account of the Lenders, a nonrefundable commitment fee in an amount equal to $75,000 (the "Commitment Fee"). The Commitment Fee shall be fully earned on the Closing Date in accordance with the terms hereof, shall be nonrefundable for any reason whatsoever and shall be in addition to any other fees, costs and expenses payable pursuant to the Loan Documents.  Borrowers' obligations to pay the Commitment Fee will not be subject to counterclaim or setoff or be otherwise affected by any claim or dispute the Loan Parties may have.

(b)     On each Payment Date, Borrowers will pay to Administrative Agent, for Administrative Agent's own account, an agent fee (the "Administrative Agent Fee") in an amount equal to the product of (i) the average outstanding daily balance of the Loans for the calendar month immediately preceding the calendar month in which such Payment Date occurs, multiplied by (ii) 0.50% per annum. The Administrative Agent Fee shall accrue at all times from and after the Closing Date in accordance with the terms hereof, shall be nonrefundable for any reason whatsoever and shall be in addition to any other fees, costs and expenses payable pursuant to the Loan Documents.  Borrowers' obligations to pay the Administrative Agent Fee will not be subject to counterclaim or setoff or be otherwise affected by any claim or dispute the Loan Parties may have.

(c)     Upon the earliest to occur of (i) the one (1) year anniversary of the Closing Date, (ii) the date on which the outstanding principal amount to Loan and all accrued unpaid interest thereon are paid in full and (iii) the date on which the Obligations are accelerated by Administrative Agent following the occurrence of an Event of Default (the "Yield Maintenance Trigger Date"), Borrowers will pay to Administrative Agent, for the account of the Lenders, a yield maintenance fee (the "Yield Maintenance Fee") in the amount necessary to result in the Lenders achieving an internal rate of return in respect of the Loan (as calculated by Administrative Agent through and including the Yield Maintenance Trigger Date, based on all payments made in respect of the principal of and accrued unpaid interest on the Loan through and including the Yield Maintenance Trigger Date) (the "Lender IRR") of fifteen percent (15.00%).  For the avoidance of doubt, no Yield Maintenance Fee shall be payable if the Lender IRR as of the Yield Maintenance Trigger Date is greater than or equal to fifteen percent (15.00%).  Borrowers' obligations to pay the Yield Maintenance Fee will not be subject to counterclaim or setoff or be otherwise affected by any claim or dispute the Loan Parties may have.

2.6     Prepayment; Application of Payments.

(a)     Voluntary Prepayment.  Borrowers shall have the right to prepay the Loans in whole or in part at any time without premium or penalty, but subject to Borrowers having provided at least fifteen (15) days prior written notice to Administrative Agent.

(b)     Mandatory Prepayment.

(i) Immediately upon the receipt by any Loan Party of any Net Proceeds, Borrowers shall deliver, or cause to be delivered, to Administrative Agent an amount equal to such Net Proceeds for application to the Obligations in accordance with Section 2.6(c) hereof.

(ii) If at any time that the aggregate outstanding balance of the Obligations under the Loan Documents exceeds fifty-five percent (55.00%) of the then-current OLV of the Eligible Inventory, then

10

Borrowers shall, within ten (10) Business Days following the first date on which such excess exists, and without the requirement of demand or notice from Administrative Agent, prepay the Obligations in an amount equal to such excess (with the amounts so repaid being applied to the Obligations in accordance with Section 2.6(c)).

(c)    Application of Payments.  Notwithstanding anything herein to the contrary, (i) except as otherwise provided in Section 2.6(c)(iii), all payments, proceeds or recoveries received by Administrative Agent or the Lenders in respect of the Obligations or the Collateral prior to the occurrence of any Event of Default hereunder shall be applied (A) first, to the payment of fees, costs and expenses due and owing to Administrative Agent or any Lender, together with the amount of any protective advances made by Administrative Agent or any Lender to preserve or protect any Collateral, until paid in full, (B) second, to the payment accrued unpaid interest on the Loans, until paid in full, and (C) third, to the payment of the outstanding principal amount of the Loans, until paid in full,  (ii) following the occurrence of any Event of Default hereunder, all payments, proceeds or recoveries received by Administrative Agent or the Lenders in respect of the Obligations or the Collateral shall be applied to the Obligations in such order as Administrative Agent shall determine in its sole discretion, and (iii) with respect to any prepayments under Sections 2.5(a) or 2.5(b) hereof, so long as no Event of Default as occurred hereunder, any portion of such prepayments allocable to principal (other than scheduled periodic payments) will be applied to reduce future scheduled payments in the inverse order of maturity, and the remaining portion of such prepayment shall be applied in the order of priority specified in Section 2.5(c)(i).

2.7    Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of setoff or otherwise, obtain payment in respect of any principal of or interest on its portion of the Loans or prepayment premium in connection therewith resulting in such Lender's receiving payment of a proportion of the aggregate amount of the Loans and accrued interest thereon and prepayment premium in connection therewith greater than its pro rata share thereof as provided herein, then such Lender shall (a) notify the Administrative Agent of such fact and (b) purchase (for cash at face value) participations in the portions of the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of, accrued interest on and prepayment premium in connection with their respective portions of the Loans and other amounts owing them; provided, that: (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and (ii) the provisions of this Section 2.7 shall not be construed to apply to (x) any payment made by or on behalf of Borrowers pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its portion of the Loans to any assignee or participant.  Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

3.    CONDITIONS PRECEDENT.

3.1    Closing Date.  The obligation of Administrative Agent and the Lenders to enter into this Agreement, the other Loan Documents and to make the Advance of the Closing Date Term Loan on the Closing Date shall be subject to the following conditions precedent:

(a)    Borrowers shall have delivered to Administrative Agent and each Lender the following documents, each in form and substance satisfactory to Administrative Agent and duly executed on behalf of each of the Persons party thereto:

11

4869-1815-9362.7

(i)  this Agreement;

(ii)  the Security Agreement;

(iii)  each Note;

(iv)  the Guaranty

(v)  the Exclusivity Agreement;

(vi)  the Pledge Agreement; and

(vii)  each of the other Loan Documents and Security Documents, each in form and substance satisfactory to the Administrative Agent and each Lender.

(b)  a validly executed officer's certificate with respect to each Borrower in form and substance acceptable to the Administrative Agent and attaching (i) a fully executed copy of such Person's certificate of formation, certificate or article of incorporation, articles of organization or certificate of partnership (as applicable) bylaws, operating agreements or partnership agreements (as applicable) and all amendments thereto, (i) resolutions evidencing such Person's authorization of the Loans; (iii) evidence of such Person's good standing; and (iv) incumbency certificates.

(c)  Administrative Agent shall have received an opinion letter of counsel to the Loan Parties, in form and substance acceptable to Administrative Agent;

(d)  Administrative Agent shall have received such other documents and information as Administrative Agent may request; and

(e)  on the Closing Date, the following statements shall be true and correct and Borrowers, by requesting and accepting the Advance of the Closing Date Term Loan, shall be deemed to have represented and certified that:

(i)  the representations, warranties and covenants of each of the Borrowers set forth in this Agreement are true and correct; and

(ii)  no Default or Event of Default shall exist immediately before or immediately after giving effect to the Closing Date Term Loan.

3.2   Future Advances.  The obligation of the Administrative Agent and the Lenders to honor any request of an Advance following the Closing Date is subject to the Administrative Agent and the Lenders' receipt of a duly executed Delayed Draw Loan Advance Request and satisfaction of each of the following conditions precedent, unless waived by the Administrative Agent:

(a)  the representations and warranties contained in this Agreement and in each of the other Loan Documents shall be true and correct in all material respects on and as of the Settlement Date of such Advance;

(b)  no Default or Event of Default shall exist immediately before or immediately after giving effect to the requested Advance;

12

(c)       Borrowers shall have provided evidence satisfactory to Administrative Agent, in its sole and absolute discretion, of the price, make, model, vehicle identification number and seller of the vehicle inventory to be purchased with such Advance;

(d)       Borrowers shall have provided to Administrative Agent copies of the certificates of title with respect to all vehicle inventory (including all Eligible Inventory) then owned by Borrower, together with such additional documentation and information as Administrative Agent may require to evidence compliance by Borrower with the terms of Section 2.6(b)(ii) hereof; and

(e)       Administrative Agent shall have received such documentation and other items as Administrative Agent may require to evidence that the conditions to such Advance have been satisfied.

4.       LOAN PARTY REPRESENTATIONS AND WARRANTIES.

4.1       To induce Administrative Agent and each Lender to enter into this Agreement, each Loan Party represents and warrants to Administrative Agent and each Lender, as of the Closing Date, and at all times during which any of the Obligations hereunder remain outstanding, as follows:

(a)       *Existence; Compliance with Laws*.  Each Borrower is duly formed, validly existing and in good standing under the laws of the state of its jurisdiction of organization and has the requisite power and authority, and the legal right, to own, lease and operate its properties and assets and to conduct its business as it is now being conducted.  Each Borrower is in compliance with all Laws and Orders except to the extent that the failure to comply therewith could not be expected to have a material adverse effect on such Borrower's financial condition or the ability of such Borrower to perform its obligations under each of the Loan Documents.

(b)       *Power and Authority*.  Each Borrower has the power and authority, and the legal right, to execute and deliver each of the Loan Documents to which it is a party and to perform its obligations hereunder.

(c)       *Authorization; Execution and Delivery*.  The execution and delivery of each of the Loan Documents by Borrowers and the performance of their respective obligations thereunder have been duly authorized by all necessary corporate or limited liability company (as applicable) action in accordance with all Applicable Laws.  Each Loan Party has duly executed and delivered each of the Loan Documents to which it is a party.

(d)       *No Approvals*.  No consent or authorization of, filing with, notice to or other act by, or in respect of, any Governmental Authority or any other Person is required in order for any Borrower to execute, deliver, or perform any of its obligations under the Loan Documents.

(e)       *No Violations*.  The execution and delivery of each of the Loan Documents and the consummation by each Loan Party of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of any Borrower's organizational documents; (ii) violate any material Law or Order applicable to any Loan Party or by which any of its properties or assets may be bound; or (iii) constitute a material default under any material agreement or contract by which any Loan Party may be bound.

(f)       *Enforceability*.  Each of the Loan Documents to which a Loan Party is a party is a valid, legal and binding obligation of such Loan Party, enforceable against each Loan Party in accordance with its terms.

13

4869-1815-9362.7

(g)     *No Litigation*.  No action, suit, litigation, investigation or proceeding of, or before, any arbitrator or Governmental Authority is pending or threatened by or against any Loan Party or any principal, general partner, manager, sole member, managing member or majority shareholder of any Borrower or any of its Property or assets (i) with respect to the Loan Documents or any of the transactions contemplated hereby or (ii) that could reasonably be expected to materially adversely affect any Loan Party's financial condition or the ability of any Loan Party to perform its obligations under any of the Loan Documents.

(h)     *Limited Offering of Notes*.  The offer and sale of the Notes are not required to be registered pursuant to the provisions of Section 5 of the Securities Act of 1933, as amended or the registration or qualification provisions of the blue sky laws of any state.  No Borrower, and no agent on any Borrower's behalf, has solicited or will solicit any offers to sell all or any part of the Notes, to any Person so as to bring the sale of the Notes, by Borrowers within the registration provisions of the Securities Act of 1933, as amended or any state securities laws.  All prior offerings and sales of securities of Borrowers were in compliance with all applicable federal and state securities laws.  Borrowers are under no requirement to register under the Securities Act of 1933, as amended, or the Trust Indenture Act of 1939, as amended, any of its presently outstanding securities or any of its securities that may subsequently be issued.  All taxes imposed on Borrowers in connection with the issuance, sale and delivery of the Notes have been or will be fully paid, and all laws imposing such taxes have been or will be fully satisfied by Borrowers.

(i)     *No Bankruptcy Filing*.  No bankruptcy or insolvency proceedings are pending or contemplated by any Loan Party or, to the best knowledge of each Loan Party, against any principal, general partner, manager, sole member, managing member or majority shareholder of any Borrower.  No petition in bankruptcy has been filed against any Loan Party or any principal, general partner, manager, sole member, managing member or majority shareholder of any Borrower, as applicable, and no Loan Party, nor any principal, general partner, manager, sole member, managing member or majority shareholder of any Borrower has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors.

(j)     *Title*.  Each Loan Party has good and indefeasible title to the Collateral owned and to be pledged by such Loan Party pursuant to the applicable Loan Documents, free and clear of all Liens except the Permitted Liens.  The Security Agreement, the Pledge Agreement and any UCC Financing Statements required to be filed in connection therewith, will create a valid, perfected first priority lien on each Loan Party's interest in the all Collateral, whether now owned or hereafter acquired.  As of the Closing Date, each Borrower is the owner and operator of the applicable Site(s) set forth on Schedule 4.1(j) hereof with respect to such Borrower.

(k)     *Full and Accurate Disclosure*.  No statement of fact made by any Loan Party in any Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading.  There is no material fact presently known to any Loan Party that has not been disclosed to the Administrative Agent or the Lenders which adversely affects, or, as far as any Loan Party can foresee, could reasonably be expected to materially adversely affect the Collateral or the business, operations or condition (financial or otherwise) of any Loan Party.  All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Administrative Agent in respect of any Loan Party (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of such Loan Party as of the date of such reports, and (iii) have been prepared in accordance with sound accounting practices, on a cash/tax basis, consistently applied throughout the periods covered, except as disclosed therein.  Each Loan Party represents that it does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by this Agreement.  Since the date of such financial statements, there

14

4869-1815-9362.7

has been no material adverse change in the financial condition, operations or business of any Loan Party from that set forth in said financial statements.

(l) *Fraudulent Transfer*. No Loan Party has entered into the Loan Documents or consummated any of the transactions contemplated thereby with the actual intent to hinder, delay, or defraud any creditor, and each Loan Party has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of each Loan Party's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed such Loan Party's probable total liabilities, including subordinated, unliquidated, disputed or contingent liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured. No Loan Party's assets currently, and immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. No Loan Party intends to, and no Loan Party believes that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of such Loan Party).

(m) *ERISA*. No Borrower has an employee pension benefit plan as defined under the Employee Retirement Income Security Act of 1974.

(n) *No Broker*. No broker or finder introduced by any Loan Party to Administrative Agent or any Lender, brought about this transaction, or is entitled to any commission in connection therewith, except for such brokers as are identified on the Flow of Funds Memorandum attached hereto as Exhibit B and paid in full on the Closing Date, and Borrowers agree to indemnify, defend and hold Administrative Agent and Lenders harmless from and against any and all claims, demands, liabilities or expenses from brokers or other claims for commissions or fees including but not limited to reasonable attorneys' fees and expenses on account of the making of the Loan secured hereby. Each Borrower's indemnity hereunder shall survive any discharge of the Collateral, if any, and payment in full of the Obligations.

(o) *Ownership*. Schedule 4.1(o) hereto sets forth a true and correct copy of the capitalization table and ownership of each Borrower. Borrowers have no Subsidiaries. All ownership interests in Borrowers are owned free and clear of any Lien (other than the Liens granted in connection with the Security Agreement and the Pledge Agreement).

(p) *Name; Principal Place of Business*. No Borrower uses, and no Borrower will use, any trade name, and no Borrower has done, and no Borrower will do, business under any name other than its actual name set forth herein. The principal place of business of each Borrower is its primary address for notices as set forth in Section 10.1, and no Borrower has any other place of business (other than any Site Lease owned by such Borrower).

(q) *Other Debt; Liens*. No Borrower has any Debt, other than Permitted Debt. No Property of any Borrower is subject to any Lien, other than Permitted Liens.

4.2 Advances. The submission of a Delayed Draw Loan Advance Request made by Borrowers pursuant to this Agreement or any other Loan Document shall constitute an automatic representation and warranty by each Loan Party to Administrative Agent and each Lender that there does not then exist any Default or Event of Default and a reaffirmation as of the date of said request that all representations and warranties of each Loan Party contained in Section 4.1 hereof are true in all material respects on and as of the date of the Settlement Date, (a) as stated if such representation and warranty contains an express materiality qualification or (b) in all material respects if such representation and warranty does not contain

such a qualification, except, in each case, to the extent deviations from such representation or warranty has been disclosed in writing to Administrative Agent (including on the schedules to the Loan Documents) or expressly relates to an earlier date (in which case such representation and warranty shall be true and correct as of such date).  All representations and warranties contained in this Agreement or in any of the other Loan Documents shall survive the execution, delivery and acceptance hereof by Administrative Agent and each Lender and the closing of the transactions described herein.

5.      AFFIRMATIVE COVENANTS.

5.1      Affirmative Covenants.  During the term of this Agreement, and thereafter for so long as there is any outstanding Obligations to the Administrative Agent or any Lender, each Loan Party covenants that, unless otherwise consented to by Administrative Agent in writing, it shall*:*

(a)      *Maintenance of Existence*.  (i) Preserve, renew and maintain in full force and effect its corporate or organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, where the failure to do so could not be expected to materially adversely affect any Loan Party's financial condition or the ability of any Loan Party to perform its obligations under the Loan Documents.

(b)      *Compliance*.  Comply with (i) all of the terms and provisions of its Organizational Agreements; (ii) its obligations under its material contracts and agreements; and (iii) all Laws and Orders applicable to it and its business, except where the failure to do so could not be expected to materially adversely affect any Borrower's financial condition or the ability of any Borrower to perform its obligations under the Loan Documents.

(c)      *Payment Obligations*.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all of its material obligations of whatever nature, including any and all taxes, claims or otherwise, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings, and reserves in conformity with GAAP with respect thereto have been provided on its books.

(d)      *Notice of Events of Default*.  As soon as possible and in any event within two (2) Business Days after it becomes aware that a Default or an Event of Default has occurred, notify Administrative Agent and each Lender in writing of the nature and extent of such Default or Event of Default and the action, if any, it has taken or proposes to take with respect to such Default or Event of Default.

(e)      *Further Assurances*.  Each Loan Party shall, on the request of Administrative Agent and at the expense of Loan Parties:  (a) promptly correct any defect, error or omission which may be discovered in the contents of this Agreement or in the contents of any of the other Loan Documents; (b) promptly execute, acknowledge, deliver and record or file such further instruments (including, without limitation, further security agreements, financing statements and continuation statements) and promptly do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Agreement and the other Loan Documents and to subject to the liens and security interests hereof and thereof any property intended by the terms hereof and thereof to be covered hereby and thereby, including specifically, but without limitation, any renewals, additions, substitutions, replacements or appurtenances to the Collateral; and (c) promptly execute, acknowledge, deliver, procure and record or file any document or instrument (including specifically, without limitation, any financing statement) reasonably deemed advisable by Administrative Agent to protect, continue or perfect the Liens or the security interests in the Collateral hereunder or under any of the Security Documents against the rights or interests of third persons.

16

4869-1815-9362.7

(f)     *Monthly and Quarterly Documents.* As soon as practicable or available after the end of each calendar month and each fiscal quarter of each year, commencing with the first such period ending after the Closing Date, but no later than tenth (10th) Business Day following the end of each calendar month and forty-five (45) calendar days after the end of each respective fiscal quarter of Borrowers, Borrowers must prepare and deliver to the Administrative Agent, with respect to each Borrower (i) a profit and loss statement (both actual and pro-forma for the following twelve (12) months), together with Site-level detail, (ii) a balance sheet, (iii) a cashflow and income statement, (iv) a financial analysis and supplemental financial report, in the form required by Administrative Agent from time to time, (v) a current capitalization table and (vi) a compliance certificate stating whether or not Borrowers are in compliance with the covenant set forth in Sections 5.1(p) hereof, including all calculations evidencing the same and the certification thereto by Borrowers' Chief Financial Officer or other appropriate officer.  All such financial statements and other items shall in in form and substance reasonably acceptable to the Administrative Agent.

(g)     *Annual Financial Statements.*  As soon as practicable or available after the end of each fiscal year of Borrowers, and in any event within one hundred twenty (120) calendar days after the close of each fiscal year, Borrowers must prepare and deliver to Administrative Agent the annual audited financial statement of each Borrower.  Such annual financial statements (a) must include the types of financial statements and information required on a quarterly basis under Section 5.1(f) as well as a reconciliation of consolidated net worth and capital accounts, (b) must be prepared in accordance with GAAP consistently applied and (c) must be prepared by, and include an unqualified audit opinion issued by, an independent certified public accounting firm acceptable to Administrative Agent in its reasonable discretion.  Borrowers shall also deliver no later than thirty (30) days prior to the end of each fiscal year of Borrowers, a comprehensive budget forecasting the revenues, expenses and cash position of each Borrower on a month-to-month basis for the upcoming fiscal year, in form and substance reasonably acceptable to Administrative Agent.  Upon request, Borrowers shall promptly provide any other documentation or information reasonably requested by Administrative Agent and in form and substance reasonable acceptable to Administrative Agent, including but not limited to a current capitalization table of each Borrower.

(h)     *Tax Returns*.  Within fourteen (14) days after the date that any Borrower makes any filing with the IRS relating to its liability for income taxes (or otherwise delivers to any equity owner of Borrowers annual tax or capital information on Form K-1), Borrowers must deliver a complete copy thereof to the Administrative Agent and each Lender.

(i)     *Exclusivity Agreement.*  Contemporaneously with the execution and delivery of this Agreement, Borrowers shall execute and deliver to Administrative Agent the Exclusivity Agreement.

(j)     *Insurance*.  Borrowers shall maintain insurance on the Collateral and Borrowers' businesses in such amounts and in such types as are reasonable and customary for similar businesses. The Collateral insurance shall include a lender's loss payee endorsement in favor of the Administrative Agent. Borrowers shall deliver to Administrative Agent copies of such insurance certificates, on the Closing Date and as requested by Administrative Agent thereafter.

(k)     *Collateral; New Sites; Subsidiaries*.  Loan Parties will warrant and defend the title to the Collateral, and the validity and priority of all Liens granted or otherwise given to Administrative Agent under the Loan Documents, subject only to Permitted Liens, against the claims of all Persons. Without Administrative Agent's prior written consent, Loan Parties shall not create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Collateral or any direct legal or beneficial ownership interest in Borrowers or any other Pledged Entities (as defined in the Pledge Agreement)(including any Person required to be joined as a Borrower hereunder pursuant to Section 5.1(m) hereof), except Liens in

17

favor of Administrative Agent and Permitted Liens.  At all times Borrowers shall maintain Eligible Inventory compromised of not less than thirty-five (35) vehicles. Borrowers may not transfer any Collateral into a Subsidiary, an Affiliate or any other Person without the prior written consent of Administrative Agent. Concurrently with each delivery by Borrowers of quarterly financial statements pursuant to Section 4.1(f) hereof, Borrowers will provide an updated Schedule 4.1(j) hereof reflecting any new Site acquired by a Borrower, or removing any Site at which a Borrower has terminated operations, in each case, since the most recent update to Schedule 4.1(j) delivered hereunder.

(l)     *Books and Records; Inspection and Examination*.  Each Loan Party will keep accurate books of record and account for itself pertaining to the Collateral, the Sites and the business and financial condition of Borrowers and such other matters as Administrative Agent may from time to time reasonably request in which true and complete entries will be made in accordance with GAAP consistently applied and, upon request of and reasonable notice by Administrative Agent, will permit any officer, employee, auditor, attorney or accountant for Administrative Agent or any Lender to audit, review, make extracts from or copy any and all corporate and financial books and records of any Loan Party at all reasonable times during ordinary business hours, and to discuss the affairs of Loan Parties, including the operation of the Sites, with any of its members, employees or agents and to conduct a review and audit of each Loan Party's books and records (the foregoing is collectively referred to herein as "Audit Activities"). Loan Parties will reimburse Administrative Agent upon demand for all out-of-pocket costs and expenses incurred by Administrative Agent or any Lender in connection with Audit Activities.  Without limitation of the foregoing, not less frequently than two (2) times per calendar month for the first three (3) complete calendar months following the Closing Date, and once per calendar month thereafter, Borrowers will prepare and deliver to Administrative Agent, and at Administrative Agent's request shall allow Administrative Agent and/or its designees to perform and/or verify, a detailed floor plan review and audit with respect to Borrowers' business operations, which shall include a reconciliation of all vehicle inventory and sales, the existence and release of all certificates of title therefor, a sources and uses reconciliation for all Borrower cash flows, and such other matters as Administrative Agent may from time to time require.

(m)     *New Subsidiaries and Affiliates*.  Concurrently with (i) the formation by any Borrower of any Subsidiary after the Closing Date, or (ii) the formation or acquisition by any Guarantor or any Borrower of any Person constituting an Affiliate of any Guarantor or any Borrower, or any direct or indirect ownership interest by any Guarantor or any Borrower in any other Person operating a car dealership or other automotive business of any type or nature, Loan Parties will deliver to Administrative Agent (A) a joinder to this Agreement of such Person to add such Person as a "Borrower" hereunder and under the other Loan Documents and a "Merchant" under the Exclusivity Agreement, and (B) a joinder to Security Agreement granting to Administrative Agent, for the benefit of the Lenders, a first priority Lien on all assets of, and all ownership interests in, such Person, in each case, in form and substance acceptable to the Administrative Agent.

(n)     *Cash; Deposit Accounts; Certificates of Title*.  Commencing on (i) the date which is twenty (20) days following the Closing Date and continuing at all times thereafter, each Borrower shall cause all cash of Borrowers, including all revenues received by each Borrower in connection with the operation of any Site, to be remitted directly to, and be maintained solely in, one or more segregated deposit accounts of Borrowers, subject at all times to a "springing" deposit account control agreement, in form and substance acceptable to Administrative Agent, and (ii) the Closing Date and continuing at all times thereafter, each Borrower shall keep the original certificates of title with respect to all vehicle inventory of such Borrower in a secure, fireproof safe or other customary and secure on-Site storage location, and shall permit Administrative Agent and its designees with access thereto at all times during ordinary business hours for purposes of verifying compliance by Borrowers with the representations, warranties and covenants of Borrowers hereunder.

18

4869-1815-9362.7

(o)      For so long as all or any portion of the Loans or any other Obligation remain outstanding Administrative Agent shall have the right, at its sole option, to attend all meetings of the board of managers or equivalent governing body (and all committees thereof) of Borrowers as a non-voting observer.  Borrowers shall (i) give Administrative Agent notice, at the same time as furnished to the members of the board of managers or equivalent governing body (or any committee thereof), (ii) provide to Administrative Agent all notices, documents and information furnished to the such members or board, whether at or in anticipation of a meeting, an action by written consents or otherwise, at the same time as furnished to the such members or board, (iii) notify Administrative Agent by telephone of, and permit Administrative Agent to attend by telephone, emergency meetings of the board of managers or equivalent governing body (and all committees thereof), and (iv) reimburse Administrative Agent for its reasonable out-of-pocket expenses incurred in connection with its rights under this subsection (o).

(p)      *Debt Service Coverage Ratio*.  Commencing with the fiscal quarter of Borrowers ending December 31, 2021 and continuing thereafter, Borrowers, on a consolidated basis, shall maintain the Debt Service Coverage Ratio, as measured on the last day of each fiscal quarter of Borrowers for the period of twelve (12) consecutive calendar months then ended, at not less than 1.50 to 1.00.

(q)      *Other Notices*.  Each Loan Party shall give notice to Administrative Agent as soon as possible, but in any event no later than five (5) days after it becomes aware of (i) any litigation, investigation, or other adverse change with respect to itself or any other Loan Party, along with any and all pleadings or other materials relating to the same; and (ii) any default by any Loan Party on any other obligation in excess of $25,000 or other defaults under any material contract, along with a copy of any documentation received by such Loan Party pertaining to the same.  Borrowers shall also provide copies of any amendments or modifications to any Westlake Financing Documents to Administrative Agent within five (5) days of executing the same.

6.      NEGATIVE COVENANTS.

6.1      Negative Covenants.  During the term of this Agreement, and thereafter for so long as there are Obligations outstanding, each Loan Party hereby covenants that unless Administrative Agent and each Lender has first consented thereto in writing, it will not (directly or indirectly), with respect to Borrowers, and will not permit Borrowers or any Subsidiary of the foregoing to:

(a)      *Indebtedness*.  Incur, create or assume any Debt, other than Permitted Debt, or provide any Debt to any other Person.

(b)      *Liens*.  Incur, create, assume or suffer to exist any Lien on any of its Property or assets, whether now owned or hereinafter acquired other than Permitted Liens.

(c)      *Line of Business*.  Enter into any business, directly or indirectly, except for (i) those businesses in which Borrowers are engaged on the Closing Date or that are reasonably related thereto, and (ii) other businesses, the entering into of which by Borrowers could not be reasonably expected to cause a material adverse effect on any Borrower's financial condition, the ability of any Borrower to perform its obligations under any of the Loan Documents or the ability of Borrowers to utilize credit card processing and other related services provided by any Lender or any of its Affiliates.

(d)      *Transactions With Affiliates*.  Enter into, or permit to exist, any transaction or agreement with any Affiliate except transactions and agreements in the ordinary course and on terms and conditions not less favorable to them than could be obtained on an arm's-length basis from unrelated third parties.

19

(e) *Restricted Payments*.  Make any Restricted Payment, or incur any obligation (contingent or otherwise) to do so.

(f) *Certain Prohibited Actions*.  Directly or indirectly do any of the following: (i) change its principal place of business or chief executive office without first giving Administrative Agent and each Lender thirty (30) days' prior notice; (ii) make or permit any change, amendment or modification to its certificate of formation or incorporation, operating agreement, by-laws or other organizational documents; (iii) cancel or otherwise forgive or release any claim or Debt owed to such Person by any other Person, except for adequate consideration and in the ordinary course of such Person's business in its reasonable judgment; (iv) take any action which could result in Administrative Agent and the Lenders not having a perfected Lien in all of the assets of and the ownership interests in Borrowers, subject only to Permitted Liens; (v) sell, lease, assign, transfer or otherwise dispose of any Collateral, any Site or any other material portion of such Person's Property; (vi) consolidate with or merge into any Person, or permit any other Person to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all the assets of any other Person; (vii) purchase or acquire, or make any commitment to purchase or acquire any equity interests of any kind of, or any obligations or other securities of, or any interest in, any Person, including the establishment or creation of any Subsidiary hereunder and with respect to which Loan Parties have complied with the requirements of Section 5.1(n) hereof; (viii) make or purchase, or commit to make or purchase, any advance, loan, extension of credit or capital contribution to or any other investment in, any Person; (ix) liquidate, dissolve or suspend its business operations; or (x) acquire or permit an Affiliate to acquire any loans or other debt securities.

(g) *Insolvency*.  File a petition for bankruptcy under any Debtor Relief Law, request for reorganization or liquidation, or otherwise become insolvent, seek appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or make a general assignment for the benefit of its creditors.

(h) *Organizational Documents*.  Amend or repeal any Loan Party's Organizational Agreements.

(i) *Alteration of Rights*.  Otherwise alter the rights and preferences under any Loan Document.

(j) *Amending Westlake Financing Documents*.  Amend any Westlake Financing Document in a manner which would cause the (1) aggregate debt owed by Borrowers and their respective Affiliates to exceed the maximum principle amount of $1,000,000 or (2) commitment of Westlake to equal an amount in excess of $1,000,000.

7. <u>EVENTS OF DEFAULT</u>.

7.1 <u>List of Events of Default</u>.  The occurrence of any one or more of the following conditions or events shall constitute an "<u>Event of Default</u>":

(a) *Failure to Pay*.  Borrowers fail to pay (i) any principal amount of the Loans when due or (ii) interest, fees or any other amount when due under the Loan Documents and such failure continues for five (5) calendar days following receipt by Borrowers of written notice from Administrative Agent of such failure.

(b) *Breach of Representations and Warranties*.  Any representation or warranty made or deemed made by any Loan Party to Administrative Agent and/or Lender in any Loan Document is incorrect on the date as of which such representation or warranty was made or deemed made.

20

(c)      *Breach of Covenants*.  Any Loan Party fails to perform or observe any other covenant, condition or agreement of (i) Sections 5 or 6 of this Agreement; or (ii) any other provision of this Agreement or any of the other Loan Documents (other than to the extent the same constitutes an Event of Default under any provision of this Section 7.1 other than this Section 7.1(c)(ii), and such event or circumstance, if capable of being cured, is not cured within (A) thirty (30) days following the occurrence thereof either; or (B) if shorter, the applicable grace period, if any, specified in such other Loan Document.

(d)      *Cross-Defaults*.  Any Loan Party fails to pay when due any of its other Debt in excess of $25,000 in the aggregate, or, in each case, any interest or premium thereon when due (whether by scheduled maturity, acceleration, demand or otherwise), and such failure continues after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt (except for Debt arising under the Loan Documents).

(e)      *Bankruptcy*.  (i) Any Loan Party or any of its Subsidiaries commences any case, proceeding or other action (A) under any existing or future Law relating to bankruptcy, insolvency, reorganization, or other relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or any Loan Party or any of its Subsidiaries makes a general assignment for the benefit of its creditors; (ii) there is commenced against any Loan Party or any of its Subsidiaries any case, proceeding or other action of a nature referred to in Section 7.1(e)(i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of thirty (30) days; (iii) there is commenced against any Loan Party or any Subsidiary any case, proceeding or other action seeking issuance of a warrant of attachment, execution or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which has not been vacated, discharged, or stayed or bonded pending appeal within thirty (30) days from the entry thereof; (iv) any Loan Party or any of its Subsidiaries takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in Section 7.1(e)(i), Section 7.1(e)(ii) or Section 7.1(e)(iii) above; or (v) any Loan Party or any of its Subsidiaries is generally not, or shall be unable to, or admits in writing its inability to, pay its debts as they become due.

(f)      *Judgments*.  One or more judgments or decrees aggregating at least $50,000 shall be entered against any Loan Party or any of its Subsidiaries and all of such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within sixty (60) days from the entry thereof.

(g)      *Exclusivity Agreement*.  Any material breach of (or default under) (subject to applicable cure periods), or any early termination or non-renewal of the Exclusivity Agreement.

(h)      *Change in Condition*.  If the Administrative Agent shall have determined in its sole but reasonable discretion that one or more conditions exist or events have occurred which have resulted or may result in a material adverse change in the business, properties or financial condition of the Borrowers.

(i)      *Change of Control; Guarantors*.  The occurrence of any Change of Control; or the death or permanent incapacitation of any Guarantor that is a natural Person.

(h)      *Criminal Acts.*  Any Loan Party or Related Party of the foregoing is (i) criminally indicted or convicted of a felony; or (ii) charged under any applicable law that could reasonably be expected

to lead to forfeiture of any material portion of the Collateral or a material adverse effect on the financial condition, business prospects, properties or operations of such Person.

8.      REMEDIES.

8.1      Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Administrative Agent may at its option, take any action that it deems advisable to protect and enforce all available rights and remedies of Administrative Agent and the Lenders hereunder, under each of the other Loan Documents or which may otherwise be available at law or in equity, including, without limitation, all rights and remedies with respect to Borrowers, each other Loan Party or the Collateral; and Administrative Agent may, at its option and without notice or demand (a) declare all outstanding Obligations owing or payable hereunder or under any other Loan Document to be immediately due and payable and terminate all Commitments of Lenders hereunder, and when any Event of Default described in subsection (e) of Section 7.1 exists, then all outstanding Obligations shall immediately and automatically become due and payable together with all other amounts payable under the Loan Documents without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Borrowers and each other Loan Party; (c) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents; and (d) exercise any or all of its rights, powers or remedies under Applicable Law.  Notwithstanding the foregoing, if any Event of Default shall occur under Section 7.1(e), the principal of and accrued interest on the Loans shall become immediately due and payable, and all Commitments of Lenders hereunder shall terminate, without any notice, declaration or other act on the part of the Administrative Agent or any Lender.

8.2      If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of Borrowers or any other Loan Party against any and all of the obligations of Borrowers or such other Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or its Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of Borrowers or such other Loan Party may be contingent or unmatured or are owed to a branch office or Affiliate of such Lender different from the branch office or Affiliate holding such deposit or obligated on such Debt.  The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.  Each Lender agrees to notify Borrowers and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

8.3      *Standards for Exercising Remedies*.  To the extent that applicable law imposes duties on the Administrative Agent and/or Lender to exercise remedies in a commercially reasonable manner, each Loan Party acknowledges and agrees that it is not commercially unreasonable for the Administrative Agent and/or Lender (a) to fail to incur expenses deemed significant by the Administrative Agent and/or Lender to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection

22

agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as the Borrowers or any other Loan Party, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure the Administrative Agent and/or Lender against risks of loss, collection or disposition of Collateral or to provide to the Administrative Agent and/or Lender a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by the Administrative Agent and/or Lender, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Lender in the collection or disposition of any of the Collateral. Each Loan Party acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by the Administrative Agent and/or Lender would not be commercially unreasonable in the Administrative Agent's and/or Lender's exercise of remedies against the Collateral and that other actions or omissions by the Administrative Agent and/or Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section. Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any rights to the Borrowers or to impose any duties on the Administrative Agent and/or Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section.

9.      WAIVERS.

Failure by Administrative Agent or any Lender to exercise any right, remedy or option under this Agreement, any other Loan Document, any other documents relating to the Obligations, or as provided by Applicable Law, or any delay by Administrative Agent or any Lender in exercising the same, shall not operate as a waiver of any such right, remedy or option.  No waiver hereunder shall be effective unless it is in writing, signed by the party against whom such waiver is sought to be enforced and then only to the extent specifically stated, which in the case of the Administrative Agent or any Lender shall only be granted as provided herein.  To the extent permitted by Applicable Law, neither the Administrative Agent nor any Lender, nor any party acting as attorney for the Administrative Agent or any Lender, shall be liable hereunder for any acts or omissions or for any error of judgment or mistake of fact or law other than their gross negligence or willful misconduct hereunder.  The rights and remedies of the Administrative Agent and the Lenders under this Agreement shall be cumulative and not exclusive of any other right or remedy that the Administrative Agent or the Lenders may have.

10.      NOTICES.

10.1      *Written Notices*.

(a)      All notices and other communications to any party herein to be effective shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

If to Borrowers or Guarantors:

c/o Karma of Palm Beach, Inc.
1001 Clint Moore Road, Unit B
Boca Raton, FL 33487
Attn: Scott Zankl

23

4869-1815-9362.7

If to Administrative Agent and/or Lenders:

> c/o FVP Servicing, LLC
> 1202 Broadway, 7th Floor
> New York, NY 10001
> Attn: Keith Lee / Tom Betts
> Telephone: 646.902.6645
> E-mail:klee@feenixpartners.com / tbetts@feenixpartners.com

(b)     Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and (ii) sent by e-mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by a return e-mail or other written acknowledgment).

(c)     Any party hereto may change its address for notices and other communications hereunder by notice to the other parties hereto.  All such notices and other communications shall, when transmitted by overnight delivery, be effective when delivered for overnight (next-day) delivery, or if mailed, upon the third Business Day after the date deposited into the mails or if delivered, upon delivery; provided, that notices delivered to Lenders shall not be effective until actually received by such Person at its address specified in this Section 10.

(d)     Any agreement of Administrative Agent or any Lender herein to receive certain notices by telephone or e-mail is solely for the convenience and at the request of Borrowers.  Administrative Agent and each Lender shall be entitled to rely on the authority of any Person purporting to be a Person authorized by a Loan Party to give such notice and neither Administrative Agent nor any Lender shall have any liability to any Loan Party or other Person on account of any action taken or not taken by Administrative Agent or any Lender in reliance upon such telephonic or e-mail notice.  The obligation of Borrowers to repay the Loans and all other Obligations and hereunder shall not be affected in any way or to any extent by any failure of Administrative Agent or any Lender to receive written confirmation of any telephonic or e-mail notice or the receipt by Administrative Agent or any Lender of a confirmation which is at variance with the terms understood by Administrative Agent or any Lender to be contained in any such telephonic or e-mail notice.

10.2     *Electronic Communications*.

(a)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and internet or intranet websites) pursuant to procedures approved by Administrative Agent; provided that the foregoing shall not apply to notices to Administrative Agent or any Lender pursuant to Section 2 hereof unless Administrative Agent or such Lender has agreed to receive notices under such Section by electronic communication and have agreed to the procedures governing such communications. Any Party may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(b)     Unless Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by a return e-mail or other written acknowledgement); provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted

4869-1815-9362.7

to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

11.    EXPENSES AND INDEMNIFICATION.

11.1    Costs and Expenses.  Borrowers shall reimburse Administrative Agent and each Lender upon demand for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Administrative Agent and each Lender in connection with the Loans and other transactions contemplated hereby, including (i) the preparation, negotiation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby; (ii) Borrowers' ongoing performance under and compliance with the Loan Documents, including confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications of or under any Loan Document and any other documents or matters requested by Administrative Agent; (iv) filing and recording of any Loan Documents; (v) the creation, perfection or protection of Administrative Agent's and Lenders' Liens in the Collateral (including fees and expenses for title and lien searches, intangibles taxes, personal property taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports, surveys and engineering reports); (vi) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting any Borrower, any other Loan Party, the Loan Documents, the Collateral, or any other security given for the Obligations; and (vii) enforcing any obligations of or collecting any payments due from any Borrower or any other Loan Party under any Loan Document or with respect to the Collateral or in connection with any refinancing or restructuring of the Loans in the nature of a "work-out", or any insolvency or bankruptcy proceedings.  All obligations provided for in this Section 11.1 shall survive the termination of this Agreement and/or the repayment of the Obligations.

11.2    Indemnity.  Each Borrower shall indemnify Administrative Agent and each Lender, each Affiliate and Subsidiary of Administrative Agent and each Lender, and each investment manager, servicer, partner, member, officer, director, employee, agent and advisor of Administrative Agent and each Lender (each, an "Indemnitee") against, defend and hold each of them harmless from, any and all Specified Losses (defined below) unless such Specified Losses incurred by any such Indemnitee are determined by a court of competent jurisdiction in a final and non-appealable judgment to have resulted from (i) the gross negligence or willful misconduct of such Indemnitee; or (ii) a claim brought by any Borrower, any other Loan Party or any third Person against such Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document.  For purposes of this Section, the term "Specified Losses" means all costs, losses, liabilities, claims, damages and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, which may be incurred by any Indemnitee, or asserted against any Indemnitee by Borrowers, any other Loan Party or any third Person, arising out of, in connection with or as a result of (a) the execution or delivery of this Agreement or any other agreement or instrument contemplated hereby and the performance by Administrative Agent or any Lender of its respective obligations hereunder or the consummation of any of the transactions contemplated hereby, (b) any Loan or any actual use of the proceeds therefrom, (c) any actual claim, litigation, investigation or proceeding relating to any of the foregoing, or (d) any actual claim, litigation or proceeding by any third party, so long as all Indemnitees are in compliance with Applicable Law related to such third party, collections or exercise of remedies relating to any third party.  Borrowers shall pay, and hold Lender harmless from and against, any and all present and future stamp, documentary, and other similar taxes with respect to this Agreement and any other Loan Documents, any collateral described therein, or any payments due thereunder, and save Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission to pay such taxes.

25

4869-1815-9362.7

11.3     Taxes.  Borrowers shall pay, and hold Lender harmless from and against, any and all present and future stamp, documentary, and other similar taxes with respect to this Agreement and any other Loan Documents, any collateral described therein, or any payments due thereunder, and save Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission to pay such taxes.

11.4     Reimbursement by Lenders.  To the extent that Borrowers for any reason fail to indefeasibly pay any amount required under this Section 11 to be paid by them to the Administrative Agent (or any sub-agent thereof) or any Related Party thereof, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender), such payment to be made severally among them (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought), provided, further that, the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), or against any Related Party thereof acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this Section 11.4 are subject to the provisions of Section 2.1(b).

11.5     Waiver of Damages.  To the fullest extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, and acknowledges that no other Person shall have, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in Section 11.2 above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

11.6     Payment.  All amounts due under this Section shall be payable promptly after written demand therefor.

11.7     Survival.  The agreements and indemnity provisions of this Section 11 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Obligations.

11.8     Payments Set Aside.  To the extent that any payment by or on behalf of Borrowers or any other Loan Party is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the federal funds rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

4869-1815-9362.7

12.    ADMINISTRATIVE AGENT.

12.1    Appointment and Authority.   Each of the Lenders hereby irrevocably appoints the Administrative Agent to act on its behalf as the administrative agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are incidental thereto.  The provisions of this Section are solely for the benefit of the Administrative Agent and the Lenders, and Borrowers shall have no rights as third-party beneficiaries of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law.  Instead such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties.

12.2    Rights as a Lender.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  The Administrative Agent and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Loan Party or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

12.3    Exculpatory Provisions.

(a)    The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  The parties do not intend to create any agency, partnership, joint venture, trust, fiduciary or other relationship with duties or incidents different from those of parties to an arm's-length contract.  Without limiting the generality of the foregoing, the Administrative Agent (a) shall not be subject to any fiduciary or other implied duties except as expressly set forth in this Agreement, regardless of whether a Default has occurred and is continuing; (b) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Lenders, provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law; and (c) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Loan Party or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

(b)    The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Lenders or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given in writing to the Administrative Agent by any Loan Party, or a Lender.

27

(c)     The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

12.4     Reliance by Administrative Agent.   The Administrative Agent shall be entitled to reasonably rely upon, and shall not incur any liability for reasonably relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.   The Administrative Agent also may reasonably rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.   In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is reasonably satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.   The Administrative Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. The Loan Parties shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of such Loan Party.

12.5     Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Section shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

12.6     Resignation of Administrative Agent.   The Administrative Agent may resign as Administrative Agent at any time by giving thirty (30) days advance notice thereof to the Lenders and Borrowers and, thereafter, the retiring Administrative Agent shall be discharged from its duties and obligations hereunder.  Upon any such resignation, the Lenders shall have the right to appoint a successor Administrative Agent.  If no successor Administrative Agent shall have been so appointed by the Lenders, or have accepted such appointment within thirty (30) days after the Administrative Agent's giving of notice of resignation, then the Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all rights, powers, privileges and duties of the retiring Administrative Agent.  After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this Section 12.6 shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by

28

4869-1815-9362.7

it while it was acting as Administrative Agent.  If no successor has accepted appointment as Administrative Agent by the date which is thirty (30) days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Lenders appoint a successor agent as provided for above.

12.7    Non-Reliance on Administrative Agent and Other Lenders.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

12.8    Administrative Agent May File Proofs of Claim.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to Borrowers, the Administrative Agent (irrespective of whether the principal of the Loans shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

(c)    and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent hereunder.

13.    MISCELLANEOUS.

13.1    Entire Agreement; Amendment.  This Agreement and the other Loan Documents embody the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, and any prior agreements, whether written or oral, with respect thereof, are expressly superseded hereby.  This Agreement, or any term contained herein, may not be modified, waived or amended except by an agreement in writing signed by Borrowers and the Administrative Agent.

13.2    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that no Loan Party may assign this Agreement, any other Loan Document, or any right or benefit hereunder to any Person.  Any Lender may assign any or all of its rights and obligations hereunder at any time and to any Person, upon Administrative Agent's prior written consent and the execution and delivery of an assignment and assumption agreement by such assigning Lender to the proposed assignee, in form and substance acceptable to Administrative

29

Agent.  From and after the effective date of any such assignment, the assignee shall be a party to this Agreement and, to the extent of the interest assigned, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Lender, be released from its obligations under this Agreement.  Upon request, Borrowers shall execute and deliver a Note to the assignee Lender.  Subject to the foregoing, any Lender shall have the right to enter into one or more participations with respect to the Obligations without prior notice or consent of Borrowers.

13.3    Governing Law. This Agreement and the other Loan Documents and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any of the other Loan Documents and the transactions contemplated hereby shall be governed by the laws of the State of New York.

13.4    Submission to Jurisdiction.

(a)    Each Loan Party hereby irrevocably and unconditionally (i) agrees that any legal action, suit or proceeding arising out of or relating to this Agreement and the other Loan Documents may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit or proceeding. Final judgment against any Loan Party in any action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.  Nothing in this Section 13.4 shall affect the right of Administrative Agent and each Lender to (i) commence legal proceedings or otherwise sue any Loan Party in any other court having jurisdiction over such Loan Party or (ii) serve process upon any Loan Party in any manner authorized by the laws of any such jurisdiction.

(b)    In accordance with Rule 9, Accelerated Adjudication Actions, as set forth in Section 202.70(g) of the Rules of the Commercial Division of the Supreme Court, subject to the requirements for a case to be heard in the Commercial Division of the Supreme Court of the State of New York, Borrowers hereby agree to submit to the exclusive jurisdiction of the Commercial Division, New York State Supreme Court, and to the application of the such Court's accelerated procedures, in connection with any dispute, claim or controversy arising out of or relating to this Agreement or any other Loan Document, or the breach, termination, enforcement or validity thereof.

13.5    Venue.  Each Loan Party irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement and the other Loan Documents in any court referred to in Section 13.4 and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

13.6    Advertising.  Administrative Agent and each Lender, and their affiliates, in their sole and absolute discretion, may disclose publicly (including on its website) for marketing and promotional purposes that the Borrowers are in such Administrative Agent's and Lender's portfolio, including but not limited to a royalty-free, non-exclusive, worldwide, irrevocable license in any intellectual property for use solely in marketing and promotional materials.

13.7    Waiver of Jury Trial. EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY.

4869-1815-9362.7

13.8    Counterparts; Effectiveness. This Agreement and the other Loan Documents and any amendments, waivers, consents or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

13.9    Waiver of Notice. Each Loan Party hereby waives demand for payment, presentment for payment, protest, notice of payment, notice of dishonor, notice of nonpayment, notice of acceleration of maturity and diligence in taking any action to collect sums owing hereunder.

13.10    USA PATRIOT Act. Administrative Agent and each Lender hereby notifies each Loan Party that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify, and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow Administrative Agent and each Lender to identify such Loan Party in accordance with the USA PATRIOT Act, and each Loan Party agrees to provide such information from time to time to the Administrative Agent.

13.11    Interpretation. For purposes of this Agreement (i) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (ii) the word "or" is not exclusive; and (iii) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. Unless the context otherwise requires, references herein: (x) to Schedules, Exhibits and Sections mean the Schedules, Exhibits and Sections of this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement and the other Loan Documents shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

13.12    Amendments and Waivers. No term of this Agreement may be waived, modified or amended except by an instrument in writing signed by the Parties hereto. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

13.13    Headings. The headings of the various Sections and subsections herein are for reference only and shall not define, modify, expand or limit any of the terms or provisions hereof.

13.14    No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising on the part of the Administrative Agent or any Lender, of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Applicable Law.

13.15    Electronic Execution. The words "execution," "signed," "signature," and words of similar import in this Agreement shall be deemed to include electronic or digital signatures or the keeping of records in electronic form, each of which shall be of the same effect, validity and enforceability as manually executed signatures or a paper-based recordkeeping system, as the case may be, to the extent and as provided for under Applicable Law, including the Electronic Signatures in Global and National Commerce

31

Act of 2000 (15 USC § 7001 et seq.), the Electronic Signatures and Records Act of 1999 (N.Y. State Tech. Law §§ 301-309), or any other similar state laws based on the Uniform Electronic Transactions Act.

13.16    Severability.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

13.17    Joint and Several Obligations.  The obligations of each Borrower hereunder and under each of the other Loan Documents are joint and several.  Each reference to the term "Borrower" hereunder or under any other Loan Document shall be deemed to refer to each Borrower, each representation and warranty made by a Borrower hereunder or under any other Loan Document shall be deemed to have been made by each Borrower; each covenant and undertaking on the part of a Borrower hereunder or under any other Loan Document shall be deemed individually applicable with respect to each Borrower; and each event constituting a Default hereunder or under any other Loan Document shall be determined with respect to each Borrower.  A separate action or actions may be brought and prosecuted against any Borrower whether an action is brought against any other Borrower or whether any other Borrower is joined in any such action or actions.  Each Borrower waives the right to require Administrative Agent to: (a) proceed against any other Borrower; (b) proceed against or exhaust any Collateral held from any other Borrower; or (c) pursue any other remedy in Administrative Agent's power whatsoever.  Any consent on the part of a Borrower hereunder or under any other Loan Document shall be effective when provided by any Borrower, and Administrative Agent shall be entitled to rely upon any notice or consent given by any Borrower as being notice and consent given by all Borrowers hereunder and under each other Loan Document.  In the event any obligation of a Borrower hereunder and under each other Loan Document is deemed by a court of competent jurisdiction to be an agreement by any Borrower to answer for the debt or default of another Borrower or as a hypothecation of property as security therefor, each Borrower represents, warrants and agrees that: (i) no representation has been made to it as to the creditworthiness of any other Borrower; (ii) it has established an adequate means of obtaining from each other Borrower, on a continuing basis, financial or other information pertaining to each other Borrower's financial condition; (iii) it expressly waives diligence, demand, presentment, protest and notice of every kind and nature whatsoever, consents to the alteration or release by Administrative Agent (in any manner) of any Collateral now or hereafter held in connection with any obligations under any Loan Document, and consents that Administrative Agent and any Borrower may deal with each other in connection with said obligations or otherwise, including the voluntary grant of additional security for the obligations of any Borrower, or alter any contracts now or hereafter existing between them, in any manner whatsoever, including, without limitation, the renewal, extension, acceleration, changes in time for payment, and increases or decreases in any rate of interest or other amounts owing, all without in any way altering the liability of any Borrower, or affecting any security for such obligations.  Upon the occurrence and during the continuance of any Default, Administrative Agent is hereby expressly given the right, at its option, to proceed in the enforcement of any Loan Document independently of any other remedy or security it may at any time hold in connection with such Loan Document and it shall not be necessary for Administrative Agent to proceed upon or against and/or exhaust any other security or remedy before proceeding to enforce its rights against any Borrower.  Until the Loans and all other Debt or indebtedness under the Loan Documents have been paid in full, each Borrower further waives any right or subrogation, reimbursement, exoneration, contribution, indemnification, setoff or other recourse in respect of sums paid to Lender by any other Borrower.  Borrowers do not intend that any Borrower be deemed to be a guarantor.

[signatures appear on following page]

32

IN WITNESS WHEREOF, the undersigned, by their duly authorized officers, have executed this Agreement and it is effective as of the day and year first above written.

**BORROWERS:**

**KARMA OF BROWARD, INC.,**
a Florida corporation

By: _____
Name: Scott Zankl
Title: President

**KARMA OF PALM BEACH, INC.,**
a Florida corporation

By: _____
Name: Scott Zankl
Title: President

**GUARANTORS:**

_____
**SCOTT ZANKL**

_____
**KRISTEN ZANKL**

*[Signature Page – Loan Agreement]*

**ADMINISTRATIVE AGENT:**

**FVP SERVICING, LLC**,
a Delaware limited liability company

By: _Keith Lee_
Name:  Keith Lee
Title:    Manager

**LENDERS:**

**FVP OPPORTUNITY FUND III, LP**,
a Delaware limited partnership

By:  FVP Fund III GP, LLC, its General Partner

By: _Keith Lee_
Name:  Keith Lee
Title:    Manager

**FVP INVESTMENTS, LLC**,
a Delaware limited liability company

By: _Keith Lee_
Name:  Keith Lee
Title:    Manager

*[Signature Page – Loan Agreement]*
4869-1815-9362.7

**SCHEDULE I TO LOAN AGREEMENT**

**LENDER COMMITMENT SCHEDULE**

| LENDER | COMMITMENT |
|---|---|
| FVP Opportunity Fund III, LP | $4,500,000.00 |
| FVP Investments, LLC | $3,000,000.00*<br>*Subject Commitment limited to Advances in respect of the Delayed Draw Term Loan. |

4869-1815-9362.7

## SCHEDULE 4.1(O) TO LOAN AGREEMENT

## LOAN PARTY CAPITALIZATION

### KARMA OF BROWARD, INC.

| Name | Ownership |
|---|---|
| Scott Zankl | 50% |
| Kristen Zankl | 50% |
| | |
| Total | 100.00% |

### KARMA OF PALM BEACH, INC.

| Name | Ownership |
|---|---|
| Scott Zankl | 50% |
| Kristen Zankl | 50% |
| | |
| Total | 100.00% |

4869-1815-9362.7

## SCHEDULE 4.1(J) TO LOAN AGREEMENT

### SITES

| LOAN PARTY | SITE ADDRESS | CONCEPT | FEE OR LEASED/REMAINING LEASE TERM |
|---|---|---|---|
| Karma of Broward, Inc. | 1717 17th Street Ft. Lauderdale, FL 33316 | Auto Dealership | 10 years |
| Karma of Palm Beach, Inc. | 1001 Clint Moore Road Boca Raton, FL 33487 | Auto Dealership | 10 years |

4869-1815-9362.7

**EXHIBIT A TO LOAN AGREEMENT**

**NOTE**

$4,500,000.00                                                                                                    January 26, 2022

        **FOR VALUE RECEIVED, KARMA OF PALM BEACH, INC.**, a Florida corporation ("Palm Beach") and **KARMA OF BROWARD, INC.**, a Florida corporation ("Broward"; Palm Beach and Broward, each, a "Borrower" and collectively, "Borrowers"), on a joint and several basis, hereby promise to pay to the order of **FVP SERVICING, LLC**, a Delaware limited liability company, as administrative agent ("Administrative Agent"), for the benefit of **FVP OPPORTUNITY FUND III, LP**, a Delaware limited partnership (the "Noteholder"), the principal amount of FOUR MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($4,500,000.00) (or, if less, the aggregate outstanding principal amount of all Advances to Borrowers in respect of the Loans) held by Noteholder, in accordance with the provisions of that certain Loan Agreement dated as of January 26, 2022, by and among Borrowers, the Noteholder, the other Lenders party thereto, Administrative Agent and the other Loan Parties party thereto (the "Loan Agreement").  Capitalized terms used herein shall have the meanings set forth in the Loan Agreement.

Borrowers promise to pay interest on the unpaid principal amount of this Note (this "Note") at such interest rates and at such times as provided in the Loan Agreement.  All payments of principal and interest shall be made to Administrative Agent, for the benefit Noteholder, in immediately available funds by wire, checks or money orders made payable to Administrative Agent in accordance with Section 2.2 of the Loan Agreement.  If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest at a rate, to be paid as set forth in the Loan Agreement.

This Note is entitled to the benefits of the Loan Agreement and may be prepaid in whole or in part subject to the terms and conditions provided therein.  Upon the occurrence and continuation of one or more of the Events of Default specified in the Loan Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as and to the extent provided in the Loan Agreement.  Administrative Agent may attach schedules to this Note and endorse thereon the date, amount and maturity of its Advances under the Loan Agreement and payments with respect thereto.

Each Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[Execution Page Follows]

4869-1815-9362.7

IN WITNESS WHEREOF, Borrowers have caused this Note to be executed and delivered and it is effective as of the date first written above.

**KARMA OF BROWARD, INC.,**
a Florida corporation

By:_____
Name:
Title:

**KARMA OF PALM BEACH, INC.,**
a Florida corporation

By:_____
Name:
Title:

4869-1815-9362.7

**NOTE**

$3,000,000.00                                                                           January 26, 2022

        **FOR VALUE RECEIVED, KARMA OF PALM BEACH, INC.**, a Florida corporation ("Palm Beach") and **KARMA OF BROWARD, INC.**, a Florida corporation ("Broward"; Palm Beach and Broward, each, a "Borrower" and collectively, "Borrowers"), on a joint and several basis, hereby promise to pay to the order of **FVP SERVICING, LLC**, a Delaware limited liability company, as administrative agent ("Administrative Agent"), for the benefit of **FVP INVESTMENTS, LLC**, a Delaware limited liability company (the "Noteholder"), the principal amount of THREE MILLION AND 00/100 DOLLARS ($3,000,000.00) (or, if less, the aggregate outstanding principal amount of all Advances to Borrowers in respect of the Loans) held by Noteholder, in accordance with the provisions of that certain Loan Agreement dated as of January 26, 2022, by and among Borrowers, the Noteholder, the other Lenders party thereto, Administrative Agent and the other Loan Parties party thereto (the "Loan Agreement"). Capitalized terms used herein shall have the meanings set forth in the Loan Agreement.

Borrowers promise to pay interest on the unpaid principal amount of this Note (this "Note") at such interest rates and at such times as provided in the Loan Agreement. All payments of principal and interest shall be made to Administrative Agent, for the benefit Noteholder, in immediately available funds by wire, checks or money orders made payable to Administrative Agent in accordance with Section 2.2 of the Loan Agreement. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest at a rate, to be paid as set forth in the Loan Agreement.

This Note is entitled to the benefits of the Loan Agreement and may be prepaid in whole or in part subject to the terms and conditions provided therein. Upon the occurrence and continuation of one or more of the Events of Default specified in the Loan Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as and to the extent provided in the Loan Agreement. Administrative Agent may attach schedules to this Note and endorse thereon the date, amount and maturity of its Advances under the Loan Agreement and payments with respect thereto.

Each Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[Execution Page Follows]

4869-1815-9362.7

IN WITNESS WHEREOF, Borrowers have caused this Note to be executed and delivered and it is effective as of the date first written above.

**KARMA OF BROWARD, INC.**,
a Florida corporation

By:_____
Name:
Title:

**KARMA OF PALM BEACH, INC.**,
a Florida corporation

By:_____
Name:
Title:

4869-1815-9362.7

**EXHIBIT B TO LOAN AGREEMENT**

**<u>FLOW OF FUNDS MEMORANDUM (CLOSING DATE TERM LOAN)</u>**

| Source of Funds: | Amount | |
|---|---|---|
| Loan Proceeds | $3,500,000.00 | |
| **Use of Funds** | **Amount** | **Payee/Wire Transfer Instructions** |
| Net Proceeds to Borrower | $2,913,133.55 | Bank Name:  JPMorgan Chase Bank<br>Bank Address: 240 E. Palmetto Park Road<br> Boca Raton, FL 33432<br>Account Name:  Karma Broward<br>ABA Routing #:  021000021<br>Account #:  705157995<br>Reference:  Karma |
| Payoff of Existing Debt to Quick Shift Capital, LLC | $487,996.45 | Bank Name:  Synovus Bank<br>Bank Address: 1048 Broadway, Columbus, GA 31901<br>Account Name:  Quick Shift Capital, LLC<br>ABA Routing #:  061100606<br>Account #:  1015599176<br>Reference:  Karma |
| Commitment Fee to Lenders | $75,000.00 | To be withheld by Administrative Agent from Loan proceeds and applied to payment. |
| Attorneys' Fees of Administrative Agent and the Lenders | $23,870.00 | Bank Name:  First National Bank of Omaha<br>Bank Address: 1620 Dodge Street, Omaha, Nebraska<br>Account Name:  Kutak Rock LLP<br>ABA Routing #:  104000016<br>Account #:  24-690470<br>Reference:  Matter #1700101-54 |

4869-1815-9362.7

**EXHIBIT C TO LOAN AGREEMENT**

**FORM OF DELAYED DRAW LOAN ADVANCE REQUEST**

[**DATE**]

FVP Servicing, LLC
325 Hudson Street, 4th Floor
New York, NY 10013
Attn: Keith Lee / Tom Betts
Telephone: 646.902.6645
E-mail: klee@feenixpartners.com / tbetts@feenixpartners.com

Re:   Request for Advance under that certain Loan Agreement (the "Loan Agreement") dated as of January 26, 2022, by and among Karma of Broward, Inc. and Karma of Palm Beach, Inc. (each, a "Borrower" and, collectively, "Borrowers"), FVP Servicing, LLC, a Delaware limited liability company, as administrative agent for the "Lenders" party thereto from time to time (the "Administrative Agent") and the other parties thereto from time to time.  Capitalized terms used herein shall have the meanings set forth in the Loan Agreement.

Ladies and Gentlemen:

The undersigned Borrowers hereby delivers this Delayed Draw Loan Advance Request to the Administrative Agent and the Lenders and hereby request the Lenders to advance the requested funds to Borrowers in accordance with and in reliance upon the following instructions and certifications:

| 1. | Facility Requested | Delayed Draw Term Loan |
|---|---|---|
| 2. | Total Amount Requested | $[1,000,000.00] |
| 3. | Requested Settlement Date | [_____], 20[__] |

In connection with this Delayed Draw Loan Advance Request, the undersigned Borrowers hereby represent and certify to the Administrative Agent and the Lenders as follows, which representations and certifications are accurate and complete as of the date hereof and as of the Settlement Date for the Advance requested hereunder: (i) the proceeds of the requested Advance will be used for purposes that are authorized under the Loan Agreement and otherwise in compliance with the terms of the Loan Agreement; and (ii) all conditions precedent for the Advances requested hereby under the Loan Agreement, as set forth in Section 3.2 of the Loan Agreement, have been satisfied.

The Lenders and Administrative Agent are hereby irrevocably authorized and instructed to arrange for and to disburse the proceeds of the requested Advance in accordance with the instructions below:

Bank: [_____]
Routing No.: [_____]
Account No.: [_____]
Account Name: [_____]

4869-1815-9362.7

**IN WITNESS WHEREOF**, this Delayed Draw Loan Advance Request is hereby executed, delivered and effective as of the date first written above.

Very truly yours,

**KARMA OF BROWARD, INC.**,
a Florida corporation

By:_____
Name:
Title:

**KARMA OF PALM BEACH, INC.**,
a Florida corporation

By:_____
Name:
Title:

4869-1815-9362.7

# EXHIBIT C

**NOTE**

$3,000,000.00                                                                                              January 26, 2022

        **FOR VALUE RECEIVED, KARMA OF PALM BEACH, INC.**, a Florida corporation ("Palm Beach") and **KARMA OF BROWARD, INC.**, a Florida corporation ("Broward"; Palm Beach and Broward, each, a "Borrower" and collectively, "Borrowers"), on a joint and several basis, hereby promise to pay to the order of **FVP SERVICING, LLC**, a Delaware limited liability company, as administrative agent ("Administrative Agent"), for the benefit of **FVP INVESTMENTS, LLC**, a Delaware limited liability company (the "Noteholder"), the principal amount of THREE MILLION AND 00/100 DOLLARS ($3,000,000.00) (or, if less, the aggregate outstanding principal amount of all Advances to Borrowers in respect of the Loans) held by Noteholder, in accordance with the provisions of that certain Loan Agreement dated as of January 26, 2022, by and among Borrowers, the Noteholder, the other Lenders party thereto, Administrative Agent and the other Loan Parties party thereto (the "Loan Agreement"). Capitalized terms used herein shall have the meanings set forth in the Loan Agreement.

Borrowers promise to pay interest on the unpaid principal amount of this Note (this "Note") at such interest rates and at such times as provided in the Loan Agreement. All payments of principal and interest shall be made to Administrative Agent, for the benefit Noteholder, in immediately available funds by wire, checks or money orders made payable to Administrative Agent in accordance with Section 2.2 of the Loan Agreement. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest at a rate, to be paid as set forth in the Loan Agreement.

This Note is entitled to the benefits of the Loan Agreement and may be prepaid in whole or in part subject to the terms and conditions provided therein. Upon the occurrence and continuation of one or more of the Events of Default specified in the Loan Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as and to the extent provided in the Loan Agreement. Administrative Agent may attach schedules to this Note and endorse thereon the date, amount and maturity of its Advances under the Loan Agreement and payments with respect thereto.

Each Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[Execution Page Follows]

IN WITNESS WHEREOF, Borrowers have caused this Note to be executed and delivered and it is effective as of the date first written above.

**KARMA OF BROWARD, INC.,**
a Florida corporation

By:_____

Name: Scott Zankl

Title: Pres

**KARMA OF PALM BEACH, INC.,**
a Florida corporation

By:_____

Name: Scott Zankl

Title: Pres

# EXHIBIT D

**NOTE**

$4,500,000.00                                                           January 26, 2022

       **FOR VALUE RECEIVED, KARMA OF PALM BEACH, INC.**, a Florida corporation ("Palm Beach") and **KARMA OF BROWARD, INC.**, a Florida corporation ("Broward"; Palm Beach and Broward, each, a "Borrower" and collectively, "Borrowers"), on a joint and several basis, hereby promise to pay to the order of **FVP SERVICING, LLC**, a Delaware limited liability company, as administrative agent ("Administrative Agent"), for the benefit of **FVP OPPORTUNITY FUND III, LP**, a Delaware limited partnership (the "Noteholder"), the principal amount of FOUR MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($4,500,000.00) (or, if less, the aggregate outstanding principal amount of all Advances to Borrowers in respect of the Loans) held by Noteholder, in accordance with the provisions of that certain Loan Agreement dated as of January 26, 2022, by and among Borrowers, the Noteholder, the other Lenders party thereto, Administrative Agent and the other Loan Parties party thereto (the "Loan Agreement").  Capitalized terms used herein shall have the meanings set forth in the Loan Agreement.

Borrowers promise to pay interest on the unpaid principal amount of this Note (this "Note") at such interest rates and at such times as provided in the Loan Agreement.  All payments of principal and interest shall be made to Administrative Agent, for the benefit Noteholder, in immediately available funds by wire, checks or money orders made payable to Administrative Agent in accordance with Section 2.2 of the Loan Agreement.  If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest at a rate, to be paid as set forth in the Loan Agreement.

This Note is entitled to the benefits of the Loan Agreement and may be prepaid in whole or in part subject to the terms and conditions provided therein.  Upon the occurrence and continuation of one or more of the Events of Default specified in the Loan Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as and to the extent provided in the Loan Agreement.  Administrative Agent may attach schedules to this Note and endorse thereon the date, amount and maturity of its Advances under the Loan Agreement and payments with respect thereto.

Each Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[Execution Page Follows]

IN WITNESS WHEREOF, Borrowers have caused this Note to be executed and delivered and it is effective as of the date first written above.

**KARMA OF BROWARD, INC.,**
a Florida corporation

By:_____
Name: Scott Zankl
Title: Pres

**KARMA OF PALM BEACH, INC.,**
a Florida corporation

By:_____
Name: Scott Zankl
Title: Pres

# EXHIBIT E

**Exhibit E**

EXECUTION COPY

## GUARANTY AGREEMENT

This **GUARANTY AGREEMENT** (this "**Guaranty**") is executed as of January 26, 2022, by **SCOTT ZANKL**, an individual, **KRISTEN ZANKL**, an individual, and each other Person from time to time executing a joinder hereto for purposes of becoming a "Guarantor" hereunder in accordance with Section 5.1(m) of the hereafter defined Loan Agreement (each, a "**Guarantor**" and, collectively, the "**Guarantors**"), for the benefit of **FVP SERVICING, LLC**, in its capacity as administrative agent for the Lenders under the Loan Agreement (as defined below) (the "**Administrative Agent**"), and the Lenders from time to time party to the Loan Agreement.  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such term in the Loan Agreement.

W I T N E S S E T H:

A.  Pursuant to that certain Loan Agreement dated of even date herewith (as the same may be amended, modified, supplemented, replaced or otherwise modified from time to time, the "**Loan Agreement**") by and among Karma of Broward, Inc. and Karma of Palm Beach, Inc., as borrowers (individually and collectively, "**Borrower**"), Guarantors, Administrative Agent and the Lenders party thereto, Lenders have agreed to make certain term loans to Borrower in the aggregate original principal amount of up to $7,500,000.00 (collectively, the "**Loan**").  Lenders are not willing to make the Loan, or otherwise extend credit, to Borrower unless each Guarantor unconditionally guarantees the payment and performance to Lenders of the Guaranteed Obligations (as herein defined).

B.  Each Guarantor will directly benefit from Lender's making the Loan to Borrower.

NOW, THEREFORE, as an inducement to Lenders to make the Loan to Borrower and to extend such additional credit as Lenders may from time to time agree to extend under the Loan Documents, as an inducement to Administrative Agent and the Lenders to enter into the Loan Documents, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

### ARTICLE 1
### NATURE AND SCOPE OF GUARANTY

Section 1.1   Guaranty of Obligation.

(a)  Each Guarantor hereby irrevocably and unconditionally jointly and severally guarantees to Administrative Agent and the Lenders and each of their respective successors and assigns the payment and performance of the Guaranteed Obligations (as defined below) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.  Each Guarantor hereby irrevocably and unconditionally covenants and agrees that it is jointly and severally liable for the Guaranteed Obligations as a primary obligor.

(b)  As used herein, the term "**Guaranteed Obligations**" means the aggregate principal amount of all of the Obligations, whether now existing or made subsequent hereto, or so much thereof as may be due and owing under the Loan Agreement or any of the other Loan Documents, together with interest, fees, costs, expenses and any other sums owing under the Loan Agreement or any of the other Loan Documents and all costs or expenses incurred by Administrative Agent or any Lender in the enforcement or collection of this Guaranty.

Section 1.2   Nature of Guaranty.  This Guaranty is a continuing guaranty of payment and performance and not a guaranty of collection.  This Guaranty may not be revoked by any Guarantor and

4874-0469-8626.4

shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by such Guarantor and after (if any Guarantor is a natural person) such Guarantor's death (in which event this Guaranty shall be binding upon such Guarantor's estate and such Guarantor's legal representatives and heirs).  The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of any Guarantor hereunder with respect to the Guaranteed Obligations.  This Guaranty may be enforced by the Administrative Agent, Lenders and any subsequent holder of the Loan Agreement or the Notes and shall not be discharged by the assignment or negotiation of all or part of the Loan Agreement, the Notes or the Obligations.

Section 1.3      Guaranteed Obligations Not Reduced by Offset.  The Guaranteed Obligations and the liabilities and obligations of Guarantors hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party against the Administrative Agent or Lenders or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

Section 1.4      Payment By Guarantor.  If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, each Guarantor shall, immediately upon demand by Administrative Agent and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, all such notices being hereby waived by each Guarantor, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lenders at Administrative Agent's address as set forth herein.  Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations and may be made from time to time with respect to the same or different items of Guaranteed Obligations.  Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

Section 1.5      No Duty To Pursue Others.  It shall not be necessary for Administrative Agent or any Lender (and Guarantor hereby waives any rights which such Guarantor may have to require Lender), in order to enforce the obligations of Guarantors hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other Person, (ii) enforce Administrative Agent's or any Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Administrative Agent's or any Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Administrative Agent or Lenders against any collateral which shall ever have been given to secure the Loan or other Obligations, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations.  All of the remedies set forth herein and/or provided for in or at law or equity shall be equally available to Administrative Agent, and the choice by Administrative Agent of one such remedy over another shall not be subject to question or challenge by any Guarantor or any other Person, nor shall any such choice be asserted as a defense, setoff, or failure to mitigate damages in any action, proceeding, or counteraction by Administrative Agent to recover or seeking any other remedy under this Guaranty, nor shall such choice preclude Administrative Agent from subsequently electing to exercise a different remedy.

Section 1.6      Waivers.  Each Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lenders to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Loan Agreement or any other Loan Document, (iv) the execution and delivery by Borrower, Administrative Agent and Lenders of any other loan or credit agreement or of Borrower's execution and delivery of any promissory note or other document arising under the Loan Documents, (v) the occurrence of (A) any breach by Borrower of any of the terms or conditions of the Loan Agreement or any of the other Loan Documents, or (B) an Event of Default, (vi) Administrative

2

Agent's or any Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) the sale or foreclosure (or the posting or advertising for the sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Administrative Agent or any Lender and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and/or the obligations hereby guaranteed.

Section 1.7    Payment of Expenses.  In the event that any Guarantor shall breach or fail to timely perform any provisions of this Guaranty, Guarantors shall, immediately upon demand by Administrative Agent, pay all of Administrative Agent's and each Lender's costs and expenses (including court costs and attorneys' fees) incurred by Administrative Agent and Lenders in the enforcement hereof or the preservation of all of Administrative Agent's and each Lender's rights hereunder, together with interest thereon from the date requested by Administrative Agent until the date of payment to Administrative Agent and Lenders.  The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations.

Section 1.8    Effect of Bankruptcy.  In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Administrative Agent or any Lender must rescind or restore any payment or any part thereof received by Administrative Agent or any Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Administrative Agent or any Lender shall be without effect and this Guaranty shall remain (or shall be reinstated to be) in full force and effect.  It is the intention of Borrower and Guarantors that Guarantor's obligations hereunder shall not be discharged except by each Guarantor's performance of such obligations and then only to the extent of such performance.

Section 1.9    Waiver of Subrogation, Reimbursement and Contribution.    Notwithstanding anything to the contrary contained in this Guaranty, each Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Administrative Agent and each Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for the payment of any or all of the Guaranteed Obligations for any payment made by Guarantors under or in connection with this Guaranty or otherwise.

## ARTICLE 2
## EVENTS AND CIRCUMSTANCES NOT REDUCING
## OR DISCHARGING GUARANTOR'S OBLIGATIONS

Each Guarantor hereby consents and agrees to each of the following and agrees that such Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including, without limitation, rights to notice) which such Guarantor might otherwise have as a result of or in connection with any of the following:

Section 2.1    Modifications.  Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Notes, the Loan Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower, Administrative Agent and Lenders or any other parties pertaining to the Guaranteed Obligations or any failure of Administrative Agent or any Lender to notify any such Guarantor of any such action.

3

Section 2.2    Adjustment.  Any adjustment, indulgence, forbearance or compromise that might be granted or given by Administrative Agent or any Lender to Borrower or any Guarantor.

Section 2.3    Condition of Borrower or Guarantor.  The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, any Guarantor or any other Person at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or any Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or any Guarantor or any changes in the direct or indirect shareholders, partners or members, as applicable, of Borrower or any Guarantor; or any reorganization of Borrower or any Guarantor.

Section 2.4    Invalidity of Guaranteed Obligations.  The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever.

Section 2.5    Release of Obligors.  Any full or partial release of the liability of Borrower for the Guaranteed Obligations or any part thereof, or of any co-guarantors, or of any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by each Guarantor that such Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support from any other Person, and such Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other Persons (including Borrower) will be liable to pay or perform the Guaranteed Obligations or that Lenders will look to other Persons (including Borrower) to pay or perform the Guaranteed Obligations.

Section 2.6    Other Collateral.  The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

Section 2.7    Release of Collateral.    Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including, without limitation, negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

Section 2.8    Unenforceability.  The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by each Guarantor that such Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.

Section 2.9    Offset.  Any existing or future right of offset, claim or defense of Borrower against Administrative Agent or any Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

Section 2.10    Merger.    The reorganization, merger or consolidation of Borrower or any Guarantor into or with any other Person.

Section 2.11    Preference.  Any payment by Borrower to Administrative Agent or any Lender are held to constitute a preference under bankruptcy laws or for any reason Administrative Agent or any Lender is required to refund such payment or pay such amount to Borrower or to any other Person.

4

4874-0469-8626.4

Section 2.12     Other Actions Taken or Omitted.   Any (a) defense based upon any legal disability or other defense of Borrower, any other Guarantor or Person, or by reason of the cessation or limitation of the liability of Borrower from any cause other than full payment and performance of those obligations of Borrower which are guaranteed hereunder; (b) any defense based upon any lack of authority of the officers, directors, partners, managers, members or agents acting or purporting to act on behalf of Borrower, any Guarantor or any principal of Borrower or any Guarantor, any defect in the formation of Borrower, any Guarantor or any principal of Borrower or any Guarantor; (c) defense based upon the application by Borrower of the proceeds of the Guaranteed Obligations for purposes other than the purposes represented by Borrower to Administrative Agent or any Lender or intended or understood by Administrative Agent or any Lender or Guarantor; (d) and all rights and defenses arising out of an election of remedies by Administrative Agent or any Lender, even though that election of remedies (such as a nonjudicial foreclosure, if available and/or permitted, with respect to security for a guaranteed obligation) has or may have destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of any applicable state law or otherwise; (e) defense based upon Administrative Agent or any Lender's failure to disclose to any such Guarantor any information concerning Borrower's financial condition or any other circumstances bearing on Borrower's ability to pay and perform its obligations under this Guaranty or any of the other Loan Documents, or upon the failure of any other principals of Borrower to guaranty the Guaranteed Obligations; (f) right of subrogation, any right to enforce any remedy which Administrative Agent or any Lender may have against Borrower and any right to participate in, or benefit from, any security for this Guaranty or the other Loan Documents; (g) presentment, demand, protest and notice of any kind; (h) the benefit of any statute of limitations affecting the liability of any Guarantor hereunder or the enforcement hereof to the extent permitted by law; and (i) duty or obligation on Administrative Agent or any Lender to proceed to collect payment or performance of the obligations from, or to commence an action against, Borrower or any other Person, or to resort to any security or to any balance of any deposit account or credit on the books of Administrative Agent or any Lender in favor of Borrower or any other Person, despite any notice or request of any Guarantor to do so.

Section 2.13     Joint and Several Liability.     THE LIABILITY OF EACH GUARANTOR UNDER THIS AGREEMENT SHALL BE JOINT AND SEVERAL WITH BORROWER AND ALL OTHER GUARANTORS OF GUARANTEED OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

To induce Lenders to enter into the Loan Documents and to extend credit to Borrower, the Guarantors jointly and severally represent and warrant to Administrative Agent and Lenders as follows:

Section 3.1     Benefit.   Each Guarantor is an Affiliate of Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

Section 3.2     Familiarity and Reliance.   Each Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Obligations or Guaranteed Obligations; however, no Guarantor is relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

Section 3.3     No Representation By Lender.   Neither Administrative Agent, Lenders nor any other party has made any representation, warranty or statement to any Guarantor in order to induce such Guarantor to execute this Guaranty.

4874-0469-8626.4

Section 3.4   Guarantor's Financial Condition.  As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, each Guarantor (a) is and will be solvent, (b) has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and (c) has and will have property and assets sufficient to satisfy and repay its obligations and liabilities, including the Guaranteed Obligations.

Section 3.5   Legality.  The execution, delivery and performance by each Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, contract, agreement or other instrument to which such Guarantor is a party or which may be applicable to such Guarantor.  This Guaranty is a legal and binding obligation of each Guarantor and is enforceable against each Guarantor in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

Section 3.6   Survival.  All representations and warranties made by Guarantors herein shall survive the execution hereof.

Section 3.7   Power and Authority.  Each Guarantor has the power and authority, and the legal right, to execute and deliver this Guaranty and to perform its obligations hereunder.

Section 3.8   Authorization; Execution and Delivery.  The execution and delivery of this Guaranty by Guarantors and the performance of such Guarantor's obligations hereunder have been duly authorized by all necessary corporate or limited liability company action, as applicable, in accordance with all Applicable Laws.  Each Guarantor has duly executed and delivered this Guaranty.

## ARTICLE 4
## SUBORDINATION OF CERTAIN INDEBTEDNESS

Section 4.1   Subordination of All Guarantor Claims.  As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantors, whether such debts and liabilities now exist or are hereafter incurred or arise, and whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be, created, or the manner in which they have been, or may hereafter be, acquired by Guarantors.  The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations.  So long as any portion of the Obligations or the Guaranteed Obligations remain outstanding, no Guarantor shall receive or collect, directly or indirectly, from Borrower or any other Person any amount upon the Guarantor Claims.

Section 4.2   Claims in Bankruptcy.  In the event of any receivership, bankruptcy, reorganization, arrangement, debtor's relief or other insolvency proceeding involving any Guarantor as a debtor, Administrative Agent and Lenders shall have the right to prove their claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims.  Each Guarantor hereby assigns such dividends and payments to Administrative Agent for the ratable benefit of the Lenders.  Should Administrative Agent receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to any Guarantor and which, as between Borrower and such Guarantor,

6

shall constitute a credit against the Guarantor Claims, then, upon payment to Administrative Agent for the ratable benefit of the Lenders in full of the Obligations and the Guaranteed Obligations, such Guarantor shall become subrogated to the rights of Administrative Agent and Lenders to the extent that such payments to Administrative Agent and Lenders on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Administrative Agent and Lenders had not received dividends or payments upon the Guarantor Claims.

Section 4.3    Payments Held in Trust.  Notwithstanding anything to the contrary contained in this Guaranty, in the event that any Guarantor should receive any funds, payments, claims and/or distributions which are prohibited by this Guaranty, such Guarantor agrees to hold in trust for Administrative Agent and Lenders an amount equal to the amount of all funds, payments, claims and/or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims and/or distributions so received except to pay such funds, payments, claims and/or distributions promptly to Administrative Agent for the ratable benefit of the Lenders, and Guarantor covenants promptly to pay the same to Administrative Agent for the ratable benefit of the Lenders.

Section 4.4    Liens Subordinate.  Each Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of any Guarantor, Administrative Agent or any Lenders presently exist or are hereafter created or attach.  Without the prior written consent of Administrative Agent, Guarantor shall not (i) exercise or enforce any creditor's rights it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including, without limitation, the commencement of, or the joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgages, deeds of trust, security interests, collateral rights, judgments or other encumbrances on the assets of Borrower held by any Guarantor.  The foregoing shall in no manner vitiate or amend, nor be deemed to vitiate or amend, any prohibition in the Loan Documents against Borrower granting liens or security interests in any of its assets to any Person other than Administrative Agent for the ratable benefit of the Lenders.

**ARTICLE 5**
**COVENANTS**

Section 5.1    Covenants.  Until all of the Obligations and the Guaranteed Obligations have been paid in full, (i) no Guarantor shall sell, pledge, mortgage or otherwise transfer any of its assets, or any interest therein, on terms materially less favorable than would be obtained in an arms-length transaction, and (ii) within ninety (90) days following the end of each calendar year, each Guarantor acknowledges and agrees to deliver to Administrative Agent, upon request, the financial statements and tax returns of such Guarantor along with such other financial information as Lender may reasonably request.

Section 5.2    Prohibited Transactions.  No Guarantor shall, at any time while a default in the payment of the Guaranteed Obligations has occurred and is continuing, either (i) enter into or effectuate any transaction with any Affiliate which would reduce the Net Worth of Guarantor, including, without limitation, the payment of any dividend or distribution to a shareholder, partner or member, as applicable, or the redemption, retirement, purchase or other acquisition for consideration of any stock or other ownership interest in such Guarantor, or (ii) sell, pledge, mortgage or otherwise transfer to any Person any of such Guarantor's assets, or any interest therein.  As used in this Section 5.2, the term "Net Worth" means, with respect to any Guarantor as of any date of determination, an amount equal to (i) such Guarantor's, total assets as of such date, less (ii) such Guarantor's total liabilities as of such date, in each case, as

7

4874-0469-8626.4

determined in accordance with GAAP.

## ARTICLE 6
## MISCELLANEOUS

Section 6.1 <u>Waiver</u> . No failure to exercise, and no delay in exercising, on the part of Administrative Agent or any Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Administrative Agent and Lenders hereunder shall be in addition to all other rights provided by law. No modification or waiver of any provision of this Guaranty, nor any consent to any departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

Section 6.2 <u>Notices</u>. All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "**Notice**") required, permitted or desired to be given hereunder shall be in writing and shall be sent by telefax (with answer back acknowledged) or by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or by reputable overnight courier, addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this <u>Section 6.2</u>. Any Notice shall be deemed to have been received: (a) three (3) days after the date such Notice is mailed, (b) on the date of sending by telefax if sent during business hours on a Business Day (otherwise on the next Business Day), (c) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day), and (d) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

| | |
|---|---|
| If to Lender: | c/o Feenix Venture Partners, LLC<br>1202 Broadway, 7th Floor<br>New York, NY 10001<br>Attn: Keith Lee<br>Telephone: 646.902.6645<br>E-mail:<u>klee@feenixpartners.com</u> |
| with a copy to: | Kutak Rock LLP<br>The Omaha Building<br>1650 Farnam Street<br>Omaha, NE 68102<br>Attention: Joel L. Wiegert<br>Email: joel.wiegert@kutakrock.com |
| If to Guarantor: | Scott Zankl<br>1001 Clint Moore Road, Unit B<br>Boca Raton, FL 33487 |
| with a copy to: | Kristen Zankl<br>1001 Clint Moore Road, Unit B<br>Boca Raton, FL 33487 |

Any party may change the address to which any such Notice is to be delivered by furnishing ten (10) days' written notice of such change to the other parties in accordance with the provisions of this <u>Section 6.2</u>.

8

Notices shall be deemed to have been given on the date set forth above, even if there is an inability to actually deliver any Notice because of a changed address of which no Notice was given or there is a rejection or refusal to accept any Notice offered for delivery.  Notice for any party may be given by its respective counsel.

Section 6.3    Invalid Provisions.  If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

Section 6.4    Amendments.  This Guaranty may be amended only by an instrument in writing executed by Administrative Agent and each of the other party(ies) against whom such amendment is sought to be enforced.

Section 6.5    Parties Bound; Assignment.  This Guaranty shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs and legal representatives.  Administrative Agent and Lenders shall have the right to assign or transfer its rights under this Guaranty in connection with any assignment of the Loan and the Loan Documents.  Any assignee or transferee of Lenders shall be entitled to all the benefits afforded to Lenders under this Guaranty.  No Guarantor shall have the right to assign or transfer its rights or obligations under this Guaranty without the prior written consent of Administrative Agent, and any attempted assignment without such consent shall be null and void.

Section 6.6    Headings.  Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

Section 6.7    Recitals.  The recitals and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered *prima facie* evidence of the facts and documents referred to therein.

Section 6.8    Counterparts.  To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required.  It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart.  All counterparts shall collectively constitute a single instrument.  It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto.  Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

Section 6.9    Rights and Remedies.  If any Guarantor becomes liable for any indebtedness owing by Borrower to Administrative Agent or any Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lenders hereunder shall be cumulative of any and all other rights that Administrative Agent and Lenders may ever have against such Guarantor.  The exercise by Administrative Agent or any Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

9

4874-0469-8626.4

Section 6.10     Entirety.  **THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTORS, ADMINISTRATIVE AGENT AND LENDERS WITH RESPECT TO EACH SUCH GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF.  THIS GUARANTY IS INTENDED BY GUARANTORS, ADMINISTRATIVE AGENT AND LENDERS AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTORS, ADMINISTRATIVE AGENT AND LENDERS, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY.  THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTORS, ADMINISTRATIVE AGENT AND/OR ANY LENDER.**

Section 6.11     Governing Law.  This Guaranty and the other Loan Documents and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Guaranty or any of the other Loan Documents and the transactions contemplated hereby shall be governed by the laws of the State of New York.

Section 6.12     Submission to Jurisdiction.  Each Guarantor hereby irrevocably and unconditionally (i) agrees that any legal action, suit or proceeding arising out of or relating to this Guaranty and the other Loan Documents may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit or proceeding. Final judgment against Guarantor in any action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.

Section 6.13     Venue.  Each Guarantor irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Guaranty and the other Loan Documents in any court referred to in Section 6.12 and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

Section 6.14     WAIVER OF JURY TRIAL.  EACH GUARANTOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY.

Section 6.15     Cooperation.  Each Guarantor acknowledges that Administrative Agent and/or any Lender and its successors and assigns may (i) sell this Guaranty, the Loan Agreements, the Notes and the other Loan Documents to one or more investors as a whole loan or in part, (ii) participate the Loan secured by this Guaranty to one or more investors, (iii) deposit this Guaranty, the Loan Agreements, the Note and the other Loan Documents with a trust, which trust may sell certificates to investors evidencing an ownership interest in the trust assets, or (iv) otherwise sell the Loan or one or more interests therein to investors (the transactions referred to in clauses (i) through (iv) are hereinafter each referred to as "Secondary Market Transaction").  Each Guarantor shall cooperate with Administrative Agent and the Lenders in effecting any such Secondary Market Transaction and shall cooperate to implement all requirements imposed by any of the rating agencies involved in any Secondary Market Transaction.  Each Guarantor shall provide such information and documents relating to such Guarantor and Borrower, as

10

applicable, as Administrative Agent or the Lenders may reasonably request in connection with such Secondary Market Transaction. In addition, each Guarantor shall make available to Administrative Agent all information concerning its business and operations that Administrative Agent may reasonably request. Administrative Agent shall be permitted to share all such information with the investment banking firms, Rating agencies, accounting firms, law firms and other third-party advisory firms involved with the Loan and the Loan Documents or the applicable Secondary Market Transaction. It is understood that the information provided by any Guarantor to Administrative Agent, including any and all financial statements provided to Lenders pursuant hereto, may ultimately be incorporated into the offering documents for the Secondary Market Transaction and thus various investors and potential investors may also see some or all of the information. Administrative Agent, Lenders and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, any such Guarantor in the form as provided by such Guarantor. Administrative Agent and Lenders may publicize the existence of the Loan in connection with its marketing for a Secondary Market Transaction or otherwise as part of its business development.

Section 6.16    Reinstatement in Certain Circumstances. If at any time any payment of the principal of or interest under the Loan or any other amount payable by Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, each Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

Section 6.17    Gender; Number; General Definitions. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, (a) words used in this Guaranty may be used interchangeably in the singular or plural form, (b) any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, (c) the word "Borrower" shall mean "each Borrower from time to time under the Loan Agreement", (d) the word "Lender" shall mean "Lenders and any subsequent holder of a Note or otherwise party to the Loan Agreement", (e) the word "Guarantor" shall mean each Guarantor and any subsequent Guarantor from time to time party hereto, (f) the word "Note" shall mean "the Note and any other evidence of indebtedness secured by the Loan Agreement", including, without limitation, and additional notes issues under the Loan Agreement, (g) the word "Property" shall include any portion of the Property and any interest therein, and (g) the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels, incurred or paid by Administrative Agent or Lenders in protecting its interest in the Collateral, and/or in enforcing its rights hereunder.

**[NO FURTHER TEXT ON THIS PAGE]**

11

IN WITNESS WHEREOF, each Guarantor has executed this Guaranty as of the day and year first above written.

**GUARANTORS:**

_____
**SCOTT ZANKL**

_____
**KRISTEN ZANKL**

SIGNATURE PAGE TO GUARANTY AGREEMENT

**ACKNOWLEDGED, ACCEPTED AND AGREED TO BY**:

FVP SERVICING, LLC,
as Administrative Agent

By: _keith lee_____

Name:  Keith Lee
Title:    Manager

SIGNATURE PAGE TO GUARANTY AGREEMENT

# EXHIBIT F

**Exhibit F**

EXECUTION COPY

## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** is made and effective as of January 26, 2022, by and among **KARMA OF PALM BEACH, INC.**, a Florida corporation ("Palm Beach"), and **KARMA OF BROWARD, INC.**, a Florida corporation ("Broward"; Palm Beach, Broward and each other direct or indirect Subsidiary of Borrowers added as a "Grantor" hereunder, each, a "Grantor", and collectively, the "Grantors"), in favor of **FVP SERVICING, LLC**, a Delaware limited liability company, as administrative agent (including any successor, participant, assignee or transferee thereof, "Administrative Agent") for itself and the Lenders (as defined in the Loan Agreement referred to below).

## R E C I T A L S

WHEREAS, pursuant to that certain Loan Agreement (as amended, restated, supplemented, extended or otherwise modified from time to time, the "Loan Agreement") dated as of the date hereof by and among Palm Beach and Broward, as borrowers (each, a "Borrower" and, together, "Borrowers"), the other Grantors from time to time party thereto, Administrative Agent and the Lenders from time to time party thereto, each Grantor is required to have executed and delivered this Security Agreement encumbering substantially all of each Grantor's tangible and intangible personal property assets in favor of Administrative Agent for the ratable benefit of itself and the Lenders; and

WHEREAS, each Grantor has determined that it is in its best interest to execute this Security Agreement.

NOW, THEREFORE, for good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged) and intending to be legally bound hereby, each Grantor and Administrative Agent hereby agree as follows:

## ARTICLE 1

### SECURITY INTEREST, COLLATERAL ASSIGNMENT AND PLEDGE

1.1     Grant of Security.

To secure the prompt payment and performance in full when due of the Secured Obligations, each Grantor (as of the effective date of becoming a signatory hereto) hereby grants to Administrative Agent, for the ratable benefit of itself and the Lenders, a continuing security interest in such Grantor's right, title and interest in and to all of the following (collectively, the "Collateral"): (a) all Accounts; (b) all cash and currency; (c) all Chattel Paper; (d) those certain Commercial Tort Claims set forth on Schedule 2.10 hereto; (e) all Copyrights; (f) all Copyright Licenses; (g) all Deposit Accounts; (h) all Documents; (i) all Domain Names; (j) all Equipment; (k) all Fixtures; (l) all General Intangibles; (m) all Instruments; (n) all Inventory; (o) all Investment Property; (p) all Letter-of-Credit Rights; (q) all Other Intellectual Property; (r) all Patents; (s) all Patent Licenses; (t) all Pledged Equity and dividends and distributions thereon; (u) all Software; (v) all Supporting Obligations; (w) all Trademarks; (x) all Trademark Licenses; (y) all Goods and other personal property of any kind; and (z) all Accessions and all Proceeds of any and all of the foregoing, in each instance (whether or not expressly specified above), wherever located, and whether now existing, owned, leased or licensed or hereafter acquired, leased, licensed, arising, developed, generated, adopted or created for or by any Grantor, and howsoever any Grantor's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise).

1.2     Security for Secured Obligations.  This security interest created hereby in the Collateral secures the payment and performance in full when due of (a) all Obligations and (b) all costs and expenses

incurred by Administrative Agent or any Lender in enforcing and collecting the Obligations (collectively, the "Secured Obligations").

1.3     Continuing Security Interest; Assignment; Termination.  This Security Agreement creates a continuing security interest in the Collateral and will remain in full force and effect until terminated in accordance with the Loan Agreement.  This Security Agreement is binding upon each Grantor and its successors, transferees and assignees, and (together with the rights and remedies of Administrative Agent hereunder) inures to the benefit of Administrative Agent and its permitted successors, transferees, participants and assignees.  Upon any such termination, (a) all security interests arising under this Security Agreement automatically shall be released, discharged and terminated (without representation, warranty, recourse or liability of any kind by Administrative Agent) and (b) Administrative Agent (at Grantors' request and sole expense) (i) will execute and deliver such UCC termination statements and other documentation and instruments (all in form and substance reasonably acceptable to Administrative Agent) as may be reasonably requested and provided to Administrative Agent to effect such releases and terminations, and (ii) will deliver to a Grantor or to another Person designated by a Grantor or, if required by applicable law, to another Person that Administrative Agent reasonably believes may be entitled thereto (without any representation, warranty or recourse of any kind whatsoever) all stock certificates, and instruments representing or evidencing Collateral being physically held by Administrative Agent hereunder.

1.4     Security Interest Absolute.  All rights of Administrative Agent and the Lenders and the security interests granted to Administrative Agent hereunder, and all obligations of each Grantor hereunder, are absolute and unconditional, irrespective of the occurrence of any one or more of the following:

     (a)     Any lack of validity or enforceability of any Loan Document; or

     (b)     The failure of Administrative Agent or any Lender or any holder of any Note:

          (i)     To assert any claim or demand or to enforce any right or remedy under the provisions of any Loan Document or otherwise, or

          (ii)     To exercise any right or remedy against any other Grantor of, or any collateral securing, any obligations of any Borrower or any other Grantor owing to any Lender; or any change in the time, manner or place of payment of, or in any other term of, any Secured Obligation; or

     (c)     Any other extension, increase, refinancing, restructuring, compromise or renewal of any Secured Obligation; or

     (d)     Any reduction, limitation, impairment or termination of any Secured Obligation for any reason, including any waiver, release, surrender, alteration or compromise; or

     (e)     Any amendment to, rescission, waiver, or other modification of, or any consent to departure from, the terms of any Loan Document; or

     (f)     Any addition, exchange, release, surrender or nonperfection of any collateral (including the Collateral), or any amendment to or waiver or release of or addition to or consent to departure from any guaranty, for any Secured Obligation; or

2

4870-1882-2658.5

(g)      Any other circumstances which might otherwise constitute a defense available to, or a legal or equitable discharge of, any Grantor or its obligations hereunder, including, without limitation, any and all suretyship defenses.

Each Grantor hereby waives any right to or any claim of any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of any invalidity, illegality, nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Secured Obligation.

1.5      Collateral Assignment of Contracts.

(a)      Grant of Security Interest.  Subject to Section 1.1, without limiting the generality thereof, each Grantor grants a security interest in and collaterally assigns to Administrative Agent all of such Grantor's right, title and interest in and to all of such Grantor's contracts, licenses, leases and other agreements and all rights, interests, powers, privileges and other benefits thereunder (including the rights to receive all proceeds and payments under each such contract, license, lease and other agreement.  This collateral assignment of each contract, license, lease and other agreement constitutes a fully perfected security interest and collateral assignment; provided, however, that so long as no Event of Default has occurred and is continuing, each Grantor may exercise all rights and powers under and may receive all payments and enjoy all other benefits of each such contract, license, lease and other agreement, subject to the other terms and provisions of this Security Agreement and the other Loan Documents.

(b)      Administrative Agent's Right to Cure.  Administrative Agent shall have the right (but not the obligation) to cure or remedy any breach or default on the part of any Grantor under any contract, license, lease or other agreement included in the Collateral.  The exercise by Administrative Agent of any of its rights hereunder will not release any Grantor from any of its duties or obligations under any such contracts, licenses, leases or other agreements included in the Collateral.  Neither Administrative Agent nor any Lender has any obligation or liability under any such contracts, licenses, leases or other agreements included in the Collateral by reason of this Security Agreement, nor is Administrative Agent or any Lender obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

1.6      Collateral Interest.  Notwithstanding anything to the contrary herein, Administrative Agent's interest in the Collateral is as a security interest and not as an absolute assignment.

ARTICLE 2

REPRESENTATIONS AND WARRANTIES

Each Grantor hereby represents and warrants to Administrative Agent, as of the Closing Date and as of the Settlement Date for each Advance, as set forth in this Article 2.

2.1      Location of Collateral.  Schedule 2.1 identifies (a) all of the locations at which the Collateral is located (other than (i) Inventory or Equipment in transit to any location of a Grantor or (ii) in the possession of employees of a Grantor and used on a remote basis in the ordinary course of business) and (b) the location of the chief executive office of each Grantor.

2.2      Ownership.  Grantors own or have the right to possess and use the Collateral and full corporate, partnership or limited liability company authority, as applicable, to grant a security interest in the Collateral.  There exists no "adverse claim" within the meaning of Section 8-102 of the UCC with respect to the Pledged Equity of any Grantor.

3

2.3     Government Contracts.  Except as identified on Schedule 2.3, no Grantor is a party to any federal, state or local government contract (either domestic or foreign).

2.4     Negotiable Documents, Instruments, Certificated Securities and Chattel Paper. Contemporaneously with the execution hereof, each Grantor has delivered to Administrative Agent possession of all originals of all certificated Pledged Equity, Instruments, Documents or Tangible Chattel Paper (other than checks received in the ordinary course of business) owned or held by such Grantor on the date hereof (duly endorsed in blank, if requested by Administrative Agent).

2.5     Intellectual Property Collateral.  With respect to each item of Intellectual Property Collateral:

(a)     Schedule 2.5(a) sets forth a complete and accurate list of all (i) applications and registrations for Intellectual Property Collateral owned by any Grantor, (ii), all Copyright Licenses (including customized applications and systems integration software licenses, but excluding "off-the-shelf" mass market, non-customized software licenses), Patent Licenses, and Trademark Licenses and (iii) all Software (including customized applications and systems integration software licenses, but excluding "off-the-shelf" mass market, non-customized software licenses).

(b)     To each Grantor's knowledge, the Intellectual Property Collateral is subsisting, valid and enforceable; and the Intellectual Property Collateral owned by such Grantor has not been adjudged invalid or unenforceable, in whole or in part.

(c)     To each Grantor's knowledge, no claim has been made that the use of any Intellectual Property Collateral does or may violate the rights of any Person.

(d)     Each Grantor has performed all acts and has paid all required fees and taxes to maintain the Intellectual Property Collateral owned by any grantor in full force and effect in the jurisdictions in which it engages in commerce and it deems it reasonably necessary, as applicable, except where such fees and taxes are being contested in good faith with diligent prosecution.

(e)     Each Grantor owns, or is entitled to use by license or otherwise, all Intellectual Property Collateral necessary for or used in the conduct of its business.  To the extent any such Intellectual Property Collateral was developed, authored, conceived or created, in whole or in part, for or on behalf of any Grantor by any Person (except in the case of a Copyright, by an employee of any Grantor acting within the scope of such employee's employment), then such Grantor has entered into a written agreement with such Person in which such Person has assigned all right, title and interest in and to such Intellectual Property Collateral to such Grantor.

(f)     To each Grantor's knowledge, neither the operation of its business nor any slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Grantor violates, infringes or misappropriates any rights held by any other Person.  To each Grantor's knowledge, no claim or litigation regarding any of the foregoing is pending or threatened.

2.6     Pledged Equity.  With respect to any Pledged Equity constituting Collateral, which is set forth on Schedule 2.6, all of such Pledged Equity is validly issued, fully paid, and non-assessable and, except as set forth on Schedule 2.6, constitutes all of the issued and outstanding shares or interests (and other rights) of equity ownership of each Subsidiary owned by any Grantor.

4

4870-1882-2658.5

2.7     Valid and Perfected Security Interest.  This Security Agreement creates a valid security interest in the Collateral and proceeds thereof securing the payment and performance in full of the Secured Obligations.  Upon (a) the filing of UCC financing statements (i) naming each Grantor as "debtor", (ii) naming Administrative Agent as "secured party" and (iii) describing the Collateral, in the state of formation of such Grantor, (b) in the case of the Pledged Equity consisting of certificated Securities or evidenced by Instruments, in addition to filing of such UCC financing statements, delivery of the certificates representing such certificated Securities and delivery of such Instruments to Administrative Agent (and in the case of Pledged Equity issued by a foreign issuer, any actions required under foreign law to perfect a security interest in such Pledged Equity), in each case duly endorsed or accompanied by duly executed instruments of assignment or transfer in blank, (c) in the case of Collateral consisting of the Intellectual Property Collateral, in addition to the filing of such UCC financing statements, the recordation of a grant of security interest with the PTO, the United States Copyright Office or any other Official Body, as applicable, (d) in the case of Equipment that is covered by a certificate of title, the filing with the registrar of motor vehicles or other appropriate authority in the applicable jurisdiction of an application requesting the notation of the security interest created hereunder on such certificate of title, and (e) in the case of Collateral consisting of a Deposit Account or Securities Account or held in a Securities Account, the execution and delivery by the applicable Grantor, the applicable Bank or Securities Intermediary and Administrative Agent of an agreement granting control to Administrative Agent over such Collateral, the security interests in the Collateral granted to Administrative Agent for the ratable benefit of Lenders will constitute perfected security interests therein prior to all other Liens (except for Permitted Liens).

2.8     Authorization and Approval.  No authorization, approval or other action by (and no notice to or filing with) any Official Body or other Person is required either (a) for the grant by any Grantor of the security interest granted hereby, or (b) for the execution, delivery and performance of this Security Agreement by any Grantor, or (c) for the perfection by Administrative Agent of its rights and interests hereunder (other than as set forth in Section 2.7 hereof), or (d) for the exercise by Administrative Agent of its rights and remedies hereunder.

2.9     Type of Collateral.  None of the Collateral consists of, or is the Proceeds of, As-Extracted Collateral, Consumer Goods, Farm Products, Manufactured Homes or standing timber.

2.10     Commercial Tort Claims.  As of the date hereof, no Grantor has any Commercial Tort Claims other than as set forth on Schedule 2.10 hereto.

2.11     Partnership and Limited Liability Company Interests.  Except as set forth on Schedule 2.11 hereto, none of the Collateral (i) is dealt in or traded on a securities exchange or in a securities market, (ii) by its terms expressly provides that it is a Security governed by Article 8 of the UCC, (iii) is an investment company security, (iv) is held in a Securities Account or (v) constitutes a Security or a Financial Asset.

2.12     Title.  The Collateral is free and clear of all Liens except (a) Liens for taxes not yet due or which are being contested in good faith by appropriate proceedings; (b) non-consensual Liens arising by operation of law, arising in the ordinary course of business, and for amounts which are not overdue for a period of more than thirty 30 days or that are being contested in good faith by appropriate proceedings; and (c) those Liens listed on Schedule 2.12 (collectively, the "Permitted Liens").

2.13     Litigation. Except for the litigation disclosed on Schedule 2.13, no action, suit, litigation, investigation or proceeding of, or before, any arbitrator or Governmental Authority is pending or, to the knowledge of any Grantor, threatened by or against any Grantor.   Each Grantor represents and warrants that none of the actions disclosed on Schedule 2.13 are reasonably likely to result in a material adverse

4870-1882-2658.5

effect on its financial condition or the ability of such Grantor to perform its obligations under this Agreement or any of the other Loan Documents.

ARTICLE 3

COVENANTS

Each Grantor covenants and agrees that, so long as this Security Agreement remains effective, each Grantor will comply with the covenants set forth in this Article 3, unless Administrative Agent otherwise consents in writing.

3.1     Pledged Equity.

(a)     Powers and Appointments.  Each Grantor will promptly deliver to Administrative Agent all such certificates, powers, appointments, instruments and similar documents (satisfactory in form and substance to Administrative Agent) constituting Pledged Equity.  Prior to delivery to Administrative Agent, all such certificates constituting Pledged Equity shall be held in trust by such Grantor for the benefit of Administrative Agent pursuant hereto. From time to time at Administrative Agent's request after the occurrence and during the continuance of any Event of Default, each Grantor will promptly transfer any Pledged Equity or other shares of capital stock or ownership interests constituting Collateral into the name of any nominee designated by Administrative Agent.

(b)     Pledged Equity. Each Grantor will warrant and defend the right and title herein granted to Administrative Agent in and to the Pledged Equity (and all right, title, and interest represented by the Pledged Equity) against the claims and demands of all Persons.

(c)     Voting Rights.

(i)     So long as no Event of Default shall have occurred and be continuing, (A) each Grantor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Pledged Equity or any part thereof for any purpose not prohibited by the terms of this Security Agreement or the Loan Agreement; provided, no Grantor shall exercise or refrain from exercising any such right if Administrative Agent shall have notified such Grantor that, in Administrative Agent's judgment, such action would infringe on the interests of the Administrative Agent in the Collateral in a material manner and such Grantor shall promptly notify Administrative Agent in writing of material infringements detected, and (B) each Grantor shall be entitled to receive and retain any and all dividends, other distributions, principal and interest paid in respect of the Pledged Equity.

(ii)     Upon the occurrence and during the continuation of an Event of Default, (A) upon written notice from Administrative Agent to any Grantor, all rights of such Grantor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant hereto shall cease, and all such rights shall thereupon become vested in Administrative Agent who shall thereupon have the sole right to exercise such voting and other consensual rights; (B) all rights of such Grantor to receive the dividends and other distributions which it would otherwise be authorized to receive and retain pursuant hereto shall cease, and all such rights shall thereupon become vested in Administrative Agent who shall thereupon have the sole right to receive and hold as Collateral such dividends and other distributions; and (C) all dividends and other distributions which are received by such Grantor contrary to the provisions of clause (B) above shall be received in trust for the benefit of Administrative Agent, shall be segregated from other funds of such Grantor and shall forthwith be paid over to Administrative Agent as Collateral in the same form as

6

so received (with any necessary endorsements as determined by Administrative Agent).  Upon the cure or waiver by the Administrative Agent of any such Event of Default, the provisions of clause (c)(i) above shall apply.

(iii)  In order to permit Administrative Agent to exercise the voting and other consensual rights which it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions which it may be entitled to receive hereunder, (A) each Grantor shall promptly execute and deliver (or cause to be executed and delivered) to Administrative Agent all such proxies, dividend payment orders and other instruments as Administrative Agent may from time to time reasonably request, and (B) without limiting the effect of clause (A) above, each Grantor hereby grants to Administrative Agent an irrevocable proxy to vote the Pledged Equity and to exercise all other rights, powers, privileges and remedies to which a holder of the Pledged Equity would be entitled (including giving or withholding written consents of holders of equity interests, calling special meetings of holders of equity interests and voting at such meetings), which proxy shall be effective automatically and without the necessity of any action (including any transfer of any Pledged Equity on the record books of the issuer thereof) by any other Person (including the issuer of the Pledged Equity or any officer or agent thereof), upon the occurrence of an Event of Default and which proxy shall only terminate upon the payment in full of the Secured Obligations, the cure of such Event of Default or waiver thereof as evidenced by a writing executed by Administrative Agent.

3.2  As to Intellectual Property Collateral.  With respect to each item of Intellectual Property Collateral:

(a)  No Grantor (i) will fail to use a commercially appropriate standard of quality (which may be consistent with such Grantor's past practices) in the manufacture, sale and delivery of products and services sold or delivered under or in connection with Trademarks owned by or licensed to such Grantor, or (ii) will fail to employ with all Trademarks (whether or not registered with any Official Body) an appropriate notice of such Trademark, or (iii) will fail to employ with all Copyrights an appropriate notice of such Copyright, or (iv) will fail to employ with all Patents registered with the PTO, or with an Official Body in a foreign country, an appropriate notice of such registration.

(b)  No Grantor will do or permit any act (or omit to do any act) whereby any Intellectual Property Collateral owned by Grantor may lapse or become abandoned, forfeited, invalid, dedicated to the public or unenforceable (except upon expiration of the end of an unrenewable term of a registration thereof) without the prior written consent of Administrative Agent; provided that so long as no Default or Event of Default has occurred or is continuing, no Grantor shall be obligated to protect, defend or maintain any such Intellectual Property Collateral that such Grantor determines, in the good faith and reasonable exercise of its business judgment, is no longer material to such Grantor, to Grantors taken as a whole, or to the business or operations of such Grantor or Grantors taken as a whole (but provided further, that after the occurrence and during the continuance of a Default or Event of Default, Administrative Agent may require a Grantor to protect, defend or maintain such Intellectual Property Collateral and thereafter protect, defend or maintain such Intellectual Property Collateral in such jurisdictions as Administrative Agent deems necessary or desirable).

(c)  Each Grantor will promptly notify Administrative Agent if such Grantor believes (or has reason to believe) that (i) any application to register or registration relating to any Intellectual Property Collateral may become abandoned, dedicated to the public, placed in the public domain, invalid or unenforceable, or (ii) there has been or will be an adverse determination

7

or development (including the institution of, or any determination or development in, any proceeding in the PTO, the United States Copyright Office or any other Official Body) regarding such Grantor's ownership of any Intellectual Property Collateral, its right to register the same, or its right to use, keep, maintain and enforce the same.

(d)     If any Grantor files an application for the registration of any Intellectual Property Collateral with the PTO, the United States Copyright Office or any other Official Body, then such Grantor must notify Administrative Agent thereof within 90 calendar days thereafter (or 30 calendar days thereafter, for any Copyright), and upon request of Administrative Agent, must promptly execute and deliver any and all agreements, instruments, documents and papers that Administrative Agent may request to evidence Administrative Agent's security interest in such Intellectual Property Collateral.

(e)     Each Grantor will perform all acts and will pay all required fees and taxes (including in any proceeding before the PTO, the United States Copyright Office or any other Official Body) to maintain all Intellectual Property Collateral owned by such Grantor (including Domain Names registered by or on behalf of Grantor) in full force and effect in such jurisdictions as is necessary (in such Grantor's reasonable business judgment, unless otherwise provided in Section 3.2(b)) for the proper conduct of such Grantor's business and to pursue any application for registration filed with respect to such Intellectual Property Collateral, including the filing of applications for renewal, affidavits of use, affidavits of incontestability and opposition, and interference and cancellation proceedings.

(f)     Upon any Grantor's acquisition of any Intellectual Property Collateral, the acquisition of which must be recorded in order to perfect such Grantor's interest therein, then such Grantor will promptly record its interest therein.

(g)     Each Grantor (i) will protect, defend and maintain the validity and enforceability of all the Intellectual Property Collateral and (ii) will use commercially reasonable efforts to detect violations, infringements and misappropriations of such Intellectual Property Collateral and promptly notify Administrative Agent in writing of material violations, infringements and/or misappropriations detected.

(h)     Each Grantor, on a continuing basis, will apply to register such Grantor's Trademarks, pursue patent protection for such Grantor's inventions, and register the most recent versions of any of such Grantor's Copyrights and Other Intellectual Property to the extent that any such registration would be consistent with customary industry practice or such Grantor's historical business practices or the failure to register could reasonably be expected to be materially adverse to Grantor's business.

(i)     No Grantor will enter into any agreement that would impair or conflict with such Grantor's obligations hereunder with respect to the Intellectual Property Collateral, except as otherwise permitted hereby or under the Loan Agreement.

(j)     Each Grantor, on a continuing basis, will make, execute, acknowledge and deliver, and will file and record in the proper filing and recording places in the United States, any state thereof and any other country or any political subdivision thereof, all such instruments, collateral agreements and filings (including all appropriate financing and continuation statements) with the PTO, the United States Copyright Office or any other Official Body, as applicable, and will take all such action as Administrative Agent may reasonably deem to be necessary to perfect Administrative Agent's security interest in all Intellectual Property Collateral and otherwise to

8

carry out the intent and purpose of this Security Agreement, or for assuring and confirming to Administrative Agent the grant or perfection of a security interest in all Intellectual Property Collateral.

(k)        Each Grantor, on a continuing basis, will ensure that it has appropriate measures in place to ensure that all material that may constitute Intellectual Property Collateral created by or on behalf of such Grantor has been appropriately assigned by any developer to such Grantor.

3.3        <u>As to Customer and Material Business Records and Computer Software, and Trade Secrets</u>. Each Grantor will utilize standard industry precautions to safeguard the utility, value and confidentiality of all such records, materials and information covered by this Section.

3.4        <u>Issuance or Acquisition of Equity Interests</u>.  No Grantor shall, without executing and delivering, or causing to be executed and delivered, to Administrative Agent such agreements, documents and instruments as Administrative Agent may reasonably require, issue or acquire any Pledged Equity consisting of an interest in a partnership or a limited liability company that (i) is dealt in or traded on a securities exchange or in a securities market, (ii) by its terms expressly provides that it is a Security governed by Article 8 of the UCC, (iii) is an investment company security, (iv) is held in a Securities Account or (v) constitutes a Security or a Financial Asset.

3.5        <u>Further Assurances</u>.  Each Grantor (from time to time at its own expense) will promptly execute and deliver all further instruments and documents, and will take all further action, that may be necessary (or that Administrative Agent may reasonably request) in order to perfect any security interest, collateral assignment or pledge granted or purported to be granted hereby or to enable Administrative Agent to exercise and enforce its rights and remedies hereunder with respect to any Collateral.  Without limiting the generality of the foregoing, each Grantor shall:

(a)        If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument or Tangible Chattel Paper, or if any Property constituting Collateral shall be stored or shipped subject to a Document, ensure that such Instrument, Tangible Chattel Paper or Document is either in the possession of such Grantor at all times or, if requested by Administrative Agent to perfect its security interest in such Collateral, is delivered to Administrative Agent duly endorsed in a manner satisfactory to Administrative Agent.  Such Grantor shall ensure that any Collateral consisting of Tangible Chattel Paper is marked with a legend acceptable to Administrative Agent indicating Administrative Agent's security interest in such Tangible Chattel Paper.

(b)        Execute and deliver all agreements, assignments, instruments or other documents as reasonably requested by Administrative Agent for the purpose of obtaining and maintaining control with respect to any Collateral consisting of (i) Deposit Accounts, (ii) Investment Property, (iii) Letter-of-Credit Rights and (iv) Electronic Chattel Paper.

(c)        If any Collateral is at any time in the possession or control of a warehouseman, bailee or any agent or processor of such Grantor and Administrative Agent so requests (i) notify such Person in writing of Administrative Agent's security interest therein, (ii) instruct such Person to hold all such Collateral for Administrative Agent's account and subject to Administrative Agent's instructions and (iii) use reasonable best efforts to obtain a written acknowledgment from such Person that it is holding such Collateral for the benefit of Administrative Agent.

(d)        To the extent that any Grantor shall, now or at any time hereafter, hold or acquire a Commercial Tort Claim, such Grantor shall immediately notify Administrative Agent in a writing

9

signed by such Grantor of the particulars thereof and grant to Administrative Agent, for the benefit of the Lenders and Administrative Agent, in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Security Agreement, with such writing to be in form and substance reasonably satisfactory to Administrative Agent.

(e)    Will execute and file such financing or continuation statements, or amendments thereto, and such other instruments or notices as may be necessary (or as Administrative Agent may reasonably request) in order to perfect the security interests, collateral assignments, pledges and other rights granted or purported to be granted to Administrative Agent hereby.

(f)    Will furnish to Administrative Agent (from time to time at Administrative Agent's request) statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Administrative Agent may reasonably request, all in reasonable detail.

(g)    Will notify Administrative Agent in writing immediately upon such Grantor becoming a party to any federal, state or local government contract (either domestic or foreign), and, upon the request of Administrative Agent, promptly take all actions required under the Federal Assignment of Claims Act or any similar state, local or foreign laws as Administrative Agent may reasonably request.

3.6    Joinder.  Each Grantor added after the date hereof shall execute the joinder in the form attached hereto as Schedule 3.6, whereupon such party shall be deemed to be a party to, and shall be subject to all of the terms and conditions of, this Agreement as if it were a Grantor on the date of this Agreement.

3.7    Liens.  Each grantor covenants and agrees not to create, assume or suffer to exist any Lien on any of its Property or assets, whether now owned or hereinafter acquired other than Permitted Liens.

3.8    Litigation.  Each Grantor covenants and agrees to provide Administrative Agent written evidence of the payment in full for any judgment entered against such Grantor or settlement entered into by such Grantor that relates to the actions disclosed on Schedule 2.13, within the earlier of thirty (30) days of such judgment being entered or the period set forth in such settlement.

With respect to the foregoing and the grant of the security interest hereunder, each Grantor hereby authorizes Administrative Agent to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of such Grantor where permitted by law.  A carbon, photographic or other reproduction of this Security Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

ARTICLE 4

LENDER

4.1    Administrative Agent Appointed Attorney-in-Fact.  Each Grantor hereby irrevocably appoints Administrative Agent as such Grantor's attorney-in-fact, with full authority in the name, place and stead of such Grantor or otherwise, from time to time in Administrative Agent's reasonable discretion, to take any action and to execute any instrument which Administrative Agent may deem reasonably necessary to accomplish the purposes of this Security Agreement.  This authority includes the power, upon the occurrence of and during the continuance of an Event of Default:

10

4870-1882-2658.5

(a)     To ask, demand, collect, sue for, recover, compromise, restructure, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral including proceeding against any of the Collateral; and/or

(b)     To notify the parties obligated on any of the Collateral to make payment to Administrative Agent of any amount due or to become due in connection therewith; and/or

(c)     To receive, endorse, and collect any drafts, checks or other instruments, documents and chattel paper in connection with clause (a) of this Section 4.1; and/or

(d)     To file any claims or take any action or institute any proceedings which Administrative Agent may deem reasonably necessary for the collection of any of the Collateral or otherwise to enforce the rights of Administrative Agent, any Lender or any Grantor with respect to any of the Collateral; and/or

(e)     To execute (in the name, place and stead of any Grantor) endorsements, assignments, powers and other instruments of conveyance or transfer with respect to all or any of the Collateral; and/or

(f)     To exercise all rights with respect to any Pledged Collateral of such Grantor hereunder; and/or

(g)     To perform any and all of the affirmative obligations and covenants of such Grantor hereunder (with notice thereof to be provided to such Grantor by Administrative Agent within a reasonable time thereafter).

Each Grantor hereby acknowledges, consents and agrees that the power of attorney granted pursuant to this Section 4.1 is irrevocable and coupled with an interest, but that it will terminate upon the termination of this Security Agreement pursuant to Section 1.3.

4.2     Administrative Agent May Perform.  From time to time, Administrative Agent (at its option) may perform (or may cause the performance of) any act which any Grantor agrees hereunder to perform and which such Grantor fails to perform after being requested in writing so to perform (it being understood that no such request need be given during the continuance of an Event of Default), and Administrative Agent from time to time (at its option) may also take any other action (or may cause the performance of any action) which Administrative Agent reasonably deems necessary for the maintenance, preservation or protection of any of the Collateral or of its security interest therein or collateral assignments or pledges thereof.  The costs and expenses of Administrative Agent incurred in connection with any such performance will be payable by Grantors (jointly and severally) and shall be Secured Obligations.

4.3     Administrative Agent Has No Duty.  The rights and powers conferred upon Administrative Agent hereunder are solely to protect Administrative Agent's and each Lender's interest in the Collateral and do not impose any duty on Administrative Agent to exercise any such rights or powers.  Except for reasonable care of any Collateral in Administrative Agent's possession in accordance with Section 4.4 and the accounting for moneys actually received by it hereunder, Administrative Agent has no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

4.4     Reasonable Care.  Administrative Agent is required to exercise reasonable care in the custody and preservation of any of the Collateral in its possession; provided, however, Administrative Agent will be deemed to have exercised such reasonable care in the custody and preservation of any of the

11

Collateral if Administrative Agent takes such action for that purpose as any Grantor reasonably requests in writing at times other than after the occurrence or during the continuance of a Default.  Notwithstanding the foregoing, any failure or refusal by Administrative Agent at any time to comply with any such request by any Grantor will not in itself be deemed a failure to exercise reasonable care.

ARTICLE 5

DEFAULTS AND REMEDIES

5.1     Certain Remedies.  If any Event of Default occurs and is continuing:

(a)     In addition to other rights and remedies provided for herein (including under Article 4) or otherwise available to Administrative Agent or any Lender (including under the other Loan Documents and/or applicable law), Administrative Agent may also exercise in respect of the Collateral all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral).  Upon the occurrence of any Event of Default, Administrative Agent will have the immediate right to enforce and realize upon any and all collateral security granted under the Loan Documents (including the Collateral hereunder) in any manner or order that Administrative Agent deems expedient without regard to any equitable principles of marshalling or otherwise.  All rights and remedies available to Administrative Agent or any Lender are to be considered cumulative in nature.

(b)     Without notice, except as expressly specified herein or required by applicable law, Administrative Agent may also sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Administrative Agent's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as Administrative Agent may deem commercially reasonable.  To the extent notice of sale is required by law, each Grantor agrees that prior notice to a Grantor of at least ten (10) calendar days indicating the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. Administrative Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  Administrative Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale (without further notice) may be made at the time and place to which it was so adjourned.

(c)     Administrative Agent may require Grantors to, and each Grantor hereby agrees (at its expense) that it will, forthwith assemble all or part of the Collateral as directed by Administrative Agent and make such Collateral available to Administrative Agent at a place designated by Administrative Agent that is reasonably convenient to both Administrative Agent and Grantors.

(d)     Unless Administrative Agent otherwise consents, each Grantor will remit to Administrative Agent all cash proceeds received in respect of any sale of, or collection from, or other realization upon all or any part of the Collateral.  All cash proceeds received by Administrative Agent from any Grantor or otherwise in respect of any sale of, collection from, or other realization upon all or any part of the Collateral (in the discretion of Administrative Agent) may be held by Administrative Agent as additional Collateral for the Secured Obligations, and/or then or at any time thereafter may be applied in whole or in part by Administrative Agent against all or any part of the Secured Obligations in an order consistent with the designated application of payments provided for in the Loan Agreement.  Any surplus of such cash or cash proceeds held by Administrative Agent and remaining after payment in full of all the Secured Obligations will be paid over to a Grantor or to whomsoever Administrative Agent reasonably believes may be lawfully entitled to receive such surplus.

12

(e)        To the extent any of the Collateral represents an interest in a partnership, a limited liability company or other unincorporated enterprise, in addition to any other rights and remedies available to Administrative Agent or any Lender under the Loan Documents or applicable law, Administrative Agent (at its option but with notice to the relevant Grantor) may also exercise all rights and privileges of the holder of such interest under the agreements governing such Collateral and the Organizational Documents for the related organization or may instruct such Grantor how to exercise such rights and privileges (with which instructions each Grantor hereby agrees to comply). Each Grantor, in addition, covenants and agrees (at Administrative Agent's request) to amend (and to use commercially reasonable efforts to cause others to amend) any of the Organizational Documents for such organization in order to authorize Administrative Agent to so exercise any such rights and privileges associated with such Collateral (including voting rights and the rights to participate in management decisions). The rights of Administrative Agent under this Section 5.1(e) may be transferred to and exercised by any subsequent acquiror or transferee of the Collateral pursuant to any sale of or foreclosure on such Collateral. Each Grantor hereby agrees that the rights of Administrative Agent and each Lender (or any subsequent acquiror or transferee of the Collateral) under this Section 5.1(e) may be enforced by specific performance or otherwise.

5.2        Special Securities-Related Remedies—Compliance with Restrictions.    Each Grantor agrees that, in any sale of any of the Pledged Equity, Administrative Agent is authorized to comply with any limitation or restriction in connection with the type of such sale pursued as Administrative Agent may be advised by counsel is necessary in order to avoid any violation of applicable law (including compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that such prospective bidders and purchasers have certain qualifications, and restrict such prospective bidders and purchasers to persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of such Collateral), or in order to obtain any required approval of the sale or of the purchaser by any Official Body. Each Grantor further agrees that such compliance will not result in such sale being considered or deemed not to have been made in a commercially reasonable manner, nor will Administrative Agent or any Lender be liable or accountable to any Grantor for any discount allowed by reason of the fact that such Collateral is sold at foreclosure or otherwise in compliance with any such limitation or restriction or by reason of the fact that such Pledged Equity may represent a minority interest in any Grantor.

5.3        Special IP-Related Remedies (License of Intellectual Property Collateral). Each Grantor hereby grants Administrative Agent a royalty-free, non-exclusive, worldwide, irrevocable license (the "Remedies License") under all present and future Intellectual Property Collateral of such Grantor to make, have made, use, sell, offer for sale, import, rent, lease, reproduce, display, distribute, perform, prepare derivative works (including the right to sub-license such rights to another Person), in any and all media now known or hereafter developed and in all channels of distribution, without restriction, from time to time after the occurrence and during the continuance of any Event of Default and delivery of notice thereof by Administrative Agent (unless such Event of Default is under Section 7.1(e) of the Loan Agreement, in which case no such notification shall be required) in connection with the maintenance, preservation, preparation, sale, disposition, collection, foreclosure, or other realization of, upon, or with respect to the Collateral or payment of the Secured Obligations in accordance with the Loan Documents, with the use of registered Trademarks subject to a commercially appropriate standard of quality. The Remedies License shall remain in full force and effect until this Security Agreement is terminated in accordance with Section 1.3 (but any sub-license or transfer of the Remedies License prior to the termination of the Remedies License shall survive such termination of the Remedies License unless otherwise provided on such sub-license or transfer document). The rights of Administrative Agent under the Remedies License are assignable by Administrative Agent (without the consent of such Grantor) in connection with (a) any sale or other disposition of Collateral in accordance with the Loan Documents to the extent necessary to permit the purchaser of such Collateral to have continuing and royalty free, worldwide rights with respect to the

13

items of Collateral sold to such purchaser or (b) any assignment or other transfer by Administrative Agent of all or any part of its rights under and in accordance with the Loan Documents.  Upon or at any time after the occurrence of any Event of Default, each Grantor will deliver (or cause to be delivered) to Administrative Agent (at Administrative Agent's request but at such Grantor's expense) a copy of all such Intellectual Property Collateral and all related other Collateral in a form requested by Administrative Agent. Administrative Agent's rights, as a licensee under this Section 5.3, constitute a separately enforceable contract from the balance of this Security Agreement.

5.4    Retention of Collateral.  In addition to the rights and remedies hereunder, Administrative Agent may, in compliance with Sections 9-620 and 9-621 of the UCC or otherwise complying with the requirements of applicable law of the relevant jurisdiction, accept or retain the Collateral in satisfaction of the Secured Obligations.  Unless and until Administrative Agent shall have provided such notices, however, Administrative Agent shall not be deemed to have retained any Collateral in satisfaction of any Secured Obligations for any reason.

5.5    Deficiency.  In the event that the proceeds of any sale, collection or realization are insufficient to pay all amounts to which Administrative Agent or the Lenders are legally entitled, the Grantors shall be jointly and severally liable for the deficiency, together with interest thereon as provided in the Loan Agreement, together with the costs of collection and the fees, charges and disbursements of counsel.  Any surplus remaining after the full payment and satisfaction of the Secured Obligations shall be returned to the Grantors or to whomsoever a court of competent jurisdiction shall determine to be entitled thereto.

5.6    Administrative Agent's Rights Upon Occurrence of a Liquidation Event.

(a)    Right to Certain Payments and Distributions.  Upon the occurrence of any Liquidation Event, any payment or distribution of any kind or character (whether in cash, securities or other property) that but for this Security Agreement would be payable or deliverable to a Grantor must instead be paid or delivered directly to Administrative Agent for application to the Secured Obligations.

(b)    Non-Cash Payments and Distributions.  Notwithstanding the provisions of clause (a) of this Section 5.6, if Administrative Agent receives delivery of any such payment or distribution in connection with a Liquidation Event in a form other than cash, then Administrative Agent may hold such Property as additional Collateral for the Secured Obligations, and no Grantor of the Secured Obligations will be entitled to a credit with respect to the Secured Obligations, nor will the Secured Obligations otherwise be adjusted in any respect, until such time as Administrative Agent (in its sole and absolute discretion) has sold, discounted or otherwise liquidated such distribution and then (subject to the terms of Section 7.6), such credit or adjustment to the Secured Obligations will be limited only to the net cash proceeds realized therefrom after the payment of all costs and expenses associated with such sale or liquidation.

(c)    Collection of Payments and Distributions.  In addition to any rights otherwise permitted under the Loan Documents or applicable law, each Grantor hereby irrevocably authorizes and empowers Administrative Agent, upon the occurrence of any Liquidation Event, to file and/or vote claims and take such other proceedings, in each instance in Administrative Agent's own name or in the name of a Grantor, or otherwise, all as Administrative Agent may reasonably deem necessary for the enforcement of this Security Agreement.  Each Grantor further agrees duly and promptly to (i) take such action as may be requested by Administrative Agent to assist in the collection and/or compromise of any amounts owed to any Grantor in respect of a Liquidation Event, (ii) file appropriate proofs of claim in respect of such amounts, (iii) execute and deliver to

14

Administrative Agent on demand such powers of attorney, proofs of claim, assignments of claim or other instruments as may be requested by Administrative Agent to enable Administrative Agent to enforce any and all claims upon or with respect to such amounts, and (iv) collect, compromise and receive any and all payments or distributions which may be payable or deliverable at any time upon or with respect to such amounts.

5.7     Delivery of Payments and Distributions.  If any Grantor receives any payment, distribution or any other funds or property in contravention of the provisions hereof or any other Loan Document, then such Grantor must immediately deliver such payment, distribution or other funds or property (or proceeds thereof) to Administrative Agent in precisely the form received (except for the endorsement or assignment without recourse of such Grantor where necessary) for application to the Secured Obligations (or, at Administrative Agent's option, held as additional Collateral therefor), whether or not then due or mature in accordance with the provisions of the Loan Agreement.  Until such funds or property are delivered to Administrative Agent, such Grantor must hold such payment, distribution or other funds or property (or proceeds thereof) (a) in trust for the benefit of and as property of Administrative Agent and (b) separate from (i.e., not commingled with) its other assets.  If a Grantor fails or refuses to make any such endorsement or assignment, then Administrative Agent (or any of its officers or employees) is hereby irrevocably authorized by such Grantor to make the endorsement and/or assignment.

5.8     Cooperation and Assistance.  Each Grantor agrees (during the existence of a Default or an Event of Default) to take any actions that Administrative Agent may reasonably request in order to enable Administrative Agent and each Lender to receive the full rights and benefits granted to Administrative Agent and each Lender by the Loan Documents.  Each Grantor further agrees that each Grantor will assist and cooperate with Administrative Agent (and will use its best efforts to cause others to assist and cooperate with Administrative Agent) to ensure that each Grantor continues (a) to operate in the normal course of business, (b) to fulfill all of its legal, regulatory and contractual obligations and (c) to otherwise be properly and professionally managed.  At Administrative Agent's request and the expense of Grantors (jointly and severally), at any time during the existence of an Event of Default, such assistance and cooperation may include the employment of (and, to the maximum extent not prohibited by the rules, regulations and orders of any Official Body with jurisdiction, the delegation of appropriate management authority to) one or more qualified and independent consultants and professional managers acceptable to Administrative Agent to assist in the interim operations of Grantors; all of which each Grantor hereby agrees not to challenge.

5.9     Standards for Exercising Remedies. To the extent that applicable law imposes duties on the Administrative Agent and/or Lender to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it is not commercially unreasonable for the Administrative Agent and/or Lender (a) to fail to incur expenses deemed significant by the Administrative Agent and/or Lender to prepare the Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as such Grantor, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i)

15

to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure the Administrative Agent and/or Lender against risks of loss, collection or disposition of Collateral or to provide to the Administrative Agent and/or Lender a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by the Administrative Agent and/or Lender, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Lender in the collection or disposition of any of the Collateral. Each Grantor acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by the Administrative Agent and/or Lender would not be commercially unreasonable in the Administrative Agent's and/or Lender's exercise of remedies against the Collateral and that other actions or omissions by the Administrative Agent and/or Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section. Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any rights to the Grantors or to impose any duties on the Administrative Agent and/or Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section.

## ARTICLE 6

## DEFINITIONS

6.1     Loan Agreement Definitions.  Unless otherwise defined herein or the context otherwise requires, capitalized terms used in this Security Agreement (including the preamble and recitals hereof) have the meanings provided in the Loan Agreement.

6.2     Rules of Construction.  The rules of interpretation and construction set forth in the Loan Agreement apply to the interpretation and construction of this Security Agreement.

6.3     Certain Terms.  The following terms (whether or not underscored) when used in this Security Agreement (including the preamble and recitals hereof) have the following meanings:

"Administrative Agent" is defined in the introductory paragraph hereof.

"Borrower" or "Borrowers" is defined in the introductory paragraph hereof.

"Collateral" is defined in Section 1.1.

"Copyright License" means any agreement, whether written or oral, providing for the grant by or to a Grantor of any right under any Copyright.

"Copyrights" means all copyright and similar rights under the laws of the United States (including all proprietary rights afforded pursuant to Title 17 of the United States Code, including, without limitation, all rights in copyrights, works of authorship, original designs and mask works) and all other countries for the full term thereof (and including all rights accruing by virtue of bilateral or international copyright treaties and conventions), whether registered or unregistered, including, but not limited to, all registrations, applications for registration, renewals, extensions, reversions or restorations thereof now or hereafter provided for by law, all rights to make applications for registrations and recordations, and all adaptations, derivations, and versions thereof, regardless of the medium of fixation or means of expression, now existing or hereafter applied for, registered, created, or acquired.

"Domain Names" means all internet domain names and applications therefor and all URLs.

16

4870-1882-2658.5

"Grantor" is defined in the introductory paragraph hereof.

"Intellectual Property Collateral" means, collectively, all Copyrights, all Domain Names, all Patents, all Software, all Trademarks, all Trade Secrets, and all Other Intellectual Property owned and/or used by a Grantor, and all Copyright Licenses, all Patent Licenses, and all Trademark Licenses granted by or to a Grantor.

"Liquidation Event" means any foreclosure on or any sale of all or any material part of the assets of any Grantor, or any liquidation, dissolution or other winding up (partial or complete) of any Grantor or any Grantor's business, or any sale, receivership, insolvency or bankruptcy proceeding, any assignment for the benefit of creditors, or any other proceeding by or against any Grantor or its assets for any relief under any bankruptcy or insolvency law relating to the relief of debtors, readjustment of indebtedness, arrangements, reorganizations, compositions or extensions.

"Loan Agreement" is defined in the recitals hereof.

"Other Intellectual Property" means all worldwide intellectual property rights, industrial property rights, proprietary rights and common-law rights, whether registered or unregistered, not otherwise included in Copyrights, Copyright Licenses, Domain Names, Patents, Patent Licenses, Trademarks, Trademark Licenses and Trade Secrets, including, without limitation, all rights to and under all new and useful inventions, discoveries, technology, confidential information, methods, processes, designs, technology, art, brands, formulas, algorithms, software, concepts, protocols, electronic or other databases, tangible embodiments (in whatever form or medium), and all improvements thereof and all know-how related thereto, together with the rights to all related past, present and future causes of action and any and all interests, claims, and rights for damages, profits, and other awards or remedies by reason of any infringement, unauthorized use, dilution, misappropriation, or other violation of intellectual property rights, now existing or hereafter created or acquired.

"Patent License" means any agreement, whether written or oral, providing for the grant by or to a Grantor of any right under any Patent.

"Patents" means all letters patent and patent applications in the United States and all other countries (and all letters patent that issue therefrom), including all industrial designs, industrial models, utility models, certificates of invention and other indices of invention ownership, and all reissues, reexaminations, extensions, renewals, substitutes, divisions and continuations (including continuations-in-part and continuing prosecution applications) thereof, all rights to make applications for issuance and recordations, for the full term thereof, now existing or hereafter applied for, issued, or acquired.

"Pledged Equity" means, with respect to each Grantor, (a) 100% of the issued and outstanding equity interests of each Subsidiary that is directly owned by Grantor and (b) 66% (or such greater percentage that, due to a change in an applicable law after the date hereof, (i) could not reasonably be expected to cause the undistributed earnings of such foreign Subsidiary as determined for United States federal income tax purposes to be treated as a deemed dividend to such foreign Subsidiary's United States parent and (ii) could not reasonably be expected to cause any material adverse tax consequences) of the issued and outstanding equity interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and 100% of the issued and outstanding equity interests not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) in each foreign Subsidiary that is directly owned by such Grantor, including the equity interests of the Subsidiaries owned by such Grantor as set forth on Schedule 2.6 hereto, in each case together with the certificates (or other agreements or instruments), if any, representing such equity interests, and all

17

4870-1882-2658.5

options and other rights, contractual or otherwise, with respect thereto, including, but not limited to, (A) all equity interests representing a dividend thereon, or representing a distribution or return of capital upon or in respect thereof, or resulting from a stock split, revision, reclassification or other exchange therefor, and any subscriptions, warrants, rights or options issued to the holder thereof, or otherwise in respect thereof; and (B) in the event of any consolidation or merger involving the issuer thereof and in which such issuer is not the surviving Person, all shares of each class of the equity interests of the successor Person formed by or resulting from such consolidation or merger, to the extent that such successor Person is a direct Subsidiary of such Grantor.

"Secured Obligations" is defined in Section 1.2.

"Security Agreement" means this Security Agreement and all exhibits, schedules and supplemental addenda hereto, all as may be amended and otherwise modified from time to time hereafter.

"Software" means computer software (including source code and object code), data, databases and all documentation related thereto.

 "Trade Secrets" means any data or information of any Grantor that is not commonly known by or available to the public, and which (a) derives economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"Trademark License" means any agreement, written or oral, providing for the grant by or to Grantor of any right to use any Trademark.

 "Trademarks" means all trademark and service mark rights, statutory and common-law trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, trade dress, logos and other source or business identifiers and indicia of commercial source or origin, together with all translations, adaptations, derivations and combinations thereof, and the goodwill associated therewith, all registrations and applications for registration thereof, and all rights to make applications for registrations and recordations, under the laws of the United States, any state thereof or any other country or any political subdivision thereof, or otherwise, for the full term and all renewals thereof, now existing or hereafter applied for, registered, adopted, or acquired.

6.4    UCC Definitions.  The following terms shall have the meanings ascribed to such terms as defined in the Uniform Commercial Code in effect from time to time in the State of New York except as such terms may be used in connection with the perfection of the Collateral and then the applicable jurisdiction with respect to such affected Collateral shall apply (the "UCC"): Accession, Account, As-Extracted Collateral, Bank, Chattel Paper, Commercial Tort Claim, Consumer Goods, Deposit Account, Document, Electronic Chattel Paper, Equipment, Farm Products, Financial Asset, Fixtures, General Intangible, Goods, Instrument, Inventory, Investment Property, Letter-of-Credit Right, Manufactured Home, Proceeds, Securities Entitlement, Securities Account, Securities Intermediary, Security, Software, Supporting Obligation and Tangible Chattel Paper.

## ARTICLE 7

## MISCELLANEOUS PROVISIONS

18

7.1     Loan Document.  This Security Agreement and each separate assignment executed in connection herewith are Loan Documents executed pursuant to the Loan Agreement and (unless otherwise expressly indicated herein) are to be construed, administered and applied in accordance with the terms and provisions thereof.

7.2     Amendments.  No amendment to or waiver of any provision of this Security Agreement, nor consent to any departure by any Grantor herefrom, shall in any event be effective unless such amendment, waiver or consent is in writing and signed by Administrative Agent and Grantor.  Any such waiver or consent will be effective only in the specific instance and for the specific purpose for which given.

7.3     Notices.

(a)     Written Notices.

(i)     All notices and other communications to any party herein to be effective shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, as follows:

If to Grantor:

c/o Excell Auto Group, Inc.
1001 Clint Moore Road, Unit B
Boca Raton, FL 33487

Attn: Scott Zankl If to Administrative Agent:

FVP Servicing, LLC
1201 Broadway, 7th Floor
New York, NY 10001
Attn: Keith Lee / Tom Betts
Telephone: 646.902.6645
E-mail:klee@feenixpartners.com / tbetts@feenixpartners.com

(ii)     Notices if (a) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and (b) sent by e-mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment).

(iii)     Any party hereto may change its address for notices and other communications hereunder by notice to the other parties hereto.  All such notices and other communications shall, when transmitted by overnight delivery, be effective when delivered for overnight (next-day) delivery, or if mailed, upon the third Business Day after the date deposited into the mails or if delivered, upon delivery; provided, that notices delivered to Lenders shall not be effective until actually received by such Person at its address specified in this Section 10.

(iv)     Any agreement of Administrative Agent or any Lender herein to receive certain notices by telephone or e-mail is solely for the convenience and at the request of Borrowers.  Administrative Agent and each Lender shall be entitled to rely on the authority of any Person purporting to be a Person authorized by

19

4870-1882-2658.5

Borrowers to give such notice and neither Administrative Agent nor any Lender shall have any liability to Borrowers or other Person on account of any action taken or not taken by Administrative Agent or any Lender in reliance upon such telephonic or e-mail notice. The obligation of Borrowers to repay the Loans and all other obligations and hereunder shall not be affected in any way or to any extent by any failure of Administrative Agent or any Lender to receive written confirmation of any telephonic or e-mail notice or the receipt by Administrative Agent or any Lender of a confirmation which is at variance with the terms understood by Administrative Agent or any Lender to be contained in any such telephonic or e-mail notice.

(b)     Electronic Communications.

(i)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and internet or intranet websites) pursuant to procedures approved by Administrative Agent; provided that the foregoing shall not apply to notices to Administrative Agent or any Lender pursuant to Section 2 hereof unless Administrative Agent or such Lender has agreed to receive notices under such Section by electronic communication and have agreed to the procedures governing such communications. Any Party may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(ii)     Unless Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

7.4     Severability. Wherever possible, each provision of this Security Agreement shall be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Security Agreement shall be prohibited by or invalid under such law, then such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Security Agreement.

7.5     Entire Agreement. This Security Agreement and the other Loan Documents constitute the entire understanding among the parties hereto with respect to the subject matter hereof and supersede any prior agreements (written or oral) with respect thereto.

7.6     Reinstatement. To the maximum extent not prohibited by applicable law, this Security Agreement shall continue to be effective or be reinstated if at any time any amount received by

20

Administrative Agent or any Lender in respect of the Loan Agreement or any other Loan Document is rescinded or must otherwise be restored or returned by Administrative Agent or any Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of any Grantor or upon the appointment of any receiver, intervenor, conservator, trustee or similar official for any Grantor or any substantial part of any Grantor's assets, or otherwise, all as though such payments had not been made.

7.7     Conflict Provision.  In the event of any irreconcilable conflict between the terms and conditions of this Security Agreement and the terms and conditions of the Loan Agreement, the terms and conditions of the Loan Agreement shall govern.

7.8     Administrative Agent.  References in this Security Agreement to Administrative Agent shall mean either to Administrative Agent in such capacity or (where appropriate) to Administrative Agent for the benefit of itself and other Lenders.  Unless otherwise indicated in this Security Agreement or the other Loan Documents, all Collateral held and all payments received by Administrative Agent are deemed to be held and received, respectively, for the benefit of itself and the other Lenders.

7.9     Waiver of Suretyship Defenses.  Each Grantor hereby waives any and all defenses and rights of discharge based on suretyship or impairment of collateral (including any lack of attachment or perfection with respect thereto) that it may now have or may hereafter acquire with respect to Administrative Agent or any Lender or any of such Grantor's obligations hereunder or under any other agreement that it may have or hereafter enter into with Administrative Agent or any Lender.

7.10    Waiver of Subrogation.  Until this Security Agreement is terminated in accordance with Section 1.3, each Grantor hereby irrevocably waives any claim or other rights which it may now have or may hereafter acquire against any other Grantor that arise from the existence, payment, performance or enforcement of any Grantor's obligations under this Security Agreement or any other Loan Document, including any right of subrogation, reimbursement, contribution, exoneration, or indemnification, any right to participate in any claim or remedy of Administrative Agent or any Lender against any other Grantor or any collateral which Administrative Agent or any Lender now has or hereafter acquires, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law.

7.11    Waiver of Notice; Waiver of Bond.  Each Grantor waives all rights of notice and hearing of any kind prior to the exercise by Administrative Agent or any Lender of its rights during the continuance of any Event of Default to repossess the Collateral with judicial process or to replevy, attach or levy upon the Collateral.  Each Grantor waives the posting of any bond otherwise required of Administrative Agent or any Lender in connection with any judicial process or proceeding to obtain possession of, replevy, attach or levy upon Collateral or other security for the Secured Obligations, to enforce any judgment or other court order entered in favor of Administrative Agent or any Lender, or to enforce by specific performance, temporary restraining order or preliminary or permanent injunction this Security Agreement or any other Loan Document.

7.12    Waiver of Liability.  Each Grantor (a) agrees that neither Administrative Agent nor any Lender (nor any director, officer, employee or agent of Administrative Agent or any Lender) shall have any liability to any Grantor (whether sounding in tort, contract or otherwise) for losses or costs suffered or incurred by any Grantor in any way related to the transactions contemplated or the relationship established by any Loan Document, or any act, omission or event occurring in connection therewith, except for actual losses resulting directly from Administrative Agent's or such Lender's own gross negligence, willful misconduct or fraud, and (b) waives, releases and agrees not to sue upon any claim against Administrative Agent or any Lender (or their directors, officers, employees or agents) whether sounding in tort, contract or otherwise, except for claims for actual losses resulting directly from Administrative Agent's or such Lender's own gross negligence, willful misconduct or fraud.  Moreover, whether or not such damages are

21

related to a claim that is subject to the waiver effected above and whether or not such waiver is effective, neither Administrative Agent nor any Lender (nor any director, officer, employee or agent of Administrative Agent or any Lender) shall have any liability with respect to (and each Grantor hereby waives, releases and agrees not to sue upon any claim for) any special, indirect, consequential, punitive or non-foreseeable damages suffered by any Grantor in any way related to the transactions contemplated or the relationship established by any Loan Document, or any act, omission or event occurring in connection therewith.

7.13    Counterparts.  This Security Agreement may be executed in any number of counterparts with the same effect as if all the signatures on such counterparts appeared on one document.  Each counterpart will be deemed to be an original, but all counterparts together will constitute one and the same instrument.  A signature page hereto sent or delivered by facsimile or other electronic transmission shall be as legally binding and enforceable as a signed original for all purposes.

7.14    Governing Law; Submission to Jurisdiction; Venue; WAIVER OF JURY TRIAL.  The terms of Sections 13.3, 13.4, 13.5 and 13.7 of the Loan Agreement with respect to governing law, submission to jurisdiction, venue and waiver of jury trial are incorporated herein by reference, *mutatis mutandis*, and the parties hereto agree to such terms.

[SIGNATURE PAGES FOLLOW]

22

4870-1882-2658.5

IN WITNESS WHEREOF, the undersigned, by their duly authorized officers, have executed this Security Agreement, and it is effective as of the day and year first above written.

**GRANTORS:**

**KARMA OF BROWARD, INC.,**
a Florida corporation

By: _____
Name: Scott Zunell
Title: Pres.

**KARMA OF PALM BEACH,**
**INC.,** a Florida corporation

By: _____
Name: Scott Zunell
Title: Pres.

SECURITY AGREEMENT

**ADMINISTRATIVE
AGENT:**

**FVP SERVICING, LLC**,
a Delaware limited liability company,
as Administrative Agent

By: _Keith Lee_

Name: Keith Lee

Title: Manager

SECURITY AGREEMENT

Schedule 2.1

Location of Collateral

| Grantor | Address |
|---|---|
| Karma of Broward, Inc. | 1717 17th Street, Ft. Lauderdale, FL 33316 |
| Karma of Palm Beach, Inc. | 1001 Clint Moore Road, Boca Raton, FL 33487 |

Schedule 2.3

Government Contracts

None.

Schedule 2.5A

Intellectual Property Collateral

None.

Schedule 2.6

Pledged Equity

None.

SECURITY AGREEMENT

Schedule 2.10

Commercial Tort Claims

None.

Schedule 2.11

Pledged Interests – Securities

None.

SECURITY AGREEMENT

Schedule 2.13

Litigation

None.

SECURITY AGREEMENT

Schedule 3.6
Form Joinder

JOINDER BY _____
TO SECURITY AGREEMENT

The undersigned, _____, a _____ ("New Grantor") hereby joins in the Security Agreement dated as of January 26, 2022 (the "Security Agreement") by and among the Grantors thereto (collectively, the "Grantor") and FVP SERVICING, LLC, as administrative agent (including any successor, participant, assignee or transferee thereof, "Administrative Agent") for itself and the Lenders (as defined in the Loan Agreement). All terms not defined herein shall have the meanings ascribed to them in the Security Agreement.  New Grantor has received and reviewed a copy of the Security Agreement and hereby acknowledges and affirms:

1.    the continuing validity of the Security Agreement and the other Loan Documents to which New Grantor is a party;

2.    all of the terms, conditions and obligations contained in the Security Agreement and other Loan Documents to which New Grantor is a party, which terms, conditions and obligations are and shall remain in full force and effect;

3.    that the Security Agreement and other Loan Documents to which New Grantor is a party are the legal, valid and binding obligations of New Grantor as a party thereto, and the obligations and liabilities thereunder shall not be diminished by the execution hereof; and

4.    that this instrument is executed by New Grantor as an inducement to the Administrative Agent and each Lender to continue the Loans, and with the knowledge that the Administrative Agent and each Lender shall rely on the statements made herein.

Dated: _____, 20__                    _____

Address for Notice:                              By: _____
_____                          Print Name:
_____                          Print Title:
_____

Schedule 3.6                                                    SECURITY AGREEMENT

# EXHIBIT G

**Exhibit G**

EXECUTION COPY

## PLEDGE AND SECURITY AGREEMENT

**THIS PLEDGE AND SECURITY AGREEMENT** (the "Agreement") is dated as of January 26, 2022, and is by and among **SCOTT ZANKL**, an individual, **KRISTEN ZANKL**, an individual (individually and collectively, "Pledgor"), and **FVP SERVICING, LLC**, in its capacity as administrative agent for the Lenders under the Loan Agreement (as defined below) (the "Administrative Agent"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such term in the Loan Agreement.

## BACKGROUND

1.      Pledgor is the owner of the number of the Equity Interests listed next to its name on Schedule A in the entities listed on Schedule A next to its name (each such entity, a "Pledged Entity").

2.      Contemporaneously with the execution of this Agreement, Karma of Palm Beach, Inc. and Karma of Broward, Inc. (each, a "Borrower" and, together, "Borrowers") are entering into a Loan Agreement (as amended, modified, supplemented, extended, restated or renewed from time to time, the "Loan Agreement") with Administrative Agent and the lenders party thereto (collectively, the "Lenders"), pursuant to which, among other things, the Lenders have agreed to make certain term loans to Borrowers in the aggregate original principal amount of $7,500,000.00 (the "Loan").

3.      As a condition to entering into the Loan Agreement, Administrative Agent requires that Pledgor pledge and grant a security interest in favor of Administrative Agent, for the benefit of itself and the Lenders, in all of Pledgor's right, title and interest in and to all Equity Interests in each Pledged Entity to secure, *inter alia*, the repayment of the Loan and the due and prompt payment and performance of all other Obligations (as hereinafter defined) under the Loan Documents.

4.      Pledgor will derive substantial direct and indirect benefits from the making of the Loan by the Lenders to Borrowers and the consummation of the transactions contemplated by the Loan Agreement, and is willing to execute and deliver this Agreement to induce Administrative Agent to enter into the Loan Agreement.

NOW THEREFORE, the parties agree as follows:

## AGREEMENT

1.      Definitions.  As used in this Agreement, the following terms shall have the meanings specified below:

"Distributions" means all dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and payments or economic benefits or interests to which Pledgor is entitled with respect to the Pledged Equity whether or not received by or otherwise distributed to Pledgor, whether such dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and economic benefits are paid or distributed by each Pledged Entity in respect of operating profits, sales, exchanges, refinancing, condemnations or insured losses of the company's assets, the liquidation of the company's assets and affairs, management fees, guaranteed payments, repayment of loans, reimbursement of expenses or otherwise in respect of or in exchange for any or all of the Pledged Equity.

"Equity Interests" means (a) partnership interests (general or limited) in a partnership; (b) membership interests in a limited liability company; (c) shares or stock interests in a corporation, and (d) the beneficial ownership interests in a trust.

4870-8593-1522.4

"Event of Default" means any "Event of Default" as defined in the Loan Agreement.

"Obligations" means the "Obligations" as defined in the Loan Agreement.

"Organizational Agreement" means the partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement, articles or certificate of organization, by-laws, certificate of formation and other organizational or governing documents, as applicable, of each Pledged Entity.

"Pledged Equity" means all Equity Interests issued by each Pledged Entity owned or held by or on behalf of Pledgor, whether beneficially or of record, and whether now owned or hereafter acquired, including all such Equity Interests described in Schedule A hereto, and all certificates, instruments and other documents, if any, representing or evidencing such Equity Interests and all interests of Pledgor on the books and records of each Pledged Entity with respect to such Equity Interests, and all Distributions or other dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Equity Interests.

"Security Interest" has the meaning assigned to such term in Section 2a hereof.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

2.      Security Interest.

a.      Grant of Security.  As security for the payment and performance in full of the Obligations and Pledgor's obligations under this Agreement, whether allowed or allowable as claims (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, including without limitation the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)) (collectively, the "Secured Obligations"), Pledgor hereby grants, pledges, hypothecates, transfers and assigns to Administrative Agent, for the benefit of itself and the Lenders, a first priority (except to the extent of any Permitted Liens) and continuing lien on and security interest in (the "Security Interest"), and, in furtherance of such grant, pledge, hypothecation, transfer and assignment, hereby transfers and assigns to Administrative Agent, for the benefit of itself and the Lenders, as collateral security, all of Pledgor's right, title, ownership, equity or other interests in and to the following, whether now owned or hereafter acquired, now existing or hereafter arising and wherever located (collectively, the "Collateral"):

(i)      the legal and beneficial ownership interests in and to the Pledged Equity;

(ii)      all rights, privileges, general intangibles, payments intangibles, voting rights, authority and power arising from its interest in the Pledged Equity;

(iii)      the capital of Pledgor and any and all profits, losses, Distributions, and allocations attributable to the Pledged Equity as well as the proceeds of any Distribution thereof, whether arising under the terms of any Organizational Agreement or otherwise;

(iv)      all Distributions and all other payments, if any, due or to become due, to Pledgor and all other present or future claims by Pledgor against each Pledged Entity, or in respect of the Pledged Equity,

2

under or arising out of (i) any Organizational Agreement, (ii) monies loaned or advanced, for services rendered or otherwise, (iii) any other contractual obligations, commercial tort claims, supporting obligations, damages, insurance proceeds, condemnation awards or other amounts due to Pledgor from each Pledged Entity or with respect to the Pledged Equity;

(v)        Pledgor's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or arising out of the ownership of the Pledged Equity;

(vi)        to the extent permitted by applicable law, Pledgor's rights, if any, in each Pledged Entity pursuant to any Organizational Agreement, or at law, to exercise and enforce every right, power, remedy, authority, option and privilege of Pledgor relating to the Pledged Equity, including without limitation, the right to (i) execute any instruments and to take any and all other action on behalf of and in the name of Pledgor in respect of the Pledged Equity, (ii) exercise any and all voting, consent and management rights of Pledgor in or with respect to each Pledged Entity, (iii) exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval with respect to each Pledged Entity, (iv) enforce or execute any checks, or other instruments or orders of each Pledged Entity, and (v) file any claims and to take any action in connection with any of the foregoing, together with full power and authority to demand, receive, enforce or collect any of the foregoing or any property of each Pledged Entity;

(vii)       all Investment Property (as such term is defined in Section 9-102 of the UCC) issued by or relating to each Pledged Entity, or otherwise relating to the Pledged Equity;

(viii)      all additional Equity Interests or other property, securities, or assets now existing or hereafter acquired by Pledgor relating to each Pledged Entity, including, without limitation, as a result of any consolidation, combinations, mergers, reorganizations, acquisitions, exchange offers, recapitalizations of any type, contributions to capital, splits, spin-offs, or similar actions or the exercise of options or other rights relating to the Pledged Equity;

(ix)        all partnership certificates, member certificates, stock certificates, or any other instrument, note, chattel paper, electronic chattel paper or certificate (including, without limitation, all "certificated securities" within the meaning of Section 8-102 of the UCC) (whether or not qualifying as Investment Property) representing the Pledged Equity in each Pledged Entity and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such certificates or writings, and all options and warrants for the purchase of such Equity Interests now or hereafter held in the name of Pledgor (collectively, "Certificated Securities"), and all Certificated Securities in each Pledged Entity from time to time acquired by Pledgor in any manner, and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such Certificated Securities, and all securities convertible into and options, warrants, dividends, cash, instruments and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Certificated Securities (including all rights to request or cause the issuer thereof to register any or all of the Collateral under federal and state securities laws to the maximum extent possible under any agreement for such registration rights), and all put rights, tag-along rights or other rights pertaining to the sale or other transfer of such Collateral, together in each case with all right under any Organizational Agreements pertaining to such rights; and

(x)        (i) all "proceeds" (as such term is defined in Section 9-102 of the UCC) of any or all of the foregoing (whether cash or non-cash proceeds, including insurance proceeds), (ii) whatever is receivable or received when any of the Collateral is sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto and also includes all interest, dividends and other property receivable or received on account of any of the Collateral or proceeds thereof, and in any

3

event, shall include all Distributions or other income from any of the Collateral, all collections thereon or all Distributions with respect thereto, and (iii) all proceeds, products, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the Collateral. The inclusion of proceeds in the Collateral does not authorize Pledgor to sell, dispose of or otherwise use the Collateral in any manner not specifically authorized hereby.

b.    <u>Continuing Perfection and Priority</u>.  Pledgor hereby covenants and agrees that, if at any time on or after the date hereof any asset or property acquired, owned or held by or on behalf of Pledgor that constitutes or would constitute Collateral hereunder is not subject to the Security Interest in favor of the Administrative Agent hereunder with the perfection or priority required hereby, then Pledgor shall, at its own cost and expense, promptly (i) notify Administrative Agent thereof and (ii) execute and deliver any and all agreements, instruments and other documents, and take all further action (including the filing and recording of financing statements and other documents), that may be necessary or reasonably requested by the Administrative Agent to cause such asset or property to become subject to a perfected lien and security interest in favor of the Administrative Agent hereunder (including, where applicable, perfection by establishing "sole dominion and control" under applicable law and "control" within the meaning of the UCC), with the priority required hereby.

c.    <u>Security for Obligations</u>.  This Agreement secures, and the Collateral is collateral security for, the prompt and complete payment or performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 262(a) of Title 11 of the United States Code, or any similar provision of any other bankruptcy, insolvency, receivership or other similar law), of all Secured Obligations.

d.    <u>No Assumption of Liability</u>.  Notwithstanding anything to the contrary herein, the Security Interest is granted as security only and shall not subject the Administrative Agent to, or in any way alter or modify, any obligation or liability of Pledgor with respect to or arising out of the Pledged Equity.

3.    <u>Representations, Warranties and Covenants</u>.

a.    <u>Representations and Warranties</u>.  Pledgor represents and warrants to the Administrative Agent, jointly and severally, for the benefit of itself and the Lenders that:

i.    Scott Zankl and Kristen Zankl are individuals and residents of the State of Florida and their full and correct legal names and the address of such individual's residence is specified on <u>Schedule A</u>, such name and address matches that reflected on each individual's respective driver's license or other government-issued identification card.

ii.    Pledgor owns the applicable Equity Interests in each Pledged Entity specified next to its name on <u>Schedule A</u>.  Pledgor has good and valid title to the Pledged Equity specified next to its name on <u>Schedule A</u> and all related Collateral, and Pledgor does not have any outstanding options or rights or other agreements to acquire or sell or otherwise transfer all or any portion of any Pledged Equity or other Collateral.

iii.    All actions and consents, including all filings, notices, registrations and recordings, necessary or desirable to create, perfect or ensure the priority of the Security Interest in the Pledged Equity and the other Collateral or for the exercise by the Administrative Agent of any voting or other rights provided for in this Agreement or the exercise of any remedies in respect of the Pledged Equity and the other Collateral have been made or obtained.

4

iv. The Pledged Equity and other Collateral of Pledgor is owned by Pledgor free and clear of any lien, security interests or other encumbrance. Pledgor has not filed nor authorized the filing of (A) any financing statement or analogous document under the UCC or any other applicable laws covering the Pledged Equity or any other Collateral, or (B) any assignment in which Pledgor assigns any of the Pledged Equity or other Collateral, or any pledge agreement or similar instrument covering any of the Pledged Equity or other Collateral, with any foreign governmental authority or other office, in each case which financing statement, analogous document, assignment or other instrument, as applicable, is still in effect.

v. The Pledged Equity has been duly authorized and is validly issued.

vi. The Pledged Equity constitutes all of the issued and outstanding Equity Interests of each Pledged Entity.

vii. The pledge of the Pledged Equity and the other Collateral pursuant to this Agreement creates a valid and, upon the filing of a financing statement in accordance with the UCC, to the extent such security interest can be perfected by filing of a financing statement under the UCC, or other appropriate method, perfected security interest in the Pledged Equity and the other Collateral securing the payment and performance of the Secured Obligations. The taking possession by the Administrative Agent of the Certificated Securities (if any) described on Schedule A hereto, together with endorsed stock or unit powers duly executed in blank, will perfect the Administrative Agent's Security Interest in all of the Pledged Equity and related Collateral evidenced by such Certificated Securities.

viii. Except for consents already obtained by Pledgor in connection with this Agreement, no consent of any other person or entity and no authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required (A) for the pledge by Pledgor of the Pledged Equity pursuant to this Agreement or for the execution, delivery or performance of this Agreement by Pledgor, (B) for the perfection or maintenance of the Security Interest created hereby or (C) for the exercise by Administrative Agent of the voting or other rights provided for in this Agreement or the remedies in respect of the Pledged Equity and other Collateral pursuant to this Agreement (except as may be required in connection with any disposition of any portion of the Pledged Equity by laws affecting the offering and sale of securities generally).

ix. There are no conditions precedent to the effectiveness of this Agreement that have not been satisfied or waived.

x. Pledgor has, independently and without reliance upon Administrative Agent, and based on such documents and information as Pledgor has deemed appropriate, and following consultation with Pledgor's independent legal counsel, made its own credit analysis and decision to enter into this Agreement.

xi. Except as expressly provided in this Agreement, Pledgor will not sell, convey or otherwise dispose of any of the Pledged Equity or other Collateral, nor will Pledgor create, incur or permit to exist any lien, security interest or other encumbrance with respect to any of the Pledged Equity or other Collateral.

xii. There are no contractual restrictions upon the voting rights or the transfer of the Pledged Equity.

xiii. The execution, delivery and performance hereof, and the grant of the Security Interest in the Pledged Equity and the other Collateral hereunder, to Pledgor's knowledge, do not contravene

4870-8593-1522.4

any law, rule or regulation or any judgment, decree or order of any governmental authority or any agreement or instrument to which Pledgor is a party or by which Pledgor or any of Pledgor's property is bound or affected or constitute a default thereunder.

xiv. Attached hereto as Exhibit B are true, correct, and complete copies of the Organizational Agreement of each Pledged Entity. Each Organizational Agreement is in full force and effect and has not been modified or amended except as attached hereto. Pledgor is not in default of any of its obligations under the Organizational Agreements. Pledgor shall not allow any Pledged Entity to (A) amend any provision of its Organizational Agreements, (B) cause any of its Equity Interests to become Certificated Securities after the date hereof, (C) dissolve, liquidate, wind-up, merge or consolidate with any other entity, (D) transfer any of its respective assets and properties to any person or entity (or otherwise) except as permitted by the Loan Documents, or (E) take any action, or refrain from taking any action, in either case, to the extent the same would constitute an Event of Default. The Organizational Agreements of each Pledged Entity provide that (A) all owners of Equity Interests therein are authorized to pledge or assign such Equity Interests to Administrative Agent, and that such pledge or assignment shall include all voting, management and control rights and is not limited to economic rights; (B) neither the exercise by Administrative Agent of any right or remedy under the Loan Documents, including, foreclosure of the Collateral, nor the transfer to Administrative Agent or its successors or assigns of title to any Collateral, shall constitute a default or breach, or give rise to any right of first refusal or option to purchase under the Organizational Agreement of any Pledged Entity; (C) until the Secured Obligations are paid in full: (1) no owners of Equity Interests in any Pledged Entity shall be entitled to withdraw from any Pledged Entity or assign, encumber, or convey any interest in any Pledged Entity (except in favor of Administrative Agent pursuant to the Loan Documents); (2) no additional Equity Interests in each Pledged Entity shall be created or issued, no Equity Interest shall be redeemed, exchanged, diluted or modified and, without limitation of the foregoing, no Equity Interests shall become Certificated Securities; (3) no Pledged Entity shall be dissolved, either voluntarily or as the result of the withdrawal or removal of any owners of Equity Interests in such Pledged Entity; (4) the Organizational Agreements of each Pledged Entity shall not be modified or terminated in any manner adverse to Administrative Agent; and (5) upon foreclosure or other transfer of the Pledged Equity by Administrative Agent or its successors or assigns pursuant to the Loan Documents or applicable law, Administrative Agent has the right to terminate all non-member managers of each Pledged Entity.

b. Covenants and Agreements. Pledgor hereby covenants and agrees as follows:

i. Pledgor will promptly notify the Administrative Agent in writing of any change in Pledgor's legal name, the address at which Pledgor maintains its residency, maintains books or records relating to any of the Pledged Equity or Pledgor's social security number. Pledgor agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Administrative Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Pledged Equity and the other Collateral with the priority required hereby.

ii. Pledgor shall maintain, at Pledgor's own cost and expense, such complete and accurate records with respect to the Pledged Equity as is consistent with Pledgor's current practices, but in any event to include complete accounting records indicating all Distributions received with respect to any part of the Pledged Equity, and, at such time or times as the Administrative Agent may reasonably request (but in no event more than one time in any calendar year, unless an Event of Default has occurred and is continuing), promptly to prepare and deliver to the Administrative Agent a duly certified schedule or schedules in form and detail satisfactory to the Administrative Agent showing the identity and amount of any and all such Pledged Equity.

6

4870-8593-1522.4

iii.     Pledgor shall, at Pledgor's own cost and expense, take any and all actions reasonably necessary to defend title to the Pledged Equity and the other Collateral against all persons and to defend the Security Interest in the Pledged Equity and the other Collateral and the priority thereof against any lien, security interest or other encumbrance, and in furtherance thereof, Pledgor shall not take, or permit to be taken, any action not otherwise expressly permitted by the Loan Agreement that could reasonably be expected to impair the Security Interest or the priority thereof or the Administrative Agent's rights in or to the Pledged Equity or the other Collateral.

iv.     Upon reasonable prior written notice, the Administrative Agent and such persons as the Administrative Agent may designate shall have the right, at the cost and expense of Administrative Agent (except during the continuance of an Event of Default, in which event such cost and expense shall be the sole responsibility of Pledgor), to inspect all of Pledgor's records (and to make extracts and copies from such records) concerning the Pledged Equity and to verify under reasonable procedures the validity, amount, quality, quantity, value, condition and status of, or any other matter relating to, the Pledged Equity or the other Collateral.

v.     At its option after the occurrence and during the continuance of an Event of Default, Administrative Agent may discharge past due taxes, assessments, charges, fees, liens, security interests or other encumbrances at any time levied or placed on the Pledged Equity or the other Collateral, and may pay for the maintenance and preservation of the Pledged Equity or the other Collateral to the extent Pledgor fails to do so as required hereby and by the Loan Documents, and Pledgor agrees to reimburse the Administrative Agent on demand for any payment made or any reasonable expense incurred by the Administrative Agent pursuant to the foregoing authorization; provided, however, that nothing in this paragraph shall be interpreted as excusing Pledgor from the performance of, or imposing any obligation on the Administrative Agent to cure or perform, any covenants or other promises of Pledgor with respect to taxes, assessments, charges, fees, liens, security interests or other encumbrances and maintenance as set forth herein or in the Loan Documents.

vi.     Pledgor shall observe and perform all the conditions and obligations to be observed and performed by it under each contract, agreement or instrument relating to the Pledged Equity and the other Collateral, all in accordance with the terms and conditions thereof, and Pledgor agrees to indemnify, defend and hold harmless the Administrative Agent from and against any and all liability to perform such conditions and obligations, except if caused by the gross negligence or willful misconduct of Administrative Agent.

vii.     Pledgor shall not make, nor permit to be made, an assignment, pledge or hypothecation of the Pledged Equity or the other Collateral or grant any other lien, security interest or other encumbrance in respect of the Pledged Equity or the other Collateral.  Pledgor not shall make nor permit to be made any transfer of the Pledged Equity or the other Collateral, and Pledgor shall remain the owner, beneficially and of record, of the Pledged Equity and the other Collateral.

4.     Pledged Equity Interests.

a.     Pledged Equity; Certificated Securities.  Pledgor represents and warrants that, except as otherwise specified on Schedule A hereto, none of the Pledged Equity is issued in the form of Certificated Securities.  Pledgor represents and warrants that it has delivered to Administrative Agent all Certificated Securities constituting the Pledged Equity, duly indorsed in blank within the meaning of the UCC, and all such Certificated Securities have been in the physical possession of the applicable Pledgor at all times prior to such delivery to Administrative Agent.  Pledgor covenants and agrees that it shall not permit each Pledged Entity to convert existing Equity Interests, or issue new Equity Interests. Notwithstanding the foregoing, Pledgor shall promptly notify Administrative Agent if any Equity Interests with respect to each Pledged

7

Entity (whether now owned or hereafter acquired by Pledgor) is not evidenced by a Certificated Security, and shall promptly thereafter take all actions required to perfect the security interest of Administrative Agent in such Pledged Equity under applicable law as required under Section 2. Pledgor further agrees to take such additional actions as Administrative Agent deems necessary or desirable to effect the foregoing and to permit Administrative Agent to exercise any of its rights and remedies hereunder and agrees to provide an opinion of counsel satisfactory to Administrative Agent with respect to any such pledge of Equity Interests which are not Certificated Securities promptly upon request of Administrative Agent. WITHOUT LIMITING THE EFFECT OF THE IMMEDIATELY PRECEDING CLAUSE AND SUBJECT TO SECTION 2 HEREOF, PLEDGOR HEREBY GRANTS TO ADMINISTRATIVE AGENT AN IRREVOCABLE PROXY TO, FOLLOWING THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT OF DEFAULT, VOTE THE PLEDGED EQUITY AND TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF THE PLEDGED EQUITY WOULD BE ENTITLED (INCLUDING WITHOUT LIMITATION (A) GIVING OR WITHHOLDING WRITTEN CONSENTS, (B) CALLING SPECIAL MEETINGS, (C) VOTING AT SUCH MEETINGS, AND (D) VOTING AT ANY TIME OR PLACE) WITH RESPECT TO ANY ACTION, DECISION, DETERMINATION OR ELECTION BY THE PLEDGED ENTITIES OR THE HOLDERS OF THE RESPECTIVE EQUITY INTERESTS THEREIN THAT THE PLEDGED EQUITY (OR ANY NEW OR ADDITIONAL EQUITY INTEREST IN SUCH PLEDGED ENTITY) BE, OR CEASE TO BE, A CERTIFICATED SECURITY, AND ALL OTHER MATTERS RELATED TO ANY SUCH ACTION, DECISION, DETERMINATION OR ELECTION, WHICH PROXY SHALL BE EFFECTIVE AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY PLEDGED EQUITY ON THE RECORD BOOKS OF THE ISSUER THEREOF BY ANY OTHER PERSON (INCLUDING THE ISSUER OF THE PLEDGED EQUITY OR ANY OFFICER OR AGENT THEREOF) AS OF THE DATE HEREOF) AND WHICH PROXY SHALL ONLY TERMINATE UPON THE CURE OF SUCH EVENT OF DEFAULT. THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

b.      <u>Registration in Nominee Name; Denominations</u>.  Pledgor hereby agrees that (i) the Administrative Agent shall have the right (in its sole and absolute discretion) to hold any Pledged Equity in its own name as Administrative Agent or in the name of its nominee, (ii) at the Administrative Agent's request, Pledgor will promptly give to Administrative Agent copies of any material notices or other communications received by it with respect to any Pledged Equity registered in its name, and (iii) the Administrative Agent shall at all times have the right to exchange any certificates, instruments or other documents representing or evidencing any Pledged Equity owned or held by or on behalf of Pledgor for certificates, instruments or other documents of smaller or larger denominations for any purpose consistent with this Agreement.

c.      <u>Pledged Equity</u>.  Pledgor shall (a) deliver to Administrative Agent any Certificated Securities representing the Pledged Equity, in form and content reasonably acceptable to Administrative Agent, duly endorsed or subscribed in blank, or accompanied by appropriate stock or unit powers or other instruments of transfer, pledge or assignment, and enter into such other arrangements as may be necessary to give control of any Investment Property to Administrative Agent within the meaning of Section 8-106 of the UCC, (b) cause each Pledged Entity to execute and deliver the Agreement and Acknowledgment to Pledge attached hereto as Exhibit A (the "<u>Agreement and Acknowledgment</u>"), and (c) promptly take all other actions required to perfect the security interest of Administrative Agent in the Collateral under applicable law. It is the intention of Pledgor and Administrative Agent that at all times while any Secured Obligations under the Loan Agreement remains outstanding, the Pledged Equity shall constitute Investment Property, and, to that end, Pledgor shall take, and shall cause the  Pledged Entity to take, all necessary action to obtain such classification pursuant to the UCC.

8

4870-8593-1522.4

d.  <u>Issuance or Acquisition of Equity Interests</u>.  Pledgor shall not, without executing and delivering, or causing to be executed and delivered, to the Administrative Agent such agreements, documents and instruments as the Administrative Agent may reasonably require, issue or acquire any Equity Interests that (i) is dealt in or traded on a securities exchange or in a securities market, (ii) by its terms expressly provides that it is a Security (as defined in the UCC) governed by Article 8 of the UCC, (iii) is an investment company security, (iv) is held in a Securities Account (as defined in the UCC)  or (v) constitutes a Security or a Financial Asset (each as defined in the UCC).

e.  <u>Voting and Distributions</u>.

i.  Unless and until an Event of Default shall have occurred and for so long as same is continuing:

(1)  Pledgor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of the Pledged Equity, or any part thereof, for any purpose consistent with the terms of this Agreement and the other Loan Documents; provided, however, that Pledgor will not exercise any such right if the result thereof is reasonably likely to adversely affect the rights inuring to a holder of the Pledged Equity or the rights and remedies of the Administrative Agent under this Agreement or any of the other Loan Documents.

(2)  Pledgor shall be entitled to receive, retain or use any cash Distributions paid on the Pledged Equity not in connection with a partial or total liquidation or dissolution, return of capital, capital surplus or paid-in surplus, in each case, to the extent expressly permitted pursuant to the terms of the Loan Agreement.

(3)  All non-cash Distributions paid or payable in cash or otherwise in connection with a partial or total liquidation or dissolution, return of capital, capital surplus or paid-in surplus, and all other Distributions (other than distributions referred to in the preceding sentence) made on or in respect of the Pledged Equity, whether paid or payable in cash or otherwise, whether resulting from a subdivision, combination or reclassification of the outstanding Pledged Equity or received in exchange for the Pledged Equity, or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Equity, and, if received by Pledgor, shall not be commingled with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of the Administrative Agent and the Lenders hereunder and shall be forthwith delivered to the Administrative Agent in the same form received (with any necessary endorsement).

ii.  Without limiting the generality of the foregoing, upon the occurrence and during the continuance of an Event of Default, all rights of Pledgor to receive and retain Distributions and to exercise the voting and consensual rights and powers it is entitled to exercise pursuant to the above, and the obligations of the Administrative Agent in connection therewith, shall cease, and all such rights shall thereupon become vested in the Administrative Agent, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers.

iii.  All Distributions received by or on behalf of Pledgor contrary to the provisions of this Agreement or the Loan Agreement shall be held in trust for the benefit of Administrative Agent, shall be segregated from other property or funds of Pledgor and shall be forthwith delivered to the Administrative Agent upon demand in the same form as so received (with any necessary endorsement).  Any and all money and other property paid over to or received by the Administrative Agent pursuant to the provisions of this Section shall be applied by Administrative Agent to the Secured Obligations in such order as Administrative

9

4870-8593-1522.4

Agent shall determine in its sole discretion.

4.      Further Assurances

Pledgor hereby covenants and agrees, at the cost and expense of Pledgor, to execute, acknowledge, deliver and/or cause to be duly filed all such further agreements, instruments and other documents (including favorable legal opinions), and take all such further actions, that are necessary to preserve, protect and perfect to the extent contemplated hereby (including without limitation as a result of any change in applicable law) the Pledged Equity and the Security Interest granted by Pledgor and the rights and remedies created hereby, including the payment of any fees and taxes required in connection with its execution and delivery of this Agreement, the granting by Pledgor of the Security Interest and the filing of any financing statements or other documents in connection herewith or therewith. In addition, to the extent permitted by applicable law, Pledgor hereby irrevocably authorizes the Administrative Agent to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Pledged Equity and the other Collateral and agrees that a photographic or other reproduction of this Agreement or of a financing statement shall be sufficient as a financing statement and may be filed as a financing statement in any and all jurisdictions. Pledgor hereby further irrevocably authorizes Administrative Agent to file a record or records, including financing statements, in all jurisdictions and with all filing offices that Administrative Agent may determine, in its sole and absolute discretion, are necessary, advisable or prudent to perfect the Security Interest granted by Pledgor and agrees that such financing statements may describe the Pledged Equity and the other Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner that the Administrative Agent may determine, in its sole and absolute discretion, is necessary, advisable or prudent to perfect the Security Interest granted by Pledgor.

5.      Administrative Agent Appointed Attorney-In-Fact

Pledgor hereby appoints the Administrative Agent as Pledgor's true and lawful agent and attorney-in-fact for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Administrative Agent may deem necessary or advisable to accomplish the purposes hereof, which appointment is irrevocable and coupled with an interest and is effective only upon the occurrence and during the continuance of an Event of Default. The Administrative Agent shall have the right, with power of substitution for Pledgor and in Pledgor's name or otherwise, for the use and benefit of the Administrative Agent, only upon the occurrence and during the continuance of an Event of Default, (i) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Pledged Equity, the other Collateral or any part thereof; (ii) to demand, collect, receive payment of, give receipt for, and give discharges and releases of, any of such Pledged Equity or other Collateral; (iii) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on any of the Pledged Equity or the other Collateral or to enforce any rights in respect of any of such Collateral; (iv) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to any of such Pledged Equity or other Collateral; (v) to notify, or to require Pledgor to notify, issuers or obligors to make payment directly to the Administrative Agent, and (vi) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Pledged Equity or the other Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Administrative Agent were the absolute owner of such Pledged Equity or other Collateral for all purposes; provided, however, that nothing herein contained shall be construed as requiring or obligating the Administrative Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Administrative Agent, or to present or file any claim or notice, or to take any action with respect to any of the Pledged Equity, the other Collateral or the moneys due or to become due in respect thereof or any property covered thereby, and no action taken or omitted to be taken by the

10

4870-8593-1522.4

Administrative Agent with respect to any of the Pledged Equity or the other Collateral shall give rise to any defense, counterclaim or offset in favor of Pledgor or to any claim or action against Administrative Agent. The provisions of this Section 5 shall in no event relieve Pledgor of any of its obligations hereunder or under the other Loan Documents with respect to any of the Pledged Equity or the other Collateral or impose any obligation on the Administrative Agent to proceed in any particular manner with respect to any of the Pledged Equity or the other Collateral, or in any way limit the exercise by the Administrative Agent of any other or further right that it may have on the date of this Agreement or hereafter, whether hereunder, under any Loan Document, by law or otherwise.

6.      Remedies Upon Default

a.      Remedies Generally.

i.      General Rights.  If any Event of Default shall have occurred and is continuing, the Administrative Agent shall have all the rights and remedies of a secured party under the UCC or otherwise available at law or in equity and, in addition, the Administrative Agent may without being required to give any notice, (i) liquidate any of the Pledged Equity or the other Collateral for cash for application to the payment of the Secured Obligations, absolutely free of any right or claim of Pledgor of any kind.  If Administrative Agent should be required by law to give any notice to Pledgor of the sale of any Pledged Equity or other Collateral, Pledgor agrees that notice mailed postage prepaid to Pledgor in accordance with Section 17 below at least ten (10) days before the sale shall be reasonable.  Without limiting the generality of the foregoing, Pledgor agrees that the Administrative Agent shall have the right, subject to the mandatory requirements of applicable law, to sell or otherwise dispose of any of the Pledged Equity or the other Collateral at public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Administrative Agent shall deem appropriate.  At any such sale, the Pledged Equity and the other Collateral, or any portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as Administrative Agent may determine.  The Administrative Agent shall be irrevocably authorized at any such sale of the Pledged Equity or other Collateral (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to persons who will represent and agree that they are purchasing such Pledged Equity or other Collateral for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale, the Administrative Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Pledged Equity or other Collateral so sold.  Each such purchaser at any sale shall hold the property sold absolutely free from any claim or right on the part of Pledgor and Pledgor waives and releases, to the extent permitted by law, any right of equity of redemption of the Pledged Equity and the other Collateral, stay or appraisal which Pledgor now has or at any time in the future may have under any rule of law or statute, now existing or hereafter enacted.  Administrative Agent shall not be required to proceed against the Pledged Equity and the other Collateral in any order and Administrative Agent may proceed against any and all of the Pledged Equity and the other Collateral in any order it deems advisable in its sole discretion.

ii.      Application of Proceeds of Sale.  The Administrative Agent may apply the proceeds of any collection or sale of the Pledged Equity or the other Collateral, as well as any Collateral consisting of cash, to the Secured Obligations in such order as Administrative Agent shall determine.  The Administrative Agent shall have sole discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement.

7.      Reimbursement of Administrative Agent

In the event that Pledgor shall breach or fail to timely perform any provisions of this Agreement, Pledgor shall, immediately upon demand by Administrative Agent, pay all of Administrative Agent's and each Lender's costs and expenses (including court costs and attorneys' fees) incurred by Administrative

11

4870-8593-1522.4

Agent and Lenders in the enforcement hereof or the preservation of all of Administrative Agent's and each Lender's rights hereunder, together with interest thereon from the date requested by Administrative Agent until the date of payment to Administrative Agent and Lenders.  The covenant contained in this Section shall survive the payment and performance of the Secured Obligations.

8.       Waivers; Amendment

No failure or delay of the Administrative Agent in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent are cumulative and are not exclusive of any rights or remedies that Administrative Agent would otherwise have.  No waiver of any provision of this Agreement or any other agreement or consent to any departure by Pledgor or any Pledged Entity therefrom shall in any event be effective unless the same shall be in writing and signed by the Administrative Agent, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on Pledgor in any case shall entitle Pledgor to any other or further notice or demand in similar or other circumstances.  Neither this Agreement nor any provision hereof may be waived, amended, supplemented or otherwise modified, or any departure therefrom consented to, except pursuant to an agreement or agreements in writing entered into between the Administrative Agent and Pledgor to which such waiver, amendment, supplement, modification or consent relates.

9.       Security Interest Absolute

All rights of the Administrative Agent hereunder, the Security Interest and all obligations of Pledgor hereunder shall be absolute and unconditional irrespective of (i) any lack of validity or enforceability of any of the Loan Documents, any agreement with respect to any of the Secured Obligations, or any other agreement or instrument relating to any of the foregoing, (ii) any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other waiver, amendment, supplement or other modification of, or any consent to any departure from any of the Loan Documents or any other agreement or instrument relating to any of the foregoing, (iii) any exchange, release or non-perfection of any lien on any other collateral, or any release or waiver, amendment, supplement or other modification of, or consent under, or departure from, any guaranty, securing or guaranteeing all or any of the Secured Obligations, or (iv) any other circumstance that might otherwise constitute a defense available to, or a discharge of, Pledgor in respect of the Secured Obligations or in respect of this Agreement, any other Loan Document, or any other agreement or instrument between Pledgor and Administrative Agent and/or any Lender.

10.      Waivers; Obligations Not Waived

Pledgor waives presentment, demand of payment and protest in connection with any of the Obligations or the Note and also waives notice of acceptance of its pledge hereunder and notice of protest for nonpayment.  To the fullest extent permitted by applicable law, the obligations of Pledgor hereunder shall not be affected by (i) the failure of the Administrative Agent to assert any claim or demand or to enforce or exercise any right or remedy against Borrower or any guarantor under the provisions of the Loan Documents, or any other document or instrument, or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from, any of the terms or provisions of this Agreement, any other document or instrument, any guarantee or any other agreement or (iii) the failure to perfect any security interest in, or the release of, any of the security held by or on behalf of the Administrative Agent or any Lender.

11.      Defenses Waived

12

4870-8593-1522.4

Pledgor waives any defense based on or arising out of any defense of Borrower or any guarantor of the Secured Obligations or the unenforceability of the Secured Obligations or any part thereof from any cause, or the cessation from any cause of the liability of Borrower or any guarantor of the Secured Obligations, other than the final and indefeasible payment in full in cash and full performance of the Secured Obligations.  The Administrative Agent may, at its election, following the occurrence and during the continuance of an Event of Default, foreclose on any security held by it by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Secured Obligations, make any other accommodation with any other person or exercise any other right or remedy available to it against any other person, without affecting or impairing in any way the liability of Pledgor hereunder except to the extent the Secured Obligations have been fully, finally and indefeasibly paid in cash.  Pursuant to applicable law, Pledgor waives any defense arising out of any such election even though such election operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of Pledgor against each Pledged Entity, or any security.

12.    Agreement To Pay; Subordination

Upon payment by Pledgor of any sums to the Administrative Agent, all rights of Pledgor against any other person or entity arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior final and indefeasible payment in full in cash of the Secured Obligations.  If, notwithstanding the foregoing, any amount shall be paid to Pledgor on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such debt of any other person or entity, such amount shall be held in trust for the benefit of the Administrative Agent and shall forthwith be paid to Administrative Agent to be credited against the payment of the Secured Obligations, whether matured or unmatured.

13.    Information

Pledgor assumes all responsibility for being and keeping itself informed of all circumstances bearing upon the risk of nonpayment of the Secured Obligations and the nature, scope and extent of the risks that Pledgor assumes and incurs hereunder, and agrees that the Administrative Agent will not have any duty to advise Pledgor of information known to it regarding such circumstances or risks.

14.    Reasonable Care

Beyond the exercise of reasonable care to assure the safe custody of the Pledged Equity while held hereunder, under no circumstances shall Administrative Agent be deemed to assume any responsibility for or obligation or duty with respect to any part or all of the Pledged Equity or the other Collateral of any nature or kind or any matter or proceedings arising out of or relating thereto.  Administrative Agent shall not have any duty or liability to collect any sums due in respect thereof or to protect or preserve its or Pledgor's rights pertaining thereto and shall be relieved of all responsibility for any of the Pledged Equity or the other Collateral upon surrendering the same to Pledgor.

15.    Marshalling

Administrative Agent shall not be required to marshal any present or future collateral security (including, but not limited to the Pledged Equity) for, or other assurances of payment of, the Secured Obligations, or any of them, or to resort to such collateral security or other assurances of payment in any particular order.  All of Administrative Agent's rights and remedies hereunder and in respect of such

13

4870-8593-1522.4

security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising.  To the extent that Pledgor lawfully may, Pledgor hereby agrees that it will not invoke any law relating to the marshalling of collateral that might cause delay in or impede the enforcement of Administrative Agent's rights under this Agreement or under any other instrument evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and to the extent that it lawfully may, Pledgor hereby irrevocably waives the benefits of all such laws.

16.    Termination; Effectiveness

(a)    Pledgor's obligations hereunder shall terminate when all the Secured Obligations have been finally and indefeasibly paid in full in cash and all other obligations performed thereunder.

(b)    This Agreement shall continue to be effective or be automatically reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Secured Obligations is rescinded or must otherwise be restored or returned by the Administrative Agent or any of the Secured Obligations as a preference, fraudulent conveyance or otherwise under any bankruptcy, insolvency or similar law, all as though such payment had not been made; provided that in the event payment of all or any part of the Secured Obligations is rescinded or must be restored or returned, all reasonable costs and expenses (including, without limitation, attorneys' fees, the allocated cost of internal counsel and disbursements) actually incurred by the Administrative Agent or any holder of the Secured Obligations in defending and enforcing such reinstatement shall be deemed to be included as a part of the Secured Obligations.

17.    Notices

All communications and notices hereunder shall be in writing and given as provided in the Loan Agreement, in each case, at the applicable notice address specified (a) in the Loan Agreement, with respect to Administrative Agent, and (b) on Schedule A hereto (or at such other address as the applicable Pledgor may thereafter specify for such purpose in accordance with the terms of the Loan Agreement), with respect to Pledgor.

18.    Binding Effect; Several Agreement; Assignments

Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party, and all covenants, promises and agreements by or on behalf of Pledgor that are contained in this Agreement shall bind and inure to the benefit of each party hereto and its successors and assigns.  Notwithstanding the foregoing, Pledgor shall not have any right to assign its rights or obligations hereunder without the consent of Administrative Agent, and any such assignment in violation of this Section 18 shall be null and void.

19.    Survival of Agreement; Severability

All covenants, agreements, representations and warranties made by Pledgor herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the Administrative Agent and shall survive the execution and delivery of hereof, regardless of any investigation made by the Administrative Agent or on its behalf, and shall continue in full force and effect until this Agreement shall terminate.  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein or therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any

14

4870-8593-1522.4

other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

20.     Counterparts

This Agreement may be executed and delivered in any number of counterparts each of which shall constitute an original, but all of which taken together shall constitute but one and the same agreement. Delivery of an executed signature page to this Agreement by facsimile or e-mail transmission shall be effective as delivery of a manually signed counterpart of this Agreement.

21.     Headings

Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

22.     Governing Law

This Agreement and the other Loan Documents and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any of the other Loan Documents and the transactions contemplated hereby shall be governed by the laws of the State of New York.

23.     Submission to Jurisdiction; Venue

(a)     Pledgor hereby irrevocably and unconditionally (i) agrees that any legal action, suit or proceeding arising out of or relating to this Agreement may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit or proceeding.  Final judgment against Pledgor in any action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.  Nothing in this Agreement or any other Loan Document shall affect the right of Administrative Agent to bring any action or proceeding relating to this Agreement or any other Loan Document against Pledgor, any Pledged Entity or their respective properties in the courts of any jurisdiction.

(b)     Pledgor irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any court referred to in Section 23(a) and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

24.     Waiver of Jury Trial

**PLEDGOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY.**

25.     Joint and Several Liability.

THE LIABILITY OF PLEDGOR UNDER THIS AGREEMENT SHALL BE JOINT AND SEVERAL WITH BORROWER UNDER THIS AGREEMENT AND THE OTHER LOAN

15

4870-8593-1522.4

16

DOCUMENTS.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

4870-8593-1522.4

IN WITNESS WHEREOF, the parties hereto have duly executed this Pledge and Security Agreement as of the day and year first above written.

**PLEDGOR:**

_____
**SCOTT ZANKL**

_____
**KRISTEN ZANKL**

*Signature Page to Pledge and Security Agreement*

ADMINISTRATIVE AGENT:

**FVP SERVICING, LLC**,
as Administrative Agent

By: _____

Name: _____

Title: _Manager_____

*Signature page to Pledge and Security Agreement*

18

**SCHEDULE A**
**List of Pledged Equity Interests and Pledgor Information**

I.    Pledgor Information

| Pledgor | Pledgor Notice Address |
|---|---|
| Scott Zankl | 1001 Clint Moore Road, Unit B<br>Boca Raton, FL 33487<br>Attn: Scott Zankl |
| Kristen Zankl | 1001 Clint Moore Road, Unit B<br>Boca Raton, FL 33487<br>Attn: Scott Zankl |

II.    Pledged Equity Interests

| Pledgor | Pledged Entity | Description of Equity Interests Owned | Percentage of Issued Equity Interests Owned | Certificated Security (Yes/No) and Certificate No. (if applicable) |
|---|---|---|---|---|
| Scott Zankl | Karma of Broward, Inc. | Stock | 50% | No |
|  | Karma of Palm Beach, Inc. | Stock | 50% | No |
|  | Excell Auto Sport and Service, Inc. | Stock | 23% | No |
|  | Excell Auto Finance, LLC | Membership Interests | 25% | No |
| Kristen Zankl | Karma of Broward, Inc. | Stock | 50% | No |
|  | Karma of Palm Beach, Inc. | Stock | 50% | No |
|  | Excell Auto Sport and Service, Inc. | Stock | 0% | No |
|  | Excell Auto Finance, LLC | Membership Interests | 0% | No |

4870-8593-1522.4

**EXHIBIT A**

Agreement and Acknowledgment

Each of the undersigned (each, a "Pledged Entity") hereby consents to the pledge of Equity Interests in such Pledged Entity as described in the Pledge and Security Agreement dated as of January 26, 2022 (as amended, modified, supplemented, extended, restated or renewed from time to time, the "Pledge Agreement") by and among Scott Zankl and Kristen Zankl, individual and collectively as Pledgor, and FVP Servicing, LLC, as Administrative Agent. Each Pledged Entity agrees that upon the receipt of a written notice from Administrative Agent that an Event of Default has occurred and is continuing under the Loan Agreement, each Pledged Entity shall pay all Distributions on the Pledged Equity issued by it directly to Administrative Agent. All capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Pledge Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the undersigned hereby represents, warrants, covenants and agrees for the benefit of Administrative Agent as follows:

1. Representations and Warranties. Each of the undersigned represents and warrants that (a) the execution and delivery of the Pledge Agreement does not violate any of such undersigned's Organizational Agreements or any other agreement to which such undersigned is a party or by which any of the property of such undersigned is bound, (b) the undersigned has not entered into a control agreement perfecting a security interest in any of the Pledged Equity Interests favor of any other party, other than pursuant to a Permitted Lien, (c) the Collateral is not subject to any security interest or lien in favor of any person or entity (or otherwise) other than Administrative Agent and has not been pledged, transferred or assigned to, and is not otherwise in the control of, any person or entity (or otherwise) other than Administrative Agent, in each case, other than pursuant to a Permitted Lien, (d) none of the undersigned has any present claim, right of offset, or counterclaim against Pledgor under or with respect to the Collateral or otherwise under the Organizational Agreements of any of the undersigned, (e) no Pledgor is in default to the undersigned or otherwise under or in respect of any of its respective obligations under any of such undersigned's Organizational Agreements, and (f) all of the representations and warranties of Pledgor made in the Pledge Agreement are true, accurate and complete in all respects and, without limitation of the foregoing, the ownership of each Pledged Entity, as set forth on Schedule A to the Pledge Agreement, is true, accurate and complete in all respects.

2. Covenants and Agreements.

(a) Books and Records. Each of the undersigned (i) shall cause all of its respective books and records to reflect the pledge of the Collateral to Administrative Agent and agrees not to consent to or to permit any transfer thereof or any other action that may be taken by Pledgor that might constitute an Event of Default so long as any of the Secured Obligations remain outstanding, (ii) agrees that Administrative Agent and/or its representatives may, upon reasonable advance notice and at any reasonable time during normal business hours, inspect the books, records and properties of such undersigned.

(b) UCC Matters. The undersigned confirms, agrees and acknowledges that (i) all Pledged Equity has been validly issued and is fully paid for, (ii) none of the Pledged Equity in the undersigned is, except as otherwise specified in Schedule A to the Pledge Agreement, a Certificated Security, (iii) with respect to such Pledged Equity so designated in Schedule A to the Pledge Agreement as a Certificated Security (A) such Pledged Equity is and shall continue to be evidenced by one (1) certificate issued to the Pledgor specified in Schedule A, as its sole members or shareholders, as the case may be, (B) such certificate represents and embodies all right, title and interest in and to the Pledged Equity, (C) each such original

4870-8593-1522.4

certificate that has been physically delivered to Administrative Agent, was in the physical possession of the Pledgor at all times prior to such delivery to Administrative Agent, and has been duly indorsed in blank within the meaning of the UCC, and (D) such certificate has not been modified or amended and remains in full force and effect, (iv) ownership of all Pledged Equity in each of the undersigned is registered in the respective books and records of the undersigned in the name of the Pledgor, in such amounts and in such manner as specified in Schedule A to the Pledge Agreement, subject only to the pledge thereof in favor of Administrative Agent as security for the Secured Obligations and Permitted Liens, (v) notwithstanding any provisions in the Organizational Agreements, Pledgor is hereby authorized and permitted to pledge, assign and grant a security interest in the Collateral in favor of Administrative Agent pursuant to the Pledge Agreement, (vi) this Agreement and Acknowledgment is intended to, and shall, provide Administrative Agent with "control" over the Collateral within the meaning of Articles 8 and 9 of the UCC, (vii) each of the undersigned shall comply with all instructions relating to the Collateral originated by Administrative Agent without further authorization or consent from Pledgor, the intention of such covenant being to comply with Section 8-106(c)(2) of the UCC, and (viii) no additional Equity Interest held by Pledgor in any of the undersigned other than those held by Pledgor and specified in Schedule A to the Pledge Agreement are valid or will be recognized by the undersigned.

(c) Organizational Agreements; Additional Issuances.  None of the undersigned shall (i) suffer or permit its Organizational Agreements to be amended or modified in any manner adverse to Administrative Agent, or (ii) issue any additional Equity Interests (other than to Pledgor), in each case, without the prior written consent of Administrative Agent.

(d) Notices; Defaults.  Each of the undersigned shall give Administrative Agent a copy of all notices, reports or communicates received or given pursuant to its Organizational Agreements promptly after the same shall have been received or contemporaneously with the giving thereof, as the case may be. The undersigned shall permit Administrative Agent the right to cure any default (beyond any applicable notice and cure periods) by Pledgor under the Organizational Agreements, and no notice of any default by Pledgor with respect to the Organizational Agreements shall be effective unless and until such notice has been received by Administrative Agent; provided, however, in no event shall Administrative Agent be obligated to cure such default. Administrative Agent shall have fifteen (15) days in excess of the amount of time to cure any such default as given to Pledgor under the Organizational Agreements, as measured from the date notice of such default has been received by Administrative Agent.

3. Events of Default; Sales of Collateral.  Each of the undersigned hereby agrees that during the continuance of an Event of Default, (a) all Distributions will be made directly to Administrative Agent, (b) Administrative Agent shall have the sole and exclusive right to exercise all voting, consensual and other powers of ownership pertaining to the Collateral in accordance with the Pledge Agreement, (c) Administrative Agent may take any reasonable action which Administrative Agent may deem necessary for the maintenance, preservation and protection of any of the Collateral or Administrative Agent's security interests therein, including, without limitation, the right to declare any or all Secured Obligations to be immediately due and payable without demand or notice and the right to transfer any of the Pledged Equity or other Collateral into Administrative Agent's name or the name of any designee or nominee of Administrative Agent, (d) Administrative Agent may dispose of the Collateral in accordance with Articles 8 and 9 of the UCC and the provisions of the Pledge Agreement, in which case, notwithstanding anything to the contrary in the Organizational Agreements, (i) Administrative Agent, or its designee or assign, at its election, shall automatically be admitted as a shareholder, member or partner, as the case may be, of the undersigned and shall be entitled to receive all benefits and exercise all rights in connection therewith pursuant to the Organizational Agreements of the undersigned, (ii) the undersigned shall recognize Administrative Agent (or its designee or assign), at its election, as the successor in interest to Pledgor, and (iii) notwithstanding any provisions to the contrary in the Organizational Agreements, Administrative Agent shall not be required to pay any fees or other consideration of any type, or execute any documents,

or be limited by any requirements or conditions whatsoever (regarding Distributions receivable by Administrative Agent from the undersigned, Administrative Agent's financial condition or otherwise), other than any such requirements, if any, that are expressly set forth in the Loan Documents.

4. <u>No Liability</u>.  Notwithstanding the security interests of Administrative Agent in the Collateral or any of its rights hereunder or under the Pledge Agreement, (a) Administrative Agent shall have no obligation or liability whatsoever for matters in connection with the Pledged Equity arising or occurring, directly or indirectly, prior to Administrative Agent's (or its designee's, successor's or assign's) becoming a shareholder, member or partner, as the case may be, of the undersigned, and (b) Administrative Agent shall not be obligated to perform any of the obligations or duties of Pledgor under any of the undersigned's Organizational Agreements, or to take any action to collect or enforce any claim for payment due Pledgor arising thereunder.

5. <u>Transfers</u>.  Each of the undersigned acknowledges that the security interest of Administrative Agent in the Collateral and all of Administrative Agent's rights and remedies under the Pledge Agreement may be freely transferred or assigned by Administrative Agent. In the event of any such transfer or assignment, all of the provisions of this Agreement and Acknowledgment shall inure to the benefit of the transferees, successors, and/or assigns of Administrative Agent. The provisions of this Agreement and Acknowledgment shall likewise be binding upon any and all permitted transferees, successors and assigns of the undersigned.

6. <u>Further Assurances</u>.  Each of the undersigned shall, from time to time, promptly execute and deliver such further instruments, documents and agreements, and perform such further acts as may be reasonably necessary or proper to carry out and effect the terms of the Pledge Agreement and this Agreement and Acknowledgment.

7. <u>Reliance</u>.  This Agreement and Acknowledgment is being given to induce Administrative Agent to accept the Pledge Agreement and with the understanding that Administrative Agent will rely hereon.

8. <u>Counterparts</u>.  This Agreement and Acknowledgment may be executed in counterparts.

9. <u>Miscellaneous</u>.  The provisions of Sections 8, 10, 11, 17-19, 21, 23-25 and 27 of the Pledge Agreement are hereby incorporated herein by this reference (with all references to Pledgor therein deemed to mean and refer to the undersigned).

[The remainder of this page is intentionally left blank.]

4870-8593-1522.4

IN WITNESS WHEREOF, each of the undersigned has duly executed this Agreement and Acknowledgment as of the day and year first above written.

**KARMA OF BROWARD, INC.,**
a Florida corporation

By:_____
Name:   Scott Zankl
Title:   Pres

**KARMA OF PALM BEACH, INC.,**
a Florida corporation

By:_____
Name:   Scott Zankl
Title:   Pres

**EXCELL AUTO SPORT AND SERVICE,**
**INC.,** a Florida corporation

By:_____
Name:   Scott Zankl
Title:   Pres

**EXCELL AUTO FINANCE, LLC,**
a Florida limited liability company

By:_____
Name:   Scott Zankl
Title:   Pres

*Signature Page to Agreement and Acknowledgment*

<u>Exhibit B</u>
Organizational Agreements

[See Attached]



# State of Florida

## Department of State

I certify the attached is a true and correct copy of the Articles of Incorporation, as amended to date, of KARMA OF BROWARD, INC., a corporation organized under the laws of the State of Florida, as shown by the records of this office.

The document number of this corporation is P20000026081.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Nineteenth day of November, 2021



*Laurel M. Lee*
*Secretary of State*

CR2E022 (01-11)

# Electronic Articles of Incorporation
## For

P20000026081
FILED
March 25, 2020
Sec. Of State
wlawrence

KARMA OF BROWARD, INC.

The undersigned incorporator, for the purpose of forming a Florida profit corporation, hereby adopts the following Articles of Incorporation:

## Article I

The name of the corporation is:

KARMA OF BROWARD, INC.

## Article II

The principal place of business address:

1699 S. FEDERAL HIGHWAY
SUITE 300
BOCA RATON, FL.   33432

The mailing address of the corporation is:

1699 S. FEDERAL HIGHWAY
SUITE 300
BOCA RATON, FL.   33432

## Article III

The purpose for which this corporation is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The number of shares the corporation is authorized to issue is:

100

## Article V

The name and Florida street address of the registered agent is:

THOMAS U GRANER
1699 S. FEDERAL HIGHWAY
SUITE 300
BOCA RATON, FL.   33432

I certify that I am familiar with and accept the responsibilities of registered agent.

Registered Agent Signature:   THOMAS U. GRANER

P20000026081
FILED
March 25, 2020
Sec. Of State
wlawrence

## Article VI

The name and address of the incorporator is:

THOMAS U. GRANER
1699 S. FEDERAL HIGHWAY
SUITE 300
BOCA RATON, FL 33432

Electronic Signature of Incorporator:    THOMAS U. GRANER

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are true. I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of this corporation and every year thereafter to maintain "active" status.

## Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

Title:   P
SCOTT  ZANKL
1699 S. FEDERAL HIGHWAY
BOCA RATON, FL.   33432  US

## Article VIII

The effective date for this corporation shall be:

03/20/2020

**Articles of Amendment
to
Articles of Incorporation
of**

KARMA OF BROWARD, INC.

**(Name of Corporation as currently filed with the Florida Dept. of State)**

P20000026081

(Document Number of Corporation (if known))

Pursuant to the provisions of section 607.1006, Florida Statutes, this *Florida Profit Corporation* adopts the following amendment(s) to its Articles of Incorporation:

**A. If amending name, enter the new name of the corporation:**

_____*The new*
*name must be distinguishable and contain the word "corporation," "company," or "incorporated" or the abbreviation "Corp.,"*
*"Inc.," or Co.," or the designation "Corp," "Inc," or "Co". A professional corporation name must contain the word*
*"chartered," "professional association," or the abbreviation "P.A."*

**B. Enter new principal office address, if applicable:**          _____
*(Principal office address MUST BE A STREET ADDRESS )*

_____

_____

**C. Enter new mailing address, if applicable:**
*(Mailing address MAY BE A POST OFFICE BOX)*          _____

_____

**D. If amending the registered agent and/or registered office address in Florida, enter the name of the new registered agent and/or the new registered office address:**

*Name of New Registered Agent*          _____

*(Florida street address)*

*New Registered Office Address:*  _____, Florida_____
                    *(City)*                    *(Zip Code)*

**New Registered Agent's Signature, if changing Registered Agent:**
*I hereby accept the appointment as registered agent. I am familiar with and accept the obligations of the position.*

_____
*Signature of New Registered Agent, if changing*

**Check if applicable**
☐ The amendment(s) is/are being filed pursuant to s. 607.0120 (11) (e), F.S.

**If amending the Officers and/or Directors, enter the title and name of each officer/director being removed and title, name, and address of each Officer and/or Director being added:**

*(Attach additional sheets, if necessary)*

*Please note the officer/director title by the first letter of the office title:*

*P = President; V= Vice President; T= Treasurer; S= Secretary; D= Director; TR= Trustee; C = Chairman or Clerk; CEO = Chief Executive Officer; CFO = Chief Financial Officer. If an officer/director holds more than one title, list the first letter of each office held. President, Treasurer, Director would be PTD.*

*Changes should be noted in the following manner.  Currently John Doe is listed as the PST and Mike Jones is listed as the V. There is a change, Mike Jones leaves the corporation, Sally Smith is named the V and S. These should be noted as John Doe, PT as a Change, Mike Jones, V as Remove, and Sally Smith, SV as an Add.*

**Example:**

| | | |
|---|---|---|
| X Change | PT | John Doe |
| X Remove | V | Mike Jones |
| X Add | SV | Sally Smith |

| Type of Action (Check One) | Title | Name | Address |
|---|---|---|---|
| 1) X Change / ___ Add / ___ Remove | P | KRISTEN N.. ZANKL | 1699 S FEDERAL HIGHWAY / BOCA RATON, FL 33432 |
| 2) ___ Change / X Add / ___ Remove | VP | SCOTT T. ZANKL | 1699 S FEDERAL HIGHWAY / BOCA RATON, FL 33432 |
| 3) ___ Change / ___ Add / ___ Remove | | | |
| 4) ___ Change / ___ Add / ___ Remove | | | |
| 5) ___ Change / ___ Add / ___ Remove | | | |
| 6) ___ Change / ___ Add / ___ Remove | | | |

E. **If amending or adding additional Articles, enter change(s) here:**
(Attach *additional sheets, if necessary).*    *(Be specific)*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____



F. **If an amendment provides for an exchange, reclassification, or cancellation of issued shares, provisions for implementing the amendment if not contained in the amendment itself:**
*(if not applicable, indicate N/A)*

_____

_____

_____

_____

_____

_____

_____

_____

**The date of each amendment(s) adoption:** _____, if other than the date this document was signed.

**Effective date if applicable:** _____
*(no more than 90 days after amendment file date)*

**Note:** If the date inserted in this block does not meet the applicable statutory filing requirements, this date will not be listed as the document's effective date on the Department of State's records.

**Adoption of Amendment(s)**             (**CHECK ONE**)

☒ The amendment(s) was/were adopted by the incorporators, or board of directors without shareholder action and shareholder action was not required.

☐ The amendment(s) was/were adopted by the shareholders. The number of votes cast for the amendment(s) by the shareholders was/were sufficient for approval.

☐ The amendment(s) was/were approved by the shareholders through voting groups. *The following statement must be separately provided for each voting group entitled to vote separately on the amendment(s):*

"The number of votes cast for the amendment(s) was/were sufficient for approval

by _____ "
*(voting group)*

Dated_____

Signature _____
(By a director, president or other officer – if directors or officers have not been selected, by an incorporator – if in the hands of a receiver, trustee, or other court appointed fiduciary by that fiduciary)

SCOTT T. ZANKL

_____
(Typed or printed name of person signing)

PRESIDENT

_____
(Title of person signing)



# State of Florida

## Department of State

I certify the attached is a true and correct copy of the Articles of Incorporation of KARMA OF PALM BEACH, INC., a corporation organized under the laws of the State of Florida, filed on June 16, 2020, as shown by the records of this office.

The document number of this corporation is P20000045476.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Nineteenth day of November, 2021



*Laurel M. Lee*

*Secretary of State*

CR2E022 (01-11)

# Electronic Articles of Incorporation
## For

P20000045476
FILED
June 16, 2020
Sec. Of State
kepage

KARMA OF PALM BEACH, INC.

The undersigned incorporator, for the purpose of forming a Florida profit corporation, hereby adopts the following Articles of Incorporation:

## Article I
The name of the corporation is:
KARMA OF PALM BEACH, INC.

## Article II
The principal place of business address:
1001 CLINT MOORE ROAD
SUITE 101
BOCA RATON, FL. US  33487

The mailing address of the corporation is:
1001 CLINT MOORE ROAD
SUITE 101
BOCA RATON, FL. US  33487

## Article III
The purpose for which this corporation is organized is:
ANY AND ALL LAWFUL BUSINESS.

## Article IV
The number of shares the corporation is authorized to issue is:
100

## Article V
The name and Florida street address of the registered agent is:
THOMAS U GRANER
1699 S FEDERAL HIGHWAY
SUITE 300
BOCA RATON, FL.   33432

I certify that I am familiar with and accept the responsibilities of registered agent.

Registered Agent Signature:   THOMAS U. GRANER

P20000045476
FILED
June 16, 2020
Sec. Of State
kepage

## Article VI

The name and address of the incorporator is:

THOMAS U. GRANER
1699 S FEDERAL HIGHWAY
SUITE 300
BOCA RATON, FL 33432

Electronic Signature of Incorporator:   THOMAS U. GRANER

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.  I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of this corporation and every year thereafter to maintain "active" status.

## Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

Title:   P
SCOTT  ZANKL
1001 CLINT MOORE ROAD, #101
BOCA RATON, FL.   33487  US

Title:   VP
KRISTEN  ZANKL
1001 CLINT MOORE ROAD, #101
BOCA RATON, FL.   33487  US

# Electronic Articles of Organization For Florida Limited Liability Company

L16000193119
FILED 8:00 AM
October 19, 2016
Sec. Of State
tscott

## Article I

The name of the Limited Liability Company is:

EXCELL AUTO FINANCE, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

5471 N. DIXIE HIGHWAY
SUITE 5
BOCA RATON, FL. US  33487

The mailing address of the Limited Liability Company is:

5471 N. DIXIE HIGHWAY
SUITE 5
BOCA RATON, FL. US  33487

## Article III

Other provisions, if any:

ANY AND ALL LAWFUL PURPOSES

## Article IV

The name and Florida street address of the registered agent is:

THOMAS U GRANER
720 E. PALMETTO PARK ROAD
BOCA RATON, FL.   33432

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   THOMAS U. GRANER

## Article V

The name and address of person(s) authorized to manage LLC:

Title:  MGR
SCOTT  ZANKL
5471 N. DIXIE HIGHWAY, SUITE 5
BOCA RATON, FL.  33487  US

Title:  MGR
THOMAS U GRANER
720 E. PALMETTO PARK ROAD
BOCA RATON, FL.  33432  US

**L16000193119
FILED 8:00 AM
October 19, 2016
Sec. Of State**
tscott

## Article VI

The effective date for this Limited Liability Company shall be:

10/19/2016

Signature of member or an authorized representative

Electronic Signature: THOMAS U. GRANER

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L16000180406
FILED 8:00 AM
September 27, 2016
Sec. Of State
kpcardwell

## Article I

The name of the Limited Liability Company is:

EXCELL AUTO SPORT AND SERVICE, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

5471 N. DIXIE HIGHWAY
SUITE 5
BOCA RATON, FL. US  33487

The mailing address of the Limited Liability Company is:

6560 W. ROGERS CIRCLE
SUITE 27
BOCA RATON, FL. US  33487

## Article III

Other provisions, if any:

ANY AND ALL LAWFUL PURPOSES

## Article IV

The name and Florida street address of the registered agent is:

SCOTT  GHERMAN
902 CLINT MOORE ROAD
SUITE 108
BOCA RATON, FL.   33487

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   SCOTT GHERMAN

## Article V

The name and address of person(s) authorized to manage LLC:

**L16000180406**
**FILED 8:00 AM**
**September 27, 2016**
**Sec. Of State**
**kpcardwell**

Title:  MGR
MOSHE  FARACHE
2660 NW 2ND AVE
BOCA RATON, FL.   33431  US

Title:  MGR
ROBERT  O'CONNELL JR
2660 NW 2ND AVE
BOCA RATON, FL.   33431  US

Title:  MGR
SCOTT  ZANKL
5471 N. DIXIE HIGHWAY, SUITE 5
BOCA RATON, FL.   33487  US

Signature of member or an authorized representative

Electronic Signature: THOMAS U. GRANER

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

Bylaws
of
KARMA OF BROWARD, Inc.


### ARTICLE I – DIRECTORS

Section 1 – Function.  All corporate powers shall be exercised by or under the authority of the Board of Directors.  The business and affairs of the Corporation shall be managed under the direction of the Board of Directors.  Directors must be natural persons who are at least 18 years of age but need not be shareholders of the Corporation.  Residents of any state may be directors.  If the Corporation is a professional corporation, in order for a director to also be a shareholder of the Corporation the director must be duly licensed or otherwise legally authorized to render the same professional service as the Corporation.

Section 2 – Compensation.  The shareholders shall have authority to fix the compensation of directors.  Unless specifically authorized by a resolution of the shareholders, the directors shall serve in such capacity without compensation.

Section 3 – Presumption of Assent.  A director who is present at a meeting of the Board of Directors or a committee of the Board of Directors at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless he objects at the beginning of the meeting (or promptly upon arriving) to the holding of the meeting or transacting the specified business at the meeting, or if the director votes against the action taken or abstains from voting because of an asserted conflict of interest.

Section 4 – Number.  The Corporation shall have a least the minimum number of directors required by law.  The number of directors may be increased or decreased from time to time by the Board of Directors.

Section 5 – Election and Term.  At each annual meeting of the shareholders, the shareholders shall elect directors to hold office until the next annual meeting or until their earlier resignation, removal from office or death.  Directors shall be elected by a plurality of the votes cast by the shares entitled to vote in the election at a meeting at which a quorum is present.

Section 6 – Vacancies.  Any vacancy occurring in the Board of Directors, including a vacancy created by an increase in the number of directors, may be filled by the shareholders or by the affirmative vote of a majority of the remaining directors though less than a quorum of the Board of Directors.  A director elected to fill a vacancy shall hold office only until the next election of directors by the shareholders.  If there are no remaining directors, the vacancy shall be filled by the shareholders.

Section 7 – Removal of Directors.  At a meeting of shareholders, any director or the entire Board of Directors may be removed, with or without cause, provided the notice of the meeting states that one of the purposes of the meeting is the removal of the director.  A director may be removed only if the number of votes cast to remove him/her exceeds the number of votes cast against removal.

Section 8 – Quorum and Voting.  A majority of the number of directors fixed by these Bylaws shall constitute a quorum for the transaction of business.  The act of a majority of directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

Section 9 – Executive and Other Committees.  The Board of Directors, by resolution adopted by a majority of the full Board of Directors, may designate from among its members one or more committees each of which must have at least two members.  Each committee shall have the authority set forth in the resolution designating the committee.

Section 10 – Place of Meeting.  Regular and special meeting of the Board of Directors shall be held at the principal place of the business of the Corporation or at another place designated by person or persons giving notice of otherwise calling the meeting.

Section 11 – Time, Notice and Call of Meetings.  Regular meetings of the Board of Directors shall be held without notice at the time and on the date designated by resolution of the Board of Directors.  Written notice of the time, date and place of special meetings of the Board of Directors shall be given to each director by mail delivery at least two days before the meeting.

Notice of a meeting of the Board of Directors need not be given to a director who signs a waiver of notice either before or after the meeting.  Attendance of a director at a meeting constitutes a waiver of notice of that meeting and waiver of all objections to the place of the meeting, the time of the meeting, and the manner in which it has been called or convened, unless a director objects to the transaction of business (promptly upon arrival at the meeting) because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors must be specified in the notice or waiver of notice of the meeting.

A majority of the directors present, whether or not a quorum exists, may adjourn any meeting of the Board of Directors to another time and place.  Notice of an adjourned meeting shall be given to the directors who were not present at the time of the adjournment and, unless the time and place of the adjournment and, unless the time and place of the adjourned meeting are announced at the time of the adjournment, to the other directors.  Meetings of the Board of Directors may be called by the President of the Chairman of the Board of Directors.  Members of the Board of Directors and any committee of the Board may participate in a meeting by telephone conference or similar communications equipment if all persons participating in the meeting can hear each other at the same time.  Participation by these means constitutes presence in person at a meeting.

Section 12 – Action by Written Consent.  Any action required or permitted to be taken at a meeting of directors may be taken without a meeting if consent in writing setting forth the action to be taken and signed by all of the directors is filed in the minutes of the proceedings of the Board.  The action taken shall be deemed effective when the last director signs the consent, unless the consent specifies otherwise.

## <u>ARTICLE II – MEETINGS OF SHAREHOLDERS</u>

<u>Section 1 – Annual Meeting</u>.  The annual meeting of the shareholders of the corporation for the election of officers and for such other business as may properly come before the meeting shall be held at such time and place as designated by the Board of Directors.

<u>Section 2 – Special Meeting</u>.  Special meetings of the shareholders shall be held when directed by the President or when requested in writing by shareholders holding at least ten percent (10%) of the Corporation's stock having the right and entitled to vote at such meeting.  A meeting requested by shareholders shall be called by the President for a date note less than ten (10) nor more than sixty (60) days after the request is made.  Only business within the purposes described in the meeting notice may be conducted at a special shareholders' meeting.

<u>Section 3 – Place</u>.  Meetings of the shareholders will be held at the principal place of business of the Corporation or at such other place as is designated by the Board of Directors.

<u>Section 4 – Notice</u>.  A written notice of each meeting of shareholders shall be mailed to each shareholder having the right and entitled to vote at the meeting at the address as it appears on the records of the Corporation.  The meeting notice shall be mailed not less than ten (10) nor more than sixty (60) days before the date set for the meeting.  The record date for determining shareholders entitled to vote at the meeting will be the close of business on the date before the notice is sent.  The notice shall state the time and place the meeting is to be held.  A notice of a special meeting shall also state the purposes of the meeting.  A notice of meeting shall be sufficient for that meeting and any adjournment of it.  If a shareholder transfers any shares after the notice is sent, it shall not be necessary to notify the transferee.  All shareholders may waive notice of a meeting at any time.

<u>Section 5 – Shareholder Quorum</u>.  A majority of the shares entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of shareholders.  Any number of shareholders, even if less than a quorum, may adjourn the meeting without further notice until a quorum is obtained.

<u>Section 6 – Shareholder Voting</u>.  If a quorum is present, the affirmative vote of a majority of the shares represented at the meeting and entitled to vote on the subject matter shall be the act of the shareholders.  Each outstanding share shall be entitled to one vote on each matter submitted to a vote at a meeting of shareholders.  An alphabetical list of all shareholders who are entitled to notice of a shareholders' meeting along with their addresses and the number of shares held by each shall be produced at a shareholders' meeting upon the request of any shareholder.

<u>Section 7 – Proxies</u>.  A shareholder entitled to vote at any meeting of shareholders or any adjournment thereof may vote in person or by proxy executed in writing and signed by the shareholder of his attorney-in-fact.  The appointment of proxy will be effective when received by the Corporation's officer or agent authorized to tabulate votes.  No proxy shall be valid more than eleven (11) months after the date of its execution unless a longer term is expressly stated in the proxy.

Section 8 – Validation.  If shareholders who hold a majority of voting stock entitled to vote at a meeting are present at the meeting, and sign a written consent to the meeting on the record, the acts of the meeting shall be valid, even if the meeting was not legally called and noticed.

Section 9 – Conduct of Business by Written Consent.   Any action of the shareholders may be taken without a meeting if written consents, setting forth the action taken, are signed by at least a majority of shares entitled to vote and are delivered to the officer of agent of the Corporation having custody of the Corporation's records within sixty (60) days after the date that the earliest written consent was delivered.  Within ten (10) days after obtaining an authorization of an action by written consent, notice shall be given to those shareholders who have not consented in writing or who are not entitled to vote on the action.  The notice shall fairly summarize the material features of the authorized action.  If the action creates dissenters' rights, the notice shall contain a clear statement of the right of dissenting shareholders to be paid the fair value of their shares upon compliance with and as provided for by the state law governing corporations.

## ARTICLE III – OFFICERS

Section 1 – Officers; Election; Resignation; Vacancies.  The Corporation shall have the officers and assistant officers that the Board of Directors appoint from time to time.  Except as otherwise provided in an employment agreement which the Corporation has with an officer, each officer shall serve until a successor is chosen by the directors at a regular or special meeting of the directors or until removed.  Officers and agents shall be chosen, serve for the terms, and have the duties determined by the directors.  A person may hold two or more offices.

Any officer may resign at any time upon written notice to the Corporation.  The resignation shall be effective upon receipt, unless the notice specifies a later date.  If the resignation is effective at a later date and the Corporation accepts the future effective date, the Board of Directors may fill the pending vacancy before the effective date provided the successor officer does not take office until the future effective date.  Any vacancy occurring in any office of the Corporation by death, resignation, removal or otherwise may be filled for the unexpired portion of the term by the Board of Directors at any regular or special meeting.

Section 2 – Powers and Duties of Officers.  The officers of the Corporation shall have such powers and duties in the management of the Corporation to sign for loans that have been approved by the Corporation, as well as any other powers and duties as may be prescribed by the Board of Directors and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board of Directors.

Section 3 – Removal of Officers.  An officer or agent or member of a committee elected or appointed by the Board of Directors may be removed by the Board with or without cause whenever in its judgment the best interests of the Corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Election or appointment of an officer, agent or member of a committee shall not of itself create contract rights. Any officer, if appointed by another officer, may be removed by that officer.

Section 4 – Salaries.  The Board of Directors may cause the Corporation to enter into employment agreements with any officer of the Corporation.  Unless provided for in an employment agreement between the Corporation and an officer, all officers of the Corporation serve in their capacities without compensation.

Section 5 – Bank Accounts.  The Corporation shall have accounts with financial institutions as determined by the Board of Directors.

## ARTICLE IV – DISTRIBUTIONS

The Board of Directors may, from time to time, declare distributions to its shareholders in cash, property, or its own shares, unless the distribution would cause (i) the Corporation to be unable to pay its debts as they become due in the usual course of business, or (ii) the Corporation's assets to be less than its liabilities plus the amount necessary, if the Corporation were dissolved at the time of the distribution, to satisfy the preferential rights of shareholders whose rights are superior to those receiving the distribution.  The shareholders and the Corporation may enter into an agreement requiring the distribution of corporate profits, subject to the provisions of law.

## ARTICLE V – CORPORATE RECORDS

Section 1 – Corporate Records.  The corporation shall maintain its records in written form or in another form capable of conversion into written form within a reasonable time.  The Corporation shall keep as permanent records minutes of all meetings of its shareholders and Board of Directors, a record of all actions taken by the shareholders or Board of Directors without a meeting, and a record of all actions taken by a committee of the Board of Directors on behalf of the Corporation.  The Corporation shall maintain accurate accounting records and a record of its shareholders in a form that permits preparation of a list of the names and addresses of all shareholders in alphabetical order by class of shares showing the number and series of shares held by each.

The Corporation shall keep a copy of its articles or restated articles of incorporation and all amendments to them currently in effect; these Bylaws or restated Bylaws and all amendments currently in effect; resolutions adopted by the Board of Directors creating one or more classes or series of shares and fixing their relative rights, preferences, and limitations, if shares issued pursuant to those resolutions are outstanding; the minutes of all shareholders' meetings and records of all actions taken by shareholders without a meeting for the past three years; written communications to all shareholders generally or all shareholders of a class of series within the past three years, including the financial statements furnished for the last three years; a list of names and business street addresses of its current directors and officers; and its most recent annual report delivered to the Department of State.

Section 2 – Shareholders' Inspection Rights.  A shareholder is entitled to inspect and copy, during regular business hours at a reasonable location specified by the Corporation, any books and records of the Corporation.  The shareholder must give the Corporation written notice of this demand at least five (5) business dates before the date on which he/she wishes to inspect and copy the record(s).  The demand must be made in good faith and for a proper purpose.  The shareholder must describe with reasonable particularity the purpose and the records he/she desires to inspect,

and the records must be directly connected with this purpose.  This Section does not affect the right of a shareholder to inspect and copy the shareholders' list described in this Article if the shareholder is in litigation with the Corporation.  In such a case, the shareholder shall have the same rights as any other litigant to compel the production of corporate records for examination.

The Corporation may deny any demand for inspection if the demand was made for an improper purpose, or if the demanding shareholder has within the two (2) years preceding his demand, sold or offered for sale any list of shareholders of the Corporation or of any other corporation, had aided or abetted any person in procuring any list of shareholders for that purpose, or has improperly used any information secured through any prior examination of the records of this Corporation or any other corporation.

Section 3 – Financial Statements for Shareholders.  Unless modified by resolution of the shareholders with 120 days after the close of each fiscal year, the Corporation shall furnish its shareholders with annual financial statements which may be consolidated or combined statements of the Corporation and one or more of its subsidiaries, as appropriate, that include a balance sheet as of the end of the fiscal year, an income statement for that year, and a statement of cash flows for that year.  If financial statements are prepared for the Corporation on the basis of generally accepted accounting principles, the annual financial statements must also be prepared on the basis.

If the annual financial statements are reported upon by a public accountant, his/her report must accompany them.  If not, the statements must be accompanied by a statement of the President or the person responsible for the Corporation's accounting records stating his reasonable belief whether the statements were prepared on the basis of generally accepted accounting principles and, if not, describing the basis of preparation and describing any respects in which the statements were not prepared on a basis of accounting consistent with the statements prepared for the preceding year.  The Corporation shall mail the annual financial statements to each shareholder within 120 days after the close of each fiscal year or within such additional time thereafter as is reasonably necessary to enable the Corporation to prepare its financial statements.  Thereafter, on written request from a shareholder who was not mailed the statements, the Corporation shall mail him/her the latest annual financial statement.

Section 4 – Other Reports to Shareholders.  If the Corporation indemnifies or advances expenses to any director, officer, employee or agent otherwise than by court order or action by the shareholders or by an insurance carrier pursuant to insurance maintained by the Corporation, the Corporation shall report the indemnification or advance in writing to the shareholders with or before the notice of the next annual shareholders' meeting, or prior to the meeting if the indemnification or advance occurs after the giving of the notice but prior to the time the annual meeting is held.  This report shall include a statement specifying the persons paid, the amounts paid, and the nature and status at the time of such payment of the litigation or threatened litigation.

If the Corporation issues or authorizes the issuance of shares for promises to render services in the future, the Corporation shall report in writing to the shareholders then number of shares authorized or issued, and the consideration received by the corporation, with or before the notice of the next shareholders' meeting.

## ARTICLE VI – STOCK CERTIFICATES

Section 1 – Issuance.  The Board of Directors may authorize the issuance of some or all of the shares of any or all of its classes or series without certificates.  Each certificate issues shall be signed by the President and the Secretary (or the Treasurer).  The rights and obligations of shareholders are identical whether or not their shares are represented by certificates.

Section 2 – Registered Shareholders.  No certificate shall be issued for any share until the share is fully paid.  The Corporation shall be entitled to treat the holder of record of shares as the holder in fact and, except as otherwise provided by law, shall not be bound to recognize any equitable or other claim to or interest in the shares.

Section 3 – Transfer of Shares.  Shares of the Corporation shall be transferred on its books only after the surrender to the Corporation of the share certificates duly endorsed by the holder of record or attorney-in-fact.  If the surrender certificates are canceled, new certificates shall be issued to the person entitled to them, and the transaction recorded on the books of the Corporation.

Section 4 – Lost, Stolen or Destroyed Certificates.  If a shareholder claims to have lost or destroyed a certificate of shares issued by the Corporation, a new certificate shall be issued upon the delivery to the Corporation of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed, and, at the discretion of the Board of Directors, upon the deposit of a bond other indemnity as the Board reasonably requires.

## ARTICLE VII – INDEMNIFICATION

Section 1 – Right to Indemnification.  The Corporation hereby indemnifies each person (including heirs, executors, administrators, or estate of such person) who is or was a director or officer of the Corporation to the fullest extent permitted or authorized by current or future legislation or judicial or administrative decision against all fines, liabilities, costs and expenses, including attorneys' fees, arising out of his or her status as a director, officer, agent, employee or representative.  The foregoing right of indemnification shall not be exclusive of other rights to which those seeking an indemnification may be entitled.  The Corporation may maintain insurance, at its expense, to protect itself and all officers and directors against fines, liabilities, costs and expenses, whether or not the Corporation would have the legal power to indemnify them directly against such liability.

Section 2 – Advances.  Costs, charges and expenses (including attorneys' fees) incurred by a person referred to in Section 1 of this Article in defending a civil or criminal proceeding shall be paid by the Corporation in advance of the final disposition thereof upon receipt of an undertaking to repay all amounts advanced if it is ultimately determined that the person is not entitled to be indemnified by the Corporation as authorized by this Article, and upon satisfaction of other conditions required by current or future legislation.

Section 3 – Savings Clause.  If this Article or any portion of it is invalidated on any ground by a court of competent jurisdiction, the Corporation nevertheless indemnifies each person described in Section 1 of this Article to the fullest extent permitted by all portions of this Article that have not been invalidated and to the fullest extent permitted by law.

## ARTICLE VIII – AMENDMENT

These Bylaws may be altered, amended or repealed, and new Bylaws adopted, by a majority vote of the directors or by a vote of the shareholders holding a majority of the shares.

I certify that these are the Bylaws adopted by the Board of Directors of the Corporation.

Date: 12-27-21

Scott Zankl, President

Date: 12-27-21

Kristen Zankl, Vice President

8

Bylaws
of
KARMA OF PALM BEACH, Inc.


## ARTICLE I – DIRECTORS

Section 1 – Function.  All corporate powers shall be exercised by or under the authority of the Board of Directors.  The business and affairs of the Corporation shall be managed under the direction of the Board of Directors.  Directors must be natural persons who are at least 18 years of age but need not be shareholders of the Corporation.  Residents of any state may be directors.  If the Corporation is a professional corporation, in order for a director to also be a shareholder of the Corporation the director must be duly licensed or otherwise legally authorized to render the same professional service as the Corporation.

Section 2 – Compensation.  The shareholders shall have authority to fix the compensation of directors.  Unless specifically authorized by a resolution of the shareholders, the directors shall serve in such capacity without compensation.

Section 3 – Presumption of Assent.  A director who is present at a meeting of the Board of Directors or a committee of the Board of Directors at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless he objects at the beginning of the meeting (or promptly upon arriving) to the holding of the meeting or transacting the specified business at the meeting, or if the director votes against the action taken or abstains from voting because of an asserted conflict of interest.

Section 4 – Number.  The Corporation shall have a least the minimum number of directors required by law.  The number of directors may be increased or decreased from time to time by the Board of Directors.

Section 5 – Election and Term.  At each annual meeting of the shareholders, the shareholders shall elect directors to hold office until the next annual meeting or until their earlier resignation, removal from office or death.  Directors shall be elected by a plurality of the votes cast by the shares entitled to vote in the election at a meeting at which a quorum is present.

Section 6 – Vacancies.  Any vacancy occurring in the Board of Directors, including a vacancy created by an increase in the number of directors, may be filled by the shareholders or by the affirmative vote of a majority of the remaining directors though less than a quorum of the Board of Directors.  A director elected to fill a vacancy shall hold office only until the next election of directors by the shareholders.  If there are no remaining directors, the vacancy shall be filled by the shareholders.

Section 7 – Removal of Directors.  At a meeting of shareholders, any director or the entire Board of Directors may be removed, with or without cause, provided the notice of the meeting states that one of the purposes of the meeting is the removal of the director.  A director may be removed only if the number of votes cast to remove him/her exceeds the number of votes cast against removal.

Section 8 – Quorum and Voting.  A majority of the number of directors fixed by these Bylaws shall constitute a quorum for the transaction of business.  The act of a majority of directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

Section 9 – Executive and Other Committees.  The Board of Directors, by resolution adopted by a majority of the full Board of Directors, may designate from among its members one or more committees each of which must have at least two members.  Each committee shall have the authority set forth in the resolution designating the committee.

Section 10 – Place of Meeting.  Regular and special meeting of the Board of Directors shall be held at the principal place of the business of the Corporation or at another place designated by person or persons giving notice of otherwise calling the meeting.

Section 11 – Time, Notice and Call of Meetings.  Regular meetings of the Board of Directors shall be held without notice at the time and on the date designated by resolution of the Board of Directors.  Written notice of the time, date and place of special meetings of the Board of Directors shall be given to each director by mail delivery at least two days before the meeting.

Notice of a meeting of the Board of Directors need not be given to a director who signs a waiver of notice either before or after the meeting.  Attendance of a director at a meeting constitutes a waiver of notice of that meeting and waiver of all objections to the place of the meeting, the time of the meeting, and the manner in which it has been called or convened, unless a director objects to the transaction of business (promptly upon arrival at the meeting) because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors must be specified in the notice or waiver of notice of the meeting.

A majority of the directors present, whether or not a quorum exists, may adjourn any meeting of the Board of Directors to another time and place.  Notice of an adjourned meeting shall be given to the directors who were not present at the time of the adjournment and, unless the time and place of the adjournment and, unless the time and place of the adjourned meeting are announced at the time of the adjournment, to the other directors.  Meetings of the Board of Directors may be called by the President of the Chairman of the Board of Directors.  Members of the Board of Directors and any committee of the Board may participate in a meeting by telephone conference or similar communications equipment if all persons participating in the meeting can hear each other at the same time.  Participation by these means constitutes presence in person at a meeting.

Section 12 – Action by Written Consent.  Any action required or permitted to be taken at a meeting of directors may be taken without a meeting if consent in writing setting forth the action to be taken and signed by all of the directors is filed in the minutes of the proceedings of the Board.  The action taken shall be deemed effective when the last director signs the consent, unless the consent specifies otherwise.

## <u>ARTICLE II – MEETINGS OF SHAREHOLDERS</u>

<u>Section 1 – Annual Meeting</u>.  The annual meeting of the shareholders of the corporation for the election of officers and for such other business as may properly come before the meeting shall be held at such time and place as designated by the Board of Directors.

<u>Section 2 – Special Meeting</u>.  Special meetings of the shareholders shall be held when directed by the President or when requested in writing by shareholders holding at least ten percent (10%) of the Corporation's stock having the right and entitled to vote at such meeting.  A meeting requested by shareholders shall be called by the President for a date note less than ten (10) nor more than sixty (60) days after the request is made.  Only business within the purposes described in the meeting notice may be conducted at a special shareholders' meeting.

<u>Section 3 – Place</u>.  Meetings of the shareholders will be held at the principal place of business of the Corporation or at such other place as is designated by the Board of Directors.

<u>Section 4 – Notice</u>.  A written notice of each meeting of shareholders shall be mailed to each shareholder having the right and entitled to vote at the meeting at the address as it appears on the records of the Corporation.  The meeting notice shall be mailed not less than ten (10) nor more than sixty (60) days before the date set for the meeting.  The record date for determining shareholders entitled to vote at the meeting will be the close of business on the date before the notice is sent.  The notice shall state the time and place the meeting is to be held.  A notice of a special meeting shall also state the purposes of the meeting.  A notice of meeting shall be sufficient for that meeting and any adjournment of it.  If a shareholder transfers any shares after the notice is sent, it shall not be necessary to notify the transferee.  All shareholders may waive notice of a meeting at any time.

<u>Section 5 – Shareholder Quorum</u>.  A majority of the shares entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of shareholders.  Any number of shareholders, even if less than a quorum, may adjourn the meeting without further notice until a quorum is obtained.

<u>Section 6 – Shareholder Voting</u>.  If a quorum is present, the affirmative vote of a majority of the shares represented at the meeting and entitled to vote on the subject matter shall be the act of the shareholders.  Each outstanding share shall be entitled to one vote on each matter submitted to a vote at a meeting of shareholders.  An alphabetical list of all shareholders who are entitled to notice of a shareholders' meeting along with their addresses and the number of shares held by each shall be produced at a shareholders' meeting upon the request of any shareholder.

<u>Section 7 – Proxies</u>.  A shareholder entitled to vote at any meeting of shareholders or any adjournment thereof may vote in person or by proxy executed in writing and signed by the shareholder of his attorney-in-fact.  The appointment of proxy will be effective when received by the Corporation's officer or agent authorized to tabulate votes.  No proxy shall be valid more than eleven (11) months after the date of its execution unless a longer term is expressly stated in the proxy.

Section 8 – Validation.  If shareholders who hold a majority of voting stock entitled to vote at a meeting are present at the meeting, and sign a written consent to the meeting on the record, the acts of the meeting shall be valid, even if the meeting was not legally called and noticed.

Section 9 – Conduct of Business by Written Consent.   Any action of the shareholders may be taken without a meeting if written consents, setting forth the action taken, are signed by at least a majority of shares entitled to vote and are delivered to the officer of agent of the Corporation having custody of the Corporation's records within sixty (60) days after the date that the earliest written consent was delivered.  Within ten (10) days after obtaining an authorization of an action by written consent, notice shall be given to those shareholders who have not consented in writing or who are not entitled to vote on the action.  The notice shall fairly summarize the material features of the authorized action.  If the action creates dissenters' rights, the notice shall contain a clear statement of the right of dissenting shareholders to be paid the fair value of their shares upon compliance with and as provided for by the state law governing corporations.

## ARTICLE III – OFFICERS

Section 1 – Officers; Election; Resignation; Vacancies.  The Corporation shall have the officers and assistant officers that the Board of Directors appoint from time to time.  Except as otherwise provided in an employment agreement which the Corporation has with an officer, each officer shall serve until a successor is chosen by the directors at a regular or special meeting of the directors or until removed.  Officers and agents shall be chosen, serve for the terms, and have the duties determined by the directors.  A person may hold two or more offices.

Any officer may resign at any time upon written notice to the Corporation.  The resignation shall be effective upon receipt, unless the notice specifies a later date.  If the resignation is effective at a later date and the Corporation accepts the future effective date, the Board of Directors may fill the pending vacancy before the effective date provided the successor officer does not take office until the future effective date.  Any vacancy occurring in any office of the Corporation by death, resignation, removal or otherwise may be filled for the unexpired portion of the term by the Board of Directors at any regular or special meeting.

Section 2 – Powers and Duties of Officers.  The officers of the Corporation shall have such powers and duties in the management of the Corporation to sign for loans that have been approved by the Corporation, as well as any other powers and duties as may be prescribed by the Board of Directors and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board of Directors.

Section 3 – Removal of Officers.  An officer or agent or member of a committee elected or appointed by the Board of Directors may be removed by the Board with or without cause whenever in its judgment the best interests of the Corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Election or appointment of an officer, agent or member of a committee shall not of itself create contract rights.  Any officer, if appointed by another officer, may be removed by that officer.

Section 4 – Salaries.  The Board of Directors may cause the Corporation to enter into employment agreements with any officer of the Corporation.  Unless provided for in an employment agreement between the Corporation and an officer, all officers of the Corporation serve in their capacities without compensation.

Section 5 – Bank Accounts.  The Corporation shall have accounts with financial institutions as determined by the Board of Directors.

## ARTICLE IV – DISTRIBUTIONS

The Board of Directors may, from time to time, declare distributions to its shareholders in cash, property, or its own shares, unless the distribution would cause (i) the Corporation to be unable to pay its debts as they become due in the usual course of business, or (ii) the Corporation's assets to be less than its liabilities plus the amount necessary, if the Corporation were dissolved at the time of the distribution, to satisfy the preferential rights of shareholders whose rights are superior to those receiving the distribution.  The shareholders and the Corporation may enter into an agreement requiring the distribution of corporate profits, subject to the provisions of law.

## ARTICLE V – CORPORATE RECORDS

Section 1 – Corporate Records.  The corporation shall maintain its records in written form or in another form capable of conversion into written form within a reasonable time.  The Corporation shall keep as permanent records minutes of all meetings of its shareholders and Board of Directors, a record of all actions taken by the shareholders or Board of Directors without a meeting, and a record of all actions taken by a committee of the Board of Directors on behalf of the Corporation.  The Corporation shall maintain accurate accounting records and a record of its shareholders in a form that permits preparation of a list of the names and addresses of all shareholders in alphabetical order by class of shares showing the number and series of shares held by each.

The Corporation shall keep a copy of its articles or restated articles of incorporation and all amendments to them currently in effect; these Bylaws or restated Bylaws and all amendments currently in effect; resolutions adopted by the Board of Directors creating one or more classes or series of shares and fixing their relative rights, preferences, and limitations, if shares issued pursuant to those resolutions are outstanding; the minutes of all shareholders' meetings and records of all actions taken by shareholders without a meeting for the past three years; written communications to all shareholders generally or all shareholders of a class of series within the past three years, including the financial statements furnished for the last three years; a list of names and business street addresses of its current directors and officers; and its most recent annual report delivered to the Department of State.

Section 2 – Shareholders' Inspection Rights.  A shareholder is entitled to inspect and copy, during regular business hours at a reasonable location specified by the Corporation, any books and records of the Corporation.  The shareholder must give the Corporation written notice of this demand at least five (5) business dates before the date on which he/she wishes to inspect and copy the record(s).  The demand must be made in good faith and for a proper purpose.  The shareholder must describe with reasonable particularity the purpose and the records he/she desires to inspect,

and the records must be directly connected with this purpose.  This Section does not affect the right of a shareholder to inspect and copy the shareholders' list described in this Article if the shareholder is in litigation with the Corporation.  In such a case, the shareholder shall have the same rights as any other litigant to compel the production of corporate records for examination.

The Corporation may deny any demand for inspection if the demand was made for an improper purpose, or if the demanding shareholder has within the two (2) years preceding his demand, sold or offered for sale any list of shareholders of the Corporation or of any other corporation, had aided or abetted any person in procuring any list of shareholders for that purpose, or has improperly used any information secured through any prior examination of the records of this Corporation or any other corporation.

Section 3 – Financial Statements for Shareholders.  Unless modified by resolution of the shareholders with 120 days after the close of each fiscal year, the Corporation shall furnish its shareholders with annual financial statements which may be consolidated or combined statements of the Corporation and one or more of its subsidiaries, as appropriate, that include a balance sheet as of the end of the fiscal year, an income statement for that year, and a statement of cash flows for that year.  If financial statements are prepared for the Corporation on the basis of generally accepted accounting principles, the annual financial statements must also be prepared on the basis.

If the annual financial statements are reported upon by a public accountant, his/her report must accompany them.  If not, the statements must be accompanied by a statement of the President or the person responsible for the Corporation's accounting records stating his reasonable belief whether the statements were prepared on the basis of generally accepted accounting principles and, if not, describing the basis of preparation and describing any respects in which the statements were not prepared on a basis of accounting consistent with the statements prepared for the preceding year.  The Corporation shall mail the annual financial statements to each shareholder within 120 days after the close of each fiscal year or within such additional time thereafter as is reasonably necessary to enable the Corporation to prepare its financial statements.  Thereafter, on written request from a shareholder who was not mailed the statements, the Corporation shall mail him/her the latest annual financial statement.

Section 4 – Other Reports to Shareholders.  If the Corporation indemnifies or advances expenses to any director, officer, employee or agent otherwise than by court order or action by the shareholders or by an insurance carrier pursuant to insurance maintained by the Corporation, the Corporation shall report the indemnification or advance in writing to the shareholders with or before the notice of the next annual shareholders' meeting, or prior to the meeting if the indemnification or advance occurs after the giving of the notice but prior to the time the annual meeting is held.  This report shall include a statement specifying the persons paid, the amounts paid, and the nature and status at the time of such payment of the litigation or threatened litigation.

If the Corporation issues or authorizes the issuance of shares for promises to render services in the future, the Corporation shall report in writing to the shareholders then number of shares authorized or issued, and the consideration received by the corporation, with or before the notice of the next shareholders' meeting.

## ARTICLE VI – STOCK CERTIFICATES

Section 1 – Issuance.  The Board of Directors may authorize the issuance of some or all of the shares of any or all of its classes or series without certificates.  Each certificate issues shall be signed by the President and the Secretary (or the Treasurer).  The rights and obligations of shareholders are identical whether or not their shares are represented by certificates.

Section 2 – Registered Shareholders.  No certificate shall be issued for any share until the share is fully paid.  The Corporation shall be entitled to treat the holder of record of shares as the holder in fact and, except as otherwise provided by law, shall not be bound to recognize any equitable or other claim to or interest in the shares.

Section 3 – Transfer of Shares.  Shares of the Corporation shall be transferred on its books only after the surrender to the Corporation of the share certificates duly endorsed by the holder of record or attorney-in-fact.  If the surrender certificates are canceled, new certificates shall be issued to the person entitled to them, and the transaction recorded on the books of the Corporation.

Section 4 – Lost, Stolen or Destroyed Certificates.  If a shareholder claims to have lost or destroyed a certificate of shares issued by the Corporation, a new certificate shall be issued upon the delivery to the Corporation of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed, and, at the discretion of the Board of Directors, upon the deposit of a bond other indemnity as the Board reasonably requires.

## ARTICLE VII – INDEMNIFICATION

Section 1 – Right to Indemnification.  The Corporation hereby indemnifies each person (including heirs, executors, administrators, or estate of such person) who is or was a director or officer of the Corporation to the fullest extent permitted or authorized by current or future legislation or judicial or administrative decision against all fines, liabilities, costs and expenses, including attorneys' fees, arising out of his or her status as a director, officer, agent, employee or representative.  The foregoing right of indemnification shall not be exclusive of other rights to which those seeking an indemnification may be entitled.  The Corporation may maintain insurance, at its expense, to protect itself and all officers and directors against fines, liabilities, costs and expenses, whether or not the Corporation would have the legal power to indemnify them directly against such liability.

Section 2 – Advances.  Costs, charges and expenses (including attorneys' fees) incurred by a person referred to in Section 1 of this Article in defending a civil or criminal proceeding shall be paid by the Corporation in advance of the final disposition thereof upon receipt of an undertaking to repay all amounts advanced if it is ultimately determined that the person is not entitled to be indemnified by the Corporation as authorized by this Article, and upon satisfaction of other conditions required by current or future legislation.

Section 3 – Savings Clause.  If this Article or any portion of it is invalidated on any ground by a court of competent jurisdiction, the Corporation nevertheless indemnifies each person described in Section 1 of this Article to the fullest extent permitted by all portions of this Article that have not been invalidated and to the fullest extent permitted by law.

## ARTICLE VIII – AMENDMENT

These Bylaws may be altered, amended or repealed, and new Bylaws adopted, by a majority vote of the directors or by a vote of the shareholders holding a majority of the shares.

I certify that these are the Bylaws adopted by the Board of Directors of the Corporation.

Date: 12-27-21

Scott Zankl, President

Date: 12-27-21

Kristen Zankl, Vice President

8

**BYLAWS OF Excell Auto Sport and Service, Inc**
(the "Corporation")

**SHAREHOLDERS (the "Shareholders")**

## Annual Meeting

1. A meeting of the Shareholders will be held annually for the purpose of electing directors (the "Directors") of the Corporation and for the purpose of doing other business as may come before the meeting. If the day fixed for the annual meeting is a legal holiday in the State of Florida, the annual meeting will be held on the next succeeding business day or on a date determined by the board of directors for the Corporation (the "Board") that is no later than two weeks after the date specified in the meeting notice.

2. The Corporation must hold its annual meeting within any 13 months period. If the annual meeting is not held within that time period then any shareholder may apply to the circuit court of the county where the Corporation's principal office is located to fix the time and place of the meeting.

## Special Meetings

3. Unless otherwise prescribed by statute, special meetings of the Shareholders may only be called for any purpose or purposes in the following ways:

    a. By a majority of the Board; or

    b. By the president of the Corporation (the "President"); or

    c. By the holders of shares entitled to cast in total not less than 10 percent of the votes on any issue proposed for the meeting where written request(s) describing the purpose or purposes for the special meeting are signed, dated and delivered to a member of the Board or other Officer of the Corporation.

4. The Board will determine the time, place and date of any special meeting provided that, in the case of a special meeting called by the requisite percentage of Shareholders in accordance with these Bylaws, the Board will issue notice of the special meeting within 60 days of receipt of the written demand(s) by the relevant Officer of the Corporation.

**Place of Meeting**

5. The annual meetings or special meetings of the Shareholders may be held at any place in or out of the State of Florida at a place to be determined at the discretion of the Board. If no designation of the location is made for any annual or special meeting of the Shareholders, the place of the meeting will be the Principal Office of the Corporation.

**Notice of Meetings**

6. The written notice of any meeting will be given not less than 10 days, but not more than 60 days before the date of the meeting to each Shareholder entitled to vote at that meeting. The written notice of the meeting will state the place, date and hour of the meeting, the means of remote communications, if any, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.

7. If mailed, notice is given when the notice is deposited in the United States mail, postage prepaid, and directed to the Shareholder at the address of the Shareholder as it appears on the records of the Corporation. An affidavit of the secretary (the "Secretary") of the Corporation that the notice has been given will, in the absence of fraud, be prima facie evidence of the facts stated in the notice.

8. A written waiver, signed by the person entitled to a notice of meeting, or a waiver by electronic transmission by the person entitled to that notice, whether before or after the time stated in the notice, will be deemed equivalent to the person receiving the notice. Further, attendance of a person at a meeting will constitute a waiver of notice of that meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

**Consent of Shareholders in Lieu of Meeting**

9. Any action to be taken at any annual or special meeting of Shareholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action to be taken, is signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take the action at a meeting at which all shares entitled to vote on the matter were present and voted is delivered to the Corporation. Every written consent will bear the date of signature of each Shareholder who signs the consent. However, no written consent will be effective unless the consent is delivered, either by hand or by certified or registered mail, within 90 days of the earliest dated consent, to the Principal

Office of the Corporation in this state, the Principal Place of Business of the Corporation, the corporate secretary, or another agent of the Corporation having custody of the book in which proceedings of meetings of Shareholders are recorded.

### Remote Communication Meetings

10. Remote communication means any electronic communication including conference telephone, video conference, the Internet, or any other method currently available or developed in the future by which Shareholders not present in the same physical location may simultaneously communicate with each other.

11. Where permitted under the statutes and regulations of the State of Florida, and in the sole and reasonable discretion of the Board of Directors, a meeting of Shareholders of the Corporation may be held at a specific location or may be held by any means of remote communication. Where a meeting will employ remote communication, one or more Shareholders may participate by means of remote communication or the meeting may be held solely by means of remote communication at the sole discretion of the Board of Directors. Where any remote communication is used in a Shareholder meeting, all persons authorized to vote or take other action at the meeting must be able to hear each other during the meeting and each person will have a reasonable opportunity to participate. This remote participation in a meeting will constitute presence in person at the meeting. All votes or other actions taken at the meeting by means of electronic transmission must be maintained as a matter of record by the Corporation.

### List of Shareholders Entitled to Vote

12. The Officer who has charge of the Shareholders' List of the Corporation will prepare and make, not more than 70 days before every meeting of the Shareholders, a complete list of the Shareholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each Shareholder and the number of shares of stock registered in the name of each Shareholder. The list must be available for inspection by any Shareholder beginning ten days prior to the meeting and continuing through the meeting. The list must be provided for any purpose related to the meeting:

   a. On a reasonably accessible electronic network, so long as the information required to access the list is provided with the notice of the meeting; or

    b. During ordinary business hours, at the Principal Office of the Corporation, the office of the Corporation's transfer agent if specified in the meeting notice or at another place identified in the meeting notice in the city where the meeting will be held.

13. If the Corporation decides to make the list available on an electronic network, the Corporation will ensure that this information is available only to Shareholders of the Corporation. If the meeting is to be held at a physical location, then the list will be produced and kept at the time and place of the meeting during the whole time of the meeting and may be inspected by any Shareholder who is present.

14. If the meeting is to be held solely by means of remote communication, then the list will also be open to the examination of any Shareholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access the list will be provided with the notice of the meeting.

15. If any Director willfully neglects or refuses to produce the list of Shareholders at any meeting for the election of Directors, or to open such a list to examination on a reasonably accessible electronic network during any meeting for the election of Directors held solely by means of remote communication, those Directors will be ineligible for election to any office at that meeting.

16. The Shareholders' List will be the only evidence as to who are the Shareholders entitled by this section to examine the list required by this section or to vote in person or by proxy at any meeting of Shareholders.

**<u>Quorum and Required Vote</u>**

17. A minimum of 51 percent of the shares entitled to vote, present in person or represented by proxy, will constitute a quorum entitled to take action at a meeting of Shareholders.

18. In all matters other than the election of Directors, any act of the Shareholders must be passed by an affirmative vote of the majority of the shares present in person or represented by proxy at the meeting and entitled to vote on the matter.

19. Directors will be elected by a majority of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of Directors.

20. Where a separate vote by a class or series or classes or series of shares ("Eligible Shares") is required, 51 percent of the outstanding Eligible Shares present in person or represented by proxy, will constitute a quorum entitled to take action with respect to that vote on that matter. Any act to be taken must be passed by an affirmative vote of the majority of the outstanding Eligible Shares present in person or represented by proxy.

**Shareholders Voting Rights and Proxies**

21. Subject to the Articles of Incorporation, each Shareholder will be entitled to one vote for each share of stock held by that Shareholder.

22. Each Shareholder entitled to vote at a meeting of Shareholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for that Shareholder by proxy, but no proxy will be valid after 11 months from the date of its execution unless the proxy provides for a longer period.

23. Execution of a proxy may be accomplished by the Shareholder or by the authorized Officer, Director, employee or agent of the Shareholder, signing the writing or causing that person's signature to be affixed to the writing by any reasonable means including, but not limited to, by facsimile signature.

24. A duly executed proxy will be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the shares or an interest in the Corporation generally.

**Voting Rights of Fiduciaries, Pledgers and Joint Owners of Shares**

25. Persons holding shares in a fiduciary capacity will be entitled to vote the shares so held. Persons whose shares are pledged will be entitled to vote, unless, in the transfer by the pledger on the books of the Corporation, that person has expressly empowered the pledgee to vote the shares, in which case only the pledgee, or that pledgee's proxy, may represent and vote the shares.

**Voting Trusts and Other Voting Agreements**

26. Two or more Shareholders may, by agreement in writing, create a voting trust by depositing their shares with a voting trustee, who will have the authority to vote the shares in accordance with the

terms and conditions of the voting trust agreement. To be valid, the voting trustee must deliver copies of the list of Shareholders and the voting trust agreement to the Principal Office of the Corporation. Upon receiving the voting trust agreement, the Corporation will issue new share certificates in the name of the trustee and cancel the old share certificates. The new share certificates issued will state that they are issued pursuant to a voting trust agreement.

27. Any amendment to a voting trust agreement will be made by a written agreement, a copy of which will be filed with the Principal Office of the Corporation.

28. The right of inspection of any voting trust agreement or related amendment by a Shareholder of record or a holder of a voting trust certificate, in person or by agent, will be the same right of inspection that applies to the securities register of the Corporation.

29. An agreement between two or more Shareholders, if in writing and signed by the parties to the agreement, may provide that in exercising any voting rights, the shares held by them will be voted as provided by the agreement, or as the parties may agree, or as determined in accordance with a procedure agreed upon by them.

30. The above provisions concerning voting trusts and voting agreements will not be deemed to invalidate any voting or other agreement among Shareholders or any irrevocable proxy which is not otherwise illegal.

### **Cumulative Voting**

31. Shareholders may use cumulative voting elections when electing Directors.

## **BOARD OF DIRECTORS**

### **General Powers**

32. The business and affairs of the Corporation will be managed by or under the direction of the Board.

### **Number, Tenure and Quorum**

33. The Board will consist of three members, each of whom will be a natural person. Directors need not be Shareholders. Each Director will hold office until that Director's successor is elected and

qualified or until that Director's earlier resignation or removal. Any Director may resign at any time upon notice given in writing or by electronic transmission to the Corporation. In order to transact business at a meeting of the Directors, a quorum of 51 percent of the total number of Directors eligible to vote will be required. The vote of the majority of the Directors present at a meeting at which a quorum is present will be the act of the Board.

## Regular Meetings

34. By resolution, the Board may provide the time and place, either within or without the State of Florida, for the holding of regular meetings without any notice other than that resolution.

## Special Meetings

35. Special meetings of the Board may be called by or at the request of the President or by a majority of the Directors. The person or persons calling that special meeting of the Board may fix any date, time or place, either within or without the State of Florida, to be the date, time and place for holding that special meeting.

## Notice

36. Written notice of the date, time, and place of a special meeting of the Board will be given at least 10 days prior to the date set for that meeting. The written notice can be given personally, by mail, by private carrier, by telegraph, by telephone facsimile, or by any other manner as permitted by the Florida Business Corporation Act. The notice will be given by the Secretary or one of the persons authorized to call Directors' meetings.

37. If written notice is mailed, correctly addressed to a Director's address as provided in the Corporation's current records, the notice will be deemed to have been given to that Director at the time of mailing. If written notice is sent by private carrier or if the written notice is sent by United States mail, postage prepaid and by registered or certified mail, return receipt requested, the notice will be deemed to have been given to a Director on the date shown on the return receipt. Otherwise notice is effective when received by a Director.

38. Notice of any Directors' meeting may be waived by a Director before or after the date and time of the meeting. The waiver must be in writing, must be signed by a Director, and must be delivered to the Corporation for inclusion in the minutes or filing with the corporate records. The attendance of a Director at a meeting of the Board will constitute a waiver of notice of that meeting except where

a Director attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully convened.

**Action by Directors Without a Meeting**

39. Any action to be taken at any meeting of the Board or of any committee of the Board may be taken without a meeting if all members of the Board or committee, as the case may be, consent to it in writing, or by electronic transmission and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board, or committee. This filing will be in paper form if the minutes are maintained in paper form and will be in electronic form if the minutes are maintained in electronic form.

**Remote Communication Meetings**

40. Remote communication means any electronic communication including conference telephone, video conference, the Internet, or any other method currently available or developed in the future by which Directors not present in the same physical location may simultaneously communicate with each other.

41. A meeting of the Board may be held by any means of remote communication by which all persons authorized to vote or take other action at the meeting can hear each other during the meeting and each person has a reasonable opportunity to participate. This remote participation in a meeting will constitute presence in person at the meeting.

**Vacancies and Newly Created Directorships**

42. When vacancies or newly created directorships resulting from any increase in the authorized number of Directors occur, a majority of the Directors then in office, although less than a quorum, or a sole remaining Director will have the power to appoint new Directors to fill this vacancy or vacancies. Each new Director so chosen will hold office until the next annual meeting of the Shareholders.

43. If at any time, by reason of death or resignation or other cause, the Corporation should have no Directors in office, then any Officer or any Shareholder or an executor, administrator, trustee or guardian of a Shareholder, or other fiduciary entrusted with like responsibility for the person or estate of a Shareholder, may call a special meeting of Shareholders for an election to fill the vacancy.

44. When one or more Directors resign from the Board and the resignation is to become effective at a future date, a majority of the Directors then in office, including those who have so resigned, will have the power to appoint new Directors to fill this vacancy or vacancies. The appointments of these new Directors will take effect when the resignation or resignations are to become effective, and each new Director so chosen will hold office until the next annual meeting of the Shareholders.

### Removal

45. Any Director or the entire Board may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of Directors at a special meeting of the Shareholders called for that purpose. No director may be removed when the votes cast against removal would be sufficient to elect the director if voted cumulatively at an election where the same total number of votes were cast.

### Organization

46. Meetings of the Board will be presided over by the President, or in the President's absence by a Director chosen at the meeting. The Secretary will act as secretary of the meeting, but in the absence of the Secretary, the person presiding at the meeting may appoint any person to act as secretary of the meeting.

### Chairman of the Board

47. The Chairman of the Board, if present, will preside at all meetings of the Board, and exercise and perform any other authorities and duties as may be from time to time delegated by the Board.

### Compensation

48. The Board will, by resolution, fix the fees and other compensation for the Directors for their services as Directors, including their services as members of committees of the Board. All changes to Director compensation are subject to ratification by the Shareholders.

### Presumption of Assent

49. A Director of the Corporation who is present at a meeting of the Board will be presumed to have assented to an action taken on any corporate matter at the meeting unless:

a. The Director objects at the beginning of the meeting, or promptly upon the Director's arrival, to holding the meeting or transacting business at the meeting;

b. The Director's dissent or abstention from the action taken is entered in the minutes of the meeting; or

c. The Director delivers written notice of the Director's dissent or abstention to the presiding officer of the meeting before the adjournment of the meeting or to the Corporation within a reasonable time after adjournment of the meeting.

50. Any right to dissent or abstain from the action will not apply to a Director who voted in favor of that action.


## COMMITTEES

### Appointment

51. The Board may designate one or more committees, each committee to consist of one or more of the Directors of the Corporation. The Board may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.

52. In the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not that member or members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any absent or disqualified member.

53. The committee or committees, to the extent provided in the resolution of the Board will have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it. No such committee will have the power or authority in reference to the following matters:

a. Approving or adopting, or recommending to the Shareholders, any action or matter (other than the election or removal of Directors) expressly required by the Florida Business Corporation Act to be submitted to Shareholders for approval; or

b. Adopting, amending or repealing any Bylaw of the Corporation.

### Tenure

54. Each member of a committee will serve at the pleasure of the Board.

### Meetings and Notice

55. The method by which Directors' meetings may be called and the notice requirements for these meetings as set out in these Bylaws will apply to any committee designated by the Board as appropriate.

### Quorum

56. The requirements for a quorum for the Board as set out in these Bylaws will apply to any committee designated by the Board as appropriate.

### Action Without a Meeting

57. The requirements and procedures for actions without a meeting for the Board as set out in these Bylaws will apply to any committee designated by the Board as appropriate.

### Resignation and Removal

58. Any member of a committee may be removed at any time, with or without cause, by a resolution adopted by a majority of the full Board. Any member of a committee may resign from the committee at any time by giving written notice to the Chairman of the Board of the Corporation, and unless otherwise specified in the notice, the acceptance of this resignation will not be necessary to make it effective.

### Vacancies

59. Any vacancy in a committee may be filled by a resolution adopted by a majority of the full Board.

### Committee Rules of Procedure

60. A committee will elect a presiding officer from its members and may fix its own rules of procedure provided they are not inconsistent with these Bylaws. A committee will keep regular minutes of its proceedings, and report those minutes to the Board at the first subsequent meeting of the Board.

## OFFICERS

### Appointment of Officers

61. The Officers of the Corporation (individually the "Officer" and collectively the "Officers") will consist of the President, a treasurer (the "Treasurer") and the Secretary.

62. The Officers will be appointed by the Board at the first meeting of the Directors or as soon after the first meeting of the Directors as possible, if Officers have not already been appointed. Any appointee may hold one or more offices.

### Term of Office

63. Each Officer will hold office until a successor is duly appointed and qualified or until the Officer's death or until the Officer resigns or is removed as provided in these Bylaws.

### Removal

64. Any Officer or agent appointed by the Board or by the Incorporators may be removed by the Board at any time with or without cause, provided, however, any contractual rights of that person, if any, will not be prejudiced by the removal.

### Vacancies

65. The Board may fill a vacancy in any office because of death, resignation, removal, disqualification, or otherwise.

### President

66. Subject to the control and supervisory powers of the Board and its delegate, the powers and duties of the President will be:

a. To have the general management and supervision, direction and control of the business and affairs of the Corporation;

b. To preside at all meetings of the Shareholders when the Chairman of the Board is absent;

c. To call meetings of the Shareholders to be held at such times and at such places as the President will deem proper within the limitations prescribed by law or by these Bylaws;

d. To ensure that all orders and resolutions of the Board are effectively carried out;

e. To maintain records of and certify, whenever necessary, all proceedings of the Board and the Shareholders;

f. To put the signature of the Corporation to all deeds, conveyances, mortgages, guarantees, leases, obligations, bonds, certificates and other papers and instruments in writing which have been authorized by the Board or which, in the opinion of the President, should be executed on behalf of the Corporation; to sign certificates for the Corporation's shares; and, subject to the instructions of the Board, to have general charge of the property of the Corporation and to supervise and manage all Officers, agents and employees of the Corporation; and

g. To perform all other duties and carry out other responsibilities as determined by the Board.

**Treasurer**

67. Subject to the control and supervisory powers of the Board and its delegate, the powers and duties of the Treasurer will be:

a. To keep accurate financial records for the Corporation;

b. To deposit all money, drafts and checks in the name of and to the credit of the Corporation in the banks and depositories designated by the Board;

c. To endorse for deposit all notes, checks and drafts received by the Corporation as instructed by the Board, making proper vouchers for them;

d. To disburse corporate funds and issue checks and drafts in the name of the Corporation, as instructed by the Board;

e. To submit to the President and the Board, as requested, an account of all transactions by the Treasurer and the financial condition of the Corporation;

f. To prepare and submit to the Board annual reports detailing the financial status of the Corporation; and

g. To perform all other duties and carry out other responsibilities as prescribed by the Board or the President.

**Secretary**

68. The Secretary will perform the following duties:

a. Prepare the minutes of the meetings of the Shareholders and meetings of the Board and keep those minutes in one or more books provided for that purpose;

b. Authenticate the records of the Corporation as will from time to time be required;

c. Ensure that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

d. Act as custodian of the corporate records and of the corporate seal, if any, and ensure that the seal of the Corporation, if any, is affixed to all documents the execution of which on behalf of the Corporation under its seal is duly authorized;

e. Keep a register of the post office address of each Shareholder;

f. Sign, along with the President, certificates for shares of the Corporation, the issuance of which will have been authorized by resolution of the Board;

g. Have general charge of the Shareholders' List of the Corporation; and

h. Perform all duties incidental to the office of Secretary and any other duties as from time to time may be delegated to the Secretary by the President or the Board.

## Delegation of Authority

69. The Board reserves the authority to delegate the powers of any Officer to any other Officer or agent, notwithstanding any provision in these Bylaws.

# LOANS, CHECKS, DEPOSITS, CONTRACTS

## Loans

70. Without authorization by a resolution of the Board, the Corporation is prohibited from making or accepting loans in its name, or issuing evidences of indebtedness in its name. The authorization of the Board for the Corporation to perform these acts can be general or specific.

## Checks, Drafts, Notes

71. All checks, drafts, or other orders for the payment of money, notes, or other evidences of indebtedness issued in the name of the Corporation must be signed by a designated Officer or Officers, agent or agents of the Corporation and in a manner as will from time to time be determined by resolution of the Board.

## Deposits

72. All funds of the Corporation not otherwise used will be deposited to the credit of the Corporation in banks, trust companies, or other depositories designated by the Board.

## Voting Securities Held by the Corporation

73. The President, or another Officer or agent designated by the Board will, with full power and authority attend, act, and vote, on behalf of the Corporation, at any meeting of security holders or interest holders of other corporations or entities in which the Corporation may hold securities or interests. At that meeting, the President or other delegated agent will have and execute any and all rights and powers incidental to the ownership of the securities or interests that the Corporation holds.

**Contracts**

74. The Board may give authority to any Officer or agent, to make any contract or execute and deliver any instrument in the name of the Corporation and on its behalf, and that authority may be general or specific.

**Conflict of Interest by Directors**

75. A Director or Officer of the Corporation will be disqualified from voting as a Director or Officer on a specific matter where that Director or Officer deals or contracts with the Corporation either as a vendor or purchaser.

76. A Director or Officer of the Corporation will not be disqualified as a Director or Officer for the sole reason that the Director or Officer deals or contracts with the Corporation either as a vendor, purchaser, or otherwise.

**Loans to Employees and Officers**

77. The Corporation may lend money to, or guaranty any obligation of, or otherwise assist, any Officer or employee of the Corporation or of its subsidiary, including any Officer or employee who is a Director of the Corporation or any subsidiary of the Corporation, whenever, in the opinion of the Directors, the loan, guaranty or assistance may reasonably be expected to benefit the Corporation. The loan, guaranty or other assistance may be with or without interest, and may be unsecured, or secured in such manner as the Board will approve, including, without limitation, a pledge of shares of the Corporation. Nothing contained in this section is to be construed so as to deny, limit or restrict the powers of guaranty or warranty of the Corporation at common law or under any applicable statute.

## APPENDIX

### Glossary

- **Bylaws** - the purpose of these bylaws (the "Bylaws") is to provide rules governing the internal management of the Corporation.

- **Chairman of the Board** - Once a Board of Directors has been appointed or elected by the Shareholders, the Board will then elect a chairman (the "Chairman of the Board"). The Chairman of the Board will act to moderate all meetings of the Board of Directors and any other duties and obligations as described in these Bylaws.

- **Corporate Officer** - A corporate officer (individually the "Officer" and collectively the "Officers") is any individual acting for or on behalf of the Corporation. An Officer of the Corporation will usually be appointed to a specific task such as secretary, president, treasurer or other similar position. One person may hold several offices. The Officers will manage the day-to-day operations of the Corporation and report to the Board of Directors.

- **Principal Executive Office** - The Principal Executive Office for the Corporation is where the President of the Corporation has an office.

- **Principal Office** - The Principal Office of the Corporation is the address designated in the annual report where the executive offices of the Corporation are located.

- **Principal Place of Business** - The Principal Place of Business is the address at which the Corporation conducts its primary business.

- **Registered Office** - The Registered Office is the physical street address within the state where the registered agent can be contacted during normal business hours for service of process.

- **Shareholders' List** - A Shareholders' List is the complete record of the owners of shares of stock in the Corporation.

## Signature Page

By: _____

Name: Scott Zamel

Title: Director   V.P.

By: _____

Name: ROB O'Connell

Title: Director   Secretary

By: _____

Name: Jay Heckler

Title: Director   pres.

By: _____

Name:

Title: Director

## OPERATING AGREEMENT

## OF

## EXCELL AUTO FINANCE, LLC

**THIS OPERATING AGREEMENT** (hereinafter referred to as the "Agreement") is made and entered into as of the _19th_ day of _October_____, 2016, and effective as of said date ("Effective Date"), by and among SCOTT ZANKL and THOMAS GRANER (referred to from time-to-time herein collectively as the "Members" and each individually as a "Member").

### W I T N E S S E T H :

**WHEREAS**, it is the intention of the parties to form a Limited Liability Company, pursuant to the laws of the State of Florida and, in particular, the Florida Revised Limited Liability Company Act, Chapter 605 of the Florida Statutes (the "Act");

**WHEREAS**, the parties desire to enter into this Agreement to establish their respective rights and obligations in connection with the limited liability company, which will be operated and maintained pursuant to the laws of the State of Florida and for the purposes hereinafter set forth;

**NOW, THEREFORE**, in consideration of the mutual covenants set forth herein and other valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties agree as follows:

### 1.  Formation and Definitions

The parties hereby confirm that there has been formed a limited liability company (the "Limited Liability Company") pursuant to the provisions of Chapter 605 of the Act. To the extent permitted by the Act, the terms and provisions of this Agreement shall control if there is a conflict between such law and this Agreement.

### 2.  Name; Members and Interest Holders

The name of the Limited Liability Company is EXCELL AUTO FINANCE, LLC, and all business of the Limited Liability Company shall be conducted under said name, or such other name as the Members from time to time may determine. For purposes of this Agreement, any person who owns an interest in the Limited Liability Company but is not admitted as a Member or that has become a Withdrawing Member (as defined in Article 17 below) shall be referred to as an "Interest Holder." An Interest Holder shall have no right to participate in any matter that requires the vote or consent of the Members and shall not have any other rights of a Member, except as specifically provided in this Agreement.

1

### 3. Purposes

The Limited Liability Company is formed for the purpose of engaging in an automobile financing business, and engaging in any and all activities necessary or incidental to the foregoing, and for all other purposes authorized under the Act and the laws of the State of Florida.

### 4. Place of Business

The principal place of business of the Limited Liability Company shall be 1001 Clint Moore Road, Suite 101, Boca Raton, Florida 33487, or such other or additional places of business within or outside of the State of Florida as the Members from time to time may designate. The mailing address of the Limited Liability Company shall be 1001 Clint Moore Road, Suite 101, Boca Raton, Florida 33487, or such other or additional mailing addresses within or outside of the State of Florida as the Members from time to time may designate.

The Limited Liability Company has designated Thomas Graner, whose address is 720 East Palmetto Park Road, Boca Raton, Florida 33432, as the Registered Agent of the Limited Liability Company for service of process.

The registered office and Registered Agent may be changed from time to time by the Members by filing the prescribed forms with the appropriate governmental authorities.

### 5. Term

The term of the Limited Liability Company shall continue until the occurrence of an event hereinafter set forth which causes the termination of the Limited Liability Company.

### 6. Capital Contributions

As initial contributions to the Limited Liability Company, THOMAS GRANER has agreed to contribute the capital necessary for the automobile financial transactions conducted by the Limited Liability Company; SCOTT ZANKL shall contribute to the Limited Liability Company his business contacts, prospects, customer lists and client base by directing business to the Limited Liability Company. In exchange for the foregoing initial contributions ("Capital Contributions"), the Members shall receive Percentage Interests in the Limited Liability Company in the amounts and percentages set forth on Exhibit "A" attached hereto. Each Member's initial Capital Contributions plus any additional Capital Contributions, less any distributions made to a Member pursuant to Article 8(g) and Article 20 shall be referred to as each Member's "Contribution Account."

The capital of the Limited Liability Company shall be the amount noted in the company records, which shall consist of the aggregate of the Capital Contributions made by the Members in accordance with this Agreement and applicable law.

Except as specifically provided in this Agreement or required by law, no Member shall have the right to withdraw or reduce its contributions to the capital of the Limited Liability

2

Company until the termination of the Limited Liability Company. No Member shall have the right to demand and receive any distribution from the Limited Liability Company in any form other than cash, regardless of the nature of such Member's Capital Contribution. No Member shall be paid interest on such Member's Capital Contributions to the Limited Liability Company, except as otherwise provided herein.

The liability of any Member for the losses, debts, liabilities and obligations of the Limited Liability Company shall be limited to: the Capital Contribution of such Member when due under this Agreement; such Member's share of any undistributed assets of the Limited Liability Company; and (only if and to the extent at any time required by applicable law) any amounts previously distributed to such Member by the Limited Liability Company.

The Members shall make additional Capital Contributions in cash, as may be determined by the Members from time to time to be reasonably necessary to pay any operating, capital or other expenses relating to the Limited Liability Company's business (such additional Capital Contributions, the "Additional Capital Contributions"). In the event a Member does not make timely payment of the required Additional Capital Contributions (the "Non-Contributing Member"), the other Members (the "Contributing Members") may make the Additional Capital Contribution on behalf of the Non-Contributing Member and the Contributing Members shall be entitled to reimbursement for said amount out of any proceeds and/or distributions made by the Limited Liability Company plus ten percent (10%) interest per annum until said sum is paid in full out of said proceeds and/or distributions. The Members understand and agree that the nature of the business and operations of the Limited Liability Company is such that capital calls and Additional Capital Contributions by the Members may be necessary to operate the business of the Limited Liability Company, acquire assets, service and maintain such assets, and pay costs and expenses associated therewith, and that although existing Capital Contributions will be used to a certain extent to satisfy the aforesaid costs and expenses, the Members may determine that it is in the best interest of the Limited Liability Company to utilize Additional Capital Contributions for such purposes.

For purposes of this Article 6, the term "Members" shall also include "Interest Holders," except with respect to any matter requiring the consent or vote of the Members.

## 7. Loans and Advances by Members

If any Member shall loan or advance any funds to the Limited Liability Company in excess of the Capital Contribution of such Member prescribed herein, except as described in Article 8 below, such loan or advance shall not be deemed a Capital Contribution to the Limited Liability Company and shall not in any respect increase such Member's interest in the Limited Liability Company.

For purposes of this Article 7, the term "Members" shall also include "Interest Holders."

3

## 8. Allocations and Distributions

(a)     The term "cash receipts" shall mean all cash receipts of the Limited Liability Company from whatever source derived, except not including Capital Contributions made by the Members, minus all reasonable and necessary expenses of the Limited Liability Company, including, without limitation, the proceeds of any sale, exchange, or other disposition of all or any part of the assets of the Limited Liability Company; the proceeds of any loan to the Limited Liability Company; the proceeds of any insurance policy payable to the Limited Liability Company; and the proceeds from the liquidation of the assets of the Limited Liability Company following a termination of the Limited Liability Company.

(b)     The term "Percentage Interests" shall mean the percentages of each Member as set forth in the attached Exhibit "A". Any reference to Exhibit "A" in this Agreement means Exhibit "A" as revised from time to time by the Members to reflect any changes in the information specified herein. The Members acknowledge and agree that their Percentage Interests as of the date of this Agreement are consistent with their understanding as to their interests upon formation of the Limited Liability Company.

(c)     The term "Amortized Principal" shall mean the amortized principal for each payment received pursuant to the amortization schedule to which Members shall agree for each separate financing transaction.

(d)     Profits for each fiscal year (and each item of income and gain entering into the computation thereof) shall be allocated among the Members (and credited to their respective Capital Accounts) in the following order and priority:

(i)     First, to the Members, based on the amount of Losses being offset, until the cumulative Profits allocated pursuant to this Article 8(c)(i) are equal to the cumulative Losses, if any, previously allocated to the Members pursuant to Article 8(d)(v) for all prior periods in proportion to the Members' respective shares of the Losses being offset;

(ii)     Second, to the Members, based on the amount of Losses being offset, until the cumulative Profits allocated pursuant to this Article 8(c)(ii) are equal to the cumulative Losses, if any, previously allocated to the Members pursuant to Article 8(d)(iv) for all prior periods in proportion to the Members' respective shares of the Losses being offset;

(iii)     Third, to the Members, based on the amount of Losses being offset, until the cumulative Profits allocated pursuant to this Article 8(c)(iii) are equal to the cumulative Losses, if any, previously allocated to the Members pursuant to Article 8(d)(iii) for all prior periods in proportion to the Members' respective shares of the Losses being offset;

(iv)     Fourth, to the Members, based on the amount of Losses being offset, until the cumulative Profits allocated pursuant to this Article 8(c)(iv) are equal to the cumulative Losses, if any, previously allocated to the Members pursuant to Article 8(d)(ii) for all prior periods in proportion to the Members' respective shares of the Losses being offset; and

(v)     Fifth, to the Members, in accordance with their Percentage Interests.

4

(e)     Notwithstanding the above, the Members acknowledge that THOMAS GRANER will provide the Limited Liability Company with the requisite capital for each individual financing transaction and shall be repaid by the cash receipts of the Limited Liability Company on a preferred basis. The Limited Liability Company shall make monthly distributions from its cash receipts to the Members allocated in the following order and priority:

(i)     First, to THOMAS GRANER, for the amount of Amortized Principal received from each financing transaction;

(ii)     Second, to THOMAS GRANER, for the cost of capital based on the Wall Street Journal published prime rate plus two points, which is currently 3.5% (meaning the current cost of capital shall be 5.5% as of the date of this Agreement), of the amortized loan balance remaining on each financing transaction; and

(iii)     Third, to the Members in accordance with their Percentage Interests.

(f)     Losses for each fiscal year (and each item of loss and deduction entering into the computation thereof) shall be allocated among the Members (and charged to their respective Capital Accounts) in the following order and priority:

(i)     First, to the Members, pro rata based on the amount of Profits being offset, until the cumulative Losses allocated pursuant to this Article 8(d)(i) are equal to the cumulative Profits, if any, previously allocated to the Members pursuant to Article 8(c)(v) for all prior periods in proportion to the Members' respective shares of the Profits being offset;

(ii)     Second, to the Members, in proportion to, and in the amount of, the excess of (1) the total amount of the additional Capital Contributions (i.e. not included in each Member's initial Capital Contributions) made by each of the Members and (2) the Losses previously allocated to each of the Members pursuant to this Article 8(d)(ii);

(iii)     Third, if any, to the Members in accordance with their Contribution Account balances as of the end of the period to which the allocation of Losses under this Article 8(d)(iii) relates;

(iv)     Fourth, to the Members in accordance with their Percentage Interests; and

(v)     Losses allocated in accordance with clauses (i), (ii), (iii), or (iv) of this Article 8(d) to the Capital Account of any Member shall not exceed the maximum amount of Losses that can be so allocated without creating an Adjusted Capital Account Balance deficit with respect to such Capital Account. This limitation shall be applied individually with respect to each Member in order to permit the allocation pursuant to this Article 8(d)(v) of the maximum amount of Losses permissible under Treasury Regulations ("Regulations") § 1.704-1(b)(2)(ii)(d). All Losses in excess of the limitations set forth in this Article 8(d)(v) shall be allocated solely to those Members that bear the economic risk for such additional Losses within the meaning of § 704(b) of the Internal Revenue Code of 1986, as thereafter amended ("Code"), and the Regulations thereunder. If it is necessary to allocate Losses under the preceding sentence, the Members shall, in accordance with the

5

Regulations promulgated under Code § 704(b), determine those Members that bear the economic risk for such additional Losses.

(g)     Except as otherwise provided in Article 8(f) below, for income tax purposes, all items of income, gain, loss, deduction and credit of the Limited Liability Company for any tax period shall be allocated among the Members in accordance with the allocation of Profits and Losses prescribed in this Article 8.

(h)     In accordance with Code § 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Limited Liability Company shall, solely for tax purposes, be allocated among Members so as to take account of any variation between the adjusted basis of such property to the Limited Liability Company for federal income tax purposes and its initial Gross Asset Value under the Traditional Method as defined under Regulations § 1.704-3(b).  Allocations pursuant to Articles 8(e) and (f) are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses or other items or distributions pursuant to any other provision of this Agreement.

(i)     Except as provided in Article 20 (in connection with the dissolution or liquidation of the Limited Liability Company), or otherwise agreed to by the Members, distributions of cash receipts shall be on a monthly basis and in amounts determined by the Profits for the previous month after any expenses, and any such distribution shall be allocated among the Members in proportion to the Percentage Interests.

(j)     For purposes of this Article 8, the term "Members" shall also include "Interest Holders," except with respect to any matter requiring the consent or vote of the Members.

### 9.  Books, Records and Tax Returns

At all times during the continuance of the Limited Liability Company, the Members shall keep or cause to be kept complete and accurate records and books of account in which shall be entered each transaction of the Limited Liability Company in accordance with generally accepted accounting principles.

The fiscal year of the Limited Liability Company for both accounting and income tax purposes shall be the calendar year.  The Limited Liability Company shall report its operations, net income and net losses in accordance with the methods of accounting selected by the Members.

To the extent deemed necessary, the Members may choose and employ, on behalf of the Limited Liability Company, and at the expense of the Limited Liability Company, such firm of certified public accountants as is appropriate to serve as the Limited Liability Company's accountants.

The Members shall prepare or cause to be prepared all required Federal, State and local income tax and information returns for the Limited Liability Company, and shall cause such tax and information returns to be filed timely with the appropriate governmental authorities.  After the end of each fiscal year, the Members shall forward to each Member and Interest Holder during the

preceding fiscal year a true copy of the Limited Liability Company's information return filed with the Internal Revenue Service for the preceding fiscal year.

All books and records of the Limited Liability Company shall be kept at the office of the Limited Liability Company or at such other place or places as may be determined by the Members and shall be available at reasonable times during business hours and upon reasonable notice for inspection and examination by the Members or their duly authorized representatives.   For clarification, Interest Holders shall have no right to inspect and examine the books and records of the Limited Liability Company.

## 10.  Bank Accounts

All funds of the Limited Liability Company shall be deposited in the Limited Liability Company's name in such account or accounts as shall be designated by the Members.

## 11.  Management of the Limited Liability Company

Management of the Limited Liability Company is vested in the Members.  All actions or decisions affecting or arising from the management of the Limited Liability Company must be approved by the consent of the Members whose Percentage Interests exceed fifty percent (50%) of the Percentage Interests of all Members ("Majority of the Members").  Except as otherwise provided in this Agreement, acts of the Members shall require the prior consent of the Majority of the Members.  Except as expressly authorized in this Agreement or approved by the consent of the Majority of Members, no single Member is authorized or empowered to execute, deliver, or perform any agreements, acts, transactions, or matters on behalf of the Limited Liability Company as agent for the Limited Liability Company.

The business and affairs of the Limited Liability Company shall be conducted and managed by the Members of the Limited Liability Company in accordance with this Agreement and the Act. The Limited Liability Company shall have all powers afforded to such entities under the Act and any other applicable laws, and the Members may exercise all such powers and authority and take all such actions as are necessary to carry out the powers and purposes of the Limited Liability Company, in accordance with and subject to the terms and provisions of this Agreement and the Act.

The Members shall oversee the management of the business and affairs of the Limited Liability Company, and each Member shall devote such time and provide such managerial and administrative services as are necessary to further the interests of the Limited Liability Company, it being understood that the Members shall not be required to devote any specific amount of time to the affairs of the Limited Liability Company.  The Members shall not receive a salary or compensation associated with their management roles as Members of the Limited Liability Company.

The Limited Liability Company shall reimburse all reasonable costs and expenses incurred by the Members in connection with the management and administration of the Limited Liability Company.  The Members are hereby expressly authorized to negotiate and enter into contracts

7

with such brokers, agents, management firms, attorneys, and other professionals and individuals as the Members may deem in their discretion necessary for the furtherance of the purposes of the Limited Liability Company, including such contracts as may provide for payment of such individuals out of the proceeds of the operations of the Limited Liability Company, and the Limited Liability Company shall reimburse the Members for any costs and expenses advanced in connection with the foregoing.

A Member's duty of care in the discharge of the Member's duties to the Limited Liability Company and the Members is limited to refraining from engaging in grossly negligent conduct, intentional misconduct, or a knowing violation of law. In discharging the duties of a Members, each Member shall be fully protected in relying in good faith upon the records of the Limited Liability Company and upon such information, opinions, reports or statements by Members, agents, accountants, attorneys, management professionals, or other persons as to matters each Member reasonably believes are within such person's professional or expert competence, including without limitation information, opinions, reports or statements as to the value or amount of the assets, liabilities, profits or losses of the Limited Liability Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

To the extent of the Limited Liability Company's assets, and to the extent permitted by law, the Limited Liability Company shall indemnify and hold each Member harmless from and against all liability, claim, loss, damage or expense, including reasonable attorneys' fees, incurred by the Member by reason of any act or omission of the Member made in good faith on behalf of the Limited Liability Company.

The Members shall have the power to hire, appoint, or promote such number of employees and officers, and to set the compensation of the same, of the Limited Liability Company or any of its affiliates as the Members deem appropriate, and to remove, replace, demote, accept the resignation of, or terminate the services of the same.

## 12.  Member Meetings

(a)     Regular and special meetings of the Members may be held at any place within or without the State of Florida as agreed by the Members. In accordance with the procedures in Article 22, notice shall be delivered personally or sent by mail, fax, or email. Except where not required in this Agreement, notice is required to be given to each Member five days prior to the meeting. Any meeting, regular or special, may be held by conference telephone or similar communication equipment. So long as all Members participating in the meeting can hear one another, all such Members shall be deemed to be present at the meeting.

(b)     No annual meetings of the Members are required.

(c)     Regular meetings of the Members shall be held without notice and without call at such time as from time to time may be agreed by the Members.

(d)     Special meetings of the Members for any purpose or purposes shall be called at any time by any Member.

8

(e)    Any action of the Members may be approved without a meeting provided that such action shall be by written consent of all of the Members ("Unanimous Consent"). Such written consent or consents shall be filed with the minutes of the proceedings of the Members and shall have the same force and effect as a vote of the Majority of the Members at a meeting duly held.

(f)    The presence of the Majority of the Members at a meeting of the Members constitutes a quorum for the transaction of business. Every act or decision done or made by the majority of the quorum at a meeting duly held at which a quorum is present shall be the act of the Members, unless a greater number, or the same number after disqualifying one or more Members from voting, is required by law, by the articles of organization, or by this Agreement. A meeting at which a quorum is initially present may continue to transact business notwithstanding the departure of a Member, provided that any action taken is approved by at least the majority of the quorum for such meeting. If less than a quorum shall be in attendance at the time for which said meeting shall have been called, those present may, by majority vote, adjourn the said meeting to another date certain.

(g)    Without limiting the generality of the powers of the Members to manage the Limited Liability Company, the Members are not authorized to make the following decisions without the prior Unanimous Consent of the Members:

(i)    To cause or permit the Limited Liability Company to dissolve, wind up, or liquidate;

(ii)    To terminate or amend this Agreement;

(iii)    To determine the fair market value of any property distributed in-kind to a Member, pursuant to Article 20; and

(iv)    To designate a Liquidating Agent (as defined in Article 20).

(h)    The transactions of any meeting of the Members which transactions satisfy the approval requirements set forth above, but which transactions are deficient for reason of improper notice shall be valid as though duly held after regular call and notice if a quorum is present and if, either before or after the meeting, each Member not present, or who though present had prior to the meeting or at its commencement protested the lack of proper notice to him, signs a written waiver of notice or a consent to holding such meeting or an approval of the minutes thereof. All such waivers, consents, or approvals shall be filed with the Limited Liability Company records or made a part of the minutes of the meeting.

(i)    The majority of the quorum may adjourn any Members meeting to meet again at a stated day and hour; provided, however, that in the absence of a quorum, a majority of the Members present at any Members meeting, either regular or special, may adjourn from time to time until the time fixed for the next regular meeting of the Members.

(j)    If the meeting is adjourned for more than 24 hours, notice of any adjournment to another time or place shall be given prior to the time of the adjourned meeting to the Members who were not present at the time of adjournment. Otherwise notice of the time and place of holding

9

an adjourned meeting need not be given to absent Members if the time and place be fixed at the meeting adjourned.

(k)     For clarification, Interest Holders shall have no right to participate in any matter, including, without limitation, any meeting and the receipt of any notice of any meeting, requiring the consent or vote of the Members.

## 13.  Member Deadlock and Activities

(a)     In the event that after 30 days the Members are deadlocked as to any action to be taken or task to be performed by the Members ("Deadlock Issue"), any Member may refer the Deadlock Issue to a mediator by written notice to the other Members. If not resolved by mediation, the parties shall resolve the Deadlock Issue by arbitration pursuant to this Article.  In the arbitration, a Member may tender an offer to buy the Interest of another Member or all of the assets of the Limited Liability Company.  The arbitrator has the power and authority to resolve the Deadlock Issue and may do so by compelling the sale of one or more Interests (either to a tendering Member or a third party) or the dissolution and liquidation of the Limited Liability Company, by such means and at such prices as the arbitrator determines to be in the best interests of the Limited Liability Company and its Members.  The arbitrator may compel production of documents, order reports, or retain experts to assist him in the arbitration, and the costs are allocated among the Members as the arbitrator determines.  The provisions of this Section 13 do not limit the remedies that the arbitrator may otherwise award.  Notwithstanding the foregoing, except as it pertains to a Deadlock Issue, either party may file a lawsuit in the Circuit Court of the appropriate jurisdiction as it relates to any dispute arising out of this Agreement or as otherwise allowed by applicable law.

(b)     In the event that either party hereto seeks to collect any damages resulting from, or the injunction of any action constituting, a breach of any of the terms or provisions of this Agreement, then the party found to be at fault shall pay all reasonable costs and attorneys' fees (including costs of appeal) of the other.

(c)     Each Member may engage in or possess interests in other business ventures of every kind and description for such person's own account, including but not limited to those competitive with the business of the Limited Liability Company.  Neither the Limited Liability Company nor any of the other Members shall have any rights by virtue of this Agreement in and to such independent business ventures or to the income or profits derived therefrom.

## 14.  Assignment of Interests

Except as otherwise provided in this Agreement, no Members may assign, pledge, hypothecate, transfer or otherwise dispose of all or any part of his or her interest in the Limited Liability Company, including without limitation the capital, profits or distributions of the Limited Liability Company, without the prior written consent of the Majority of the Members.

An assignment, pledge, hypothecation, transfer or other disposition of all or any part of the interest of a Member in the Limited Liability Company in violation of the provisions hereof shall be null and void for all purposes.

10

As between a Member and an assignee or transferee of such Member's interest in accordance with this Agreement, allocations and distributions for any fiscal year shall be apportioned as of the date of the assignment or transfer, on the basis of the number of days before and after said date, without regard to the results of the Limited Liability Company's operations before or after the assignment or transfer.

No assignment or other disposition of any interest of any Member may be made if such assignment or disposition, alone or when combined with other transactions, would result in the termination of the Limited Liability Company within the meaning of the Code or under any other relevant section of the Code or any successor statute. No assignment or other disposition of any interest of any Member may be made without an opinion of counsel satisfactory to the Members that such assignment or disposition is subject to an effective registration under, or exempt from the registration requirements of, applicable State and Federal securities laws. No interest in the Limited Liability Company may be assigned or given to any person below the age of 21 years or to a person who has been adjudged to be insane or incompetent.

Anything herein contained to the contrary, the Members and the Limited Liability Company shall be entitled to treat the record holder of the interest of a Member as the absolute owner thereof, and shall incur no liability by reason of distributions made in good faith to such record holder, unless and until there has been delivered to the Members the assignment or other instrument of transfer and such other evidence as may be reasonably required by the Members to establish to the satisfaction of the Members that an interest has been assigned or transferred in accordance with this Agreement.

Notwithstanding anything contained in this Article 14 or elsewhere to the contrary, assignments or other dispositions of any interest of a Member to a Member's spouse, a Member's issue, the spouse of such issue, or a trust for the benefit of any of the foregoing may be made without compliance with the terms and conditions of this Agreement pertaining to assignments or other dispositions.

For purposes of this Article 14, the term "Members" shall also include "Interest Holders," except with respect to any matter requiring the consent or vote of the Members.

## 15. Right of First Refusal

If a Member or Interest Holder desires to sell, transfer or otherwise dispose of all or any part of his or her interest in the Limited Liability Company, such Member (the "Selling Member") shall first offer to sell and convey such interest to the other Members ("Non-Selling Members") before selling, transferring or otherwise disposing of such interest to any other person, corporation or other entity ("Offer"). Such Offer shall be in writing, shall be given to every Non-Selling Member, and shall set forth the interest to be sold, the purchase price to be paid, the date on which the closing is to take place (which date shall be not less than 30 nor more than 60 days after the delivery of the offer), the location at which the closing is to take place, and all other material terms and conditions of the sale, transfer or other disposition.

11

Within 30 days after the delivery of said Offer ("Offer Period"), the Non-Selling Members shall deliver to the Selling Member a written notice either accepting or rejecting the Offer. Failure to deliver said notice within the Offer Period conclusively shall be deemed a rejection of the Offer. Any or all of the Non-Selling Members may elect to accept the Offer, and if more than one of the Non-Selling Members elects to accept the Offer, the interest being sold and the purchase price therefor shall be allocated among the Non-Selling Members accepting the Offer in proportion to such Non-Selling Members' Percentage Interests, unless they otherwise agree in writing.

If any or all of the Non-Selling Members elect to accept the Offer, then the closing of title shall be held in accordance with the Offer and the Selling Member shall deliver to the Non-Selling Members who have accepted the Offer an assignment of the interest being sold by the Selling Member, and the Non-Selling Members shall pay the purchase price prescribed in the Offer.

If no Non-Selling Member accepts the Offer, or if the Non-Selling Members who have accepted such Offer default in their obligations to purchase the interest, then the Selling Member within 120 days after the delivery of the Offer ("Post-Offer Period") may sell such interest to any other person or entity at a purchase price which is not less than the purchase price prescribed in the Offer and upon terms and conditions which are substantially the same as the terms and conditions set forth in the Offer, provided all other applicable requirements of this Agreement are complied with. An assignment of such interest to a person or entity who is not a Member of the Limited Liability Company shall only entitle such person or entity to the allocations and distributions to which the assigned interest is entitled as an Interest Holder, unless such person or entity applies for admission to the Limited Liability Company and is admitted to the Limited Liability Company as a Member in accordance with this Agreement.

If the Selling Member does not sell such interest within the Post-Offer Period, then the Selling Member may not thereafter sell such interest without again offering such interest to the Non-Selling Members in accordance with this Article 15.

For clarification, for purposes of this Article 15 the term "Selling Member" shall include "Interest Holders," but otherwise the term "Member" or "Non-Selling Member" as used in this Article 15 shall not include Interest Holders.

### 16. Admission of New Members

The Members may admit new Members (or transferees of any interests of existing Members or Interest Holders) into the Limited Liability Company only by the consent of the Majority of the Members.

As a condition to the admission of a new Member, such new Member shall execute and acknowledge such instruments, in form and substance satisfactory to the Members, as the Members may deem necessary or desirable to effectuate such admission and to confirm the agreement of such new Member to be bound by all of the terms, covenants and conditions of this Agreement, as the same may have been amended. Such new Member shall pay all reasonable expenses in connection with such admission, including without limitation reasonable attorneys' fees and the cost of the preparation, filing or publication of any amendment to this Agreement or the Articles

12

of Organization, which the Members may deem necessary or desirable in connection with such admission.

No new Member shall be entitled to any retroactive allocation of income, losses, or expense deductions of the Limited Liability Company. The Members may make pro rata allocations of income, losses or expense deductions to a new Member for that portion of the tax year in which the new Member was admitted in accordance with applicable sections of the Code and Regulations thereunder.

In no event shall a new Member be admitted to the Limited Liability Company if such admission would be in violation of applicable Federal or State securities laws or would adversely affect the treatment of the Limited Liability Company for income tax purposes.

### 17. Withdrawal Events Regarding Members and Election to Continue the Limited Liability Company

In the event of the death, permanent disability, withdrawal, expulsion, dissociation or dissolution of a Member, or an event of bankruptcy or insolvency, as hereinafter defined, with respect to a Member, or the occurrence of any other event which terminates the continued membership of a Member in the Limited Liability Company pursuant to the laws of the State of Florida (each of the foregoing being hereinafter referred to as a "Withdrawal Event" and each such Member a "Withdrawing Member"), the Limited Liability Company shall not terminate and the business of the Limited Liability Company shall continue, unless, within 60 days after notice to the Members of such Withdrawal Event, the remaining Members, by the consent of a Majority of the Members (other than the Withdrawing Member who caused the Withdrawal Event), shall elect to terminate the Limited Liability Company.

In the event of a Withdrawal Event with respect to Withdrawing Member, such Withdrawing Member's membership and participation in the Limited Liability Company shall cease, any successor in interest to such Withdrawing Member (including without limitation any executor, administrator, heir, committee, guardian, trustee, receiver, or other representative or successor) shall not become entitled to any rights or interest of such Withdrawing Member in the Limited Liability Company, including the right to review or obtain books or records of the Limited Liability Company (unless required by law), other than the allocations and distributions to which such Withdrawing Member would be entitled, unless such successor in interest is admitted as a Member in accordance with this Agreement, and the Withdrawing Member shall become and have only the rights of an Interest Holder under this Agreement.

An "event of bankruptcy or insolvency" with respect to a Member shall occur if such Member: applies for or consents to the appointment of a receiver, trustee or liquidator of all or a substantial part of his assets; or makes a general assignment for the benefit of creditors; or is adjudicated a bankrupt or an insolvent; or files a voluntary petition in bankruptcy or a petition or an answer seeking an arrangement with creditors or to take advantage of any bankruptcy, insolvency, readjustment of debt or similar law or statute, or an answer admitting the material allegations of a petition filed against him in any bankruptcy, insolvency, readjustment of debt or similar proceedings; or takes any action for the purpose of effecting any of the foregoing; or an

13

order, judgment or decree shall be entered, with or without the application, approval or consent of such Member, by any court of competent jurisdiction, approving a petition for or appointing a receiver or trustee of all or a substantial part of the assets of such Member, and such order, judgment or decree shall continue unstayed and in effect for thirty days.

## 18.  Purchase Upon a Withdrawal Event

(a)      Upon the death of a Member ("Decedent"), the Limited Liability Company shall not terminate.  If the Decedent's interest in the Limited Liability Company is bequeathed or passed by operation of law to one or more of the Decedent's spouse, issue, spouse of such issue or a trust for their benefit, such successors shall be substituted for the Decedent as Members of the Limited Liability Company. (The fact that the Decedent's interest may be held by the Decedent's personal representatives for a period of time shall not disqualify such interest from falling within the preceding sentence.)  Otherwise, the Decedent's interest in the Limited Liability Company shall be subject to the provisions of Article 18(b) below, provided, however, that if a Majority of the Members vote to have the personal representative of the Decedent substituted for the Decedent as a Member of the Limited Liability Company, and, in such event, the personal representative agrees to such substitution, then such personal representative shall be substituted in the place and stead of the Decedent and such personal representative shall have the same rights and obligations in the Limited Liability Company as the Decedent would have had if the Decedent had survived.

(b)      Upon the occurrence of a Withdrawal Event as defined above, and subject to the provisions of Article 18(a) above, unless the remaining Members have consented to terminate the Limited Liability Company as provided in Article 17 and unless a successor of the Withdrawing Member has been substituted for the Withdrawing Member as a Member of the Limited Liability Company, within 30 days of the Withdrawal Event the Withdrawing Member, or the legal representative or representatives of, or the heirs, distributees or beneficiaries of, or the executor or administrator of, or the trustee, receiver, or guardian of the estate of the Withdrawing Member, as the case may be (the "Withdrawing Member's representative"), shall notify the Limited Liability Company in writing of the occurrence of the Withdrawal Event ("Withdrawal Notice").  If a Withdrawal Notice is not sent as contemplated herein, then notice shall be deemed given 30 days from the date the Limited Liability Company is made aware of such Withdrawal Event.  For the 60 day period (the "Company's Option Period") commencing upon the date the Withdrawal Notice is given, the Limited Liability Company shall have the option (the "Company's Withdrawal-Related Purchase Option") to purchase all, and not less than all, of the Withdrawing Member's interest in the Limited Liability Company.  The Company's Withdrawal-Related Purchase Option shall be deemed exercised upon delivery of written notice (the "Company's Withdrawal-Related Exercise Notice") to the Withdrawing Member (or the Withdrawing Member's representative) prior to the expiration of the Company's Option Period.

(c)      The purchase price for the interest in the Limited Liability Company purchased pursuant to this Article 18 shall be determined in accordance with the provisions of Article 19 below.  The following terms and conditions shall apply to the purchase and sale of the interest in the Limited Liability Company of a Withdrawing Member:

14

(i)      Not less than 30% percent of the purchase price for the interest in the Limited Liability Company shall be paid in cash or by certified check to the Withdrawing Member or such Withdrawing Member's representative on the closing date indicated in the Company's Withdrawal-Related Exercise Notice, which shall not be a date that is less than five business days nor more than 60 business days after the end of the Company's Option Period ("Closing Date").

(ii)      Any balance of the purchase price shall be paid to the Withdrawing Member or such Withdrawing Member's representative in cash or by certified check, or, at the option of the Limited Liability Company, in 36 consecutive equal monthly installments, with the first installment to be paid on the date which is 30 days after the Closing Date, and with each subsequent payment to be paid on the like day of each succeeding month.  This obligation shall be evidenced by a negotiable promissory note to the order of the Withdrawing Member or such Withdrawing Member's representative providing for:  (1) the right of prepayment without penalty; and (2) acceleration of the entire unpaid principal balance in the event of a default in payment for more than ten days after notice and demand.  Said promissory note shall be executed and delivered by the Limited Liability Company simultaneously with the payment provided for in Article 18(c)(i) above.

(iii)      Upon receipt of the cash payment and the promissory note, if any, required in Article 18(c)(i) and (ii) above, the Withdrawing Member or such Withdrawing Member's representative shall deliver an assignment to the Limited Liability Company of all of the interest in the Limited Liability Company of the Withdrawing Member, with any other instruments required by the Limited Liability Company, including any applicable tax waivers, so that full and complete title to the Withdrawing Member's interest in the Limited Liability Company can be transferred on the books of the Limited Liability Company.

(iv)      If the Withdrawing Member's interest in the Limited Liability Company has been purchased by delivery of a promissory note, then, when the interest is transferred as provided in Article 18(c)(iii), the Limited Liability Company shall note in its books that said interest is held as collateral security for payment of the promissory note and is not to be further transferred until the promissory note is paid in full.

If the remaining Members unanimously elect to terminate the Limited Liability Company because of the Withdrawal Event pursuant to Article 17 above, the provisions of this Article 18 shall be null and void.

## 19.  Purchase Price

For purposes of a purchase of an interest in the Limited Liability Company referring to this Article 19, the purchase price for the interest in the Limited Liability Company shall be the fair market value of such interest as determined pursuant to this Article.  The fair market value of each one percent interest in the Limited Liability Company as re-determined from time to time shall take into account the tangible and intangible assets of the Limited Liability Company, including good will and other relevant factors, and liabilities of the Limited Liability Company.

15

If the parties hereto fail to re-determine the fair market value of each one percent interest in the Limited Liability Company within 60 days after any fiscal year, the fair market value of each one percent interest in the Limited Liability Company for the purpose of establishing the purchase price hereunder shall be as agreed upon by the Withdrawing Member or the Withdrawing Member's representative and the Limited Liability Company. In the event the purchase price is being computed as a result of a Withdrawal Event, the fair market value shall be computed as of the date immediately preceding said Withdrawal Event. If the parties are unable to agree upon the fair market value 30 days prior to the date of the purchase, then the fair market value of each one percent interest in the Limited Liability Company shall be determined by appraisal performed by a qualified business appraiser mutually selected by the Withdrawing Member or the Withdrawing Member's representative and the Limited Liability Company. All costs of any such appraisal shall be borne equally by the Withdrawing Member or the Withdrawing Member's representative and the Limited Liability Company. If the Withdrawing Member or the Withdrawing Member's representative and the Limited Liability Company cannot agree on an appraiser within 25 days prior to the date of the purchase, then an appraiser shall be determined as follows:

(i)      Not less than 20 days prior to the date of the purchase, the Withdrawing Member or the Withdrawing Member's representative shall appoint one appraiser, and the Limited Liability Company shall appoint one appraiser.

(ii)      If either the Withdrawing Member or the Withdrawing Member's representative or the Limited Liability Company shall fail to appoint an appraiser, the appraiser appointed by the other shall determine the fair value of each interest in the Limited Liability Company.

(iii)      If the two appraisers appointed by the Withdrawing Member or the Withdrawing Member's representative and the Limited Liability Company shall fail to agree upon the fair value of each one percent interest in the Limited Liability Company ten days prior to the date of the purchase, the two appraisers shall appoint a third appraiser to evaluate the appraisals of the first two appraisers, and the determination of the majority of the appraisers shall be binding upon all parties.

(iv)      All costs of any such appraisal shall be borne equally by the Withdrawing Member or the Withdrawing Member's representative and the Limited Liability Company.

### 20. Dissolution and Liquidation

The Limited Liability Company shall terminate upon the occurrence of any of the following: the election by Unanimous Consent of the Members to dissolve the Limited Liability Company; or any other event which pursuant to this Agreement or applicable law, as either may hereafter be amended, shall cause a termination of the Limited Liability Company.

The liquidation of the Limited Liability Company shall be conducted and supervised by the Members or by a person designated for such purposes by the Unanimous Consent of the Members (the "Liquidating Agent"). The Liquidating Agent hereby is authorized and empowered to execute any and all documents and to take any and all actions necessary or desirable to effectuate

16

the dissolution and liquidation of the Limited Liability Company in accordance with this Agreement.

Promptly after the termination of the Limited Liability Company, the Members or Liquidating Agent shall cause to be prepared and furnished to the Members a statement setting forth the assets and liabilities of the Limited Liability Company as of the date of termination. The Members or Liquidating Agent, to the extent practicable, shall liquidate the assets of the Limited Liability Company as promptly as possible, but in an orderly and businesslike manner so as not to involve undue sacrifice.

The proceeds of sale and all other assets of the Limited Liability Company shall be applied and distributed in the following order of priority: (a) to the payment of the expenses of liquidation and the debts and liabilities of the Limited Liability Company, other than debts and liabilities to Members; (b) to the payment of debts and liabilities to Members; (c) to the setting up of any reserves which the Members or Liquidating Agent may deem necessary or desirable for any contingent or unforeseen liabilities or obligations of the Limited Liability Company, to be held for a period of two years for the purpose of payment of the aforesaid liabilities and obligations, at the expiration of which period the balance of such reserves shall be distributed as hereinafter provided; (d) to the Members in accordance with the positive balance of each Member's Capital Account as determined after taking into account all Capital Account adjustments for the Limited Liability Company's taxable year during which the liquidation occurs, including any Capital Account adjustments associated with the allocation of Profits and Losses with respect to any sale, transfer or other taxable disposition of the property of the Limited Liability Company; any such distributions to the Members in respect of their Capital Accounts shall be made within the time requirements of Regulations § 1.704-1(b)(2)(ii)(b)(2); and (e) to the Members in proportion to the Members' Percentage Interests.

No Member shall have any obligation to contribute or advance any funds or other property to the Limited Liability Company by reason of any negative or deficit balance in such Member's Capital Account during or upon completion of winding up or at any other time except to the extent that a deficit balance is directly attributable to a distribution in violation of this Agreement.

A Member shall have no right to demand and receive any distribution from the Limited Liability Company in any form other than cash.

Upon compliance with the distribution plan, the Members shall cease to be such, and the Members or Liquidating Agent shall execute, acknowledge and cause to be filed such certificates and other instruments as may be necessary or appropriate to evidence the dissolution and termination of the Limited Liability Company.

For purposes of this Article 20, the term "Members" shall also include "Interest Holders," except with respect to any matter requiring the consent or vote of the Members.

17

## 21. Representations of Members

Each of the Members represents, warrants and agrees that the Member is holding the interest in the Limited Liability Company for the Member's own account as an investment and not with a view to the sale or distribution thereof; the Member, if an individual, is over the age of 21, or if the Member is an organization, such organization is duly organized, validly existing and in good standing under the laws of its state of organization and that it has full power and authority to execute and perform its obligations under this Agreement; and the Member shall not dispose of such interest or any part thereof in any manner which would constitute a violation of the Securities Act of 1933, the Rules and Regulations of the Securities and Exchange Commission, or any applicable laws, rules or regulations of any State or other governmental authorities, as the same may be amended. Each party to this Agreement represents and warrants to each other party that such party has read and fully understood the terms and provisions hereof, has had an unlimited opportunity to review this Agreement with legal counsel, and has executed this Agreement based upon such party's own judgment and advice of independent legal counsel, if sought.

For purposes of this Article 21, the term "Members" shall also include "Interest Holders."

## 22. Notices

All notices, demands, requests or other communications which any of the parties to this Agreement may desire or be required to give hereunder shall be in writing and shall be deemed to have been properly given if sent by Federal Express courier or by registered or certified mail, return receipt requested, with postage prepaid, addressed as follows: (a) if to the Limited Liability Company, to the Limited Liability Company at such address or addresses as may be designated by the Limited Liability Company or the Members by notice to the Members pursuant to this Article 22; and (b) if to any Member, to such address as may be designated by said Member by notice to the Limited Liability Company and the other Members pursuant to this Article 22. Unless otherwise designated, the addresses referred to in this Article 22 shall be the addresses reflected in the books and records of the Limited Liability Company.

For purposes of this Article 22, the term "Members" shall also include "Interest Holders," except with respect to any matter requiring the consent or vote of the Members.

## 23. Amendments

This Agreement may not be altered, amended, changed, supplemented, waived or modified in any respect or particular unless the same shall be in writing and agreed to by the Unanimous Consent of the Members.

## 24. Miscellaneous

This Agreement and the rights and liabilities of the parties hereunder shall be governed by and determined in accordance with the laws of the State of Florida. If any provision of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement, which shall remain in full force and effect.

18

The captions in this Agreement are for convenience only and are not to be considered in construing this Agreement. All pronouns shall be deemed to be the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require. References to a person or persons shall include partnerships, corporations, limited liability companies, unincorporated associations, trusts, estates and other types of entities.

This Agreement, and any amendments hereto, may be executed in counterparts all of which taken together shall constitute one agreement.

To the extent any provision of this Agreement is prohibited or otherwise ineffective under Chapter 605 of the Florida Statutes, such provision shall be considered to be ineffective to the smallest degree possible in order to make this Agreement effective under Chapter 605 of the Florida Statutes. If Chapter 605 of the Florida Statutes is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

Subject to the limitations on transferability contained herein, this Agreement shall be binding upon and inure to the benefit of the parties hereto and to their respective heirs, executors, administrators, successors and assigns. No provision of this Agreement is intended to be for the benefit of or enforceable by any third party.

(REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)

19

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement effective as of the date first above written.

**MEMBERS:**

WITNESSES:

_____
Print Name: Ashley Durst

_____
**THOMAS GRANER**, Individually

_____
Print Name: Ashley Durst

_____
**SCOTT ZANKL**, Individually

20

# OPERATING AGREEMENT

## OF

## EXCELL AUTO FINANCE, LLC

### EXHIBIT "A"

Percentage Interest of each Member in Limited Liability Company.

| MEMBER | PERCENTAGE INTEREST IN THE LLC |
|---|---|
| THOMAS GRANER | 75% |
| SCOTT ZANKL | 25% |

21

# EXHIBIT H

**Exhibit H**

# FINANCING STATEMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**

CAPITOL SERVICES; 8003454647

Email MSHUNK@CAPITOLSERVICES.COM

**B. SEND ACKNOWLEDGEMENT TO:**

**FILED**

2022 Jan 26 05:17 PM

\*\*\*\*\*\*\* 202200273243 \*\*\*\*\*\*\*

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (1a OR 1b) - Do Not Abbreviate or Combine Names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| KARMA OF BROWARD, INC. | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS Line One | | | | |
|---|---|---|---|---|
| 1717 17TH STREET | This space not available. | | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | FT. LAUDERDALE | FL | 33316 | US |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (2a OR 2b) - Do Not Abbreviate or Combine Names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| KARMA OF PALM BEACH, INC. | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS Line One | | | | |
|---|---|---|---|---|
| 1001 CLINT MOORE ROAD, UNIT B | This space not available. | | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | BOCA RATON | FL | 33487 | US |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| FVP SERVICING, LLC | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS Line One | | | | |
|---|---|---|---|---|
| 1201 BROADWAY, 7TH FLOOR | This space not available. | | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | NEW YORK | NY | 10001 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

ALL ASSETS OF DEBTORS NOW OWNED OR HEREAFTER ACQUIRED AND WHEREVER LOCATED.

**5. ALTERNATE DESIGNATION (if applicable)**

☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR
☐ AG LIEN ☐ NON-UCC FILING ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** - YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☑ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA** 1700101-54 (FEENIX KARMA) - FL - STATE

**STANDARD FORM - FORM UCC-1 (REV.05/2013)**     **Filing Office Copy**     **Approved by the Secretary of State, State of Florida**

# EXHIBIT I

**Exhibit I**

TO:       FVP Servicing LLC

FROM:    1001 Clint Moore, LLC

DATE:     January __, 2022

Re:        Loan to Karma of Palm Beach, Inc./Karma of Broward, Inc.

     1001 Clint Moore LLC ("1001") is the owner of the property located at 1001 Clint Moore Road, Unit B, Boca Raton, Florida (the "Leased Premises"). The Leased Premises are currently being rented to Excell Auto Group, Inc. ("Excell") and Karma of Palm Beach, Inc., pursuant to a written lease agreements between 1001 and Excell and 1001 and Karma of Palm Beach, Inc. as amended, modified, supplemented, restated, extended or renewed from time to time, (the "Lease").

     The owner/representative of Excell and Karma of Palm Beach, Inc., Scott Zankl ("Zankl"), has advised us that his companies Karma of Palm Beach, Inc./Karma of Broward, Inc., (collectively "Karma") are attempting to obtain financing from FVP Servicing LLC ("FVP"), on its own behalf and/or as agent for and on behalf of one or more other lenders (collectively, "Lender"); and, as condition to the loan, FVP requires 1001's agreement that, in the event of Excell's and/or Karma of Palm Beach, Inc., default of the Lease, 1001 will allow FVP access to the Lease Premises to retrieve the collateral that serves as the security for its loan.

     Although neither 1001, nor any of its members, are parties to the loan, or will in any way either directly, or indirectly, receive any consideration by virtue of the loan to Karma, in good faith, 1001 agrees to allow FVP/Lender access to the Lease Premises to retrieve the collateral that serves as the security for its loan.

     Please note that, in giving its agreement for FVP/Lender to access to the Leased Premises to retrieve the collateral securing its loan, 1001 has not been asked, nor is it agreeing to provide notice to FVP/Lender in the event of Excell's default of the lease, except as required by Florida law. In addition, the access being granted by 1001 is for the specific purpose of FVP/Lender retrieving only the property owned by Karma securing FVP/Lender's loan, and does not include any property owned by 1001, or other person or entity, including but not limited to, any fixtures, furniture, office equipment, and/or vehicles, which is currently or may from time to time be located on the Leased Premises.

     Finally, in exchange 1001's good faith agreement to FVP/Lender in the event of a default of the Lease, 1001 expects that FVP/Lender will show the same good faith in the event FVP/Lender will be accessing the Leased Premises to retrieve its collateral under circumstances where there has been no default of the Lease, by providing 1001 written notice of its intent do the same. Accordingly, 1001 does hereby request that, in any circumstance where FVP/Lender will be accessing the Leased Premises for the purpose of retrieving the collateral securing its loan to Karma, FVP will give at least five (5) days prior to notice to 1001, including the date and time FVP/Lender will be making access.

Please send any and all future notices pertaining to this matter via email to:

Lisa Farache (lisafarache@gmail.com )
Moshe Farache (moshefarache@gmail.com)
Michele Martin (michelemartin1010@gmail.com )
Scott C. Gherman, Esq. (sgherman@scottghermanpa.com)

LANDLORD:

1001 CLINT MOORE, LLC

By:_____ Manager
Name: Lisa Farache, as Manager

# EXHIBIT J

**Exhibit J**



**Kutak Rock LLP**
The Omaha Building | 1650 Farnam Street, Omaha, NE 68102-2186
office 402.346.6000


JOEL L. WIEGERT
402.346.6000
joel.wiegert@kutakrock.com


April 7, 2022


**VIA FEDERAL EXPRESS AND
   VIA ELECTRONIC MAIL**


Karma of Palm Beach, Inc.
Karma of Broward, Inc.
Scott Zankl
Kristen Zankl
1001 Clint More Road, Unit B
Boca Raton, Florida 33487

   RE:  NOTICE OF DEFAULT, ACCELERATION AND DEMAND

Ladies and Gentlemen:

  Reference is hereby made to (a) that certain Loan Agreement dated as of January 26, 2022 (as amended, modified, supplemented, extended or renewed from time to time, the "Loan Agreement") by and among Karma of Palm Beach, Inc. ("Karma Palm Beach"), Karma of Broward, Inc. ("Karma Broward"; Karma Broward and Karma Palm Beach, each, a "Borrower" and, together, "Borrowers"), FVP Servicing, LLC, as administrative agent (in such capacity, "Agent"), and the Lenders from time to time party thereto, (b) that certain Guaranty Agreement dated as of January 26, 2022 (as amended, modified, supplemented, extended or renewed from time to time, the "Guaranty") by Scott Zankl ("S. Zankl") and Kristen Zankl ("K. Zankl"; K. Zankl and S. Zankl, each, a "Guarantor" and, together, "Guarantors") in favor of Agent and the Lenders. Capitalized terms used herein without definition shall have the meanings assigned to such terms in the Loan Agreement. Kutak Rock LLP represents Agent and the Lenders in connection with the Loan Agreement, the Guaranty and the Events of Default described herein.

  Borrowers and Guarantors are hereby notified that Events of Default have occurred and are continuing under the Loan Documents as a result of, among other things, Borrowers' failure to deliver required financial reporting information, including evidence of Borrowers' vehicle inventory constituting Collateral, as and when required pursuant to Sections 5.1(f), (l) and (n) of the Loan Agreement (collectively, the "Subject Defaults"). As a result of the Subject Defaults, Agent, at the direction of the Lenders, has elected to accelerate the Obligations, including the outstanding principal amount of the Loan, all accrued unpaid interest thereon and all fees, costs and expenses payable under the Loan Documents (the "Accelerated Balance"). Interest, fees, costs and expenses shall continue to accrue on the Accelerated Balance from and after the date hereof in accordance with the terms of the Loan Documents.

  Agent hereby makes demand upon Borrowers and Guarantors, on a joint and several basis, for the immediate payment in full of the Accelerated Balance. Please contact the undersigned for a statement of the amounts required to pay the Accelerated Balance as of the applicable date of payment. Agent and the

4864-9799-9634.1

**KUTAK**ROCK

Lenders hereby reserve the right to exercise all other rights and remedies by contract, at law or in equity on account of the Subject Defaults, in such order as Agent and the Lenders may determine in their sole discretion.

Nothing contained in this letter shall be construed to (a) limit the right of Agent or any Lender to receive any and all sums that are or may become due or payable pursuant to the Loan Documents, or otherwise, including, without limitation, costs of collection (including reasonable attorneys' fees); (b) waive any default or Event of Default under any Loan Document, whether or not known to Agent or any Lender; (c) waive, limit, modify, prejudice or otherwise adversely affect any rights, remedies or powers of Agent or any Lender under the Loan Documents, by statute, at law or in equity, all of which rights, remedies and powers are expressly reserved; (d) alter or amend any of the Loan Documents; (e) create a course of dealing; or (f) waive, limit, modify, prejudice or otherwise adversely affect any of the claims of Agent or any Lender against Borrowers, Guarantors or any other obligor under the Loan Documents.

Sincerely,

Joel L. Wiegert

Kutak Rock LLP

# EXHIBIT K

**Exhibit K**



**KARMA | PALM BEACH**

O: 561.998.5557
F: 561.998.4703
1001 Clint Moore Rd. Ste 103
Boca Raton, FL 33487

On 04/01/2022,

The following vehicle titles are being given to Auto Wholesale of Boca LLC as collateral against the loan amount

of $_____:

2013 Ferrari 458 #0191526---$230,000
2021 Jeep Gladiator #564806---$117,000
2018 Cadillac Escalade #261612---$60,000
2018 Mclaren 720 #001804----$282,080.03
2020 Lamborghini Huracan Evo #A14316---$330,000

2017 Lamborghini Huracan #A08121---$240,000
2019 Mclaren 720s #003714---$295,000
2020 Mercedes G63 #334940---$225,000
2021 Jeep Gladiator #571540---$138,607.80

The values of these vehicles, along with the $115,000.00 wired to Auto Wholesale of Boca LLC on 4/1/22 towards 2020 Bentley Flying Spur #082455, shall serve as collateral for the aforementioned loan amount.

As the loan is reduced, these vehicle titles will be returned.

_Moshe Farache MGr_

Moshe Farache--Auto Wholesale of Boca LLC

_Kristen Zankl_

Kristen Zankl- Karma Palm Beach

excellauto.com

# EXHIBIT L

**Exhibit L**

MERCHANT AGREEMENT TERMS AND CONDITIONS

**1    TERMS OF ENROLLMENT IN PROGRAM**

1.1    Merchant Deposit Agreement and Processor. Merchant shall (A) execute an agreement acceptable to hbc with a Bank acceptable to hbc to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to HBC with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide HBC and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes HBC and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to HBC for the receipts as specified herein and to pay such amounts to HBC. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre- approved by HBC or not. This additional authorization is not a waiver of HBC's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which HBC did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of HBC.

1.2    Term of Agreement. This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by HBC as per the terms of this Agreement.

1.3    Reconciliation. As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to Reconciliations@hibarcapital.com Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. HBC retains the right the request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and HBC shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by HBC within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by HBC shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide HBC with the right to interfere with HBC's right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

1.4    Adjustments to the Remittance. As long an Event of Default, or breach of this agreement, has not occurred, Merchant may give notice to HBC to request a decrease in the Remittance, should they experience a decrease in its Future Receipts. All requests hereunder must be in writing to Reconciliations@hibarcapital.com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report omstanding from the date of this Agreement through and including the date the request is made. HBC retains the right the request additional reasonable documentation including without limitation bank login or 3rd party software access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and HBC shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Merchant shall provide HBC with viewing access to their bank account as well as all information reasonably requested by HBC to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

1.5    Financial Condition. Merchant and Guarantor(s)(s) (as hereinafter defined and limited) authorize HBC and its agents to investigate their financial responsibility and history, and will provide to HBC any authorizations, bank or financial statements, tax returns, etc., as HBC requests in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. HBC is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

1.6    Transactional History. Merchant authorizes all of its banks, brokers and processor to provide HBC with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide HBC with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from HBC.

1.7    Indemnification. Merchant and Guarantor(s)(s) hereby jointly and severally indemnify and hold harmless HBC and each Processor, their respective officers, directors, agents and representatives, and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any such indemnitee as a direct or indirect result of (a) claims asserted by HBC for monies owed to HBC from Merchant and (b) actions taken by indemnitee in reliance upon any fraudulent, misleading or deceptive information or instructions provided by HBC

1.8    No Liability. In no event will HBC be liable for any claims asserted by Merchant or Guarantor(s)s under any legal or equitable theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s)(s), In the event these claims are nonetheless raised, Merchant and Guarantor(s)s will be jointly liable for all of HBC's attorney's fees and expenses resulting therefrom.

1.9    Reliance on Terms. Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, HBC, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action. 1.10    Sale of Receipts. Merchant and HBC agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from HBC to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. HBC has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Merchant acknowledges that HBC's share of Receipts collected are being held by Merchant in trust and are the sole property of HBC until they are remitted to HBC. Payments made to HBC in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. By this Agreement, Merchant transfers to HBC full and complete ownership of the Purchased Amount and Merchant retains no legal or equitable interest therein. HBC hereby appoints Merchant, and Merchant accepts appointment, as servicer for and on behalf of HBC for the purpose of collecting and delivering Receipts to HBC as required by this Agreement until HBC has received the Receipts Purchased Amount, and Merchant agrees that all such Receipts shall be received and held in trust for the benefit of SPFL for purposes of carrying out the terms of this Agreement. Merchant agrees that it will treat the amounts received and the Purchased Receipts delivered to HBC under this Agreement in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that HBC is entitled to audit Merchant's accounting records upon reasonable notice to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant asserts that this transaction is anything other than a sale of future receipts. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that HBC has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and HBC shall promptly refund to Merchant any interest received by HBC in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that HBC not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

1.11    Power of Attorney. Merchant irrevocably appoints HBC and its agents and representatives, as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to HBC from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to HBC; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s)(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which HBC may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by merchant.

1.12    Protections against Default. The following Protections 1 through 8 may be invoked by HBC immediately and without notice to Merchant in the event:
(a)

Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the HBC electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to HBC; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts or ceases the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of HBC, and (ii) the written agreement of any HBC or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to HBC; (e) Merchant takes any action, fails

Initial(1): _____    Initial(2): STE

to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide HBC with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from HBC; or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of Default contained in Section 3.1 herein. These protections are in addition to any other remedies available to HBC at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** HBC may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes HBC to execute in the name of the Merchant a Confession of Judgment in favor of HBC pursuant to the terms of the Confession of Judgment. Upon an Event of Default, HBC may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** HBC may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.

**Protection 5.** HBC may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9

**Protection 6.** HBC may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if HBC recovers a Judgment against Merchant, Merchant shall be liable for all of HBC's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to HBC. Upon breach of any provision in this Agreement, HBC may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. HBC may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to HBC. **Protection 8.** HBC may debit Merchant's depository accounts wherever situated in such amounts as determined by HBC in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to HBC by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to HBC.

**L.13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor(s), in respect of himself or herself personally, authorizes HBC to disclose information concerning Merchant's and each Owner's and each Guarantor(s)'s credit standing (including credit bureau reports that HBC obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor(s) hereby and each waives to the maximum extent permitted by law any claim for damages against HBC or any of its affiliates relating to any (i)investigation undertaken by or on behalf of HBC as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by HBC, including this Agreement and any other HBC documents (collectively, "Confidential Information") are proprietary and confidential information of HBC. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of HBC to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles HBC to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.15 Publicity.** Merchant and each of Merchant's Owners and all Guarantor(s)s hereto all hereby authorizes HBC to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that HBC may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between HBC and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2        REPRESENTATIONS, WARRANTIES AND COVENANTS**

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

2.1        **Financial Condition and Financial Information.** Merchant's and Guarantor(s)s' bank and financial statements, copies of which have been furnished to HBC, and future statements which will be furnished hereafter at the discretion of HBC, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s)s have a continuing, affirmative obligation to advise HBC of any material adverse change in their financial condition, operation or ownership. HBC may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s)s shall provide them to HBC within five business days after request from HBC. Merchant's or Guarantor(s)s' failure to do so is a material breach of this Agreement.

2.2        **Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

2.3        **Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4        **Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

2.5        **Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without HBC's prior written consent. Any such changes shall be a material breach of this Agreement.

2.6        **Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and HBC, nor shall Merchant change any of its places of business without prior written consent by HBC.

2.7        **Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

2.8        **Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from HBC to Merchant, execute, acknowledge and deliver to HBC and/or to any other person, firm or corporation specified by HBC, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

2.9        **No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection pursuant to the United States Bankruptcy Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

2.10        **Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts and all collateral in which HBC has been granted a security interest under the Security Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of HBC or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of HBC.

2.11        **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.12        **Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

2.13        **Good Faith.** Merchant and Guarantor(s)s hereby affirm that Merchant is receiving the Purchase Price and selling HBC the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business.

**3        EVENTS OF DEFAULT AND REMEDIES**

(a)    Merchant or Guarantor(s) shall violate any term or covenant in this Agreement;

(b)    Any representation or warranty by Merchant or Guarantor(s) in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

(c)    the sending of notice of termination by Merchant or verbally notifying HBC of its intent to breach this Agreement;

(d)    the Merchant fails to give HBC 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored

3

PROPERTY OF HI BAR CAPITAL

Initial(1):_____        Initial(2):_____

by Merchant's bank, the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;

(e) Merchant fails to provide its bank statements, and/or month to date bank activity, and/or accounts receivable reports, and/or bank login information within two (2) business days of a request by HBC.

(f) Merchant shall voluntarily transfer or sell all or substantially all its assets.

(g) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant.

(h) Merchant shall use multiple depository accounts without the prior written consent of HBC or takes any other action that intentionally interferes with or prevents HBC from receiving the Purchased Amount in accordance with the terms of this Agreement.

(i) Merchant shall enter into any financing agreements with any other party including but not limited to; Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.

(j) Merchant shall change its depositing account without the prior written consent of HBC; or

(k) Merchant shall close its depositing account used for ACH debits without the prior written consent of HBC

(l) Merchant's bank returns a code other than NSF cutting HBC from its collections

(m) Merchant or any Owner/Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant.

(n) Merchant shall default under any of the terms, covenants and conditions of any other agreement with HBC.

3.2 Limited Personal Guaranty Upon the occurrence of an Event of Default, HBC will enforce its rights against the Guarantor(s)s of this transaction. Said Guarantor(s)s will jointly and severally liable to HBC for all of HBC's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

3.3 Remedies. Upon the occurrence of an Event of Default occurs and is not waived pursuant to Section 4.4, hereof, HBC may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of HBC in connection with this Agreement may be exercised at any time by HBC after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.4 Attorney's Fees. Upon the occurrence of an Event of Default, and HBC retains an attorney or law firm to enforce this Agreement, Merchant and Guarantor(s) agree that a fee equal to 30% of the Remaining Balance (purchased amount less amount remitted by Merchant) ("Attorney's Fees") shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable.

3.5 Costs. Merchant shall pay to HBC all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of HBC's remedies set forth in this Agreement. including but not limited to court costs and attorneys' fees.

3.6 Required Notifications. Merchant is required to give HBC written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give HBC seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## 4 MISCELLANEOUS

4.1 Modifications; Agreements. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by HBC

4.2 Assignment. HBC may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

4.3 Notices. All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to HBC shall become effective only upon receipt by HBC. Notices to Merchant shall become effective three days after mailing.

4.4 Waiver Remedies. No failure on the part of HBC to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.5 Binding Effect; Governing Law, Venue and Jurisdiction. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums attachments, exhibits, and other documents relating to this Agreement in any way, shall be binding upon and inure to the benefit of Merchant and Guarantor(s) on the one hand, and HBC and their respective successors and assigns, except that Merchant and Guarantor(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of HBC which consent may be withheld in HBC's sole discretion. HBC reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if HBC so elects, be instituted in any court sitting in New York. (the "Acceptable Forums"). All Parties to this Agreement, including but not limited to, Merchant, Guarantor(s), Corporate Guarantor(s) Merchant and Guarantor(s) that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum. Merchant and Guarantor(s) waives any right to oppose any motion or application made by HBC to transfer such proceeding to an Acceptable Forum. **Merchant and Guarantor(s) hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by HBC by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement, or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.**

4.6 Survival of Representation. etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

4.7 Interpretation. All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

4.8 Severability. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

4.9 Entire Agreement. Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant Guarantor(s) and Corporate Guarantor(s)s and HBC and supersede all prior agreements and understandings relating to the subject matter hereof.

4.10 JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

4.11 CLASS ACTION WAIVER. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.12 Facsimile & Digital Acceptance. Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

## SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY OF PEFORMANCE. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

Merchant's LegalName: EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

D/B/A: EXCELL AUTO GROUP, INC  AND ALL ENTITIES LISTED ON THE " EXHIBIT A"  Federal ID#:

Physical Address: 1001 CLINT MOORE ROAD #101    City: BOCA RATON    State: FL    Zip: 33487

### SECURITY AGREEMENT

Security Interest. This Agreement will constitute a security agreement under the Uniform Commercial Code. To secure Merchant's obligations under the Revenue Purchase Agreement to make available or deliver Purchased Amount to HBC and HBC's right to realize the Purchased Amount, as and to the extent required by the terms of the Revenue Purchase Agreement, and performance of and compliance by Merchant with its other undertakings and agreements herein, Merchant and Guarantor(s)(s) grants to HBC a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to HBC under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to HBC upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover HBC's entitlements under this Agreement, HBC is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of HBC's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, HBC or an affiliate of HBC is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

In the event Merchant, any of its officers or directors or any Owner/Guarantor(s), during the term of the Revenue Purchase Agreement or while Merchant remains liable to HBC for any obligations under the Revenue Purchase Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due HBC under the Revenue Purchase Agreement. With respect to any such entity, HBC shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. HBC shall be held harmless by Merchant and each Owner/Guarantor(s) and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. HBC shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of HBC's rights, including without limitation, HBC's right to collect all accounts, and to notify any payment card processor or creditor of such entity that HBC has such rights in such entity's assets. Merchant also agrees that, at the HBC's discretion, HBC may choose to amend any existing financing statement to include any such newly formed entity as debtor.

This security interest may be exercised by HBC without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. HBC shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, HBC has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, HBC will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from HBC written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor(s) (s) agree(s) that this is a contract of recoupment and HBC is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s)(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by HBC. Merchant and Guarantor(s)(s) agree(s) to execute and deliver to HBC such instruments and documents HBC may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. HBC is authorized to execute all such instruments and documents in Merchant's and Guarantor(s)(s) name.

Merchant and Guarantor(s)(s) each acknowledge and agree that any security interest granted to HBC under any other agreement between Merchant or Guarantor(s)(s) and HBC (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s)(s) each agrees to execute any documents or take any action in connection with this Agreement as HBC deems necessary to perfect or maintain HBC's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s)(s) each hereby authorizes HBC to file any financing statements deemed necessary by HBC to perfect or maintain HBC's security interest. Merchant and Guarantor(s)(s) shall be liable for, and HBC may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by HBC in protecting, preserving and enforcing HBC's security interest and rights.

Negative Pledge. Merchant and Guarantor(s)(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

Consent to Enter Premises and Assign Lease. HBC shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, HBC may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that HBC may enter into an agreement with Merchant's landlord giving HBC the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

Remedies. Upon any Event of Default, HBC may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to HBC, whether by acceleration or otherwise.

5

Initial(1):_____  Initial(2):_____

PROPERTY OF HI BAR CAPITAL

## GUARANTY OF PERFORMANCE

As an additional inducement for HBC to enter into the Revenue Purchase Agreement, the undersigned Guarantor(s)(s) hereby provides HBC with this Guaranty. Guarantor(s)(s) will not be personally liable for any amount due under the Revenue Purchase Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of the Revenue Purchase Agreement. Each Guarantor(s) shall be jointly and severally liable for all amounts owed to HBC in the Event of Default. Guarantor(s)(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement including the Merchant's full and timely delivery of the Purchased Amount pursuant to (and limited by) the Revenue Purchase Agreement, in each case as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor(s)'s obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

Guarantor(s) Waivers. In the event of a breach of the above, HBC may seek recovery from Guarantor(s)s for all of HBC's losses and damages by enforcement of HBC's rights under this Agreement without first seeking to obtain payment from Merchant, any other Guarantor(s), or any Collateral or Additional Collateral HBC may hold pursuant to this Agreement or any other guaranty. In addition, Section 4.5, 4 10 and 4.11 are expressly reiterated in the Security Agreement and Guaranty herein. HBC is not required to notify Guarantor(s) of any of the following events and Guarantor(s) will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) HBC's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to HBC. In addition, HBC may take any of the following actions without releasing Guarantor(s) from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to HBC; (ii) release Merchant from its obligations to HBC;

(iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations, and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor(s) to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to HBC under the Merchant Agreement and this Agreement are paid in full, Guarantor(s) shall not seek reimbursement from Merchant or any other Guarantor(s) for any amounts paid by it under this Agreement. Guarantor(s) permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other Guarantor(s), or any collateral provided by Merchant or any other Guarantor(s), for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that HBC must return any amount paid by Merchant or any other Guarantor(s) of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor(s)'s obligations under this Agreement shall include that amount.

Guarantor(s) Acknowledgement. Guarantor(s) acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

This Security Agreement and Guaranty and Guaranty of Performance shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if HBC so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant, Guarantor and Corporate Guarantors waives any right to oppose any motion or application made by HBC to transfer such proceeding to an Acceptable Forum.

The Merchant Guarantor(s) and Corporate Guarantor(s) acknowledge that they have read Paragraph 4.5 of this Agreement in its entirety and understand that they are waiving their right to Service of Process by traditional manners and will accept process of any Summons and Complaint or other legal process by certified mail, return receipt requested to the Mailing Address on Page 1 of this Agreement.

FOR ALL MERCHANT(S) (#1) By: **KRISTEN ZANKL**
(Print Name and Title)

_(Signature)_

FOR ALL MERCHANT(S) (#2) By: **SCOTT THOMAS ZANKL**
(Print Name and Title)

DocuSigned by:
Scott Thomas Zankl
(Signature)

GUARANTOR(S) (#1) By: **KRISTEN ZANKL**
(Print Name and Title)

DocuSigned by:
(Signature)

GUARANTOR(S) (#2) By: **SCOTT THOMAS ZANKL**
(Print Name and Title)

SSN

DocuSigned by:
Scott Thomas Zankl
(Signature)

6

PROPERTY OF HI BAR CAPITAL

## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT), DIRECT PAYMENTS (ACH DEBITS), AND CHECK DEBIT

Merchant: EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

        (Merchant's Legal Name)

Merchant Agreement: Merchant Agreement between HBC and Merchant, dated as of: 10/27/2021

Designated Checking Account:

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. This Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.

DISBURSEMENT OF ADVANCE PROCEEDS. By signing below, Merchant authorizes HBC to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. By signing below, Merchant also authorizes HBC to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits or to initiate a Check Debit to the Designated Checking Account, as follows:

Bank Name: _____    Branch: _____

Federal ID#: _____

ABA: Routing: _____    DDA: Account: _____

In the Amount of: $ 150,000.00

(Or) Percentage of each Banking Deposit: 20     %

On the Following Days: MONDAY-FRIDAY

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that HBC may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes HBC to initiate ACH entries to correct any erroneous payment transaction.

MISCELLANEOUS. HBC is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association). This Authorization Agreement is to remain in full force and effect until HBC has received written notification from Merchant at the address set forth below at least 5 banking days prior of its termination to afford HBC a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

Merchant agrees to be bound by the ACH Rules as defined by the National ACH Association (NACHA). Merchant understands that this authorization is to remain in full force and effect until HBC has received written notification from me of its termination at least five (5) business days prior to the payment due date. Merchant further understands that canceling their ACH authorization does not relieve them of the responsibility of paying account in full, and that if Merchant cancels or revokes this authorization before any remaining debt is paid in full, the HBC may take additional actions including legal actions to secure the debt.

EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

Merchant: _____

    (Merchant's Legal Name)

Print Name: KRISTEN ZANKL

    DocuSigned by:

X _____
(Signature)    Kristen

_____
(Title)

Date: 10/27/2021
(Month) (Day) (Year)

Print Name: SCOTT THOMAS ZANKL

X _____
(Signature)    scott zankl

_____
(Title)

Date: 10/27/2021
(Month) (Day) (Year)

7

PROPERTY OF HI BAR CAPITAL

# APPENDIX A - THE FEE STRUCTURE:

A.  **Underwriting Fee:** $ 5,687.50  to cover Underwriting and relates expenses.

B.  **UCC Filing Fee:** $499.00 and are not an automated process, requiring us to charge this fee to cover costs.

C.  **NSF Fee Standard:** $50.00 (each) up to TWO TIMES ONLY before a default is declared.

D.  **Bank Change Fee:** $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

E.  **Blocked ACH Payment:** $5,000.00 This fee is applied when Merchant directs the bank to BLOCK our ACH Debits. Blocking ACH Debits will place Merchant's account in default.

F.  **Default Fee:** Shall be applied to Merchant's account in the event that Merchant defaults under the terms of the Merchant Agreement.

G.  **ACH Processing Fee:** $249.00 (or 10% of the contract amount, depending on size of advance) ACH's are labor intensive

H.  **Account Management Fee:** At the end of each month, Merchant will pay to HBC an Account Management Fee. This fee will not be applied towards the reduction of the Purchased Amount. This monthly fee will equal the average of all the payments received as a Specified percentage of the Merchants settlement amount for that Month.

I.  **Miscellaneous Service Fee:** Merchant shall pay certain fees for services related to the origination and maintenance of Accounts. Each Merchant shall receive their funding electronically to their designated bank account and will be charged $30.00 for a Fed Wire or 0.00 for a bank ACH. The current charge for the underwriting and origination of each Merchant

J.  **Working Capital Funding:** A fee of $5,000.00 or 10% shall be applied every time Merchant enters into any arrangement, agreement, or commitment that relates to or involves the Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales with any party other than HBC

K.  **Contract Service Fee:** Commencing at date funded (the "Start Date"), merchant shall pay a fee of $499.00 per month (the "Monthly Fee") the monthly fee is payable each month during the term of this agreement, at a minimum of three months.

L.  **Attorney's Fee:** $10,000. When merchant breaches any term of this Agreement and HBC is required to retain counsel to enforce, defend or collect any term of this Agreement.

[ALL FEES ARE SUBJECT TO CHANGE]

FOR THE MERCHANT (#1) By: KRISTEN ZANKL

(Print Name and Title)

(Signature)

FOR THE MERCHANT (#2) By: SCOTT THOMAS ZANKL

(Print Name and Title)

(Signature)

8

PROPERTY OF HI BAR CAPITAL

## EXHIBIT A

### ADDENDUM TO
### THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT AND GUARANTY

This **ADDENDUM TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT and GUARANTY** (this "Addendum"), dated 10/27/2021 is entered into by and among **PROPERTY OF HI BAR CAPITAL** ("BUYER") and **Business Legal Name: EXCELL AUTO GROUP, INC** D/B/A: EXCELL AUTO GROUP

Business Legal Name: LEGAL/CORPORATE NAME: KARMA OF PALM BEACH INC
DBA: KARMA OF PALM BEACH
**Form of Business Entity:**

EIN #:
("Seller #1"); and

**Business Legal Name:** AUTOMOTIVE SERVICE SYSTEMS, INC.
**Form of Business Entity:**

EIN #:
("Seller #2"); and

**Business Legal Name:** KZ CONSULTANTS, INC.
**Form of Business Entity:**

EIN #:
("Seller #3"); and

**Business Legal Name:** MISS KRIS, LLC
**Form of Business Entity:**

EIN #:
("Seller #4"); and

**Business Legal Name:** EXCELL AUTO LEASING INC
**Form of Business Entity:**

EIN #:
("Seller #5"); and

**Business Legal Name:** EXCELL AUTO WHOLESALE INC.
**Form of Business Entity:**

EIN #:
("Seller #6"); and

**Business Legal Name:** DEALER SOUQ USA LLC
**Form of Business Entity:**

EIN #:
("Seller #7"); and

**Business Legal Name:** EAG WHOLESALE LLC
**Form of Business Entity:**

EIN #:
("Seller #8"); and

**Business Legal Name:** KARMA OF BROWARD, INC.
**Form of Business Entity:**

EIN #:
("Seller #9"); and

**Business Legal Name:** LAVISH HERO FUND INC
**Form of Business Entity:**

EIN #:
("Seller #10"); and

**Business Legal Name:** KARMA OF PALM BEACH, INC.
**Form of Business Entity:**

EIN #:
("Seller #11"); and

**Business Legal Name:** APPLE 3 INVESTMENTS, INC.
**Form of Business Entity:**

EIN #:
("Seller #12"); and

**Business Legal Name:** KZ CONSULTANTS INC
**Form of Business Entity:**

**EIN #:**
("Seller #13"); and

**Business Legal Name: EXCELL AUTO SPORT AND SERVICE, INC**

EIN #:
("Seller #14").

Signature: [DocuSigned by: 6CEA230F51E247A...]

Signature: [DocuSigned by: Scott Thomas Zankl 763D464660D2410...]
Name: SCOTT THOMAS

Name: KRISTEN ZANKL

Title: OWNER

Title: OWNER 2

Hereinafter: (i) Seller # 1 is referred to as the "Original Seller"; and (ii) Seller # 2, Seller # 3 and Seller # 4 are referred to, individually and collectively, jointly and severally, as the "Additional Seller"; and (iii) the Original Seller and the Additional Seller are referred to, individually and collectively, jointly and severally, as the "Seller."

Hereinafter, Guarantor # 1 is referred to as the "Original Guarantor."

W-I-T-N-E-S-S-E-T-H

WHEREAS, BUYER, the Original Seller and the Original Guarantor entered into that certain FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT, dated 10/27/2021      (the "Agreement"); and
WHEREAS, the obligations of the Original Seller under the Agreement are further guaranteed by the Original Guarantor pursuant to the Personal Guaranty of Performance set forth as Exhibit
A to the Agreement (the "Guaranty"); and
WHEREAS, the parties hereto desire to amend and restate the Agreement by adding the name(s) of the Additional Seller as the parties to the Agreement, as if the Additional Seller were the signatories to the Agreement.

NOW, THEREFORE, for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged, the parties to this Addendum hereby agree to the foregoing and as follows:

Guarantor #1 Initials: [DS]      Guarantor #2 Initials: [DS] STZ

PROPERTY OF HI BAR CAPITAL

**Bank Login Information**

Dear Merchant,

Thank you for accepting this offer from HBC. We look forward to being your funding partner for as long as you need.

**Daily ACH Program:**

HBC will require viewing access s to your bank account, each business day, in order to verify the amount of your daily payment. Please be assured that  e w carefully safeguard your confidential information, and only essential personnel will have access to it.

HBC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

\* Be sure to indicate capital or lower-case letters.

Name of Bank: _____

Bank portal website:

Username: _____

Password: _____

Security Question / Answer 1:_____

Security Question /Answer 2: _____

Security Question / Answer 3: _____

Any other information necessary to access your account:

| | | |
|---|---|---|
| _____ | DocuSigned by: | 10/27/2021 |
| **KRISTEN ZANKL** | | |
| FOR THE MERCHANT (#1) By: | DocuSigned by: | Date |
| | Scott Thomas Zankl | 10/27/2021 |
| **SCOTT THOMAS ZANKL** | | |
| FOR THE MERCHANT (#2) By: | | Date |

9

PROPERTY OF HI BAR CAPITAL

# EXHIBIT M

**Exhibit M**

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "SETTLEMENT AGREEMENT" or "Agreement") is entered into by and between **EXCELL AUTO GROUP, INC.; KARMA OF PALM BEACH INC; AUTOMOTIVE SERVICE SYSTEMS, INC.; KZ CONSULTANTS, INC.; MISS KRIS, LLC; EXCELL AUTO LEASING INC; EXCELL AUTO WHOLESALE INC.; DEALER SOUQ USA LLC; EAG WHOLESALE LLC; KARMA OF BROWARD, INC.; LAVISH HERO FUND; KARMA OF PALM BEACH, INC.; APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC.** (collectively the "Seller" or "Sellers"), **KRISTIN ZANKL and SCOTT THOMAS ZANKL** (collectively the "Guarantors,"), and referred to herein together with Seller collectively and individually as (the "Sellers"), and **HI BAR CAPITAL, LLC** ("Purchaser,") and referred to herein collectively with the Sellers as (the "Parties") on this **December 19, 2021** (the "Effective Date").

WHEREAS, the Parties entered into a receivables purchase agreement on **October 27, 2021**; (collectively the "Purchase Agreement")

WHEREAS, on NOVEMBER 16, 2021, the Sellers defaulted on the Purchase Agreement. ("Default Date")

WHEREAS, the Sellers are indebted to Purchaser in the amount of **$2,677,880.00** plus fees and costs.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED BETWEEN THE PARTIES AS FOLLOWS:

Sellers shall pay to Purchaser the agreed amount of **$2,677,880.00** at a 1.50 factor rate for a total payback amount of $4,016,820 ("Settlement Amount") as follows:

1.  Payments
    a.  Seller shall make payments of **$200,000.00** per week until the balance plus factor rate is paid in full. See attached Payment Schedule attached hereto as **Exhibit "B"**.
    b.  First payment shall be due on Monday, December 20, 2021 and shall continue each week until paid in full.
2.  Early Payoff Discount.
    a.  Within 30 days of execution of this Settlement Agreement, Seller may payoff the Settlement Amount at a discounted factor rate of **1.10** for a total payback amount of **$2,945,668.00.**
    b.  If Seller does not exercise this early payoff option, payments shall continue at the agreed payment schedule as listed in Exhibit "B".
3.  Payments shall be made by Wire or ACH each week on the scheduled payment dates.

1.  **SECURITY AGREEMENT:**
    Sellers and Guarantor agree to provide security interest in the following collateral:

    a.  Security Interest in Vehicle
        i.  Sellers shall provide an unencumbered security interest in the **2017 Pagani (VIN #ZA9H12UA5HSF76013).** (the "Vehicle") A copy of the Vehicle's Title is attached

Settlement Agreement and Release - Page 1 of 10

EXHIBIT B

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

hereto as **Exhibit "A"**.

   ii.  Sellers shall execute a security interest and any other documents necessary to effectuate this security interest and perfect the lien against the Vehicle.

   iii.  Sellers shall deliver an original title to the Vehicle to be held in escrow until the Settlement Amount is paid in full.

b.  Additional Security

   i.  As additional security for the prompt and complete payment and performance of any and all liabilities, obligations, covenants or agreements of Seller under this Settlement Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Sellers hereby pledge, assign and hypothecate to Purchaser (collectively, "Pledge") and grants to Purchaser a continuing, perfected and first priority lien upon and security interest in, to and under all of Sellers' right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

      1.  all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Sellers; and all of Sellers' proceeds, as such term is defined by Article 9 of the UCC.

c.  REPRESENTATIONS AND WARRANTIES. Sellers warrant and covenant that:

   i.  No other creditors has a security interest in the Collateral Sellers is the owner of the Collateral free from any adverse lien or encumbrance except this lien and the others described in this Agreement.

   ii.  Sellers will defend the Collateral against all claims of other persons.

   iii.  Sellers will immediately notify the Purchaser in writing of any change in name or address.

   iv.  Sellers will do all such things as Purchaser at any time or from time to time may reasonably request to establish and maintain a perfected security interest in the Collateral.

   v.  Sellers will pay the cost of filing this agreement in all public offices where recording is deemed by Purchaser to be necessary or desirable. A photographic or other reproduction of this agreement is sufficient as a financing statement.

   vi.  Sellers will not transfer or encumber the Collateral without the prior written consent of Purchaser.

   vii.  Sellers will keep the Collateral insured against risk of loss or damage upon such terms as Purchaser may reasonably require.

   viii.  Sellers will keep the Collateral free from any adverse lien and in good repair, will not waste or destroy the Collateral, and will not use the Collateral in violation of any law or policy of insurance. Purchaser may examine and inspect the Collateral at any reasonable time.

   ix.  Sellers will pay promptly when due all taxes and assessments upon the Collateral or for its use or operation or upon this Agreement or upon any note evidencing the Obligations.

d.  Representations with Respect to Collateral. Sellers hereby represents and warrants to Purchaser that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC-1s); and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Sellers are a party or by which any of Sellers' assets (including, without limitation, the Collateral) are bound.

e. Further Assurances. Upon the request of Purchaser, Sellers, at Sellers' sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as Purchaser may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

f. Attorney-in-Fact. Sellers hereby authorize Purchaser at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints Purchaser as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Sellers and in the name of Seller or otherwise, from time to time, in Purchaser's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Sellers, and thereafter filing any such financing and/or continuation statements, and

to receive, endorse and collect all instruments made payable to Sellers.

2.      There shall be no cure period. If any payment is not received on the aforementioned dates, Purchaser shall have leave to enforce the full balance due less any payments made hereunder.

3.      Purchaser hereby covenants not to sue and forever releases, acquits, and discharges Sellers and any of their guarantors, agents, employees, officers, partners, principals, insurers, representatives, successors, transferees or assigns, from any and all liability, claims, damages or demands Purchaser has now or may have in connection with said Purchase Agreement, unless there is a breach of this Settlement Agreement.

4.      Upon Sellers' fulfillment of its obligations hereunder and the clearance of all payments in accordance with the terms of this Settlement Agreement, Sellers and any applicable guarantor of the sums due under the Receivables Purchase Agreement shall be relieved of any such further liability.

5.      Within five (5) business days after Sellers' fulfillment of its obligations hereunder and the clearance of all payments in accordance with the terms of this Settlement Agreement, Purchaser terminate any/all UCC filings and liens previously filed by Purchaser against Sellers, and release any/all of Sellers' obligations to Purchaser pursuant to the Receivables Purchase Agreement, and Purchaser will so notify Sellers' attorney in writing.

6.      Waiver of Purchaser's Liability. Upon the Effective Date, the Sellers for itself and on behalf of all parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns, hereby releases and forever discharges Purchaser and its respective parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, actions, causes of action and suits, known or unknown, liquidated or contingent, arising from, which may arise in the future from, or which are related in any manner to the Action or the underlying Agreement, including any claims that were or could have been asserted,

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

other than Purchaser's obligations under this Settlement Agreement.

7.    Withdraw Claims and Consent to Judgment. Seller and Guarantor hereby withdraw any defenses arising from the Purchase Agreement or any pending actions filed by the Purchaser. Sellers and Guarantors further agree to waive all defenses, claims, or counterclaims that may arise from this Agreement or the Purchase Agreement. In the event of default of this Agreement, Purchaser may, without further notice, file a claim for the total indebtedness plus accrued fees and costs less payments received.

8.    CONSENT TO JURISDICTION. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Sellers and Guarantors irrevocably submits to the exclusive jurisdiction of any New York county Supreme Court or any federal court sitting within the State of New York over any suit, action or proceeding arising out of or relating to this Agreement. Seller and Guarantor irrevocably waive, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Seller and Guarantor agree that final judgment in any such suit, action or proceeding brought in such a court shall be enforced in any court of proper jurisdiction by a suit upon such judgment, provided that service of process in such action, suit or proceeding shall have been effected upon the Seller and Guarantor in a manner permitted by law.

9.    WAIVER OF SERVICE OF PROCESS. The parties further agree to waive personal service of process and to accept mail by electronic mail or by mailing by certified or registered mail, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

10.    Alter Egos. Seller may not own, operate, or affiliate with any entities in the same or similar industry without Purchaser's express consent.

11.    Personal Guaranty ("Guaranty"). as an inducement for Purchaser to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantors hereby agree as follows:
    a.    Defined Terms. All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.
    b.    Guaranty of Obligations. Guarantors hereby irrevocably, absolutely and unconditionally guarantees to Purchaser prompt, full, faithful and complete performance and observance of all of Sellers' obligations in this Agreement; and Guarantors unconditionally covenants to Purchaser that if default or breach shall at any time be made by Sellers, Guarantors shall well and truly pay or perform (or cause to be paid or performed) the all obligations under this Agreement and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.
    c.    Guarantors' Other Agreements. Guarantors will not dispose, convey, sell or otherwise transfer, or cause Sellers to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Sellers' business without the prior written consent of Purchaser, which consent may be withheld for any reason, until receipt of the entire Settlement Amount. Guarantors shall pay to Purchaser upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Purchaser's rights hereunder or Purchaser's rights under the Agreement. This Guaranty is binding upon Guarantors and Guarantors' heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Purchaser. If there is more than one

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantors shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Sellers and Purchaser, or the existence of any defense, setoff or counterclaim, which Seller may assert. Purchaser is hereby authorized, without notice or demand and without affecting the liability of Guarantors hereunder, to at any time renew or extend Sellers' obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement.

12. **Seller's Obligations Upon Default**. Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to Purchaser the entire unpaid portion of the Settlement Amount plus fees, penalties, and costs. In addition, Seller shall also pay to Purchaser, as additional damages, any reasonable expenses incurred by Purchaser in connection with recovering the monies due to Purchaser from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees in the amount 33% of the undelivered portion of the Settlement Amount (collectively, "Reasonable Damages"). The parties agree that Purchaser shall not be required to itemize or prove its Reasonable Damages and that the fair value of the Reasonable Damages, not including attorneys' fees or collections fees, shall be calculated as twenty-five percent (25%) of the undelivered portion of the Settlement Amount upon the occurrence of an event of default.

13. **Remedies Upon Default**. Upon Seller's default, Purchaser may immediately proceed to protect and enforce its rights under this Agreement and/or Guaranty by:
    a. Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of Purchaser's security interest;
    b. Enforcing the provisions of the personal guaranty against the personal guarantors named herein without first seeking recourse from Seller for the full balance owed at the time of default plus applicable fees and costs;
    c. Commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy including without limitation Purchaser's rights of a secured party under the UCC.

14. **Remedies are not Exclusive**. All rights, powers and remedies of Purchaser in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall be in addition to any other rights, powers or remedies provided to Purchaser by law or equity.

15. Modifications; Agreements. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

16. Assignment. Purchaser may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Sellers. Sellers shall not assign its rights or obligations under this Agreement without first obtaining Purchaser's written consent.

17. Notices. Unless different means of delivering notices are set forth elsewhere in this Agreement, all notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective as of the date of receipt or declined receipt.

18. Waiver Remedies. No failure on the part of Purchaser to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

19. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties and their

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

respective successors and permitted assigns.

20. JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

21. Severability. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

22. Entire Agreement. This Agreement embodies the entire agreement between Seller and Purchaser and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

THE UNDERSIGNED REPRESENT AND WARRANT THAT THEY HAVE READ THIS STIPULATED SETTLEMENT AGREEMENT IN ITS ENTIRETY AND HAVE THE FULL CAPACITY, POWER, AND AUTHORITY TO MAKE THIS AGREEMENT AS SET FORTH ABOVE, AND THAT NO OTHER REPRESENTATIONS OR INDUCEMENTS APART FROM THIS STIPULATED SETTLEMENT AGREEMENT, EITHER WRITTEN OR ORAL, HAVE BEEN MADE.

IN WITNESS WHEREOF, Sellers and Purchaser have hereunder set their hands and seals on **December 19, 2021**.

[SIGNATURES ON FOLLOWING PAGE]

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

| "SELLERS" | "GUARANTORS" |
|---|---|

**"SELLERS"**

EXCELL AUTO GROUP, INC.;
KARMA OF PALM BEACH INC;
AUTOMOTIVE SERVICE SYSTEMS, INC.;
KZ CONSULTANTS, INC.; MISS KRIS, LLC;
EXCELL AUTO LEASING INC;
EXCELL AUTO WHOLESALE INC.;
DEALER SOUQ USA LLC;
EAG WHOLESALE LLC; KARMA OF
BROWARD, INC.;
LAVISH HERO FUND; KARMA OF PALM
BEACH, INC.;
APPLE 3 INVESTMENTS, INC.; KZ
CONSULTANTS INC.; EXCELL AUTO
SPORT AND SERVICE, INC. (collectively the
"Sellers")

X _Kristin Zankl_____
Name: KRISTIN ZANKL, individually and as
authorized signor on behalf of the Sellers

EXCELL AUTO GROUP, INC.;
KARMA OF PALM BEACH INC;
AUTOMOTIVE SERVICE SYSTEMS, INC.;
KZ CONSULTANTS, INC.; MISS KRIS, LLC;
EXCELL AUTO LEASING INC;
EXCELL AUTO WHOLESALE INC.;
DEALER SOUQ USA LLC;
EAG WHOLESALE LLC; KARMA OF
BROWARD, INC.;
LAVISH HERO FUND; KARMA OF PALM
BEACH, INC.;
APPLE 3 INVESTMENTS, INC.; KZ
CONSULTANTS INC.; EXCELL AUTO
SPORT AND SERVICE, INC. (collectively the
"Sellers")

X _Scott Thomas Zankl_____
Name: SCOTT THOMAS ZANKL, individually
and as authorized signor on behalf of the Sellers

**"GUARANTORS"**

SCOTT THOMAS ZANKL
"GUARANTOR"

X _Scott Thomas Zankl_____
SCOTT THOMAS ZANKL,
Individually

KRISTIN ZANKL
"GUARANTOR"

X _Kristin Zankl_____
KRISTIN ZANKL,
Individually

**"PURCHASER"**
HI BAR CAPITAL, LLC

X _Steven Zakharyayev_____
Name: Steven Zakharyayev
Title: Attorney for Purchaser, Hi Bar Capital

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

# EXHIBIT A



DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

## EXHIBIT B

## PAYMENT SCHEDULE

| Weeks | Payment Due Date | Payments |
|-------|------------------|-------------|
| 1 | 12/20/21 | $200,000.00 |
| 2 | 12/27/21 | $200,000.00 |
| 3 | 01/03/22 | $200,000.00 |
| 4 | 01/10/22 | $200,000.00 |
| 5 | 01/17/22 | $200,000.00 |
| 6 | 01/24/22 | $200,000.00 |
| 7 | 01/31/22 | $200,000.00 |
| 8 | 02/07/22 | $200,000.00 |
| 9 | 02/14/22 | $200,000.00 |
| 10 | 02/21/22 | $200,000.00 |
| 11 | 02/28/22 | $200,000.00 |
| 12 | 03/07/22 | $200,000.00 |
| 13 | 03/14/22 | $200,000.00 |
| 14 | 03/21/22 | $200,000.00 |
| 15 | 03/28/22 | $200,000.00 |
| 16 | 04/04/22 | $200,000.00 |
| 17 | 04/11/22 | $200,000.00 |
| 18 | 04/18/22 | $200,000.00 |
| 19 | 04/25/22 | $200,000.00 |
| 20 | 05/02/22 | $216,820.00 |

Settlement Agreement and Release - Page 9 of 10

# EXHIBIT N

**Exhibit N**

FINANCING STATEMENT FORM

| A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON |
|---|
| STEVEN ZAKHARYAYEV; 9546044222 |
| Email STEVEN@STEVENZLAW.COM |

**FILED**

2022 Jan 25 10:55 PM

******* 202109624865 *******

| B. SEND ACKNOWLEDGEMENT TO: |
|---|

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S EXACT FULL LEGAL NAME**- INSERT ONLY ONE DEBTOR NAME (1a OR 1b) - Do Not Abbreviate or Combine Names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| EXCELL AUTO GROUP INC. | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX | |
| 1c. MAILING ADDRESS Line One | | | | | |
| 1001 CLINT MOORE ROAD | | This space not available. | | | |
| MAILING ADDRESS Line Two | | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | | BOCA RATON | FL | 33487 | US |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (2a OR 2b) - Do Not Abbreviate or Combine Names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| KARMA OF PALM BEACH INC. | | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX | |
| 2c. MAILING ADDRESS Line One | | | | | |
| 1001 CLINT MOORE ROAD | | This space not available. | | | |
| MAILING ADDRESS Line Two | | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | | BOCA RATON | FL | 33487 | US |

**3. SECURED PARTY'S NAME**   (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| LAW OFFICES OF STEVEN ZAKHARYAYEV, AS REPRESENTATIVE FOR SECURED PARTY | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX | |
| 3c. MAILING ADDRESS Line One | | | | | |
| 10 WEST 37TH STREET | | This space not available. | | | |
| MAILING ADDRESS Line Two | | CITY | STATE | POSTAL CODE | COUNTRY |
| #602 | | NEW YORK | NY | 10018 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

All accounts receivable, receipts, instruments, contract rights, and other rights to receive the payment of money, patents, goods, inventory, equipment, deposit accounts, money, chattel paper, licenses, leases, and general intangibles, whether now owned or hereafter acquiredac

| 5. ALTERNATE DESIGNATION (If applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR |
|---|---|---|---|
| | ☐ AG LIEN | ☐ NON-UCC FILING | ☐ SELLER/BUYER |

**6. Florida DOCUMENTARY STAMP TAX** - YOU ARE REQUIRED TO CHECK EXACTLY ONE  BOX

☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☑ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

STANDARD FORM - FORM UCC-1 (REV.05/2013)     Filing Office Copy     Approved by the Secretary of State, State of Florida

Exhibit E

## STATE OF FLORIDA UNIFORM COMMERICAL CODE
## FINANCING STATEMENT FORM - ADDITIONAL PARTY

**18. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT**

18a. ORGANIZATION'S NAME

EXCELL AUTO GROUP INC.

| 18b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**19. MISCELLANEOUS:**

**20. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (20a OR 20b) - Do Not Abbreviate or Combine Names

| 20a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| AUTOMOTIVE SERVICE SYSTEMS INC. | | | | |
| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) SUFFIX | | |
| 20c. MAILING ADDRESS Line One | | | | |
| 1001 CLINT MOORE ROAD | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | BOCA RATON | FL | 33487 | US |

**21. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (21a OR 21b) - Do Not Abbreviate or Combine Names

| 21a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| KZ CONSULTANTS INC. | | | | |
| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) SUFFIX | | |
| 21c. MAILING ADDRESS Line One | | | | |
| 1001 CLINT MOORE ROAD | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | BOCA RATON | FL | 33487 | US |

**22. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (22a OR 22b) - Do Not Abbreviate or Combine Names

| 22a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| MISS KRIS LLC | | | | |
| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) SUFFIX | | |
| 22c. MAILING ADDRESS Line One | | | | |
| 1001 CLINT MOORE ROAD | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | BOCA RATON | FL | 33487 | US |

**23. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (23a OR 23b) - Do Not Abbreviate or Combine Names

| 23a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| EXCELL AUTO LEASING INC. | | | | |
| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) SUFFIX | | |
| 23c. MAILING ADDRESS Line One | | | | |
| 1001 CLINT MOORE ROAD | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | BOCA RATON | FL | 33487 | US |

**24. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (24a OR 24b) - Do Not Abbreviate or Combine Names

| 24a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| EXCELL AUTO WHOLESALE INC. | | | | |
| 24b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) SUFFIX | | |
| 24c. MAILING ADDRESS Line One | | | | |
| 1001 CLINT MOORE ROAD | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | BOCA RATON | FL | 33487 | US |

**25. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (25a OR 25b) - Do Not Abbreviate or Combine Names

| 25a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| DEALER SOUQ USA LLC | | | | |
| 25b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) SUFFIX | | |
| 25c. MAILING ADDRESS Line One | | | | |
| 1001 CLINT MOORE ROAD | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| #101 | BOCA RATON | FL | 33487 | US |

STANDARD FORM - FORM UCC-1 ADDITIONAL PARTY (REV.05/2013)　　　Filing Office Copy　　　Approved by the Secretary of State, State of Florida

**STATE OF FLORIDA UNIFORM COMMERICAL CODE**
**FINANCING STATEMENT FORM - ADDITIONAL PARTY**

**18. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT**

18a. ORGANIZATION'S NAME

EXCELL AUTO GROUP INC.

| 18b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**19. MISCELLANEOUS:**

---

**26. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (26a OR 26b) - Do Not Abbreviate or Combine Names

26a. ORGANIZATION'S NAME
EAG WHOLESALE LLC

| 26b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) SUFFIX | | |
|---|---|---|---|---|
| 26c. MAILING ADDRESS Line One 1001 CLINT MOORE ROAD | | This space not available. | | |
| MAILING ADDRESS Line Two #101 | | CITY BOCA RATON | STATE FL | POSTAL CODE 33487 | COUNTRY US |

**27. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (27a OR 27b) - Do Not Abbreviate or Combine Names

27a. ORGANIZATION'S NAME
KARMA OF BROWARD INC.

| 27b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) SUFFIX | | |
|---|---|---|---|---|
| 27c. MAILING ADDRESS Line One 1001 CLINT MOORE ROAD | | This space not available. | | |
| MAILING ADDRESS Line Two #101 | | CITY BOCA RATON | STATE FL | POSTAL CODE 33487 | COUNTRY US |

**28. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (28a OR 28b) - Do Not Abbreviate or Combine Names

28a. ORGANIZATION'S NAME
LAVISH HERO FUND INC.

| 28b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) SUFFIX | | |
|---|---|---|---|---|
| 28c. MAILING ADDRESS Line One 1001 CLINT MOORE ROAD | | This space not available. | | |
| MAILING ADDRESS Line Two #101 | | CITY BOCA RATON | STATE FL | POSTAL CODE 33487 | COUNTRY US |

**29. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (29a OR 29b) - Do Not Abbreviate or Combine Names

29a. ORGANIZATION'S NAME
KRISTIN ZANKL

| 29b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) SUFFIX | | |
|---|---|---|---|---|
| 29c. MAILING ADDRESS Line One 16937 PIERRE CIR | | This space not available. | | |
| MAILING ADDRESS Line Two | | CITY DEL RAY BEACH | STATE FL | POSTAL CODE 33446 | COUNTRY US |

**30. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (30a OR 30b) - Do Not Abbreviate or Combine Names

30a. ORGANIZATION'S NAME
SCOTT THOMAS ZANKL

| 30b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) SUFFIX | | |
|---|---|---|---|---|
| 30c. MAILING ADDRESS Line One 16937 PIERRE CIR | | This space not available. | | |
| MAILING ADDRESS Line Two | | CITY DEL RAY BEACH | STATE FL | POSTAL CODE 33446 | COUNTRY US |

# EXHIBIT O

**Exhibit O**

## STIPULATION OF SETTLEMENT PURSUANT TO CPLR 3215(i)

THIS STIPULATION OF SETTLMENT (the "STIPULATION OF SETTLEMENT") is entered into by and between EXCELL AUTO GROUP, INC.; KARMA OF PALM BEACH INC; AUTOMOTIVE SERVICE SYSTEMS, INC.; KZ CONSULTANTS, INC.; MISS KRIS, LLC; EXCELL AUTO LEASING INC; EXCELL AUTO WHOLESALE INC.; DEALER SOUQ USA LLC; EAG WHOLESALE LLC; KARMA OF BROWARD, INC.; LAVISH HERO FUND; KARMA OF PALM BEACH, INC.; APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC. (individually and collectively the "Merchant"), KRISTIN ZANKL and SCOTT THOMAS ZANKL (collectively the "Guarantors" and together with the Merchant, the "Obligated Parties") and HI BAR CAPITAL, LLC ("Purchaser,") and referred to herein collectively with the Obligated Parties as (the "Parties") on this February 1, 2022 (the "Effective Date").

WHEREAS, the Parties entered into a receivables purchase agreement on **October 27, 2021** pursuant to which the Purchase purchased a specified percentage of the Merchant's total future accounts receivable up to a specified amount in exchange for an upfront purchase price (the "Purchase Agreement");

WHEREAS, the Guarantors guaranteed the Merchant's obligations to Purchase pursuant to the Purchase Agreement pursuant to a Guaranty agreement that was contained in the Purchase Agreement (the "Guaranty" and together with the Purchase Agreement, the "Agreements");

WHEREAS, on NOVEMBER 16, 2021 (the "Default Date"), the Obligated Parties defaulted on their obligations to Purchaser under the Agreements.

WHEREAS, on December 19, 2021, the Parties entered into a settlement agreement (the "Settlement Agreement") pursuant to which the Parties settled the dispute between them arising from the Obligated Parties' breaches of the Agreements. A copy of the Settlement Agreement is attached as **Exhibit A.**

WHEREAS, on December 27, 2021, the Obligated Parties defaulted on the Settlement Agreement.

WHEREAS, on January 28, 2022, Purchaser filed an action against the Obligated Parties for breach of the Settlement Agreement in Kings County Supreme Court, Index No. **502846/2022** (the "Action").

WHEREAS, the parties seek to resolve the claims asserted in the Action pursuant to the terms of this Stipulation of Settlement.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED BETWEEN THE PARTIES AS FOLLOWS:

Obligated Parties shall pay to Purchaser the sum of **$3,800,000.00 ("Settlement Amount")** as follows:

1. Payments
   a. $1,300,000 by February 7, 2022
   b. $1,300,000 by February 11, 2022
   c. $600,000 by February 16, 2022

Settlement Agreement and Release - Page 1 of 5

EXHIBIT C

d. $600,000 by February 21, 2022

Payments shall be made by wire transfer to Purchaser's attorney each week on the scheduled payment date to the following account:

**Law Offices of Steven Zakharyayev, PLLC**
**10 W. 37th St, #602, New York, NY 10018**
**JP Morgan Chase Bank N.A.**
**Routing Number: 021 000 021**
**Account Number: 317 527 817**

1.   **SETTLEMENT AGREEMENT**: Notwithstanding the terms herein, all terms agreed upon in the Settlement Agreement dated December 19, 2021 shall remain enforceable against the Parties. Any conflicts between the terms of the Settlement Agreement and this Stipulation of Settlement shall be resolved in favor of this Stipulation of Settlement.

2.   REPRESENTATIONS AND WARRANTIES AND INDEMNITY.

   a.   Obligated Parties warrant and covenant that any payments to Purchaser pursuant to this Stipulation of Settlement shall be made from unencumbered assets free of any liens or superior interests to Purchaser.

   b.   In the event any payments made to Purchaser are subject to a levy or a party claiming to hold a superior interest in any assets of the Merchant to Purchaser, Obligated Parties agree to indemnify, defend, and hold Purchaser and any employees, agents, partners, or affiliates harmless from any and all claims, demands, costs, liabilities, losses, expenses and damages (including reasonable attorneys' fees, costs, and expert witnesses' fees) arising out of or in connection with any claim brought by a third party against Purchaser.

3.   **Default Judgment pursuant to CPLR 3215(i)**. There shall be no cure period for the settlement payments set forth above. In the event that a settlement payment is not made, the Obligated Parties hereby acknowledge, consent and agree that the Purchaser may file an application for a default judgment to the Kings County Clerk in the Action pursuant to CPLR 3215(i) for the full Settlement Amount ($3,800,000) less payments made pursuant to this Agreement, plus the sum of 25% of the amount due at the time of default for attorneys' fees (based upon standard contingency fee rates), plus interest at the rate of 16% per annum from the date of default to the date of entry of judgment. The Parties agree that it shall be sufficient for the entry of such default judgment for the Purchaser's attorney of record to submit an affirmation stating the amount paid pursuant to this Stipulation of Settlement, the date of the default hereunder, the amount outstanding, and an amount for attorneys' fees to be included in the default judgment calculated as 25% of the Settlement Amount less payments made pursuant to this Stipulation of Settlement. The Parties agree that the application to the Kings County Clerk for a default judgment may be made without notice to the Obligated Parties and that this Stipulation of Settlement shall not be required to be filed in the Action unless and until there is a default hereunder.

4.   Upon the Obligated Parties' full performance of the their obligations pursuant to this Stipulation of Settlement including, without limitation, the full payment of the Settlement Amount, Purchaser hereby covenants not to sue and forever releases, acquits, and discharges the Obligated Parties and any of their guarantors, agents, employees, officers, partners, principals, insurers, representatives, successors, transferees or assigns, from any and all liability, claims, damages or demands Purchaser has now or may have in connection with said Purchase Agreement. For avoidance of doubt, this release shall be null and void in the event of a breach of this Stipulation

Settlement Agreement and Release - Page 2 of 5

of Settlement by the Obligated Parties.

5.      Within five (5) business days after Obligated Parties' fulfillment of their obligations hereunder and the clearance of all payments in accordance with the terms of this Stipulation of Settlement, Purchaser terminate any/all UCC filings and liens previously filed by Purchaser against Merchant, and release any/all of Obligated Parties' obligations to Purchaser pursuant to the Agreements, and Purchaser will so notify the Obligated Parties' attorney in writing. Purchaser further agrees to file a discontinuance of the Action.

6.      Waiver of Purchaser's Liability. Upon the Effective Date, the Obligated Parties for themselves and on behalf of all parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns, hereby releases and forever discharges Purchaser and its respective parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, actions, causes of action and suits, known or unknown, liquidated or contingent, arising from, which may arise in the future from, or which are related in any manner to the Action or the underlying Agreement, including any claims that were or could have been asserted, other than Purchaser's obligations under this Settlement Agreement.

7.      Withdraw Claims and Consent to Judgment. Merchant and Guarantors hereby withdraw any defenses they may have to the claims asserted in the Action.

8.      CONSENT TO JURISDICTION. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Merchant and Guarantors irrevocably submits to the exclusive jurisdiction of any New York Supreme Court or any federal court sitting within the State of New York over any suit, action or proceeding arising out of or relating to this Agreement. Merchant and Guarantors irrevocably waive, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Merchant and Guarantors agree that final judgment in any such suit, action or proceeding brought in such a court shall be enforced in any court of proper jurisdiction by a suit upon such judgment, provided that service of process in such action, suit or proceeding shall have been effected upon the Merchant and Guarantors in a manner permitted by law.

9.      WAIVER OF SERVICE OF PROCESS. The Parties further agree to waive personal service of process and to accept mail by electronic mail or by mailing by certified or registered mail, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

10.     Alter Egos. Merchant may not own, operate, or affiliate with any entities in the same or similar industry without Purchaser's express consent.

11. Modifications; Agreements. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all Parties.
12. Assignment. Purchaser may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Sellers. Sellers shall not assign its rights or obligations under this Agreement without first obtaining Purchaser's written consent.
13. Notices. Unless different means of delivering notices are set forth elsewhere in this Agreement, all notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective as of the date of receipt or declined receipt.

14. Waiver Remedies. No failure on the part of Purchaser to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

15. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

16. JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

17. Severability. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

18. Entire Agreement. This Agreement embodies the entire agreement between Seller and Purchaser and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

THE UNDERSIGNED REPRESENT AND WARRANT THAT THEY HAVE READ THIS STIPULATED SETTLEMENT AGREEMENT IN ITS ENTIRETY AND HAVE THE FULL CAPACITY, POWER, AND AUTHORITY TO MAKE THIS AGREEMENT AS SET FORTH ABOVE, AND THAT NO OTHER REPRESENTATIONS OR INDUCEMENTS APART FROM THIS STIPULATED SETTLEMENT AGREEMENT, EITHER WRITTEN OR ORAL, HAVE BEEN MADE.

IN WITNESS WHEREOF, Sellers and Purchaser have hereunder set their hands and seals on **February 1, 2022**.

| | |
|---|---|
| **"MERCHANT"** | **"GUARANTORS"** |
| | |
| EXCELL AUTO GROUP, INC.; KARMA OF PALM BEACH INC; AUTOMOTIVE SERVICE SYSTEMS, INC.; KZ CONSULTANTS, INC.; MISS KRIS, LLC; EXCELL AUTO LEASING INC; EXCELL AUTO WHOLESALE INC.; DEALER SOUQ USA LLC; EAG WHOLESALE LLC; KARMA OF BROWARD, INC.; LAVISH HERO FUND; KARMA OF PALM BEACH, INC.; APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC. (collectively the "Merchants") | SCOTT THOMAS ZANKL "GUARANTOR" |

**"MERCHANT"**

EXCELL AUTO GROUP, INC.;
KARMA OF PALM BEACH INC;
AUTOMOTIVE SERVICE SYSTEMS, INC.;
KZ CONSULTANTS, INC.; MISS KRIS, LLC;
EXCELL AUTO LEASING INC;
EXCELL AUTO WHOLESALE INC.;
DEALER SOUQ USA LLC;
EAG WHOLESALE LLC; KARMA OF BROWARD, INC.;
LAVISH HERO FUND; KARMA OF PALM BEACH, INC.;
APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC. (collectively the "Merchants")

DocuSigned by:

X _____
Name: KRISTIN ZANKL, individually and as authorized signor on behalf of the Merchants referenced above

EXCELL AUTO GROUP, INC.;
KARMA OF PALM BEACH INC;
AUTOMOTIVE SERVICE SYSTEMS, INC.;
KZ CONSULTANTS, INC.; MISS KRIS, LLC;
EXCELL AUTO LEASING INC;
EXCELL AUTO WHOLESALE INC.;
DEALER SOUQ USA LLC;
EAG WHOLESALE LLC; KARMA OF BROWARD, INC.;
LAVISH HERO FUND; KARMA OF PALM BEACH, INC.;
APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC. (collectively the "Merchants")

DocuSigned by:

X _____
Name: SCOTT THOMAS ZANKL, individually and as authorized signor on behalf of the Merchants

---

**"GUARANTORS"**

SCOTT THOMAS ZANKL
"GUARANTOR"

DocuSigned by: Scott Thomas Zankl

X _____
SCOTT THOMAS ZANKL,
Individually

KRISTIN ZANKL
"GUARANTOR"

DocuSigned by:

X _____
KRISTIN ZANKL,
Individually

---

**"PURCHASER"**
HI BAR CAPITAL, LLC

DocuSigned by: Steven Zakharyayev

X _____
Name: Steven Zakharyayev
Title: Attorney for Purchaser, Hi Bar Capital

Settlement Agreement and Release - Page 5 of 5

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "SETTLEMENT AGREEMENT" or "Agreement") is entered into by and between **EXCELL AUTO GROUP, INC.; KARMA OF PALM BEACH INC; AUTOMOTIVE SERVICE SYSTEMS, INC.; KZ CONSULTANTS, INC.; MISS KRIS, LLC; EXCELL AUTO LEASING INC; EXCELL AUTO WHOLESALE INC.; DEALER SOUQ USA LLC; EAG WHOLESALE LLC; KARMA OF BROWARD, INC.; LAVISH HERO FUND; KARMA OF PALM BEACH, INC.; APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC.** (collectively the "Seller" or "Sellers"), **KRISTIN ZANKL and SCOTT THOMAS ZANKL** (collectively the "Guarantors,"), and referred to herein together with Seller collectively and individually as (the "Sellers"), and **HI BAR CAPITAL, LLC** ("Purchaser,") and referred to herein collectively with the Sellers as (the "Parties") on this **December 19, 2021** (the "Effective Date").

WHEREAS, the Parties entered into a receivables purchase agreement on **October 27, 2021**; (collectively the "Purchase Agreement")

WHEREAS, on NOVEMBER 16, 2021, the Sellers defaulted on the Purchase Agreement. ("Default Date")

WHEREAS, the Sellers are indebted to Purchaser in the amount of **$2,677,880.00** plus fees and costs.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED BETWEEN THE PARTIES AS FOLLOWS:

Sellers shall pay to Purchaser the agreed amount of **$2,677,880.00** at a 1.50 factor rate for a total payback amount of $4,016,820 ("Settlement Amount") as follows:

1. Payments
   a. Seller shall make payments of **$200,000.00** per week until the balance plus factor rate is paid in full. See attached Payment Schedule attached hereto as **Exhibit "B"**.
   b. First payment shall be due on Monday, December 20, 2021 and shall continue each week until paid in full.
2. Early Payoff Discount.
   a. Within 30 days of execution of this Settlement Agreement, Seller may payoff the Settlement Amount at a discounted factor rate of **1.10** for a total payback amount of **$2,945,668.00.**
   b. If Seller does not exercise this early payoff option, payments shall continue at the agreed payment schedule as listed in Exhibit "B".
3. Payments shall be made by Wire or ACH each week on the scheduled payment dates.

1. **SECURITY AGREEMENT:**
   Sellers and Guarantor agree to provide security interest in the following collateral:

   a. Security Interest in Vehicle
      i. Sellers shall provide an unencumbered security interest in the **2017 Pagani (VIN #ZA9H12UA5HSF76013).** (the "Vehicle") A copy of the Vehicle's Title is attached

Settlement Agreement and Release - Page 1 of 10

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

hereto as **Exhibit "A"**.

ii. Sellers shall execute a security interest and any other documents necessary to effectuate this security interest and perfect the lien against the Vehicle.

iii. Sellers shall deliver an original title to the Vehicle to be held in escrow until the Settlement Amount is paid in full.

b. Additional Security

i. As additional security for the prompt and complete payment and performance of any and all liabilities, obligations, covenants or agreements of Seller under this Settlement Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Sellers hereby pledge, assign and hypothecate to Purchaser (collectively, "Pledge") and grants to Purchaser a continuing, perfected and first priority lien upon and security interest in, to and under all of Sellers' right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

1. all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Sellers; and all of Sellers' proceeds, as such term is defined by Article 9 of the UCC.

c. REPRESENTATIONS AND WARRANTIES. Sellers warrant and covenant that:

i. No other creditors has a security interest in the Collateral Sellers is the owner of the Collateral free from any adverse lien or encumbrance except this lien and the others described in this Agreement.

ii. Sellers will defend the Collateral against all claims of other persons.

iii. Sellers will immediately notify the Purchaser in writing of any change in name or address.

iv. Sellers will do all such things as Purchaser at any time or from time to time may reasonably request to establish and maintain a perfected security interest in the Collateral.

v. Sellers will pay the cost of filing this agreement in all public offices where recording is deemed by Purchaser to be necessary or desirable. A photographic or other reproduction of this agreement is sufficient as a financing statement.

vi. Sellers will not transfer or encumber the Collateral without the prior written consent of Purchaser.

vii. Sellers will keep the Collateral insured against risk of loss or damage upon such terms as Purchaser may reasonably require.

viii. Sellers will keep the Collateral free from any adverse lien and in good repair, will not waste or destroy the Collateral, and will not use the Collateral in violation of any law or policy of insurance. Purchaser may examine and inspect the Collateral at any reasonable time.

ix. Sellers will pay promptly when due all taxes and assessments upon the Collateral or for its use or operation or upon this Agreement or upon any note evidencing the Obligations.

d. Representations with Respect to Collateral. Sellers hereby represents and warrants to Purchaser that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC-1s); and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Sellers are a party or by which any of Sellers' assets (including, without limitation, the Collateral) are bound.

e. Further Assurances. Upon the request of Purchaser, Sellers, at Sellers' sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as Purchaser may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

f. Attorney-in-Fact. Sellers hereby authorize Purchaser at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints Purchaser as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Sellers and in the name of Seller or otherwise, from time to time, in Purchaser's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Sellers, and thereafter filing any such financing and/or continuation statements, and

to receive, endorse and collect all instruments made payable to Sellers.

2. There shall be no cure period. If any payment is not received on the aforementioned dates, Purchaser shall have leave to enforce the full balance due less any payments made hereunder.

3. Purchaser hereby covenants not to sue and forever releases, acquits, and discharges Sellers and any of their guarantors, agents, employees, officers, partners, principals, insurers, representatives, successors, transferees or assigns, from any and all liability, claims, damages or demands Purchaser has now or may have in connection with said Purchase Agreement, unless there is a breach of this Settlement Agreement.

4. Upon Sellers' fulfillment of its obligations hereunder and the clearance of all payments in accordance with the terms of this Settlement Agreement, Sellers and any applicable guarantor of the sums due under the Receivables Purchase Agreement shall be relieved of any such further liability.

5. Within five (5) business days after Sellers' fulfillment of its obligations hereunder and the clearance of all payments in accordance with the terms of this Settlement Agreement, Purchaser terminate any/all UCC filings and liens previously filed by Purchaser against Sellers, and release any/all of Sellers' obligations to Purchaser pursuant to the Receivables Purchase Agreement, and Purchaser will so notify Sellers' attorney in writing.

6. Waiver of Purchaser's Liability. Upon the Effective Date, the Sellers for itself and on behalf of all parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns, hereby releases and forever discharges Purchaser and its respective parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, actions, causes of action and suits, known or unknown, liquidated or contingent, arising from, which may arise in the future from, or which are related in any manner to the Action or the underlying Agreement, including any claims that were or could have been asserted,

Settlement Agreement and Release - Page 3 of 10

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

other than Purchaser's obligations under this Settlement Agreement.

7.     Withdraw Claims and Consent to Judgment. Seller and Guarantor hereby withdraw any defenses arising from the Purchase Agreement or any pending actions filed by the Purchaser. Sellers and Guarantors further agree to waive all defenses, claims, or counterclaims that may arise from this Agreement or the Purchase Agreement. In the event of default of this Agreement, Purchaser may, without further notice, file a claim for the total indebtedness plus accrued fees and costs less payments received.

8.     CONSENT TO JURISDICTION. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Sellers and Guarantors irrevocably submits to the exclusive jurisdiction of any New York county Supreme Court or any federal court sitting within the State of New York over any suit, action or proceeding arising out of or relating to this Agreement. Seller and Guarantor irrevocably waive, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Seller and Guarantor agree that final judgment in any such suit, action or proceeding brought in such a court shall be enforced in any court of proper jurisdiction by a suit upon such judgment, provided that service of process in such action, suit or proceeding shall have been effected upon the Seller and Guarantor in a manner permitted by law.

9.     WAIVER OF SERVICE OF PROCESS. The parties further agree to waive personal service of process and to accept mail by electronic mail or by mailing by certified or registered mail, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

10.    Alter Egos. Seller may not own, operate, or affiliate with any entities in the same or similar industry without Purchaser's express consent.

11.    Personal Guaranty ("Guaranty"). as an inducement for Purchaser to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantors hereby agree as follows:
   a. Defined Terms. All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.
   b. Guaranty of Obligations. Guarantors hereby irrevocably, absolutely and unconditionally guarantees to Purchaser prompt, full, faithful and complete performance and observance of all of Sellers' obligations in this Agreement; and Guarantors unconditionally covenants to Purchaser that if default or breach shall at any time be made by Sellers, Guarantors shall well and truly pay or perform (or cause to be paid or performed) the all obligations under this Agreement and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.
   c. Guarantors' Other Agreements. Guarantors will not dispose, convey, sell or otherwise transfer, or cause Sellers to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Sellers' business without the prior written consent of Purchaser, which consent may be withheld for any reason, until receipt of the entire Settlement Amount. Guarantors shall pay to Purchaser upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Purchaser's rights hereunder or Purchaser's rights under the Agreement. This Guaranty is binding upon Guarantors and Guarantors' heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Purchaser. If there is more than one

Settlement Agreement and Release - Page 4 of 10

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantors shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Sellers and Purchaser, or the existence of any defense, setoff or counterclaim, which Seller may assert. Purchaser is hereby authorized, without notice or demand and without affecting the liability of Guarantors hereunder, to at any time renew or extend Sellers' obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement.

12. **Seller's Obligations Upon Default**. Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to Purchaser the entire unpaid portion of the Settlement Amount plus fees, penalties, and costs. In addition, Seller shall also pay to Purchaser, as additional damages, any reasonable expenses incurred by Purchaser in connection with recovering the monies due to Purchaser from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees in the amount 33% of the undelivered portion of the Settlement Amount (collectively, "Reasonable Damages"). The parties agree that Purchaser shall not be required to itemize or prove its Reasonable Damages and that the fair value of the Reasonable Damages, not including attorneys' fees or collections fees, shall be calculated as twenty-five percent (25%) of the undelivered portion of the Settlement Amount upon the occurrence of an event of default.

13. **Remedies Upon Default**. Upon Seller's default, Purchaser may immediately proceed to protect and enforce its rights under this Agreement and/or Guaranty by:

   a. Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of Purchaser's security interest;

   b. Enforcing the provisions of the personal guaranty against the personal guarantors named herein without first seeking recourse from Seller for the full balance owed at the time of default plus applicable fees and costs;

   c. Commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy including without limitation Purchaser's rights of a secured party under the UCC.

14. **Remedies are not Exclusive**. All rights, powers and remedies of Purchaser in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall be in addition to any other rights, powers or remedies provided to Purchaser by law or equity.

15. **Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

16. **Assignment**. Purchaser may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Sellers. Sellers shall not assign its rights or obligations under this Agreement without first obtaining Purchaser's written consent.

17. **Notices**. Unless different means of delivering notices are set forth elsewhere in this Agreement, all notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective as of the date of receipt or declined receipt.

18. **Waiver Remedies**. No failure on the part of Purchaser to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

19. **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties and their

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

respective successors and permitted assigns.

20. JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

21. Severability. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

22. Entire Agreement. This Agreement embodies the entire agreement between Seller and Purchaser and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

THE UNDERSIGNED REPRESENT AND WARRANT THAT THEY HAVE READ THIS STIPULATED SETTLEMENT AGREEMENT IN ITS ENTIRETY AND HAVE THE FULL CAPACITY, POWER, AND AUTHORITY TO MAKE THIS AGREEMENT AS SET FORTH ABOVE, AND THAT NO OTHER REPRESENTATIONS OR INDUCEMENTS APART FROM THIS STIPULATED SETTLEMENT AGREEMENT, EITHER WRITTEN OR ORAL, HAVE BEEN MADE.

IN WITNESS WHEREOF, Sellers and Purchaser have hereunder set their hands and seals on **December 19, 2021**.

[SIGNATURES ON FOLLOWING PAGE]

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

| "SELLERS" | "GUARANTORS" |
|---|---|

**"SELLERS"**

EXCELL AUTO GROUP, INC.;
KARMA OF PALM BEACH INC;
AUTOMOTIVE SERVICE SYSTEMS, INC.;
KZ CONSULTANTS, INC.; MISS KRIS, LLC;
EXCELL AUTO LEASING INC;
EXCELL AUTO WHOLESALE INC.;
DEALER SOUQ USA LLC;
EAG WHOLESALE LLC; KARMA OF
BROWARD, INC.;
LAVISH HERO FUND; KARMA OF PALM
BEACH, INC.;
APPLE 3 INVESTMENTS, INC.; KZ
CONSULTANTS INC.; EXCELL AUTO
SPORT AND SERVICE, INC. (collectively the
"Sellers")

X _____ *kristin Zankl* _____
Name: KRISTIN ZANKL, individually and as
authorized signor on behalf of the Sellers

EXCELL AUTO GROUP, INC.;
KARMA OF PALM BEACH INC;
AUTOMOTIVE SERVICE SYSTEMS, INC.;
KZ CONSULTANTS, INC.; MISS KRIS, LLC;
EXCELL AUTO LEASING INC;
EXCELL AUTO WHOLESALE INC.;
DEALER SOUQ USA LLC;
EAG WHOLESALE LLC; KARMA OF
BROWARD, INC.;
LAVISH HERO FUND; KARMA OF PALM
BEACH, INC.;
APPLE 3 INVESTMENTS, INC.; KZ
CONSULTANTS INC.; EXCELL AUTO
SPORT AND SERVICE, INC. (collectively the
"Sellers")

X _____ *Scott Thomas Zankl* _____
Name: SCOTT THOMAS ZANKL, individually
and as authorized signor on behalf of the Sellers

**"GUARANTORS"**

SCOTT THOMAS ZANKL
"GUARANTOR"

X _____ *Scott Thomas Zankl* _____
SCOTT THOMAS ZANKL,
Individually

KRISTIN ZANKL
"GUARANTOR"

X _____ *kristin Zankl* _____
KRISTIN ZANKL,
Individually

**"PURCHASER"**
HI BAR CAPITAL, LLC

X _____ *Steven Zakharyayev* _____
Name: Steven Zakharyayev
Title: Attorney for Purchaser, Hi Bar Capital

DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

# EXHIBIT A



DocuSign Envelope ID: 5F776371-CD50-4370-BD46-DED587EA79B8

# EXHIBIT B

## PAYMENT SCHEDULE

| Weeks | Payment Due Date | Payments |
|-------|------------------|----------|
| 1 | 12/20/21 | $200,000.00 |
| 2 | 12/27/21 | $200,000.00 |
| 3 | 01/03/22 | $200,000.00 |
| 4 | 01/10/22 | $200,000.00 |
| 5 | 01/17/22 | $200,000.00 |
| 6 | 01/24/22 | $200,000.00 |
| 7 | 01/31/22 | $200,000.00 |
| 8 | 02/07/22 | $200,000.00 |
| 9 | 02/14/22 | $200,000.00 |
| 10 | 02/21/22 | $200,000.00 |
| 11 | 02/28/22 | $200,000.00 |
| 12 | 03/07/22 | $200,000.00 |
| 13 | 03/14/22 | $200,000.00 |
| 14 | 03/21/22 | $200,000.00 |
| 15 | 03/28/22 | $200,000.00 |
| 16 | 04/04/22 | $200,000.00 |
| 17 | 04/11/22 | $200,000.00 |
| 18 | 04/18/22 | $200,000.00 |
| 19 | 04/25/22 | $200,000.00 |
| 20 | 05/02/22 | $216,820.00 |

# EXHIBIT P

**Exhibit P**

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

CASE NO. **CACE22005125**   DIVISION: **21**   JUDGE: **Singer, Michele Towbin (21)**

**FVP Opportunity Fund III, LP, et al**

Plaintiff(s) / Petitioner(s)

v.

**Scott Zankl, et al**

Defendant(s) / Respondent(s)

_____/

**ORDER SCHEDULING EVIDENTIARY HEARING ON DEFENDANTS' MOTION TO
DISSOLVE APRIL 14, 2022 ORAL FREEZE ORDER AND ON PLAINTIFFS' MOTION FOR
TEMPORARY INJUNCTION AND APPOINTMENT OF RECEIVER, AND SHOW CAUSE
IN REPLEVIN**

THIS CAUSE comes before the Court on Defendants, MOSHE FARACHE, AUTO WHOLESALE OF BOCA, LLC and MMS ULTIMATE SERVICES, INC.'s (the "Farache Defendants") Motion to Schedule Hearing Pursuant to Fla. R. Civ. P. 1.610(d) Within 5 Days on Defendants' Motion to Dissolve April 14, 2022 Oral Freeze Order or; Alternatively, Set Evidentiary Hearing on Plaintiffs' Verified Motion for Temporary Restraining Order and Injunction, and the Court having commenced a hearing on the Plaintiffs' Motion for Injunction and Appointment of a Receiver beginning on April 14, 2022 which the Plaintiffs seek the Court to conclude, and the Court being advised that the Plaintiffs have filed a Motion for Order to Show Cause in Replevin to which they are entitled to a hearing; and the Court being otherwise fully advised in the premises, it is hereby

ORDERED AND ADJUDGED

1. The Parties shall appear before the Court in person in Courtroom 15170 on Defendants, Moshe Farache, Auto Wholesale Of Boca, LLC's, and MMS Ultimate Services, Inc.'s Motion to Dissolve April 14, 2022 Oral Freeze Order; Plaintiffs Motion for Injunction and Appointment of a Receiver; and to show cause should not be taken from the possession of the Farache Defendants who have possession of the same and delivered to the Plaintiffs.

2. The hearing on this matter shall be heard on July 8, 2022 at 3 p.m..

3. The Farache Defendants may file affidavits, appear personally or with an attorney, and present testimony at the time of the hearing, or, on a finding by the court pursuant to Section 78.067(2) of the Florida Statutes that the Plaintiffs are entitled to possession of the Vehicle Inventory pending final adjudication of the claims of the parties, file with the Court a written undertaking executed by a surety approved by the Court in an amount equal to the value of the property to stay an Order authorizing the delivery of the property to the Plaintiffs.

**DONE AND ORDERED** in Chambers at Broward County, Florida on 25th day of May, 2022.



CACE22005125 05-25-2022 3:56 PM
Hon. Michele Towbin Singer
**CIRCUIT JUDGE**
Electronically Signed by Singer, Michele Towbin (21)

**Copies Furnished To:**
Alan R Crane , E-mail : rrivera@furrcohen.com
Alan R Crane , E-mail : staff1@furrcohen.com
Alan R Crane , E-mail : acrane@furrcohen.com
Bradford M Cohen , E-mail : service@floridajusticefirm.com
Bradford M Cohen , E-mail : lawronin@aol.com
Cory Mauro , E-mail : cory@maurolawfirm.com
Cory Mauro , E-mail : service@maurolawfirm.com
Cory Mauro , E-mail : cory.mauro@maurolawfirm.com
Evan Appell , E-mail : evan@maurolawfirm.com
Henry B Handler , E-mail : hbh@whcfla.com
Henry B Handler , E-mail : filings@whcfla.com
Henry B Handler , E-mail : jn@whcfla.com
Jay L Farrow , E-mail : service@farrowlawfirm.com
Jay L Farrow , E-mail : stephanie@farrowlawfirm.com
Jerrell Andrew Breslin , E-mail : jerrellbreslin@gmail.com
Jerrell Andrew Breslin , E-mail : jb@richardbaronlaw.com
Jerrell Andrew Breslin , E-mail : eservice@richardbaronlaw.com
Joel L. Wiegert, Esq. , E-mail : Joel.Wiegert@KutakRock.com
Jonathan Noah Schwartz , E-mail : jnsesquire@gmail.com
Jonathan Noah Schwartz , E-mail : JNS.NGQB@case.prolific.com
Jonathan Schwartz, Esq. , E-mail : jschwartz@jonschwartzlaw.com
Jose J Teurbe-Tolon , E-mail : jose@xanderlaw.com
Jose J Teurbe-Tolon , E-mail : service@xanderlaw.com
Keith Lee , E-mail : klee@feenixpartners.com
Mark C Perry , E-mail : mark@markperrylaw.com
Mark C Perry , E-mail : maureen@markperrylaw.com

Matthew Pilkington , E-mail : mpilkington@feenixpartners.com
Michael A. Mullavey , E-mail : mmullavey@mcper.com
Michael James McMullen , E-mail : Service@FloridaJusticeFirm.com
Michael James McMullen , E-mail : Michael@FloridaJusticeFirm.com
Thomas U Graner , E-mail : kristin@granerlaw.com
Thomas U Graner , E-mail : ivy@granerlaw.com
Thomas U Graner , E-mail : tom@granerlaw.com
Xavier A Franco , E-mail : docketclerk@mcper.com
Xavier A Franco , E-mail : xfranco@mcper.com

# EXHIBIT Q

**Exhibit Q**

Filing # 151047714 E-Filed 06/07/2022 06:48:16 PM

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO. **CACE22005125**  DIVISION: **21**  JUDGE: **Singer, Michele Towbin (21)**

**FVP Opportunity Fund III, LP, et al**

Plaintiff(s) / Petitioner(s)

v.

**Scott Zankl, et al**

Defendant(s) / Respondent(s)

_____/

**Order on Defendants' Motion to Dissolve April 14, 2022 Oral Freeze Order**

THIS CAUSE comes before the Court on Defendants, MOSHE FARACHE, AUTO WHOLESALE OF BOCA, LLC and MMS ULTIMATE SERVICES, INC.'s (the "Farache Defendants") on Defendants' Motion to Dissolve April 14, 2022 Oral Freeze Order Pursuant to Fla. R. Civ. P. 1.610(d) Within 5 Days. In response to the motion, the Court scheduled a hearing on the motion for June 3, 2022 at which hearing counsel for the Plaintiffs and the Farache Defendants appeared and the Court having heard the arguments of Counsel and the Court being otherwise fully advised in the premises, it is hereby

ORDERED AND ADJUDGED

1. The motion of the Farache Defendants to dissolve the injunction is Denied, without prejudice, for the reasons stated by the Court on the record.

2. This Court will hold a full evidentiary hearing and has scheduled two (2) full days for the hearing on the Plaintiffs' Motion for Injunction, Plaintiffs Motion to Appoint a Receiver, Plaintiffs Rule to Show Cause in Replevin and the Farache Defendants Motion to Dissolve the Injunction. The hearing will be held on July 25, 2022 and July 26, 2022.

3. This Courts' Order of May 25, 2022 entitled "ORDER SCHEDULING EVIDENTIARY HEARING ON DEFENDANTS' MOTION TO DISSOLVE APRIL 14, 2022 ORAL FREEZE ORDER AND ON PLAINTIFFS' MOTION FOR TEMPORARY INJUNCTION AND APPOINTMENT OF RECEIVER, AND SHOW CAUSE IN REPLEVIN" is hereby modified only to the extent that the date of the hearing is

Page 1 of 3

rescheduled from July 8, 2022 to July 25, 2022 and July 26, 2022.

4. The Court on June 3, 2022 also heard the Plaintiffs' *ore tenus* motion to compel the discovery due from the Farache Defendants as ordered by the Court on April 14, 2022 as well as the production requested by the Plaintiffs on the Farache Defendants on April 18, 2022. In response the parties agreed as follows:

   a. The Farache Defendants shall supply the ordered discovery and supply the discovery requested in the Plaintiffs' discovery requests by close of business June 15, 2022.

   b. The Plaintiffs shall comply with production requests from the Farache Defendants within ten (10) days of the request or by close of business June 15, 2022, whichever is later.

   c. The Court ratifies the agreement of the parties and orders the parties to comply with the Agreement to supply discovery.

   d. To the extent that there are any disputes regarding the discovery, either party shall set the dispute on the next available motion calendar date and notify opposing counsel of the date and the Court will resolve the dispute. It is the intent of the Court for discovery to be exchanged well in advance of the hearings scheduled for July 25, 2022 and July 26, 2022.

5. The Court reserves jurisdiction to enforce this Order as required.

**DONE AND ORDERED** in Chambers at Broward County, Florida on 7th day of June, 2022.

CACE22005125 0(

CACE22005125 06-07-2022 2:34 PM
Hon. Michele Towbin Singer
**CIRCUIT JUDGE**
Electronically Signed by Singer, Michele Towbin (21)

**Copies Furnished To:**
Alan R Crane , E-mail : rrivera@furrcohen.com
Alan R Crane , E-mail : staff1@furrcohen.com
Alan R Crane , E-mail : acrane@furrcohen.com
Bradford M Cohen , E-mail : bmc@floridajusticefirm.com
Bradford M Cohen , E-mail : service@floridajusticefirm.com
Bradley S Shraiberg , E-mail : dwoodall@slp.law
Bradley S Shraiberg , E-mail : bss@slp.law

Bradley S Shraiberg , E-mail : pmouton@slp.law
Cory Mauro , E-mail : cory@maurolawfirm.com
Cory Mauro , E-mail : service@maurolawfirm.com
Cory Mauro , E-mail : cory.mauro@maurolawfirm.com
Evan Appell , E-mail : evan@maurolawfirm.com
Henry B Handler , E-mail : hbh@whcfla.com
Henry B Handler , E-mail : filings@whcfla.com
Henry B Handler , E-mail : jn@whcfla.com
Jay L Farrow , E-mail : service@farrowlawfirm.com
Jay L Farrow , E-mail : stephanie@farrowlawfirm.com
Jerrell Andrew Breslin , E-mail : jerrellbreslin@gmail.com
Jerrell Andrew Breslin , E-mail : jb@richardbaronlaw.com
Jerrell Andrew Breslin , E-mail : eservice@richardbaronlaw.com
Joel L. Wiegert, Esq. , E-mail : Joel.Wiegert@KutakRock.com
Jonathan Noah Schwartz , E-mail : jnsesquire@gmail.com
Jonathan Noah Schwartz , E-mail : JNS.NGQB@case.prolific.com
Jonathan Schwartz, Esq. , E-mail : jschwartz@jonschwartzlaw.com
Jose J Teurbe-Tolon , E-mail : jose@xanderlaw.com
Jose J Teurbe-Tolon , E-mail : service@xanderlaw.com
Keith Lee , E-mail : klee@feenixpartners.com
Mark C Perry , E-mail : mark@markperrylaw.com
Mark C Perry , E-mail : maureen@markperrylaw.com
Mark J Wolfson , E-mail : CRowell@foley.com
Mark J Wolfson , E-mail : mwolfson@foley.com
Matthew Pilkington , E-mail : mpilkington@feenixpartners.com
Michael A. Mullavey , E-mail : mmullavey@mcper.com
Michael James McMullen , E-mail : Service@FloridaJusticeFirm.com
Michael James McMullen , E-mail : Michael@FloridaJusticeFirm.com
Patrick Dorsey , E-mail : pdorsey@slp.law
Thomas U Graner , E-mail : kristin@granerlaw.com
Thomas U Graner , E-mail : ivy@granerlaw.com
Thomas U Graner , E-mail : tom@granerlaw.com
Xavier A Franco , E-mail : docketclerk@mcper.com
Xavier A Franco , E-mail : xfranco@mcper.com

# EXHIBIT R

**Exhibit R**

Case 22-01218-EPK    Doc 145    Filed 12/09/22    Page 294 of 459

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

CASE NO. **CACE22005125**   DIVISION: **21**   JUDGE: **Singer, Michele Towbin (21)**

**FVP Opportunity Fund III, LP, et al**

Plaintiff(s) / Petitioner(s)

v.

**Scott Zankl, et al**

Defendant(s) / Respondent(s)

_____/

**ORDER ISSUING RULE TO SHOW CAUSE IN CONTEMPT AND SETTING CONTEMPT
HEARING OF DEFENDANT MOSHE FARACHE**

THIS CAUSE comes before the Court on the Motion For Rule To Show Cause In Contempt For Fraud Upon The Court ("Motion") directed at Defendant Moshe Farache ("Farache"), the Court has reviewed the Motion, the arguments of counsel, and noting of the Farache's counsel agreed to the setting of an evidentiary hearing upon Plaintiff's Motion, it is hereby:

ORDERED AND ADJUDGED that:

A. Defendant Moshe Farache is hereby ordered to appear before this Court to show cause as to why he should not be held in contempt of this Court for knowingly and intentionally filing allegedly false statements in an Affidavit in the record of this Court.

A. **DEFENDANT MOSHE FARACHE IS HEREBY ORDERED TO APPEAR IN PERSON BEFORE THIS COURT, THE HONORABLE MICHELE TOWBIN SINGER, CIRCUIT COURT JUDGE, BROWARD COUNTY COURTHOUSE, 201 S.E. 6TH STREET, COURTROOM WW15170, FORT LAUDERDALE, FL 33301, ON JULY 26, 2022 AT 10:30 A.M. TO SHOW CAUSE AS TO WHY HE SHOULD NOT BE HELD IN CONTEMPT OF COURT.**

B. The Defendant may have legal counsel present with him, and may present testimony, including witness testimony, or other evidence at such hearing.

Case Number: CACE22005125

C. Defendant Farache, on the record and further pursuant to the representations of his Attorney, Jay L. Farrow, Esq., has agreed to accept service of this Order by service upon Attorney Jay L. Farrow, Esq., which may be effectuated electronically.

**DONE AND ORDERED** in Chambers at Broward County, Florida on <u>8th day of July, 2022</u>.

<u>CACE22005125 07-08-2022 3:55 PM</u>
Hon. Michele Towbin Singer
**CIRCUIT JUDGE**
Electronically Signed by Michele Towbin Singer

**Copies Furnished To:**
Alan R Crane , E-mail : staff1@furrcohen.com
Alan R Crane , E-mail : rrivera@furrcohen.com
Alan R Crane , E-mail : acrane@furrcohen.com
Allison B Duffie , E-mail : abd@mellingerlaw.com
Allison B Duffie , E-mail : legalassistant@duffie.law
Allison B Duffie , E-mail : allison@duffie.law
Bradford M Cohen , E-mail : bmc@floridajusticefirm.com
Bradford M Cohen , E-mail : service@floridajusticefirm.com
Bradley S Shraiberg , E-mail : dwoodall@slp.law
Bradley S Shraiberg , E-mail : bss@slp.law
Bradley S Shraiberg , E-mail : pmouton@slp.law
Cory Mauro , E-mail : cory@maurolawfirm.com
Cory Mauro , E-mail : service@maurolawfirm.com
Cory Mauro , E-mail : cory.mauro@maurolawfirm.com
Craig H. Blinderman , E-mail : cblinderman@kfb-law.com
Craig H. Blinderman , E-mail : bvillalobos@kfb-law.com
Craig H. Blinderman , E-mail : lbevans@kfb-law.com
Crystal B Carswell , E-mail : atownsend@foley.com
Crystal B Carswell , E-mail : ccarswell@foley.com
Darin Wade Mellinger , E-mail : dwm@mellingerlaw.com
Evan Appell , E-mail : evan@maurolawfirm.com
Henry B Handler , E-mail : hbh@whcfla.com
Henry B Handler , E-mail : filings@whcfla.com
Henry B Handler , E-mail : jn@whcfla.com
Jay L Farrow , E-mail : service@farrowlawfirm.com
Jay L Farrow , E-mail : stephanie@farrowlawfirm.com

Jerrell Andrew Breslin , E-mail : jb@richardbaronlaw.com
Jerrell Andrew Breslin , E-mail : jerrellbreslin@gmail.com
Jerrell Andrew Breslin , E-mail : eservice@richardbaronlaw.com
Joel L. Wiegert, Esq. , E-mail : Joel.Wiegert@KutakRock.com
John M. Brennan Jr. , E-mail : jessica.rolon@gray-robinson.com
John M. Brennan Jr. , E-mail : jack.brennan@gray-robinson.com
Jonathan Noah Schwartz , E-mail : jnsesquire@gmail.com
Jonathan Noah Schwartz , E-mail : JNS.NGQB@case.prolific.com
Jonathan Schwartz, Esq. , E-mail : jschwartz@jonschwartzlaw.com
Jose J Teurbe-Tolon , E-mail : service@xanderlaw.com
Jose J Teurbe-Tolon , E-mail : jose@xanderlaw.com
Keith Lee , E-mail : klee@feenixpartners.com
Mark C Perry , E-mail : mark@markperrylaw.com
Mark C Perry , E-mail : maureen@markperrylaw.com
Mark J Wolfson , E-mail : mwolfson@foley.com
Mark J Wolfson , E-mail : CRowell@foley.com
Matthew Pilkington , E-mail : mpilkington@feenixpartners.com
Michael James McMullen , E-mail : Michael@FloridaJusticeFirm.com
Michael James McMullen , E-mail : Service@FloridaJusticeFirm.com
Patrick Dorsey , E-mail : pdorsey@slp.law
Thomas U Graner , E-mail : kristin@granerlaw.com
Thomas U Graner , E-mail : ivy@granerlaw.com
Thomas U Graner , E-mail : tom@granerlaw.com

# EXHIBIT S

**Exhibit S**

FLORIDA SECURED TRANSACTION REGISTRY

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

FILED

**A. NAME & PHONE OF CONTACT AT FILER** (optional)
CSC   1-800-858-5294

**B. E-MAIL CONTACT AT FILER** (optional)
SPRFiling@cscglobal.com

2021 Nov 16 03:55 PM

****** 20210917156X ******

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

2218 57634

CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Florida
(S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
202106583131 03/26/2021

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee In item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☑ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:

AND Check one of these three boxes to:

This Change affects ☑ Debtor or ☐ Secured Party of record

☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☑ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | KARMA OF PALM BEACH, INC. | | |
|---|---|---|---|

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 7b. INDIVIDUAL'S SURNAME | | | |
|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | FRANKLIN CAPITAL GROUP, LLC | | |
|---|---|---|---|

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**10. OPTIONAL FILER REFERENCE DATA:** Debtor:EXCELL AUTO GROUP INC-15492-72 NJR/ASW

2218 57634

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

FLORIDA SECURED TRANSACTION REGISTRY

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC   1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscglobal.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

2218 55184
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Florida
(S.O.S.)

FILED

2021 Nov 16 03:55 PM

****** 202109171578 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER 202106583131 03/26/2021 | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):**  Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:**  Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☑ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:
This Change affects ☑ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☑ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:**  Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME KARMA OF BROWARD, INC | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ **COLLATERAL CHANGE:**  Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME FRANKLIN CAPITAL GROUP, LLC | | | |
|---|---|---|---|
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA: Debtor:EXCELL AUTO GROUP INC-15492-72 NJR/ASW

2218 55184

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT **AMENDMENT**
FOLLOW INSTRUCTIONS

FLORIDA SECURED TRANSACTION REGISTRY

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC   1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscglobal.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

2223 27803
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Florida
(S.O.S.)

FILED

2021 Nov 29 03:53 PM

****** 202109288491 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
202106583131 03/26/2021

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☑ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:
This Change affects ☑ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☑ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| ZANKL | THOMAS SCOTT | | |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 7b. INDIVIDUAL'S SURNAME | | | |
|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME FRANKLIN CAPITAL GROUP, LLC | | | |
|---|---|---|---|

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

**10. OPTIONAL FILER REFERENCE DATA:** Debtor:EXCELL AUTO GROUP INC-15492-72 NJR/ASW

2223 27803

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

FLORIDA SECURED TRANSACTION REGISTRY

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC   1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscglobal.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

2223 20264
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Florida
(S.O.S.)

FILED

2021 Nov 29 03:53 PM

****** 202109288505 ******

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
202106583131 03/26/2021

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):**  Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☑ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:
This Change affects ☑ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☑ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:**  Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **6b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| ZANKL | KRISTEN | | |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **7b. INDIVIDUAL'S SURNAME** | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE:  Also check one of these four boxes:** ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | FRANKLIN CAPITAL GROUP, LLC | | |
|---|---|---|---|
| **9b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:** Debtor: EXCELL AUTO GROUP INC - 15492-72 NJR/ASW

2223 20264

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# EXHIBIT T

**Exhibit T**

Case 22-01218-EPK    Doc 145    Filed 12/09/22    Page 303 of 459



# BILL OF SALE

**THIS IS NOT AN INVOICE**

**DOCUMENT NOT VALID FOR EXPORT**

| | |
|---|---|
| **731 MANHEIM PALM BEACH**<br>600 SANSBURYS WAY<br>WEST PALM BEACH, FL 33411 US | **Sale Date**<br>14-APR-2022 17:28:48 |

**Yr Wk Ln Rn**
2022-15-94-11

Please refer to the vehicle release for the pickup location

**Sale Type**
OVE

| Vehicle Purchase Price | |
|---|---|
| Sale Price | $ 130,000.00 |
| Adjustments | $ 0.00 |
| Final Sale Price | $ 130,000.00 |

**Seller**
AUTO WHOLESALE OF BOCA LLC
6560 W ROGERS CIR # B27
BOCA RATON, FL 33487 US

Seller Rep:
*Signature on file*

**Remarketer**
LUXLANE REMARKETING

**Owner**
AUTO WHOLESALE OF BOCA LLC

**Buyer**
PROVIDENCE AUTO GROUP LLC
1635 N ALBANY AVE
ATLANTIC CITY, NJ 08401 US

Buyer Rep: MIRANDA, ANTHONY
*Signature on file*

## Vehicle Information
2021 JEEP GLAD SPT S
CREW SPORT S BLACK Four Wheel Drive
1C6HJTAG0ML564806

Mileage: 1267 Miles     0

License Plate No:

## Title Information
State: FL      Number: 1

## Vehicle Features

| | |
|---|---|
| Convertible Hardtop | Power Windows |
| 6-cylinder Gas | Power Door Locks |
| A/T | Cruise Control |
| Power Steering | Rear Defrost |
| ORA | Driver Air Bag |
| Leather Seats | Emissions label missing |
| A/C | |

## Auction Lights

GREEN       Buyer protection to conditions
YELLOW     Certain conditions announced prior to sale

## Odometer Disclosure
Federal law (and state law, if applicable) requires the Seller to state the mileage upon transfer of ownership. Failure to complete or providing false information may result in fines and/or imprisonment.

Seller hereby states that the odometer for this Vehicle now reads identically to the Mileage stated on this Bill of Sale under Vehicle Information and certifies to the best of Seller's knowledge that this reflects the actual mileage of the Vehicle, unless disclosed otherwise in the Announcements & Notes below.

## Announcements & Notes
STRUCTURAL ALTERATION
 THIRD PARTY SELLER

Seller agrees to sell the vehicle covered by this Bill of Sale to Buyer for the price noted herein.
Seller is the transferor of the vehicle and is responsible for all disclosures, including odometer and mileage.
Buyer must return a signed copy of the title front and back, including the odometer statement therein, to Seller or be subject to civil and criminal penalties.  See 49 CFR § 580.5(f).
Manheim retains a purchase money security interest in the Vehicle and its title until good funds are received from the Buyer.
Seller and Buyer agree to the Manheim Terms and Conditions in effect at the time of the sale.
Sale terms and this Bill of Sale are subject to adjustments by Manheim. Please check your customer account at Manheim.com for most current version of this document.
Bill of Sale is not an Invoice. Please refer to Invoices in your account on Manheim.com.

Printed on: 11-May-2022 06:12:50

# Manheim

# Credit Memo # 52629085

**PAY TO**
AUTO WHOLESALE OF BOCA LLC
6560 W ROGERS CIR # B27
BOCA RATON, FL 33487 US
5333629

**REMIT TO**
Cox Automotive, Inc.
PO Box 105156
Atlanta, GA 30348-5156 US

| | |
|---|---|
| **INVOICE TYPE** | Seller |
| **INVOICE DATE** | 10-MAY-2022 |
| **PAYMENT DUE DATE** | 10-MAY-2022 |
| **BUYER REPRESENTATIVE** | MIRANDA, ANTHONY |
| **TRANSACTION LOCATION** | 731 MANHEIM PALM BEACH |
| **ORIGINAL BUYER** | |
| **LEASE ACCOUNT NO** | |
| **YEAR MAKE MODEL** | 2021 JEEP GLAD SPT S |
| **VIN** | 1C6HJTAG0ML564806 |
| **MILEAGE** | 1267 Miles |

**BUYER**
PROVIDENCE AUTO GROUP LLC
1635 N ALBANY AVE
ATLANTIC CITY, NJ 08401 US

**REMARKETER**
LUXLANE REMARKETING
6579 NW 31ST WAY
BOCA RATON, FL 33496 US

**INVOICING-SALES LOCATION**
MANHEIM PALM BEACH
600 SANSBURYS WAY
WEST PALM BEACH, FL 33411 US

| CHARGE DATE | WORK ORDER | UNIVERSAL KEY | DESCRIPTION | CUSTOMER PO# | PRICE | TAX | LINE TOTAL |
|---|---|---|---|---|---|---|---|
| 14-APR-2022 | 2062859 | 2022-15-94-11 | 2021 JEEP GLAD SPT S | | ($130,000.00) | $0.00 | ($130,000.00) |
| 14-APR-2022 | 2062859 | 2022-15-94-11 | SELLER SUCCESS FEE | | $575.00 | $0.00 | $575.00 |
| 29-APR-2022 | 2062859 | 2022-15-94-11 | REMIT ADMIN FEE TO SELLER - Luxlane Remarketing Rep fee | | $250.00 | $0.00 | $250.00 |
| 08-APR-2022 | 2062859 | 2022-15-94-11 | 15+3 Image Fee | | $25.00 | $0.00 | $25.00 |
| 08-APR-2022 | 2062859 | 2022-15-94-11 | CR W/O ESTIMATE FEE | | $25.00 | $0.00 | $25.00 |

**ADJUSTMENTS**

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| | TOTAL ADJUSTMENTS | $0.00 |

**PAYMENTS**

| DATE | REF NO | DESCRIPTION | AMOUNT |
|---|---|---|---|
| 10-MAY-2022 | 1970196 | Invoice Applied SBM13RAA6KW006903 | $2,000.00 |
| 10-MAY-2022 | 6131991 | Check Issued | $127,125.00 |
| | | TOTAL PAYMENTS | $129,125.00 |

**SPECIAL INSTRUCTIONS**
Please include the invoice number on all remittances and include remittance copy with postal payments.
Visit your Account at Manheim.com to manage preferences, view invoices & statuses, see history and pay invoices.
A late fee will be added, wherever applicable, to all past due invoices, subject to details in the Manheim Terms and Conditions.
If you have questions concerning this invoice, please call or email Manheim Client Care @ 1-866-MANHEIM (626-4346), Mon-Sat 8am-10pm; or email us by clicking on Contact Us on Manheim.com.

| | |
|---|---|
| SUB TOTAL | ($129,125.00) |
| TAX | $0.00 |
| ADJUSTMENTS | $0.00 |
| TOTAL BEFORE PAYMENTS | ($129,125.00) |
| PAYMENTS | $129,125.00 |
| AMOUNT DUE TO | $0.00 |

Overnight mailing address:
Cox Automotive Inc, Attn: Lockbox 105156, 3585 Atlanta Avenue, Hapeville, GA 30354-1705 US

Printed on: 2022-05-11 14:12:50

Case 22-01218-EPK Doc 145 Filed 12/09/22 Page 304 of 459

# Manheim

**Invoice # 1970196**

| | |
|---|---|
| **DUE FROM** | |
| AUTO WHOLESALE OF BOCA LLC | |
| 6560 W ROGERS CIR # B27 | |
| BOCA RATON, FL 33487 US | |
| 5333629 | |

| **REMIT TO** | **INVOICE TYPE** | Seller |
|---|---|---|
| Cox Automotive, Inc. | **INVOICE DATE** | 27-APR-2022 |
| PO Box 105156 | **PAYMENT DUE DATE** | 27-APR-2022 |
| Atlanta, GA 30348-5156 US | **BUYER REPRESENTATIVE** | WILDRICK, RYAN |
| | **TRANSACTION LOCATION** | 731 MANHEIM PALM BEACH |
| | **ORIGINAL BUYER** | |

| **BUYER** | **REMARKETER** | **INVOICING-SALES LOCATION** | **LEASE ACCOUNT NO** | |
|---|---|---|---|---|
| BMD LLC | LUXLANE REMARKETING | MANHEIM PALM BEACH | **YEAR MAKE MODEL** | 2019 MCLAREN 600LT |
| 612 PLYMOUTH ST STE 4R | 6579 NW 31ST WAY | 600 SANSBURYS WAY | **VIN** | SBM13RAA6KW006903 |
| EAST BRIDGEWATER, MA 02333 US | BOCA RATON, FL 33496 US | WEST PALM BEACH, FL 33411 US | **MILEAGE** | 7673 Miles |

| CHARGE DATE | WORK ORDER | UNIVERSAL KEY | DESCRIPTION | CUSTOMER PO# | PRICE | TAX | LINE TOTAL |
|---|---|---|---|---|---|---|---|
| | 2062658 | 2022-14-2-109 | Sale Price Adjustment Item | | $2,000.00 | $0.00 | $2,000.00 |

**ADJUSTMENTS**

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| | | |
| | **TOTAL ADJUSTMENTS** | $0.00 |

**PAYMENTS**

| DATE | REF NO | DESCRIPTION | AMOUNT |
|---|---|---|---|
| 10-MAY-2022 | 52629085 | Credit Memo Applied 1C6HJTAG0ML564806 | $2,000.00 |
| | | **TOTAL PAYMENTS** | $2,000.00 |

**SPECIAL INSTRUCTIONS**
Please include the invoice number on all remittances and include remittance copy with postal payments.
Visit your Account at Manheim.com to manage preferences, view invoices & statuses, see history and pay invoices.
A late fee will be added, wherever applicable, to all past due invoices, subject to details in the Manheim Terms and Conditions.
If you have questions concerning this invoice, please call or email Manheim Client Care @ 1-866-MANHEIM (626-4346), Mon-Sat 8am-10pm; or email us by clicking on Contact Us on Manheim.com.

| | |
|---|---|
| SUB TOTAL | $2,000.00 |
| TAX | $0.00 |
| ADJUSTMENTS | $0.00 |
| TOTAL BEFORE PAYMENTS | $2,000.00 |
| PAYMENTS | ($2,000.00) |
| OUTSTANDING BALANCE | $0.00 |

Overnight mailing address:
Cox Automotive Inc, Attn: Lockbox 105156, 3585 Atlanta Avenue, Hapeville, GA 30354-1705 US

Printed on: 2022-05-11 18:18:08

Case 22-01218-EPK    Doc 145    Filed 12/09/22    Page 305 of 459

# EXHIBIT U

**Exhibit U**

# PROMISSORY NOTE
## (Term Loan)

$6,000,000

Maturity Date: November 3, 2024                                              Dated:  November 3, 2021

      **FOR VALUE RECEIVED,** on or before the Maturity Date stated above "Maturity Date"), the undersigned ("Borrower") promises to pay to the order of Franklin Capital Group, LLC (including its successors and assigns, "Lender"), at its offices located at 32300 Northwestern Hwy, Farmington Hills, Michigan 48334, or at such other place as Lender may designate in writing, the principal sum of Six Million Dollars ($6,000,000), plus interest as hereinafter provided, in lawful money of the United States.

      The unpaid principal balance outstanding from time to time under this Promissory Note (Term Loan) (this "Note") shall bear interest at twenty two percent (22%) per annum.  Interest shall be calculated on the basis of a 360 day year for the actual number of days elapsed.  Interest shall be paid monthly in arrears on the last day of each month in the amounts and on the dates set forth on Schedule A hereto.

      This Note shall be repaid by consecutive monthly installments of principal on the last day of each month, in the amounts and on the dates set forth on Schedule A hereto (as may be adjusted from time to time as necessary to reflect any prepayments).  The unpaid principal balance and all accrued interest thereon shall be due and payable in full on the Maturity Date (or earlier upon acceleration).  Amounts repaid may not be readvanced.

      The sums advanced hereunder shall be charged to a loan account in Borrower's name on Lender's books (the "Loan Account"), and Lender shall credit to such account the amount of each repayment hereunder.  Lender shall render Borrower, from time to time, a statement of account setting forth the Borrower's loan balance in said Loan Account which shall be presumed to be correct and accepted by and binding upon Borrower, unless Lender receives a written statement of exceptions within ten (10) days after such statement has been rendered to Borrower. Such statement of account shall be prima facie evidence of the loan and amounts owing to Lender by Borrower hereunder.

      Any payment made by mail will be deemed tendered and received only upon actual receipt (time being of the essence), at the address of Lender designated for such payment whether or not Lender has authorized payment by mail or any other manner.  Borrower hereby expressly assumes all risk of loss or liability resulting from non-delivery or delay in delivery of any payment transmitted by mail or in any other manner.

      No delay or failure of Lender in exercising any right, remedy, power or privilege hereunder shall affect such right, remedy, power or privilege, nor shall any single or partial exercise thereof preclude the exercise of any other right, remedy, power or privilege.  No delay or failure of Lender at any time to demand strict adherence to the terms of this Note shall be deemed to constitute a course of conduct inconsistent with the Lender's right at any time, before

or after any Event of Default (defined below), to demand strict adherence to the terms of this Note.

Unless separately agreed in writing by Lender in its sole and absolute discretion, Borrower shall not be permitted to prepay any principal or interest outstanding under this Note.

Nothing herein contained, nor any transaction relating thereto, or hereto, shall be construed or so operate as to require the Borrower to pay, or be charged, interest at a greater rate than the maximum allowed by the applicable law relating to this Note. Should any interest or other charges, charged, paid or payable by the Borrower in connection with this Note, or any other document delivered in connection herewith, result in the charging, compensation, payment or earning of interest in excess of the maximum allowed by the applicable law as aforesaid, then any and all such excess shall be and the same is hereby waived by the holder, and any and all such excess paid shall be automatically credited against and in reduction of the principal due under this Note.

As of the date of this Note, Borrower represents that Borrower has not made any qualified dispositions of any of Borrower's property to (a) a trust established under the Qualified Dispositions in Trust Act (codified at MCL 700.1041 et. seq.) ("Act"), or (b) any other asset protection trust.

Borrower agrees that Borrower will not make or attempt any qualified dispositions or other distribution or transfers of Borrower's property into a trust established under the Act, or any other asset protection trust, without obtaining the prior written consent of Lender. Lender's consent to any such requested distribution shall be at the sole and absolute discretion of Lender. Any consent provided by Lender described in this paragraph shall only be applicable for property identified and disclosed in writing by Borrower to Lender. Lender's consent shall not be applicable to: (x) any other property of Borrower which is not disclosed to Lender in writing as part of the qualified disposition under the Act; or (y) any other qualified disposition of property under the Act previously attempted or attempted in the future by Borrower.

Borrower acknowledges and agrees that if Lender does not provide its written consent to Borrower for a qualified or other disposition under the Act, then such disposition by Borrower shall not be valid under the Act with respect to Lender.

Borrower agrees that Borrower has an obligation to disclose immediately in writing to Lender any qualified dispositions or attempted qualified dispositions to a trust under the Act.

Borrower agrees that this Note constitutes a written agreement described in the Act between a transferor and a creditor providing for and establishing the obligations of a transferor as stated in Subsection (11) of Section 5 of the Act.

The terms used in the previous five paragraphs shall have the meaning ascribed to them in the Act, unless otherwise defined herein.

Any of the following events shall constitute an "Event of Default" under this Note: (a) Borrower shall default in the payment of any sum which is or becomes due and payable under this Note, or (b) any representation or warranty made by Borrower in this Note or in any other

2

Bodman_18055842_4

Loan Document or other agreement, certificate or document furnished in connection with this Note shall prove untrue in any material respect, or (c) Borrower shall fail to observe or perform any other condition, covenant or agreement of Borrower set forth in this Note or in any other Loan Document, or (d) Borrower or any guarantor of all or any portion of the indebtedness under this Note (each a "Guarantor") shall default in the performance of any of its obligations to Lender, and such default shall not be cured or remedied by Borrower or such Guarantor within any applicable period of grace or cure with respect thereto, or (e) the default in the payment of any other obligation of Borrower or any Guarantor for borrowed money, or in the observance or performance of any conditions, covenants or agreements related or given with respect to any obligations for borrowed money (including under or in respect of any Existing Indebtedness (as defined in the Letter Agreement) notwithstanding the consolidation of such Existing Indebtedness into the Term Loan (as defined in the Letter Agreement)) sufficient to permit the holder thereof to accelerate the maturity of such obligation, including, without limitation, obligations of Borrower or any Guarantor to Lender, or (f) a judgment for the payment of money in excess of the sum of Ten Thousand Dollars ($10,000) in the aggregate shall be rendered against Borrower or any Guarantor and such judgment shall remain unpaid, unvacated, unbonded or unstayed by appeal or otherwise for a period of thirty (30) consecutive days from the date of its entry and such judgment is not covered by insurance from a solvent insurer who is defending such action without reservation of rights, or (g) Borrower or any Guarantor (i) shall admit in writing the inability to pay its or his debts as they become due and payable; or (ii) shall make an assignment for the benefit of creditors; or (iii) shall be adjudicated a bankrupt; or (iv) shall file a voluntary petition in bankruptcy or effect a plan or other arrangement with creditors; or (v) shall have applied for, or permitted the appointment of, a receiver or trustee or custodian for all or substantially all of the property or assets of such Borrower or Guarantor, or a trustee, receiver or custodian shall have been appointed for all or substantially all of the property or assets of such Borrower or Guarantor who shall not have been discharged within sixty (60) days after the date of his appointment, or (h) Borrower or any Guarantor shall dissolve or merge with or into any entity not theretofore affiliated with Borrower or Guarantor, as applicable, or Borrower or any Guarantor shall dispose of all or any material portion of its assets or equity, or (i) any Guarantor shall deny its liability or obligations under its guaranty or shall notify the Lender of its intention to attempt to cancel, revoke or terminate its guaranty, or shall fail to observe or comply with any term, covenant, condition and requirement under its guaranty, or (j) any suit or proceeding is filed against Borrower or any Guarantor which, if adversely determined to Borrower or such Guarantor, would have, as determined by Lender in its sole discretion, a material adverse effect on such Borrower or Guarantor, which suit is not dismissed within sixty (60) days of its filing, or (k) Borrower or any Guarantor (if a natural person) shall die or shall be determined mentally incapacitated by a court of competent jurisdiction, or (l) any breach or default by Borrower of any material term or condition under any swap, interest protection agreement, derivatives agreement, or similar agreements now or hereafter entered into by Borrower with Lender or any affiliate of Lender, or (m) the occurrence of any event (including any change, for any reason whatsoever, in the management, ownership or control of Borrower) which Lender determines, in its sole discretion and judgment, would have a material adverse effect upon Borrower and/or its ability to pay or perform any of its liabilities or obligations under this Note or (n) Borrower shall terminate the Consulting Engagement (as defined in the Letter Agreement) or shall otherwise breach any of its obligations with respect thereto or (o) the Key Man Life Insurance Policy (as defined in the Letter Agreement) ceases to be in full force and effect or (p) within 90 days from

3

the date hereof, the Key Man Life Insurance Policy shall not have been issued and subject to a first priority collateral assignment in favor of Lender (subject to documentation acceptable to Lender).

Upon the occurrence of an Event of Default: (a) the entire unpaid principal balance and all accrued interest shall at the sole option of Lender be immediately due and payable, without presentment, demand, protest or any further notice or any other formalities of any kind, all of which are hereby expressly and irrevocably waived, together with (to the extent permitted under applicable law) the costs, attorneys' fees, and outside consultants' fees reasonably incurred by Lender in collecting or enforcing payment, (b) Lender may proceed to protect and enforce all or any of its rights, remedies, powers and privileges under this Note by action at law, suit in equity or other appropriate proceedings, and (c) any commitment or obligation, if any, on the part of Lender to make loans or otherwise extend credit to or in favor of Borrower shall immediately terminate. Upon the occurrence and at any time during the continuance or existence of an Event of Default under subsection (g) of the preceding paragraph, then the Obligations and all indebtedness then outstanding thereunder shall automatically become immediately due and payable without any notice by Lender to Borrower and any commitment or obligation, if any, on the part of Lender to make loans or otherwise extend credit to or in favor of Borrower shall immediately terminate. Further, upon the occurrence or at any time during the continuance or existence of any Events of Default hereunder, Lender may collect, deal with and dispose of all or any part of any security in any manner permitted or authorized by the Michigan Uniform Commercial Code or other applicable law (including public or private sale), and after deducting expenses (including, without limitation, reasonable attorneys' fees and expenses), Lender may apply the proceeds thereof in part or full payment of any of the Obligations, whether due or not, in any manner or order Lender elects.

Borrower hereby grants to Lender a security interest in Lender's own indebtedness or liability to Borrower, if any, however evidenced, including a security interest in all of Borrower's bank deposits, instruments, negotiable documents and chattel paper which at any time are in the possession or control of Lender, as further security for repayment of the Obligations; and the Borrower hereby grants to Lender all rights and privileges afforded a secured party under the Michigan Uniform Commercial Code.

All payments other than scheduled payments paid hereunder shall, at the option of Lender, first be applied against any and all fees, costs and expenses (including expenses of collection), then against accrued interest, and the balance against principal in inverse order of maturity. Acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default.

Borrower hereby waives presentment for payment, demand, notice of non-payment, notice of protest and protest of this Note, diligence in collection or bringing suit.

Borrower's obligations hereunder are cross-collateralized and cross-defaulted with all other indebtedness owing to Lender by Borrower.

Bodman_18055842_4

No delay or omission of the Lender to exercise any right under this Note impairs that right nor can it be construed to waive any Event of Default or acquiesce in any Event of Default, and the making of an advance notwithstanding the existence of an Event of Default or the inability of the Borrower to satisfy the conditions precedent to such advance does not constitute a waiver or acquiescence. Any single or partial exercise of any right does not preclude any other or further exercise of it or the exercise of any other right, and no waiver, amendment or other variation of the terms of this Note is valid unless in writing signed by Borrower and Lender, and then only to the extent that such writing specifies. All remedies contained in this Note or afforded by law are cumulative and all are available to the Lender until this Note has been paid in full.

The Borrower must reimburse the Lender for any costs, internal charges and out-of-pocket expenses (including attorneys' fees and time charges of attorneys for the Lender, who may be employees of the Lender) paid or incurred by the Lender in connection with the preparation, review, execution, delivery, amendment, modification, administration, collection and enforcement of this Note. The Borrower further indemnifies the Lender, its directors, officers and employees against all losses, claims, damages, penalties, judgments, liabilities and expenses (including without limitation all expenses of litigation or preparation for litigation whether or not the Lender is a party) which any of them pay or incur arising out of or relating to this Note or the direct or indirect application or proposed application of the proceeds of this Note.

This Note, if executed by more than one Person, shall be the joint and several obligation of all of such Persons, and shall be binding upon each Borrower and its heirs, personal representatives, successors and assigns, whether expressed or not. The liability of each Borrower shall be absolute and unconditional, without regard to the liability of any other party hereto.

The terms of this Note bind and benefit the Borrower and the Lender and their respective successors and assigns, except that the Borrower shall not assign its rights or obligations under this Note. The Lender may at any time sell to one or more Persons participating interests in this Note. The Lender may at any time assign to one or more Persons all or any part of its rights and obligations under this Note, and the Borrower releases the Lender for the amount so assigned.

This Note is to be construed in accordance with the internal laws (but not the law of conflicts) of the State of Michigan. The Borrower irrevocably submits to the non-exclusive jurisdiction of any United States federal court sitting in the Eastern District of Michigan or any state court in Oakland County in the State of Michigan in any action or proceeding arising out of or relating to this Note, and the Borrower irrevocably agrees that all such claims may be heard and determined in any such court and irrevocably waives any present and future objection it may have as to the venue of any action or proceeding brought in that court, or that that court is an inconvenient forum. Any suit brought by Borrower related to this Note or the Loan Documents may only be brought in the United States federal court sitting in the Eastern District of Michigan or in a state court in Oakland County in the State of Michigan. Nothing herein shall limit the right of the Lender to bring any action or proceeding against the Borrower in the courts of any other jurisdiction if necessary or convenient to effect the relief sought.

5

Lender hereby notifies Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "Act"), and the Lender's policies and practices, Lender is required to obtain, verify and record certain information and documentation that identifies the Borrower, which information includes the name and address of the Borrower and such other information that will allow Lender to identify the Borrower in accordance with the Act.

## DEFINITIONS

As used in this Note, the following terms shall have the given meaning:

"Consulting Obligations" shall mean the obligations of Borrower arising in respect of the Consulting Engagement.

"Letter Agreement" shall mean the Letter Agreement, dated as of the date hereof between Borrower and Lender (as it may be amended, restated, supplemented or otherwise modified from time to time).

"Loan Documents" shall mean, collectively, this Note, any other promissory note evidencing other loans made by Lender to Borrower, the Letter Agreement, any guaranties, mortgage, security agreement, any swap agreements, other interest rate protection agreements, derivative agreements, any certificates (including, for the avoidance of doubt, the Perfection Certificate, dated as of the date hereof and executed by Company and each of the Guarantors), and any other document, instrument or agreement evidencing, securing or relating to this Note, together with any and all modifications and amendments to any of the foregoing.

"Obligations" shall mean, collectively, (i) Borrower's obligations for the payment of all sums advanced or to be advanced hereunder, together with interest on the outstanding principal balance of such sums and with any and all other sums payable by Borrower to the Lender pursuant to this Note or any other Loan Documents, along with Borrower's obligation for the payment of any letters of credit issued by Lender and payment and performance of all of the warranties, representations, covenants and agreements to be paid, fulfilled, observed and performed by Borrower under each Loan Document to which Borrower is a party and (ii) the Consulting Obligations.

"Person" shall mean any corporation, natural person, firm, limited liability company, joint venture, partnership, trust, unincorporated organization, enterprise, government or any department or agency of any government.

**LENDER AND BORROWER KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT EITHER OF THEM TO HAVE TO A TRIAL BY JURY IN ANY PROCEEDING (WHETHER SOUNDING IN CONTRACT OR TORT) WHICH IS IN ANY WAY CONNECTED WITH THIS NOTE, ANY RELATED AGREEMENT, OR THE RELATIONSHIP ESTABLISHED UNDER IT.**

[remainder of page intentionally left blank]

6

IN WITNESS WHEREOF, the undersigned have executed this Note as of the date first written above.

BORROWER:

EXCELL AUTO GROUP, INC.

By:_____

Name: Scott Zankl
Title: Vice President

[Signature Page to Promissory Note (Term Loan) (18055842)]

## Schedule A

| Payment Date | Interest | Principal |
|---|---|---|
| November 30, 2021 | $99,000.00 | $41,555.66 |
| December 31, 2021 | $109,238.15 | $31,317.52 |
| January 31, 2022 | $108,663.99 | $31,891.67 |
| February 28, 2022 | $108,079.31 | $32,476.35 |
| March 31, 2022 | $107,483.91 | $33,071.75 |
| April 30, 2022 | $106,877.60 | $33,678.07 |
| May 31, 2022 | $106,260.16 | $34,295.50 |
| June 30, 2022 | $105,631.41 | $34,924.25 |
| July 31, 2022 | $104,991.14 | $35,564.53 |
| August 31, 2022 | $104,339.12 | $36,216.54 |
| September 30, 2022 | $103,675.15 | $36,880.51 |
| October 31, 2022 | $102,999.01 | $37,556.66 |
| November 30, 2022 | $102,310.47 | $38,245.20 |
| December 31, 2022 | $101,609.31 | $38,946.36 |
| January 31, 2023 | $100,895.29 | $39,660.37 |
| February 28, 2023 | $100,168.18 | $40,387.48 |
| March 31, 2023 | $99,427.75 | $41,127.92 |
| April 30, 2023 | $98,673.73 | $41,881.93 |
| May 31, 2023 | $97,905.90 | $42,649.77 |
| June 30, 2023 | $97,123.99 | $43,431.68 |
| July 31, 2023 | $96,327.74 | $44,227.93 |
| August 31, 2023 | $95,516.89 | $45,038.77 |
| September 30, 2023 | $94,691.18 | $45,864.48 |
| October 31, 2023 | $93,850.33 | $46,705.33 |
| November 30, 2023 | $92,994.07 | $72,561.59 |
| December 31, 2023 | $91,663.77 | $73,891.89 |
| January 31, 2024 | $90,309.09 | $75,246.58 |
| February 28, 2024 | $88,929.57 | $76,626.10 |
| March 31, 2024 | $87,524.76 | $78,030.91 |
| April 30, 2024 | $86,094.19 | $79,461.47 |
| May 31, 2024 | $84,637.40 | $80,918.27 |
| June 30, 2024 | $83,153.89 | $82,401.77 |
| July 31, 2024 | $81,643.20 | $83,912.47 |
| August 31, 2024 | $80,104.80 | $85,450.86 |
| September 30, 2024 | $78,538.20 | $87,017.46 |
| October 31, 2024 | $76,942.88 | $88,612.78 |

# EXHIBIT V

**Exhibit V**

November 3, 2021

Excell Auto Group, Inc.
1001 Clint Moore Road
Boca Raton, FL 33487

Ladies and Gentlemen:

This letter (the "Agreement") constitutes an agreement by and between Franklin Capital Group, LLC (including its successors and assigns, "Lender"), and Excell Auto Group, Inc., a Florida corporation (herein called "Company"), pertaining to certain loans and other credit which Lender has made or may from time to time hereafter make available to Company. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Promissory Note (Term Loan), dated as of the date hereof, made by Company to Lender (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Term Note" and, together with any future loans evidenced by a note, the "Term Notes"), in respect of the term loan made to Company on the date hereof, in an aggregate principal amount equal to $6,000,000 (the "Term Loan" and, together with any future loans made by Lender to Borrower, the "Term Loans").

In consideration of the Obligations and all present and future loans and credit from time to time made available by Lender to or in favor of Company, and in consideration of all present and future liabilities, obligations and indebtedness of Company to Lender, howsoever created, evidenced, existing or arising, whether direct or indirect, absolute or contingent, joint or several, now or hereafter existing or arising, or due or to become due, and all extensions and/or renewals thereof (herein collectively called the "Liabilities"), Company covenants and agrees as follows:

1.      As used in this Agreement, the following terms shall have the following respective meanings set forth below:

**"Capital Expenditure"** shall mean any expenditure by a Person for (a) an asset which will be used in a year or years subsequent to the year in which the expenditure is made and which asset is properly classified in relevant financial statements of such Person as equipment, real property, a fixed asset or a similar type of capitalized asset in accordance with GAAP (as defined below), or (b) an asset relating to or acquired in connection with an acquired business, and (c) any and all acquisition costs related to (a) or (b) above.

"**Capital Securities**" shall mean shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of capital, whether now outstanding or issued or acquired after the date hereof, including common shares, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership or any other equivalent of such ownership interest.

"**Consulting Engagement**" shall mean Company's engagement of Franklin Capital Management, LLC ("Franklin Management") as a consultant (the "Consulting Engagement") under that certain engagement letter, dated as of the date hereof, between Franklin Management and Company (or such other agreement evidencing such Consulting Engagement).

"**Corporate Guarantor**" shall mean any Guarantor that is not an Individual Guarantor. As of the date hereof, the Corporate Guarantors are Karma of Palm Beach, Inc., a Florida corporation ("Karma Palm Beach") and Karma of Broward, Inc., a Florida corporation ("Karma Broward").

"**Guaranty**" shall mean a guaranty in form and substance satisfactory to Lender pursuant to which a Person guaranties payment of all or any portion of the Liabilities.

"**Individual Guarantor**" shall mean each Guarantor that is a natural person. As of the date hereof, the Individual Guarantors are Scott Zankl and Kristen Zankl.

"**Key Man Life Insurance Policy**" shall mean a "key man life insurance policy" insuring the life of Scott Zankl, to be in the face amount of at least $5,000,000 (or such lesser amount as agreed by Lender in its sole discretion) to be obtained by Company and collaterally assigned to Lender within 30 days of the date hereof.

"**Loan Documents**" shall mean, collectively, this Letter Agreement, the Note, any other promissory notes evidencing other loans made by Lender to Company, any guaranties, mortgage, security agreement, any swap agreements, other interest rate protection agreements, derivative agreements, any certificates (including, for the avoidance of doubt, the Perfection Certificate, dated as of the date hereof and executed by Company and each of the Guarantors), and any other or document, instrument or agreement evidencing, securing or relating to this Agreement, together with any and all modifications and amendments to any of the foregoing.

"**Material Adverse Effect**" shall mean a material, adverse effect on (i) the business, property or condition (financial or otherwise) of Company, any subsidiary of Company or any Guarantor; (ii) Company's, any subsidiary's or any Guarantor's ability to perform its obligations hereunder or any other Loan Document to which it is a party, or (iii) the validity or enforceability of this Agreement or any other Loan Document.

"**Organizational Documents**" shall mean, with respect to any Person, its articles of incorporation, articles of organization, bylaws, operating agreement, partnership agreement, declaration of trust or other trust agreement, or such other applicable organizational documents, including all of the exhibits thereto.

"**Permitted Affiliate Transactions**" shall mean any transaction between Company and any of its affiliates (including, for the avoidance of doubt, Karma Palm Beach and Karma Broward) for the sale and transfer of any motor vehicle; provided that (a) immediately prior to such sale and transfer, all necessary steps shall have been taken such that Lender maintains a valid, enforceable, perfected first priority secured interest in such motor vehicle and the proceeds thereof, (b) such sale is properly documented in form and substance acceptable to Lender, and (c) contemporaneous with the closing of such sale, the sale proceeds are deposited into an account maintained by Company that is subject to an account control agreement (satisfactory to Lender) in favor of Lender.

Bodman_18055845_4

2.      Each loan or other extension of credit made by Lender to or otherwise in favor of Company shall be evidenced by and subject to a promissory note or other agreement or evidence of indebtedness acceptable to Lender, and executed and delivered by Company unto Lender.

3.      Company represents and warrants to Lender, and such representations and warranties shall be deemed to be continuing representations and warranties during the entire life of this Agreement, and thereafter, so long as any Liabilities remain unpaid and outstanding:

(a)    Organization and Existence.

(i)      As of the date hereof, neither Company nor any Corporate Guarantor has any subsidiaries.

(ii)     Company and each of its subsidiaries  (i) is duly organized, validly existing and in good standing as a corporation, general partnership, limited partnership or limited liability company, as applicable, under the laws of the state in which it is incorporated, organized, or formed; (ii) has all necessary power and authority and full legal right to own its property and to carry on its businesses; and (iii) has all necessary power and authority, and full legal right, to enter into this Agreement and each of the other Loan Documents to which it is a party, and to perform, observe and comply with all of its agreements and obligations under this Agreement and the other Loan Documents;

(iii)    Each Corporate Guarantor  (i) is duly organized, validly existing and in good standing as a corporation, general partnership, limited partnership or limited liability company, as applicable, under the laws of the state in which it is incorporated, organized, or formed; (ii) has all necessary power and authority and full legal right to own its property and to carry on its businesses; and (iii) has all necessary power and authority, and full legal right, to enter into this Agreement and each of the other Loan Documents to which it is a party, and to perform, observe and comply with all of its agreements and obligations under this Agreement and the other Loan Documents;

(iv)     Company and each Corporate Guarantor has provided Lender with true, correct and complete copies of its Organizational Documents.  All of the Organizational Documents are unmodified since the date delivered to Lender and are in full force and effect;

(b)    Due Authorization.

(i)      The execution and delivery by Company of this Agreement and the other Loan Documents to which Company is a party, the execution and delivery by each Corporate Guarantor of each of the Loan Documents to which it is a party, the performance by Company and each Corporate Guarantor of all of its agreements and obligations under such documents and the making of the borrowings contemplated by this Agreement have been duly

3

Bodman_18055845_4

authorized by all necessary action on the part of Company and such Corporate Guarantor , as applicable, and do not and will not (i) contravene any provision of its Organizational Documents; (ii) conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any lien (other than those in favor of Lender pursuant to the Loan Documents) upon any of its property under any agreement, indenture, mortgage or other instrument to which it is a party or by which it is bound or affected; (iii) violate or contravene any provision of any law, rule or regulation (including, without limitation, the Regulations of the Board of Governors of the Federal Reserve System) or any order, ruling or interpretation thereunder or any decree, order or judgment of any court or governmental or regulatory authority, bureau, agency or official binding on it; or (iv) require any waivers, consents or approvals by any of its creditors or trustees for its creditors.

(ii)     Except as to matters which Company or a Corporate Guarantor has procured, obtained or performed prior to or concurrently with Company's execution and delivery of this Agreement, no approval, consent, order, authorization or license by, or giving notice to, or taking any other action with respect to, any governmental or regulatory authority or agency is required under any provision of any applicable law for (i) Company's execution and delivery of this Agreement and the other Loan Documents to which it is a party or Company's performance of its obligations under this Agreement and the other Loan Documents and the borrowings contemplated by this Agreement, (ii) the execution and delivery by any Guarantor of any Loan Documents to which it is a party or such Guarantor's performance of its obligations under such other Loan Documents, or (iii) the continuing legality, validity, binding effect, enforceability or admissibility in evidence of this Agreement and the other Loan Documents.

(c)     <u>Material Adverse Effect</u>. There are no actions, suits or proceedings pending or, to the actual knowledge of Company, threatened against Company, any subsidiary or any Guarantor, which could, if determined adversely to Company, such subsidiary or such Guarantor, reasonably be expected to have a Material Adverse Effect upon Company, such subsidiary or such Guarantor.

(d)     <u>Loan Documents</u>. Each Loan Document to which Company or any Guarantor is a party constitutes the legal, valid and binding obligation of Company and such Guarantor, enforceable against Company and such Guarantor in accordance with its terms (except as such enforceability may be limited by bankruptcy, insolvency or similar laws generally affecting the enforcement of creditor's rights).

(e)     <u>No Default</u>. No event has occurred and is continuing, and no condition exists, which constitutes (or would, with the provision of notice or the passage of time, or both, constitute) an Event of Default.  Neither Company nor any Guarantor has

4

any right to rescind, cancel or terminate this Agreement or any other Loan Document.

(f)    Financial Statements. All of the financial statements of Company, each subsidiary of Company, and each Guarantor delivered to Lender in connection with the transactions contemplated by the Loan Documents have been prepared in accordance with generally accepted accounting principles consistently applied ("GAAP"), and fairly present in all material respects the financial condition of Company, such subsidiary and such Guarantor as of the dates on which the same were prepared.  There are no material liabilities or obligations, secured or unsecured (whether accrued, absolute or actual, contingent or otherwise), not reflected in such financial statements, which, in accordance with GAAP, should have been reflected therein.  From the date of the most recent financial statements provided to Lender until the date hereof, there has been no materially adverse change in the financial condition of Company, any subsidiary of Company or any Guarantor.

(g)    Tax Returns. Each of Company and its subsidiaries, and each Guarantor has filed all federal, state and other tax returns required to be filed in respect of all taxing periods prior to the date of this Agreement (or has been granted extensions with respect to same), and has paid or made reasonable provision, in accordance with applicable laws for the payment of all taxes (if any) which have or may become due and payable pursuant to any such returns (or pursuant to any matters raised by audits).  Each of Company, each of its subsidiaries and each Guarantor has paid or caused to be paid all real and personal property taxes and assessments and other governmental charges lawfully levied or imposed on or against Company, such subsidiary or Guarantor or its property (other than those presently payable without payment of interest or penalty and those which are subject to contests initiated in good faith and diligently prosecuted and as to which adequate reserves have been provided).

(h)    Solvency. Company does not intend to, and does not believe that it will, incur debts beyond its ability to pay as they mature, taking into account the timing of and amounts of cash to be received by it and the timing of the amounts of cash to be payable on or in respect of its indebtedness.  Company is solvent, and, giving effect to the closing of the transactions contemplated by this Agreement and the disbursement of the proceeds of any loans from Lender, shall remain solvent.

(i)    Encumbrances. There are no security interests in, or liens, mortgages, or other encumbrances on, any of Company's or any Guarantor's property or assets, except Permitted Liens (as defined below).

(j)    Inventory.  Company has provided Lender with (i) a true and correct list of all inventory owned by Company, Karma Palm Beach and Karma Broward, (ii) copies of all existing floor plans or other financing documents or credit facilities with respect to which any inventory of Company, Karma Palm Beach or Karma

5

Broward is subject to a lien in favor of a third party and (iii) all physical titles of all vehicles owned by Company.

(k)     <u>Merchant Cash Advances</u>. Neither Company nor any Guarantor is party to any agreement with any merchant cash advance company or similar party other than those disclosed to Lender in writing, including copies of all documents and agreements arising under or in connection therewith.

4.     So long as Lender shall have any commitment or obligation, if any, to make or extend loans, advances or other credit to or in favor of Company, and so long as any Liabilities remain unpaid and/or outstanding, Company covenants and agrees that it shall and it shall cause each of its subsidiaries, each Corporate Guarantor and each of its subsidiaries to:

(a)     Furnish to Lender, or cause to be furnished to Lender, in each case, in form and detail and on a reporting basis satisfactory to Lender, the following:

      (i)     as soon as available, and in any event not later than 60 days after and as of the end of each fiscal year of Company, consolidated and consolidating financial statements of Company and its consolidated subsidiaries for and as of the end of each such fiscal year, containing the consolidated and consolidating balance sheets of Company and its consolidated subsidiaries as of the close of each such fiscal year, consolidated and consolidating statements of income and retained earnings and a statement of cash flows of Company and its consolidated subsidiaries for each such fiscal year, and such other comments and financial details as are usually included in similar reports. Such financial statements shall be prepared in accordance with GAAP, shall be in such detail as Lender may reasonably require, and shall be audited by independent certified public accountants of recognized standing selected by Company and acceptable to Lender;

      (ii)     as soon as available, and in any event not later than 15 days after and as of the end of each month of each fiscal year of Company, consolidated and consolidating financial statements of Company and its consolidated subsidiaries, containing the balance sheet of Company and its consolidated subsidiaries as of the end of each such month, consolidated and consolidating statements of income and retained earning and a statement of cash flows for Company and its consolidated subsidiaries for such month and for the portion of the fiscal year of Company through the end of the month then ending, and such other comments and financial details as are usually included in similar reports. Such financial statements shall be prepared in accordance with GAAP, shall be in such detail as Lender may reasonably require, and shall be certified as to accuracy and fairness by the chief executive or chief financial officer of Company (or, if none exists, such other officer with similar duties and responsibilities and familiarity with Company's finances and operations);

6

(iii)     simultaneous with the delivery to Lender of the respective financial statements required in sub-sections (i) and (ii) above, a compliance certificate in form and detail satisfactory to Lender, certified by the chief financial officer of such Company, certifying that, as of the date thereof, to the best of each such person's knowledge, no Default or Event of Default shall have occurred and be continuing or exist, or if any Default or Event of Default shall have occurred and be continuing or exist, specifying, in detail, the nature and period of existence thereof and any action taken or proposed to be taken by Companies in respect thereof;

(iv)     as soon as available, and in any event within 15 days after and as of the end of each month, agings of Company's and its subsidiaries' accounts receivable and accounts payable and an inventory report of Company and its subsidiaries for and as of the end of each such month, each in form satisfactory to Lender, certified by a duly authorized officer of Company and its subsidiaries;

(v)     (a) within 15 days after filing, the federal income tax returns for Company and each of its consolidated subsidiaries, including all schedules thereto and (b) within 15 days after filing, the federal payroll tax returns for Company and each of its consolidated subsidiaries, including all schedules thereto;

(vi)     within 15 days after and as of the end of each month of each fiscal year of Company, statements for each bank account maintained by Company;

(vii)     (A) as soon as available, and in any event within 60 days after each year, a personal financial statement for each Individual Guarantor as of the last day of the preceding year, in form acceptable to Lender and certified by such Individual Guarantor as to the accuracy and completeness, and (B) within 10 days of filing, a copy of each Individual Guarantor's federal income tax return, including all schedules thereto; and

(viii)     promptly, at such times as Lender may reasonably require, in form and detail satisfactory to Lender, such other information and reports as may be required under the terms of any Loan Documents or as Lender may reasonably request from time to time.

(b)     Promptly inform Lender of the occurrence of any Event of Default, or any condition or event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default (any such condition or event, a "Default"), under any of the Liabilities or Loan Documents, and of any condition or event which has had or could have a material adverse effect upon Company's business, properties, financial condition or its ability to observe, perform or comply with its liabilities and obligations hereunder or otherwise in respect of any of the Liabilities or the Loan Documents.

7

(c)     (i) Keep proper books of record and account in which full and correct entries shall be made of all of its financial transactions and its assets and businesses so as to permit the presentation of financial statements (including, without limitation, those financial statements to be delivered to Lender pursuant to Section 4(a) above) prepared in accordance with GAAP; provided that (x) Lender, in its sole discretion, may require Company to employ a certified public accountant acceptable to Lender to maintain such books and records and (y) within 90 days from the date of this Agreement, such books and records shall be maintained in QuickBooks Online and (ii) permit Lender, or its attorneys, accountants or other representatives, upon reasonable advance notice (unless a Default or Event of Default has occurred and is continuing, in which case such notice shall not be required), to visit all of Company's and each of its consolidated subsidiaries' offices and to make inquiries as to Company's and such subsidiary's financial matters with their respective directors, members, managers, officers, employees, and independent certified public accountants; and permit Lender, or its attorneys, accountants or other representatives, to inspect, audit and examine Company's and each of its respective consolidated subsidiaries' books, accounts, records, ledgers and assets and properties of every kind and description, wherever located (including, for the avoidance, as maintained in QuickBooks Online), at all reasonable times.  Company shall reimburse Lender for all reasonable costs and expenses incurred by Lender in connection with such inspections, examinations and audits, and to pay to Lender such fees as Lender may reasonably charge in respect of such inspections, examinations and audits, or as otherwise mutually agreed upon by Company and Lender.

(d)     Maintain insurance of the type and in the manner set forth in Section 4(k) of the Continuing Security Agreement, dated as of the date hereof, between Company and Lender and the other debtors party thereto from time to time.

(e)     Preserve and maintain its existence and all of its rights, franchises and privileges.

(f)     Comply with all applicable laws, and will promptly notify Lender in the event that Company or any of their respective subsidiaries receives any notice, claim or demand from any governmental authority asserting the violation of any applicable legal requirement which could reasonably be expected to have a material adverse effect upon Company or any of its subsidiaries.

(g)     Obtain all such approvals, consents, orders, authorizations and licenses from, give all such notices promptly to, register, enroll or file all such agreements, instruments or documents promptly with, and promptly take all such other action with respect to, any governmental authority, regulatory agency or official or any central bank or other fiscal or monetary authority, agency or official, as may be required from time to time under any provision of any applicable law:

  (i)     for the performance by Company, such Corporate Guarantor or such subsidiary of any of its agreements or obligations under the Term Note, this Agreement or any other Loan Document to which it is a party or for

8

the payment by Company, such Corporate Guarantor or such subsidiary to Lender of any sums which shall become due and payable by it thereunder;

(ii)   to ensure the continuing legality, validity, binding effect or enforceability of the Term Note or any other Loan Document;

(iii)   to continue the proper operation of the business and operations of Company, each Corporate Guarantor and each of their respective subsidiaries.

(h)   (i) Cause any newly formed or acquired direct or indirect subsidiary to (x) become a Guarantor and (y) cause Lender to have a first priority security interest in all of its assets, and take all such actions requested by Lender in order to perfect Lender's security interest therein and (ii) without limiting the foregoing clause (i), execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all further assurances reasonably requested by Lender from time to time in order to give full effect to any of the Loan Documents.

(i)   Use the proceeds of any loans from Lender or the proceeds of any collateral securing the Liabilities only for (i) working capital, (ii) general corporate purposes, (iii) the payments of costs, fees and expenses in connection with this Agreement, the other Loan Documents, and the Consulting Engagement, and (iv) the repayment or consolidation of certain indebtedness for borrowed money or other financing obligations of Company existing prior to the date of this Agreement, including but not limited to bank financings and merchant advance obligations (in each case in this clause (iv) which may have been acquired by Lender from the provider of such financing arrangement).

(j)   (i) Keep its assets, whether now owned or hereafter acquired, free of any lien, charge or claim (other than the (x) liens for taxes or assessments or governmental charges or levies not yet due or delinquent, or which can thereafter be paid without penalty, or which are being contested in good faith by proceedings diligently pursued, (y) any other lien, encumbrance or charge acceptable to and approved in writing by Lender and (z) the liens and encumbrances arising under the Loan Documents (collectively, "Permitted Liens")); and (ii) not encumber its assets, whether now owned or hereafter acquired, or any portion thereof or interest therein, permit any lien, levy, attachment or restraint to be made or filed against its assets, whether now owned or hereafter acquired, or any portion thereof or interest therein or permit any receiver or assignee for the benefit of creditors to be appointed to take possession of its assets, whether now owned or hereafter acquired, or any portion thereof.

(k)   Deliver to Lender the following, each of which shall be in form and substance acceptable to Lender: (a) executed landlord waivers or other collateral access agreements with respect to all locations leased by Company or any Corporate

9

Guarantor and (b) executed bailee letters with respect to all locations at which Company stores any inventory or other assets.

(l)  Subject to the occurrence of any Default or Event of Default, and upon the written request of Lender, use commercially reasonable efforts to make such financial adjustments (including with respect to compensation and other budgetary matters) that Lender believes in good faith will improve the overall financial stability of the Company and its subsidiaries as a whole.

(m)  (i) Maintain all of its bank accounts with a bank that has entered into a control agreement with Lender with respect to such accounts in form and substance satisfactory to Lender and (ii) permit Lender to have "view access" to each of its bank accounts.

(n)  (i) Utilize ADP (or such other payroll service vendor satisfactory to Lender in its sole discretion) for the purposes of managing payroll and withholding taxes, (ii) promptly upon receipt, furnish to Lender payroll reports from such payroll service vendor evidencing current payment (or deposit, as the case may be) of all employer and employee withholding taxes and assessments and (iii) take such actions as may be required by ADP (or such other satisfactory payroll service) in order to authorize Lender to have full access to all reports and other information that such vendor makes available to Company or such Corporate Guarantor.

(o)  With respect to Company, if requested by Lender, hire a chief executive officer or chief financial officer deemed acceptable by Franklin Management, which officer shall (x) have such duties and responsibilities typical of such office and (y) receive aggregate compensation deemed reasonable by Franklin Management.

(p)  With respect to Company only, if requested by Lender, request inforce illustrations with respect to the Key Man Life Insurance Policy from an insurance company satisfactory to Lender, and deliver such illustrations to Lender promptly upon receipt thereof.

(q)  Maintain the Key Man Life Insurance Policy in full force and effect.

(r)  With respect to Company only, within one business day of receipt by Company of the proceeds of the Term Loan, use a portion of the proceeds of the Term Loan as specified under the heading "Paid out of Proceeds by Company" in the Closing Statement and Authorization dated as of the date hereof (if any) and executed by Company (the "Closing Statement").

(s)  With respect to Company, immediately upon acquiring the same, cause to be delivered to Lender (or otherwise cause Lender to be listed as the lienholder on) each certificate of title or ownership certificate covering any collateral securing any part of any of the Liabilities, including but not limited to motor vehicles, and otherwise comply with the certificate of title or ownership laws of the relevant jurisdiction issuing such certificate of title or ownership certificate in order to

10

properly evidence and validly perfect Lender's first priority security interest in the assets represented by such certificate of title or ownership certificate.

(t)     Within 30 days of the date hereof, cause all debt and other obligations of Company (including, without limitation, under existing floor plans or similar credit facilities) to be paid in full, evidenced by a payoff letter in form and substance satisfactory to Lender, and cause all liens or other encumbrances in respect thereof to be terminated in a manner satisfactory to Lender, and take, or cause any such lienholder to take, such actions reasonably necessary to effectuate or evidence the foregoing.

5.     So long as Lender shall have any commitment or obligation, if any, to make or extend loans, advances or other credit to or in favor of Company, and so long as any Liabilities remain unpaid and/or outstanding, Company covenants and agrees that it shall not and it shall not permit any of its subsidiaries or any Corporate Guarantor or any of its subsidiaries to:

(a)     Modify, amend or terminate any of its Organizational Documents, or permit any of its Organizational Documents to be modified, amended or terminated, without the prior written consent of Lender.  Lender's consent to any such modification, amendment or termination shall not be unreasonably withheld, provided (a) that there shall be no Default or Event of Default at the time of Company's request for such consent, and (b) the proposed modification, amendment or termination does not (with the provision of notice or the passage of time, or both) violate any provision of any Loan Document.

(b)     Directly or indirectly (i) except in the ordinary course of business, sell, transfer, lease, assign or otherwise dispose of all or any portion of its assets or any interest therein; (ii) except for Permitted Liens, encumber, hypothecate, create a security interest or create or permit any lien upon or affecting its assets or any portion thereof or interest therein; (iii) assign, transfer or encumber any interest of Company or any of its subsidiaries under this Agreement or under any other Loan Document; (iv) purchase, acquire, issue or redeem any of its Capital Securities or make any material change in its capital structure; (v) change its name, consolidate with or merge into any other Person or permit any other Person to merge into it; or (vi) enter into any sale-leaseback transaction.

(c)     Directly or indirectly, become or remain obligated for any indebtedness for borrowed money, or for any indebtedness incurred in connection with the acquisition of any property, real or personal, tangible or intangible, except: (i) indebtedness to Lender and (ii) current unsecured trade payables and accrued liabilities arising in the ordinary course of its business.

(d)     Directly or indirectly, (i) make any loan, investment, advance or extension of credit to any Person, (ii) purchase, create or acquire all or substantially all of the properties or assets of any other Person or any Capital Securities of any other Person, (iii) incur any obligation as surety or guarantor, other than in the ordinary course of business, (iv) enter into any transaction with an affiliate that is not (x)

11

on an arms' length basis or otherwise on terms and conditions as favorable to Company as would be obtainable in a transaction with a Person that is not an affiliate or (y) a Permitted Affiliate Transaction, or (v) subordinate any indebtedness due it from any Person to indebtedness of other creditors of such Person.

(e)     Pay any dividends or make any other distributions (whether in cash, securities or other property)  with respect to any of its Capital Securities, including but not limited to repayment of any loans made by any of its members or shareholders, return of capital contributions, distributions upon termination, liquidation or dissolution, or any development, property management, accounting or other fees payable to any of its members or shareholders; provided that (i) Company and any Corporate Guarantor may pay cash dividends or distributions to its shareholders, partners or members, as applicable, from time to time during a year to the extent necessary to enable such shareholders, partners, or members to pay income taxes for such year and make estimated income tax payments to satisfy their liabilities under federal and state income tax law for such year which arise solely from such shareholders', partners', members', status as a shareholder, partner, or member, as applicable, of Company and (ii) any of Company's subsidiaries or any Corporate Guarantor's subsidiaries may make any such dividends or other distributions to Company or such Corporate Guarantor, as applicable.

(f)     Terminate the Consulting Engagement or otherwise breach its obligations with respect thereto.

(g)     Make or incur any (i) Capital Expenditures other than in the ordinary course of business, or as Lender may otherwise agree in writing or (ii) other expenditure that is not, in the good faith judgment of Company, reasonably necessary for the purpose of carrying out its business or the business of its subsidiaries (as applicable), or that would otherwise impede Company's or any Corporate Guarantor's ability to perform its obligations hereunder or under any other Loan Document to which it is a party.

(h)     Make any payment of wages, salary, bonus or other compensation to any of Company's or any Corporate Guarantor's equityholders, officers, directors, managers, or their respective family members or affiliates in excess of $450,000 in the aggregate in any fiscal year of Company, or such greater amount as agreed in writing by Lender in its reasonable discretion.

6.      Expenses; Taxes; Indemnity.

(a)     Company hereby agrees to pay all stamp, document, transfer, recording, filing, registration, search, sales and excise fees and taxes and all similar impositions (excluding taxes on the overall net income or gross receipts of Lender) now or hereafter determined by Lender to be payable in connection with this Agreement or any other Loan Document or any other documents, instruments or transactions pursuant to or in connection herewith or therewith, and Company agrees to save

12

Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such fees, taxes or impositions.

(b)     Company hereby agrees to reimburse and indemnify Lender, its affiliates and their respective investors, officers, directors, employees, advisors and agents (collectively, the "Indemnified Parties") from and against any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever (including, without limitation, the fees and disbursements of counsel for such Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnified Party shall be designated a party thereto) that may at any time be imposed on, asserted against or incurred by such Indemnified Party as a result of, or arising out of, or in any way related to or by reason of, this Agreement or any other Loan Document or any transaction from time to time contemplated hereby or thereby, but excluding any such losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements resulting solely from the gross negligence or willful misconduct of such Indemnified Party, as finally determined by a court of competent jurisdiction.

7.     Company shall pay Lender a commitment fee in an aggregate principal amount equal to 2.75% of the Term Loan, which fee shall be earned, due and payable upon the making of the Term Loan, and paid to Lender by deducting such amount from the total Term Loan proceeds advanced to Company.

8.     (a) Company and/or certain of its subsidiaries or affiliates have certain existing indebtedness owing to third parties (collectively, the "Third Parties") for borrowed money or other financing obligations, including but not limited to bank financings and merchant advance obligations (the "Existing Indebtedness"). Company acknowledges and agrees that: (i) the amount of the Existing Indebtedness is accurately reflected on the Closing Statement and is due and owing in full now without setoff or defenses of any kind; (ii) Lender may purchase (or may have purchased) all or any portion of the Existing Indebtedness from the Third Parties at a discount (a "Purchase Discount") and may enforce such Existing Indebtedness at par; (iii) any portion of the Existing Indebtedness purchased by Lender shall be consolidated into and shall constitute part of the Term Loan on a dollar for dollar basis (based on the par value of such Existing Indebtedness) and shall, together with any Withheld Proceeds (as defined below) reduce the cash proceeds of the Term Loan otherwise available for disbursement; (iv) Lender has no further obligations to Company with respect to the Existing Indebtedness; and (v) any portion of the Existing Indebtedness not purchased by Lender (as determined by Lender in its sole discretion) must be paid in full either: (x) upon closing of the Term Loan, in which case a portion of the Term Loan proceeds may be disbursed directly to pay such portion of the Existing Indebtedness or (y) at such later date as Lender may determine in its sole discretion, in which case Lender may withhold proceeds of the Term Loan (the "Withheld Proceeds") in an amount equal to the par value of such Existing Indebtedness not so prepaid ("Unpaid Existing Indebtedness").

13

(b)   Company also acknowledges and agrees that Lender may have been able to (or, with respect to Unpaid Existing Indebtedness, may be able to) negotiate, on behalf of Company, with the providers of certain of the Existing Indebtedness for the repayment of such Existing Indebtedness in an amount below the par value of such Existing Indebtedness (such difference, the "Repayment Discount").  In consideration of Lender making the Term Loan, Company agrees that 100% of such Repayment Discount shall be, in such amounts as directed by Lender in its sole discretion, either (1) paid to Lender for its own account (which such payment shall not reduce the principal amount of the Term Loan or any of the Liabilities) or (2) deposited into the Cash Collateral Account for application to future regularly scheduled payments due in respect of the Term Note and the Consulting Engagement (or for other purposes acceptable to Lender in its sole discretion).  The Repayment Discount shall be distributed in accordance with the preceding sentence either (i) directly out of the proceeds of the Term Loan when made or (ii) with respect to any Unpaid Existing Indebtedness, out of the Withheld Proceeds not used by Lender for the repayment of such Unpaid Existing Indebtedness.

(c)  Company further acknowledges that (i) Company is in default under each of the documents evidencing or otherwise relating to all of the Existing Indebtedness ("Existing Defaults"), (ii) Lender's consolidation of such Existing Indebtedness into the Term Loan does not constitute a novation or cure any Existing Defaults and, accordingly, an Event of Default exists under the Loan Documents as of the date hereof and (iii) Lender may exercise any rights or remedies available to it under the Loan Documents or applicable law arising from the existence of any such Event of Default.

9.   Without in any way whatsoever limiting or affecting Lender's right to make demand for payment of all or any part of any of the Liabilities which may, at any time, be payable upon demand, Company hereby acknowledges and agrees that, in addition to any and all other provisions set forth in any of the Loan Documents relating to any Default or Event of Default thereunder, an Event of Default shall also occur under the Liabilities and the Loan Documents in the event that there shall be any change, for any reason whatsoever, in (i) the management of Company, which could, in the sole discretion and judgment of Lender, have a material adverse effect upon Company and/or its ability to pay or perform any of its liabilities or obligations in respect of the Liabilities and the Loan Documents or (ii) the ownership or control of Company.

10.   A portion of the Term Loan in an aggregate principal amount equal to $1,800,000 shall be disbursed into a cash collateral account in the name of Lender (or such other Person as directed by Lender) (the "Cash Collateral Account).  Company hereby authorizes Lender to apply such amounts as required under the Term Note and the Consulting Engagement when due; provided that, if requested by Company, Lender may agree in its sole discretion to permit Company to use amounts in the Cash Collateral Account for other purposes approved by Lender.

11.   Any failure by Company to fully observe, perform or otherwise comply with any of the covenants or agreements of Company set forth in this Agreement shall constitute an Event of Default under the Liabilities and the Loan Documents, and Lender shall be entitled to exercise any and all rights and remedies available to or otherwise conferred upon Lender as a result thereof, whether by agreement, by law or otherwise.

14

12. **Company hereby acknowledges and agrees that Company's compliance with the terms and conditions set forth herein, and the absence of any Default or Event of Default by Company in the observance or performance of any of the covenants or agreements of Company hereunder, shall not in any way limit, restrict or otherwise affect or impair Lender's right or ability to make demand for payment of any or all of the Liabilities which may be on a demand basis at any time in Lender's sole and absolute discretion, with or without reason or cause, and the existence of any Default or Event of Default hereunder shall not be the sole reason or basis for enabling Lender to make demand for payment of all or any part of such Liabilities.**

13. All accounting terms not specifically defined in this Agreement shall be determined and construed in accordance with GAAP.

14. No forbearance on the part of Lender in enforcing any of its rights or remedies under this Agreement or any other Loan Document, nor any renewal, extension or rearrangement of any payment or covenant to be made or performed by Company hereunder or any such other Loan Document, shall constitute a waiver of any of the terms of this Agreement or such Loan Document or of any such right or remedy.

15. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Michigan. Company irrevocably submits to the non-exclusive jurisdiction of any United States federal court sitting in the Eastern District of Michigan or any state court in Oakland County in the State of Michigan in any action or proceeding arising out of or relating to this Agreement, and Company irrevocably agrees that all such claims may be heard and determined in any such court and irrevocably waives any present and future objection it may have as to the venue of any action or proceeding brought in that court, or that that court is an inconvenient forum. Any suit brought by Company related to this Agreement or the Loan Documents may only be brought in the United States federal court sitting in the Eastern District of Michigan or in a state court in Oakland County in the State of Michigan. Nothing herein shall limit the right of Lender to bring any action or proceeding against Company in the courts of any other jurisdiction if necessary or convenient to effect the relief sought.

16. Company agrees to pay to or reimburse Lender, upon demand, for all costs and expenses (including, without limitation, reasonable attorneys' fees, whether in-house or outside counsel) incurred by Lender in connection with the documentation, preparation, execution, delivery, amendment, administration and performance of this Agreement, the other Loan Documents, and otherwise in respect of the Liabilities, and the consummation and the closing of the transactions contemplated hereby or thereby, any Default or Event of Default under or in respect of any of the Liabilities or in collecting or in attempting to collect any of the Liabilities, in perfecting, maintaining or defending any of Lender's liens or security interests (or the priority thereof), if any, in any collateral securing any part of any of the Liabilities, or otherwise in enforcing any of Lender's rights or remedies under any of the Loan Documents or otherwise in respect of any of the Liabilities.  Company waives any rights to assert against Lender, any defense (legal or equitable), set-off, counterclaim, or claim which Company may now or at any time hereafter have against Lender or any other party liable to Lender or that may arise, directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Liabilities or any security therefor.

15

17.    This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns; provided, however, that Company shall not assign or transfer any of its rights or obligations hereunder or otherwise in respect of any of the Liabilities without the prior written consent of Lender.    Company acknowledges that Lender may, at any time, assign its rights under this Agreement and any other Loan Document, including without limitation  Lender's rights to payment and enforcement of the Liabilities.

18.    Company acknowledges that Lender, its investors, principals and/or affiliates may be (a) providing debt financing, equity capital or other services (including financial advisory or consulting services) to other companies in respect of which Company and its subsidiaries may have conflicting interests regarding the transactions described herein or otherwise or (b) engaged in a broad range of transactions (including providing merchant cash advances or merchant consumer financing) that may involve interests that differ from the interests of Company and its subsidiaries.    Without limiting the foregoing, certain providers of merchant cash advances (including providers who may have provided merchant cash advances to the Company), or their principals, may be referral sources to Lender and may also be investors in Lender or an affiliate of Lender. Company further acknowledges that neither Lender, its investors, principals and/or affiliates have any obligation to disclose such interests and transactions to Company or its subsidiaries by virtue of any fiduciary, advisory or agency relationship, and Company and its subsidiaries waive, to the fullest extent permitted by law, any actual or alleged conflict of interest, and any claims they may have against, Lender, its investors, principals and/or affiliates, for breach of fiduciary duty or alleged breach of fiduciary duty, and agree that Lender, its investors, principals and or affiliates shall have no liability (whether direct or indirect) to Company and its subsidiaries in respect of such a conflict of interest or fiduciary duty claim, or to any person alleging a conflict of interest or asserting a fiduciary duty claim on behalf of or in right of Company and its subsidiaries, including any stockholders, employees or creditors. Company further acknowledges that Lender is not a fiduciary of Company or any of its subsidiaries. Company also (i) acknowledges that Lender, its investors, principals and/or affiliates may refer Company or its subsidiaries and/or affiliates to certain providers of goods or services, for which Lender, its investors, principals and/or affiliates might receive a referral or similar fee, (ii) consents to any such arrangements and (iii) waives, to the fullest extent permitted by law, any claims Company may have against Lender, its investors, principals and/or affiliates in connection with the foregoing.

19.    Company hereby releases Lender, Franklin Management, their respective affiliates and subsidiaries and all of their respective officers, directors, employees, shareholders, agents, attorneys and representatives as well as their respective successors and assigns from any and all claims, obligations, rights, causes of action, and liabilities, of whatever kind or nature, whether known or unknown, whether foreseen or unforeseen, arising on or before the date hereof (the "Released Matters").    Without limiting the generality of the foregoing, Company hereby waives the provisions of any statute or doctrine to the effect that a general release does not extend to claims which a releasing party does not know or suspect to exist in its favor at the time of executing the release, which if known by such releasing party would have materially affected the releasing party's settlement with the party being released.    Company acknowledges that the agreements in this paragraph are intended to be in full satisfaction of all or any alleged injuries or damages arising in connection with the Released Matters.    If Company asserts or commences any claim, counter-claim, demand, obligation, liability or cause of action in derogation of the

16

foregoing release or challenges the enforceability of the foregoing release (in each case, a "Violation"), then Company agrees to pay in addition to such other damages as any party being released may sustain as a result of such Violation, all reasonable attorneys' fees and expenses (including in-house and outside counsel) incurred by such party being released as a result of such Violation.

20.     COMPANY AND LENDER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED.   EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT OR THE LIABILITIES.

[Remainder of Page Intentionally Left Blank]

17

If the foregoing is acceptable to Company, please indicate such with the signature(s) of Company as provided below.

Very truly yours,

FRANKLIN CAPITAL GROUP, LLC

Shaya Baum

FA08B3623F534CA...Baum

Title: Authorized Representative

ACCEPTED, ACKNOWLEDGED
AND AGREED:

EXCELL AUTO GROUP, INC.

By:
Name: Scott Zankl
Title: Vice President

[Signature Page to Loan Agreement (18055845)]

# EXHIBIT W

**Exhibit W**

## Continuing Security Agreement

Dated as of November 3, 2021

1.     **Grant of Security Interest.**   Each of the undersigned (each, a "Debtor") grants to Franklin Capital Group, LLC (including its successors and assigns, the "Lender"), whose address is 32300 Northwestern Highway, Farmington Hills, MI 48334, a continuing security interest in the Collateral, as defined below, to secure the payment and performance when due, whether by stated maturity, demand, acceleration or otherwise, of all of the Liabilities (as defined below) of such Debtor and all Liabilities of Excell Auto Group, Inc., (the "Borrower").

"Liabilities", as used in this Continuing Security Agreement (this "Agreement"), means all obligations, indebtedness and liabilities of the Debtor and/or Borrower to the Lender and/or any of the Lender's subsidiaries, affiliates or successors, now existing or later arising, including, without limitation, all loans, advances, interest, costs, overdraft indebtedness, credit card indebtedness, lease obligations, management and services fees or obligations relating to any interest rate, currency or commodity swap agreement, cap or collar agreement, and any other agreement or arrangement designated to protect against fluctuations in interest rates, currency exchange rates or commodity prices, all monetary obligations incurred or accrued during the pendency of any Bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding, and including all "Liabilities" as defined in any of the other Loan Documents, and all renewals, extensions, modifications, consolidations or substitutions of any of the foregoing in this definition, whether the Debtor or the Borrower may be liable jointly with others or individually liable as a debtor, maker, co-maker, drawer, endorser, guarantor, surety or otherwise, and whether voluntarily or involuntarily incurred, due or not due, absolute or contingent, direct or indirect, known or unknown, liquidated or unliquidated. Liabilities also include all interest, costs, expenses, and attorneys' fees accruing to, or incurred in either collecting any of the Liabilities of the Debtor or the Borrower or protecting, maintaining, or liquidating any collateral for any of the Liabilities, including the Collateral.

"Loan Documents", as used in this Agreement, means, collectively, (i) this Agreement, (ii) the "Loan Documents" (as defined in the Promissory Note (Term Loan) dated as of the date hereof, made by Borrower in favor of Lender), (iii) the "Loan Documents" (as defined in the Letter Agreement, dated as of the date hereof, between Borrower and Lender) and (iv) any guaranty, mortgage, security agreement, swap agreement, other interest rate protection agreement, derivative agreement, and any other document, instrument or agreement evidencing, securing or relating to any of the foregoing, together with any and all modifications and amendments to any of the foregoing.

"Consulting Engagement Documents", as used in this Agreement, means, collectively, (i) the Engagement Letter, dated as of the date hereof, between Borrower and Franklin Capital Management, LLC ("Consultant") and (ii) any guaranty, mortgage, security agreement, and any other document, instrument or agreement evidencing, securing or relating to any of the foregoing, together with any and all modifications and amendments to any of the foregoing.

2.     **Description of Collateral.** "Collateral," as used in this Agreement, means all personal property of the Debtor including, without limitation, all of the following property Debtor now or later owns or has an interest in, wherever located:

(a)     all of the Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights (whether or not given in support of Accounts), Software, as defined below (words and phrases used herein and not otherwise specifically defined herein shall have the respective meanings assigned to such terms as such terms are defined in the Uniform Commercial Code of the State of Michigan, as in effect from time to time (the "UCC")), present and future, including but not limited to any items listed on Schedule 1 attached hereto, if any;

(b) all present and future insurance claims relating to any of the above;

(c) all Goods, Instruments (including, without limit, promissory notes), Documents (including, without limit, negotiable Documents), policies and certificates of insurance, Deposit Accounts, and money or other property (except real property which is not a fixture) which are now or later in possession of Lender, or as to which Lender now or later controls possession by documents or otherwise;

(d) all present and future books, records, and data of the Debtor relating to any of the above; and

(e) all present and future accessions, additions and attachments to, proceeds, parts, products, replacement, substitutions, Supporting Obligations and rights arising out of, any of the above, including but not limited to stock rights, subscription rights, interest, distributions, dividends, stock dividends, stock splits, or liquidating dividends, renewals, all cash and Accounts, insurance policies and proceeds, arising from the sale, rent, lease, casualty loss or other disposition of any of the above and cash and other property which were proceeds of any of the above and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by the Debtor.

In the definition of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more specific or narrower type of that collateral.

Where the Collateral is in the possession of the Lender, the Debtor agrees to deliver to the Lender any property which represents an increase in the Collateral or profits or proceeds of the Collateral.

3. **Collateral Definitions.**

(a) **"Accounts"** means all of the Debtor's (i) "accounts," (including without limit "health-care insurance receivables") as defined in Article 9 of the UCC, (ii) rights to any refund of taxes paid at any time to any governmental entity, (iii) contract rights, and (iv) commercial tort claims.

(b) **"Chattel Paper"** means all of the Debtor's "chattel paper" (including without limit "electronic chattel paper" and "tangible chattel paper") as such terms are defined in Article 9 of the UCC.

(c) **"Deposit Accounts"** means all of the Debtor's "deposit accounts," as defined in Article 9 of the UCC.

(d) **"Documents"** means all of the Debtor's "documents," "documents of title" or a "warehouse receipts," as such terms are defined in the UCC.

(e) **"Equipment"** means (i) all of the Debtor's "equipment," as defined in Article 9 of the UCC, and (ii) any Documents issued with respect to any of Debtor's "equipment" (as defined in the UCC).

(f) **"Farm Products"** means all of the Debtor's "farm products," as defined in Article 9 of the UCC. The Debtor will provide the Lender with a written list of the buyers, commission merchants or selling agents to or through whom it may sell any Farm Products, in form acceptable to the Lender. The Debtor will keep this list current by notice to the Lender at least seven (7) days prior to any sale. In this paragraph the terms "buyers," "commission merchants," and "selling agents" have the meanings given to them in the Federal Food Security Act of 1985, as amended, and in the UCC, as applicable.

(g) **"Fixtures"** means all of the Debtor's "fixtures," as defined in Article 9 of the UCC.

(h) **"General Intangibles"** means (i) all of the Debtor's "general intangibles," (including without limit "payment intangibles") as such terms are defined in Article 9 of the UCC, and (ii) whether or not constituting "investment property" as defined in Article 9 of the UCC, all pledged stock, meaning, collectively, all shares of

2

capital stock listed in Schedule I, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the capital stock of any person that may be issued or granted to, or held by, any Debtor, its successors and assigns.

    (i)    **"Goods"** means all of the Debtor's "goods," as defined in Article 9 of the UCC.

    (j)    **"Instruments"** means all of the Debtor's "instruments," as defined in Article 9 of the UCC

    (k)    **"Inventory"** means (i) all of the Debtor's "inventory," as defined in Article 9 of the UCC, and (ii) any Documents issued with respect to any of Debtor's "inventory" (as defined in the UCC).

    (l)    **"Investment Property"** means (i) all of the Debtor's "investment property," as defined in Article 9 of the UCC, including, without limit, securities, securities accounts, security entitlements, and financial assets, and (ii) whether or not constituting "investment property" as defined, (a) all pledged notes, meaning, collectively, all promissory notes listed in Schedule I, all other promissory notes issued to or held by any Debtor, its successors and assigns, and (b) all pledged stock, meaning, collectively, all shares of capital stock listed in Schedule I, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the capital stock of any person that may be issued or granted to, or held by, any Debtor, its successors and assigns.

    (m)    **"Letter of Credit Rights"** means all of the Debtor's "letter of credit rights," as defined in Article 9 of the UCC.

    (n)    **"Software"** means all of the Debtor's "software," as defined in Article 9 of the UCC.

    (o)    **"Supporting Obligation"** means a Letter of Credit Right or secondary obligation that supports the payment or performance of an Account, Chattel Paper, a Document, a General Intangible, an Instrument, or Investment Property.

4.    **Representations, Warranties, and Covenants.** The Debtor represents and warrants to and covenants with the Lender that:

    (a)    Its principal residence or chief executive office is at the address set forth in the Perfection Certificate, dated as of the date hereof, executed by Debtor and the guarantors signatory thereto (the "Perfection Certificate");

    (b)    If the Debtor is not a natural person (i) the Debtor's name as it appears in this Agreement is identical to the name of the Debtor appearing in the Debtor's organizational documents, as amended, including any trust documents; and (ii) both the Taxpayer I.D. No. and the State Organization No., if any, set forth in the Perfection Certificate are correct;

    (c)    If the Debtor is not a natural person, (i) that it is duly organized, existing and in good standing pursuant to the laws under which it is organized; and (ii) that the execution and delivery of this Agreement and the performance of the obligations it imposes (A) are within its powers and have been duly authorized by all necessary action of its governing body; (B) do not contravene the terms of its articles of incorporation or articles of organization, its by-laws, or any partnership agreement, operating agreement or other agreement governing its affairs;

    (d)    The execution and delivery of this Agreement and the performance of the obligations it imposes do not violate any law, conflict with any agreement by which it is bound, or require the consent or approval of any governmental authority or any third party;

    (e)    This Agreement is a valid and binding agreement, enforceable according to its terms;

Bodman_18055849_2

(f)      All balance sheets, profit and loss statement, and other financial statements furnished to the Lender are accurate and fairly reflect the financial condition of the organizations and persons to which they apply on their effective dates, including contingent liabilities of every type, which financial condition has not changed materially and adversely since those dates;

(g)      It will pay its Liabilities to the Lender;

(h)      It is or will become the owner of the Collateral free from any liens, encumbrances or security interests, except for this security interest and existing liens disclosed to and accepted by the Lender in writing, and will defend the Collateral against all claims and demands of all persons at any time claiming any interest in it;

(i)      No person, other than Lender or Consultant, has possession or control (as defined in the UCC) of the Collateral;

(j)      It will keep the Collateral free of liens, encumbrances and other security interests (other than pursuant to this Agreement, the other Loan Documents, or the Consulting Engagement Documents), maintain it in good repair, not use it illegally, and exhibit it to the Lender on demand;

(k)      It will protect the Collateral from loss, damage, or deterioration from any cause. At its own expense, the Debtor will maintain comprehensive casualty insurance and other insurance on the Collateral as may be reasonably required by Lender against such risks, in such amounts, with such deductibles and with such companies as may be satisfactory to the Lender, and provide the Lender with proof of insurance acceptable to the Lender. Each insurance policy shall contain a lender's loss payable endorsement satisfactory to the Lender and a prohibition against cancellation or amendment of the policy or removal of the Lender as loss payee without at least 30 days prior written notice to the Lender. In all events, the amounts of such insurance coverages shall conform to prudent business practices and shall be in such minimum amounts that the Debtor will not be deemed a co-insurer. The Debtor will promptly deliver to Lender, at Lender's request, evidence satisfactory to Lender that such insurance has been so procured and, with respect to casualty insurance, made payable to Lender.  The Debtor hereby appoints Lender, or any employee or agent of Lender, as Debtor's attorney-in-fact, which appointment is coupled with an interest and irrevocable, and authorizes Lender, or any employee or agent of Lender, on behalf of the Debtor, to adjust and compromise any loss under said insurance and to endorse any check or draft payable to the Debtor in connection with returned or unearned premiums on said insurance or the proceeds of said insurance, and any amount so collected may be applied toward satisfaction of the Liabilities; provided, however, that Lender shall not be required hereunder so to act.  If the Debtor fails to maintain satisfactory insurance, Lender has the option (but not the obligation) to do so and the Debtor agrees to repay all amounts so expended by Lender immediately upon demand, together with interest at the highest lawful default rate which could be charged by Lender on any of the Liabilities;

(l)      It will not sell or offer to sell, lease, license or otherwise transfer the Collateral, nor change the location of the Collateral, without the written consent of the Lender, except for sale of Inventory in the ordinary course of business;

(m)      It will pay promptly when due all taxes and assessments upon the Collateral, or for its use or operation.  If the Debtor fails to pay any of these taxes, assessments, or other charges in the time provided above, Lender has the option (but not the obligation) to do so and the Debtor agrees to repay all amounts so expended by Lender immediately upon demand, together with interest at the highest lawful default rate which could be charged by Lender on any of the Liabilities;

(n)      No financing statement covering all or any part of the Collateral or any proceeds is on file in any public office, unless the Lender has approved that filing. The Debtor irrevocably authorizes Lender to file one or more financing statements in form satisfactory to the Lender and will pay the cost of filing them in all public

4

offices where filing is deemed by the Lender to be necessary or desirable. In addition, the Debtor shall execute and deliver, or cause to be executed and delivered, such other documents as the Lender may from time to time request to perfect or to further evidence the security interest created in the Collateral by this Agreement, including, without limitation: (i) any certificates of title to the Collateral with the security interest of the Lender noted thereon or executed applications for such certificates of title in form satisfactory to the Lender; (ii) any assignments of claims under government contracts which are included as part of the Collateral, together with any notices and related documents as the Lender may from time to time request; (iii) any assignment of any specific account receivable as the Lender may from time to time request; (iv) a notice of security interest and a control agreement with respect to any Collateral, all in form and substance satisfactory to the Lender; (v) a notice to and acknowledgment from any bailee or other person in possession of any Collateral, all in form and substance satisfactory to the Lender; and (vi) any consent to the assignment of proceeds of any letter of credit, all in form and substance satisfactory to the Lender;

(o)     Lender has no obligation to acquire or perfect any lien on or security interest in any asset(s), whether real property or personal property, to secure payment of the Liabilities, and the Debtor is not relying upon assets in which the Lender may have a lien or security interest for payment of the Liabilities;

(p)     It will not, without the prior written consent of the Lender, change (i) the Debtor's name, (ii) the Debtor's business organization, (iii) the jurisdiction under which the Debtor's business organization is formed or organized, or (iv) the address of the Debtor's chief executive office or principal residence or of any additional places of the Debtor's business;

(q)     It will (i) provide any information that Lender may reasonably request, and will permit Lender to inspect and copy its books and records and (ii) allow the Lender or the Lender's representative to enter upon all premises where Collateral is kept or may be located and inspect the Collateral, in each case, on the terms set forth in the Loan Documents;

(r)     It will allow the Lender to take such actions in its own name or in the Debtor's name as Lender, in its sole discretion, deems necessary or appropriate to establish exclusive control (as defined in the UCC) over any Collateral of such nature where control perfects the Lender's security interest;

(s)     The Lender shall have the right now and at any time in the future, in its sole and absolute discretion and without notice to the Debtor, to (i) prepare, file, and sign the Debtor's name on any proof of claim in bankruptcy or similar document against any owner of the Collateral and (ii) prepare, file, and sign the Debtor's name on any notice of lien, assignment or satisfaction of lien, or similar document in connection with the Collateral.  The Debtor authorizes the Lender to file financing statements containing the collateral description "All of the Debtor's assets whether now owned or hereafter acquired" or such lesser amount of assets as the Lender may determine, or the Lender may, at its option, file financing statements containing any collateral description which reasonably describes the Collateral in which a security interest is granted under this Agreement;

(t)     At any time and without notice, Lender may, as to any Collateral: (a) cause any or all of such Collateral to be transferred to its name or to the name of its nominees; (b) receive or collect, by legal proceedings or otherwise, all dividends, interest, principal payments and other sums and all other distributions at any time payable or receivable on account of such Collateral, and hold the same as Collateral, or apply the same to the Liabilities, the manner and distribution of the application to be in the sole discretion of Lender; (c) enter into any extension, subordination, reorganization, deposit, merger or consolidation agreement or any other agreement relating to or affecting such Collateral, and deposit or surrender control of such Collateral, and accept other property in exchange for such Collateral and hold or apply the property or money so received pursuant to this Agreement; and (d) take such actions in its own name or in the Debtor's name as Lender, in its sole discretion, deems necessary or appropriate to establish exclusive control (as defined in the UCC) over

Bodman_18055849_2

any Collateral of such nature that perfection of the Lender's security interest may be accomplished by control; and

(u)      The Debtor shall hold in trust for Lender all payments received in connection with the Collateral, and all proceeds from the sale, lease or other disposition of any Collateral, and shall deposit all such payments and proceeds into bank accounts with a bank that has entered into a control agreement with Lender with respect to such accounts in form and substance satisfactory to Lender.

5.      **Accounts.**

(a)      The Debtor will, in the usual course of its business and at its own cost and expense, on the Lender's behalf but not as the Lender's agent, demand and receive and use its best efforts to collect all moneys due or to become due on the Accounts. Until the Lender gives notice to the Debtor to the contrary or until the Debtor is in default, it may use the funds collected in its business. Upon notice from the Lender or upon an Event of Default, the Debtor agrees that all sums of money it receives on account of or in payment or settlement of the Accounts shall be held by it as trustee for the Lender without commingling with any of its funds, and shall immediately be delivered to the Lender with endorsement to the Lender's order of any check or similar instrument.  If Lender notifies the Debtor that the Liabilities are on a remittance basis, the Debtor shall notify its account debtors that all electronic payments on any Account shall be made directly to an account at Lender designated by and under the exclusive control of Lender, and all other payments on the Accounts shall be made directly to a post office box designated by and under the exclusive control of Lender. Lender shall apply received payments in such order and manner as Lender elects, in its sole discretion.  All notices required in this paragraph will be immediately effective when sent. Such notices need not be given prior to the Lender taking action.  It is agreed that, at any time the Lender elects, it shall be entitled, in its own name or in the name of the Debtor or otherwise, but at the expense and cost of the Debtor, to collect, demand, receive, sue for or compromise any and all Accounts, and to give good and sufficient releases, to endorse any checks, drafts or other orders for the payment of money payable to the Debtor in payment and, in its discretion, to file any claims or take any action or proceeding which the Lender may deem necessary or advisable.  It is expressly understood and agreed, however, that the Lender shall not be required or obligated in any manner to make any demand or to make any inquiry as to the nature or sufficiency of any payment received by it or to present or file any claim or take any other action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)      The Debtor appoints the Lender or the Lender's designee as the Debtor's attorney-in-fact to do all things with reference to the Collateral as provided for in this section including without limitation (1) to notify the post office authorities to change the Debtor's mailing address to one designated by the Lender, (2) to receive, open and dispose of mail addressed to the Debtor, (3) to sign the Debtor's name on any invoice or bill of lading relating to any Collateral, on assignments and verifications of account and on notices to the Debtor's customers, and (4) to do all things necessary to carry out this Agreement. The Debtor ratifies and approves all acts of the Lender as attorney-in-fact.

(c)      The Lender shall not be liable for any act or omission, nor any error of judgment or mistake of fact or law, for any loss or damage which the Debtor may suffer as a result of Lender's processing of items or its exercise of any other rights or remedies under this Agreement, but only for its gross negligence or willful misconduct. Except as caused by Lender's gross negligence or willful misconduct, the Debtor agrees to indemnify and hold Lender harmless from and against any third party claims, demands or actions, and all related expenses or liabilities, including, without limitation, attorneys fees and causes of action whatsoever. This power being coupled with an interest is irrevocable until the Liabilities have been fully satisfied.

(d)      Immediately upon the Debtor's receipt of any Collateral evidenced by an agreement, Instruments, Chattel Paper or Documents ("Special Collateral"), the Debtor shall mark the Special Collateral to show that it is subject to the Lender's security interest and shall deliver the original to the Lender together with

6

appropriate endorsements and other specific evidence of assignment in form and substance satisfactory to the Lender.

(e)    On each occasion on which the Debtor evidences to Lender the account balances on and the nature and extent of any Accounts, the Debtor shall be deemed to have warranted that, except as otherwise indicated: (a) each of those Accounts is valid and enforceable without performance by the Debtor of any act; (b) each of those account balances are in fact owing; (c) there are no setoffs, recoupments, credits, contra accounts, counterclaims or defenses against any of those Accounts; (d) as to any Accounts represented by a note, trade acceptance, draft or other instrument or by any chattel paper or document, the same has/have been endorsed and/or delivered by the Debtor to Lender; (e) the Debtor has not received with respect to any Account, any notice of the death of the related account debtor, nor of the dissolution, liquidation, termination of existence, insolvency, business failure, appointment of a receiver for, assignment for the benefit of creditors by, or filing of a petition in bankruptcy by or against, the account debtor; and (f) as to each Account, except as may be expressly permitted by Lender to the contrary in another document, the account debtor is not an affiliate of the Debtor, the United States of America or any department, agency or instrumentality of it, or a citizen or resident of any jurisdiction outside of the United States. The Debtor will do all acts and will execute all writings requested by Lender to perform, enforce performance of, and collect all Accounts. Debtor will deliver to Lender such documents, instruments and other writings evidencing or otherwise relating to the Accounts as Lender may reasonably request from time to time. The Debtor shall neither make nor permit any modification, compromise or substitution for any Account without the prior written consent of Lender. Lender may at any time and from time to time verify Accounts directly with account debtors or by other methods acceptable to Lender without notifying the Debtor. The Debtor agrees, at Lender's request, to arrange or cooperate with Lender in arranging for verification of Accounts.

6.    **Additional Covenants.** If the Debtor is not liable for all or any part of the Liabilities (such Liabilities being referred to in this paragraph as the "Debt"), then the Debtor agrees that:

(a)    If any monies become available to the Lender that it can apply to any Debt, the Lender may apply them to Debt not secured by this Agreement.

(b)    Without notice to or the consent of the Debtor, the Lender may (i) take any action it chooses against the Borrower, against any collateral for the Debt, or against any other person liable for the Debt; (ii) release the Borrower or any other person liable for the Debt, release any collateral for the Debt, and neglect to perfect any interest in any such collateral; (iii) forbear or agree to forbear from exercising any rights or remedies, including any right of setoff, that it has against the Borrower, any other person liable for the Debt, or any other collateral for the Debt; (iv) extend to the Borrower additional Debt to be secured by this Agreement; or (v) renew, extend, modify or amend any Debt, and deal with the Borrower or any other person liable for the Debt as it chooses.

(c)    None of the Debtor's obligations under this Agreement shall be affected by (i) any act or omission of the Lender; (ii) the voluntary or involuntary liquidation, sale or other disposition of all or substantially all of the assets of the Borrower, (iii) any receivership, insolvency, bankruptcy, reorganization or other similar proceedings affecting the Borrower or any of its assets; or (iv) any change in the composition or structure of the Borrower or any Debtor, including a merger or consolidation with any other entity.

(d)    The Lender's rights under this section and this Agreement are unconditional and absolute, regardless of the unenforceability of any provision of any agreement between the Borrower and the Lender, or the existence of any defense, setoff or counterclaim that the Borrower may be able to assert against the Lender.

(e)    The Debtor waives all rights of subrogation, contribution, reimbursement, indemnity, exoneration, implied contract, recourse to security, setoff and any other claim (as that term is defined in the

7

federal Bankruptcy Code, as amended from time to time) that it may have or acquire in the future against the Borrower, any other person liable for the Debt, or any collateral for the Debt, because of the existence of this Agreement, the Debtor's performance under this Agreement, or the Lender's availing itself of any rights or remedies under this Agreement.

(f)     If any payment to the Lender on any Debt is wholly or partially invalidated, set aside, declared fraudulent or required to be repaid under any bankruptcy or insolvency act or code, under any state or federal law, or under common law or equitable principles, then this Agreement shall remain in full force and effect or be reinstated, as the case may be, until payment in full to the Lender of the repaid amounts, and of the Debt. If this Agreement must be reinstated, the Debtor agrees to execute and deliver to the Lender new agreements and financing statements, if necessary, in form and substance acceptable to the Lender, covering the Collateral.

7.     **Default/Remedies.**

(a)     If (i) any of the Liabilities are not paid, when due, whether upon demand or at maturity, whether by acceleration or otherwise, (ii) any warranty, representation, covenant, financial statement, or other information made, given or furnished to Lender by or on behalf of Borrower, the Debtor, or any guarantor of any of the Liabilities ("Guarantor") shall be, or shall prove to have been, false or materially misleading when made, given, or furnished; (iii) any substantial loss, theft, damage or destruction to or of any Collateral, or the issuance or filing of any attachment, levy, garnishment or the commencement of any proceeding in connection with any Collateral or of any other judicial process of, upon or in respect of Borrower, the Debtor, any Guarantor, or any Collateral, (iv) there shall occur any sale or other disposition by Borrower, the Debtor, or any Guarantor of any substantial portion of its assets or property or voluntary suspension of the transaction of business by Borrower, the Debtor, or any Guarantor, or death, dissolution, termination of existence, merger, consolidation, insolvency, business failure, or assignment for the benefit of creditors of or by Borrower, the Debtor, or any Guarantor; or commencement of any proceedings under any state or federal bankruptcy or insolvency laws or laws for the relief of debtors by or against Borrower, the Debtor, or any Guarantor; or the appointment of a receiver, trustee, court appointee, sequestrator or otherwise, for all or any part of the property of Borrower, the Debtor, or any Guarantor, (v) Lender deems the margin of Collateral insufficient or itself insecure, in good faith believing that the prospect of payment of the Liabilities or performance of this Agreement is impaired or shall fear deterioration, removal, or waste of Collateral; or (vi) any default or event of default shall occur under any instrument, agreement or other document evidencing, securing or otherwise relating to any of the Liabilities (including, for the avoidance of doubt, under any of the Loan Documents) or under the Consulting Engagement Documents (the foregoing (i) through (vi), each an "Event of Default"), then Lender may at its discretion and without prior notice to the Debtor declare any or all of the Liabilities to be immediately due and payable, and shall have and may exercise any right or remedy available to it including, without limitation, any one or more of the following rights and remedies: (1) exercise all the rights and remedies upon default, in foreclosure and otherwise, available to secured parties under the provisions of the Uniform Commercial Code and other applicable law, (2) institute legal proceedings to foreclose upon the lien and security interest granted by this Agreement, to recover judgment for all amounts then due and owing as Liabilities, and to collect the same out of any Collateral or the proceeds of any sale of it, (3) institute legal proceedings for the sale, under the judgment or decree of any court of competent jurisdiction, of any or all Collateral, (4) require the Debtor to assemble the Collateral and make it available to the Lender at a place to be designated by the Lender which is reasonably convenient to both parties, (5) personally or by agents, attorneys, or appointment of a receiver, enter upon any premises where Collateral may then be located, and take possession with or without demand and with or without process of law of all or any of it and/or render it unusable; and without being responsible for loss or damage to such Collateral, hold, operate, sell, ship, reclaim, recover, store, finish, maintain, repair, lease, or dispose of all or any Collateral at one or more public or private sales, leasings or other dispositions, at places (including, without limit, the Debtor's premises) and times and on terms and conditions as Lender may deem fit, without any previous demand or advertisement; and except as provided in this Agreement, all notice of sale, lease or other disposition, and advertisement, and

8

other notice or demand, any right or equity of redemption, and any obligation of a prospective purchaser or lessee to inquire as to the power and authority of Lender to sell, lease, or otherwise dispose of the Collateral or as to the application by Lender of the proceeds of sale or otherwise, which would otherwise be required by, or available to the Debtor under, applicable law are expressly waived by the Debtor to the fullest extent permitted.

(b)     Should an Event of Default occur, the Debtor will pay to the Lender all costs reasonably incurred by the Lender for the purpose of enforcing its rights hereunder, to the extent not prohibited by law, including, without limitation: costs of foreclosure; costs of obtaining money damages; and a reasonable fee for the services of internal and outside attorneys employed or engaged by the Lender for any purpose related to this Agreement, including, without limitation, consultation, drafting documents, sending notices or instituting, prosecuting or defending litigation or any proceeding, all such costs shall bear interest at the highest per annum rate applicable to any of the Liabilities, but not in excess of the maximum rate permitted by law.

(c)     The Debtor agrees that upon an Event of Default the Lender may dispose of any of the Collateral in its then present condition, that the Lender has no duty to repair or clean the Collateral prior to sale, and that the disposal of the Collateral in its present condition or without repair or clean-up shall not affect the commercial reasonableness of such sale or disposition. The Lender's compliance with any applicable state or federal law requirements in connection with the disposition of the Collateral will not adversely affect the commercial reasonableness of any sale of the Collateral. The Lender may disclaim warranties of title, possession, quiet enjoyment, and the like, and the Debtor agrees that any such action shall not affect the commercial reasonableness of the sale. In connection with the right of the Lender to take possession of the Collateral, the Lender may take possession of any other items of property in or on the Collateral at the time of taking possession, and hold them for the Debtor without liability on the part of the Lender. The Debtor expressly agrees that Lender may enter upon the premises where the Collateral is believed to be located without any obligation of payment to the Debtor, and that the Lender may, without cost, use any and all of the Debtor's "equipment" (as defined in the UCC) in the manufacturing or processing of any "inventory" (as defined in the UCC) or in growing, raising, cultivating, caring for, harvesting, loading and transportation of any of the Collateral that constitutes "farm products" (as defined in the UCC). If there is any statutory requirement for notice, that requirement shall be met if the Lender sends notice to the Debtor at least ten (10) days prior to the date of sale, disposition, or other event giving rise to the required notice, and such notice shall be deemed commercially reasonable. The Debtor is liable for any deficiency remaining after disposition of the Collateral.

(d)     The proceeds of any sale or other disposition of Collateral authorized by this Agreement shall be applied by Lender first upon all expenses authorized by the UCC and all attorneys fees and legal expenses incurred by Lender; then the balance of the proceeds of the sale or other disposition shall be applied to the payment of interest on the Liabilities, then to the payment of principal on Liabilities, then any remaining proceeds shall be paid over to the Debtor or to such other person(s) as may be entitled to it under applicable law. The Debtor shall remain liable for any deficiency, which shall be due to Lender immediately upon demand. The Debtor agrees that Lender shall be under no obligation to accept any noncash proceeds in connection with any sale or disposition of Collateral unless failure to do so would be commercially unreasonable.  If Lender agrees in its sole discretion to accept noncash proceeds (unless the failure to do so would be commercially unreasonable), Lender may ascribe any commercially reasonable value to such proceeds.  Without limiting the foregoing, Lender may also apply any discount factor in determining the present value of proceeds to be received in the future or may elect to apply proceeds to be received in the future only as and when such proceeds are actually received in cash by Lender.

(e)     At any sale pursuant to this Section 7, whether under the power of sale, by virtue of judicial proceedings or otherwise, it shall not be necessary for Lender or a public officer under order of a court to have present physical or constructive possession of Collateral to be sold. The recitals contained in any conveyances and receipts made and given by Lender or the public officer to any purchaser at any sale made pursuant to this Agreement shall, to the extent permitted by applicable law, conclusively establish the truth and accuracy of the matters stated (including, without limit, as to the amounts of the principal of and interest on the Liabilities, the

9

accrual and nonpayment of it and advertisement and conduct of the sale); and all prerequisites to the sale shall be presumed to have been satisfied and performed. Upon any sale of any Collateral, the receipt of the officer making the sale under judicial proceedings or of Lender shall be sufficient discharge to the purchaser for the purchase money, and the purchaser shall not be obligated to see to the application of the money. Any sale of any Collateral under this Agreement shall be a perpetual bar against the Debtor with respect to that Collateral. At any sale or other disposition of the Collateral pursuant to this Section 7, Lender disclaims all warranties which would otherwise be given under the Uniform Commercial Code, including, without limit, a disclaimer of any warranty relating to title, possession, quiet enjoyment or the like, and Lender may communicate these disclaimers to a purchaser at such disposition. This disclaimer of warranties will not render the sale commercially unreasonable. Lender may, in its discretion, bid and purchase any of the Collateral at any sale pursuant to this Section 7.

8.  **Waivers.**  The Debtor absolutely, unconditionally, knowingly, and expressly waives:

(a)  To the extent not expressly prohibited by applicable law, any right to require Lender to (a) proceed against any person or property; (b) give notice of the terms, time and place of any public or private sale of personal property security held from the Debtor or any other person, or otherwise comply with the provisions of Section 9.504 of the Uniform Commercial Code in effect prior to July 1, 2001 or its successor provisions thereafter; or (c) pursue any other remedy in the Lender's power. The Debtor waives notice of acceptance of this Agreement and presentment, demand, protest, notice of protest, dishonor, notice of dishonor, notice of default, notice of intent to accelerate or demand payment of any Liabilities, any and all other notices to which the Debtor might otherwise be entitled, and diligence in collecting any Liabilities, and agrees that the Lender may, once or any number of times, modify the terms of any Liabilities, compromise, extend, increase, accelerate, renew or forbear to enforce payment of any or all Liabilities, or permit Borrower to incur additional Liabilities, all without notice to the Debtor and without affecting in any manner the unconditional obligation of the Debtor under this Agreement. The Debtor unconditionally and irrevocably waives each and every defense and setoff of any nature which, under principles of guaranty or otherwise, would operate to impair or diminish in any way the obligation of the Debtor under this Agreement, and acknowledges that such waiver is by this reference incorporated into each security agreement, collateral assignment, pledge and/or other document from the Debtor now or later securing the Liabilities, and acknowledges that as of the date of this Agreement no such defense or setoff exists. The Debtor ratifies and approves all acts of Lender acting in its capacity as the Debtor's attorney-in-fact under this Agreement. Neither Lender nor its attorney-in-fact will be liable for any acts or omissions or for any error of judgment or mistake of fact or law.

(b)  Its right to require Lender to institute suit against, or to exhaust any rights and remedies which Lender has or may have against, Borrower or any third party, or against any Collateral provided by Borrower or any third party.  In this regard, the Debtor is bound to the payment of all Liabilities whether now existing or hereafter accruing, as fully as if such Liabilities were directly owing to Lender by the Debtor.  The Debtor waives any defense arising by reason of any disability or other defense (other than the defense that the Liabilities shall have been fully and finally performed and indefeasibly paid) of Borrower or by reason of the cessation from any cause whatsoever of the liability of Borrower in respect thereof.

(c)  (i) Any rights to assert against Lender, any defense (legal or equitable), set-off, counterclaim, or claim which the Debtor may now or at any time hereafter have against the Borrower or any other party liable to Lender; (ii) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Liabilities or any security therefor; (iii) any defense the Debtor has to performance hereunder, and any right the Debtor has to be exonerated arising by reason of: the impairment or suspension of Lender's rights or remedies against Borrower; the alteration by Lender of the Liabilities; any discharge of the Liabilities by operation of law as a result of Lender's intervention or omission; or the acceptance by Lender of anything in partial satisfaction of the Liabilities; (iv) the benefit of any statute of limitations affecting the Debtor's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations

10

applicable to the Liabilities shall similarly operate to defer or delay the operation of such statute of limitations applicable to the Debtor's liability hereunder.

(d)  Any defense arising by reason of or deriving from (i) any claim or defense based upon an election of remedies by Lender; or (ii) any election by Lender under the Bankruptcy Code Section 1111(b) to limit the amount of, or any collateral securing, its claim against Borrower.

(e)  Any and all rights (whether by subrogation, indemnity, reimbursement, or otherwise) to recover from Borrower or any other person any amounts paid or the value of any Collateral given by the Debtor pursuant to this Agreement until such time as all of the Liabilities have been fully paid.

9.  **Miscellaneous.**

(a)  Where the Collateral is located at, used in or attached to a facility not owned by the Debtor, the Debtor will obtain from the lessor, or other appropriate party, a consent to the granting of this security interest and a subordination of the lessor's interest in any of the Collateral, in form acceptable to the Lender.

(b)  At its option the Lender may, but shall be under no duty or obligation to, discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Collateral, pay for insurance on the Collateral, and pay for the maintenance and preservation of the Collateral, and the Debtor agrees to reimburse the Lender on demand for any payment made or expense incurred by the Lender, with interest at the maximum legal rate.

(c)  No delay on the part of Lender in the exercise of any right or remedy shall operate as a waiver, nothing in this Agreement is intended, nor shall it be construed, to preclude Lender from pursuing any other right or remedy provided by law or in equity, and no waiver or indulgence by the Lender of any default or Event of Default shall be effective unless in writing and signed by an authorized officer of the Lender, nor shall a waiver on one occasion be construed as a waiver of that right on any future occasion or a waiver of any other right.

(d)  The Lender shall not be required to marshal any present or future collateral security (including this Agreement and the Collateral) for the Liabilities or any of them or to resort to such collateral security or other assurances of payment in any particular order.  To the extent that it lawfully may, the Debtor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Lender's rights under this Agreement or under any other instrument creating or evidencing any of the Liabilities or under which any of the Liabilities is outstanding or by which any of the Liabilities is secured or payment thereof is otherwise assured, and, to the extent allowed by applicable law, the Debtor irrevocably waives the benefits of all such laws.

(e)  If any provision of this Agreement is invalid, it shall be ineffective only to the extent of its invalidity, and the remaining provisions shall be valid and effective.

(f)  Notice from one party to another relating to this Agreement shall be deemed effective if made in writing (including telecommunications) and delivered to the recipient's address, telex number or telecopier number set forth above by any of the following means: (i) hand delivery, (ii) registered or certified mail, postage prepaid, with return receipt requested, (iii) first class or express mail, postage prepaid, (iv) Federal Express or like overnight courier service or (v) telecopy, telex or other wire transmission with request for assurance of receipt in a manner typical with respect to communications of that type. Notice made in accordance with this section shall be deemed delivered on receipt if delivered by hand or wire transmission, on the third business day after mailing if mailed by first class, registered or certified mail, or on the next business day after mailing or deposit with an overnight courier service if delivered by express mail or overnight courier.

11

(g)    To the extent that any of the Liabilities is payable upon demand, nothing contained in this Agreement shall modify the terms and conditions of those Liabilities nor shall anything stated in this Agreement prevent Lender from making demand, with or without notice and with or without reason, and whether or not a default or Event of Default has occurred, for immediate payment of any or all of those Liabilities at any time.

(h)    All rights of the Lender shall inure to the benefit of the Lender's successors and assigns; and all obligations of the Debtor shall bind the Debtor's heirs, executors, administrators, successors and assigns. If there is more than one Debtor, their obligations are joint and several.  Debtor acknowledges that Lender may, at any time, assign its rights under this Agreement and any other Loan Document, including without limitation Lender's rights to payment and enforcement of the Liabilities.

(i)    The Debtor shall pay or reimburse the Lender for all costs, fees and expenses incurred by the Lender or for which the Lender becomes obligated in connection with the enforcement of this Agreement, including attorneys' fees of counsel to the Lender, which shall also include attorneys' fees and time charges of attorneys who may be employees of the Lender of any of it subsidiaries or affiliates, plus costs and expenses of such attorneys or of the Lender; search fees, costs and expenses; and all taxes payable in connection with this Agreement.  The Debtor shall pay any and all stamp and other taxes, UCC search fees, filing fees and other costs and expenses in connection with the execution and delivery of this Agreement to be delivered hereunder, and agrees to save and hold the Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such costs and expenses.  That portion of the Liabilities consisting of costs, expenses or advances to be reimbursed by the Debtor to the Lender pursuant to this Agreement which are not paid on or prior to the date hereof shall be payable by the Debtor to the Lender on demand.  If at any time or times hereafter the Lender: (i) employs counsel for advice or other representation (A) with respect to this Agreement, (B) to represent the Lender in any litigation, contest, dispute, suit or proceeding or to commence, defend, or intervene or to take any other action in or with respect to any litigation, contest, dispute, suit, or proceeding (whether instituted by the Lender, the Debtor, or any other party) in any way or respect relating to this Agreement, or (C) to enforce any rights of the Lender against the Debtor or any other party under of this Agreement; (ii) takes any action to protect, collect, sell, liquidate, or otherwise dispose of any of the Collateral; and/or (iii) attempts to or enforces any of the Lender's rights or remedies under this Agreement, the costs and expenses incurred by the Lender in any manner or way with respect to the foregoing, shall be part of the Liabilities, payable by the Debtor to the Lender on demand.

(j)    A carbon, photographic or other reproduction of this Agreement is sufficient, and can be filed as a financing statement, The Lender is irrevocably appointed the Debtor's attorney-in-fact to execute any financing statement on the Debtor's behalf covering the Collateral.

(k)    The terms and provisions of this security agreement shall be governed by and construed in accordance with the laws of the State of Michigan (without regard to conflict of law principles). The Debtor irrevocably submits to the non-exclusive jurisdiction of any United States federal court sitting in the Eastern District of Michigan or any state court in Oakland County in the State of Michigan in any action or proceeding arising out of or relating to this Agreement, and the Debtor irrevocably agrees that all such claims may be heard and determined in any such court and irrevocably waives any present and future objection it may have as to the venue of any action or proceeding brought in that court, or that that court is an inconvenient forum. Any suit brought by the Debtor related to this Agreement may only be brought in the United States federal court sitting in the Eastern District of Michigan or in a state court in Oakland County in the State of Michigan. Nothing herein shall limit the right of the Lender to bring any action or proceeding against the Debtor in the courts of any other jurisdiction if necessary or convenient to effect the relief sought.

(l)    The parties intend that the terms used herein which are defined in the UCC have, at all times, the broadest and most inclusive meanings possible.  Accordingly, if the UCC shall in the future be amended or held by a court to define any term used herein more broadly or inclusively than the UCC in effect on the date of this Agreement, then such term, as used herein, shall be given such broadened meaning.  If the Uniform

12

Commercial Code shall in the future be amended or held by a court to define any term used herein more narrowly, or less inclusively, than the UCC in effect on the date of this Agreement, such amendment or holding shall be disregarded in defining terms used in this Agreement.

10.     **Release**.  The Debtor hereby releases the Lender, its affiliates and subsidiaries and all of their respective officers, directors, employees, shareholders, agents, attorneys and representatives as well as their respective successors and assigns from any and all claims, obligations, rights, causes of action, and liabilities, of whatever kind or nature, whether known or unknown, whether foreseen or unforeseen, arising on or before the date hereof (the "Released Matters").  Without limiting the generality of the foregoing, the Debtor hereby waives the provisions of any statute or doctrine to the effect that a general release does not extend to claims which a releasing party does not know or suspect to exist in its favor at the time of executing the release, which if known by such releasing party would have materially affected the releasing party's settlement with the party being released.  The Debtor acknowledges that the agreements in this paragraph are intended to be in full satisfaction of all or any alleged injuries or damages arising in connection with the Released Matters.  If the Debtor asserts or commences any claim, counter-claim, demand, obligation, liability or cause of action in derogation of the foregoing release or challenges the enforceability of the foregoing release (in each case, a "Violation"), then the Debtor  agrees to pay in addition to such other damages as any party being released may sustain as a result of such Violation, all reasonable attorneys' fees and expenses (including in-house and outside counsel) incurred by such party being released as a result of such Violation.

11.     **Information Sharing.** The Lender may provide, without any limitation whatsoever, any information or knowledge the Lender may have about the undersigned or any matter relating to this Agreement and any related documents to any of its subsidiaries or affiliates or their successors, or to any one or more purchasers or potential purchasers of this Agreement or any related documents, and the undersigned waives any right to privacy the undersigned may have with respect to such matters. The Debtor agrees that the Lender may at any time sell, assign or transfer one or more interests or participations in all or any part of its rights or obligations in this Agreement to one or more purchasers whether or not related to the Lender.

12.     **WAIVER OF JURY TRIAL.** THE LENDER AND THE DEBTOR, AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, KNOWINGLY AND VOLUNTARILY AND FOR THEIR MUTUAL BENEFIT WAIVE ANY RIGHT EITHER OF THEM HAVE TO A TRIAL BY JURY IN ANY PROCEEDING (WHETHER SOUNDING IN CONTRACT OR TORT) WHICH IS IN ANY WAY CONNECTED WITH THIS OR ANY RELATED AGREEMENT, OR THE RELATIONSHIP ESTABLISHED UNDER THEM. THIS PROVISION MAY ONLY BE MODIFIED IN A WRITTEN INSTRUMENT EXECUTED BY LENDER AND THE DEBTOR.

13.     **Perfection of Certain Collateral**. The Lender and Debtor acknowledge that Debtor is also granting a security interest in the Collateral in favor of Consultant. In the event that the Lender takes possession of or has "control" (as such term is used in the Uniform Commercial Code as in effect in each applicable jurisdiction) over any Collateral for purposes of perfecting its lien therein, the Lender shall be deemed to be holding such Collateral on its own behalf, and as representative for Consultant solely for purposes of perfection of Consultant's lien under the Uniform Commercial Code; provided that the Lender shall not have any duty or liability to protect or preserve any rights pertaining to any of the Collateral for Consultant.

13

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

Debtor:

EXCELL AUTO GROUP, INC.

By: _____

Name: Scott Zankl
Title: Vice President

KARMA OF PALM BEACH, INC.

By: _____

Name: Scott Zankl
Title: President

KARMA OF BROWARD, INC.

By: _____

Name: Scott Zankl
Title: Vice President

Accepted and Agreed:

Lender:

L GROUP, LLC

DocuSigned by:

Shaya Baum

FA0863623F534CA...um

Title: Authorized Representative

Bodman_18055849_2

15

## SCHEDULE I

## PLEDGED SHARES

| Pledgor/Record & Beneficial Owner | Issuing Entity | Class of Issued Stock/Units | Certificate No. of Issued Shares/Units | Number of Shares/Units Issued | Total Shares/Units Issued in such Class |
|---|---|---|---|---|---|
| | | | | | |

15

Bodman_18055849_2

# EXHIBIT X

**Exhibit X**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

FLORIDA SECURED TRANSACTION REGISTRY

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC   1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscglobal.com

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

┌ 2180 73344
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703 ┘

$ 50

Filed In: Florida
(S.O.S.)

FILED

2021 Sep 09 03:59 PM

****** 202108401154 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of Item 1 blank, check here ☐ and provide the Individual Debtor Information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | EXCELL AUTO GROUP, INC. | | | | |
|---|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS 6454 EAST ROGERS CIRCLE | | CITY BOCA RATON | STATE FL | POSTAL CODE 33487 | COUNTRY USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of Item 2 blank, check here ☐ and provide the Individual Debtor Information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | FRANKLIN CAPITAL GROUP, LLC | | | | |
|---|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS 32300 NORTHWESTERN HWY. | | CITY FARMINGTON HILLS | STATE MI | POSTAL CODE 48334 | COUNTRY USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
Florida Documentary Stamp Tax is not required.
All personal property of the Debtor including, without limitation, all of the following property Debtor now or later owns or has an interest in, wherever located:

a) all of the Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights (whether or not given in support of Accounts), Software, as defined below (words and phrases used herein and not otherwise specifically defined herein shall have the respective meanings assigned to such terms as such terms are defined in the Uniform Commercial Code of the State of Michigan, as in effect from time to time (the "UCC"), present and future, including but not limited to any items listed on Schedule 1 attached hereto, if any;
b) all present and future insurance claims relating to any of the above;
c) all Goods, Instruments (including, without limit, promissory notes), Documents (including, without limit, negotiable

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, Item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:** NJR/ASW (15492-1)

2180 73344

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| EXCELL AUTO GROUP, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 10b. INDIVIDUAL'S SURNAME | | | | |
|---|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
Documents), policies and certificates of insurance, Deposit Accounts, and money or other property (except real property which is not a fixture) which are now or later in possession of Secured Party, or as to which Secured Party now or later controls possession by documents or otherwise;
d) all present and future books, records, and data of the Debtor relating to any of the above; and
e) all present and future accessions, additions and attachments to, proceeds, parts, products, replacement, substitutions, Supporting Obligations and rights arising out of, any of the above, including but not limited to stock rights;

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS  (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in Item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

**9a. ORGANIZATION'S NAME**
EXCELL AUTO GROUP, INC.

OR **9b. INDIVIDUAL'S SURNAME**

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

**10a. ORGANIZATION'S NAME**

OR **10b. INDIVIDUAL'S SURNAME**

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

**11a. ORGANIZATION'S NAME**

OR | 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
subscription rights, interest, distributions, dividends, stock dividends, stock splits, or liquidating dividends, renewals, all cash and Accounts, insurance policies and proceeds, arising from the sale, rent, lease, casualty loss or other disposition of any of the above and cash and other property which were proceeds of any of the above and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by the Debtor.

In this description of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in Item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

EXCELL AUTO GROUP, INC.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
specific or narrower type of that collateral.

UNDER AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO SELL, ASSIGN, PLEDGE OR OTHERWISE ENCUMBER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT, WHICH INCLUDES ALL AFTER ACQUIRED PROPERTY, INCLUDING ALL OF DEBTOR'S ACCOUNTS, FUTURE ACCOUNTS, CONTRACT RIGHTS, FUTURE SALES, RECEIPTS AND OTHER

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS  (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| EXCELL AUTO GROUP, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| |
| FIRST PERSONAL NAME |
| |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c.

| 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 10b. INDIVIDUAL'S SURNAME | | | | |
|---|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral)
OBLIGATIONS. THE SALE, ASSIGNMENT, PLEDGE OR ENCUMBERING OF ANY SUCH COLLATERAL WOULD CONSTITUTE TORTIOUS INTERFERENCE WITH SECURED PARTY'S CONTRACTUAL RELATIONSHIP WITH DEBTOR. IN THE EVENT THAT ANY THIRD PARTY PURCHASES, TAKES AN ASSIGNMENT OR PLEDGE OF, AND/OR IS GRANTED A SECURITY INTEREST IN ANY OF THE ASSETS DESCRIBED IN THIS FINANCING STATMENT, SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH THIRD PARTY. DEBTOR HAS ALSO AGREED TO HOLD IN TRUST FOR SECURED PARTY ALL PAYMENTS RECEIVED IN

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

EXCELL AUTO GROUP, INC.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

CONNECTION WITH SECURED PARTY'S COLLATERAL, AND FROM THE SALE, LEASE OR OTHER DISPOSITION OF SUCH COLLATERAL ANY ATTEMPT BY A THIRD PARTY TO EXERCISE DOMINION OR CONTROL OVER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT WOULD CONSTITUTE CONVERSION OF SECURED PARTY'S COLLATERAL.

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# DOCUMENT SEPARATOR

**Document Seperator**

FLORIDA SECURED TRANSACTION REGISTRY

## UCC FINANCING STATEMENT
**FOLLOW INSTRUCTIONS**

FILED

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC  1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscglobal.com          50

2022 Jan 27 04:10 PM

****** 202200284736 ******

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

2209 64968
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed in: Florida
(S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of Item 1 blank, check here ☐ and provide the Individual Debtor information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME KARMA OF PALM BEACH, INC. | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 1001 CLINT MOORE RD., STE. 101 | CITY BOCA RATO | STATE FL  POSTAL CODE 33487 | COUNTRY USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of Item 2 blank, check here ☐ and provide the Individual Debtor information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE  POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):** Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME FRANKLIN CAPITAL GROUP, LLC | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 32300 NORTHWESTERN HWY. | CITY FARMINGTON HILLS | STATE MI  POSTAL CODE 48334 | COUNTRY USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
Florida Documentary Stamp Tax is not required.
All personal property of the Debtor including, without limitation, all of the following property Debtor now or later owns or has an interest in, wherever located:

a) all of the Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights (whether or not given in support of Accounts), Software, as defined below (words and phrases used herein and not otherwise specifically defined herein shall have the respective meanings assigned to such terms as such terms are defined in the Uniform Commercial Code of the State of Michigan, as in effect from time to time (the "UCC"), present and future, including but not limited to any items listed on Schedule 1 attached hereto, if any;
b) all present and future insurance claims relating to any of the above;
c) all Goods, Instruments (including, without limit, promissory notes), Documents (including, without limit, negotiable

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, Item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:** NJR/ASW (15492-72)

2209 64968

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
| --- |
| KARMA OF PALM BEACH, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME |
| --- |

| FIRST PERSONAL NAME |
| --- |

| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| --- | --- |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME |
| --- |

OR

| 10b. INDIVIDUAL'S SURNAME |
| --- |

| INDIVIDUAL'S FIRST PERSONAL NAME |
| --- |

| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| --- | --- |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
| --- |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| --- | --- | --- | --- |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
Documents), policies and certificates of insurance, Deposit Accounts, and money or other property (except real property which is not a fixture) which are now or later in possession of Secured Party, or as to which Secured Party now or later controls possession by documents or otherwise;

d) all present and future books, records, and data of the Debtor relating to any of the above; and

e) all present and future accessions, additions and attachments to, proceeds, parts, products, replacement, substitutions, Supporting Obligations and rights arising out of, any of the above, including but not limited to stock rights,

13. ☐ This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

KARMA OF PALM BEACH, INC.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**
subscription rights, interest, distributions, dividends, stock dividends, stock splits, or liquidating dividends, renewals, all cash and Accounts, insurance policies and proceeds, arising from the sale, rent, lease, casualty loss or other disposition of any of the above and cash and other property which were proceeds of any of the above and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by the Debtor.

In this description of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14. This FINANCING STATEMENT:** ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| KARMA OF PALM BEACH, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME | | |
|---|---|---|
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME |
|---|
| |

OR

| 10b. INDIVIDUAL'S SURNAME | | | | |
|---|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME:** Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
|---|
| |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):** specific or narrower type of that collateral.

UNDER AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO SELL, ASSIGN, PLEDGE OR OTHERWISE ENCUMBER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT, WHICH INCLUDES ALL AFTER ACQUIRED PROPERTY, INCLUDING ALL OF DEBTOR'S ACCOUNTS, FUTURE ACCOUNTS, CONTRACT RIGHTS, FUTURE SALES, RECEIPTS AND OTHER

**13. ☐** This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut     ☐ covers as-extracted collateral     ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank, because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
KARMA OF PALM BEACH, INC.

OR 9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)                          SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR 10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                          SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
OBLIGATIONS. THE SALE, ASSIGNMENT, PLEDGE OR ENCUMBERING OF ANY SUCH COLLATERAL WOULD CONSTITUTE TORTIOUS INTERFERENCE WITH SECURED PARTY'S CONTRACTUAL RELATIONSHIP WITH DEBTOR. IN THE EVENT THAT ANY THIRD PARTY PURCHASES, TAKES AN ASSIGNMENT OR PLEDGE OF, AND/OR IS GRANTED A SECURITY INTEREST IN ANY OF THE ASSETS DESCRIBED IN THIS FINANCING STATMENT, SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH THIRD PARTY. DEBTOR HAS ALSO AGREED TO HOLD IN TRUST FOR SECURED PARTY ALL PAYMENTS RECEIVED IN

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS  (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut    ☐ covers as-extracted collateral    ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| KARMA OF PALM BEACH, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME | | |
|---|---|---|
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 10b. INDIVIDUAL'S SURNAME | | | | |
|---|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE    POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
CONNECTION WITH SECURED PARTY'S COLLATERAL, AND FROM THE SALE, LEASE OR OTHER DISPOSITION OF SUCH COLLATERAL ANY ATTEMPT BY A THIRD PARTY TO EXERCISE DOMINION OR CONTROL OVER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT WOULD CONSTITUTE CONVERSION OF SECURED PARTY'S COLLATERAL.

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut  ☐ covers as-extracted collateral.  ☐ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in Item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# DOCUMENT SEPARATOR

**Document Seperator**

FLORIDA SECURED TRANSACTION REGISTRY

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

FILED

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC   1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscglobal.com   50

2022 Jan 27 04:10 PM

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

****** 202200284908 ******

2209 64506
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Florida
(S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | KARMA OF BROWARD, INC. | | |
|---|---|---|---|

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS 1699 S. FEDERAL HWY., STE. 300 | CITY BOCA RATON | STATE FL | POSTAL CODE 33432 | COUNTRY USA |
|---|---|---|---|---|

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | FRANKLIN CAPITAL GROUP, LLC | | |
|---|---|---|---|

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS 32300 NORTHWESTERN HWY. | CITY FARMINGTON HILLS | STATE MI | POSTAL CODE 48334 | COUNTRY USA |
|---|---|---|---|---|

**4. COLLATERAL:** This financing statement covers the following collateral:
Florida Documentary Stamp Tax is not required.
All personal property of the Debtor including, without limitation, all of the following property Debtor now or later owns or has an interest in, wherever located:

a) all of the Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights (whether or not given in support of Accounts), Software, as defined below (words and phrases used herein and not otherwise specifically defined herein shall have the respective meanings assigned to such terms as such terms are defined in the Uniform Commercial Code of the State of Michigan, as in effect from time to time (the "UCC"), present and future, including but not limited to any items listed on Schedule 1 attached hereto, if any;
b) all present and future insurance claims relating to any of the above;
c) all Goods, Instruments (including, without limit, promissory notes), Documents (including, without limit, negotiable

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, Item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:** NJR/ASW (15492-72)

2209 64506

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

**9a. ORGANIZATION'S NAME**
KARMA OF BROWARD, INC.

OR

**9b. INDIVIDUAL'S SURNAME**

**FIRST PERSONAL NAME**

**ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c.

**10a. ORGANIZATION'S NAME**

OR

**10b. INDIVIDUAL'S SURNAME**

**INDIVIDUAL'S FIRST PERSONAL NAME**

**INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX**

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

**11a. ORGANIZATION'S NAME**

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**
Documents); policies and certificates of insurance, Deposit Accounts, and money or other property (except real property which is not a fixture) which are now or later in possession of Secured Party; or as to which Secured Party now or later controls possession by documents or otherwise;

d) all present and future books, records, and data of the Debtor relating to any of the above; and

e) all present and future accessions, additions and attachments to, proceeds, parts, products, replacement, substitutions, Supporting Obligations and rights arising out of, any of the above, including but not limited to stock rights,

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14. This FINANCING STATEMENT:**
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in Item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

**9a. ORGANIZATION'S NAME**
KARMA OF BROWARD, INC.

OR **9b. INDIVIDUAL'S SURNAME**

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

**10a. ORGANIZATION'S NAME**

OR **10b. INDIVIDUAL'S SURNAME**

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

**11a. ORGANIZATION'S NAME**

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
subscription rights, interest, distributions, dividends, stock dividends, stock splits, or liquidating dividends, renewals, all cash and Accounts, insurance policies and proceeds, arising from the sale, rent, lease, casualty loss or other disposition of any of the above and cash and other property which were proceeds of any of the above and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by the Debtor.

In this description of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in Item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| KARMA OF BROWARD, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME | | |
|---|---|---|
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c.

| 10a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|

OR

| 10b. INDIVIDUAL'S SURNAME | | | | | |
|---|---|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**
specific or narrower type of that collateral.

UNDER AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO SELL, ASSIGN, PLEDGE OR OTHERWISE ENCUMBER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT, WHICH INCLUDES ALL AFTER-ACQUIRED PROPERTY, INCLUDING ALL OF DEBTOR'S ACCOUNTS, FUTURE ACCOUNTS, CONTRACT RIGHTS, FUTURE SALES, RECEIPTS AND OTHER

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14. This FINANCING STATEMENT:**
☐ covers timber to be cut    ☐ covers as-extracted collateral    ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

KARMA OF BROWARD, INC.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)                    SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                    SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME   or   ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
OBLIGATIONS. THE SALE, ASSIGNMENT, PLEDGE OR ENCUMBERING OF ANY SUCH COLLATERAL WOULD CONSTITUTE TORTIOUS INTERFERENCE WITH SECURED PARTY'S CONTRACTUAL RELATIONSHIP WITH DEBTOR. IN THE EVENT THAT ANY THIRD PARTY PURCHASES, TAKES AN ASSIGNMENT OR PLEDGE OF, AND/OR IS GRANTED A SECURITY INTEREST IN ANY OF THE ASSETS DESCRIBED IN THIS FINANCING STATMENT, SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH THIRD PARTY. DEBTOR HAS ALSO AGREED TO HOLD IN TRUST FOR SECURED PARTY ALL PAYMENTS RECEIVED IN

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| KARMA OF BROWARD, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| FIRST PERSONAL NAME |

| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME |
|---|

OR

| 10b. INDIVIDUAL'S SURNAME |
|---|
| INDIVIDUAL'S FIRST PERSONAL NAME |

| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
CONNECTION WITH SECURED PARTY'S COLLATERAL, AND FROM THE SALE, LEASE OR OTHER DISPOSITION OF SUCH COLLATERAL ANY ATTEMPT BY A THIRD PARTY TO EXERCISE DOMINION OR CONTROL OVER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT WOULD CONSTITUTE CONVERSION OF SECURED PARTY'S COLLATERAL.

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable).

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in Item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# EXHIBIT Y

**Exhibit Y**

DocuSign Envelope ID: A9238ED1-827F-40BD-90DC-7DB819E8499C

## ASSIGNMENT OF OBLIGATIONS AND MERCHANT DOCUMENTS

Assignment of Obligations and Merchant Documents ("Assignment") executed and delivered as of October $\frac{11/1}{\_\_\_}$, 2021 by Spin Capital, with EIN _____, ("Assignor") to Franklin Capital Group, LLC ("Assignee").

**RECITALS:**

Assignee desires to purchase from Assignor, and Assignor has agreed to sell to Assignee all outstanding obligations ("Obligations") of Excell Auto Group, Inc. and each of its affiliates (collectively, "Company") owing to Assignor under each of (i) the Revenue Purchase Agreement, dated as of June 1, 2021, by and between Assignor and Company, and (ii) the Revenue Purchase Agreement, dated as of July 9, 2021, by and between Assignor and Company (collectively, the "Merchant Agreements") and all rights of Assignor under any similar or related documents (including without limitation, any guaranties, security agreements, forbearance agreements, settlement agreements and judgments), including with respect to all collateral securing the obligations of Company under the Merchant Agreements or securing any guaranties in respect thereof (the documents, including the Merchant Agreements, are defined collectively as the "Merchant Documents"), for a purchase price of $1.00 (the "Purchase Price").

For good and valuable consideration, the receipt and adequacy of which is acknowledged, Assignor agrees as follows:

1.      The total amount of the outstanding Obligations as of October 21, 2021 is $1.00.

2.      Effective upon receipt by Assignor of the Purchase Price, which Purchase Price must be paid by Assignee to Assignor by no later than November 3, 2021 (the "Deadline") by wire transfer of immediately available funds in accordance with wire instructions set forth below:

(a)      Assignor sells, transfers and assigns to Assignee the Obligations and all of Assignor's right, title and interest under the Merchant Documents, including any claims, rights or actions Assignor may have (whether known or unknown to Assignor as of the date hereof) against any third party arising in connection with, or otherwise related to, the Merchant Documents or the Obligations ("Third Party Claims");

(b)      Assignee is authorized to file UCC-3 assignments, assigning from Assignor to Assignee all UCC-1 financing statements that Assignor has of record against Company or any guarantors or pledgors of collateral securing the Obligations (collectively, the "Credit Parties"), including without limitation those identified on the attached Exhibit 1; and

(c)      Upon request of Assignee, Assignor will (i) file all necessary papers dismissing any litigation and assigning or discharging (as directed by Assignee) any judgments that may have been entered in favor of Assignor against Company, (ii) execute and deliver such documents as are necessary to rescind or retract any garnishments or instructions given by Assignor to (x) account debtors or customers of Company directing such parties to make payments to Assignor, or (y) any bank or financial institution regarding Company's deposit or other accounts with such bank or financial institution, and (iii) execute and deliver such additional documents and take such other actions as are necessary or advisable in order to evidence or otherwise give effect to the purposes of this Assignment.

3.      Assignor will forbear from exercising any remedies with respect to the Obligations, whether under the Merchant Documents or otherwise (including with respect to any Third Party Claims), through the Deadline.

4.      Assignor represents and warrants to Assignee that (i) Assignor's exact legal name and EIN are as set forth in the preamble above, (ii) the completed form W-9 provided to Assignee by Assignor on or prior to the date hereof is true and accurate, (iii) Assignor has not sold, assigned, transferred, granted a participation in or pledged the Obligations, the Merchant Documents or the Third Party Claims and Assignor owns the Obligations, the Merchant Documents and the Third Party Claims free and clear of any lien or other encumbrance and (iv) Assignor (including any of its affiliates) has not entered into any written or oral agreement with Company relating to this Assignment or receipt of any compensation from Company in consideration for entering into this Assignment. The sale, transfer and assignment is made without recourse, representations or warranties of any kind, except as set forth above.

Bodman_18052354_1

DocuSign Envelope ID: A9238ED1-827F-40BD-90DC-7DB819E8499C

5.    Assignor represents and warrants to Assignee that Company is currently in default under the terms of the Merchant Documents and, without limiting the effect of Section 2(a) above, all claims, rights or actions that Assignor may have against Company (or any guarantors of the Obligations) are sold, assigned and transferred to Assignee in connection with this Assignment.

6.    Assignor acknowledges that Assignee is in the business of making secured commercial loans. On and after the date of this Assignment, Assignor covenants to Assignee that, so long as Assignee has a UCC financing statement filed of record against any of the Credit Parties or any other person or entity, whether or not related to the Credit Parties (any such Credit Party, person or entity, a "Debtor") that includes language notifying parties that further sales, assignments, pledges or encumbrances with respect to the collateral described in Assignee's UCC financing statement are prohibited, or words of similar import: (a) Assignor shall not purchase any portion of accounts, future accounts, contract rights, future sales, receipts or other obligations from such Debtor, (b) Assignor shall not extend credit to such Debtor, (c) Assignor shall not take a security interest in the assets of such Debtor, and (d) if Assignor violates any of the provisions of clauses (a), (b), or (c) above, its debt and lien shall be subordinate and it shall be subject to a permanent standstill and it shall not take any legal action or otherwise exercise any rights or remedies against such Debtor. Assignor further covenants and agrees that it shall not accept any payments from any of the Credit Parties on account of, or related to, the Obligations (including any compensation in consideration for entering into this Assignment), and Assignor acknowledges and agrees that any such payments, if received, shall be held in trust for the benefit of Assignee and promptly paid over to Assignee in the form received (with proper endorsements or assignment if necessary).

7.    Assignor shall execute the Evidence of Assignment attached hereto as Exhibit 2, which Assignee, Company, or any designee of any of the foregoing may, at any time after receipt by Assignor of the Purchase Price, provide to any other person as evidence of this Assignment.

8.    This Assignment and any dispute, controversy or claim (whether or not arising out of or in connection with this Assignment) between Assignor and Assignee shall be governed by and construed in accordance with the laws of the State of Michigan, without reference to conflicts of laws. Assignor submits to the non-exclusive jurisdiction and venue of the federal court located in the Eastern District of Michigan or the state courts located in Oakland County, Michigan and shall waive any right to trial by jury, and any suit brought by Assignor, whether or not arising out of or in connection with this Assignment, may only be brought in such courts. Nothing shall limit the right of Assignee to bring any action or proceeding in the courts of any other jurisdiction if necessary or convenient to effect the relief sought.

9.    Assignor agrees to indemnify and hold Assignee harmless from and against all losses, costs, damages, liabilities and expenses, including, without limitation, in-house and outside attorneys' fees and disbursements, incurred by Assignee in connection with this Assignment or the transactions contemplated hereby, or enforcing the obligations of Assignor under this Assignment, or in exercising any rights or remedies of Assignee or in the prosecution or defense of any action or proceeding concerning any matter arising under or in connection with this Assignment. If Assignor fails to perform any of its obligations arising under or in connection with this Assignment and/or violates any provision of this Assignment, Assignee shall be entitled to triple the amount of its actual/compensatory damages and, in such event, Assignee shall be entitled to its reasonable attorney fees and expenses (in addition to any other relief to which Assignee may be entitled).

10.    Electronic and/or facsimile signatures on this Assignment shall be effective for all purposes.

11.    Assignor's wire instructions are as set forth below:

TD Bank                                                        031101266

| Bank | ABA Transit Number |
|------|--------------------|
| Spin Capital | 4362466504 |
| Account Title | Account Number |

1460 Arboretum Pkwy
Lakewood, NJ 08701

Bodman_18052354_1

DocuSign Envelope ID: A9238ED1-827F-40BD-90DC-7DB819E8499C

**ASSIGNOR:**

SPIN CAPITAL

By: _Josh Lubin_
    DC1F4B02DA904D5...

Its: President

SPIN CAPITAL

DocuSign Envelope ID: A9238ED1-827F-40BD-90DC-7DB819E8499C

## EXHIBIT 1

### UCC-1 Filings

| Debtor | UCC File No. | Date of Filing | Place of Filing |
|--------|--------------|----------------|-----------------|
|        |              |                |                 |

Bodman_18052354_1

DocuSign Envelope ID: A9238ED1-827F-40BD-90DC-7DB819E8499C

**EXHIBIT 2**

[Evidence of Assignment attached]

DocuSign Envelope ID: A9238ED1-827F-40BD-90DC-7DB819E8499C

## Evidence of Assignment

To Whom It May Concern:

Reference is made to that certain (i) Revenue Purchase Agreement, dated as of June 1, 2021, by and between Excell Auto Group, Inc. ("Company") and Spin Capital ("Assignor"), and (ii) Revenue Purchase Agreement, dated as of July 9, 2021, by and between Company and Assignor (collectively, the "Merchant Agreements") and all rights of Assignor under any similar or related documents (including without limitation, any guaranties, security agreements, settlement agreements, forbearance agreements and judgments), including with respect to all collateral securing the obligations of Company under the Merchant Agreements or securing any guaranties in respect thereof (the documents, including the Merchant Agreements, are defined collectively as the "Merchant Documents").

Assignor hereby confirms that in connection with that certain Assignment of Obligations and Merchant Documents, dated as of October ___, 2021, between Assignor and Franklin Capital Group, LLC ("Assignee"), (i) Assignor has sold, transferred and assigned all of its right, title and interest in the Merchant Documents to Assignee, (ii) Assignor no longer has any rights or interest in the accounts, receivables, or other assets of Company or its guarantors that were sold, assigned, transferred or pledged to Assignor under or in connection with the Merchant Documents and (iii) this Evidence of Assignment may be relied upon by any person as evidence of the foregoing.


**ASSIGNOR:**

SPIN CAPITAL

By: _Josh Lubin_ _____

Its: President _____

**DocuSign**

## Certificate Of Completion

Envelope Id: A9238ED1827F40BD90DC7DB819E8499C                                    Status: Completed
Subject: Please DocuSign: Franklin Capital_Excell -- (Spin Capital) Assignment of Obligations and and Me...
Source Envelope:
Document Pages: 6                          Signatures: 2                          Envelope Originator:
Certificate Pages: 4                       Initials: 0                           Wing Lake Capital Partners
AutoNav: Enabled                                                                 32300 Northwestern Hwy
EnvelopeId Stamping: Enabled                                                     Suite 200
Time Zone: (UTC-08:00) Pacific Time (US & Canada)                                Farmington Hills, MI  48334
                                                                                docusign@winglakecp.com
                                                                                IP Address: 107.147.212.64

## Record Tracking

Status: Original                  Holder: Wing Lake Capital Partners        Location: DocuSign
       10/26/2021 12:05:11 PM             docusign@winglakecp.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Josh Lubin | *Josh Lubin* | Sent: 10/26/2021 12:11:00 PM |
| josh@spincapital.com | DocuSigned by: | Resent: 10/28/2021 6:18:28 AM |
| Security Level: Email, Account Authentication (None) | 8C1F4BC2DA904D5... | Viewed: 10/26/2021 12:27:35 PM |
| | | Signed: 11/1/2021 1:13:20 PM |
| | Signature Adoption: Pre-selected Style | |
| | Using IP Address: 75.127.161.34 | |

**Electronic Record and Signature Disclosure:**
    Accepted: 10/26/2021 12:27:35 PM
    ID: ba30ce3e-e601-4a25-8e88-52772d5d91b0

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 10/26/2021 12:11:00 PM |
| Certified Delivered | Security Checked | 10/26/2021 12:27:35 PM |
| Signing Complete | Security Checked | 11/1/2021 1:13:20 PM |
| Completed | Security Checked | 11/1/2021 1:13:20 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

Electronic Record and Signature Disclosure created on: 3/29/2019 1:31:30 PM
Parties agreed to: Josh Lubin

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Franklin Capital Group (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Franklin Capital Group:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: Mhowell@FranklinCapital.net

**To advise Franklin Capital Group of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at Mhowell@FranklinCapital.net and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Franklin Capital Group**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to Mhowell@FranklinCapital.net and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Franklin Capital Group**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to Mhowell@FranklinCapital.net and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Franklin Capital Group as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Franklin Capital Group during the course of your relationship with Franklin Capital Group.

# EXHIBIT Z

**Exhibit Z**

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

FLORIDA SECURED TRANSACTION REGISTRY

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC    1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscglobal.com

$ 50

FILED

2021 Sep 09 03:59 PM

****** 202108301154 ******

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

2180 73344

CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Florida
(S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | EXCELL AUTO GROUP, INC. | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS 6454 EAST ROGERS CIRCLE | CITY BOCA RATON | STATE FL | POSTAL CODE 33487 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | FRANKLIN CAPITAL GROUP., LLC | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS 32300 NORTHWESTERN HWY. | CITY FARMINGTON HILLS | STATE MI | POSTAL CODE 48334 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
Florida Documentary Stamp Tax is not required.
All personal property of the Debtor including, without limitation, all of the following property Debtor now or later owns or has an interest in, wherever located:

a) all of the Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights (whether or not given in support of Accounts), Software, as defined below (words and phrases used herein and not otherwise specifically defined herein shall have the respective meanings assigned to such terms as such terms are defined in the Uniform Commercial Code of the State of Michigan, as in effect from time to time (the "UCC"), present and future, including but not limited to any items listed on Schedule 1 attached hereto, if any;
b) all present and future insurance claims relating to any of the above;
c) all Goods, Instruments (including, without limit, promissory notes), Documents (including, without limit, negotiable

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: NJR/ASW (15492-1)

2180 73344

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
| EXCELL AUTO GROUP, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME | | |
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | |

OR

| 10b. INDIVIDUAL'S SURNAME | | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
Documents), policies and certificates of insurance, Deposit Accounts, and money or other property (except real property which is not a fixture) which are now or later in possession of Secured Party, or as to which Secured Party now or later controls possession by documents or otherwise;

d) all present and future books, records, and data of the Debtor relating to any of the above; and
e) all present and future accessions, additions and attachments to, proceeds, parts, products, replacement, substitutions, Supporting Obligations and rights arising out of, any of the above, including but not limited to stock rights,

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in Item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

**9a. ORGANIZATION'S NAME**
EXCELL AUTO GROUP, INC.

OR **9b. INDIVIDUAL'S SURNAME**

**FIRST PERSONAL NAME**

**ADDITIONAL NAME(S)/INITIAL(S)**     **SUFFIX**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

**10a. ORGANIZATION'S NAME**

OR **10b. INDIVIDUAL'S SURNAME**

**INDIVIDUAL'S FIRST PERSONAL NAME**

**INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)**     **SUFFIX**

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

**11a. ORGANIZATION'S NAME**

| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**
subscription rights, interest, distributions, dividends, stock dividends, stock splits, or liquidating dividends, renewals, all cash and Accounts, insurance policies and proceeds, arising from the sale, rent, lease, casualty loss or other disposition of any of the above and cash and other property which were proceeds of any of the above and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by the Debtor.

In this description of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14. This FINANCING STATEMENT:**
☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
EXCELL AUTO GROUP, INC.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
specific or narrower type of that collateral.

UNDER AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO SELL, ASSIGN, PLEDGE OR OTHERWISE ENCUMBER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT, WHICH INCLUDES ALL AFTER ACQUIRED PROPERTY, INCLUDING ALL OF DEBTOR'S ACCOUNTS, FUTURE ACCOUNTS, CONTRACT RIGHTS, FUTURE SALES, RECEIPTS AND OTHER

13. ☐ This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
**EXCELL AUTO GROUP, INC.**

OR 9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c.

10a. ORGANIZATION'S NAME

OR 10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
OBLIGATIONS. THE SALE, ASSIGNMENT, PLEDGE OR ENCUMBERING OF ANY SUCH COLLATERAL WOULD CONSTITUTE TORTIOUS INTERFERENCE WITH SECURED PARTY'S CONTRACTUAL RELATIONSHIP WITH DEBTOR. IN THE EVENT THAT ANY THIRD PARTY PURCHASES, TAKES AN ASSIGNMENT OR PLEDGE OF, AND/OR IS GRANTED A SECURITY INTEREST IN ANY OF THE ASSETS DESCRIBED IN THIS FINANCING STATEMENT, SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH THIRD PARTY. DEBTOR HAS ALSO AGREED TO HOLD IN TRUST FOR SECURED PARTY ALL PAYMENTS RECEIVED IN

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
EXCELL AUTO GROUP, INC.

OR 9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)         SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c.

10a. ORGANIZATION'S NAME

OR 10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)         SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
|  |  |  |  |  |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
|  |  |  |  |  |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
CONNECTION WITH SECURED PARTY'S COLLATERAL, AND FROM THE SALE, LEASE OR OTHER DISPOSITION OF SUCH COLLATERAL ANY ATTEMPT BY A THIRD PARTY TO EXERCISE DOMINION OR CONTROL OVER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT WOULD CONSTITUTE CONVERSION OF SECURED PARTY'S COLLATERAL.

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

FLORIDA SECURED TRANSACTION REGISTRY

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

FILED

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC   1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscglobal.com    50

2022 Jan 27 04:10 PM

****** 202200284738 ******

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

2209 64968
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Florida
(S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad):

| 1a. ORGANIZATION'S NAME | KARMA OF PALM BEACH, INC. | | | |
|---|---|---|---|---|

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 1c. MAILING ADDRESS 1001 CLINT MOORE RD., STE. 101 | CITY BOCA RATO | STATE FL | POSTAL CODE 33487 | COUNTRY USA |
|---|---|---|---|---|

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad):

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):** Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | FRANKLIN CAPITAL GROUP, LLC | | | |
|---|---|---|---|---|

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 3c. MAILING ADDRESS 32300 NORTHWESTERN HWY. | CITY FARMINGTON HILLS | STATE MI | POSTAL CODE 48334 | COUNTRY USA |
|---|---|---|---|---|

**4. COLLATERAL:** This financing statement covers the following collateral:
Florida Documentary Stamp Tax is not required.
All personal property of the Debtor including, without limitation, all of the following property Debtor now or later owns or has an interest in, wherever located:

a) all of the Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights (whether or not given in support of Accounts), Software, as defined below (words and phrases used herein and not otherwise specifically defined herein shall have the respective meanings assigned to such terms as such terms are defined in the Uniform Commercial Code of the State of Michigan, as in effect from time to time (the "UCC"), present and future, including but not limited to any items listed on Schedule 1 attached hereto, if any;
b) all present and future insurance claims relating to any of the above;
c) all Goods, Instruments (including, without limit, promissory notes), Documents (including, without limit, negotiable

**5. Check only if applicable and check only one box:** Collateral is ☐ held in a Trust (see UCC1Ad, Item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

**6a. Check only if applicable and check only one box:**   ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility
**6b. Check only if applicable and check only one box:**   ☐ Agricultural Lien   ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:** NJR/ASW (15492-72)

2209 64968

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS:

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
| --- |
| KARMA OF PALM BEACH, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME | | |
| --- | --- | --- |
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |

OR

| 10b. INDIVIDUAL'S SURNAME | | | | |
| --- | --- | --- | --- | --- |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| --- | --- | --- | --- |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**
Documents), policies and certificates of insurance, Deposit Accounts, and money or other property (except real property which is not a fixture) which are now or later in possession of Secured Party, or as to which Secured Party now or later controls possession by documents or otherwise;

d) all present and future books, records, and data of the Debtor relating to any of the above; and

e) all present and future accessions, additions and attachments to, proceeds, parts, products; replacement, substitutions, Supporting Obligations and rights arising out of, any of the above, including but not limited to stock rights,

**13.** ☐ This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14. This FINANCING STATEMENT:**
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
**KARMA OF PALM BEACH, INC.**

OR 9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR 10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
subscription rights, interest, distributions, dividends, stock dividends, stock splits, or liquidating dividends, renewals, all cash and Accounts, Insurance policies and proceeds, arising from the sale, rent, lease, casualty loss or other disposition of any of the above and cash and other property which were proceeds of any of the above and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by the Debtor.

In this description of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more

13. ☐ This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
KARMA OF PALM BEACH, INC.

OR 9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR 10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
specific or narrower type of that collateral.

UNDER AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO SELL, ASSIGN, PLEDGE OR OTHERWISE ENCUMBER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT, WHICH INCLUDES ALL AFTER ACQUIRED PROPERTY, INCLUDING ALL OF DEBTOR'S ACCOUNTS, FUTURE ACCOUNTS, CONTRACT RIGHTS, FUTURE SALES, RECEIPTS AND OTHER

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank, because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
**KARMA OF PALM BEACH, INC.**

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)                    SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                    SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
OBLIGATIONS, THE SALE, ASSIGNMENT, PLEDGE OR ENCUMBERING OF ANY SUCH COLLATERAL WOULD CONSTITUTE TORTIOUS INTERFERENCE WITH SECURED PARTY'S CONTRACTUAL RELATIONSHIP WITH DEBTOR. IN THE EVENT THAT ANY THIRD PARTY PURCHASES, TAKES AN ASSIGNMENT OR PLEDGE OF, AND/OR IS GRANTED A SECURITY INTEREST IN ANY OF THE ASSETS DESCRIBED IN THIS FINANCING STATMENT, SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH THIRD PARTY. DEBTOR HAS ALSO AGREED TO HOLD IN TRUST FOR SECURED PARTY ALL PAYMENTS RECEIVED IN

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut    ☐ covers as-extracted collateral    ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

**9a. ORGANIZATION'S NAME**
KARMA OF PALM BEACH, INC.

**OR**

**9b. INDIVIDUAL'S SURNAME**

**FIRST PERSONAL NAME**

**ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

**10a. ORGANIZATION'S NAME**

**OR**

**10b. INDIVIDUAL'S SURNAME**

**INDIVIDUAL'S FIRST PERSONAL NAME**

**INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX**

**10c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY**

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

**11a. ORGANIZATION'S NAME**

**OR**

**11b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX**

**11c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY**

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**
CONNECTION WITH SECURED PARTY'S COLLATERAL, AND FROM THE SALE, LEASE OR OTHER DISPOSITION OF SUCH COLLATERAL ANY ATTEMPT BY A THIRD PARTY TO EXERCISE DOMINION OR CONTROL OVER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT WOULD CONSTITUTE CONVERSION OF SECURED PARTY'S COLLATERAL.

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14. This FINANCING STATEMENT:**
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16. Description of real estate:**

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

FLORIDA SECURED TRANSACTION REGISTRY

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

FILED

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC   1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscglobal.com    50

2022 Jan 27 04:10 PM

****** 202200284908 ******

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

2209 64506
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed in: Florida
(S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | KARMA OF BROWARD, INC. | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS 1699 S. FEDERAL HWY., STE. 300 | CITY BOCA RATON | STATE FL | POSTAL CODE 33432 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | FRANKLIN CAPITAL GROUP, LLC | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS 32300 NORTHWESTERN HWY. | CITY FARMINGTON HILLS | STATE MI | POSTAL CODE 48334 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
Florida Documentary Stamp Tax is not required.
All personal property of the Debtor including, without limitation, all of the following property Debtor now or later owns or has an interest in, wherever located:

a) all of the Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights (whether or not given in support of Accounts), Software, as defined below (words and phrases used herein and not otherwise specifically defined herein shall have the respective meanings assigned to such terms as such terms are defined in the Uniform Commercial Code of the State of Michigan, as in effect from time to time (the "UCC"), present and future, including but not limited to any items listed on Schedule 1 attached hereto, if any;
b) all present and future insurance claims relating to any of the above;
c) all Goods, Instruments (including, without limit, promissory notes), Documents (including, without limit, negotiable

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: NJR/ASW (15492-72)

2209 64506

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

**UCC FINANCING STATEMENT ADDENDUM**
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
| KARMA OF BROWARD, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME |
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME |
OR
| 10b. INDIVIDUAL'S SURNAME |
| INDIVIDUAL'S FIRST PERSONAL NAME |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
OR
| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
Documents); policies and certificates of insurance, Deposit Accounts, and money or other property (except real property
which is not a fixture) which are now or later in possession of Secured Party; or as to which Secured Party now or later
controls possession by documents or otherwise;
d) all present and future books, records, and data of the Debtor relating to any of the above; and
e) all present and future accessions, additions and attachments to, proceeds, parts, products, replacement,
substitutions, Supporting Obligations and rights arising out of, any of the above, including but not limited to stock rights,

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing |
| 15. Name and address of a RECORD OWNER of real estate described in Item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| KARMA OF BROWARD, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME |
|---|

OR

| 10b. INDIVIDUAL'S SURNAME | | | |
|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
subscription rights, interest, distributions, dividends, stock dividends, stock splits, or liquidating dividends, renewals, all cash and Accounts, Insurance policies and proceeds, arising from the sale, rent, lease, casualty loss or other disposition of any of the above and cash and other property which were proceeds of any of the above and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by the Debtor.

In this description of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in Item 10 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
| --- |
| KARMA OF BROWARD, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME |
| --- |
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S)    SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c.

| 10a. ORGANIZATION'S NAME |
| --- |

OR

| 10b. INDIVIDUAL'S SURNAME |
| --- |
| INDIVIDUAL'S FIRST PERSONAL NAME |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)    SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
| --- |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| --- | --- | --- | --- |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
specific or narrower type of that collateral.

UNDER AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO SELL, ASSIGN, PLEDGE OR OTHERWISE ENCUMBER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT, WHICH INCLUDES ALL AFTER-ACQUIRED PROPERTY, INCLUDING ALL OF DEBTOR'S ACCOUNTS, FUTURE ACCOUNTS, CONTRACT RIGHTS, FUTURE SALES, RECEIPTS AND OTHER

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut.   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

**9a. ORGANIZATION'S NAME**
KARMA OF BROWARD, INC.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX:

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
OBLIGATIONS. THE SALE, ASSIGNMENT, PLEDGE OR ENCUMBERING OF ANY SUCH COLLATERAL WOULD CONSTITUTE TORTIOUS INTERFERENCE WITH SECURED PARTY'S CONTRACTUAL RELATIONSHIP WITH DEBTOR. IN THE EVENT THAT ANY THIRD PARTY PURCHASES, TAKES AN ASSIGNMENT OR PLEDGE OF, AND/OR IS GRANTED A SECURITY INTEREST IN ANY OF THE ASSETS DESCRIBED IN THIS FINANCING STATMENT, SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH THIRD PARTY. DEBTOR HAS ALSO AGREED TO HOLD IN TRUST FOR SECURED PARTY ALL PAYMENTS RECEIVED IN

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS:

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| KARMA OF BROWARD, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME |
|---|

OR

| 10b. INDIVIDUAL'S SURNAME |
|---|
| INDIVIDUAL'S FIRST PERSONAL NAME |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
CONNECTION WITH SECURED PARTY'S COLLATERAL, AND FROM THE SALE, LEASE OR OTHER DISPOSITION OF SUCH COLLATERAL ANY ATTEMPT BY A THIRD PARTY TO EXERCISE DOMINION OR CONTROL OVER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT WOULD CONSTITUTE CONVERSION OF SECURED PARTY'S COLLATERAL.

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable).

14. This FINANCING STATEMENT:
☐ covers timber to be cut    ☐ covers as-extracted collateral    ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

**STATE OF FLORIDA UNIFORM COMMERICAL CODE**
**FINANCING STATEMENT FORM**

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON

JENNA SCHNEIDER; 4258905332

Email LEGAL@GETBACKD.COM

B. SEND ACKNOWLEDGEMENT TO:

**FILED**

2020 Oct 28 10:06 AM

\*\*\*\*\*\*\* 20200516365X \*\*\*\*\*\*\*

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S EXACT FULL LEGAL NAME**- INSERT ONLY ONE DEBTOR NAME (1a OR 1b) - Do Not Abbreviate or Combine Names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| EXCELL AUTO GROUP, INC. | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS Line One | | | |
| 1001 CLINT MOORE ROAD | | This space not available. | |
| MAILING ADDRESS Line Two | CITY | STATE POSTAL CODE | COUNTRY |
| SUITE 101 | BOCA RATON | FL 33487 | US |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (2a OR 2b) - Do Not Abbreviate or Combine Names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| ZANKL | KRISTEN | | |
| 2c. MAILING ADDRESS Line One | | | |
| 16937 PIERRE CIRCLE | | This space not available. | |
| MAILING ADDRESS Line Two | CITY | STATE POSTAL CODE | COUNTRY |
| | DELRAY | FL 33446 | US |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| AUSTIN BUSINESS FINANCE, LLC | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS Line One | | | |
| 2101 S IH 35 FRONTAGE ROAD | | This space not available. | |
| MAILING ADDRESS Line Two | CITY | STATE POSTAL CODE | COUNTRY |
| FOURTH FLOOR | AUSTIN | TX 78741 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

All inventory, fixtures, equipment, vehicles, accounts receivable, goods and the profits therefrom, stocks, bonds, cash or cash equivalents, household goods and furnishings, investment property, negotiable instruments, and general intangibles.

**5. ALTERNATE DESIGNATION (if applicable)**  ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR
☐ AG LIEN  ☐ NON-UCC FILING  ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** - YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

STANDARD FORM - FORM UCC-1 (REV.05/2013)     Filing Office Copy     Approved by the Secretary of State, State of Florida

FLORIDA SECURED TRANSACTION REGISTRY

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

FILED

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC   1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscglobal.com

2021 Sep 09 03:59 PM

\****** 202108401146 \******

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

2180 73764
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Florida
(S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | EXCELL AUTO GROUP, INC. | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS 6454 EAST ROGERS CIRCLE | CITY BOCA RATON | STATE FL | POSTAL CODE 33487 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | FRANKLIN CAPITAL MANAGEMENT, LLC | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS 32300 NORTHWESTERN HWY. | CITY FARMINGTON HILLS | STATE MI | POSTAL CODE 48334 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
Florida Documentary Stamp Tax is not required.
All personal property of the Debtor including, without limitation, all of the following property Debtor now or later owns or has an interest in, wherever located:

a) all of the Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights (whether or not given in support of Accounts), Software, as defined below (words and phrases used herein and not otherwise specifically defined herein shall have the respective meanings assigned to such terms as such terms are defined in the Uniform Commercial Code of the State of Michigan, as in effect from time to time (the "UCC"), present and future, including but not limited to any items listed on Schedule 1 attached hereto, if any;
b) all present and future insurance claims relating to any of the above;
c) all Goods, Instruments (including, without limit, promissory notes), Documents (including, without limit, negotiable

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: NJR/ASW (15492-1)

2180 73764

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

**EXCELL AUTO GROUP, INC.**

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

Documents), policies and certificates of insurance, Deposit Accounts, and money or other property (except real property which is not a fixture) which are now or later in possession of Secured Party, or as to which Secured Party now or later controls possession by documents or otherwise;

d) all present and future books, records, and data of the Debtor relating to any of the above; and

e) all present and future accessions, additions and attachments to, proceeds, parts, products, replacement, substitutions, Supporting Obligations and rights arising out of, any of the above, including but not limited to stock rights,

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

**EXCELL AUTO GROUP, INC.**

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
subscription rights, interest, distributions, dividends, stock dividends, stock splits, or liquidating dividends, renewals, all cash and Accounts, insurance policies and proceeds, arising from the sale, rent, lease, casualty loss or other disposition of any of the above and cash and other property which were proceeds of any of the above and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by the Debtor.

In this description of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR:  Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

EXCELL AUTO GROUP, INC.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME:  Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME:  Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
specific or narrower type of that collateral.

UNDER AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO SELL, ASSIGN, PLEDGE OR OTHERWISE ENCUMBER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT, WHICH INCLUDES ALL AFTER ACQUIRED PROPERTY, INCLUDING ALL OF DEBTOR'S ACCOUNTS, FUTURE ACCOUNTS, CONTRACT RIGHTS, FUTURE SALES, RECEIPTS AND OTHER

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS  (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT **ADDENDUM**

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

**EXCELL AUTO GROUP, INC.**

OR  9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR  10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR  11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
OBLIGATIONS. THE SALE, ASSIGNMENT, PLEDGE OR ENCUMBERING OF ANY SUCH COLLATERAL WOULD CONSTITUTE TORTIOUS INTERFERENCE WITH SECURED PARTY'S CONTRACTUAL RELATIONSHIP WITH DEBTOR. IN THE EVENT THAT ANY THIRD PARTY PURCHASES, TAKES AN ASSIGNMENT OR PLEDGE OF, AND/OR IS GRANTED A SECURITY INTEREST IN ANY OF THE ASSETS DESCRIBED IN THIS FINANCING STATMENT, SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH THIRD PARTY. DEBTOR HAS ALSO AGREED TO HOLD IN TRUST FOR SECURED PARTY ALL PAYMENTS RECEIVED IN

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

**EXCELL AUTO GROUP, INC.**

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)  |  SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)  |  SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
CONNECTION WITH SECURED PARTY'S COLLATERAL, AND FROM THE SALE, LEASE OR OTHER DISPOSITION OF SUCH COLLATERAL ANY ATTEMPT BY A THIRD PARTY TO EXERCISE DOMINION OR CONTROL OVER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT WOULD CONSTITUTE CONVERSION OF SECURED PARTY'S COLLATERAL.

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut    ☐ covers as-extracted collateral    ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

FLORIDA SECURED TRANSACTION REGISTRY

FILED

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

2021 Mar 26 09:56 AM

****** 202106583131 ******

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

**B. E-MAIL CONTACT AT FILER (optional)**
uccfilingreturn@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

Lien Solutions                         79641585
P.O. Box 29071
Glendale, CA  91209-9071          FLFL

File with: Department of State, FL

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| EXCELL AUTO GROUP INC | | | |
| **1b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| **1c. MAILING ADDRESS** | CITY | STATE / POSTAL CODE | COUNTRY |
| 1001 CLINTMOORE RD | BOCA RATON | FL / 33487 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| **2b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| ZANKL | KRISTEN | | |
| **2c. MAILING ADDRESS** | CITY | STATE / POSTAL CODE | COUNTRY |
| 16937 PIERRE CIRCLE | DELRAY BEACH | FL / 33446 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| C T Corporation System, as representative | | | |
| **3b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| **3c. MAILING ADDRESS** | CITY | STATE / POSTAL CODE | COUNTRY |
| 330 N Brand Blvd, Suite 700; Attn: SPRS | Glendale | CA / 91203 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
Receivables - All assets now owned or hereafter acquired and wherever located, including but not limited to, the following subcategories of assets: a. Accounts, including but not limited to, credit card receivables; b. Chattel Paper; c.Inventory; d. Equipment; e. Instruments, including but not limited to, Promissory Notes; f. Investment Property; g. Documents; h. Deposit Accounts; i. Letter of Credit Rights; j. General Intangibles; k. Supporting Obligations; and i. Proceeds and Products of the foregoing. NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN. THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCES IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY.

☐ All documentary stamps due and payable
or to become due and payable pursuant to s. 201.22.F.S. have been paid

☒ Florida documentary stamp tax is not required

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
79641585

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| EXCELL AUTO GROUP INC |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME |
|---|

OR

| 10b. INDIVIDUAL'S SURNAME |
|---|
| ZANKL |
| INDIVIDUAL'S FIRST PERSONAL NAME |
| THOMAS SCOTT |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 16937 PIERRE CIRCLE | DELRAY BEACH | FL | 33446 | USA |

11. ☐ ADDITIONAL SECURED PARTY'S NAME   or   ☐ ASSIGNOR SECURED PARTY'S NAME:  Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:  79641585-FL-0            C T Corporation System, as        File with: Department of State, FL

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)        Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDITIONAL PARTY
FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME
EXCELL AUTO GROUP INC

OR

18b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| KARMA OF BROWARD, INC | | | | | |
| OR 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 1699 S. FEDERAL HIGHWAY, SUITE 300 | BOCA RATON | FL | 33432 | | USA |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| KARMA OF PALM BEACH, INC. | | | | | |
| OR 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 1001 CLINT MOORE ROAD, SUITE 101 | BOCA RATON | FL | 33487 | | USA |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

22. ☐ ADDITIONAL SECURED PARTY'S NAME    or    ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

23. ☐ ADDITIONAL SECURED PARTY'S NAME    or    ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

24. MISCELLANEOUS: 79641585-FL-0          C T Corporation System, as          File with: Department of State, FL

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDITIONAL PARTY (Form UCC1AP) (Rev. 08/22/11)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

FLORIDA SECURED TRANSACTION REGISTRY

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

FILED

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC   1-800-858-5294

2022 Jan 27 04:10 PM

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscglobal.com

****** 202200284762 ******

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

2209 65206
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Florida
(S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | KARMA OF PALM BEACH, INC. | | | |
|---|---|---|---|---|
| OR | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 1001 CLINT MOORE RD., STE. 101 | CITY BOCA RATO | STATE FL | POSTAL CODE 33487 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | FRANKLIN CAPITAL MANAGEMENT, LLC | | | |
|---|---|---|---|---|
| OR | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 32300 NORTHWESTERN HWY. | CITY FARMINGTON HILLS | STATE MI | POSTAL CODE 48334 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
Florida Documentary Stamp Tax is not required.
All personal property of the Debtor including, without limitation, all of the following property Debtor now or later owns or has an interest in, wherever located:

a) all of the Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights (whether or not given in support of Accounts), Software, as defined below (words and phrases used herein and not otherwise specifically defined herein shall have the respective meanings assigned to such terms as such terms are defined in the Uniform Commercial Code of the State of Michigan, as in effect from time to time (the "UCC"), present and future, including but not limited to any items listed on Schedule 1 attached hereto, if any;
b) all present and future insurance claims relating to any of the above;
c) all Goods, Instruments (including, without limit, promissory notes), Documents (including, without limit, negotiable

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: NJR/ASW (15492-72)

2209 65206

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
KARMA OF PALM BEACH, INC.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

Documents), policies and certificates of insurance, Deposit Accounts, and money or other property (except real property which is not a fixture) which are now or later in possession of Secured Party, or as to which Secured Party now or later controls possession by documents or otherwise;

d) all present and future books, records, and data of the Debtor relating to any of the above; and

e) all present and future accessions, additions and attachments to, proceeds, parts, products, replacement, substitutions, Supporting Obligations and rights arising out of, any of the above, including but not limited to stock rights,

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
| --- |
| KARMA OF PALM BEACH, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME | | |
| --- | --- | --- |
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |

OR

| 10b. INDIVIDUAL'S SURNAME | | | | |
| --- | --- | --- | --- | --- |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| --- | --- | --- | --- |
| 11c. MAILING ADDRESS | CITY | STATE  POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

subscription rights, interest, distributions, dividends, stock dividends, stock splits, or liquidating dividends, renewals, all cash and Accounts, insurance policies and proceeds, arising from the sale, rent, lease, casualty loss or other disposition of any of the above and cash and other property which were proceeds of any of the above and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by the Debtor.

In this description of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing |
| --- | --- |
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

**KARMA OF PALM BEACH, INC.**

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
specific or narrower type of that collateral.

UNDER AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO SELL, ASSIGN, PLEDGE OR OTHERWISE ENCUMBER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT, WHICH INCLUDES ALL AFTER ACQUIRED PROPERTY, INCLUDING ALL OF DEBTOR'S ACCOUNTS, FUTURE ACCOUNTS, CONTRACT RIGHTS, FUTURE SALES, RECEIPTS AND OTHER

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut    ☐ covers as-extracted collateral    ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

KARMA OF PALM BEACH, INC.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)                          SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                          SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
OBLIGATIONS. THE SALE, ASSIGNMENT, PLEDGE OR ENCUMBERING OF ANY SUCH COLLATERAL WOULD
CONSTITUTE TORTIOUS INTERFERENCE WITH SECURED PARTY'S CONTRACTUAL RELATIONSHIP WITH
DEBTOR. IN THE EVENT THAT ANY THIRD PARTY PURCHASES, TAKES AN ASSIGNMENT OR PLEDGE OF,
AND/OR IS GRANTED A SECURITY INTEREST IN ANY OF THE ASSETS DESCRIBED IN THIS FINANCING
STATMENT, SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH THIRD
PARTY. DEBTOR HAS ALSO AGREED TO HOLD IN TRUST FOR SECURED PARTY ALL PAYMENTS RECEIVED IN

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

## UCC FINANCING STATEMENT **ADDENDUM**

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

**KARMA OF PALM BEACH, INC.**

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

CONNECTION WITH SECURED PARTY'S COLLATERAL, AND FROM THE SALE, LEASE OR OTHER DISPOSITION OF SUCH COLLATERAL ANY ATTEMPT BY A THIRD PARTY TO EXERCISE DOMINION OR CONTROL OVER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT WOULD CONSTITUTE CONVERSION OF SECURED PARTY'S COLLATERAL.

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

**STATE OF FLORIDA UNIFORM COMMERCIAL CODE**
**FINANCING STATEMENT AMENDMENT FORM**

**Florida Secured Transaction Registry**

**FILED**

2021 Oct 26 04:02 PM

\*\*\*\*\*\* 202108916438 \*\*\*\*\*\*

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON

ONLINE DEPT.; 888-507-4593

Email ONLINE@FICOSO.COM

B. SEND ACKNOWLEDGEMENT TO:

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # 202106787470 | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|

**2. CURRENT RECORD INFORMATION - DEBTOR NAME - INSERT ONLY ONE DEBTOR NAME (2a OR 2b)**

2a. ORGANIZATION'S NAME
EXCELL AUTO GROUP, INC.

2b. INDIVIDUAL'S NAME (SURNAME, FIRST PERSONAL NAME, ADDITIONAL NAME(S)/INITIAL(S), SUFFIX)

**3. CURRENT RECORD INFORMATION - SECURED PARTY NAME - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

3a. ORGANIZATION'S NAME
KRISTEN ZANKL

3b. INDIVIDUAL'S NAME (SURNAME, FIRST PERSONAL NAME, ADDITIONAL NAME(S)/INITIAL(S), SUFFIX)

| 4. | ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement. |
|---|---|
| 5. | ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law. |
| 6. | ☐ **ASSIGNMENT** ☐ Full or ☐ Partial : Give name of assignee in item 9a or 9b and address of assignee in item 9c; and also give name of assignor in item 11. |
| 7. | ☑ **AMENDMENT** (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☑ Secured Party of record. Check only one of these two boxes. |

Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.

☑ **CHANGE** name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c.

☐ **DELETE** name: Give record name to be deleted in item 8a or 8b.

☐ **ADD** name: Complete item 9a or 9b, and 9c; also complete items 9d-9g (if applicable).

**8. CURRENT RECORD INFORMATION** - INSERT ONLY ONE NAME (8a OR 8b) - Do Not Abbreviate or Combine names

8a. ORGANIZATION'S NAME
KRISTEN ZANKL

8b. INDIVIDUAL'S NAME (SURNAME, FIRST PERSONAL NAME, ADDITIONAL NAME(S)/INITIAL(S), SUFFIX)

**9. CHANGED (NEW) OR ADDED INFORMATION:** - INSERT ONLY ONE NAME (9a OR 9b) - Do Not Abbreviate or Combine names

9a. ORGANIZATION'S NAME
DIVERSE CAPITAL, LLC

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 9c. MAILING ADDRESS Line One | | | | |
|---|---|---|---|---|
| 750 MAIN ST, SUITE 906 | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY HARTFORD | STATE CT | POSTAL CODE 06103 | COUNTRY USA |

**10. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT**
(name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

11a. ORGANIZATION'S NAME
KRISTEN ZANKL

11b. INDIVIDUAL'S NAME (SURNAME, FIRST PERSONAL NAME, ADDITIONAL NAME(S)/INITIAL(S), SUFFIX)

**12. OPTIONAL FILER REFERENCE DATA** [UCC3-671172.2]

STANDARD FORM - FORM UCC-3 (REV.08/2018)   Filing Office Copy   Approved by the Secretary of State, State of Florida

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

FLORIDA SECURED TRANSACTION REGISTRY

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC   1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

2209 64674
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Florida
(S.O.S.)

FILED

2022 Jan 27 04:10 PM

****** 202200284770 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME KARMA OF BROWARD, INC. | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 1699 S. FEDERAL HWY., STE. 300 | CITY BOCA RATON | STATE FL   POSTAL CODE 33432 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE   POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME FRANKLIN CAPITAL MANAGEMENT, LLC | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 32300 NORTHWESTERN HWY. | CITY FARMINGTON HILLS | STATE MI   POSTAL CODE 48334 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
Florida Documentary Stamp Tax is not required.
All personal property of the Debtor including, without limitation, all of the following property Debtor now or later owns or has an interest in, wherever located:

a) all of the Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights (whether or not given in support of Accounts), Software, as defined below (words and phrases used herein and not otherwise specifically defined herein shall have the respective meanings assigned to such terms as such terms are defined in the Uniform Commercial Code of the State of Michigan, as in effect from time to time (the "UCC"), present and future, including but not limited to any items listed on Schedule 1 attached hereto, if any;
b) all present and future insurance claims relating to any of the above;
c) all Goods, Instruments (including, without limit, promissory notes), Documents (including, without limit, negotiable

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: :NJR/ASW (15492-72)

2209 64674

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

**KARMA OF BROWARD, INC.**

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)    SUFFIX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)    SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

Documents), policies and certificates of insurance, Deposit Accounts, and money or other property (except real property which is not a fixture) which are now or later in possession of Secured Party, or as to which Secured Party now or later controls possession by documents or otherwise;

d) all present and future books, records, and data of the Debtor relating to any of the above; and

e) all present and future accessions, additions and attachments to, proceeds, parts, products, replacement, substitutions, Supporting Obligations and rights arising out of, any of the above, including but not limited to stock rights,

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
**KARMA OF BROWARD, INC.**

OR 9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR 10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
subscription rights, interest, distributions, dividends, stock dividends, stock splits, or liquidating dividends, renewals, all cash and Accounts, insurance policies and proceeds, arising from the sale, rent, lease, casualty loss or other disposition of any of the above and cash and other property which were proceeds of any of the above and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by the Debtor.

In this description of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT **ADDENDUM**

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
| --- |
| KARMA OF BROWARD, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME | | |
| --- | --- | --- |
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |

OR

| 10b. INDIVIDUAL'S SURNAME | | | | |
| --- | --- | --- | --- | --- |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| --- | --- | --- | --- |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
specific or narrower type of that collateral.

UNDER AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO SELL,
ASSIGN, PLEDGE OR OTHERWISE ENCUMBER THE COLLATERAL DESCRIBED IN THIS FINANCING
STATEMENT, WHICH INCLUDES ALL AFTER ACQUIRED PROPERTY, INCLUDING ALL OF DEBTOR'S
ACCOUNTS, FUTURE ACCOUNTS, CONTRACT RIGHTS, FUTURE SALES, RECEIPTS AND OTHER

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16
(if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
| --- |
| KARMA OF BROWARD, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME | | |
| --- | --- | --- |
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |

OR

| 10b. INDIVIDUAL'S SURNAME | | | | |
| --- | --- | --- | --- | --- |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| --- | --- | --- | --- | --- |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
OBLIGATIONS. THE SALE, ASSIGNMENT, PLEDGE OR ENCUMBERING OF ANY SUCH COLLATERAL WOULD CONSTITUTE TORTIOUS INTERFERENCE WITH SECURED PARTY'S CONTRACTUAL RELATIONSHIP WITH DEBTOR. IN THE EVENT THAT ANY THIRD PARTY PURCHASES, TAKES AN ASSIGNMENT OR PLEDGE OF, AND/OR IS GRANTED A SECURITY INTEREST IN ANY OF THE ASSETS DESCRIBED IN THIS FINANCING STATMENT, SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH THIRD PARTY. DEBTOR HAS ALSO AGREED TO HOLD IN TRUST FOR SECURED PARTY ALL PAYMENTS RECEIVED IN

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
KARMA OF BROWARD, INC.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)                    SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                    SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
CONNECTION WITH SECURED PARTY'S COLLATERAL, AND FROM THE SALE, LEASE OR OTHER DISPOSITION OF SUCH COLLATERAL ANY ATTEMPT BY A THIRD PARTY TO EXERCISE DOMINION OR CONTROL OVER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT WOULD CONSTITUTE CONVERSION OF SECURED PARTY'S COLLATERAL.

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

FLORIDA SECURED TRANSACTION REGISTRY

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

FILED

**A. NAME & PHONE OF CONTACT AT FILER** (optional)
CSC   1-800-858-5294

**B. E-MAIL CONTACT AT FILER** (optional)
SPRFiling@cscglobal.com

2021 Nov 05 03:56 PM

****** 202109046722 ******

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

2209 59669
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Florida
(S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
202106583131 03/26/2021

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☑ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:

This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

**6a. ORGANIZATION'S NAME** C T CORPORATION SYSTEM, AS REPRESENTATIVE

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

**7a. ORGANIZATION'S NAME** FRANKLIN CAPITAL GROUP, LLC

OR

**7b. INDIVIDUAL'S SURNAME**

INDIVIDUAL'S FIRST PERSONAL NAME

| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
|---|---|---|---|
| | | | |

| 7c. MAILING ADDRESS 32300 NORTHWESTERN HWY. | CITY FARMINGTON HILLS | STATE MI | POSTAL CODE 48334 | COUNTRY USA |
|---|---|---|---|---|

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

**9a. ORGANIZATION'S NAME** C T CORPORATION SYSTEM, AS REPRESENTATIVE

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**10. OPTIONAL FILER REFERENCE DATA:** Debtor: EXCELL AUTO GROUP INC - NJR/ASW (15492-72)

2209 59669

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

FLORIDA SECURED TRANSACTION REGISTRY

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

FILED

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC   1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscglobal.com

2021 Nov 05 03:56 PM

****** 202109046730 ******

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

2209 61230
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Florida
(S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
20200516365X 10/28/2020

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☑ **ASSIGNMENT** (full or partial):  Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:

This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:**  Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| AUSTIN BUSINESS FINANCE, LLC | | | |

| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

**7. CHANGED OR ADDED INFORMATION:**  Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | |
|---|---|
| FRANKLIN CAPITAL GROUP, LLC | |

| OR | 7b. INDIVIDUAL'S SURNAME | |
|---|---|---|
| | INDIVIDUAL'S FIRST PERSONAL NAME | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 32300 NORTHWESTERN HWY. | FARMINGTON HILLS | MI | 48334 | USA |

**8.** ☐ **COLLATERAL CHANGE:**  Also check one of these four boxes: ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| AUSTIN BUSINESS FINANCE, LLC | | | |

| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

**10. OPTIONAL FILER REFERENCE DATA:** Debtor: EXCELL AUTO GROUP, INC. - NJR/ASW (15492-72)

2209 61230

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

FLORIDA SECURED TRANSACTION REGISTRY

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC   1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscglobal.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

2212 81473
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Florida
(S.O.S.)

FILED

2021 Nov 05 03:56 PM

****** 202109046749 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
202106787470 04/15/2021

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:
This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME DIVERSE CAPITAL, LLC

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME FRANKLIN CAPITAL GROUP, LLC

OR

7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                                    SUFFIX

| 7c. MAILING ADDRESS 32300 NORTHWESTERN HWY. | CITY FARMINGTON HILLS | STATE MI | POSTAL CODE 48334 | COUNTRY USA |
|---|---|---|---|---|

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME DIVERSE CAPITAL, LLC

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**10. OPTIONAL FILER REFERENCE DATA:** Debtor: EXCELL AUTO GROUP, INC. - NJR/ASW (15492-72)

2212 81473

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

**STATE OF FLORIDA UNIFORM COMMERICAL CODE**
**FINANCING STATEMENT FORM**

| A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON |
|---|

ONLINE DEPT.; 888-507-4593

Email ONLINE@FICOSO.COM

| B. SEND ACKNOWLEDGEMENT TO: |
|---|

# FILED

2021 Apr 15 01:28 PM

****** 202106787470 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

---

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (1a OR 1b) - Do Not Abbreviate or Combine Names

| 1a. ORGANIZATION'S NAME |
|---|
| EXCELL AUTO GROUP, INC. |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 1c. MAILING ADDRESS Line One | |
|---|---|
| 1001 CLINTMOORE ROAD #101 | This space not available. |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | BOCA RATON | FL | 33487 | USA |

---

**2. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (2a OR 2b)

| 2a. ORGANIZATION'S NAME |
|---|
| KRISTEN ZANKL |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 2c. MAILING ADDRESS Line One | |
|---|---|
| 16937 PIERRE CIRCLE | This space not available. |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | DELRAY BEACH | FL | 33446 | USA |

---

**3. ADDITIONAL SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME |
|---|

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| ZANKL | SCOTT | | |

| 3c. MAILING ADDRESS Line One | |
|---|---|
| 16937 PIERRE CIRCLE | This space not available. |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | DELRAY BEACH | FL | 33446 | USA |

---

**4. This FINANCING STATEMENT covers the following collateral:**

SEE ATTACHED EXHIBIT A

---

**5. ALTERNATE DESIGNATION (if applicable)**

☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR
☐ AG LIEN  ☐ NON-UCC FILING  ☐ SELLER/BUYER

---

**6. Florida DOCUMENTARY STAMP TAX** - YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☑ Florida Documentary Stamp Tax is not required.

---

**7. OPTIONAL FILER REFERENCE DATA**  [UCC1-671172] EXCELL AUTO

---

STANDARD FORM - FORM UCC-1 (REV.05/2013)  Filing Office Copy  Approved by the Secretary of State, State of Florida

**STATE OF FLORIDA UNIFORM COMMERICAL CODE**
**FINANCING STATEMENT FORM - ADDENDUM**

**8. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT**

8a. ORGANIZATION'S NAME

EXCELL AUTO GROUP, INC.

| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**9. MISCELLANEOUS**

**10. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (10a OR 10b) - Do Not Abbreviate or Combine Names

10a. ORGANIZATION'S NAME

| 10b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 10c. MAILING ADDRESS Line One | | This space not available. | | | |
|---|---|---|---|---|---|
| MAILING ADDRESS Line Two | CITY | | STATE | POSTAL CODE | COUNTRY |

**11. ADDITIONAL SECURED PARTY'S NAME** or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P - INSERT ONLY ONE SECURED PARTY NAME (11a OR 11b)

11a. ORGANIZATION'S NAME

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 11c. MAILING ADDRESS Line One | | This space not available. | | | |
|---|---|---|---|---|---|
| MAILING ADDRESS Line Two | CITY | | STATE | POSTAL CODE | COUNTRY |

**12.** This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

**13.** Description of real estate:

**14.** Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

**15.** Additional collateral description:

**16.** Check only if applicable and check only one box.

Collateral ☐ Held in Trust
☐ Being administrated by Decendent's Personal Representative

**17.** Check only if applicable and check only one box.

☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction - effective 30 years

STANDARD FORM - FORM UCC-1 ADDENDUM (REV.05/2013)     Filing Office Copy     Approved by the Secretary of State, State of Florida

EXHIBIT A

All Assets now owned or hereafter acquired and wherever located, including but not limited to, the following subcategories of assets:

a. Accounts, including but not limited to, credit card receivables; b. Chattel Paper; c. Inventory; d. Equipment; e. Instruments, including but not limited to, Promissory Notes; f. Investment Property; g. Documents; h. Deposit Accounts; i. Letter of Credits Rights; j. General Intangibles; k. Supporting Obligations; and l. Proceeds and Products of the foregoing.

NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN, THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCE IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY.

# EXHIBIT AA

**Exhibit AA**

**FINANCING STATEMENT FORM**

Case 22-01218-EPK   Doc 145   Filed 12/09/22   Page 431 of 459

**FILED**

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON

Corporation Service Company; 1-800-858-5294

Email FLSOSUCCFilingsV3@cscglobal.com

B. SEND ACKNOWLEDGEMENT TO:

2021 Dec 15 03:21 PM

\*\*\*\*\*\*\* 202109478290 \*\*\*\*\*\*\*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (1a OR 1b) - Do Not Abbreviate or Combine Names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| EXCELL AUTO GROUP INC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS Line One | | | |
| 1001 CLINT MOORE ROAD #101 | | This space not available. | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | BOCA RATON | FL | 33487 | USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (2a OR 2b) - Do Not Abbreviate or Combine Names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| ZANKL | KRISTEN | | |
| 2c. MAILING ADDRESS Line One | | | |
| 1001 CLINT MOORE ROAD #101 | | This space not available. | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | BOCA RATON | FL | 33487 | USA |

**3. SECURED PARTY'S NAME**   (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| HI BAR CAPITAL | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS Line One | | | |
| 1825 65th St | | This space not available. | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | Brooklyn | NY | 11204 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

All accounts receivable, receipts, instruments, contract rights and other rights to receive the payment of money, patents chattel paper, licenses, leases and general intangibles, whether now owned acquired or arising, and all of debtor's books and records relating to any of the foregoing.

**5. ALTERNATE DESIGNATION (if applicable)**

☐ LESSEE/LESSOR    ☐ CONSIGNEE/CONSIGNOR    ☐ BAILEE/BAILOR
☐ AG LIEN    ☐ NON-UCC FILING    ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** - YOU ARE REQUIRED TO CHECK **EXACTLY ONE**  BOX

☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S.. have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**      2235  05934

STANDARD FORM - FORM UCC-1 (REV.05/2013)      Filing Office Copy      Approved by the Secretary of State, State of Florida

# STATE OF FLORIDA UNIFORM COMMERICAL CODE
# FINANCING STATEMENT FORM - ADDITIONAL PARTY

**18. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT**

18a. ORGANIZATION'S NAME

EXCELL AUTO GROUP INC

| 18b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
|  |  |  |  |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**19. MISCELLANEOUS:**

**20. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (20a OR 20b) - Do Not Abbreviate or Combine Names

20a. ORGANIZATION'S NAME

KARMA OF PALM BEACH INC DBA KARMA OF PALM BEACH

| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 20c. MAILING ADDRESS Line One | | | | |
|---|---|---|---|---|
| 1001 CLINT MOORE ROAD #101 | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY BOCA RATON | STATE FL | POSTAL CODE 33487 | COUNTRY USA |

**21. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (21a OR 21b) - Do Not Abbreviate or Combine Names

21a. ORGANIZATION'S NAME

AUTOMOTIVE SERVICE SYSTEMS, INC.

| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 21c. MAILING ADDRESS Line One | | | | |
|---|---|---|---|---|
| 1001 CLINT MOORE ROAD #101 | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY BOCA RATON | STATE FL | POSTAL CODE 33487 | COUNTRY USA |

**22. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (22a OR 22b) - Do Not Abbreviate or Combine Names

22a. ORGANIZATION'S NAME

KZ CONSULTANTS, INC.

| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 22c. MAILING ADDRESS Line One | | | | |
|---|---|---|---|---|
| 1001 CLINT MOORE ROAD #101 | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY BOCA RATON | STATE FL | POSTAL CODE 33487 | COUNTRY USA |

**23. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (23a OR 23b) - Do Not Abbreviate or Combine Names

23a. ORGANIZATION'S NAME

MISS KRIS, LLC

| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 23c. MAILING ADDRESS Line One | | | | |
|---|---|---|---|---|
| 1001 CLINT MOORE ROAD #101 | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY BOCA RATON | STATE FL | POSTAL CODE 33487 | COUNTRY USA |

**24. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (24a OR 24b) - Do Not Abbreviate or Combine Names

24a. ORGANIZATION'S NAME

EXCELL AUTO LEASING INC

| 24b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 24c. MAILING ADDRESS Line One | | | | |
|---|---|---|---|---|
| 1001 CLINT MOORE ROAD #101 | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY BOCA RATON | STATE FL | POSTAL CODE 33487 | COUNTRY USA |

**25. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (25a OR 25b) - Do Not Abbreviate or Combine Names

25a. ORGANIZATION'S NAME

EXCELL AUTO WHOLESALE INC.

| 25b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 25c. MAILING ADDRESS Line One | | | | |
|---|---|---|---|---|
| 1001 CLINT MOORE ROAD #101 | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY BOCA RATON | STATE FL | POSTAL CODE 33487 | COUNTRY USA |

STANDARD FORM - FORM UCC-1 ADDITIONAL PARTY (REV.05/2013)        Filing Office Copy        Approved by the Secretary of State, State of Florida

# STATE OF FLORIDA UNIFORM COMMERICAL CODE
# FINANCING STATEMENT FORM - ADDITIONAL PARTY

**18. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT**

18a. ORGANIZATION'S NAME

EXCELL AUTO GROUP INC

| 18b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**19. MISCELLANEOUS:**

**26. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (26a OR 26b) - Do Not Abbreviate or Combine Names

26a. ORGANIZATION'S NAME

DEALER SOUQ USA LLC

| 26b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

26c. MAILING ADDRESS Line One
1001 CLINT MOORE ROAD #101

This space not available.

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | BOCA RATON | FL | 33487 | USA |

**27. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (27a OR 27b) - Do Not Abbreviate or Combine Names

27a. ORGANIZATION'S NAME

EAG WHOLESALE LLC

| 27b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

27c. MAILING ADDRESS Line One
1001 CLINT MOORE ROAD #101

This space not available.

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | BOCA RATON | FL | 33487 | USA |

**28. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (28a OR 28b) - Do Not Abbreviate or Combine Names

28a. ORGANIZATION'S NAME

KARMA OF BROWARD, INC.

| 28b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

28c. MAILING ADDRESS Line One
1001 CLINT MOORE ROAD #101

This space not available.

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | BOCA RATON | FL | 33487 | USA |

**29. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (29a OR 29b) - Do Not Abbreviate or Combine Names

29a. ORGANIZATION'S NAME

LAVISH HERO FUND INC

| 29b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

29c. MAILING ADDRESS Line One
1001 CLINT MOORE ROAD #101

This space not available.

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | BOCA RATON | FL | 33487 | USA |

**30. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (30a OR 30b) - Do Not Abbreviate or Combine Names

30a. ORGANIZATION'S NAME

KARMA OF PALM BEACH, INC.

| 30b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

30c. MAILING ADDRESS Line One
1001 CLINT MOORE ROAD #101

This space not available.

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | BOCA RATON | FL | 33487 | USA |

**31. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (31a OR 31b) - Do Not Abbreviate or Combine Names

31a. ORGANIZATION'S NAME

APPLE 3 INVESTMENTS, INC.

| 31b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

31c. MAILING ADDRESS Line One
1001 CLINT MOORE ROAD #101

This space not available.

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | BOCA RATON | FL | 33487 | USA |

STANDARD FORM - FORM UCC-1 ADDITIONAL PARTY (REV.05/2013)     Filing Office Copy     Approved by the Secretary of State, State of Florida

# STATE OF FLORIDA UNIFORM COMMERICAL CODE
## FINANCING STATEMENT FORM - ADDITIONAL PARTY

**18. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT**

18a. ORGANIZATION'S NAME

EXCELL AUTO GROUP INC

| 18b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**19. MISCELLANEOUS:**

---

**32. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (32a OR 32b) - Do Not Abbreviate or Combine Names

32a. ORGANIZATION'S NAME
KZ CONSULTANTS INC

| 32b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

32c. MAILING ADDRESS Line One
1001 CLINT MOORE ROAD #101

This space not available.

| MAILING ADDRESS Line Two | CITY BOCA RATON | STATE FL | POSTAL CODE 33487 | COUNTRY USA |
|---|---|---|---|---|

STANDARD FORM - FORM UCC-1 ADDITIONAL PARTY (REV.05/2013)          Filing Office Copy          Approved by the Secretary of State, State of Florida

# EXHIBIT BB

**Exhibit BB**

## Jerry Breslin

| | |
|---|---|
| **From:** | Scott Zankl <scott@excellauto.com> |
| **Sent:** | Friday, December 17, 2021 9:21 AM |
| **To:** | Josh Lubin |
| **Subject:** | Fwd: Feenix - Karma - Drafts # 2 |
| **Attachments:** | Feenix - Karma Auto - Affidavit of Out of State Delivery 4868-4039-6806 v.2.docx; Untitled attachment 00070.htm; Feenix - Karma Exclusivity Agreement 4872-5370-3682 v.3.docx; Untitled attachment 00073.htm; Feenix - Karma Loan Agreement 4869-1815-9362 v.3.docx; Untitled attachment 00076.htm; Feenix - Karma Pledge Agreement 4870-8593-1522 v.3.docx; Untitled attachment 00079.htm; Landlord Agreement - Feenix - Karma Auto.doc; Untitled attachment 00082.htm; Redline - Feenix - Karma Exclusivity Agreement-4872-5370-3682-v2 and Feenix - Karma Exclusivity Agreement-4872-5370-3682-v3.pdf; Untitled attachment 00085.htm; Redline - Feenix - Karma Loan Agreement-4869-1815-9362-v2 and Feenix - Karma Loan Agreement-4869-1815-9362-v3.pdf; Untitled attachment 00088.htm |

please call

me

Scott Zankl

Begin forwarded message:

> **From:** "Patach, Jessica  J." <jessica.patach@kutakrock.com>
> **Date:** December 16, 2021 at 11:00:45 AM EST
> **To:** frank@biltmoreconsultants.com, Matthew Pilkington <mpilkington@feenixpartners.com>, William Baker <wbaker@feenixpartners.com>, eric.gregory@thegregorylawgroup.com
> **Cc:** scott@excellauto.com, "Wiegert, Joel L." <Joel.Wiegert@kutakrock.com>, timdevine@biltmoreconsultants.com
> **Subject: Feenix - Karma - Drafts # 2**

All:

Please see the updated Loan Agreement and Exclusivity Agreement with redlines to the prior distribution. Additionally, I have attached the Affidavit discussed yesterday for international water execution, and the Landlord Agreement for the waiver. Please see below for missing information we need to put into the documents.

Loan Agreement:
Confirm first draw amount - Feenix and Scott
Please provide all the Site locations on Schedule 4.1(J) – Scott and Counsel

1

<u>Pledge Agreement</u> (No changes but I attached for your ease of review)
We need Schedule A filled out – Scott and Counsel

**Please note these documents remain subject to Feenix review and comment.**

Thank you,

**Jessica J. Patach**
Associate

**Kutak Rock LLP**
1650 Farnam Street, Omaha, NE 68102
jessica.patach@kutakrock.com
**p:** 402.231.8355   **f:** 402.346.1148

---

This E-mail message is confidential, is intended only for the named recipients above and may contain information that is privileged, attorney work product or otherwise protected by applicable law. If you have received this message in error, please notify the sender at 402-346-6000 and delete this E-mail message.
Thank you.

# EXHIBIT CC

**Exhibit CC**

**FILED**

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON

STEVEN ZAKHARYAYEV; 9546044222

Email STEVEN@STEVENZLAW.COM

B. SEND ACKNOWLEDGEMENT TO:

2021 Dec 19 06:46 PM

\*\*\*\*\*\* 202109512183 \*\*\*\*\*\*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE #** 202109478290

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

### 2. CURRENT RECORD INFORMATION - DEBTOR NAME - INSERT ONLY ONE DEBTOR NAME (2a OR 2b)

2a. ORGANIZATION'S NAME

EXCELL AUTO GROUP INC

2b. INDIVIDUAL'S NAME (SURNAME, FIRST PERSONAL NAME, ADDITIONAL NAME(S)/INITIAL(S), SUFFIX)

### 3. CURRENT RECORD INFORMATION - SECURED PARTY NAME - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

3a. ORGANIZATION'S NAME

HI BAR CAPITAL

3b. INDIVIDUAL'S NAME (SURNAME, FIRST PERSONAL NAME, ADDITIONAL NAME(S)/INITIAL(S), SUFFIX)

4. ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

5. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

6. ☐ **ASSIGNMENT** ☐ Full or ☐ Partial : Give name of assignee in item 9a or 9b and address of assignee in item 9c; and also give name of assignor in item 11.

7. ☐ **AMENDMENT** (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.

☐ **CHANGE** name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c.

☐ **DELETE** name: Give record name to be deleted in item 8a or 8b.

☐ **ADD** name: Complete item 9a or 9b, and 9c; also complete items 9d-9g (if applicable).

### 8. CURRENT RECORD INFORMATION

- INSERT ONLY ONE NAME (8a OR 8b) - Do Not Abbreviate or Combine names

8a. ORGANIZATION'S NAME

8b. INDIVIDUAL'S NAME (SURNAME, FIRST PERSONAL NAME, ADDITIONAL NAME(S)/INITIAL(S), SUFFIX)

### 9. CHANGED (NEW) OR ADDED INFORMATION:

- INSERT ONLY ONE NAME (9a OR 9b) - Do Not Abbreviate or Combine names

9a. ORGANIZATION'S NAME

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

9c. MAILING ADDRESS Line One

This space not available.

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

### 10. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

### 11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT

(name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

11a. ORGANIZATION'S NAME

HI BAR CAPITAL

11b. INDIVIDUAL'S NAME (SURNAME, FIRST PERSONAL NAME, ADDITIONAL NAME(S)/INITIAL(S), SUFFIX)

### 12. OPTIONAL FILER REFERENCE DATA

STANDARD FORM - FORM UCC-3 (REV.08/2018)        Filing Office Copy        Approved by the Secretary of State, State of Florida

# EXHIBIT DD

**Exhibit DD**

**Jerry Breslin**

| | |
|---|---|
| **From:** | Frank O'Donnell <frank@biltmoreconsultants.com> |
| **Sent:** | Monday, December 20, 2021 11:26 AM |
| **To:** | Matthew Pilkington |
| **Cc:** | William Baker; Scott Zankl |
| **Subject:** | UCC Termination |
| **Attachments:** | Hi Bar Capital.jpg |

Matthew and Will,
Attached is the termination of the UCC erroneously filed by Hi-Bar Capital.

Thanks.

Matt - let us know if you want to review financial analysis

Frank O'Donnell
Biltmore Consultants, CEO
612-584-8155
19 Town Square Blvd
Ste 403
Asheville, NC 28803

1

# EXHIBIT EE

**Exhibit EE**

**Jerry Breslin**

| | |
|---|---|
| **From:** | Scott Zankl <scott@excellauto.com> |
| **Sent:** | Friday, January 21, 2022 1:53 PM |
| **To:** | Josh Lubin |
| **Subject:** | Feenix - Karma Loan Agreement 4869-1815-9362 v.6.docx |
| **Attachments:** | Feenix - Karma Loan Agreement 4869-1815-9362 v.6.docx; Untitled attachment 00065.txt |

the guys are in my store today and monday we are signing today and they are funding monday I will get you paid next week

1

# EXHIBIT FF

**Exhibit FF**

**Jerry Breslin**

| | |
|---|---|
| **From:** | Scott Zankl <scott@excellauto.com> |
| **Sent:** | Monday, January 24, 2022 10:56 AM |
| **To:** | Josh Lubin |
| **Subject:** | Feenix - Karma Loan Agreement 4869-1815-9362 v.6.docx |
| **Attachments:** | Feenix - Karma Loan Agreement 4869-1815-9362 v.6.docx; Untitled attachment 00033.txt |

signing at 12 noon at my attorney office

# DOCUMENT SEPARATOR

**Document Seperator**

**Jerry Breslin**

| | |
|---|---|
| **From:** | Scott Zankl <scott@excellauto.com> |
| **Sent:** | Monday, January 24, 2022 10:58 AM |
| **To:** | Josh Lubin |
| **Subject:** | Feenix - Karma Security Agreement.docx |
| **Attachments:** | Feenix - Karma Security Agreement.docx; Untitled attachment 00063.txt |

# DOCUMENT SEPARATOR

**Document Seperator**

**Jerry Breslin**

| | |
|---|---|
| **From:** | Scott Zankl <scott@excellauto.com> |
| **Sent:** | Monday, January 24, 2022 10:58 AM |
| **To:** | Josh Lubin |
| **Subject:** | Feenix - Karma Pledge Agreement.docx |
| **Attachments:** | Feenix - Karma Pledge Agreement.docx; Untitled attachment 00129.txt |

1

# DOCUMENT SEPARATOR

**Document Seperator**

## Jerry Breslin

| | |
|---|---|
| **From:** | Scott Zankl <scott@excellauto.com> |
| **Sent:** | Monday, January 24, 2022 10:58 AM |
| **To:** | Josh Lubin |
| **Subject:** | Feenix Signature Pages (Feenix - Karma).pdf |
| **Attachments:** | Feenix Signature Pages (Feenix - Karma).pdf; Untitled attachment 00069.txt |

# EXHIBIT GG

**Exhibit GG**

**11:16 ✔**

**< 410**    **+1 (732) 608-...**    **>**

You gave me no other option Scott.

your getting a big wire tomorrow
$750,000
closing my loan today
i am signing my deal at 12 noon

check your email

Tue, Jan 25, 5:14 PM

Call me asap



# EXHIBIT HH

**Exhibit HH**

8:53

‹ 371     **josh** ›

??

Mon, Jan 3, 5:47 PM

$200,000
this week
trying for the full
$400,000
will let you know
tomorrow morning

should I
wire HI BaR

Wire to Spin info below.
TD bank NA
Account Name: Spin
Capital LLC
1460 Arboretum Pkwy
Lakewood NJ 08701
Routing: 031101266
Account#: 4362466504

okay 👍

Text Message

# EXHIBIT II

**Exhibit II**

8:54 ◀

< 371    **josh** >

> maybe $200,000
>
> monday $50,000
>
> tuesday $100,000
>
> thursday $50,000
>
> friday.  $100,000

Thu, Jan 13, 7:40 PM

Call me tomorrow

Thu, Jan 13, 8:43 PM

im sorry, that schedule wont work.

> let's talk tomorrow

Fri, Jan 14, 11:08 AM

Call me

This is too much stress

Text Message

8:54

< 371          **josh** >

can keep to or I have to file tomorrow.  You're costing me too much time

wow

game plan

$100,000 tomorrow maybe $200,000

monday $50,000

tuesday $100,000

thursday $50,000

friday.  $100,000

Thu, Jan 13, 7:40 PM

Call me tomorrow

Thu, Jan 13, 8:43 PM

Text Message

8:54

< 371    **josh** >

Thu, Jan 13, 4:24 PM

??

Need a game plan you can keep to or I have to file tomorrow.  You're costing me too much time

wow

game plan

$100,000 tomorrow maybe $200,000

monday $50,000

tuesday $100,000

thursday $50,000

friday.  $100,000

Text Message